UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————— x
                                              :
THERESA PITMAN, Individually and on           :
Behalf of All Others Similarly Situated,      :
                                              :
                    Plaintiff,                :
                                              :   Civil Action No. 1:21-cv-00918-KAM-VMS
         v.                                   :
                                              :
IMMUNOVANT, INC. f/k/a HEALTH                 :
SCIENCES ACQUISITIONS                         :
CORPORATION, RODERICK WONG,                   :
PETER SALZMANN, FRANK M. TORTI,               :
ANDREW FROMKIN, DOUGLAS HUGHES,               :
GEORGE MIGAUSKY, ATUL PANDE,                  :
ERIC VENKER, SVB LEERINK LLC,                 :
LIFESCI CAPITAL LLC, CHARDAN                  :
CAPITAL MARKETS LLC, GUGGENHEIM               :
SECURITIES, LLC, ROBERT W. BAIRD &            :
CO. INCORPORATED, and ROIVANT                 :
SCIENCES LTD.,                                :
                                              :
                    Defendants.               :
                                              :
———————————————————————— x


**MEMORANDUM OF LAW IN SUPPORT OF IMMUNOVANT DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ..................................................................................... 1

II.     STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE
        FACTS ....................................................................................................................... 3

        A.      Defendants. ..................................................................................................... 3

        B.      Immunovant Starts Developing IMVT-1401 to Treat Autoimmune
                Diseases........................................................................................................... 4

        C.      The Scientists Responsible for Analyzing the Results of Animal Studies
                Concluded that IMVT-1401 Caused Only Minor Increases in Cholesterol. ......... 5

        D.      Immunovant Submits Animal Study Results and Proposed Phase 1 Trial
                Protocol to FDA; FDA Allows Trial to Proceed Without Cholesterol
                Testing.............................................................................................................. 6

        E.      Immunovant Publicly Reports Detailed Results of Albumin Reductions in
                Phase 1 Clinical Trial; No One Raises Concerns About Cholesterol. .................. 7

        F.      With Knowledge that IMVT-1401 Reduces Albumin Levels in Humans,
                Two FDA Divisions Allow More Human Trials Without Monitoring
                Cholesterol. ...................................................................................................... 9

        G.      Immunovant Voluntarily Monitors Cholesterol in Subsequent Trials................. 10

        H.      Immunovant Voluntarily Pauses Dosing in Its Clinical Trials. .......................... 11

        I.      Immunovant Brings in Outside Experts to Initiate a Program-Wide
                Review. ........................................................................................................... 12

        J.      FDA Allows Immunovant to Move Forward with a Phase 3 Trial...................... 12

        K.      This Lawsuit.................................................................................................... 12

III.    APPLICABLE LEGAL STANDARDS ...................................................................... 13

IV.     ARGUMENT ........................................................................................................... 15

        A.      All Claims (Counts I–V) Should Be Dismissed for Failure to Plead a
                Materially False or Misleading Statement or Omission. ................................... 16

                1.      Plaintiff's Disagreement With Immunovant's Clinical Trial Design
                        Is Not Actionable Under the Securities Laws. ......................................... 17

                2.      None of Defendants' Statements Were False or Misleading by
                        Omission. ............................................................................................ 20

                        a.      Plaintiff's allegations regarding the animal studies do not
                                demonstrate that increased cholesterol was an anticipated
                                risk...................................................................................... 20

                                i.      The FE animal study allegations are unreliable. .............. 20

**TABLE OF CONTENTS**
(continued)

Page

ii.     Plaintiff pleads no facts to support its "belief" that the Company withheld animal study results from the FDA........................................................................... 23

b.     The scientific literature identified in the AC does not demonstrate that increased cholesterol was an anticipated risk.......................................................................... 24

3.     Plaintiff Fails to Plead That Any Challenged Statement Was Materially False or Misleading When Made. ......................................... 25

a.     Many challenged statements are honestly and reasonably held opinions that are inactionable as a matter of law. ............... 26

b.     Many others are corporate puffing statements that are immaterial as a matter of law....................................................... 27

c.     Others are protected forward-looking statements. ...................... 29

d.     Others bear no connection to the alleged basis for falsity. .......... 31

4.     Immunovant Complied With Its Affirmative Disclosure Obligations Under Items 303 and 105 (formerly 503) of Regulation S-K. ............................................................................................................... 32

B.     The Exchange Act Claims (Counts IV–V) Should Be Dismissed for a Second Reason: Failure to Plead Scienter. ........................................................... 33

1.     The Fraud Plaintiff Imagines Makes No Sense. .................................... 34

2.     Plaintiff Fails to Plead Any Cognizable Motive. ................................... 36

3.     Plaintiff Fails to Plead Conscious Misbehavior or Recklessness. ........... 37

V.     CONCLUSION..................................................................................................... 40

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbad v. Amman*,
285 F. Supp. 2d 411 (S.D.N.Y. 2003) .......................................................................37

*Abely v. Aeterna Zentaris Inc.*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) ...........................................................18

*In re Aceto Corp. Sec. Litig.*,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)..............................................................30

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)...........................................................................................36

*In re Adolor Corp. Sec. Litig.*,
616 F. Supp. 2d 551 (E.D. Pa. 2009) .........................................................................24

*In re Agent Orange Prod. Liab. Litig.*,
611 F. Supp. 1223 (E.D.N.Y. 1985) ..........................................................................23

*In re Amarin Corp. PLC Sec. Litig.*,
2016 WL 1644623 (D.N.J. Apr. 26, 2016) ................................................................19

*In re AnaptysBio, Inc.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)...........................................................39

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y 2018).........................................................................28

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ...................................................................................3, 27

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
2017 WL 8791111 (C.D. Cal. Dec. 21, 2017) ...........................................................29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................14, 24

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...............................................................................3, 32, 33

*In re Avon Prods., Inc. Sec. Litig.*,
2009 WL 848017 (S.D.N.Y. Feb. 23, 2009), *report and recommendation
adopted,* 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009) ...........................................3

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Bank of N.Y. Mellon Tr. v. Morgan Stanley Mortg. Cap., Inc.*,
  2011 WL 2610661 (S.D.N.Y. June 27, 2011) ...........................................................3

*Bay Harbour Mgmt. LLC v. Carothers*,
  282 Fed. App'x 71 (2d Cir. 2008)...........................................................................23

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015)........................................................................40

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011)......................................................................39

*Born v. Quad/Graphics, Inc.*,
  521 F. Supp. 3d 469 (S.D.N.Y. 2021)......................................................................16

*Caiafa v. Sea Containers Ltd.*,
  331 Fed. App'x 14 (2d Cir. 2009).............................................................................14

*In re Cerner Corp. Sec. Litig.*,
  425 F.3d 1079 (8th Cir. 2005) .................................................................................30

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*,
  2010 WL 4642554 (S.D.N.Y. Nov. 17, 2010)................................................14, 20, 25

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996).....................................................................................37

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*,
  2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ............................................................38

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014).....................................................................................14

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .........................................................21

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ...................................................................................35

*Davidoff v. Farina*,
  2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)..........................................................35

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..........................................................................15, 36, 37

iv

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re EDAP TMS S.A. Sec. Litig.*,
   2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)...........................................................25, 26, 29

*In re eSpeed Sec. Litig.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006)...........................................................................37

*Finger v. Pearson PLC*,
   2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019)...............................................................15

*In re Fosamax Prod. Liab. Litig.*,
   645 F. Supp. 2d 164 (S.D.N.Y. 2009)...........................................................................23

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018)............................................................................3

*In re GeoPharma, Inc. Sec. Litig.*,
   399 F. Supp. 2d 432 (S.D.N.Y. 2005)...........................................................................35

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016)...............................................................19, 26, 34, 35

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)...........................................................................21

*Grandon v. Merrill Lynch & Co.*,
   147 F.3d 184 (2d Cir. 1998)......................................................................................22

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018)...........................................................................29

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021)...........................................................................14

*In re IAC/InterActiveCorp Sec. Litig.*,
   695 F. Supp. 2d 109 (S.D.N.Y. 2010)...........................................................................21

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)......................................................................................32

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020)........................................................................34, 38, 39, 40

*Jackson v. Halyard Health, Inc.*,
   2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018) .................................................................38

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Jacquemyns v. Spartan Mullen Et Cie, S.A.*,
   2011 WL 348452 (S.D.N.Y. Feb. 1, 2011)...................................................................23

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
   2014 WL 585658 (S.D.N.Y. Feb. 14, 2014)................................................................17

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) .......................................................................37

*Kleinman v. Elan Corp.*,
   706 F.3d 153 (2d Cir. 2013)......................................................................................28

*L-7 Designs, Inc. v. Old Navy, LLC*,
   647 F.3d 419 (2d Cir. 2011).......................................................................................14

*Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012).......................................................................14

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   939 F. Supp. 2d 360 (S.D.N.Y. 2013)..........................................................................3

*In re MELA Scis., Inc. Sec. Litig.*,
   2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012)......................................................26, 38

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993).......................................................................................15

*In re Mindbody, Inc. Sec. Litig.*,
   489 F. Supp. 3d 188 (S.D.N.Y. 2020).........................................................................13

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)........................................................................................14

*Murdeshwar v. Search Media Holdings Ltd.*,
   2011 WL 7704347 (S.D. Fla. Aug. 8, 2011)...........................................................36, 40

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) .................................................................................34, 35

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
   2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) .............................................................33

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...............................................................................2, 21, 37

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*In re Novan, Inc.*,
 2018 WL 6732990 (M.D.N.C. Nov. 30, 2018)...........................................................17, 18, 33

*In re NVIDIA Corp. Sec. Litig.*,
 768 F.3d 1046 (9th Cir. 2014) ...................................................................................38

*Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
 517 F. Supp. 3d 196 (S.D.N.Y. 2021)........................................................................32

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 575 U.S. 175 (2015)...................................................................................................27

*Padnes v. Scios Nova Inc.*,
 1996 WL 539711 (N.D. Cal. Sept. 18, 1996) ............................................................17

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
 538 F. Supp. 2d 662 (S.D.N.Y. 2008)....................................................................32, 33

*Patel v. Seattle Genetics, Inc.*,
 2018 WL 2359137 (W.D. Wash. May 24, 2018)........................................................22

*In re Pfizer, Inc. Sec. Litig.*,
 538 F. Supp. 2d 621 (S.D.N.Y. 2008)..........................................................................3

*In re Philip Morris Int'l Inc. Sec. Litig.*,
 2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021)...........................................................26

*In re Philip Morris Int'l Inc. Sec. Litig.*,
 437 F. Supp. 3d 329 (S.D.N.Y. 2020)........................................................................19

*In re Pivotal Sec. Litig.*,
 2020 WL 4193384 (N.D. Cal. July 21, 2020).............................................................29

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
 11 F.4th 90 (2d Cir. 2021) .........................................................................................13

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*,
 694 F. Supp. 2d 287 (S.D.N.Y. 2010)....................................................................38, 39

*In re Regulus Therapeutics Sec. Litig.*,
 406 F. Supp. 3d 845 (S.D. Cal. 2019)........................................................................22

*In re Rigel Pharms., Inc. Sec. Litig.*,
 697 F.3d 869 (9th Cir. 2012) .....................................................................................17

vii

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Rockwell Med., Inc. Sec. Litig.*,
2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ....................................................................40

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)..............................................................................14, 27, 40

*Rose v. Rahfco Mgmt. Grp., LLC*,
2014 WL 7389900 (S.D.N.Y. Dec. 15, 2014) ...................................................................39

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007).................................................................................................3

*Rubinstein v. Credit Suisse Grp. AG*,
457 F. Supp. 3d 289 (S.D.N.Y. 2020)...............................................................................32

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009)..........................................................................................37, 38

*In re Sanofi Secs. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)..................................................................................24

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011)..........................................................................26, 28

*SEC v. Rio Tinto PLC*,
2021 WL 818745 (S.D.N.Y. Mar. 3, 2021) .......................................................................13

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)........................................................................................29, 30

*Smith v. Antares Pharma, Inc.*,
2020 WL 2041752 (D.N.J. Apr. 28, 2020) ........................................................................27

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)...................................................................39

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
552 U.S. 148 (2008)...........................................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................................................15, 33

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)...............................................................................................26

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Vallabhaneni v. Endocyte, Inc.*,
    2016 WL 51260 (S.D. Ind. Jan. 4, 2016)...............................................................24

*Venkataraman v. Kandi Techs. Grp., Inc.*,
    2021 WL 4952260 (S.D.N.Y. Oct. 25, 2021) ..........................................................34

*Weller v. Scout Analytics, Inc.*,
    230 F. Supp. 3d 1085 (N.D. Cal. 2017) .................................................................31

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020).....................................................................21

*Zagami v. Cellceutix Corp.*,
    2016 WL 3199531 (S.D.N.Y. June 8, 2016) .....................................................33, 38

**Statutes and Regulations**

15 U.S.C.
    § 77z–2(c) ...............................................................................................................29
    § 78u–4(b)(1) ....................................................................................................15, 23
    § 78u–4(b)(2)(A)......................................................................................................15
    § 78u–5(c) ...............................................................................................................29

21 C.F.R.
    § 58.1........................................................................................................................6
    § 58.33..................................................................................................................6, 23
    § 58.35..................................................................................................................6, 23
    § 312.20....................................................................................................................6
    § 312.23..............................................................................................................6, 9, 24
    § 312.42..............................................................................................................6, 24

Fed. R. Civ. P. 9(b) ................................................................................................14, 15

Defendants Immunovant, Inc. f/k/a Health Sciences Acquisitions Corporation ("Immunovant" or the "Company"), Roderick Wong, Peter Salzmann, Frank M. Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, and Eric Venker (collectively, "Immunovant Defendants") submit this memorandum of law in support of their Motion to Dismiss the Amended Complaint for Violations of the Federal Securities Laws ("AC") (ECF No. 44).

## I.      PRELIMINARY STATEMENT

Since 2018, Immunovant has been developing an antibody, IMVT-1401, to help millions around the world with autoimmune diseases. Based on the results of early animal studies, the FDA allowed Immunovant to begin testing IMVT-1401 in clinical (*i.e.*, human) trials. In the last two trials, Immunovant monitored participants' cholesterol. Although purely voluntary (as the FDA had approved several other clinical trial protocols without cholesterol monitoring), this addition proved useful: in January 2021, Immunovant discovered elevated cholesterol in patients receiving IMVT-1401. Immunovant promptly paused dosing and updated the market on February 2, 2021. After a four-month program-wide review aided by external experts, Immunovant determined that the elevated cholesterol was driven by reductions in albumin—a side-effect Immunovant had repeatedly disclosed. With the benefit of this information, Immunovant worked with internal and external experts to develop appropriate modifications to pre-screening and monitoring requirements for its next clinical trials. In December 2021, the FDA approved the modified safety plan, and allowed Immunovant to proceed with its proposed Phase 3 clinical trial.

Now, what should be a case study in the proper conduct of clinical trials has somehow become an action for securities fraud. The form is all too familiar: a securities plaintiff insists a company should have designed a trial differently or disclosed bad news earlier than it did. According to Plaintiff here, early animal studies demonstrated a "substantial risk" of elevated cholesterol in humans, and Defendants covered it up. Never mind that the FDA reviewed the same

studies and allowed clinical trials to proceed without cholesterol monitoring. And never mind that Immunovant chose on its own to monitor cholesterol, thereby guaranteeing discovery of the very thing Plaintiff claims Defendants sought to conceal. The AC is nothing more than an attempt to plead "fraud by hindsight"—and it does not even have the virtue of making sense. There are multiple grounds for dismissing the AC.

As an initial matter, the linchpin of Plaintiff's theory is missing: there are no well-pled allegations that any animal study demonstrated a "substantial risk" of elevated cholesterol in humans. This idea rests almost entirely on conjecture from a single unidentified former employee ("FE"). But the AC fails to describe him at all—let alone "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). That pleading failure is particularly problematic here, as it gives no reason to believe the FE could even understand what he says he read, much less why anyone should trust *his* interpretation of scientific data more than the FDA's. Indeed, the FE admits that, even in the results he reviewed, the "summary of findings" *prepared by experts in the field* did not indicate a "substantial risk" of elevated cholesterol. There are simply no well-pled allegations—particularized or otherwise—to support Plaintiff's theory.

Plaintiff's theory is also implausible. In Plaintiff's world, Defendants wanted to continue IMVT-1401's clinical trials badly enough to conceal the cholesterol risk, only to then (1) voluntarily implement cholesterol monitoring that revealed the risk and (2) voluntarily halt the trials and publicly disclose the risk. And now the FDA has allowed Immunovant to proceed with further trials without any modification to the dosing volumes and only minor modifications to pre-screening and monitoring requirements—something Immunovant could easily have implemented at the outset, had it really known of the risk. To state the theory is practically to refute it.

On top of all that, Plaintiff's 107-page puzzle pleading is rife with inactionable puffery, opinion, and forward-looking statements, along with dozens more statements for which Plaintiff does not even try to demonstrate falsity.

Plaintiff, in short, fails to plead both falsity and scienter. For these reasons—and more, below—the AC should be dismissed with prejudice.

## II.   STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS[1]

### A.   Defendants.

Immunovant is a publicly traded biopharmaceutical company focused on developing treatments for IgG-mediated autoimmune diseases. (¶46; Ex. 6 at 6.)[2] Its sole product candidate is IMVT-1401, a monoclonal antibody designed to reduce the amount of immunoglobulin ("IgG"),

---

[1] On a motion to dismiss, the Court may consider "documents incorporated into the complaint by reference," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), and "matters of which a Court may take judicial notice." *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (noting incorporation by reference "has its greatest applicability in cases alleging fraud"); *Bank of N.Y. Mellon Tr. v. Morgan Stanley Mortg. Cap., Inc.*, 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011) (courts may consider "documents that the plaintiff either possessed or knew about and relied upon in bringing the suit"). In addition to the documents quoted and referenced in the AC, Plaintiff states its allegations are based on "SEC filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports, reports of securities analysts, and public data related to Immunovant's testing and development of IMVT-1401." (¶12; *see also* Exs. 1–8, 10–13, 16–20, 22–27 (incorporated by reference).) The Court may take judicial notice of "public documents required to be filed with the SEC," *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 374 (S.D.N.Y. 2013), (Exs. 1–15); "press releases," *In re Pfizer*, 538 F. Supp. 2d at 627, (Ex. 16); "transcripts of companies' earnings calls," *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018), (Exs. 17–21); "analyst reports," *In re Avon Prods., Inc. Sec. Litig.*, 2009 WL 848017, at *24 n.10 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted,* 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009), (Exs. 22–24); and "scientific publications," *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022), (Exs. 25–27).

[2] "¶" refers to the AC; "App." and "Ex." refer to the appendix and exhibits attached to the Declaration of Heather M. Speers, filed concurrently herewith. Unless otherwise noted, all emphasis is added and all internal citations, quotation marks, and alterations are omitted.

which is the main driver of IgG-mediated autoimmune diseases.[3]

Before going public, Immunovant was a private company in which Roivant Sciences Ltd. ("Roivant"), a pharma-tech business that founds and funds pharmaceutical and health technology companies, owned a majority stake. (¶17.) Roivant remains a majority shareholder. (*Id.*)

Dr. Roderick Wong, a renowned healthcare and biopharmaceutical investor and Managing Partner and Chief Investment Officer of RTW Investments, L.P. ("RTW"), is also an Immunovant shareholder. Impressed by the potential of IMVT-1401, in December 2018, Dr. Wong (through RTW affiliates) invested around $10 million for a 3% stake in Immunovant. (¶276; Ex. 3 at 4.) The following year, in December 2019, Immunovant merged with Health Sciences Acquisitions Corporation ("HSAC"), a special purpose acquisition company ("SPAC") led by Dr. Wong as President and CEO, that went public seven months earlier.[4] (¶¶20, 49, 52.) Following the merger, Dr. Wong stepped down from his roles as President and CEO of the surviving entity. (¶20.)

Dr. Peter Salzmann, Immunovant's CEO since June 2019, continued in that role following the merger. (¶¶18, 19.) Frank Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, and Eric Venker (collectively, "Immunovant Directors") served as directors of Immunovant during the putative class period. (¶¶22–27.)

### B.   Immunovant Starts Developing IMVT-1401 to Treat Autoimmune Diseases.

In December 2018 (one year before the merger), Immunovant obtained development rights to IMVT-1401 from HanAll Biopharma Co., Ltd. ("HanAll"). (¶77; Ex. 1 at 89.) Drug

---

[3] IgG antibodies are helpful in healthy individuals because they defend against pathogens. In patients with autoimmune diseases, however, IgG antibodies cause the immune system to attack the patients' own organs. (Ex. 3 at 5.) IMVT-1401 reduces IgG by inhibiting neonatal fragment crystallizable receptors ("FcRn") from recycling IgG. (¶78.)

[4] A SPAC raises funds through an initial public offering and holds those funds in a trust while looking for a private company to merge with. (¶47.) SPACs typically provides a two-year window to complete a merger. For HSAC, that deadline would have been in May 2021. (*See* ¶49.)

-4-

development, however, is a long and uncertain process. Before the FDA can even consider approving a drug, it must undergo multiple preclinical and clinical trials. (¶54.) Preclinical trials (performed in a laboratory or in animals) evaluate whether the product candidate may cause serious harm, or toxicity, if administered to humans. (¶55.) If preclinical testing shows that a product candidate is expected to be reasonably safe, it may proceed to clinical (*i.e.*, human) trials. Once a drug candidate moves to clinical trials, it undergoes three phases: Phase 1 evaluates safety, Phase 2 also evaluates safety (and sometimes efficacy) at different dose ranges, and Phase 3 evaluates efficacy on a larger group of patients. (¶¶57–59; *accord* ¶¶96, 199, 230.)

Given the FDA's rigorous approval process, Immunovant continually cautioned investors throughout the putative class period that IMVT-1401 may never receive FDA approval:

- "[Immunovant] cannot be certain that IMVT-1401 will receive regulatory approval or be successfully commercialized even if it receives regulatory approval." (Ex. 1 at 10; Ex. 3 at 8; Ex. 4 at 5; Ex. 5 at 7; Ex. 6 at 27; Ex. 7 at 6; Ex. 8 at 9.)

- "Obtaining . . . regulatory approval is an extensive, lengthy, expensive and inherently uncertain process, and the FDA or other foreign regulatory authorities may delay, limit or deny approval of IMVT-1401 for many reasons." (Ex. 1 at 10; Ex. 3 at 8; Ex. 4 at 5; Ex. 5 at 7; Ex. 6 at 27; Ex. 7 at 7; Ex. 8 at 10.)

- "Investment in biopharmaceutical product development is highly speculative because it entails substantial upfront capital expenditures and significant risk that a product candidate will fail to gain regulatory approval or fail to become commercially viable." (Ex. 1 at 9; Ex. 3 at 7; Ex. 4 at 4; Ex. 5 at 6; Ex. 6 at 27; Ex. 7 at 6; Ex. 8 at 9.)

### C. The Scientists Responsible for Analyzing the Results of Animal Studies Concluded that IMVT-1401 Caused Only Minor Increases in Cholesterol.

HanAll completed five preclinical studies of IMVT-1401 in monkeys, two of which evaluated toxicity. (¶195; Ex. 1 at 78.) After obtaining the rights to develop IMVT-1401, Immunovant contracted with a third party to conduct two additional monkey studies to assess toxicity over longer dosing regimens. (Ex. 1 at 40, 79.)

Although animal studies are important for evaluating toxicity, extrapolating results from

animal studies to humans is not straightforward because animals and humans are different. Recognizing this challenge, the FDA has issued Good Laboratory Practice ("GLP") regulations for conducting preclinical studies. *See* 21 C.F.R. § 58.1. Among other things, the GLP regulations require that each preclinical study have "a scientist or other professional of appropriate education, training, and experience" as the study director, who shall have overall responsibility for the study as well as "interpretation, analysis, documentation and reporting of results." 21 C.F.R. § 58.33. In addition, the GLP regulations require each testing facility to have a "quality assurance unit" that must "review the final study report to assure that . . . the reported results accurately reflect the raw data of the nonclinical laboratory study." 21 C.F.R. § 58.35(b)(6). The AC does not allege Immunovant failed to comply with these requirements. To the contrary, Plaintiff admits that the experts responsible for interpreting and summarizing the results of the IMVT-1401 monkey toxicology studies concluded that IMVT-1401 caused only mild increases in cholesterol. (¶72.)

> **D.      Immunovant Submits Animal Study Results and Proposed Phase 1 Trial Protocol to FDA; FDA Allows Trial to Proceed Without Cholesterol Testing.**

To initiate any clinical trial, the drug sponsor must submit to the FDA an Investigational New Drug application ("IND"), a proposed clinical trial protocol, and results of toxicology or other studies demonstrating that the drug is reasonable safe for humans. 21 C.F.R. §§ 312.20, 312.23(a)(6). Failure to provide sufficient information "to assess the risks to subjects of the proposed studies" is grounds for a clinical hold. 21 C.F.R. § 312.42(b)(iv).

Before the start of the putative class period, Immunovant conducted a Phase 1 clinical trial involving 99 healthy volunteers. (¶¶84, 104.) In accordance with the above regulations, Immunovant submitted the available animal study results and a proposed Phase 1 trial protocol that did not include cholesterol monitoring. Plaintiff does not (and cannot) allege that the FDA issued a clinical hold, or otherwise raised any concerns about incomplete toxicology results or the

-6-

absence of cholesterol monitoring prior to allowing this trial to proceed.

**E.      Immunovant Publicly Reports Detailed Results of Albumin Reductions in Phase 1 Clinical Trial; No One Raises Concerns About Cholesterol.**

On October 2, 2019, the start of the putative class period, Immunovant and HSAC issued a press release announcing their upcoming merger. (¶170.) The press release highlighted development progress on IMVT-1401, including results from the Phase 1 trial (which were first reported in April 2019) demonstrating a mean IgG reduction of nearly 80%. (¶¶84, 170.) In a Form 8-K filed the same day, Immunovant provided more details on the Phase 1 study results, including that "[d]ose-dependent, reversible, and asymptomatic albumin reductions [were] observed."[5] (Ex. 9 at 33.) The decreases, however, were mild: "At day 28, mean albumin levels were 37.5 g/L in the 340 mg cohort, and 32.4 g/L in 680mg cohort (normal range 36–51 g/L)." (*Id.*)

Throughout the putative class period, Defendants provided additional information about the observed albumin reductions. (¶¶181, 183, 187, 205.) For example, during the October 11, 2019 investor call (the "Merger Call"), Dr. Wong discussed a rare condition in which patients born with no (or very little) albumin "are generally asymptomatic with the exception of maybe a little bit of occasional edema, but they're basically healthy people." (¶183.) Elaborating on this point, the following month, Immunovant disclosed:

> ***The clinical relevance of isolated, <u>mild</u> hypoalbuminemia is unknown***, however, a hereditary syndrome associated with deficient albumin production has been described (Congenital Analbumenia). In this syndrome, ***despite <u>extremely low or absent levels of albumin,</u> those affected have only mild symptoms, including fatigue, low blood pressure and edema***. It is believed that compensatory mechanisms through the production of other proteins may allow for relatively normal physiologic function in this population. (¶187.)

At a February 25, 2020 investor conference, an analyst asked Dr. Salzmann what was

---

[5] Albumin is a protein that helps keep fluid in the bloodstream from leaking into other tissues.

driving the albumin reductions observed in Immunovant's clinical trial. (Ex. 18 at 4.) Dr. Salzmann

opined that the FcRn protein extends the life of IgG as well as albumin through a recycling process,

and when IMVT-1401 blocks the FcRn protein from recycling IgG in the blood stream—which is

how it treats IgG-mediated autoimmune diseases—there is a spill-over effect, albeit to a lesser

degree, to albumin. (¶205; Ex.18 at 4–5.) He also reiterated the lack of any published literature or

expert opinions on the effect of a "mild albumin reduction." (¶205.) Notably, despite full disclosure

of the mild decreases in albumin, *there is no allegation that anyone (analysts, investors, FDA*

*personnel) raised any concern about decreased albumin creating a risk for increased*

*cholesterol*. On the contrary, analysts publicly expressed agreement with Drs. Salzmann and Wong

that the mild reductions in albumin were not a known cause for concern. For example, in a January

7, 2020 analyst report, Baird Equity Research noted, "we do not view the potential for reductions

in albumin levels presented by the FcRn class as a major area of worry." (Ex. 22 at 12.)

Immunovant also made clear that, despite promising results to-date, it had not established

the safety of IMVT-1401, and that unforeseen safety concerns could adversely impact the

development of IMVT-1401. For example, Immunovant warned that:

- "The commencement and completion of clinical trials may be delayed by several factors, including: . . . unforeseen safety issues." (Ex. 1 at 20; Ex. 3 at 17; Ex. 4 at 14; Ex. 5 at 18; Ex. 6 at 35; Ex. 7 at 14; Ex. 8 at 17.)

- "[Immunovant's] product candidate may cause adverse events ["AE"] or have other properties that could . . . cause us to suspend or discontinue clinical trials." (Ex. 1 at 27; Ex. 3 at 23; Ex. 4 at 21; Ex. 5 at 25; Ex. 6 at 41; Ex. 7 at 19; Ex. 8 at 23.)

- "A number of companies in the pharmaceutical industry, including biotechnology companies, have suffered significant setbacks in clinical trials, even after promising results in earlier nonclinical studies or clinical trials. These setbacks have been caused by, among other things, nonclinical findings made while clinical trials were underway and safety or efficacy observations made in clinical trials, including previously unreported AEs." (Ex. 1 at 22; Ex. 3 at 19; Ex. 4 at 16; Ex. 5 at 20; Ex. 6 at 37; Ex. 7 at 15; Ex. 8 at 19.)

- "[Immunovant has] not yet succeeded and may never succeed in demonstrating efficacy and safety for IMVT-1401 in pivotal clinical trials or in obtaining marketing approval

thereafter." (Ex. 1 at 23; Ex. 3 at 20; Ex. 4 at 17; Ex. 5 at 21; Ex. 6 at 37; Ex. 7 at 16; Ex. 8 at 20.)

- "Clinical trials are very expensive, time-consuming, difficult to design and implement, and involve uncertain outcomes." (Ex. 1 at 19; Ex. 3 at 17; Ex. 4 at 14; Ex. 5 at 17; Ex. 6 at 35; Ex. 7 at 13; Ex. 8 at 17.)

- "Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy traits despite having progressed through nonclinical and initial clinical trials." (Ex. 1 at 22; Ex. 3 at 19; Ex. 4 at 16; Ex. 5 at 20; Ex. 6 at 37; Ex. 7 at 15; Ex. 8 at 19.)

Throughout the putative class period, Immunovant continued to disclose the specific decreases in albumin levels observed in its clinical trials. (*See, e.g.*, ¶¶104, 193, 224, 238.) And investors continued to invest in the development of IMVT-1401. (*See, e.g.*, ¶¶93, 232.)

F.      **With Knowledge that IMVT-1401 Reduces Albumin Levels in Humans, Two FDA Divisions Allow More Human Trials Without Monitoring Cholesterol.**

In April 2019, Immunovant began a Phase 2a clinical trial for treatment in patients with thyroid eye disease ("ASCEND GO-1"). (¶87[6]; *see also* ¶109 (noting dosing began in May 2019).) And in May 2019, it began a Phase 2a clinical trial for treatment in patients with myasthenia gravis ("ASCEND MG"). (¶86; *see also* ¶109 (noting dosing began in August 2019).) Before beginning each trial, Immunovant was required to submit the proposed trial protocol to the FDA, outlining, among other things, "measures to be taken to monitor the effects of the drug in human subjects and to minimize risk." 21 C.F.R. § 312.23(a)(6)(iii)(g); *see also id.* § 312.30 (procedure for amending protocol). Additionally, Immunovant was required to provide available information on "[p]revious human experience with the investigational drug," including "detailed information about such experience that is relevant to the safety of the proposed investigation or to the investigation's rationale." 21 C.F.R. § 312.23(a)(9)(i). Because these two trials targeted diseases

---

[6] The allegation that this trial began on February 29, 2020 appears to be a typo, as that is the "Actual Primary Completion Date" identified on clinicaltrial.gov for this study.

under the purview of different FDA divisions, two different FDA divisions reviewed the information.[7] The AC does not allege that either raised any concern about the albumin reductions observed to-date, or the absence of cholesterol monitoring in the proposed Phase 2 clinical trials.

Immunovant announced results of the ASCEND GO-1 trial on March 30, 2020, and the ASCEND MG trial on August 25, 2020. (¶¶209, 240.) Both trials demonstrated significant reductions in total IgG, with no reported serious adverse events or withdrawals due to adverse events. (¶¶211, 213, 240.) Consistent with the results from the Phase 1 trial, the ASCEND GO-1 trial showed an average albumin reduction of 24%, which was not associated with any observed symptoms. (¶213.) Similarly, the ASCEND MG trial showed a 16% reduction in albumin in the 340mg arm and a 26% reduction in the 680mg arm, all asymptomatic. (¶242.) Plaintiff does not allege that these results were inaccurate; instead, it claims they were misleading because Immunovant did not also disclose that patients were not monitored for the "anticipated risk of elevated cholesterol." (¶241; *see also* ¶214.)

### G.      Immunovant <u>Voluntarily</u> Monitors Cholesterol in Subsequent Trials.

In two later clinical trials—the Phase 2b trial in thyroid eye disease ("ASCEND GO-2") and the Phase 2 trial in patients with Warm Autoimmune Hemolytic Anemia ("ASCEND WAIHA")—Immunovant chose to and did monitor cholesterol. (¶¶109, 111). Plaintiff does not allege that the FDA even suggested (much less mandated) that Immunovant include cholesterol monitoring in either of these trials. Immunovant's decision to do so, however, allowed it to discover that certain patients in the ASCEND GO-2 trial had mildly elevated cholesterol levels.

---

[7] *See* https://www.fda.gov/drugs/investigational-new-drug-ind-application/information-sponsor-investigators-submitting-investigational-new-drug-applications-inds.

### H.        Immunovant <u>Voluntarily</u> Pauses Dosing in Its Clinical Trials.

Immunovant reacted immediately upon discovering the elevated cholesterol levels. On February 2, 2021, it announced that it had voluntarily paused dosing in both of its ongoing clinical trials out of an "abundance of caution," "in order to inform patients, investigators, and regulators as well as to modify the monitoring program." (¶129.) It disclosed, based on preliminary data, that observed mean LDL cholesterol at week 12 was moderately increased by approximately 65% in the 680mg dose group and by approximately 40% in the 340mg dose group. (*Id.*) Eight weeks after cessation of therapy, the patients' LDL cholesterol levels in both groups returned to baseline (*i.e.*, pre-trial cholesterol levels) or lower. (*Id.*) Despite the increases in cholesterol, no patient reported any serious cardiovascular events—the risk associated with increased cholesterol. (*Id.*) Immunovant disclosed that it intended to work "closely with regulators and scientific experts" to understand the mechanism of the cholesterol increase. (*Id.*)

Plaintiff does not allege that anyone—analysts, investors, or FDA personnel—suggested that the increase in cholesterol was related to decreases in albumin. To the contrary, on the February 2, 2021 conference call, an analyst suggested that the increased cholesterol could be specific to thyroid eye disease ("TED")—the disease targeted in the ASCEND GO-2 trial—as a result of treating the underlying disease that would normalize the patients' thyroid function. (¶132.) Dr. Salzmann responded that it was a "plausible hypothesis and one we're definitely going to look into." (*Id.*) Other analysts issued reports indicating the same. For example, a February 2, 2021 Credit Suisse analyst report noted "that this could be an on-target effect/specific to TED." (Ex. 23 at 1.) Similarly, a UBS analyst report opined that the cholesterol increase was "likely specific to TED" and "highly unlikely . . . a function of [IMVT-1401]'s impact on albumin." (¶138; Ex. 24 at 1–2.) Immunovant's stock price declined on February 2, 2021. (¶280.)

**I.      Immunovant Brings in Outside Experts to Initiate a Program-Wide Review.**

Immediately after pausing dosing, Immunovant undertook a program-wide data review, with the help of external experts, to determine the cause of the elevated cholesterol levels. (¶141.) On June 1, 2021, Immunovant reported the results of this review, informing investors that the LDL cholesterol increases were dose-related and appeared to be driven by reductions in albumin. (*Id.*) Immunovant confirmed that both were reversible upon cessation of dosing, and no major adverse cardiovascular events had been reported. (*Id.*) Contrary to early hypotheses, Immunovant did not find a relationship between levels of thyroid hormone and the increases in LDL cholesterol. (*Id.*) Immunovant announced that, after consulting with expert medical advisors, it believed it could resume clinical development of IMVT-1401 with minor protocol changes. (Ex. 13 at 4.) Plaintiff does not allege these statements were false or misleading, nor does it allege that Immunovant was unable to resume clinical development of IMVT-1401.

**J.      FDA Allows Immunovant to Move Forward with a Phase 3 Trial.**

On December 30, 2021, Immunovant announced that the FDA would allow it to move forward with a Phase 3 trial in myasthenia gravis ("MG"). (Ex. 14 at 4.) Despite the now observed instances of elevated cholesterol, under the FDA-approved safety monitoring plan, patients in this trial would ***not*** be required to take statins to lower their cholesterol levels during the blinded treatment periods. (Ex. 21 at 5.) Dr. Salzmann noted this approach "aligns with input we received from experts that short-term LDL excursions are generally not clinically significant and don't warrant intervention." (*Id.*) He further noted that "statins may be initiated, if needed, during the long-term extension of the trial," which is "consistent with routine clinical guidelines and expert feedback regarding cholesterol management in the chronic setting." (*Id.*)

**K.      This Lawsuit.**

On March 15, 2022, Plaintiff filed the AC, which asserts five claims. Counts I and II assert

violations of Sections 11 and 12(a)(2) of the Securities Act against Immunovant, Dr. Salzmann, and Immunovant Directors.[8] Count III asserts violations of Section 15 of the Securities Act against Roivant, Dr. Salzmann, and Immunovant Directors. Count IV asserts violations of Section 10(b) of the Exchange Act against Immunovant, Roivant, Dr. Salzmann, and Dr. Wong. Count V asserts violations of Section 20(a) of the Exchange Act against Roivant, Dr. Salzmann, and Dr. Wong.[9]

All of Plaintiff's claims are premised on the same theory: that "elevated cholesterol levels were an anticipated risk, and since the cholesterol levels of clinical trial participants were not being tested prior to Immunovant's ASCEND GO-2 Phase 2b clinical trial, statements about the safety and viability of IMVT-1401 prior to this time omitted material information and were misleading." (¶91; *see also* ¶¶94, 171.)

## III.   APPLICABLE LEGAL STANDARDS

To state a Section 10(b) claim, Plaintiff must allege: (1) a material misrepresentation or omission (falsity), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) loss causation, and (6) damages.[10] *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). To state a Section 11 or a Section 12(a)(2) claim, Plaintiff must allege: "(1) the

---

[8] Plaintiff also asserts Counts I and II against Underwriter Defendants. (¶¶146–162.)

[9] On May 17, 2022, the Court dismissed Pamela Connealy without prejudice. (ECF No. 46.)

[10] To plead a "scheme" claim under Rules 10b-5(a) or (c)—separate and apart from the alleged misstatements claim under Rule 10b-5(b)—the AC must "specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). The AC alleges none of this, and thus, fails to plead an actionable "scheme." *See Danske*, 11 F.4th at 105 ("Absent some sort of enumeration of which specific acts constituted an alleged scheme in connection with the purchase or sale of securities, [plaintiff's] claim does not comply with the applicable heightened pleading standard and cannot go forward."); *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 217 (S.D.N.Y. 2020) (no scheme where it is "indistinguishable from the misstatements and omissions alleged under [Rule 10b-5(b) claim]."); *SEC v. Rio Tinto PLC*, 2021 WL 818745, at *2 (S.D.N.Y. Mar. 3, 2021) (misstatements alone insufficient to trigger scheme liability).

-13-

existence of either a misstatement or an unlawful omission; and (2) materiality." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). This requires that Plaintiff, "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, 2010 WL 4642554, at *11 (S.D.N.Y. Nov. 17, 2010).

In pleading these elements, the AC "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Plausibility . . . depends on a host of considerations" including "the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

Additionally, for claims that sound in fraud—like those alleged here—Plaintiff must "state with particularity the circumstances constituting fraud or mistake."[11] Fed. R. Civ. P. 9(b). This

---

[11] Although "[f]raud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)," when those claims are "premised on allegations of fraud," the heightened pleading standard of Rule 9(b) applies. *Rombach v. Chang*, 355 F.3d 164, 171–72 (2d Cir. 2004) (Rule 9(b) applies to Section 11 claim based on phrases such as "inaccurate and misleading" that "are classically associated with fraud"); *see also Caiafa v. Sea Containers Ltd.*, 331 Fed. App'x 14, 16 (2d Cir. 2009). "Although Plaintiff[] disclaim[s] any reliance on fraud for their '33 Act claims, these claims, by their plain terms, sound in fraud." *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F. Supp. 2d 329, 338–39 (S.D.N.Y. 2012). The AC repeatedly characterizes statements as "misleading" to support Plaintiff's Securities Act claims. (*See, e.g.*, ¶¶ 99, 105, 110.) And every statement challenged under Sections 11 and 12(a)(2) as "inaccurate statements of material fact," is challenged under Section 10(b) as "materially false and misleading" for the same exact reasons, all of which boil down to the notion that elevated cholesterol was an anticipated but undisclosed risk. (*See, e.g.*, ¶¶97, 246, 255, 257.) As such, Rule 9(b) applies. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (Section 11 claim sounded in fraud where it was identical to Section 10(b) claim); *In re HEXO Corp. Sec. Litig.*, 524

-14-

requires that the AC "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

Finally, claims arising under the Exchange Act must also meet the "[e]xacting pleading requirements" of the Private Securities Litigation Reform Act ("PSLRA"). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Congress enacted the PSLRA as "a check against abusive litigation by private parties." *Id.* As such, "hindsight-driven allegations are clearly insufficient to meet the heightened pleading standards of Rule 9(b) and the PSLRA." *Finger v. Pearson PLC*, 2019 WL 10632904, at *14 (S.D.N.Y. Sept. 16, 2019). Plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009); *see* 15 U.S.C. § 78u-4(b)(1). The PSLRA imposes an even "more stringent standard" with respect to the pleading of scienter, requiring Plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Finger*, 2019 WL 10632904, at *7; *see* 15 U.S.C. § 78u-4(b)(2)(A).

## IV.   ARGUMENT

All of Plaintiff's claims are premised on the theory that elevated cholesterol was an "anticipated risk," and therefore, every disclosure that touched on clinical trial designs or results (and many others that did not) was false and misleading because it did not disclose that cholesterol levels were not monitored in certain clinical trials. The AC, however, contains no facts that

---

F. Supp. 3d 283, 299 n.17 (S.D.N.Y. 2021) (separating Securities Act from Exchange Act claims in complaint inadequate to preclude application of Rule 9(b) to Securities Act claim where both claims "rest[ed] on the same theory"). However, as discussed below and in Underwriter Defendants' Motion to Dismiss, which Defendants incorporate by reference, Plaintiff's allegations fail even under the Rule 8 pleading standard.

plausibly support Plaintiff's "anticipated risk" theory, much less that any disclosure was rendered false or misleading as a result, or made with an intent to deceive investors about the risks of IMVT-1401. Plaintiff's failure to plead any facts supporting key elements of its alleged claims warrants dismissal of the entire AC. Specifically, the Securities Act and Exchange Act claims should be dismissed for failure to plead falsity, and the Exchange Act claims should also be dismissed for failure to plead a strong inference of scienter.

### A. All Claims (Counts I–V) Should Be Dismissed for Failure to Plead a Materially False or Misleading Statement or Omission.

Plaintiff's allegations that Defendants made false or misleading statements[12] and failed to make disclosures required under Items 303 and 105 (formerly 503) of Regulation S-K fail for four reasons. (¶¶94–128, 170–258.). *First*, Plaintiff's theory boils down to a disagreement with Immunovant's clinical trial design, which is not actionable under the securities laws. *Second*, Plaintiff fails to plead that any challenged statement was rendered misleading by Defendants' omission that cholesterol was not monitored in clinical trials prior to ASCEND GO-2 because it alleges no facts demonstrating that increased cholesterol was an "anticipated risk." *Third*, the

---

[12] Appendix A provides a breakdown of the 210 statements Plaintiff purports to challenge. Defendants include Appendix A for the convenience of the Court, and to help provide some clarity and organization to the AC's puzzle-pled allegations. Indeed, Plaintiff employs a 107-page, 307-paragraph complaint, of which 57 paragraphs spanning 47 pages are used to excerpt Defendants' statements from nearly all of Immunovant's public disclosures made during the 16-month putative class period. (¶¶94–114, 121–128, 170–253.) Plaintiff adds emphasis to some challenged statements but does so inconsistently. (*Compare, e.g.*, ¶96 *with* ¶199.) As to each challenged statement, Plaintiff refers back to or summarizes the same list of alleged omissions, all of which boil down to the same theory—that Defendants did not disclose that elevated cholesterol was an "anticipated risk." (¶¶94, 171.) In many instances, this alleged omission is untethered to the challenged statement. (*See, e.g.*, ¶95 (Roivant's status as controlling stockholder); ¶¶96, 199, 230 (general statements about clinical trials); ¶¶203–204 (IND clearance).) This method of pleading is deficient. *See, e.g.*, *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478–79 (S.D.N.Y. 2021) (dismissing puzzle pleading that "plac[ed] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts").

challenged statements are otherwise inactionable opinions, corporate puffery, protected forward-looking statements, and/or bear no connection to the alleged basis of falsity. **Fourth**, Plaintiff fails to allege that Immunovant's Item 303 and Item 105 disclosures were inadequate.

### 1.    Plaintiff's Disagreement With Immunovant's Clinical Trial Design Is Not Actionable Under the Securities Laws.

Plaintiff's criticism is first and foremost that Immunovant should have designed its trials to include—and that the FDA should not have allowed such trials to proceed without—monitoring cholesterol. (*See, e.g.*, ¶¶71, 89, 168.) Plaintiff relies on this disagreement to challenge hundreds of statements made during the putative class period about Immunovant's clinical trials. But disputes about proper trial design are not actionable under the securities laws. *See In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658, at *7 (S.D.N.Y. Feb. 14, 2014) ("That the plaintiffs . . . found the defendants' methodology to be lacking, was not sufficient to adequately allege falsity."); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 878 (9th Cir. 2012) (dismissing "allegations of 'falsity'" that "essentially are disagreements with the statistical methodology adopted by the doctors and scientists who designed and conducted the study"); *Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996) ("The securities laws do not impose a requirement that . . . companies who report information from imperfect studies include exhaustive disclosures of procedures used.").

*In re Novan* is instructive. In that case, plaintiffs alleged that the "design of the trials did not appropriately judge the efficacy of the drug" in certain groups of subjects. *In re Novan, Inc.*, 2018 WL 6732990, at *12 (M.D.N.C. Nov. 30, 2018), *report and recommendation adopted*, No. 1:17-cv-00999-CCE-JEP, Docket No. 65 (M.D.N.C. Jan. 28, 2019). In support, plaintiffs cited later statements from the defendant company's CEO indicating that future trial designs could be modified to improve efficacy measures. *Id.* Taking this into account, the court found that "in

-17-

hindsight," plaintiffs' criticism of the trial design was "reasonable," but nonetheless inactionable because "[p]laintiffs may not utilize securities litigation to second guess the decisions by scientists and company officials in how they approached the clinical trials." *Id.*

The same analysis applies here. Plaintiff alleges that the design of Immunovant's trials did not appropriately assess safety because cholesterol was not monitored. (*See, e.g.*, ¶89.) Plaintiff also cites Immunovant's later implementation of cholesterol monitoring and discovery of elevated cholesterol to bolster this allegation. (*See, e.g.*, ¶¶90–91.) Like *Novan*, although such criticism may be reasonable in hindsight, it is not a basis to second guess the experts who designed Immunovant's clinical trials, nor the FDA which allowed such trials to proceed without cholesterol monitoring. *See Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *8 (S.D.N.Y. May 29, 2013) ("plaintiff's allegations amount to a non-actionable critique of defendants' study design").

Plaintiff also faults Immunovant for stating that its clinical trials were "designed" to examine safety, and that the "primary endpoints" of the trials were "safety and tolerability," when cholesterol was not tested.[13] But cholesterol testing is not the be-all and end-all of safety or tolerability. And the AC contains no facts suggesting that mild cholesterol increases—such as those observed in the ASCEND GO-2 trial—make IMVT-1401 unsafe. To the contrary, Plaintiff admits that despite mild cholesterol increases, no patients experienced a "major adverse cardiovascular event." (¶141.)

Plaintiff also alleges that Immunovant's statement that its preclinical and clinical trials were "in accordance with experimental protocols, procedures and controls pursuant to accepted professional and scientific standards for products or product candidates comparable to those being

---

[13] ¶¶107, 109, 111, 197, 207, 213, 228; App. A Nos. 26, 28, 31, 40, 95, 99, 102, 128, 132, 167, 170, 173.

developed by the Company" was false because Immunovant "failed to adhere to good clinical practices" due to the lack of cholesterol monitoring. (¶¶189–190; *see also* ¶¶60, 89.) But, as discussed below, Plaintiff has not plausibly pled that increased cholesterol was an "anticipated risk," nor that good clinical practices ("GCP") require such testing. Moreover, Plaintiff does not allege that the FDA raised any concerns about Immunovant's clinical trial designs. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 353 (S.D.N.Y. 2020) (defendants' failure to disclose alleged design flaws in its studies did not render statements about compliance with GCP false or misleading when "the FDA ha[d] not expressed any concerns regarding Defendants' research methodology or questioned whether Philip Morris complied with GCP.").

In that same vein, Plaintiff challenges disclosures of adverse events observed in the clinical trials.[14] Again, Plaintiff quibbles about the fact that cholesterol was not tested, but does not dispute that Immunovant was reporting only what it had **observed** in the clinical trials based on the parameters that it **measured**. No reasonable investor would interpret these statements as representations about something that Immunovant did not test and therefore did not observe—*i.e.*, the test subjects' cholesterol levels. *See In re Amarin Corp. PLC Sec. Litig.*, 2016 WL 1644623, at *19 (D.N.J. Apr. 26, 2016) (rejecting plaintiff's "mischaracteriz[ation]" of defendants' actual statements); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 597–89 (S.D.N.Y. 2016) (rejecting plaintiffs' argument that statements about "**certain** respiratory safety advantages" were misleading where the study did not meet a respiratory endpoint because such statements did "not exclude the possibility that [the drug] demonstrated **other** respiratory advantages"). And Plaintiff does not dispute that as soon as the Company **observed** cholesterol measures, it promptly shared those

---

[14] ¶¶98, 104, 106, 187, 193, 213, 215, 224, 238, 240, 242, 249; App. A Nos. 7, 17–19, 22–23, 76, 91, 135, 136, 143, 158–160, 163, 188–190, 193, 195, 198, 200–201, 205.

results with investors. (*See* ¶¶129–130, 133.) Expecting Immunovant to disclose such observations earlier is nonsensical fraud by hindsight. *See, e.g.*, *KKR Fin. Holdings*, 2010 WL 4642554, at *16 (rejecting plaintiff's "extrapolation . . . made only with the clarity that hindsight provides").

In short, Plaintiff's complaints about Immunovant's clinical trials do not state a claim.

### 2.     None of Defendants' Statements Were False or Misleading by Omission.

Plaintiff's theory of falsity also fails because it rests on the unsupported and implausible notion that "elevated cholesterol levels were an anticipated risk," and that Defendants' failure to disclose this "anticipated risk" rendered every challenged statement false or misleading. (¶91; *see also* ¶¶94, 171.) Indeed, this "anticipated risk" is so fundamental to Plaintiff's theory, that the AC uses the term 45 times. But repetition is not a substitute for well-pled facts, which are noticeably absent from the AC. Instead, Plaintiff relies on conclusory allegations regarding (a) animal study results and (b) scientific literature, neither of which plausibly support an "anticipated risk" of elevated cholesterol at the time the challenged statements were made.

### a.     Plaintiff's allegations regarding the animal studies do not demonstrate that increased cholesterol was an anticipated risk.

To support its "anticipated risk" theory, Plaintiff relies most heavily on the purported results of unspecified animal studies, claiming (1) they "showed a substantial increase in cholesterol levels" and (2) "Immunovant failed to inform the FDA of the substantial increases in cholesterol experienced by animals." (¶94(d).) Neither allegation is well-pled.

### i.     The FE animal study allegations are unreliable.

Plaintiff's sole basis for alleging that "animal studies showed a substantial increase in cholesterol levels" (¶94(d)) are vague allegations from one, unidentified FE. (¶¶70, 72, 140.) The FE's allegations are unreliable and deserve no weight.

To begin with, courts do not rely on FEs unless they are "described in the complaint with

-20-

sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," including by identifying their "positions and/or job responsibilities." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589–90 (S.D.N.Y. 2011) (quoting, in part, *Novak*, 216 F.3d at 314); *see also In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *3 n.4 (S.D.N.Y. Mar. 29, 2016) (applying same test to confidential witness allegations for Securities Act claims under Rule 8 and finding conclusory, nonspecific statements insufficient).

The AC provides no such details. Plaintiff states only that the "FE worked at Immunovant," and assures the Court the FE "has first-hand knowledge" of the facts he alleges. (¶14.) In other words, "trust me." That is insufficient as a matter of law—and especially problematic here, as it sheds no light on whether the FE had the necessary context or competence to even understand the scientific results he claims to report.[15]

Nor does the FE offer any concrete facts to support his allegation that the animal studies "clearly showed a substantial increase in the cholesterol of the animals that received IMVT-1401." (¶70.) *See In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 120–21 (S.D.N.Y. 2010) (dismissing Section 11 claim where confidential witness "offered no concrete facts" to support allegations). HanAll conducted five monkey studies, two of which assessed toxicity.[16] (Ex. 1 at 78.) Immunovant conducted two additional monkey study to assess toxicity over longer durations. (*Id.* at 79.) Combined, the four toxicology studies examined over 150 monkeys. (Ex. 1 at 78-79.) The FE, however, fails to identify which of these four studies he reviewed, or how many animals received IMVT-1401 in that study. (¶70.) The FE also claims that "some of the animals showed

---

[15] Plus, the AC never specifies **when** the FE worked at Immunovant, only that he was there for at least one day of the putative class period. (¶14); *see Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 221 (S.D.N.Y. 2020) (rejecting allegations when FE "dates of employment" were unknown).

[16] Immunovant disclosed that it had "no involvement with or control over the preclinical or clinical development of IMVT-1401 prior to its in-license from HanAll." (*See, e.g.*, Ex. 3 at 18.)

-21-

cholesterol levels of 200 to 300 percent higher when compared with the control group," but never specifies how many constitutes "some," or whether those animals entered the study with high cholesterol, thereby skewing the analysis. (¶70.) Without these details, it is impossible to discern why a few animals' results bear any significance whatsoever. *See, e.g.*, *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 193–94 (2d Cir. 1998) (finding "conclusory allegation that markups are excessive is similar to a barroom generality"; "plaintiff must plead with particularity the facts that *show* the markups to be excessive"); *Patel v. Seattle Genetics, Inc.*, 2018 WL 2359137, at \*15 (W.D. Wash. May 24, 2018) (rejecting confidential witness allegations regarding animal studies that "lack[ed] detail"); *In re Regulus Therapeutics Sec. Litig.*, 406 F. Supp. 3d 845, 857 (S.D. Cal. 2019) (allegations inadequate where plaintiff failed to provide "a particularized description of the relevant analysis and findings of the purported contradictory preclinical and nonclinical studies").

If anything, the FE's own allegations confirm that the alleged results were insignificant. According to the FE, the study's "summary of findings did not reflect" substantial increases in cholesterol. (¶140.) That would make perfect sense, of course, if the number of animals showing increased cholesterol was not statistically significant or otherwise meaningful. And, based on these allegations, that is the only plausible inference.

But even putting all that aside, the FE's allegations fail for another, more fundamental reason: the AC provides absolutely no basis to conclude that medical experts would expect cholesterol increases of 200–300% in monkeys to translate to similar cholesterol increases in humans.[17] As Second Circuit courts have long recognized, "laboratory animal studies are generally viewed with more suspicion than epidemiological studies, because they require making the

---

[17] As Immunovant disclosed, "cynomolgus monkeys were selected as the primary species for nonclinical testing, given the high degree of sequence homology to human FcRn and IMVT-1401's strong binding affinity for monkey FcRn." (¶226.) Not because of shared attributes for cholesterol.

assumption that chemicals behave similarly in different species." *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1241 (E.D.N.Y. 1985); *see also In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 186 (S.D.N.Y. 2009) ("[E]xtrapolation from animal studies to humans entails some risks, as physiological differences and dosage differences can complicate comparisons."). Indeed, that is precisely why GLP regulations require animal studies to have a study director with "appropriate education, training, and experience," who is responsible for the "interpretation, analysis, documentation and reporting of results," 21 C.F.R. § 58.33, and a "quality assurance unit" to ensure "the reported results accurately reflect the raw data of the nonclinical laboratory study," 21 C.F.R. § 58.35(b)(6). And, as Plaintiff concedes, those experts did not conclude that there were substantial increases in cholesterol. (*See* ¶72.)

Thus, even accepting the FE's conclusory allegations wholesale—which the Court emphatically should not—they still fail to demonstrate that elevated cholesterol was an "anticipated risk" for humans.

            **ii.**        **Plaintiff pleads no facts to support its "belief" that the Company withheld animal study results from the FDA.**

Plaintiff alleges, on "information and belief" only, that Immunovant failed to provide the detailed animal study reports to the FDA that purportedly showed substantial increase in cholesterol. (*See* ¶¶72, 94(d)(ii), 171(d)(ii).) Under the PSLRA, allegations made on "information and belief" must state "with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The AC provides no such detail; it is not attributed, for example, to the FE, any "consultants," or any publicly available information. (*See* ¶¶13–14.) Indeed, it appears to be premised on nothing more than pure speculation. Accordingly, "the court is not required to presume that the allegations are true." *Jacquemyns v. Spartan Mullen Et Cie, S.A.*, 2011 WL 348452, at *7 (S.D.N.Y. Feb. 1, 2011); *see also Bay Harbour Mgmt. LLC v. Carothers*, 282 Fed.

-23-

App'x 71, 76–77 (2d Cir. 2008) (affirming dismissal of "allegations pled on only information and belief but lacking particularized facts").

Nor is this allegation "plausible on its face" for purposes of the Securities Act claims. *Ashcroft*, 556 U.S. at 678. If Immunovant had failed to provide the FDA a "full tabulation" of the animal toxicology results, the FDA could have issued a clinical hold. *See* 21 C.F.R. §§ 312.23(a)(8)(ii)(b), 312.42(b)(1)(iv); (*see also* ¶¶56, 60). Plaintiff does not allege that any such hold was issued. *See In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 566–67 (E.D. Pa. 2009) (rejecting allegation that defendants made false statements regarding clinical trial when "the FDA does not appear to have disapproved of the methods and procedures employed in the [clinical trial], and it is the FDA that is in the best position to monitor compliance with its regulations"); *In re Sanofi Secs. Litig.*, 87 F. Supp. 3d 510, 533, 544–45 (S.D.N.Y. 2015) ("[H]ad the FDA at any point concluded that there were serious defects in study design that would render the study incapable of producing valid evidence of safety and effectiveness, it had authority to issue a clinical hold . . . to protect human subjects from exposure to flawed and therefore scientifically worthless studies"); *Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *10 (S.D. Ind. Jan. 4, 2016) ("[I]n the absence of a more specific description of the FDA's questioning, the opposite inference is more plausible: that the FDA's concerns were not as severe and the study was not as flawed as the confidential witness suggests."). Plaintiff's conclusory "belief" that certain data was not provided to the FDA, without anything more, should be disregarded.

>           **b.       The scientific literature identified in the AC does not
>                     demonstrate that increased cholesterol was an anticipated risk.**

Plaintiff's claim that "for years," medical journals and studies have reported that "a lack of FcRn and/or lower serum albumin levels impacts cholesterol levels" (¶73), also fails because none of the articles Plaintiff identifies concludes that ***mild*** decreases in albumin ***cause*** increases in

-24-

cholesterol. (*See* ¶75 and Ex. 26 (finding that mice without murine FcRn have lower levels of albumin and higher levels of cholesterol but making no finding regarding causation); ¶76 and Ex. 27 (observing that genetically modified mice that lack **any** albumin showed elevated levels of total cholesterol); ¶74; Ex. 25 (researching link between lower levels of albumin and increased risk of heart attack while controlling for cholesterol levels).) The notion that any such link was common knowledge is further belied by the fact that despite Immunovant's robust disclosures about decreases in albumin, Plaintiff does not allege that a single investor, analyst, or FDA personnel raised concerns about elevated cholesterol levels.[18]

*     *     *

In short, all of the "alleged omissions and failings" upon which the entire AC is premised are "derived solely from hindsight" and, thus, should be dismissed. *KKR Fin. Holdings*, 2010 WL 4642554, at *1 (dismissing Section 11 claim); *see also In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *11–12 (S.D.N.Y. Sept. 14, 2015) (dismissing Section 10(b) claim).

### 3. Plaintiff Fails to Plead That Any Challenged Statement Was Materially False or Misleading When Made.

In addition to the arguments above—which again, apply to every alleged misstatement and omission and thus preclude any finding of falsity—many of the challenged statements are

---

[18] Plaintiff's reliance on the fact that Argenx SE and Harbour BioMed—two other companies that were "developing similar compounds"—monitored cholesterol in their clinical trials is equally misguided. (¶83; *see also* ¶77.) Of course, the relevant issue is not whether they monitored cholesterol (Immunovant also monitored cholesterol); it is when and why they did so. The AC does not allege that either company monitored cholesterol because of decreases in albumin. In fact, Argenx reported that its drug candidate has "no effect on albumin" levels. *Efgartigimod reaches phase III in myasthenia gravis*, Institute of Myology (September 6, 2021), https://www.institut-myologie.org/en/2021/09/06/efgartigimod-reaches-phase-iii-in-myasthenia-gravis/. As such, it is not plausible that Argenx monitored cholesterol based on an "anticipated risk" linked to mild decreases in albumin. Plaintiff's allegations with respect to Harbour are equally unavailing given that Harbour did **not** pause dosing in its trials of IMVT-1401 because it had **not** observed elevated cholesterol in its review of blinded data. (¶¶129, 138).

-25-

inactionable because they are (a) honestly and reasonably held opinions, (b) corporate puffery, (c) protected forward-looking statements, and/or (d) bear no connection to the alleged basis for falsity.

> **a.      Many challenged statements are honestly and reasonably held opinions that are inactionable as a matter of law.**

Over one-third of the challenged statements are opinions about Immunovant's clinical trial results, including observations that the trials generated "positive" or "promising" results (*see, e.g.*, ¶¶98, 211; App. A Nos. 4, 131), that IMVT-1401 was "well-tolerated" (*see, e.g.*, ¶¶98, 102; App. A. Nos. 5, 12), that Immunovant expected such results to "continue to support its IND submissions" (*see, e.g.*, ¶222; App. A No. 157), and that IMVT-1401 has the "potential to become a foundational therapy" (*see, e.g.*, ¶185; App. A No. 73).[19]

It is well-established that such "publicly stated interpretations of the results of various clinical studies . . . are opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions." *In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *9 (S.D.N.Y. Sept. 10, 2021); *see also Tongue v. Sanofi*, 816 F.3d 199, 213–14 (2d Cir. 2016); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 566–67 (S.D.N.Y. 2011); *In re MELA Scis., Inc. Sec. Litig.*, 2012 WL 4466604, at *13 (S.D.N.Y. Sept. 19, 2012); *In re EDAP TMS*, 2015 WL 5326166, at *10. In other words, Plaintiff "cannot premise a fraud claim upon a mere disagreement with how defendants chose to interpret the results of the clinical trial." *Gillis*, 197 F. Supp. 3d at 599.

Therefore, Plaintiff must plausibly allege that these "statements of opinion contained one

---

[19] ¶¶98, 100, 102, 104, 107, 109, 170, 172–173, 177, 179, 181, 183, 185, 187, 189, 191, 193, 205, 207, 209, 211, 213, 215, 220, 222, 224, 228, 234, 238, 240, 242, 247, 249, 252; App. A Nos. 4–5, 7, 10, 12–13, 16–19, 20, 22, 24–26, 29, 32, 34, 54, 57–58, 61–63, 65, 68, 70–74, 76, 79, 81, 86–87, 89, 91, 122–126, 129, 131, 134, 136, 141–142, 144, 154, 157–159, 161, 163, 171, 183, 186, 188–189, 191, 193, 195, 197–198, 201, 203–204, 206–210.

or more embedded factual statements that can be proven false." *Bristol-Myers Squibb*, 28 F.4th at 355; *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015) ("[A]n investor cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion."). Specifically, Plaintiff "must identify particular (and material) facts going to the basis for the [Defendant's] opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194; *see also Bristol-Myers Squibb*, 28 F.4th at 355 ("Although the Investors argue at length that the trial was riskier than the Investors (with hindsight) believe was necessary, they make no claim (and allege no facts indicating) that these statements of opinion were false."); *Smith v. Antares Pharma, Inc.*, 2020 WL 2041752, at *5 (D.N.J. Apr. 28, 2020) ("positive" study results "not misleading where the plaintiff fails to allege that the opinion lacked a reasonable basis.").

No such facts are pled here. Instead, Plaintiff simply concludes that because cholesterol was not monitored, Defendants had no basis to opine that the trial results were "positive" or that IMVT-1401 was "well-tolerated." There is no support for this conclusion. And Plaintiff does not (and cannot) dispute that even after discovering the elevated cholesterol levels and their link to albumin reductions, Immunovant announced "plans to resume clinical development of IMVT-1401," noting that "lipid elevations are predictable [and] manageable." (Ex. 13 at 4.) And, thereafter, the FDA allowed the Company to continue clinical trials with minor modifications. (Ex. 21 at 5.) Accordingly, Plaintiff fails to plead falsity as to each challenged opinion statement.

**b.   Many others are corporate puffing statements that are immaterial as a matter of law.**

Plaintiff challenges 36 statements that are nothing more than "expressions of puffery and optimism" which "do not give rise to securities violations," *Rombach*, 355 F.3d at 174, because

-27-

such statements "make[] no specific claims on which reasonable persons can rely," *In re Sanofi-Aventis*, 774 F. Supp. 2d at 565.[20] For example:

- "In our multi-part, placebo-controlled Phase 1 clinical trial, IMVT-1401 has been observed to be *well-tolerated* with no Grade 3 or Grade 4 AEs and no discontinuations due to AEs." (¶¶104, 193, 224, 238; App. A Nos. 17, 86, 158, 188.)

- "Consistent with previously reported Phase 1 results, IMVT-1401 was observed to be *well-tolerated* with no SAEs reported, no withdrawals due to AEs, and no imbalance in headaches." (¶¶109, 240; App. A Nos. 29, 195.)

- "I would like to start off by expressing how thrilled we are about the *positive* clinical results we are announcing today in thyroid eye disease." (¶211; App. A No. 131.)

- "The clinical benefits we observed in this trial provide strong support that IMVT-1401 might ultimately become a *best-in-class* anti-FcRn agent for MG patients." (¶240; App. A No. 197.)

- "In March, Immunovant announced positive clinical results from ASCEND GO-1, a Phase 2a trial of IMVT-1401 in Thyroid Eye Disease (TED), which reaffirmed IMVT-1401's prior safety and pharmacodynamic findings and demonstrated *encouraging* potential efficacy for patients with TED." (¶234; App. A No. 183.)

- "Our team made *outstanding* operational and strategic progress during the fiscal second quarter . . . [f]irst, we reported *positive* topline results from our randomized, placebo-controlled trial of IMVT-1401 in patients with moderate-to-severe Myasthenia Gravis (MG)." (¶247; App. A No. 203.)

- "We're extremely excited about the potential for IMVT-1401 in multiple therapeutic areas and have *made good progress* toward the initiation of our Phase 3 trial of IMVT-1401 in Myasthenia Gravis (MG), which *remains on track* for the first half of 2021[.] I'm also pleased with the team's progress developing INDs for new indications. We *remain on track* to announce three new indications by August of 2021[.]" (¶252; App. A No. 210.)

Courts routinely find such statements to be inactionable puffery. *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (press release describing clinical trial results as "*encouraging*" was inactionable); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757-58 (S.D.N.Y 2018) (statement that company had "*made remarkable progress* towards

---

[20] ¶¶98, 100, 102, 104, 107, 109, 111, 113, 170, 172–173, 177, 179, 185, 193, 207, 211, 220, 224, 234, 238, 240, 242, 244, 247, 249, 252; App. A Nos. 4–5, 7, 10, 12–13, 16–17, 26, 29, 43–44, 54, 57, 61–62, 65–68, 73, 86, 124, 131, 154, 158, 183, 188, 195, 197–198, 202–203, 206, 208, 210.

our stated goal of advancing our expanding pipeline towards commercialization" and company was "proud" to be "*on track* to have these products reach the market in 2016" were inactionable); *In re EDAP TMS*, 2015 WL 5326166, at *9–10 (statements indicating that FDA approval process was "*on track*" and continued to make "*progress*" were inactionable puffery); *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 8791111, at *5 (C.D. Cal. Dec. 21, 2017) (statements such as "[the data] gives us *great confidence*" and "[drug] is *well tolerated with no serious adverse events*" are "non-actional statements of optimism"); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *14 (N.D. Cal. July 21, 2020) ("Statements classifying [company's] products and business as '*uniquely position[ed]*,' '*strong* across sectors,' '*best-in-class*,' and 'industry-leading' are not actionable[.]"). Accordingly, none of these statements are actionable.

### c.   Others are protected forward-looking statements.

Plaintiff also purports to challenge 38 statements about Immunovant's expectations for the future timing of clinical trials and results.[21] These statements are immunized from liability under the statutory safe harbors for forward-looking statements and the bespeaks caution doctrine. 15 U.S.C. §§ 77z-2(c), 78u-5(c); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018). These provisions protect any forward-looking statement that is "identified [as forward-looking] and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *see also* 15 U.S.C. §§ 77z-2(c), 78u-5(c); *Gregory*, 297 F. Supp. 3d at 398. Here, the challenged statements are protected under both the first and third prongs of the statutory safe harbors as well as the bespeaks caution doctrine.

---

[21] ¶¶98, 100, 102, 109, 111, 113, 170, 175, 179, 192, 197, 201, 203, 207, 209, 213, 218, 228, 234, 244, 252; App. A Nos. 8–10, 14, 36–38, 41, 43–44, 51, 60, 69, 83, 85, 96, 100, 105, 107, 110, 113, 115, 117, 119, 121, 126, 130, 139, 147, 150, 152, 168, 176, 178, 181, 187, 202, 210.

***Meaningful Cautionary Language***. Each statement was identified as forward-looking and accompanied by meaningful cautionary language,[22] warning, *inter alia*, that "[t]he commencement and completion of clinical trials may be delayed by . . . unforeseen safety issues" and that IMVT-1401 "may cause adverse events or have other properties that could . . . cause us to suspend or discontinue clinical trials." (¶123.) Plaintiff argues these warnings were inadequate because it was "extremely likely" or "highly probable" the clinical trials would be halted due to cholesterol (¶124), so the Company should have warned it "would encounter problems" (¶122; *see also* ¶¶126, 128). But Plaintiff has not alleged any facts showing that Immunovant would **necessarily** pause clinical trials.[23] *See In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1084 (8th Cir. 2005) (forecast not misleading unless the omitted fact "necessarily rendered [the company] unable to achieve" it).

***No Actual Knowledge***. Even apart from the cautionary language, Plaintiff has not alleged facts sufficient to create a "strong inference" that Defendants had ***actual knowledge*** that IMVT-1401 could raise cholesterol, or that Immunovant would choose to voluntarily suspend dosing in its ongoing clinical trials. (*See infra* Section IV.B; *Slayton*, 604 F.3d at 773 (noting the "scienter requirement for forward-looking statements is [even] stricter than for statements of current fact").)

Accordingly, none of the challenged forward-looking statements are actionable.

---

[22] The language of the statements identifies them as forward looking. *See Slayton*, 604 F.3d at 769 ("facts," "circumstances," and "linguistic cues" can identify a forward-looking statement). And each call, press release, or SEC filing in which the statements were made cautioned investors about risks, including those contained in SEC filings. (*See* Ex. 1 at 64; Ex. 2 at 63; Ex. 4 at 56; Ex. 5 at 62; Ex. 6 at 4; Ex. 7 at 3; Ex. 9 at 14; Ex. 10 at 5; Ex. 11 at 6; Ex. 12 at 5; Ex. 16 at 1; Ex. 17 at 2; Ex. 18 at 2; Ex. 19 at 4; Ex. 20 at 4.) *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *6 (E.D.N.Y. Aug. 6, 2019) ("Cautionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as the forward-looking statements.").

[23] Plaintiff's allegation that Immunovant's risk disclosure about reliance on third parties to conduct clinical trials was misleading because Immunovant "knew IMVT-1401 was unsafe" (¶¶121–122) is nonsensical. The statement merely warned that Immunovant relied on third parties to comply with good clinical practices; it did not identify any anticipated risks of IMVT-1401.

### d.       Others bear no connection to the alleged basis for falsity.

Plaintiff also challenges a handful of statements about development plans for IMVT-1401 (¶¶98, 100, 102, 252; App. A Nos. 9, 10, 14, 210), but "the reasons Plaintiff offers as to why the statement is false or misleading bear no connection to the substance of the statement itself" and the statements are therefore not actionable. *Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1094 (N.D. Cal. 2017). For example, Plaintiff claims a statement such as "we intend to announce three new indications for IMVT-1401 over the next 12 months" (¶98; App. A No. 9) was misleading because "it gave the impression of widespread adoption of IMVT-1401 in a short time frame" (¶99). But the statement addresses the announcement of new target indications to be tested in clinical trials, not FDA approval or widespread adoption.

As to the remaining statements, there is no allegation indicating any were false or misleading when made. (*See* ¶¶98, 100, 185, 234; App. A Nos. 3, 11, 73, 184 (addressing the limitations of existing treatment options for autoimmune diseases and the mechanism of anti-FcRn); ¶¶96, 199, 230; App. A Nos. 2, 111, 182 (general objectives of clinical trials that are applicable to all drugs, and thus cannot be rendered false or misleading by any purported deficiencies in Immunovant's clinical trial design); ¶¶104, 107, 109, 111, 195, 197, 218, 222, 226, 228, 249; App. A Nos. 15, 24, 27, 30, 37, 41, 93, 98, 103, 109, 146, 156, 165–167, 169, 174, 180, 207 (descriptions of Immunovant's preclinical and clinical trials, including the types of animals, number of patients, and dosing); ¶¶109, 197, 203, 218, 228; App. A Nos. 35, 106, 120, 151, 177 (IND submissions); ¶95; App. A No. 1 (Roivant's ownership interest); ¶¶170, 177, 217; App. A Nos. 50, 55–56, 64, 145 (Immunovant's capital raises); ¶¶98, 104, 109, 170, 175, 179, 187, 193, 213, 218, 220, 224, 238, 240, 242; App. A Nos. 6, 21, 33, 49, 59, 66, 75, 90, 137, 153, 155, 162, 192, 196, 199 (metrics of observed trial results, including IgG and albumin reductions).)

Because the AC fails to even identify the alleged basis for falsity for these statements—let

alone plead it with particularity—they should be dismissed. *ATSI*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient.").

### 4.    Immunovant Complied With Its Affirmative Disclosure Obligations Under Items 303 and 105 (formerly 503) of Regulation S-K.

Plaintiff's allegations that Items 303 and 105 required Immunovant to disclose that elevated cholesterol was an "anticipated risk" that was not being monitored in clinical trials prior to the ACSEND GO-2 trial (¶¶116, 119, 255, 257, 258), also fail.

First, the AC contains no well-pled facts to support Plaintiff's theory that increased cholesterol was an "anticipated risk" during the putative class period. (*See supra* Section IV.A.2.) Instead, "Plaintiff asks the Court to assume that Defendants *must* have known because something did in fact occur later; this is simply inadequate pleading." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008) (emphasis in original); *see also Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 210 (S.D.N.Y. 2021) (noting "disclosure requirements of Item 503(c) and Rule 10b-5 are coextensive").

Second, the AC contains no well-pled facts demonstrating that any Defendant *actually knew* IMVT-1401 might cause increases in cholesterol. Indeed, with respect to the Securities Act claims, there are no allegations regarding Defendants' purported knowledge, thus precluding any claim premised on violations of Items 303 or 105. *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (Item 303 requires allegations of "actual knowledge" of trend or uncertainty); *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020) (allegation that defendant "can be presumed to have known the relevant facts" are "conclusory and insufficient" because plaintiff "must demonstrate actual knowledge of an existing trend, event, or risk to allege violations of Section 303 and 105"). And with respect to the Exchange Act claims, Plaintiff alleges only that Defendants "should have" or "would have" known about the "anticipated

-32-

risk," not that any of them *actually* knew. (¶¶261–265; *see also infra* Section IV.B.)

Third, even if increased cholesterol were a known risk, Plaintiff has not identified how that risk qualifies as a "trend" or "uncertainty" under Item 303, or how it would decrease the predictive value of Immunovant's reported results. *See In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) ("[T]he aim of Item 303 is to explain irregularities in offering documents and prevent a company's last reported financial results from misleading potential investors."); *Panther Partners*, 538 F. Supp. 2d at 673–74 (rejecting Item 303 allegations where the complaint lacked any information indicating the omitted information constituted a material "trend"). In any event, Immunovant made ample disclosures regarding the risks inherent in drug development, including that IMVT-1401 may never receive FDA approval or be commercially successful. (*See, e.g.*, Ex. 1 at 10; Ex 6 at 27.) Thus, to the extent disclosure was required, it was made. *See Zagami v. Cellceutix Corp.*, 2016 WL 3199531, at *14 (S.D.N.Y. June 8, 2016) (no violation of Item 303 where defendants "warned investors of the worst-case-scenario outcome"); *In re Novan*, 2018 WL 6732990, at *17 (no Item 105 violation where the company "disclosed the uncertainty and complexity of the clinical trial process").

B.      **The Exchange Act Claims (Counts IV–V) Should Be Dismissed for a Second Reason: Failure to Plead Scienter.**

Plaintiff's failure to plead a strong inference of scienter provides a second, independent basis for dismissal of the Exchange Act claims. For an inference of scienter to be strong, as required by the PSLRA, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. To satisfy this requirement, Plaintiff must plead facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Additionally, Plaintiff "must plead

-33-

circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *Venkataraman v. Kandi Techs. Grp., Inc.*, 2021 WL 4952260, at *3 (S.D.N.Y. Oct. 25, 2021). "Where a defendant is a corporation, this requires pleading facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98–99 (2d Cir. 2020) (allegations that low-level employees had requisite knowledge is insufficient to plead corporate scienter absent facts demonstrating that senior executives also had requisite knowledge).

Plaintiff's allegations fall far short of meeting these arduous standards.

### 1.    The Fraud Plaintiff Imagines Makes No Sense.

At its core, Plaintiff's theory is that Defendants concealed a known risk of IMVT-1401 in order to continue clinical trials, only to then design the trials to ensure that risk would be revealed, voluntarily halt trials the moment that risk materialized, and then publicly disclose it. That sounds absurd because it is. And "courts regularly refuse to infer scienter when confronted with such illogical allegations." *Gillis*, 197 F. Supp. 3d at 601.

Take *Gillis* for example. The plaintiffs there alleged that defendants knew the company's leading drug product would never satisfy the FDA's "superiority requirement" or receive FDA approval, but nonetheless invested substantial time and resources in clinical studies and New Drug Application ("NDA") submissions they knew were doomed to fail, all while assuring the public that approval was likely. *Id.* at 600. The court noted this "scheme" plaintiffs imagined "lacks a coherent rational objective" and found it "implausible" that defendants "harbored this state of mind." *Id.* Indeed, "by its nature, the purported scheme could not have continued in perpetuity," because the fraud would be revealed when the FDA rejected the NDA. *Id.*

*Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020), reached a similar conclusion. There, plaintiff alleged that defendants knew the medical device they were developing would

-34-

encounter issues that would prevent FDA approval within the timeframe defendants provided to the market. *Id.* at 415. The Ninth Circuit rejected that theory as "not mak[ing] a whole lot of sense" because it depended on the "supposition that defendants would rather keep the stock price high for a time and then face the inevitabl[e] fallout once [the medical device's] 'unresolvable' migration problem was revealed." *Id.* The Ninth Circuit found it implausible that "defendants were promising FDA approval for a medical device application they knew was 'unapprovable,' misleading the market all the way up to the point that defendants were 'unable to avoid the inevitable.'" *Id.*

Here, the scheme Plaintiff dreams up makes even less sense than those rejected in *Gillis* and *Nguyen*. The defendants in those cases allegedly knew the truth would come out, but—unlike here—took no affirmative steps to ensure such a revelation. Here, Plaintiff insists Defendants wanted to continue clinical trials so badly they concealed the risk of increased cholesterol, only to voluntarily implement cholesterol monitoring which ensured the risk would be discovered, and then voluntarily halt the trials and publicly disclose the risk. (¶¶89, 129.) That through-the-looking-glass theory becomes even harder to fathom given that Defendants were able to resume clinical trials with only minor modifications to pre-screening requirements and monitoring—something they could easily have implemented at the outset, had they really known of the risk. (Ex. 21 at 5.)

That is not a "cogent" and "compelling" theory of fraud; it is a preposterous one. The Court should reject it. *See, e.g.*, *Nguyen*, 962 F.3d at 414–15; *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) ("It is improbable [the company] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure."); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449–50 (S.D.N.Y. 2005) (no scienter where "the alleged scheme could not possibly have succeeded" because the truth inevitably would come out); *Davidoff v. Farina*, 2005 WL 2030501, at *11 & n.19 (S.D.N.Y. Aug. 22, 2005) ("[I]t would have made no economic

sense for defendants to invest literally billions of dollars in a venture that they knew would fail.").

### 2.   Plaintiff Fails to Plead Any Cognizable Motive.

"In order to raise a strong inference of scienter through 'motive and opportunity,'" Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. The AC makes little effort to do so and fails in any event.

Plaintiff's principal theory is that Defendants were motivated to defraud to raise capital for Immunovant, receive earnout shares, and increase their compensation. (¶¶271–276.) [24] But "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198; *see Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter.").

Plaintiff also suggests Dr. Wong was motivated to ensure HSAC merged within two years of going public to avoid dissolution. (¶271.) But that incentive is common to all SPACs. *See Murdeshwar v. Search Media Holdings Ltd.*, 2011 WL 7704347, at *15–18 (S.D. Fla. Aug. 8, 2011) (rejecting allegation that a strong inference of scienter can be drawn from the "financial motivation" of the SPAC sponsor's directors and officers to consummate a merger). More to the point, such an incentive was irrelevant here, as HSAC merged with Immunovant a mere seven months into its two-year merger window. (¶¶49–50, 52.)

To make matters worse, Plaintiff does not allege that any individual defendant sold Immunovant shares during the putative class period. To be sure, Plaintiff alleges that Dr. Wong and his entities *registered* shares, thereby *enabling* them to sell. (¶275.) But as Plaintiff's chart

---

[24] Immunovant did not sell any shares under its January 15, 2021 shelf offering. (*See* ¶275.)

confirms (¶276), there is no allegation that any meaningful number of those shares were actually sold—let alone at "suspicious" times or for a profit. *See, e.g.*, *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 381–82 (E.D.N.Y. 2003) ("For insider sales to raise an inference of improper motive, they must be 'suspicious' or 'unusual.'"); *In re eSpeed Sec. Litig.*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) (no motive where complaint "does not disclose whether either [defendant] made any profit from the [stock] sales"). Meanwhile, one of Dr. Wong's entities purchased well over $9 million in shares during the putative class period. (*See* Ex. 15.) *See Abbad v. Amman*, 285 F. Supp. 2d 411, 418 n.5 (S.D.N.Y. 2003) (stock purchases negate inference of scienter). Each of these facts diminishes any inference of scienter based on motive. Collectively, they preclude it.

### 3.    Plaintiff Fails to Plead Conscious Misbehavior or Recklessness.

Having failed to plead motive, Plaintiff's allegations of conscious misbehavior or recklessness "must be correspondingly greater" to support an inference of scienter. *ECA*, 553 F.3d at 198–99. The burden to plead "a fraud claim based on recklessness" is "significant." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). The AC must plead something akin to "deliberate illegal behavior," *Novak*, 216 F.3d at 308, "a state of mind approximating actual intent," or an "***extreme departure*** from the standards of ordinary care to the extent that ***the danger was either known to the defendant or so obvious that the defendant must have been aware of it***," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in original). The AC comes nowhere close to meeting this standard.

Plaintiff relies primarily on conclusory allegations of "access to information"—such as animal study results, scientific literature, and other companies' trial designs—that purportedly indicated increased cholesterol was an "anticipated risk." (¶268.) Even if Plaintiff could support the underlying premise (*i.e.*, that such materials indicated this risk), there is no allegation that any Defendant—and more particularly any "individual defendant" or "other officers or directors who

-37-

were involved in the dissemination of the [alleged] fraud"—***actually*** received or reviewed such materials. *Jackson*, 960 F.3d at 98; *see also Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (no scienter where plaintiffs failed to "provide specific instances in which Defendants received information that was contrary to their public declarations").

The FE, for example, does not allege that the detailed animal study results were provided to any individual defendant or discussed at any meetings they attended. *See Jackson v. Halyard Health, Inc.*, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018) ("Plaintiff's allegations attributed to confidential witness testimony do not demonstrate that the Individual Defendants 'actually possessed' adverse information regarding alleged issues."); *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *9 (S.D.N.Y. Jan. 21, 2021) (rejecting scienter allegations based on "access" to reports where plaintiffs did not allege that any defendant attended meetings discussing reports or actually accessed such documents).

Likewise, there is no allegation that any individual defendant was even aware of the three articles Plaintiff identifies, much less that the conclusions Plaintiff draws therefrom were "so obvious that the defendant must have been aware of it." *S. Cherry St.*, 573 F.3d at 109; *see also Zagami*, 2016 WL 3199531, at *13 ("Securities law is simply not a vehicle through which courts will police disagreements in the cancer research community or the parameters of clinical trials."); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1060 (9th Cir. 2014) (articles that did not reflect defendants' knowledge as of the date of the alleged misstatements did not support scienter).[25]

---

[25] As to other companies' trial designs, there is no allegation these were public when Immunovant designed its trials or made the challenged statements, much less that Defendants knew why cholesterol was monitored. *See In re MELA*, 2012 WL 4466604, at *7 (allegation that "defendants conducted a clinical trial and should have known it was flawed" inadequate to plead scienter)

-38-

Instead, Plaintiff speculates as to what Dr. Salzmann "*should have*" or "*would have*" known based solely on his title and background. (*See, e.g.*, ¶261 ("Salzmann *would have been aware* of the science and scientific literature" because he was "a highly experienced and knowledgeable professional in the biopharmaceutical industry and had extensive experience with clinical trials"); ¶262 (Salzmann "*should have been aware* of key facts related to the testing and risks involved with IMVT-1401" because he was CEO); ¶263 (Salzmann "*would have been* directly involved with . . . the IMVT-1401 clinical trials" as "CEO of the Company").)

These allegations fail as a matter of law. "Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Can. Imperial Bank*, 694 F. Supp. 2d at 300; *see also Rose v. Rahfco Mgmt. Grp., LLC*, 2014 WL 7389900, at *4 (S.D.N.Y. Dec. 15, 2014) (rejecting "must have known" scienter allegations based on job title); *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) (rejecting "should have known" scienter allegations based on job title). Likewise, "generalized allegations about the Individual Defendants' educational backgrounds and extensive experience in the [relevant] industry do not raise an inference" of scienter. *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011); *see also In re AnaptysBio, Inc.*, 2021 WL 4267413, at *10 (S.D. Cal. Sept. 20, 2021) (CEO's background does not support scienter when such background is commonly found in most CEOs of a biotechnology company). Because the AC contains no other allegations as to Dr. Salzmann—or any other Immunovant employee[26]—it fails to plead scienter for Dr. Salzmann and Immunovant.

---

[26] To the extent that Plaintiff attempts to rely on now-dismissed defendant Pamela Connealy to support scienter as to Immunovant, the allegations that Pamela Connealy "should have been aware of key facts" or "would have been aware of the anticipated risk of rising cholesterol levels" (¶¶262, 264), based on her position as CFO of Immunovant during the putative class period fail for the same reasons and cannot support scienter as to Immunovant. *See Jackson*, 960 F.3d at 98–99.

Additionally, Plaintiff's allegations regarding what Dr. Wong "***would have*** known" "[t]hrough his due diligence" (¶265), are equally deficient. The AC does not identify any specific documents Dr. Wong reviewed, much less whether such documents indicated an "anticipated risk" of elevated cholesterol. *See Murdeshwar*, 2011 WL 7704347, at *17 (allegations that SPAC sponsor was "actively involved" in due diligence without identifying what the SPAC sponsor "learned as a result of this diligence" insufficient to support scienter).[27]

Finally, Plaintiff concedes that Immunovant ***voluntarily*** paused its clinical trials and publicly disclosed the elevated cholesterol levels, promptly upon learning the results. (*See, e.g.*, ¶140.) That, in and of itself, contradicts scienter. *See Rombach*, 355 F.3d at 177 ("If anything, the fact that [defendant] voluntarily chose to issue a press release earlier than its standard year-end reporting . . . undercuts the allegation that defendants were acting recklessly.").

Plaintiff's failure to plead a strong inference of scienter provides yet another basis for dismissal of the Exchange Act claims.

## V.    CONCLUSION

For the reasons discussed above, the Court should dismiss the entire AC with prejudice.[28]

---

[27] Similarly, Plaintiff attempts to invoke the "core operations" doctrine, arguing scienter can be "imputed to Defendants" due to the importance of IMVT-1401 to the Company. (¶¶266–267.) "Such a naked assertion, without more, is plainly insufficient to raise a strong inference of collective corporate scienter." *Jackson*, 960 F.3d at 99; *see also In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018) (noting core operations is "not independently sufficient to raise a strong inference of scienter"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 738-39 (S.D.N.Y. 2015) ("must have known" allegations based on "segment's significance and the size of the client" insufficient).

[28] Because the AC does not state a primary violation, the "control person" claims under Sections 15 and 20(a) necessarily fail. *Rombach*, 355 F.3d at 177–78.

Dated: May 27, 2022

COOLEY LLP

By */s/ Koji F. Fukumura*
  Koji F. Fukumura

Koji F. Fukumura (*pro hac vice*)
Heather M. Speers (*pro hac vice*)
4401 Eastgate Mall
San Diego, CA 92121
Tel: (858) 550-6000
Fax: (858) 550-6420
Email: kfukumura@cooley.com
      hspeers@cooley.com

Shannon M. Eagan (*pro hac vice*)
3175 Hanover St
Palo Alto, CA 94304
Tel: (650) 843-5000
Fax: (650) 849-7400
Email: seagan@cooley.com

Aric H. Wu
55 Hudson Yards
New York, NY 10001-2157
Tel: (212) 479-6000
Fax: (212) 479-6275
Email: ahwu@cooley.com

*Attorneys for Immunovant, Roderick Wong, Peter Salzmann, Frank M. Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, and Eric Venker*

-41-