# Exhibit 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant  £

Filed by a Party other than the Registrant  £

Check the appropriate box:

£    Preliminary Proxy Statement

£    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

S    Definitive Proxy Statement

£    Definitive Additional Materials

£    Soliciting Material under §240.14a-12

# HEALTH SCIENCES ACQUISITIONS CORPORATION

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

£    No fee required.

£    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)    Title of each class of securities to which transaction applies:

    Common stock, par value $0.0001 per share

    (2)    Aggregate number of securities to which transaction applies:

    43,000,000 shares of Common Stock

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    The proposed maximum aggregate value of the transaction was calculated based on $9.96 per share (the average of the high and low prices reported on the Nasdaq Capital Market on September 25, 2019).

    (4)    Proposed maximum aggregate value of transaction:

    $428,280,000

    (5)    Total fee paid:

    $55,590.74

S    Fee paid previously with preliminary materials.

£    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)    Amount Previously Paid:

    (2)    Form, Schedule or Registration Statement No.:

    (3)    Filing Party:

    (4)    Date Filed:

**TABLE OF CONTENTS**

| | PAGE |
|---|---|
| FREQUENTLY USED TERMS | 1 |
| QUESTIONS AND ANSWERS ABOUT THE PROPOSALS FOR HSAC STOCKHOLDERS | 2 |
| DELIVERY OF DOCUMENTS TO HSAC'S STOCKHOLDERS | 8 |
| SUMMARY OF THE PROXY STATEMENT | 9 |
| RISK FACTORS | 19 |
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS | 75 |
| CAPITALIZATION | 77 |
| SPECIAL MEETING OF HSAC STOCKHOLDERS | 78 |
| THE BUSINESS COMBINATION PROPOSAL | 87 |
| THE SHARE EXCHANGE AGREEMENT | 97 |
| THE AMENDMENT PROPOSAL | 103 |
| THE NASDAQ PROPOSAL | 109 |
| THE EQUITY INCENTIVE PLAN PROPOSAL | 110 |
| THE BUSINESS COMBINATION ADJOURNMENT PROPOSAL | 120 |
| SELECTED HISTORICAL CONSOLIDATED FINANCIAL AND OPERATING DATA OF IMMUNOVANT SCIENCES LTD. | 121 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF IMMUNOVANT SCIENCES LTD. | 122 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 135 |
| IMMUNOVANT SCIENCES LTD.'S BUSINESS | 147 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF HSAC | 184 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF HSAC | 185 |
| HSAC'S BUSINESS | 188 |
| DIRECTORS, EXECUTIVE OFFICERS, EXECUTIVE COMPENSATION AND CORPORATE GOVERNANCE | 191 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 200 |
| CERTAIN TRANSACTIONS | 203 |
| DESCRIPTION OF HSAC'S SECURITIES | 207 |
| DESCRIPTION OF THE COMBINED COMPANY'S SECURITIES | 211 |
| SHAREHOLDER PROPOSALS AND OTHER MATTERS | 213 |
| WHERE YOU CAN FIND ADDITIONAL INFORMATION | 214 |
| INDEX TO COMBINED AND CONSOLIDATED FINANCIAL STATEMENTS | F-1 |
| ANNEX A — SHARE EXCHANGE AGREEMENT | A-1 |
| ANNEX B — FORM OF SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF HSAC | B-1 |
| ANNEX C — FORM OF 2019 EQUITY INCENTIVE PLAN | C-1 |

## FREQUENTLY USED TERMS

Unless otherwise stated in this proxy statement, the terms, "we," "us," "our" or "HSAC" refer to Health Sciences Acquisitions Corporation, a Delaware corporation. Further, in this document:

- "Board" means the board of directors of HSAC.

- "Business Combination" means the business combination pursuant to the Share Exchange Agreement.

- "Code" means the Internal Revenue Code of 1986, as amended.

- "Combined Company" means the combined company after the Business Combination.

- "Exchange Act" means the Securities Exchange Act of 1934, as amended.

- "GAAP" means accounting principles generally accepted in the United States of America.

- "HSAC Shares" means the shares of common stock, par value $0.0001 per share, of HSAC and, as context requires, the 10,000 shares of Series A Preferred Stock, par value $0.0001 per share, of HSAC to be issued to RSL upon closing of the Business Combination.

- "HSAC Units" means the units that were issued in the IPO, each consisting of one HSAC Share and one HSAC Warrant.

- "HSAC Warrant" means one redeemable warrant exercisable for one-half of an HSAC Share, at a price of $11.50 per whole HSAC Share.

- "Immunovant" means Immunovant Sciences Ltd., a Bermuda exempted limited company.

- "Immunovant, Inc." means Immunovant, Inc., a Delaware corporation and wholly owned subsidiary of Immunovant, which subsidiary will change its name prior to the closing of the Business Combination in connection with the Combined Company changing its name to Immunovant, Inc.

- "Immunovant Shares" means the common shares, par value $0.0001 per share, of Immunovant.

- "IPO" refers to the initial public offering of 11,500,000 units of HSAC consummated on May 14, 2019.

- "Private Warrants" means the warrants issued simultaneously with the closing of the IPO in a private placement to the Sponsor, each warrant being identical to the HSAC Warrants, except that such warrants are non-redeemable and may be exercised on a cashless basis.

- "Roivant" and "RSL" mean Roivant Sciences Ltd., a Bermuda exempted limited company.

- "SEC" means the U.S. Securities and Exchange Commission.

- "Securities Act" means the Securities Act of 1933, as amended.

- "Sellers" means the stockholders of Immunovant.

- "Sellers' Representative" means Roivant Sciences Ltd., a Bermuda exempted limited company.

- "Share Exchange Agreement" means that certain share exchange agreement, dated as of September 29, 2019, by and among HSAC, Immunovant, the Sellers and the Sellers' Representative.

- "Sponsor" means Health Sciences Holdings, LLC, the three directors of which are Roderick Wong, M.D., our Chief Executive Officer and President, Naveen Yalamanchi, M.D., our Chief Financial Officer and Executive Vice President, and Alice Lee, our Vice President of Operations and Secretary & Treasurer.

$5,000,000. Pursuant to the Share Exchange Agreement, all of the Private Warrants will be cancelled and up to 1,800,000 Sponsor shares will be subject to vesting and cancellation as described in the section titled "The Share Exchange Agreement — Related Agreements — Sponsor Restricted Stock Agreement."

On December 28, 2018, RTW Master Fund, Ltd. and RTW Innovation Master Fund, Ltd. (the "RTW Entities"), entities controlled by officers and directors of HSAC, purchased 2,604,166 Immunovant Shares, which represented at the time of investment approximately 3% interest in Immunovant, in exchange for approximately $10.0 million. On August 1, 2019, the RTW Entities made an additional $25.0 million investment in Immunovant in exchange for two promissory notes (the "Promissory Notes"), which automatically convert immediately prior to the consummation of the Business Combination into Immunovant Shares exchangeable for an aggregate of 2,500,000 HSAC Shares upon the closing of the Business Combination. The Promissory Notes bear interest at a rate of 5% per year, which interest will be waived and cancelled immediately prior to the closing of the Business Combination. On September 26, 2019, $2.5 million aggregate principal amount of the Promissory Notes issued to the RTW Entities was repaid, and the accrued interest on such principal amount was forgiven. In the event that the Business Combination is not consummated, the Promissory Notes will be convertible into Immunovant Shares in connection with certain qualified equity financings or other strategic transactions that Immunovant may enter into in the future.

If HSAC does not consummate the Business Combination by the date that is 24 months from the closing of the IPO, or May 14, 2021, HSAC will be required to dissolve and liquidate and the securities held by HSAC's insiders will be worthless because such holders have agreed to waive their rights to any liquidation distributions.

Approval of the Business Combination Proposal, the Nasdaq Proposal, the Equity Incentive Plan Proposal and the Business Combination Adjournment Proposal will require the affirmative vote of the holders of a majority of the issued and outstanding HSAC Shares present and entitled to vote at the special meeting. Approval of the Amendment Proposal will require the approval of a majority of the issued and outstanding HSAC Shares. As of the Record Date, 2,875,000 shares held by HSAC's initial stockholders, or approximately 20% of the outstanding HSAC Shares, would be voted in favor of each of the Proposals.

In addition, the exercise of HSAC's directors' and officers' discretion in agreeing to changes or waivers in the terms of the Business Combination may result in a conflict of interest when determining whether such changes or waivers are appropriate and in HSAC stockholders' best interests.

**Q:   When and where is the special meeting of HSAC's stockholders?**

A:   The special meeting of HSAC stockholders will take place at Loeb & Loeb LLP, 345 Park Avenue, New York, NY 10154, on December 16, 2019, at 10:00 a.m.

**Q:   Who may vote at the special meeting of stockholders?**

A:   Only holders of record of HSAC Shares as of the close of business on November 20, 2019 may vote at the special meeting of stockholders. As of November 20, 2019, there were 14,375,000 HSAC Shares outstanding and entitled to vote. Please see "Special Meeting of HSAC Stockholders — Record Date; Who is Entitled to Vote" for further information.

**Q:   What is the quorum requirement for the special meeting of stockholders?**

A:   Stockholders representing a majority of the HSAC Shares issued and outstanding as of the Record Date and entitled to vote at the special meeting must be present in person or represented by proxy in order to hold the special meeting and conduct business. This is called a quorum. HSAC Shares will be counted for purposes of determining if there is a quorum if the shareholder (i) is present and entitled to vote at the meeting, or (ii) has properly submitted a proxy card. In the absence of a quorum, stockholders representing a majority of the votes present in person or represented by proxy at such meeting, may adjourn the meeting until a quorum is present.

**Q:   What vote is required to approve the Proposals?**

A:   Approval of the Business Combination Proposal, the Nasdaq Proposal, the Equity Incentive Plan Proposal and the Business Combination Adjournment Proposal will require the affirmative vote of the holders of a majority of the issued and outstanding HSAC Shares present and entitled to vote at the special meeting. Approval of the Amendment Proposal will require the approval of a majority of the issued and outstanding HSAC Shares. Attending

and its website is *www.immunovant.com*. The information contained on, or accessible through, Immunovant's website is not incorporated by reference into this proxy statement, and you should not consider any information contained on, or that can be accessed through, Immunovant's website as part of this proxy statement or in deciding how to vote your HSAC Shares.

Immunovant is a clinical-stage biopharmaceutical company focused on enabling normal lives for patients with autoimmune diseases. Immunovant is developing a novel, fully human monoclonal antibody, IMVT-1401 (formerly referred to as RVT-1401), that selectively binds to and inhibits the neonatal fragment crystallizable receptor ("FcRn"). IMVT-1401 is the product of a multi-step, multi-year research program to design a highly potent FcRn antibody optimized for subcutaneous delivery. These efforts have resulted in a product candidate that has been dosed at small volumes and with a small gauge needle, while still generating therapeutically relevant pharmacodynamic activity, important attributes that Immunovant believes will drive patient preference and market adoption. In preclinical studies and in clinical trials conducted to date, IMVT-1401 has been observed to reduce immunoglobulin G ("IgG") antibody levels. High levels of pathogenic IgG antibodies drive a variety of autoimmune diseases and, as a result, Immunovant believes IMVT-1401 has the potential for broad application in these disease areas. Immunovant intends to develop IMVT-1401 for debilitating autoimmune diseases in which there is robust evidence that pathogenic IgG antibodies drive disease manifestation and in which reduction of IgG antibodies should lead to clinical benefit.

Autoimmune diseases are conditions where an immune response is inappropriately directed against the body's own healthy cells and tissues. Approximately 50 million people in the United States suffer from one of more than 100 diagnosed autoimmune diseases according to the American Autoimmune Related Diseases Association, Inc. Predisposing factors may include genetic susceptibility, environmental triggers and other factors not yet known. Many of these diseases are associated with high levels of pathogenic IgG antibodies, which are the most abundant type of antibody produced by the human immune system, accounting for approximately 75% of antibodies in the plasma of healthy people. IgG antibodies are important in the defense against pathogens, such as viruses and bacteria. In many autoimmune diseases, IgG antibodies inappropriately develop against normal proteins found in the body, directing the immune system to attack specific organs or organ systems. Current treatment regimens for IgG-mediated autoimmune diseases include corticosteroids and immunosuppressants in early stage disease, followed by more invasive treatments, such as intravenous immunoglobulin ("IVIg"), and plasma exchange, as the disease progresses. Such treatments are often limited by delayed onset of action, waning therapeutic benefit over time and unfavorable safety profiles.

Immunovant intends to develop IMVT-1401 as a fixed-dose, self-administered subcutaneous injection on a convenient weekly, or less frequent, dosing schedule. As a result of Immunovant's rational design, it believes that IMVT-1401, if approved for commercial sale, would be differentiated from currently available, more invasive treatments for advanced IgG-mediated autoimmune diseases, (e.g., myasthenia gravis ("MG"), Graves' ophthalmopathy ("GO"), warm autoimmune hemolytic anemia ("WAIHA"), idiopathic thrombocytopenic purpura, pemphigus vulgaris, chronic inflammatory demyelinating polyneuropathy, bullous pemphigoid, neuromyelitis optica, pemphigus foliaceus, Guillain-Barré syndrome and PLA2R+ membranous nephropathy). In 2017, these diseases had an aggregate prevalence of over 240,000 patients in the United States and 380,000 patients in Europe. To the extent Immunovant chooses to develop IMVT-1401 for certain of these rare diseases, Immunovant plans to seek orphan designation in the United States and Europe. Such designations would primarily provide financial and exclusivity incentives intended to make the development of orphan drugs financially viable. However, Immunovant has not yet sought such designation for any of its three target indications, and there is no certainty that it would obtain such designation, or maintain the benefits associated with such designation, if or when it does.

Immunovant's first target indication for IMVT-1401 is MG, an autoimmune disease associated with muscle weakness with an estimated prevalence of one in 5,000, with up to 65,000 cases in the United States. In MG, patients develop pathogenic IgG antibodies that attack critical signaling proteins at the junction between nerve and muscle cells. The majority of MG patients suffer from progressive muscle weakness, with maximum weakness occurring within six months of disease onset in most patients. In severe cases, MG patients can experience myasthenic crisis, in which respiratory function is weakened to the point where it becomes life-threatening, requiring intubation and mechanical ventilation.

In August 2019, Immunovant initiated dosing in its ASCEND-MG trial, a Phase 2a clinical trial in patients with MG. Immunovant plans to report top-line results from this trial in the first half of 2020.

## RISK FACTORS

*You should consider carefully the following risk factors, as well as the other information set forth in this proxy statement, before making a decision on the Business Combination. Risks related to Immunovant, including risks related to Immunovant's business, financial position and capital requirements, development, regulatory approval and commercialization, dependence on third parties, intellectual property and taxation, will continue to be applicable to the Combined Company after the closing of the Business Combination.*

**Risks Related to Immunovant's Business, Financial Position and Capital Requirements**

***Immunovant has a limited operating history and has never generated any product revenue.***

Immunovant is a clinical-stage biopharmaceutical company with a limited operating history. Immunovant was incorporated in July 2018, and its operations to date have been limited to organizing and staffing the company, acquiring the rights to its product candidate, IMVT-1401, and preparing for and conducting clinical trials. Immunovant has not yet demonstrated an ability to successfully complete a large-scale, pivotal clinical trial, obtain marketing approval, manufacture a commercial scale product, or arrange for a third party to do so on Immunovant's behalf, or conduct sales and marketing activities necessary for successful product commercialization. Consequently, Immunovant has no meaningful operations upon which to evaluate its business, and predictions about its future success or viability may not be as accurate as they could be if it had a longer operating history or a history of successfully developing, manufacturing and commercializing pharmaceutical products, including antibody-based products.

Immunovant's ability to generate product revenue and become profitable depends upon its ability to successfully complete the development of, and obtain the necessary regulatory approvals for, IMVT-1401 and any future product candidates. It has never been profitable, has no products approved for commercial sale, and has not generated any product revenue.

Even if Immunovant receives regulatory approval for IMVT-1401 or any future product candidate, it is not known when or if it will generate product revenue. Immunovant's ability to generate product revenue depends on a number of factors, including, but not limited to, its ability to:

- successfully complete clinical trials and obtain regulatory approval for the marketing of IMVT-1401 or any future product candidate in the United States and in other jurisdictions;

- add operational, financial and management information systems personnel, including personnel to support its clinical, manufacturing and planned future commercialization efforts and operations as a public company;

- initiate and continue relationships with third-party suppliers and manufacturers and have commercial quantities of IMVT-1401 or any future product candidate manufactured at acceptable cost and quality levels and in compliance with FDA and other regulatory requirements;

- attract and retain experienced management and advisory teams;

- raise additional funds when needed and on terms acceptable to Immunovant;

- commercially launch IMVT-1401 or any future product candidate, if approved, whether alone or in collaboration with others, including establishing sales, marketing and distribution systems;

- set an acceptable price for any approved product and obtain coverage and adequate reimbursement from third-party payors;

- achieve market acceptance of any approved product in the medical community and with third-party payors and consumers;

- compete effectively with other biotechnology and pharmaceutical companies targeting autoimmune disease indications; and

- maintain, expand and protect its intellectual property portfolio.

19

**6**

Because of the numerous risks and uncertainties associated with product development, Immunovant is unable to predict the timing or amount of increased expenses, or when or if it will be able to achieve or maintain profitability. Immunovant's expenses could increase beyond expectations if it is required by the FDA or comparable non-U.S. regulatory authorities to perform studies or clinical trials in addition to those that it currently anticipates. Even if IMVT-1401 or any future product candidate is approved for commercial sale, Immunovant anticipates incurring significant costs associated with its commercial launch. If it cannot successfully execute any one of the foregoing, its business may not succeed.

***Immunovant expects to incur significant losses for the foreseeable future and may never achieve or maintain profitability. Its independent registered public accounting firm has expressed substantial doubt about Immunovant's ability to continue as a going concern.***

Investment in biopharmaceutical product development is highly speculative because it entails substantial upfront capital expenditures and significant risk that a product candidate will fail to gain regulatory approval or fail to become commercially viable. Immunovant has never generated any product revenue, and it cannot estimate with precision the extent of its future losses. Immunovant does not currently have any products that are available for commercial sale and it may never generate product revenue or achieve profitability. Immunovant's net loss was $34.2 million, $28.6 million and $34.5 million for the period from December 19, 2017 to March 31, 2018, the year ended March 31, 2019, and the six months ended September 30, 2019, respectively. As of September 30, 2019, it had an accumulated deficit of $59.4 million.

Immunovant expects to continue to incur substantial and increasing losses through the commercialization of IMVT-1401 or any future product candidate, if approved. Immunovant currently has no products that are approved for commercial sale. As a result, it is uncertain when or if it will achieve profitability and, if so, whether Immunovant will be able to sustain it. Immunovant's ability to generate product revenue and achieve profitability is dependent on its ability to complete the development of IMVT-1401 or any future product candidate, obtain necessary regulatory approvals for such product candidate, and manufacture and successfully commercialize such product candidate alone or in collaboration with others. Immunovant cannot assure you that it will be profitable even if it successfully commercializes IMVT-1401 or any future product candidate. If Immunovant does successfully obtain regulatory approval to market a product candidate, its revenue will be dependent upon, in part and among other things, the size of the markets in the territories for which it gains regulatory approval, the number of competitors in such markets, the accepted price for Immunovant's product candidate, the reimbursement environment for its product candidate and whether Immunovant owns the commercial rights for those territories. If the indication approved by regulatory authorities for IMVT-1401 or any future product candidate is narrower than Immunovant expects, or the treatment population is narrowed by competition, physician choice or treatment guidelines, Immunovant may not generate significant revenue from sales of such product candidate, even if approved. Even if Immunovant does achieve profitability, it may not be able to sustain or increase profitability on a quarterly or annual basis. Failure to become and remain profitable may adversely affect Immunovant's ability to raise capital and continue operations.

Immunovant expects its research and development expenses in connection with its development program for IMVT-1401 to continue to be significant. In addition, if Immunovant obtains regulatory approval for IMVT-1401, it expects to incur increased sales, marketing and manufacturing expenses. As a result, Immunovant expects to continue to incur significant and increasing operating losses and negative cash flows for the foreseeable future. These losses had and will continue to have an adverse effect on Immunovant's results of operations, financial position and working capital.

Immunovant's independent registered public accounting firm has issued a going concern opinion on its combined and consolidated financial statements included elsewhere in this proxy statement, expressing substantial doubt that it can continue as an ongoing business due to insufficient capital for Immunovant to fund its operations. Immunovant's combined and consolidated financial statements do not include any adjustments that may result from the outcome of this uncertainty. If it is unable to successfully complete this Business Combination, Immunovant will need to create alternate financing or operational plans to continue as a going concern.

***Immunovant's business is heavily dependent on the successful development, regulatory approval and commercialization of its sole product candidate, IMVT-1401.***

Immunovant currently has no products that are approved for commercial sale and may never be able to develop marketable products. Immunovant expects that a substantial portion of its efforts and expenditures over the next few years will be devoted to the advancement of IMVT-1401. Accordingly, Immunovant's business currently depends heavily on the successful completion of its clinical trials for IMVT-1401 and subsequent regulatory approval and commercialization of this product candidate.

Immunovant cannot be certain that IMVT-1401 will receive regulatory approval or be successfully commercialized even if it receives regulatory approval. The research, testing, manufacturing, labeling, approval, sale, marketing and distribution of pharmaceutical products, including antibody-based products, are, and will remain, subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries that each have differing regulations. Immunovant is not permitted to market its product candidate in the United States until it receives approval of a biologics license application ("BLA") or in any foreign country until it receives the requisite approvals from the appropriate authorities in such countries for marketing authorization. In addition, Immunovant has not yet demonstrated its ability to complete later-stage or pivotal clinical trials for any product candidate.

Immunovant has not submitted a BLA for IMVT-1401 to the FDA or any comparable application to any other regulatory authority. Obtaining approval of a BLA or similar regulatory approval is an extensive, lengthy, expensive and inherently uncertain process, and the FDA or other foreign regulatory authorities may delay, limit or deny approval of IMVT-1401 for many reasons, including:

- Immunovant may not be able to demonstrate that its product candidate is safe and effective as a treatment for any of its currently targeted indications to the satisfaction of the FDA or other relevant regulatory authorities;

- the relevant regulatory authorities may require additional pre-approval studies or clinical trials, which would increase Immunovant's costs and prolong its development timelines;

- the results of Immunovant's clinical trials may not meet the level of statistical or clinical significance required by the FDA or other relevant regulatory authorities for marketing approval;

- the FDA or other relevant regulatory authorities may disagree with the number, design, size, conduct or implementation of Immunovant's clinical trials, including the design of the ongoing and planned clinical trials of IMVT-1401 for the treatment of MG, GO and WAIHA;

- the contract research organizations ("CROs") that Immunovant retains to conduct clinical trials may take actions outside of Immunovant's control, or otherwise commit errors or breaches of protocols, that materially adversely impact Immunovant's clinical trials and ability to obtain market approvals;

- the FDA or other relevant regulatory authorities may not find the data from preclinical studies or clinical trials sufficient to demonstrate that the clinical and other benefits of Immunovant's product candidate outweigh its safety risks;

- the FDA or other relevant regulatory authorities may disagree with Immunovant's interpretation of data or significance of results from the preclinical studies and clinical trials of its product candidate, or may require additional studies;

- the FDA or other relevant regulatory authorities may not accept data generated from Immunovant's clinical trial sites;

- if Immunovant's BLA or other foreign application is reviewed by an advisory committee, the FDA or other relevant regulatory authority, as the case may be, may have difficulties scheduling an advisory committee meeting in a timely manner or the advisory committee may recommend against approval of Immunovant's application or may recommend that the FDA or other relevant regulatory authority, as the case may be, require, as a condition of approval, additional preclinical studies or clinical trials, limitations on approved labeling or distribution and use restrictions;

21

- the FDA or other relevant regulatory authorities may require development of a risk evaluation and mitigation strategy ("REMS") or its equivalent, as a condition of approval;

- the FDA or other relevant regulatory authorities may require additional post-marketing studies and/or a patient registry, which would be costly;

- the FDA or other relevant regulatory authorities may find the chemistry, manufacturing and controls data insufficient to support the quality of Immunovant's product candidate;

- the FDA or other relevant regulatory authorities may identify deficiencies in the manufacturing processes or facilities of Immunovant's third-party manufacturers; or

- the FDA or other relevant regulatory authorities may change their approval policies or adopt new regulations.

Even if Immunovant does receive regulatory approval to market IMVT-1401, any such approval may be subject to limitations on the indicated uses or patient populations for which Immunovant may market IMVT-1401. Accordingly, even if Immunovant is able to obtain the requisite financing to continue to fund its development programs, Immunovant cannot assure you that its product candidate will be successfully developed or commercialized.

In addition, if Immunovant's product candidate encounters safety or efficacy problems, developmental delays, regulatory issues, supply issues, or other problems in one of its target indications, its development plans for its product candidate could be significantly harmed in other indications, which would have a material adverse effect on Immunovant's business. Further, competitors who are developing product candidates in the autoimmune disease field, including IgG-mediated autoimmune indications, or that target the same indications or use the same mechanism of action as Immunovant, may experience problems with their product candidates that could suggest problems with Immunovant's product candidate that would potentially harm its business.

***Immunovant will require additional capital to fund its operations, and if it fails to obtain necessary financing, Immunovant may not be able to complete the development and commercialization of IMVT-1401.***

Immunovant expects to spend substantial capital to complete the development of, seek regulatory approvals for, and commercialize IMVT-1401. These expenditures will include costs associated with the HanAll Agreement, pursuant to which it is required to reimburse HanAll for half of budgeted research and development costs incurred by them with respect to IMVT-1401 (up to an aggregate reimbursement amount of $20.0 million), make payments in connection with the achievement of certain regulatory milestones prior to generating any product sales (including the initiation of certain clinical trials for IMVT-1401), make significant further payments upon the achievement of certain sales milestones and make tiered royalty payments in connection with the commercial sale of IMVT-1401, if approved.

Immunovant will require additional capital to complete the development and potential commercialization of IMVT-1401. Because the length of time and activities associated with successful development of Immunovant's product candidate are highly uncertain, Immunovant is unable to estimate with certainty the actual funds Immunovant will require for development and any approved marketing and commercialization activities. Immunovant's future funding requirements, both near- and long-term, will depend on many factors, including, but not limited to:

- the initiation, timing, progress, costs and results of Immunovant's clinical trials for IMVT-1401, including Immunovant's ongoing and planned clinical trials of IMVT-1401 for the treatment of MG, GO and WAIHA;

- the outcome, timing and cost of meeting regulatory requirements established by the FDA and other comparable foreign regulatory authorities;

- the cost of filing, prosecuting, defending and enforcing Immunovant's patent claims and other intellectual property rights;

- the cost of defending potential intellectual property disputes, including patent infringement actions brought by third parties against Immunovant or any of its current or future product candidates;

22

**9**

- the cost of future product candidates or technologies that Immunovant may acquire or in-license;

- the effect of competing market developments;

- the cost and timing of completion of commercial-scale and other manufacturing activities;

- the cost of establishing sales, marketing and distribution capabilities for IMVT-1401 or any future product candidate in regions where Immunovant chooses to commercialize such product candidate on its own; and

- the initiation, progress, timing and results of Immunovant's commercialization of its product candidate, if approved for commercial sale.

Immunovant does not have any committed external source of funds. If Immunovant is unable to raise additional capital in sufficient amounts or on terms acceptable to Immunovant, it may have to significantly delay, scale back or discontinue the development or commercialization of IMVT-1401 and any future product candidates, or potentially discontinue operations altogether. In addition, attempting to secure additional capital may divert the time and attention of Immunovant's management from day-to-day activities and harm Immunovant's product candidate development efforts. Because of the numerous risks and uncertainties associated with the development and potential commercialization of IMVT-1401, Immunovant is unable to estimate the associated amounts of increased capital outlays, operating expenditures and capital requirements.

***Raising additional funds by issuing securities may cause dilution to existing stockholders, raising additional funds through debt financings may involve restrictive covenants, and raising funds through lending and licensing arrangements may restrict Immunovant's operations or require Immunovant to relinquish proprietary rights.***

Immunovant expects that significant additional capital will be needed in the future to continue its planned operations. Until such time, if ever, that Immunovant can generate substantial product revenue, Immunovant expects to finance its cash needs through a combination of equity offerings, debt financings, strategic alliances and license and development agreements or other collaborations. To the extent that Immunovant raises additional capital by issuing equity securities, Immunovant's existing stockholders' ownership may experience substantial dilution, and the terms of these securities may include liquidation or other preferences that could adversely affect the rights of a stockholder. Additionally, any agreements for future debt or preferred equity financings, if available, may involve covenants limiting or restricting Immunovant's ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends.

If Immunovant raises additional funds through collaborations, strategic alliances or marketing, distribution or licensing arrangements with third parties, Immunovant may have to relinquish valuable rights to its future revenue streams, research programs or IMVT-1401 or any future product candidate, or grant licenses on terms that may not be favorable to Immunovant. If Immunovant is unable to raise additional funds when needed, Immunovant may be required to delay, limit, reduce or terminate its product development or future commercialization efforts, or grant rights to develop and market product candidates that it would otherwise develop and market itself.

***Immunovant relies on the HanAll Agreement to provide rights to the core intellectual property relating to IMVT-1401. Any termination or loss of significant rights under the HanAll Agreement would adversely affect Immunovant's development or commercialization of IMVT-1401.***

Immunovant has licensed its core intellectual property relating to IMVT-1401 from HanAll under the HanAll Agreement. See "Immunovant Sciences Ltd.'s Business — License Agreement with HanAll Biopharma Co., Ltd." If, for any reason, the HanAll Agreement is terminated or Immunovant otherwise loses those rights, it would adversely affect Immunovant's business. The HanAll Agreement imposes on Immunovant obligations relating to exclusivity, territorial rights, development, commercialization, funding, payment, diligence, sublicensing, insurance, intellectual property protection and other matters. Immunovant is also required to reimburse HanAll for half of budgeted research and development costs incurred by them with respect to IMVT-1401, up to an aggregate reimbursement amount of $20.0 million. If Immunovant breaches any material obligations, or uses the intellectual property licensed to Immunovant in an unauthorized manner, under the HanAll Agreement, Immunovant may be required to pay damages to its collaborators and they may have the right to terminate the applicable licenses, which would result in Immunovant being unable to develop, manufacture and sell IMVT-1401, if approved.

***The HanAll Agreement obligates Immunovant to make certain milestone payments, some of which will be triggered prior to the commercialization of IMVT-1401.***

Immunovant will be responsible for future contingent payments and royalties under the HanAll Agreement, including up to an aggregate of $452.5 million upon the achievement of certain development, regulatory and sales milestone events, some of which events may occur prior to Immunovant's planned commercialization of IMVT-1401. Accordingly, Immunovant will be required to make some such payments prior to the time at which it is able to generate any revenue, if any, from commercial sales of IMVT-1401. There can be no assurance that Immunovant will have the funds necessary to make such payments, or be able to raise such funds when needed, on terms acceptable to Immunovant, or at all. As a result, Immunovant may be required to delay, limit, reduce or terminate its product development or future commercialization efforts.

***Immunovant currently has a limited number of employees who are employed by its wholly owned subsidiary and Immunovant relies on RSI and RSG to provide various administrative, business development, clinical development and other services.***

As of September 30, 2019, Immunovant had no employees, and Immunovant's wholly owned subsidiary, Immunovant, Inc., had 17 employees, including 13 who are engaged in research and development activities. Immunovant relies on the administrative support, business development, clinical development and other services provided by RSI and RSG, wholly owned subsidiaries of RSL, which provide services to Immunovant pursuant to the Services Agreements, as further described under the section titled "Certain Transactions — Certain Transactions of Immunovant — Affiliate Services Agreements." For example, Immunovant currently relies and expects to continue to rely on RSI to support its preclinical and clinical development programs. Personnel and support staff that provide services to Immunovant under the Services Agreements are not required to, and Immunovant does not expect that they will, have the management and administration of Immunovant's business as their primary responsibility, or act exclusively for Immunovant. RSI and RSG have limited finance, accounting, clinical development and other resources. Furthermore, RSI and RSG engage in other business activities and provide support for other of Immunovant's affiliates and subsidiaries of RSL. If their focus is diverted or their limited resources are otherwise employed, Immunovant could face potential delays or disruptions in the conduct of Immunovant's ongoing clinical trial programs and the commercialization of Immunovant's product candidate, if approved, which could harm Immunovant's business.

In the event of a default under or termination of the Services Agreements, Immunovant may be unable to contract with substitute service providers on similar terms, in a timely fashion, or at all, and the costs of substituting service providers may be substantial. In addition, a substitute service provider may not be able to provide the same level of services due to a lack of pre-existing knowledge or synergies. Any termination of Immunovant's relationship with RSI or RSG, or decrease in provision of services by RSI and RSG, and any delay in appointing or finding a suitable replacement provider, if one exists, could make it difficult for Immunovant to operate its business and continue the clinical development and potential commercialization of IMVT-1401 or any future product candidate.

***Immunovant may not be able to manage its business effectively if it is unable to attract and retain key personnel.***

Immunovant may not be able to attract or retain qualified management and commercial, scientific and clinical personnel due to the intense competition for qualified personnel among biotechnology, pharmaceutical and other businesses. If Immunovant is not able to attract and retain necessary personnel to accomplish its business objectives, Immunovant may experience constraints that will significantly impede the achievement of its development objectives, its ability to raise additional capital and its ability to implement its business strategies.

Immunovant is highly dependent on the skills and leadership of its senior management team and key employees. Senior management and key employees may terminate their positions with Immunovant at any time. If Immunovant loses one or more members of its senior management team or key employees, Immunovant's ability to successfully implement its business strategies could be adversely affected. Replacing these individuals may be difficult, cause disruption and may take an extended period of time due to the limited number of individuals in Immunovant's industry with the breadth of skills and experience required to develop, manufacture, gain regulatory approval of and commercialize products successfully. Competition to hire from this limited pool is intense, and Immunovant may be unable to hire, train, retain or motivate additional key personnel. Immunovant does not maintain "key person" insurance for any members of its senior management team or other employees.

24

**11**

***Immunovant will need to expand its organization, and it may experience difficulties in managing this growth, which could disrupt its operations.***

Immunovant expects to hire, either directly, or through any current or future subsidiaries, additional employees for Immunovant's managerial, finance and accounting, legal, clinical, scientific and engineering, regulatory, operational, manufacturing, medical affairs, business development and sales and marketing teams. Immunovant may have difficulties identifying, hiring and integrating new personnel. Future growth would impose significant additional responsibilities on Immunovant's management, including the need to identify, recruit, maintain, motivate and integrate additional employees, consultants and contractors. Also, Immunovant's management may need to divert a disproportionate amount of its attention away from Immunovant's day-to-day activities and devote a substantial amount of time to managing these growth activities. Immunovant may not be able to effectively manage the expansion of its operations across Immunovant's entities, which may result in weaknesses in its infrastructure, give rise to operational mistakes, loss of business opportunities, loss of employees and reduced productivity among remaining employees. Immunovant's expected growth could require significant capital expenditures and may divert financial resources from other projects, such as the development of IMVT-1401 and any future product candidate. If Immunovant's management is unable to effectively manage Immunovant's growth, Immunovant's expenses may increase more than expected, Immunovant's ability to generate or grow revenue could be reduced, and Immunovant may not be able to implement Immunovant's business strategy. Immunovant's future financial performance and Immunovant's ability to commercialize IMVT-1401 or any future product candidate and compete effectively will partly depend on Immunovant's ability to effectively manage any future growth.

Many of the other pharmaceutical companies Immunovant competes against for qualified personnel and consultants have greater financial and other resources, different risk profiles and a longer operating history in the industry than Immunovant does. They also may provide more diverse opportunities and better chances for career advancement. Some of these opportunities may be more appealing to high-quality candidates and consultants than what Immunovant has to offer. If Immunovant is unable to continue to attract and retain high-quality personnel and consultants, the rate and success at which Immunovant can develop product candidates and Immunovant's business will be harmed.

***Immunovant's or its affiliates' employees, independent contractors, principal investigators, consultants, commercial collaborators, service providers and other vendors or potential collaborators may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements, which could have an adverse effect on Immunovant's results of operations.***

Immunovant is exposed to the risk that its or its affiliates' employees and contractors, including principal investigators, CROs, consultants, commercial collaborators, service providers and other vendors may engage in misconduct or other illegal activity. Misconduct by these parties could include intentional, reckless or negligent conduct or other unauthorized activities that violate the laws and regulations of the FDA or other similar regulatory bodies, including those laws that require the reporting of true, complete and accurate information to such regulatory bodies; manufacturing and the FDA's Good Clinical Practice ("GCP") or current Good Manufacturing Practice ("cGMP") standards; federal, state and foreign healthcare fraud and abuse laws and data privacy; or laws that require the true, complete and accurate reporting of financial information or data. In particular, sales, marketing and other business arrangements in the healthcare industry are subject to extensive laws intended to prevent fraud, kickbacks, self-dealing, bribery, corruption, antitrust violations and other abusive practices. These laws may restrict or prohibit a wide range of business activities, including research, manufacturing, distribution, pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements. Activities subject to these laws also involve the improper use or misrepresentation of information obtained in the course of clinical trials, creating fraudulent data in Immunovant's preclinical studies or clinical trials or illegal misappropriation of drug product, which could result in regulatory sanctions and serious harm to Immunovant's reputation. It is not always possible to identify and deter employee or third-party misconduct, and the precautions Immunovant takes to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting Immunovant from governmental investigations or other actions or lawsuits stemming from a failure to comply with such laws or regulations. Additionally, Immunovant is subject to the risk that a person, including any person who may have engaged in any fraud or misconduct, or government agency could allege such fraud or other misconduct, even if none occurred. Furthermore, Immunovant relies on its CROs and clinical trial sites to adequately report data from Immunovant's ongoing clinical trials. For example, any failure by such parties to adequately

25

**12**

report safety signals to Immunovant in a timely manner from any such trials may also affect the approvability of Immunovant's product candidate or cause delays and disruptions for the approval of its product candidate, if at all. If Immunovant's or its affiliates' employees, independent contractors, principal investigators, consultants, commercial collaborators, service providers or other vendors are alleged or found to be in violation of any such regulatory standards or requirements, or become subject to a corporate integrity agreement or similar agreement and curtailment of Immunovant's operations, it could have a significant impact on Immunovant's business and financial results, including the imposition of significant civil, criminal and administrative penalties, damages, monetary fines, suspension or delay in Immunovant's clinical trials, possible exclusion from participation in Medicare, Medicaid and other federal healthcare programs, FDA debarment, contractual damages, reputational harm, diminished profits and future earnings, and additional reporting requirements and oversight, any of which could adversely affect Immunovant's ability to operate its business and its results of operations.

***Immunovant may not be successful in its efforts to identify and acquire or in-license additional product candidates or technologies, or to enter into collaborations or strategic alliances for the development and commercialization of any such future product candidates.***

Immunovant may seek to identify and acquire or in-license novel product candidates or technologies in the autoimmune disease field. The process by which Immunovant identifies product candidates and technologies may fail to yield product candidates for clinical development for a number of reasons, including those discussed in these risk factors and also:

- the process by which Immunovant identifies and decides to acquire product candidates or technologies, including through the business development support Immunovant receives from RSL and its subsidiaries pursuant to the Services Agreements, may not be successful;

- potential product candidates may, upon further study, be shown to have harmful side effects or other characteristics that indicate that they are unlikely to be products that will receive marketing approval and achieve market acceptance;

- potential product candidates may not be effective in treating their targeted diseases; or

- the acquisition or in-licensing transactions can entail numerous operational and functional risks, including exposure to unknown liabilities, disruption of Immunovant's business, incurrence of substantial debt or dilutive issuances of equity securities to pay transaction consideration or costs, or higher than expected acquisition or integration costs.

Immunovant may choose to focus its efforts and resources on a potential product candidate or technology that ultimately proves to be unsuccessful. Immunovant also cannot be certain that, following an acquisition or in-licensing transaction, Immunovant will achieve the revenue or specific net income that justifies such transaction. Further, time and resources spent identifying, acquiring and developing potential product candidates or technologies may distract management's attention from Immunovant's primary business or other development programs. If Immunovant is unable to identify and acquire suitable product candidates for clinical development, this could adversely impact Immunovant's business strategy and financial position.

In the future, Immunovant may also decide to collaborate with other pharmaceutical companies for the development and potential commercialization of Immunovant's product candidates in the United States or other countries or territories of the world. Immunovant will face significant competition in seeking appropriate collaborators. Immunovant may not be successful in its efforts to establish a strategic partnership or other alternative arrangements for Immunovant's product candidates because they may be deemed to be at too early of a stage of development for collaborative effort and third parties may not view Immunovant's product candidates as having the requisite potential to demonstrate safety and efficacy. If and when Immunovant collaborates with a third party for development and commercialization of a product candidate, Immunovant can expect to relinquish some or all of the control over the future success of that product candidate to the third party. Immunovant's ability to reach a definitive agreement for a collaboration will depend, among other things, upon its assessment of the collaborator's resources and expertise, the terms and conditions of the proposed collaboration and the proposed collaborator's evaluation of a number of factors.

26

**13**

*International expansion of Immunovant's business exposes it to business, legal, regulatory, political, operational, financial and economic risks associated with conducting business outside of the United States.*

Part of Immunovant's business strategy involves potentially expanding internationally with third-party collaborators to seek regulatory approval for IMVT-1401 and any future product candidates outside the United States. Doing business internationally involves a number of risks, including but not limited to:

- multiple conflicting and changing laws and regulations such as tax laws, export and import restrictions, employment laws, anti-bribery and anti-corruption laws, regulatory requirements and other governmental approvals, permits and licenses;

- failure by Immunovant or its collaborators to obtain appropriate licenses or regulatory approvals for the sale or use of Immunovant's product candidates, if approved, in various countries;

- difficulties in managing foreign operations;

- complexities associated with managing multiple payor-reimbursement regimes or self-pay systems;

- financial risks, such as longer payment cycles, difficulty enforcing contracts and collecting accounts receivable and exposure to foreign currency exchange rate fluctuations;

- reduced protection for intellectual property rights;

- natural disasters, political and economic instability, including wars, terrorism and political unrest, outbreak of disease, boycotts, curtailment of trade and other business restrictions; and

- failure to comply with the United States Foreign Corrupt Practices Act ("FCPA"), including its books and records provisions and its anti-bribery provisions, the U.K. Bribery Act 2010 ("U.K. Bribery Act"), and similar antibribery and anticorruption laws in other jurisdictions, for example by failing to maintain accurate information and control over sales or distributors' activities.

Any of these risks, if encountered, could significantly harm Immunovant's future international expansion and operations and, consequently, negatively impact its financial condition, results of operations and cash flows.

*Legal, political and economic uncertainty surrounding the planned exit of the U.K. from the European Union is a source of instability and uncertainty.*

In June 2016, a majority of the eligible members of the electorate in the United Kingdom ("U.K.") voted to withdraw from the European Union ("E.U.") in a national referendum, commonly referred to as "Brexit." Pursuant to Article 50 of the 2009 Lisbon Treaty, the U.K. will cease to be an E.U. Member State either on the effective date of a withdrawal agreement (entry into such a withdrawal agreement will require approval of the U.K. Parliament ("Parliament")) or, failing that, two years following the U.K.'s notification of its intention to leave the E.U. (the "Brexit Date"), unless the European Council (together with the U.K.) unanimously decides to extend the two year period. On March 29, 2017, the U.K. formally notified the European Council of its intention to leave the E.U. It is unclear how long it will take to negotiate a withdrawal agreement, but it appears likely that Brexit will continue to involve a process of lengthy negotiations between the U.K. and E.U. Member States to determine the future terms of the U.K.'s relationship with the E.U., given that no formal withdrawal arrangements have been agreed, there have been several extensions to the Brexit Date and the U.K. has yet to formally leave the E.U. On October 28, 2019, the E.U. granted the U.K. a further extension to the Brexit Date until January 31, 2020. Under the terms of the extension, the Brexit Date may be earlier than January 31, 2020, if a formal withdrawal agreement is ratified by Parliament. In addition, the U.K. will hold a general election on December 12, 2019. Until the post-election government is formed, there can be no guarantee or certainty as to which form Brexit will take and on which terms a withdrawal agreement with the E.U. will be agreed, if at all.

Lack of clarity about future U.K. laws and regulations as the U.K. determines which E.U. rules and regulations to replace or replicate in the event of a withdrawal, including financial laws and regulations, tax and free trade agreements, intellectual property rights, supply chain logistics, environmental, health and safety laws and regulations, immigration laws and employment laws, could decrease foreign direct investment in the U.K., increase costs, depress economic activity and restrict access to capital. In addition, if the U.K. and the E.U. are unable to negotiate acceptable withdrawal terms or if other E.U. member states pursue withdrawal, barrier-free access between the U.K. and other E.U. member states or among the European Economic Area overall could be diminished or

27

**14**

eliminated. The long-term effects of Brexit will depend on any agreements (or lack thereof) between the U.K. and the E.U. and, in particular, any arrangements for the U.K. to retain access to E.U. markets either during a transitional period or more permanently.

Such a withdrawal from the E.U. is unprecedented, and it is unclear how the U.K. access to the European single market for goods, capital, services and labor within the E.U., or the European single market, and the wider commercial, legal and regulatory environment, will impact Immunovant's U.K. operations. Immunovant may also face new regulatory costs and challenges that could have an adverse effect on Immunovant's operations and development programs. Even prior to any change to the U.K.'s relationship with the E.U., the announcement of Brexit has created economic uncertainty surrounding the terms of Brexit, and its consequences could negatively impact Immunovant's financial condition, results of operations and cash flows.

***Immunovant's business and operations would suffer in the event of system failures, cyber-attacks or a deficiency in Immunovant's cyber-security.***

Immunovant's computer systems, as well as those of various third parties on which Immunovant relies, including RSL and its affiliates, Immunovant's CROs and other contractors, consultants and law and accounting firms, may sustain damage from computer viruses, unauthorized access, data breaches, phishing attacks, cybercriminals, natural disasters (including hurricanes and earthquakes), terrorism, war and telecommunication and electrical failures. Immunovant relies on its third-party providers to implement effective security measures and identify and correct for any such failures, deficiencies or breaches. The risk of a security breach or disruption, particularly through cyber-attacks or cyber intrusion, including by computer hackers, foreign governments and cyber-terrorists, has generally increased as the number, intensity and sophistication of attempted attacks and intrusions from around the world have increased. If such an event were to occur and cause interruptions in Immunovant's operations, it could result in a material disruption of its drug development programs. For example, the loss of preclinical or clinical trial data from completed, ongoing or planned trials could result in delays in Immunovant's regulatory approval efforts and significantly increase its costs to recover or reproduce the data. To the extent that any disruption or security breach were to result in a loss of or damage to Immunovant's data or applications, or inappropriate disclosure of personal, confidential or proprietary information, Immunovant could incur liability and the further development of Immunovant's product candidate or any future product candidate that Immunovant may develop could be delayed.

***The failure to successfully implement an enterprise resource planning system could adversely impact Immunovant's business and results of operations.***

Immunovant has implemented a company-wide enterprise resource planning ("ERP") system to upgrade certain existing business, operational, and financial processes, upon which Immunovant relies. ERP implementations are complex and time-consuming projects that require transformations of business and finance processes to reap the benefits of the ERP system. Any such transformation involves risk inherent in the conversion to a new system, including loss of information and potential disruption to normal operations. Additionally, if the ERP system is not effectively implemented as planned, or the system does not operate as intended, the effectiveness of Immunovant's internal control over financial reporting could be adversely affected or Immunovant's ability to assess those controls adequately could be delayed. Significant delays in documenting, reviewing and testing Immunovant's internal control over financial reporting could cause Immunovant to fail to comply with the U.S. Securities and Exchange Commission (the "SEC"), reporting obligations related to Immunovant's management's assessment of its internal control over financial reporting. In addition, if Immunovant experiences interruptions in service or operational difficulties and is unable to effectively manage its business during or following the implementation of the ERP system, Immunovant's business and results of operations could be harmed.

***Potential product liability lawsuits against Immunovant could cause Immunovant to incur substantial liabilities and limit commercialization of any products that Immunovant may develop.***

The use of IMVT-1401 and any future product candidate in clinical trials and the sale of any products for which Immunovant obtains marketing approval exposes Immunovant to the risk of product liability claims. Product liability claims might be brought against Immunovant by consumers, health care providers, other pharmaceutical companies or others taking or otherwise coming into contact with any approved products. On occasion, large monetary judgments have been awarded in class action lawsuits where drugs have had unanticipated adverse effects.

28

**15**

If Immunovant cannot successfully defend against product liability claims, Immunovant could incur substantial liability and costs. In addition, regardless of merit or eventual outcome, product liability claims may result in:

- impairment of Immunovant's business reputation and significant negative media attention;

- delay or termination of clinical trials, or withdrawal of participants from Immunovant's clinical trials;

- significant costs to defend related litigation;

- distraction of management's attention from Immunovant's primary business;

- substantial monetary awards to patients or other claimants;

- inability to commercialize any product candidate, if approved;

- product recalls, withdrawals or labeling, marketing or promotional restrictions;

- decreased demand for any product candidate, if approved; and

- loss of revenue.

The product liability insurance Immunovant currently carries, and any additional product liability insurance coverage Immunovant acquires in the future, may not be sufficient to reimburse Immunovant for any expenses or losses Immunovant may suffer. Moreover, insurance coverage is becoming increasingly expensive and in the future Immunovant may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect Immunovant against losses due to liability. If Immunovant obtains marketing approval for IMVT-1401 or any future product candidate, Immunovant intends to acquire insurance coverage to include the sale of commercial products; however, it may be unable to obtain product liability insurance on commercially reasonable terms or in adequate amounts. A successful product liability claim or series of claims brought against Immunovant could cause its share price to decline and, if judgments exceed Immunovant's insurance coverage, could adversely affect Immunovant's results of operations and business, including preventing or limiting the commercialization any approved product.

***Changes in funding for the FDA and other government agencies could hinder their ability to hire and retain key leadership and other personnel, or otherwise prevent new products and services from being developed or commercialized in a timely manner, which could negatively impact Immunovant's business.***

The ability of the FDA to review and approve new products can be affected by a variety of factors, including government budget and funding levels, ability to hire and retain key personnel and accept the payment of user fees, and statutory, regulatory, and policy changes. Average review times at the agency have fluctuated in recent years as a result. In addition, government funding of other government agencies that fund research and development activities is subject to the political process, which is inherently fluid and unpredictable.

Disruptions at the FDA and other agencies may also slow the time necessary for new drugs to be reviewed and/or approved by necessary government agencies, which would harm Immunovant's business. For example, over the last several years, including for 35 days beginning on December 22, 2018, the U.S. government has shut down several times and certain regulatory agencies, such as the FDA, have had to furlough critical FDA employees and stop critical activities. If a prolonged government shutdown occurs, it could significantly impact the ability of the FDA to timely review and process Immunovant's regulatory submissions, which could harm Immunovant's business.

29

**16**

**Risks Related to Development, Regulatory Approval and Commercialization**

***Clinical trials are very expensive, time-consuming, difficult to design and implement, and involve uncertain outcomes.***

Immunovant's product candidate is still in clinical development and will require extensive clinical testing before Immunovant is prepared to submit a BLA or other similar application for regulatory approval. Immunovant cannot provide you any assurance that it will submit a BLA for regulatory approval for its product candidate within Immunovant's projected timeframes or whether any such application will be approved by the relevant regulatory authorities. Clinical trials are very expensive and difficult to design and implement, in part because they are subject to rigorous regulatory requirements. For instance, the FDA or other regulatory authorities may not agree with Immunovant's proposed analysis plans or trial design for any clinical trials for IMVT-1401, including Immunovant's ASCEND-MG, ASCEND-GO and planned ASCEND-WAIHA trials; and during any such review, may identify unexpected efficacy or safety concerns, which may delay the approval of a BLA or similar application. The FDA may also find that the benefits of IMVT-1401 in any of Immunovant's target indications do not outweigh its risks in a manner sufficient to grant regulatory approval. The clinical trial process is also time-consuming and costly and relies on the collaboration with many CROs and clinical trial sites.

Failures can occur at any stage of clinical trials, and Immunovant could encounter problems that cause it to abandon or repeat clinical trials. In addition, results from clinical trials may require further evaluation, delaying the next stage of clinical development or submission of a BLA. Further, product candidates in later stages of clinical trials may fail to show the desired safety and efficacy traits despite having progressed through preclinical studies and initial clinical trials, and such product candidates may exhibit negative safety signals in later stage clinical trials that they did not exhibit in preclinical or earlier-stage clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in, or the discontinuation of, advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials. Likewise, the results of early preclinical studies and clinical trials of IMVT-1401, some of which were not conducted by Immunovant, may not be predictive of the results of Immunovant's planned development programs, and there can be no assurance that the results of studies conducted by collaborators or other third parties will be viewed favorably or are indicative of Immunovant's future trial results.

The commencement and completion of clinical trials may be delayed by several factors, including:

- failure to obtain regulatory authorization to commence a trial or reaching consensus with regulatory authorities regarding the design or implementation of Immunovant's studies;

- unforeseen safety issues, or subjects experiencing severe or unexpected adverse events ("AEs");

- occurrence of serious AEs in trials of the same class of agents conducted by other sponsors;

- lack of effectiveness during clinical trials;

- resolving any dosing issues or limitations, including those raised by the FDA;

- inability to reach agreement on acceptable terms with prospective CROs and clinical trial sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and trial sites;

- slower than expected rates of patient recruitment or failure to recruit suitable patients to participate in a trial;

- failure to add a sufficient number of clinical trial sites;

- unanticipated impact from changes in or modifications to protocols or clinical trial design, including those that may be required by the FDA or other regulatory authorities;

- inability or unwillingness of clinical investigators or study participants to follow Immunovant's clinical and other applicable protocols or applicable regulatory requirements;

- an institutional review board ("IRB"), refusing to approve, suspending, or terminating the trial at an investigational site, precluding enrollment of additional subjects, or withdrawing their approval of the trial;

- premature discontinuation of study participants from clinical trials or missing data;

- failure to manufacture or release sufficient quantities of Immunovant's product candidate or placebo or failure to obtain sufficient quantities of active comparator medications for its clinical trials, if applicable, that in each case meet Immunovant's quality standards, for use in clinical trials;

- inability to monitor patients adequately during or after treatment; or

- inappropriate unmasking of trial results.

Further, Immunovant, the FDA or another regulatory authority may suspend Immunovant's clinical trials in an entire country at any time, or an IRB may suspend its clinical trial sites within any country, if it appears that Immunovant or its collaborators are failing to conduct a trial in accordance with regulatory requirements, including cGMP regulations, that Immunovant is exposing participants to unacceptable health risks, or if the FDA or other regulatory authority, as the case may be, finds deficiencies in Immunovant's IND or equivalent applications for other countries or the manner in which the clinical trials are conducted. Therefore, Immunovant cannot predict with any certainty the schedule for commencement and completion of future clinical trials. If Immunovant experiences delays in the commencement or completion of its clinical trials, or if Immunovant terminates a clinical trial prior to completion, the commercial prospects of Immunovant's product candidate could be harmed, and Immunovant's ability to generate product revenue from Immunovant's product candidate, if approved, may be delayed. In addition, any delays in Immunovant's clinical trials could increase Immunovant's costs, cause a decline in Immunovant's share price, slow down the approval process, and jeopardize its ability to commence product sales and generate revenue. Any of these occurrences may harm Immunovant's business, financial condition and results of operations. In addition, many of the factors that cause or lead to a termination or suspension of, or delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of Immunovant's product candidate. Immunovant may make formulation or manufacturing changes to its product candidate, in which case Immunovant may need to conduct additional preclinical or clinical studies to bridge Immunovant's modified product candidate to earlier versions. Any delays to Immunovant's clinical trials that occur as a result could shorten any period during which Immunovant may have the exclusive right to commercialize its product candidate and its competitors may be able to bring products to market before Immunovant does, and the commercial viability of Immunovant's product candidate could be significantly reduced.

Moreover, principal investigators for Immunovant's clinical trials may serve as scientific advisors or consultants to Immunovant from time to time and receive compensation in connection with such services. Under certain circumstances, Immunovant may be required to report some of these relationships to the FDA or other regulatory authorities. The FDA or other regulatory authorities may conclude that a financial relationship between Immunovant and a principal investigator has created a conflict of interest or otherwise affected the integrity of the study. The FDA or other regulatory authority may therefore question the integrity of the data generated at the applicable clinical trial site and the utility of the clinical trial itself may be jeopardized. This could result in a delay in approval, or rejection, of Immunovant's marketing applications by the FDA or other regulatory authority, as the case may be, and may ultimately lead to the denial of marketing approval of Immunovant's product candidate.

In addition, Immunovant had no involvement with or control over the preclinical or clinical development of IMVT-1401 prior to its in-license from HanAll. Immunovant is dependent on its licensing partner having conducted such research and development in accordance with the applicable protocols and legal, regulatory and scientific standards, having accurately reported the results of all preclinical studies and clinical trials and other research they conducted prior to Immunovant's acquisition of the rights to its product candidate, having correctly collected and interpreted the data from these studies, trials and other research, and having supplied Immunovant with complete information, data sets and reports required to adequately demonstrate the results reported through the date of Immunovant's acquisition of this asset. Problems related to Immunovant's predecessor could result in increased costs and delays in the development of Immunovant's product candidate, which could adversely affect its ability to generate any future revenue from sales of its product candidate, if approved.

31

**18**

***The results of Immunovant's preclinical and clinical trials may not support its proposed claims for its product candidate, or regulatory approval on a timely basis or at all, and the results of earlier studies and trials may not be predictive of future trial results.***

Success in preclinical testing and early clinical trials does not ensure that later clinical trials will be successful, and Immunovant cannot be sure that the results of later clinical trials will replicate the results of prior preclinical testing and clinical trials. In particular, Immunovant cannot assure you that the reductions in IgG antibodies that it has observed to date in Immunovant's Phase 1 clinical trial of IMVT-1401, which did not include pre-specified endpoints for IgG reduction, will be observed in any future clinical trials. Likewise, promising results in interim analyses or other preliminary analyses do not ensure that the clinical trial as a whole will be successful. A number of companies in the pharmaceutical industry, including biotechnology companies, have suffered significant setbacks in clinical trials, even after promising results in earlier preclinical studies or clinical trials. These setbacks have been caused by, among other things, preclinical findings made while clinical trials were underway and safety or efficacy observations made in clinical trials, including previously unreported AEs. The results of preclinical studies and early clinical trials of Immunovant's product candidate may not be predictive of the results of later-stage clinical trials. Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy traits despite having progressed through preclinical and initial clinical trials. A future failure of a clinical trial to meet its pre-specified endpoints would likely cause Immunovant to abandon its product candidate. Any delay in, or termination of, Immunovant's clinical trials will delay the submission of a BLA to the FDA or other similar applications with other relevant foreign regulatory authorities and, ultimately, Immunovant's ability to commercialize its product candidate, if approved, and generate product revenue. Even if Immunovant's clinical trials are completed as planned, Immunovant cannot be certain that their results will support Immunovant's claims for differentiation or the effectiveness or safety of Immunovant's product candidate. The FDA has substantial discretion in the review and approval process and may disagree that Immunovant's data support the differentiated claims it proposes. In addition, only a small percentage of biologics under development result in the submission of a BLA to the FDA and even fewer are approved for commercialization.

***Interim, "top-line" or preliminary data from Immunovant's clinical trials that it announces or publishes from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, Immunovant may publicly disclose preliminary or "top-line" data from its clinical trials, which is based on a preliminary analysis of then-available top-line data, and the results and related findings and conclusions are subject to change following a full analyses of all data related to the particular trial. Immunovant also makes assumptions, estimations, calculations and conclusions as part of Immunovant's analyses of data, and Immunovant may not have received or had the opportunity to fully and carefully evaluate all data. As a result, the top-line results that Immunovant reports may differ from future results of the same trials, or different conclusions or considerations may qualify such results, once additional data have been received and fully evaluated. Top-line data also remain subject to audit and verification procedures that may result in the final data being materially different from the preliminary data Immunovant previously published. As a result, top-line data should be viewed with caution until the final data are available. Immunovant may also disclose interim data from its clinical trials. Interim data from clinical trials that Immunovant may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. Adverse differences between preliminary or interim data and final data could significantly harm Immunovant's business prospects.

Further, others, including regulatory agencies, may not accept or agree with Immunovant's assumptions, estimates, calculations, conclusions or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of the particular product candidate or product and Immunovant's business in general. In addition, the information Immunovant chooses to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what Immunovant determines is the material or otherwise appropriate information to include in Immunovant's disclosure, and any information Immunovant determines not to disclose may ultimately be deemed significant with respect to future decisions, conclusions, views, activities or otherwise regarding a particular drug, product candidate or Immunovant's business. If the top-line data that Immunovant reports differ from actual results, or if others, including regulatory authorities, disagree with the conclusions reached, Immunovant's ability to obtain approval for and commercialize IMVT-1401 or any future product candidate, Immunovant's business, operating results, prospects or financial condition may be harmed.

32

**19**

*Immunovant is at a very early stage in its development efforts for IMVT-1401 and it may not be able to successfully develop and commercialize its product candidate on a timely basis or at all.*

IMVT-1401 is a novel therapeutic antibody and its potential therapeutic benefit is unproven. While several FcRn inhibitor candidates are under development by other companies, there is currently no approved therapy inhibiting FcRn for the treatment of autoimmune diseases, and, as a result, the regulatory pathway for IMVT-1401 may present novel issues that could cause delays in development or approval. While results from early clinical trials of IMVT-1401 have shown meaningful reductions in IgG antibody levels in healthy volunteers, IMVT-1401 may not demonstrate in patients any or all of the pharmacological benefits Immunovant believes it may possess. Immunovant has not yet succeeded and may never succeed in demonstrating efficacy and safety for IMVT-1401 in pivotal clinical trials or in obtaining marketing approval thereafter. For example, although Immunovant and its licensing partner have evaluated IMVT-1401 in preclinical studies and in early-stage clinical trials, Immunovant has not yet advanced IMVT-1401 into a large-scale, pivotal clinical trial for any indication. Positive results from Immunovant's early-stage clinical trials are not necessarily predictive of the results of Immunovant's ongoing and planned clinical trials of IMVT-1401. If Immunovant cannot replicate the positive results from Immunovant's Phase 1 clinical trial in Immunovant's later clinical trials, Immunovant may be unable to successfully develop, obtain regulatory approval for and commercialize IMVT-1401 for the treatment of MG, GO, WAIHA or any other autoimmune indication. As a result, Immunovant's focus on exploring FcRn inhibition may fail to result in the identification of viable additional indications for IMVT-1401. If Immunovant is unsuccessful in its development efforts, Immunovant may not be able to advance the development of or commercialize IMVT-1401, raise capital, expand its business or continue its operations.

*Immunovant has licensed the rights to IMVT-1401 in limited territories. Any adverse developments that occur during any clinical trials conducted by third parties, including HanAll, in other jurisdictions may affect Immunovant's ability to obtain regulatory approval or commercialize IMVT-1401.*

Immunovant has licensed the right to develop, manufacture and commercialize IMVT-1401 in the United States, Canada, Mexico, the E.U., the U.K., Switzerland, the Middle East, North Africa and Latin America. HanAll or any of its sublicensees or collaborators, over which Immunovant has no control, has the right to develop and commercialize IMVT-1401 in geographies outside of Immunovant's licensed territory. If serious AEs occur with patients using IMVT-1401 or during any clinical trials of IMVT-1401 conducted by HanAll or third parties in other jurisdictions outside of Immunovant's licensed territory, the FDA may delay, limit or deny approval of IMVT-1401 or require Immunovant to conduct additional clinical trials as a condition to marketing approval, which would increase Immunovant's costs. If Immunovant receive FDA approval for IMVT-1401 and a new and serious safety issue is identified in connection with clinical trials of IMVT-1401 conducted by third parties in other jurisdictions outside of Immunovant's licensed territory, the FDA may withdraw their approval of the product or otherwise restrict Immunovant's ability to market and sell IMVT-1401. In addition, treating physicians may be less willing to administer Immunovant's product candidate due to concerns over such AEs, which would limit Immunovant's ability to commercialize IMVT-1401.

*Enrollment and retention of patients in clinical trials is an expensive and time-consuming process and could be made more difficult or rendered impossible by multiple factors outside Immunovant's control.*

Immunovant may encounter delays or difficulties in enrolling, or be unable to enroll, a sufficient number of patients to complete any of its clinical trials on Immunovant's current timelines, or at all, and even once enrolled Immunovant may be unable to retain a sufficient number of patients to complete any of Immunovant's trials. Enrollment in Immunovant's clinical trials may be slower than Immunovant anticipates, leading to delays in Immunovant's development timelines. For example, Immunovant may face difficulty enrolling or maintaining a sufficient number of patients in Immunovant's clinical trials for MG, GO and WAIHA due to the existing alternative treatments available for the treatment of MG, GO and WAIHA, as patients may decline to enroll or decide to withdraw from Immunovant's clinical trials due to the risk of receiving placebo. Patient enrollment and retention in clinical trials depends on many factors, including the size of the patient population, the nature of the trial protocol, Immunovant's ability to recruit clinical trial investigators with the appropriate competencies and experience, the existing body of safety and efficacy data with respect to the study drug, the number and nature of competing treatments and ongoing clinical trials of competing drugs for the same indication, the proximity of patients to clinical sites, the eligibility criteria for the trial and the proportion of patients screened that meets those criteria, Immunovant's ability to obtain and maintain patient consents, Immunovant's ability to successfully complete prerequisite studies before enrolling

33

**20**

certain patient populations. Immunovant's product candidate is focused in part on addressing rare autoimmune indications, including MG, GO and WAIHA with limited patient pools from which to draw in order to complete Immunovant's clinical trials in a timely and cost-effective manner.

Furthermore, any negative results or new safety signals Immunovant may report in clinical trials of its product candidate may make it difficult or impossible to recruit and retain patients in other clinical trials Immunovant is conducting. Similarly, negative results reported by Immunovant's competitors about their drug candidates may negatively affect patient recruitment in Immunovant's clinical trials. Also, marketing authorization of competitors in this same class of drugs may impair Immunovant's ability to enroll patients into Immunovant's clinical trials, delaying or potentially preventing Immunovant from completing recruitment of one or more of Immunovant's trials.

Delays or failures in planned patient enrollment or retention may result in increased costs, program delays or both, which could have a harmful effect on Immunovant's ability to develop Immunovant's product candidate, or could render further development impossible. In addition, Immunovant expects to rely on CROs and clinical trial sites to ensure proper and timely conduct of Immunovant's future clinical trials, and, while Immunovant intends to enter into agreements governing their services, Immunovant will be limited in Immunovant's ability to compel their actual performance.

***Immunovant faces significant competition from other biotechnology and pharmaceutical companies targeting autoimmune disease indications, and Immunovant's operating results will suffer if it fails to compete effectively.***

The markets for autoimmune disease therapies are competitive and characterized by significant technological development and new product introduction. For example, there are several large and small pharmaceutical companies focused on delivering therapeutics for Immunovant's targeted autoimmune disease indications, including MG, GO and WAIHA. Immunovant anticipates that if it obtains regulatory approval of its product candidate, Immunovant will face significant competition from other approved therapies or drugs that become available in the future for the treatment of Immunovant's targeted indications. If approved, Immunovant's product candidate may also compete with unregulated, unapproved and off-label treatments. Even if a generic product is less effective than Immunovant's product candidate, a less effective generic may be more quickly adopted by physicians and patients than Immunovant's competing product candidate based on cost or convenience. Immunovant's product candidate, if approved, is expected to present a novel therapeutic approach for MG, GO, WAIHA and other targeted indications and will have to compete with existing therapies, some of which are widely known and accepted by physicians and patients. To compete successfully in this market, Immunovant will have to demonstrate that the relative cost, safety and efficacy of Immunovant's product, if approved, provide an attractive alternative to existing and other new therapies to gain a share of some patients' discretionary budgets and to gain physicians' attention within their clinical practices. Some of the companies that may offer competing products also have a broad range of other product offerings, large direct sales forces and long-term customer relationships with Immunovant's target physicians, which could inhibit Immunovant's market penetration efforts. Such competition could lead to reduced market share for Immunovant's product candidate and contribute to downward pressure on the pricing of its product candidate, which could harm Immunovant's business, financial condition, operating results and prospects.

Immunovant expects to face intense competition from other biopharmaceutical companies who are developing agents for the treatment of autoimmune diseases, including multiple agents which are in the same class as IMVT-1401. Immunovant is aware of several FcRn inhibitors that are in clinical development. These include ABY-039 (Affibody AB/Alexion Pharmaceuticals), efgartigimod (argenx), nipocalimab, (Momenta Pharmaceuticals), rozanolixizumab (UCB) and ALXN1830 (Alexion Pharmaceuticals). Each of efgartigimod, nipocalimab, rozanolixizumab and ALXN1830 is currently under development for the treatment of MG. In addition, for WAIHA, Alexion has announced plans to begin a Phase 2 trial for ALXN1830 in early 2020 and Momenta has announced the launch of an adaptive Phase 2/3 clinical study for nipocalimab. Momenta also announced that the FDA has granted Fast Track Designation for nipocalimab in WAIHA.

Immunovant also expects to face competition from agents with different mechanisms of action. The most commonly prescribed first-line agents for the treatment of MG are acetylcholinesterase inhibitors, such as pyridostigmine, which are marketed by several manufacturers of generic medicines. IVIg is also routinely used for patients with MG. Eculizumab (marketed by Alexion Pharmaceuticals), an antibody inhibitor of the C5 protein, was recently approved in 2017 for the treatment of generalized MG in patients who are positive for anti-AChR antibodies. The first line of treatment for patients with GO or WAIHA is generally immunosuppressive therapy, including high doses of corticosteroids. Other broad immunosuppressive drugs, such as cyclosporine, cyclophosphamide, mycophenolate

34

**21**

mofetil and azathioprine, are used when patients do not respond adequately to corticosteroids. Rituximab (Roche), a monoclonal antibody that binds to an antigen specific to antibody-producing B cells, may also be used as a treatment for GO, WAIHA and other IgG-mediated autoimmune diseases.

In addition, other product candidates in development for the treatment of MG include: zilucoplan (Ra Pharma), a peptide inhibitor of C5, currently in a Phase 3 trial in a similar patient population; amifampridine (Catalyst Pharmaceuticals), a neuronal potassium channel blocker, for MG patients with the MuSK form of the disease, which is currently in Phase 3; and Myasterix (CuraVac), a therapeutic vaccine against B and T cells, which is being tested in early stage trials in MG patients. There are at least two agents in development for the treatment of GO, including: teprotumumab (Horizon Therapeutics), an anti-IGF-1R antibody, which has completed Phase 3 development; and tocilizumab (Roche), an IL6 receptor antibody, which has been evaluated in a recent Phase 3 investigator-sponsored trial. In July 2019, Horizon Therapeutics announced it had submitted a BLA for teprotumumab and the availability of an expanded access program while the FDA reviews the BLA. Other product candidates in development for the treatment of WAIHA include: fostamatinib (Rigel Pharmaceuticals), a syk kinase inhibitor, which is in Phase 3 development, sutimlimab (Sanofi), an anti-C1s antibody, and APL-2 (Apellis Pharmaceuticals), a C3 inhibitor, each of which is currently in Phase 1/2 clinical development. Also ongoing is a Phase 2 investigator-initiated study of ibrutinib (AbbVie), a BTK inhibitor, in steroid refractory WAIHA.

Many of Immunovant's existing or potential competitors have substantially greater financial, technical and human resources than does Immunovant and significantly greater experience in the discovery and development of product candidates, as well as in obtaining regulatory approvals of those product candidates in the United States and in foreign countries. Many of Immunovant's current and potential future competitors also have significantly more experience commercializing drugs that have been approved for marketing. Mergers and acquisitions in the pharmaceutical and biotechnology industries could result in even more resources being concentrated among a smaller number of Immunovant's competitors. Competition may reduce the number and types of patients available to Immunovant to participate in clinical trials, because some patients who might have opted to enroll in Immunovant's trials may instead opt to enroll in a trial being conducted by one of Immunovant's competitors.

Due to less stringent regulatory requirements in certain foreign countries, there are many more products and procedures available for use to treat autoimmune diseases in those international markets than are approved for use in the United States. In certain international markets, there are also fewer limitations on the claims that Immunovant's competitors can make about the effectiveness of their products and the manner in which they can market their products. As a result, Immunovant expects to face more competition in these markets than in the United States.

Immunovant's ability to compete successfully will depend largely on Immunovant's ability to:

- develop and commercialize therapies in its target indications that are superior to other products in the market;

- demonstrate through its clinical trials that IMVT-1401 or any future product candidate is differentiated from existing and future therapies;

- attract qualified scientific, product development, manufacturing and commercial personnel;

- obtain patent or other proprietary protection for IMVT-1401 and any future product candidates;

- obtain required regulatory approvals, including approvals to market IMVT-1401 or any future product candidate Immunovant develops, in ways that are differentiated from existing and future products and treatments;

- have commercial quantities of any approved product manufactured at acceptable cost and quality levels and in compliance with FDA and other regulatory requirements;

- successfully commercialize IMVT-1401 or any future product candidate, if approved;

- obtain coverage and adequate reimbursement from, and negotiate competitive pricing with, third-party payors; and

- successfully collaborate with pharmaceutical companies in the discovery, development and commercialization of new therapies.

35

**22**

The availability of Immunovant's competitors' products could limit the demand and the price Immunovant is able to charge for any product candidate Immunovant develops. The inability to compete with existing or subsequently introduced treatments would have an adverse impact on Immunovant's business, financial condition and prospects.

***If Immunovant is not able to obtain required regulatory approvals, Immunovant will not be able to commercialize IMVT-1401 or any future product candidate, and Immunovant's ability to generate product revenue will be impaired.***

IMVT-1401 and any future product candidate that Immunovant may develop, as well as the activities associated with their development and commercialization, including their design, research, testing, manufacture, safety, efficacy, recordkeeping, labeling, packaging, storage, approval, advertising, promotion, sale and distribution are subject to comprehensive regulation by the FDA and other regulatory agencies in the United States and by similar regulatory authorities outside the United States. Failure to obtain marketing approval for, and thus commercialize any product candidate, could negatively impact Immunovant's ability to generate any revenue from product sales.

Immunovant has not received approval from regulatory authorities to market any product candidate in any jurisdiction, and it is possible that Immunovant's product candidate will never obtain the appropriate regulatory approvals necessary for Immunovant to commence product sales. Neither Immunovant nor any collaborator is permitted to market its product candidate in the United States or any other jurisdiction until Immunovant receives regulatory approval of a BLA from the FDA or similar regulatory authorities outside of the United States.

The time required to obtain approval of a BLA by the FDA or similar regulatory authorities outside of the United States is unpredictable but typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the substantial discretion of the regulatory authority. Prior to submitting a BLA to the FDA or any comparable application to any other foreign regulatory authorities for approval of any product candidate, Immunovant will need to complete pivotal Phase 3 clinical trials to demonstrate favorable results with respect to safety, tolerability and efficacy. In addition, approval policies, regulations, or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions.

Securing marketing approvals requires the submission of extensive preclinical and clinical data and supporting information to regulatory authorities for each therapeutic indication to establish the safety and efficacy of Immunovant's product candidate for the specified indications. Immunovant expects to rely on third-party CROs, consultants, its collaborators and personnel from RSI and RSG to assist Immunovant in filing and supporting the applications necessary to gain marketing approvals. Securing marketing approval also requires the submission of information about the product manufacturing process to, and inspection of manufacturing facilities by, the regulatory authorities. Errors in the submission of applications for marketing approval or issues, including those related to gathering the appropriate data and the inspection process, may ultimately delay or affect Immunovant's ability to obtain regulatory approval, commercialize Immunovant's product candidate and generate product revenue.

***Immunovant's product candidate may cause adverse effects or have other properties that could delay or prevent their regulatory approval, cause Immunovant to suspend or discontinue clinical trials, abandon further development or limit the scope of any approved label or market acceptance.***

Adverse events associated with Immunovant's product candidate in its clinical trials could cause Immunovant, other reviewing entities, clinical trial sites or regulatory authorities to interrupt, delay or halt clinical trials and could result in the denial of regulatory approval. The most commonly reported AE in Immunovant's Phase 1 clinical trial was mild erythema and swelling at the injection site, which typically resolved within hours. If an unacceptable frequency or severity of AEs or new safety signals are reported in Immunovant's clinical trials for Immunovant's product candidate, Immunovant's ability to obtain regulatory approval for such product candidate may be negatively impacted. Treatment-related side effects arising from, or those perceived to arise from, its product candidate or those from other companies targeting similar autoimmune indications, including incidence of headache from other product candidates targeting IgG antibody reductions, could also affect patient recruitment or the ability of enrolled patients to complete the trial or result in potential product liability claims. In addition, these side effects may not be appropriately recognized or managed by the treating medical staff. Any of these occurrences may harm Immunovant's business, financial condition and prospects.

36

**23**

If Immunovant's product candidate is approved and then causes serious or unexpected side effects, a number of potentially significant negative consequences could result, including:

- regulatory authorities may withdraw, suspend or limit their approval of the product or require a REMS (or equivalent outside the United States) to impose restrictions on its distribution or other risk management measures;

- Immunovant may be required to recall a product;

- additional restrictions may be imposed on the marketing of the particular product or the manufacturing processes for the product or any component thereof;

- regulatory authorities may require the addition of labeling statements, such as warnings or contraindications, require other labeling changes or require field alerts or other communications to physicians, pharmacies or the public;

- Immunovant may be required to change the way the product is administered or distributed, conduct additional clinical trials, change the labeling of a product or be required to conduct additional post-marketing studies or surveillance;

- Immunovant may be required to repeat a preclinical study or clinical trial or terminate a program, even if other studies or trials related to the program are ongoing or have been successfully completed;

- Immunovant may be sued and held liable for harm caused to patients;

- physicians may stop prescribing the product;

- reimbursement may not be available for the product;

- Immunovant may elect to discontinue the sale of its product;

- the product may become less competitive; and

- Immunovant's reputation may suffer.

Any of these events could prevent Immunovant from achieving or maintaining market acceptance of the affected product candidate and could substantially increase the costs of commercializing Immunovant's product candidate, if approved.

***IMVT-1401 is an antibody protein that could cause an immune response in patients, resulting in the creation of harmful or neutralizing antibodies against these therapeutic proteins, preventing or limiting regulatory approval or Immunovant's ability to commercialize IMVT-1401.***

In addition to the safety, efficacy, manufacturing, and regulatory hurdles faced by Immunovant's product candidate, IMVT-1401, the administration of proteins such as monoclonal antibodies, even those that are fully human in nature including Immunovant's product candidate, can cause an immune response, resulting in the creation of antibodies against the therapeutic protein. These anti-drug antibodies can have no effect or can neutralize the effectiveness of the protein, or require that higher doses be used to obtain a therapeutic effect. Whether anti-drug antibodies will be created and how they react can often not be predicted from preclinical or even clinical studies, and their detection or appearance is often delayed. As a result, neutralizing antibodies may be detected at a later date or upon longer exposure of patients with Immunovant's product candidates, such as following more chronic administration in longer lasting clinical trials. In some cases, detection of such neutralizing antibodies can even occur after pivotal clinical trials have been completed. Therefore, there can be no assurance that neutralizing antibodies will not be detected in future clinical trials or at a later date upon longer exposure (including after commercialization). If anti-drug antibodies reduce or neutralize the effectiveness of Immunovant's product candidate, the continued clinical development or receipt of marketing approval for Immunovant's product candidate could be delayed or prevented and, even if Immunovant's product candidate is approved, its commercial success could be limited, any of which would impair Immunovant's ability to generate revenue and continue operations.

***The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time consuming and inherently unpredictable, and even if Immunovant obtains approval for a product candidate in one country or jurisdiction, Immunovant may never obtain approval for or commercialize it in any other jurisdiction, which would limit Immunovant's ability to realize its full market potential.***

Prior to obtaining approval to commercialize a product candidate in any jurisdiction, Immunovant or its collaborators must demonstrate with substantial evidence from well controlled clinical trials, and to the satisfaction of the FDA or comparable foreign regulatory agencies, that such product candidate is safe and effective for its intended use. Results from preclinical studies and clinical trials can be interpreted in different ways. Even if Immunovant believes the preclinical or clinical data for a product candidate are promising, such data may not be sufficient to support approval by the FDA and other regulatory authorities. In order to market any products in any particular jurisdiction, Immunovant must establish and comply with numerous and varying regulatory requirements on a country-by-country basis regarding safety and efficacy. Approval by the FDA does not ensure approval by regulatory authorities in any other country or jurisdiction outside the United States. In addition, clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not guarantee regulatory approval in any other country. Approval processes vary among countries and can involve additional product testing and validation, as well as additional administrative review periods. Seeking regulatory approval could result in difficulties and costs for Immunovant and require additional preclinical studies or clinical trials, which could be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of Immunovant's products in those countries. Immunovant does not have any product candidates approved for sale in any jurisdiction, including in international markets, and Immunovant does not have experience in obtaining regulatory approval. If Immunovant fails to comply with regulatory requirements in international markets or to obtain and maintain required approvals, or if regulatory approvals in international markets are delayed, Immunovant's target market will be reduced and its ability to realize the full market potential of any product it develops will be unrealized.

***Even if Immunovant obtains regulatory approval for a product candidate, it will still face extensive ongoing regulatory requirements and its product may face future development and regulatory difficulties.***

Any product candidate for which Immunovant obtains marketing approval will be subject to extensive and ongoing regulatory requirements, including for the manufacturing processes, post-approval clinical data, labeling, packaging, distribution, AE reporting, storage, recordkeeping, conduct of potential post-market studies and post-market submission requirements, export, import, advertising and promotional activities for such product, among other things, by the FDA and other regulatory authorities. These requirements include submissions of safety and other post-marketing information and reports, establishment of registration and drug listing requirements, continued compliance with cGMP requirements relating to manufacturing, quality control, quality assurance and corresponding maintenance of records and documents, requirements regarding the distribution of drug product samples to physicians, recordkeeping and GCP requirements for any clinical trials that Immunovant conducts post-approval. Even if marketing approval of a product candidate is granted, the approval may be subject to limitations on the indicated uses for which the product may be marketed or to the conditions of approval or the FDA or other regulatory authorities may require that contraindications, warnings or precautions-including in some cases, a boxed warning be included in the product labeling, which could limit sales of the product.

Regulatory authorities closely regulate the post-approval marketing and promotion of drugs to ensure drugs are marketed only for the approved indications and in accordance with the provisions of the approved labeling. Regulatory authorities impose stringent restrictions on manufacturers' communications regarding off-label use, and if Immunovant does not market its products for their approved indications, Immunovant may be subject to enforcement action for off-label marketing. Violations of the Federal Food, Drug, and Cosmetic Act in the United States and other comparable regulations in foreign jurisdictions relating to the promotion of prescription drugs may lead to enforcement actions and investigations by the FDA, Department of Justice, State Attorneys General and other foreign regulatory agencies alleging violations of United States federal and state health care fraud and abuse laws, as well as state consumer protection laws and comparable laws in foreign jurisdictions.

38

25

In addition, later discovery of previously unknown AEs or other problems with Immunovant's product, manufacturers or manufacturing processes, or failure to comply with regulatory requirements may yield various results, including:

- restrictions on the manufacture of such product;

- restrictions on the labeling or marketing of such product, including a "black box" warning or contraindication on the product label or communications containing warnings or other safety information about the product;

- restrictions on product distribution or use;

- requirements to conduct post-marketing studies or clinical trials, or any regulatory holds on Immunovant's clinical trials;

- requirement of a REMS (or equivalent outside the United States);

- Warning or Untitled Letters;

- withdrawal of the product from the market;

- recall of a product;

- fines, restitution or disgorgement of profits or revenues;

- suspension or withdrawal of marketing approvals;

- refusal to permit the import or export of such product;

- product seizure; or

- lawsuits, injunctions or the imposition of civil or criminal penalties.

The FDA and other regulatory authorities' policies may change and additional government regulations may be enacted that could prevent, limit or delay regulatory approval of IMVT-1401 or any future product candidate. Immunovant cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the United States or abroad. If Immunovant is slow or unable to adapt to changes in existing requirements or to the adoption of new requirements or policies, or if Immunovant is not able to maintain regulatory compliance, Immunovant may lose any marketing approval that Immunovant may have obtained.

For example, certain policies of the current U.S. administration may impact Immunovant's business and industry. Namely, the current U.S. administration has taken several executive actions, including the issuance of a number of Executive Orders, that could impose significant burdens on, or otherwise materially delay, the FDA's ability to engage in routine regulatory and oversight activities such as implementing statutes through rulemaking, issuance of guidance, and review and approval of marketing applications. It is difficult to predict how these executive actions, including the Executive Orders, will be implemented, and the extent to which they will impact the FDA's ability to exercise its regulatory authority. If these executive actions impose constraints on the FDA's ability to engage in oversight and implementation activities in the normal course, Immunovant's business may be negatively impacted.

Non-compliance by Immunovant or any future collaborator with regulatory requirements, including safety monitoring or pharmacovigilance, and with requirements related to the development of products for the pediatric population can also result in significant financial penalties.

***Even if Immunovant receives marketing approval for IMVT-1401 or any future product candidate, it may fail to achieve market acceptance by physicians, patients, third-party payors or others in the medical community necessary for commercial success.***

Even if Immunovant receives marketing approval for a product candidate, it may nonetheless fail to gain sufficient market acceptance by physicians, patients, third-party payors and others in the medical community. If it does not achieve an adequate level of acceptance, Immunovant may not generate significant product revenue or become

**26**

profitable. The degree of market acceptance of any product candidate, if approved for commercial sale, will depend on a number of factors, including but not limited to:

- the safety, efficacy, risk-benefit profile and potential advantages, including in the case of IMVT-1401 subcutaneous delivery method, compared to alternative, competing or existing treatments, which physicians may perceive to be adequately effective for some or all patients;

- limitations or warnings contained in the labeling approved for Immunovant's product candidate by the FDA or other applicable regulatory authorities;

- any restrictions on the use of the product candidate, and the prevalence and severity of any side effects;

- the content of the approved product label;

- the effectiveness of sales and marketing efforts;

- the cost of treatment in relation to alternative treatments, including any similar generic treatments;

- Immunovant's ability to offer Immunovant's products for sale at competitive prices;

- the cost, convenience and ease of administration compared to alternative treatments;

- the willingness of the target patient population to try new therapies and of physicians to prescribe these therapies over existing or competing therapies;

- the strength of marketing and distribution support;

- the availability of third-party coverage and adequate reimbursement at any given price level of Immunovant's product candidate;

- utilization controls imposed by third-party payors, such as prior authorizations and step edits; and

- any restrictions on the use of Immunovant's product candidate, if approved, together with other medications.

Market acceptance of IMVT-1401 for the treatment of MG, GO and WAIHA may also be affected by the perception that existing available treatments, such as pyridostigmine, corticosteroids and immunosuppressants, may be sufficient to treat the majority of these patients. In addition, IMVT-1401, if approved, may compete with other FcRn inhibitors under development that have demonstrated similar levels of IgG reductions as IMVT-1401 in completed clinical trials to date. In addition, the potential patient population for Immunovant's initial indication and other autoimmune indications that Immunovant may target are relatively small. This could affect the rate of adoption and as a result, market acceptance of Immunovant's product candidate, if approved, could be much slower than anticipated.

Immunovant cannot assure you that IMVT-1401 or any future product candidate, if approved, will achieve broad market acceptance among physicians, patients and third-party payors. The failure of any such product candidate that receives regulatory approval or clearance to achieve market acceptance or commercial success would adversely affect Immunovant's business and results of operations.

***Immunovant may expend its limited resources to pursue one or more particular indications and fail to capitalize on indications that may be more profitable or for which there is a greater likelihood of success.***

Immunovant has limited financial and management resources. As a result, Immunovant may forego or delay pursuit of opportunities with other indications that later prove to have greater commercial potential. Immunovant's resource allocation decisions may cause Immunovant to fail to capitalize on viable commercial products or profitable market opportunities. Immunovant's spending on current and future development programs for specific indications may not yield any commercially viable products. Any such failures would adversely affect its business and results of operations.

***If Immunovant is unable to establish sales, marketing and distribution capabilities, either on its own or in collaboration with third parties, Immunovant may not be successful in commercializing its product candidate, if approved.***

Immunovant does not currently have any infrastructure for the sales, marketing, or distribution of any product, and the cost of establishing and maintaining such an organization may exceed the cost-effectiveness of doing so. In order to market any product that may be approved, Immunovant must build its sales, distribution, marketing, compliance, managerial and other nontechnical capabilities or make arrangements with third parties to perform these services. To achieve commercial success for any product for which Immunovant obtains marketing approval, Immunovant will need a sales and marketing organization.

Immunovant expects to build a focused sales, distribution and marketing infrastructure to market Immunovant's product candidate in the United States, if approved. There are significant expenses and risks involved with establishing Immunovant's own sales, marketing and distribution capabilities, including Immunovant's ability to hire, retain and appropriately incentivize qualified individuals, develop an appropriate compliance function, provide adequate training to sales and marketing personnel, and effectively manage geographically dispersed sales and marketing teams to generate sufficient demand. Any failure or delay in the development of Immunovant's internal sales, marketing and distribution capabilities could delay any product launch, which would adversely impact its commercialization. If the commercial launch of Immunovant's product candidate, if approved, for which Immunovant recruits a sales force and establishes marketing capabilities is delayed or does not occur for any reason, Immunovant would have prematurely or unnecessarily incurred these commercialization expenses. This may be costly, and Immunovant's investment would be lost if it cannot retain or reposition its sales and marketing personnel.

Factors that may inhibit Immunovant's efforts to commercialize its products on its own include:

- Immunovant's inability to recruit, train and retain adequate numbers of effective sales and marketing personnel;

- the inability of sales personnel to obtain access to physicians or attain adequate numbers of physicians to prescribe any drugs;

- the inability to obtain sufficient access and reimbursement for Immunovant's product candidate, if approved; and

- unforeseen costs and expenses associated with creating a sales and marketing organization.

If Immunovant is unable to build its own sales force or negotiate a collaborative relationship for the commercialization of any product candidate, Immunovant may be forced to delay potential commercialization or reduce the scope of Immunovant's sales or marketing activities. If Immunovant elects to increase Immunovant's expenditures to fund commercialization activities itself, Immunovant will need to obtain additional capital, which may not be available to Immunovant on acceptable terms, or at all. If Immunovant does not have sufficient funds, Immunovant will not be able to bring any product candidate to market or generate product revenue. Immunovant could enter into arrangements with collaborative partners at an earlier stage than otherwise would be ideal and Immunovant may be required to relinquish certain rights to Immunovant's product candidate or otherwise agree to terms unfavorable to Immunovant, any of which may have an adverse effect on Immunovant's business, operating results and prospects.

If Immunovant is unable to establish adequate sales, marketing, and distribution capabilities, either on Immunovant's own or in collaboration with third parties, Immunovant will not be successful in commercializing its product candidate and may not become profitable. Immunovant may be competing with many companies that currently have extensive and well-funded marketing and sales operations. Without an internal team or the support of a third party to perform marketing and sales functions, Immunovant may be unable to compete successfully against these more established companies.

***Immunovant plans to seek orphan drug designation for IMVT-1401, but it may be unable to obtain such designation or to maintain the benefits associated with orphan drug status, including market exclusivity, even if that designation is granted.***

Immunovant plans to seek orphan drug designation from the FDA for IMVT-1401 for the treatment of MG, GO and WAIHA and potentially in other orphan indications in which there is a medically plausible basis for its use, and it may seek orphan drug designation for IMVT-1401 in the E.U. Under the Orphan Drug Act, the FDA may designate a product as an orphan drug if it is intended to treat a rare disease or condition, defined as a patient population of fewer than 200,000 in the United States, or a patient population greater than 200,000 in the United States where there is no reasonable expectation that the cost of developing the drug will be recovered from sales in the United States. In the E.U., the European Medicine Agency's Committee for Orphan Medicinal Products grants orphan drug designation to promote the development of products that are intended for the diagnosis, prevention, or treatment of a life-threatening or chronically debilitating condition affecting not more than five in 10,000 persons in the E.U. Additionally, designation is granted for products intended for the diagnosis, prevention, or treatment of a life-threatening, seriously debilitating or serious and chronic condition when, without incentives, it is unlikely that sales of the drug in the E.U. would be sufficient to justify the necessary investment in developing the drug or biological product or where there is no satisfactory method of diagnosis, prevention, or treatment, or, if such a method exists, the medicine must be of significant benefit to those affected by the condition.

In the United States, orphan drug designation entitles a party to financial incentives such as opportunities for grant funding towards clinical trial costs, tax advantages, and user-fee waivers. After the FDA grants orphan drug designation, the generic identity of the drug and its potential orphan use are disclosed publicly by the FDA. In addition, if a product that has orphan drug designation from the FDA subsequently receives the first FDA approval for a particular active ingredient for the disease for which it has such designation, the product is entitled to orphan drug exclusivity, which means that the FDA may not approve any other applications, including a BLA, to market the same drug for the same indication for seven years, except in limited circumstances such as if the FDA finds that the holder of the orphan drug exclusivity has not shown that it can assure the availability of sufficient quantities of the orphan drug to meet the needs of patients with the disease or condition for which the drug was designated. Similarly, the FDA can subsequently approve a drug with the same active moiety for the same condition during the exclusivity period if the FDA concludes that the later drug is clinically superior, meaning the later drug is safer, more effective, or makes a major contribution to patient care. In the E.U., orphan drug designation entitles a party to financial incentives such as reduction of fees or fee waivers and ten years of market exclusivity following drug or biological product approval. This period may be reduced to six years if the orphan drug designation criteria are no longer met, including where it is shown that the product is sufficiently profitable not to justify maintenance of market exclusivity.

Although Immunovant intends to seek orphan drug designation for IMVT-1401 from the FDA, Immunovant may never receive such designation. Moreover, obtaining orphan drug designation for IMVT-1401 for the treatment of MG, GO or WAIHA does not mean Immunovant will be able to obtain such designation for any other indications. Even if Immunovant were to obtain orphan drug designation for IMVT-1401 from the FDA, Immunovant may not be the first to obtain marketing approval for any particular orphan indication due to the uncertainties associated with developing pharmaceutical products, and thus approval of IMVT-1401 could be blocked for seven years if another company obtains approval and orphan drug exclusivity for the same drug and same condition before Immunovant. If Immunovant does obtain exclusive marketing rights in the United States, they may be limited if Immunovant seeks approval for an indication broader than the orphan designated indication and may be lost if the FDA later determines that the request for designation was materially defective or if Immunovant is unable to assure sufficient quantities of the product to meet the needs of the relevant patients. Further, exclusivity may not effectively protect the product from competition because different drugs with different active moieties can be approved for the same condition, the same drugs can be approved for different indications and might then be used off-label in Immunovant's approved indication, and different drugs for the same condition may already be approved and commercially available. Orphan drug designation does not convey any advantage in, or shorten the duration of, the development or FDA review and approval process.

***If Immunovant obtains approval to commercialize its product outside of the United States, a variety of risks associated with international operations could adversely affect its business.***

If Immunovant's product candidate is approved for commercialization outside of the United States, Immunovant expects that it will be subject to additional risks related to entering into international business relationships, including:

- different regulatory requirements for drug approvals and rules governing drug commercialization in foreign countries;

- reduced or no protection of intellectual property rights;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign reimbursement, pricing and insurance regimes;

- foreign taxes;

- any foreign partners or collaborators not fulfilling their respective regulatory reporting requirements and any foreign regulatory authorities taking actions with respect to such failures, which would be reportable to the FDA;

- any foreign partners or collaborators not informing Immunovant of any new post-marketing safety signals in a timely manner;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- potential noncompliance with the FCPA, the U.K. Bribery Act or similar antibribery and anticorruption laws in other jurisdictions;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters including earthquakes, typhoons, floods and fires.

- Immunovant has no prior experience in commercializing any product, and many biopharmaceutical companies have found the process of marketing their products in foreign countries to be very challenging.

***Immunovant's current and future relationships with investigators, health care professionals, consultants, third-party payors, and customers are subject to applicable healthcare regulatory laws, which could expose Immunovant to penalties.***

Immunovant's business operations and current and future arrangements with investigators, healthcare professionals, consultants, third-party payors, patient support, charitable organizations and customers expose Immunovant to broadly applicable fraud and abuse and other healthcare laws and regulations. These laws regulate the business or financial arrangements and relationships through which Immunovant conducts its operations, including how Immunovant researches, markets, sells, and distributes any product for which it obtains marketing approval. Such laws include, among others:

- the federal Anti-Kickback Statute, which prohibits, among other things, persons and entities from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in cash or in kind, to induce or reward, or in return for, either the referral of an individual for, or the

43

**30**

purchase, lease, order or recommendation of, any good, facility, item or service, for which payment may be made, in whole or in part, under a federal healthcare program such as Medicare and Medicaid. The term "remuneration" has been broadly interpreted to include anything of value. Although there are a number of statutory exceptions and regulatory safe harbors protecting some common activities from prosecution, the exceptions and safe harbors are drawn narrowly. Practices that involve remuneration that may be alleged to be intended to induce prescribing, purchases or recommendations may be subject to scrutiny if they do not qualify for an exception or safe harbor. A person or entity does not need to have actual knowledge of the federal Anti-Kickback Statute or specific intent to violate it to have committed a violation; in addition, the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act. Violations of the federal Anti-Kickback Statute may result in civil monetary penalties up to $100,000 for each violation, plus up to three times the remuneration involved. Civil penalties for such conduct can further be assessed under the federal False Claims Act. Violations can also result in criminal penalties, including criminal fines and imprisonment of up to 10 years. Similarly, violations can result in exclusion from participation in government healthcare programs, including Medicare and Medicaid;

- the federal false claims laws, including the False Claims Act, which imposes criminal and civil penalties, including through civil whistleblower or qui tam actions, against individuals or entities for knowingly presenting, or causing to be presented, to the federal government, claims for payment that are false or fraudulent, knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or knowingly making or causing to be made, a false statement to avoid, decrease or conceal an obligation to pay money to the federal government. When an entity is determined to have violated the federal civil False Claims Act, the government may impose civil fines and penalties ranging from $11,181 to $22,363 for each false claim, plus treble damages, and exclude the entity from participation in Medicare, Medicaid and other federal healthcare programs;

- the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which imposes criminal and civil liability for, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program or making false or fraudulent statements relating to healthcare matters; similar to the federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH"), and their implementing regulations, which also impose obligations, including mandatory contractual terms, with respect to safeguarding the privacy, security, and transmission of individually identifiable health information on health plans, health care clearing houses, and most providers and their business associates, defined as independent contractors or agents of covered entities that create, receive or obtain protected health information in connection with providing a service for or on behalf of a covered entity;

- the federal Physician Payments Sunshine Act, which requires certain manufacturers of drugs, devices, biologics, and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually to the government information related to payments or other "transfers of value" made to physicians, certain other healthcare providers, and teaching hospitals, and requires applicable manufacturers and group purchasing organizations to report annually to the government ownership and investment interests held by the physicians described above and their immediate family members and payments or other "transfers of value" to such physician owners (covered manufacturers are required to submit reports to the government by the 90th day of each calendar year); and

- analogous state and foreign laws and regulations, such as state anti-kickback and false claims laws, which may apply to Immunovant's business practices, including but not limited to, research, distribution, sales, and marketing arrangements and claims involving healthcare items or services reimbursed by non-governmental third-party payors, including private insurers, or otherwise restrict payments that may be made to healthcare providers and other potential referral sources; and state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance

44

**31**

guidelines and the relevant compliance guidance promulgated by the federal government, and state laws that require drug manufacturers to report information related to payments and other transfers of value to physicians and other healthcare providers, marketing expenditures or drug pricing; and state and local laws require the registration of pharmaceutical sales representatives; and state and foreign laws governing the privacy and security of health information in some circumstances, many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts.

Efforts to ensure that Immunovant's current and future business arrangements with third parties will comply with applicable healthcare laws and regulations will involve substantial costs. It is possible that governmental authorities will conclude that Immunovant's business practices do not comply with current or future statutes, regulations, agency guidance or case law involving applicable healthcare laws. If Immunovant's operations are found to be in violation of any of these or any other health regulatory laws that may apply to Immunovant, Immunovant may be subject to significant penalties, including the imposition of significant civil, criminal and administrative penalties, damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal healthcare programs or similar programs in other countries or jurisdictions, contractual damages, reputational harm, diminished profits and future earnings, additional reporting requirements and oversight if Immunovant becomes subject to a corporate integrity agreement or similar agreement and curtailment or restructuring of Immunovant's operations, any of which could adversely affect Immunovant's ability to operate its business and its results of operations. Even the mere issuance of a subpoena or the fact of an investigation alone, regardless of the merit, may result in negative publicity, a drop in Immunovant's share price and other harm to Immunovant's business, financial condition and results of operations. Defending against any such actions can be costly, time-consuming and may require significant financial and personnel resources. Therefore, even if Immunovant is successful in defending against any such actions that may be brought against Immunovant, its business may be impaired.

***Changes in healthcare law and implementing regulations, as well as changes in healthcare policy, may impact Immunovant's business in ways that Immunovant cannot currently predict and may have a significant adverse effect on its business and results of operations.***

There have been, and continue to be, several legislative and regulatory changes and proposed changes regarding the healthcare system that could prevent or delay marketing approval of product candidates, restrict or regulate post-approval activities and affect Immunovant's ability to profitably sell any product candidates for which it obtains marketing approval. Among policy makers and payors in the United States there is significant interest in promoting changes in healthcare systems with the stated goals of containing healthcare costs, improving quality and/or expanding access and the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives.

The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010 (collectively, "the Affordable Care Act") substantially changed the way healthcare is financed by both the government and private insurers, and significantly impacts the U.S. pharmaceutical industry. The Affordable Care Act, among other things: (1) introduced a new average manufacturer price definition for drugs and biologics that are inhaled, infused, instilled, implanted or injected and not generally dispensed through retail community pharmacies; (2) increased the minimum Medicaid rebates owed by manufacturers under the Medicaid Drug Rebate Program and expanded rebate liability from fee-for-service Medicaid utilization to include the utilization of Medicaid managed care organizations as well; (3) established a branded prescription drug fee that pharmaceutical manufacturers of branded prescription drugs must pay to the federal government; (4) expanded the list of covered entities eligible to participate in the 340B drug pricing program by adding new entities to the program; (5) established a new Medicare Part D coverage gap discount program, in which manufacturers must agree to offer point-of-sale discounts (which through subsequent legislative amendments, will be increased to 70% from 50% starting in 2019) off negotiated prices of applicable branded drugs to eligible beneficiaries during their coverage gap period, as a condition for the manufacturer's outpatient drugs to be covered under Medicare Part D; (6) extended manufacturers' Medicaid rebate liability to covered drugs dispensed to individuals who are enrolled in Medicaid managed care organizations; (7) expanded eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to additional individuals, including individuals with income at or below 133% of the federal poverty level, thereby potentially increasing manufacturers' Medicaid rebate liability; (8) created a licensure framework for follow-on biologic products; and (9) established a Center for Medicare and Medicaid Innovation at the Centers for Medicare and Medicaid Services to test innovative payment and service delivery models to lower Medicare and Medicaid spending.

45

**32**

Since its enactment, there have been judicial and Congressional challenges to certain aspects of the Affordable Care Act, as well as recent efforts by the Trump administration to repeal or replace certain aspects of the Affordable Care Act. For example, the Tax Cuts and Jobs Act of 2017 ("TCJA"), was enacted, which includes a provision that repealed, effective January 1, 2019, the tax-based shared responsibility payment imposed by the Affordable Care Act on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate." On December 14, 2018, a U.S. District Court Judge in the Northern District of Texas ruled that the individual mandate is a critical and inseverable feature of the Affordable Care Act, and therefore, because it was repealed as part of the TCJA, the remaining provisions of the Affordable Care Act are invalid as well. While the Trump administration and CMS have both stated that the ruling will have no immediate effect, it is unclear how this decision, subsequent appeals, if any, and other efforts to repeal and replace the Affordable Care Act will impact the Affordable Care Act and Immunovant's business.

Other legislative changes have been proposed and adopted since the Affordable Care Act was enacted. These changes include aggregate reductions to Medicare payments to providers of 2% per fiscal year pursuant to the Budget Control Act of 2011 and subsequent laws, which began in 2013 and will remain in effect through 2027, unless additional Congressional action is taken. In January 2013, the American Taxpayer Relief Act of 2012 was signed into law, which, among other things, further reduced Medicare payments to several types of providers, including hospitals, imaging centers and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. New laws may result in additional reductions in Medicare and other healthcare funding, which may materially adversely affect customer demand and affordability for Immunovant's products and, accordingly, the results of Immunovant's financial operations. Also, there has been heightened governmental scrutiny recently over the manner in which pharmaceutical companies set prices for their marketed products, which have resulted in several Congressional inquiries and proposed federal legislation, as well as state efforts, designed to, among other things, bring more transparency to product pricing, reduce the cost of prescription drugs under Medicare, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drug products. At the federal level, the Trump administration's budget proposal for fiscal year 2019 contains further drug price control measures that could be enacted during the 2019 budget process or in other future legislation, including, for example, measures to permit Medicare Part D plans to negotiate the price of certain drugs under Medicare Part B, to allow some states to negotiate drug prices under Medicaid, and to eliminate cost sharing for generic drugs for low-income patients. Further, the Trump administration released a "Blueprint," or plan, to lower drug prices and reduce out of pocket costs of drugs that contains additional proposals to increase drug manufacturer competition, increase the negotiating power of certain federal healthcare programs, incentivize manufacturers to lower the list price of their products, and reduce the out of pocket costs of drug products paid by consumers. In September 2018, CMS announced that it will allow Medicare Advantage Plans the option to use step therapy for Part B drugs beginning January 1, 2019, and on January 31, 2019, the HHS Office Inspector General proposed modifications to the U.S. federal Anti-Kickback Statute discount safe harbor for the purpose of reducing the cost of drug products to consumers which, among other things, if finalized, will affect discounts paid by manufacturers to Medicare Part D plans, Medicaid managed care organizations and pharmacy benefit managers working with these organizations. Additionally, CMS issued a final rule, effective on July 9, 2019, that requires direct-to-consumer television advertisements of prescription drugs and biological products, for which payment is available through or under Medicare or Medicaid, to include in the advertisement the Wholesale Acquisition Cost, or list price, of that drug or biological product if it is equal to or greater than $35 for a monthly supply or usual course of treatment. Prescription drugs and biological products that are in violation of these requirements will be included on a public list. Congress and the Trump administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, individual states in the United States are increasingly active in passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing.

Immunovant expects that these and other healthcare reform measures that may be adopted in the future, may result in more rigorous coverage criteria and lower reimbursement, and in additional downward pressure on the price that Immunovant receives for any approved product. Any reduction in reimbursement from Medicare or other government-funded programs may result in a similar reduction in payments from private payors. The implementation of cost containment measures or other healthcare reforms may prevent Immunovant from being able to generate revenue, attain profitability or commercialize Immunovant's drugs, once marketing approval is obtained.

***Coverage and adequate reimbursement may not be available for Immunovant's product candidate, which could make it difficult for Immunovant to sell it profitably, if approved.***

Market acceptance and sales of any approved product that Immunovant develops will depend in part on the extent to which coverage and adequate reimbursement for these products and related treatments will be available from third-party payors, including government health administration authorities and private health insurers. There is no assurance that Immunovant's product candidate, if approved, would achieve adequate coverage and reimbursement levels.

In the United States, no uniform policy of coverage and reimbursement for products exists among third-party payors. Third-party payors decide which drugs they will pay for and establish reimbursement levels. Third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies. However, decisions regarding the extent of coverage and amount of reimbursement to be provided for any product candidates that Immunovant develops through approval will be made on a plan-by-plan basis. One payor's determination to provide coverage for a product does not assure that other payors will also provide coverage and adequate reimbursement for the product. Additionally, a third-party payor's decision to provide coverage for a drug does not imply that an adequate reimbursement rate will be approved. Each plan determines whether or not it will provide coverage for a drug, what amount it will pay the manufacturer for the drug, on what tier of its formulary the drug will be placed and whether to require step therapy. The position of a drug on a formulary generally determines the co-payment that a patient will need to make to obtain the drug and can strongly influence the adoption of a drug by patients and physicians. Patients who are prescribed treatments for their conditions and providers prescribing such services generally rely on third-party payors to reimburse all or part of the associated healthcare costs. Patients are unlikely to use Immunovant's products unless coverage is provided and reimbursement is adequate to cover a significant portion of the cost of Immunovant's products. Further, from time to time, typically on an annual basis, payment rates are updated and revised by third-party payors. Such updates could impact the demand for its products, to the extent that patients who are prescribed Immunovant's products, if approved, are not separately reimbursed for the cost of the product.

The process for determining whether a third-party payor will provide coverage for a product may be separate from the process for setting the price of a product or for establishing the reimbursement rate that such a payor will pay for the product. Even if Immunovant does obtain adequate levels of reimbursement, third-party payors, such as government or private healthcare insurers, carefully review and increasingly question the coverage of, and challenge the prices charged for, products. A primary trend in the U.S. healthcare industry and elsewhere is cost containment. Increasingly, third-party payors are requiring that pharmaceutical companies provide them with predetermined discounts from list prices and are challenging the prices charged for products. Immunovant may also be required to conduct expensive pharmacoeconomic studies to justify the coverage and the amount of reimbursement for particular medications. Immunovant cannot be sure that coverage and reimbursement will be available for any product that Immunovant commercializes and, if reimbursement is available, what the level of reimbursement will be. Inadequate coverage or reimbursement may impact the demand for, or the price of, any product for which Immunovant obtains marketing approval. If coverage and adequate reimbursement are not available, or are available only to limited levels, Immunovant may not be able to successfully commercialize any product candidates that it develops.

Additionally, there have been a number of legislative and regulatory proposals to change the healthcare system in the United States and in some foreign jurisdictions that could affect Immunovant's ability to sell any future drugs profitably. There can be no assurance that Immunovant's product candidate, if approved, will be considered medically reasonable and necessary, that it will be considered cost-effective by third-party payors, that coverage or an adequate level of reimbursement will be available, or that reimbursement policies and practices in the United States and in foreign countries where Immunovant's products are sold will not adversely affect Immunovant's ability to sell its product candidate profitably, if approved for sale.

47

**34**

**Risks Related to Immunovant's Dependence on Third Parties**

*Immunovant does not have its own manufacturing capabilities and will rely on third parties to produce clinical supplies and commercial supplies of its product candidate. The manufacture of biologics is complex and Immunovant or its third-party manufacturers may encounter difficulties in production that may delay or prevent Immunovant's ability to obtain marketing approval or commercialize Immunovant's product candidates, if approved.*

Immunovant has no experience in biologic manufacturing and does not own or operate, and Immunovant does not expect to own or operate, facilities for product manufacturing, storage and distribution or testing. Third-party vendors may be difficult to identify for Immunovant's product candidate process and formulation development and manufacturing due to special capabilities required, and they may not be able to meet Immunovant's quality standards. Any significant delay in the supply of a product candidate, or the raw material components thereof, or in placebo controls for an ongoing clinical trial due to the need to replace a third-party manufacturer could considerably delay completion of Immunovant's clinical trials, product testing and potential regulatory approval of IMVT-1401 or any future product candidate. If Immunovant or its manufacturers are unable to purchase these raw materials after regulatory approval has been obtained for any product candidate, the commercial launch of such product candidate would be delayed or there would be a shortage in supply, which would impair Immunovant's ability to generate revenue from the sale of such product candidate. In addition, IMVT-1401 is a biologic and requires processing steps that are more difficult than those required for most chemical pharmaceuticals. Accordingly, multiple steps are needed to control the manufacturing processes. Problems with these manufacturing processes, even minor deviations from the normal process or from the materials used in the manufacturing process, which may not be detectable by Immunovant in a timely manner, could lead to product defects or manufacturing failures, resulting in lot failures, product recalls, product liability claims and insufficient inventory.

The facilities used by Immunovant's contract manufacturers to manufacture Immunovant's product candidate must be approved by the FDA pursuant to inspections that will be conducted after Immunovant submit Immunovant's BLA to the FDA. Immunovant does not control the manufacturing process of, and are completely dependent on, Immunovant's contract manufacturing partners for compliance with cGMP requirements for manufacture of drug products. If Immunovant's contract manufacturers cannot successfully manufacture material that conforms to Immunovant's specifications and the strict regulatory requirements of the FDA or comparable foreign regulatory authorities, Immunovant will not be able to secure or maintain regulatory approval for its product candidates. In addition, Immunovant has no control over the ability of its contract manufacturers to maintain adequate quality control, quality assurance and qualified personnel. If the FDA or comparable foreign regulatory authorities do not approve these facilities for the manufacture of Immunovant's product candidate or if they withdraw any such approval in the future, Immunovant may need to find alternative manufacturing facilities, which could significantly impact Immunovant's ability to develop, obtain regulatory approval for or market Immunovant's product candidate, if approved. Further, Immunovant's reliance on third-party manufacturers entails risks, including:

- inability to meet Immunovant's product specifications and quality requirements consistently;

- delay or inability to procure or expand sufficient manufacturing capacity;

- manufacturing and product quality issues related to scale-up of manufacturing, which can be difficult for a biologic product;

- costs and validation of new equipment and facilities required for scale-up;

- failure to comply with applicable laws, regulations and standards, including cGMP and similar foreign standards; deficient or improper record-keeping;

- inability to negotiate manufacturing agreements with third parties under commercially reasonable terms;

- potential disputes with third parties that might delay work under third-party contracts;

- termination or nonrenewal of manufacturing agreements with third parties in a manner or at a time that is costly or damaging to Immunovant;

48

- reliance on a limited number of sources, and in some cases, single sources for product components, such that if Immunovant is unable to secure a sufficient supply of these product components, Immunovant will be unable to manufacture and sell any product candidate, if approved, in a timely fashion, in sufficient quantities or under acceptable terms;

- lack of qualified backup suppliers for those components that are currently purchased from a sole or single source supplier;

- operations of Immunovant's third-party manufacturers or suppliers could be disrupted by conditions unrelated to Immunovant's business or operations, including the bankruptcy of the manufacturer or supplier or other regulatory sanctions related to the manufacture of another company's products;

- carrier disruptions or increased costs that are beyond Immunovant's control; and

- failure to deliver Immunovant's products under specified storage conditions and in a timely manner.

Any of these events could lead to clinical trial delays, cost overruns, delay or failure to obtain regulatory approval or impact Immunovant's ability to successfully commercialize Immunovant's products, as well as potential product liability litigation, product recalls or product withdrawals. Some of these events could be the basis for FDA or other regulatory authority action, including injunction, recall, seizure, or total or partial suspension of production.

***Changes in methods of product candidate manufacturing or formulation may result in additional costs or delay.***

As product candidates proceed through preclinical studies to late-stage clinical trials towards potential approval and commercialization, it is common that various aspects of the development program, such as manufacturing methods and formulation, are altered along the way in an effort to optimize processes and results. Such changes carry the risk that they will not achieve these intended objectives. Any of these changes could cause IMVT-1401 or any future product candidate to perform differently and affect the results of ongoing and planned clinical trials or other future clinical trials conducted with the altered materials. Such changes may also require additional testing, FDA notification or FDA approval. This could delay completion of clinical trials, require the conduct of bridging clinical trials or the repetition of one or more clinical trials, increase clinical trial costs, delay approval of IMVT-1401 or any future product candidate or jeopardize Immunovant's ability to commence sales and generate revenue.

***Immunovant is reliant on third parties to conduct, supervise and monitor its clinical trials, and if those third parties perform in an unsatisfactory manner or fail to comply with applicable requirements, it may harm Immunovant's business.***

Immunovant currently does not have the ability to independently conduct preclinical studies that comply with Good Laboratory Practice ("GLP") requirements. Immunovant also does not currently have the ability to independently conduct any clinical trials. Immunovant relies exclusively on CROs and clinical trial sites, which need to comply with GCP, to ensure the proper and timely conduct of Immunovant's clinical trials, and Immunovant has limited influence over their actual performance.

Immunovant relies upon CROs to monitor and manage data for its clinical programs, as well as for the execution of preclinical studies. Immunovant controls only certain aspects of Immunovant's CROs' activities. Nevertheless, Immunovant is responsible for ensuring that each of its studies is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards, and Immunovant's reliance on the CROs does not relieve Immunovant of Immunovant's regulatory responsibilities.

Immunovant and its CROs are required to comply with GLP and GCP regulations and guidelines enforced by the FDA, and are also required by the competent authorities of the member states of the European Economic Area and other comparable foreign regulatory authorities to comply with the International Council for Harmonization guidelines for any of Immunovant's product candidates that are in preclinical and clinical development. The regulatory authorities enforce GCP regulations through periodic inspections of trial sponsors, principal investigators and clinical trial sites. Although Immunovant relies on CROs to conduct Immunovant's GLP-compliant preclinical studies and GCP-compliant clinical trials, Immunovant remains responsible for ensuring that each of Immunovant's GLP preclinical studies and GCP clinical trials is conducted in accordance with its investigational plan and protocol and applicable laws and regulations, and Immunovant's reliance on the CROs does not relieve Immunovant of Immunovant's regulatory responsibilities. If Immunovant or its CROs fail to comply with GCP requirements, the

clinical data generated in Immunovant's clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may reject Immunovant's marketing applications or require Immunovant to perform additional clinical trials before approving Immunovant's marketing applications. Accordingly, if Immunovant or its CROs fail to comply with these regulations or other applicable laws, regulations or standards, or fail to recruit a sufficient number of subjects, Immunovant may be required to repeat clinical trials, which would delay the relevant regulatory approval process. Failure by Immunovant's CROs to properly execute study protocols in accordance with applicable law could also create product liability and healthcare regulatory risks for Immunovant as sponsors of those studies.

While Immunovant will have agreements governing their activities, Immunovant's CROs are not Immunovant's employees, and Immunovant will not control whether or not they devote sufficient time and resources to Immunovant's future clinical and preclinical programs. These CROs may also have relationships with other commercial entities, including Immunovant's competitors, for whom they may also be conducting clinical trials, or other drug development activities, which could harm Immunovant's competitive position. Immunovant faces the risk of potential unauthorized disclosure or misappropriation of Immunovant's intellectual property by CROs, which may reduce Immunovant's trade secret and intellectual property protection and allow Immunovant's potential competitors to access and exploit Immunovant's proprietary technology. If Immunovant's CROs do not successfully carry out their contractual duties or obligations, fail to meet expected deadlines, or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to Immunovant's (or their own) clinical protocols or regulatory requirements or for any other reasons, Immunovant's clinical trials may be extended, delayed or terminated, and Immunovant may not be able to obtain regulatory approval for, or successfully commercialize any product candidate that Immunovant develops. As a result, Immunovant's financial results and the commercial prospects for any product candidate that Immunovant develops could be harmed, Immunovant's costs could increase and Immunovant's ability to generate revenue could be delayed.

If Immunovant's relationships with these CROs terminate, Immunovant may not be able to enter into arrangements with alternative CROs or do so on commercially reasonable terms or in a timely manner. Switching or adding additional CROs involves substantial cost and requires management time and focus. In addition, there is a natural transition period when a new CRO commences work. As a result, delays occur, which could adversely impact Immunovant's ability to meet Immunovant's desired clinical development timelines. Though Immunovant carefully manages Immunovant's relationships with its CROs, there can be no assurance that Immunovant will not encounter challenges or delays in the future or that these delays or challenges will not have an adverse impact on its business, financial condition and prospects.

**Risks Related to Immunovant's Intellectual Property**

***Immunovant's product candidate for which it intends to seek approval as a biologic product may face competition sooner than anticipated.***

In the United States, the Biologics Price Competition and Innovation Act of 2009 ("BPCIA") created an abbreviated approval pathway for biological products that are biosimilar to or interchangeable with an FDA-licensed reference biological product. New biologics, such as IMVT-1401, may be entitled to regulatory exclusivity under the BPCIA. The BPCIA grants new biologics 12 years of FDA-granted exclusivity. Further, under the BPCIA, an application for a biosimilar product may not be submitted to the FDA until four years following the date that the reference product was first licensed by the FDA. During the period of exclusivity, however, another company may still market a competing version of the reference product if the FDA approves a full BLA for the competing product containing the sponsor's own preclinical data and data from adequate and well-controlled clinical trials to demonstrate the safety, purity and potency of their product. After the expiration of the exclusivity period, the FDA can approve a biosimilar product through an abbreviated approval process. The law is complex and is still being interpreted and implemented by the FDA. As a result, its ultimate impact, implementation and meaning are subject to uncertainty.

Immunovant believes that its product candidate, as a biological product, should qualify for the 12-year period of exclusivity. However, there is a risk that this exclusivity could be shortened due to congressional action or otherwise, or that the FDA will not consider Immunovant's product candidate to be a reference product for competing products, potentially creating the opportunity for generic competition sooner than anticipated. Other aspects of the BPCIA, some of which may impact the BPCIA exclusivity provisions, have also been the subject of recent litigation. Moreover, the extent to which a biosimilar, once approved, will be substituted for any one of Immunovant's reference products in a way that is similar to traditional generic substitution for non-biological products is not yet clear, and will depend on a number of marketplace and regulatory factors that are still developing.

50

37

***If Immunovant is unable to obtain and maintain patent protection for IMVT-1401 or any future product candidates, or if the scope of the patent protection obtained is not sufficiently broad, Immunovant may not be able to compete effectively in Immunovant's markets.***

Immunovant relies, and will continue to rely, upon a combination of patents, trademarks, trade secret protection and confidentiality agreements with employees, consultants, collaborators, advisors and other third parties to protect the intellectual property related to Immunovant's brand, current and future drug development programs and product candidate. Immunovant's success depends in large part on Immunovant's ability to obtain and maintain patent protection in the United States and other countries with respect to IMVT-1401 and any future product candidates. Immunovant seeks to protect Immunovant's proprietary position by filing patent applications in the United States and abroad related to Immunovant's current and future drug development programs and product candidates, successfully defending Immunovant's intellectual property rights against third-party challenges and successfully enforcing Immunovant's intellectual property rights to prevent third-party infringement. The patent prosecution process is expensive and time-consuming, and Immunovant may not be able to file and prosecute all necessary or desirable patent applications at a reasonable cost or in a timely manner.

It is also possible that Immunovant will fail to identify patentable aspects of Immunovant's research and development output before it is too late to obtain patent protection. Immunovant may choose not to seek patent protection for certain innovations or products and may choose not to pursue patent protection in certain jurisdictions, and under the laws of certain jurisdictions, patents or other intellectual property rights may be unavailable or limited in scope and, in any event, any patent protection Immunovant obtains may be limited. Immunovant generally applies for patents in those countries where Immunovant intends to make, have made, use, offer for sale, or sell products and where Immunovant assess the risk of infringement to justify the cost of seeking patent protection. However, Immunovant does not seek protection in all countries where Immunovant intends to sell products and Immunovant may not accurately predict all the countries where patent protection would ultimately be desirable. If Immunovant fails to timely file a patent application in any such country or major market, Immunovant may be precluded from doing so at a later date. The patent applications that Immunovant in-license may fail to result in issued patents with claims that cover Immunovant's product candidate in the United States or in other foreign countries. Immunovant may also make statements to regulatory agencies during the regulatory approval process that may be inconsistent with positions that have been taken during prosecution of Immunovant's patents, which may result in such patents being narrowed, invalidated or held unenforceable.

The patents and patent applications that Immunovant in-license may fail to result in issued patents with claims that protect Immunovant's product candidate in the United States or in other foreign countries. Immunovant cannot guarantee any current or future patents will provide Immunovant with any meaningful protection or competitive advantage. There is no assurance that all of the potentially relevant prior art relating to Immunovant's patents and patent applications has been found, which can prevent a patent from issuing from a pending patent application, or be used to invalidate an issued patent. The examination process may require Immunovant to narrow Immunovant's claims, which may limit the scope of any patent protection Immunovant obtains. Even if patents do successfully issue based on Immunovant's patent applications, and even if such patents cover its product candidate, uses of Immunovant's product candidate or other aspects related to its product candidate, third parties may challenge their validity, ownership, enforceability or scope, which may result in such patents being narrowed, invalidated or held unenforceable or circumvented, any of which could limit Immunovant's ability to prevent competitors and other third parties from developing and marketing similar products or limit the length of terms of patent protection Immunovant may have for Immunovant's product candidate, if approved, and technologies. Other companies may also design around Immunovant's patents. Third parties may have blocking patents that could prevent Immunovant from marketing Immunovant's product candidate, if approved, or practicing Immunovant's own patented technology. Further, if Immunovant encounters delays in regulatory approvals, the period of time during which Immunovant could market a product candidate while under patent protection could be reduced. If any of Immunovant's patents expire or are challenged, invalidated, circumvented or otherwise limited by third parties prior to the commercialization of Immunovant's product candidate, and if Immunovant does not own or have exclusive rights to other enforceable patents protecting Immunovant's product candidate, competitors and other third parties could market products that are substantially similar, or superior, to it and Immunovant's business would suffer.

If the patent applications Immunovant holds or has in-licensed with respect to Immunovant's development programs and product candidates fail to issue, if their breadth or strength of protection is threatened, or if they fail to provide meaningful exclusivity for its product candidate, it could dissuade companies from collaborating with Immunovant

51

**38**

to develop its product candidate, and threaten Immunovant's ability to commercialize future drugs. Any such outcome could have an adverse effect on Immunovant's business. Immunovant's pending patent applications cannot be enforced against third parties practicing the technology claimed in such applications unless and until a patent issues from such applications.

The patent position of biotechnology and pharmaceutical companies is generally highly uncertain, involves complex legal, scientific and factual questions, and has in recent years been the subject of much litigation. The standards that the U.S. Patent and Trademarks Office (the "USPTO"), and its foreign counterparts use to grant patents are not always applied predictably or uniformly. In addition, the laws of foreign countries may not protect Immunovant's rights to the same extent as the laws of the United States, and many companies have encountered significant problems in protecting and defending such rights in foreign jurisdictions.

Patent reform legislation in the United States could increase those uncertainties and costs surrounding the prosecution of Immunovant's patent applications and the enforcement or defense of Immunovant's issued patents. For example, the Leahy Smith America Invents Act (the "Leahy-Smith Act"), was signed into law in 2011 and includes a number of significant changes to U.S. patent law. These include provisions that affect the way patent applications are prosecuted, redefine prior art and provide more efficient and cost-effective avenues for competitors to challenge the validity of patents. These include allowing third-party submission of prior art to the USPTO during patent prosecution and additional procedures to attack the validity of a patent by USPTO administered post-grant proceedings, including post-grant review, inter partes review, and derivation proceedings. After March 2013, under the Leahy-Smith Act, the United States transitioned to a first inventor to file system in which, assuming that the other statutory requirements are met, the first inventor to file a patent application will be entitled to the patent on an invention regardless of whether a third party was the first to invent the claimed invention.

Publications of discoveries in scientific literature often lag behind the actual discoveries, and patent applications in the United States and other jurisdictions are typically not published until 18 months after filing, or in some cases not at all. Therefore, Immunovant cannot know with certainty whether Immunovant was the first to make the inventions claimed in Immunovant's owned or licensed patents or pending patent applications, or that Immunovant was the first to file for patent protection of such inventions. As a result, the issuance, scope, validity, enforceability and commercial value of Immunovant's patent rights are highly uncertain. Immunovant's pending and future patent applications may not result in patents being issued which protect IMVT-1401 or any future product candidates, in whole or in part, or which effectively prevent others from commercializing competitive products. Changes in either the patent laws or interpretation of the patent laws in the United States and other countries may diminish the value of Immunovant's patents or narrow the scope of its patent protection.

Moreover, Immunovant may be subject to a third-party pre-issuance submission of prior art to the USPTO or become involved in opposition, derivation, reexamination, inter partes review, post-grant review or interference proceedings challenging Immunovant's owned or licensed patent rights. An adverse determination in any such submission, proceeding or litigation could reduce the scope of, or invalidate, Immunovant's patent rights, allow third parties to commercialize IMVT-1401 or any future product candidates and compete directly with Immunovant, without payment to Immunovant, or result in Immunovant's inability to manufacture or commercialize products without infringing third-party patent rights. In addition, if the breadth or strength of protection provided by Immunovant's patents and patent applications is threatened, it could dissuade companies from collaborating with Immunovant to license, develop or commercialize IMVT-1401 or any future product candidates.

The issuance of a patent is not conclusive as to its inventorship, scope, validity or enforceability, and Immunovant's owned and licensed patents may be challenged in the courts or patent offices, both in the United States and abroad. Such challenges may result in loss of exclusivity or in patent claims being narrowed, invalidated or held unenforceable, in whole or in part, which could limit Immunovant's ability to stop others from using or commercializing similar or identical products, or limit the duration of the patent protection of Immunovant's products. Moreover, patents have a limited lifespan. In the United States, if all maintenance fees are timely paid, the natural expiration of a patent is generally 20 years from its earliest U.S. non-provisional filing date. In certain instances, the patent term may be adjusted to add additional days to compensate for delays incurred by the USPTO in issuing the patent. Also, the patent term may be extended for a period of time to compensate for at least a portion of the time a product candidate was undergoing FDA regulatory review. However, the life of a patent, and the protection it affords, is limited. Without patent protection for IMVT-1401 or any future product candidates, Immunovant may be open to competition from generic versions of such products. Given the amount of time required for the development,

52

**39**

testing and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, Immunovant's owned and licensed patent portfolio may not provide Immunovant with sufficient rights to exclude others from commercializing similar or identical products.

***The validity, scope and enforceability of any patents that cover a biologic subject to approval by the FDA via a BLA, such as IMVT-1401, can be challenged by third parties.***

For biologics subject to approval by the FDA via a BLA, such as IMVT-1401, the BPCIA provides a mechanism for one or more third parties to seek FDA approval to manufacture or sell a biosimilar or interchangeable versions of brand name biological products. Due to the large size and complexity of biological products, as compared to small molecules, a biosimilar must be "highly similar" to the reference product with "no clinically meaningful differences between the two." The BPCIA does not require reference product sponsors to list patents in an Orange Book and does not include an automatic 30-month stay of FDA approval upon the timely filing of a lawsuit. The BPCIA, however, does require a formal pre-litigation process which includes the exchange of information between a biosimilar applicant and a reference biologic sponsor that includes the identification of relevant patents and each parties' basis for infringement and invalidity. After the exchange of this information, Immunovant may then initiate a lawsuit within 30 days to defend the patents identified in the exchange. If the biosimilar applicant successfully challenges the asserted patent claims it could result in the invalidation of, or render unenforceable, some or all of the relevant patent claims or result in a finding of non-infringement. Such litigation or other proceedings to enforce or defend intellectual property rights are often very complex in nature, may be very expensive and time-consuming, may divert Immunovant's management's attention from its core business, and may result in unfavorable results that could limit Immunovant's ability to prevent third parties from competing with IMVT-1401 or any future product candidates.

***Immunovant may not be able to protect its intellectual property rights throughout the world.***

Filing, prosecuting and defending patents on Immunovant's product candidate in all countries throughout the world would be prohibitively expensive, and even in countries where Immunovant has sought protection for its intellectual property, such protection may be less extensive than that provided in the United States. The requirements for patentability may differ in certain countries, particularly developing countries, and the breadth of patent claims allowed can be inconsistent. In addition, the laws of some foreign countries do not protect patent rights to the same extent as federal laws in the United States. Consequently, Immunovant may not be able to prevent third parties from practicing Immunovant's inventions in all countries outside the United States, or from selling or importing products made using Immunovant's inventions in and into the United States or other jurisdictions. Competitors may exploit Immunovant's inventions in jurisdictions where Immunovant has not obtained patent protection to develop their own products and may also export otherwise infringing products to territories where Immunovant has patent protection, but where enforcement is not as strong as that in the United States. These products may compete with Immunovant's products and Immunovant's patents or other intellectual property rights may not be effective or sufficient to prevent them from competing.

Immunovant does not have patent rights in certain foreign countries in which a market may exist. Moreover, in foreign jurisdictions where Immunovant may obtain patent rights, proceedings to enforce such rights could result in substantial costs and divert Immunovant's efforts and attention from other aspects of Immunovant's business, could put Immunovant's patents at risk of being invalidated or interpreted narrowly, and Immunovant's patent applications at risk of not issuing. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents, trade secrets, and other intellectual property protection, particularly those relating to biotechnology products, which could make it difficult for Immunovant to stop the infringement of Immunovant's patents or marketing of competing products in violation of Immunovant's proprietary rights generally. Proceedings to enforce Immunovant's patent rights in foreign jurisdictions, whether or not successful, could result in substantial costs and divert Immunovant's efforts and attention from other aspects of Immunovant's business, could put Immunovant's patents at risk of being invalidated or interpreted narrowly, could put Immunovant's patent applications at risk of not issuing and could provoke third parties to assert claims against Immunovant. Additionally, such proceedings could provoke third parties to assert claims against Immunovant. Immunovant may not prevail in any lawsuits that it initiates and the damages or other remedies awarded, if any, may not be commercially meaningful. Thus, Immunovant may not be able to stop a competitor from marketing and selling in foreign countries products and services that are the same as or similar to Immunovant's products and services, and Immunovant's competitive position in the international market would be harmed.

53

**40**

Many countries, including E.U. countries have compulsory licensing laws under which a patent owner may be compelled under specified circumstances to grant licenses to third parties. In those countries, Immunovant may have limited remedies if patents are infringed or if Immunovant is compelled to grant a license to a third party, which could materially diminish the value of those patents. This could limit Immunovant's potential revenue opportunities. Accordingly, Immunovant's efforts to enforce Immunovant's intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that Immunovant develops or licenses.

***Patent terms may be inadequate to protect Immunovant's competitive position on Immunovant's product candidate for an adequate amount of time.***

Patents have a limited lifespan. In the United States, if all maintenance fees are timely paid, the natural expiration of a patent is generally 20 years from its earliest U.S. non-provisional filing date. In certain instances, the patent term may be adjusted to add additional days to compensate for delays incurred by the USPTO in issuing the patent. Also, the patent term may be extended for a period of time to compensate for at least a portion of the time a product candidate was undergoing FDA regulatory review. However, the life of a patent, and the protection it affords, is limited. Even if patents covering Immunovant's product candidate are obtained, once the patent life has expired, Immunovant may be open to competition from competitive products, including generics or biosimilars. The patent family directed to the composition of matter of IMVT-1401 has a natural projected expiration date in 2035 in the United States and in foreign jurisdictions. Given the amount of time required for the development, testing and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, Immunovant's owned and licensed patent portfolio may not provide Immunovant with sufficient rights to exclude others from commercializing products similar or identical to it.

***If Immunovant is not able to obtain patent term extension in the United States under the Hatch-Waxman Act and in foreign countries under similar legislation, thereby potentially extending the term of Immunovant's marketing exclusivity for IMVT-1401 or other product candidates that Immunovant may identify, its business may be harmed.***

Immunovant's commercial success will largely depend on its ability to obtain and maintain patent and other intellectual property rights in the United States and other countries with respect to Immunovant's proprietary technology, product candidate and Immunovant's target indications. Given the amount of time required for the development, testing and regulatory review of new product candidates, patents protecting Immunovant's product candidate might expire before or shortly after such candidates begin to be commercialized. Depending upon the timing, duration and specifics of FDA marketing approval of IMVT-1401 or other product candidates that Immunovant may identify, one of the U.S. patents covering each of such product candidates or the use thereof may be eligible for up to five years of patent term extension under the Hatch-Waxman Act. The Hatch-Waxman Act allows a maximum of one patent to be extended per FDA approved product as compensation for the patent term lost during the FDA premarket regulatory review process. A patent term extension cannot extend the remaining term of a patent beyond a total of 14 years from the date of product approval, and only claims covering such approved drug product, a method for using it or a method for manufacturing it may be extended. Patent term extension also may be available in certain foreign countries, including the E.U., upon regulatory approval of Immunovant's product candidates, based on similar legislation. Nevertheless, Immunovant may not be granted patent term extension either in the United States or in any foreign country because of, for example, failing to exercise due diligence during the testing phase or regulatory review process, failing to apply within applicable deadlines, failing to apply prior to expiration of relevant patents or otherwise failing to satisfy applicable requirements. Moreover, the term of extension, as well as the scope of patent protection during any such extension, afforded by the governmental authority could be less than Immunovant requests.

If Immunovant is unable to obtain patent term extension, or the term of any such extension is less than Immunovant requests, the period during which Immunovant will have the right to exclusively market its product may be shortened and Immunovant's competitors may obtain approval to market competing products sooner, and Immunovant's revenue could be reduced, possibly materially.

It is possible that Immunovant will not obtain patent term extension under the Hatch-Waxman Act for a U.S. patent covering IMVT-1401 or other product candidates that Immunovant may identify even where that patent is eligible for patent term extension, or if Immunovant obtains such an extension, it may be for a shorter period than Immunovant

54

**41**

had sought. Further, for patents Immunovant may later in-license or jointly own, Immunovant may not have the right to control patent prosecution, including filing with the USPTO a petition for patent term extension under the Hatch-Waxman Act. Thus, if one of these patents was eligible for patent term extension under the Hatch-Waxman Act, Immunovant might not be able to control whether a petition to obtain a patent term extension would be filed, or obtained, from the USPTO.

***Immunovant does not have rights to protect or enforce intellectual property rights in certain territories and jurisdictions.***

Immunovant does not have rights to develop, manufacture, use or commercialize IMVT-1401 or file or enforce patents relating to these assets in territories other than the United States, Canada, Mexico, the E.U., the U.K., Switzerland, the Middle East, North Africa and Latin America, as such rights in other jurisdictions have been retained by HanAll or licensed by HanAll to third parties. One or more third parties may challenge the current patents, or patents that may issue in the future, in such territories for which HanAll retains rights or has licensed out rights to defend and enforce such patents. HanAll may not coordinate the defense and enforcement of such patents with Immunovant, which could impair Immunovant's ability to defend or enforce corresponding patents in other jurisdictions.

***If Immunovant fails to comply with its obligations under any license, collaboration or other agreements, Immunovant may be required to pay damages and could lose intellectual property rights that are necessary for developing and protecting Immunovant's product candidate.***

Immunovant has licensed certain intellectual property rights covering IMVT-1401 from HanAll. Immunovant is heavily dependent on the HanAll Agreement for the development, manufacture and commercialization of Immunovant's product candidate. If, for any reason, Immunovant's licenses under the HanAll Agreement are terminated or Immunovant otherwise lose those rights, it could adversely affect Immunovant's business. The HanAll Agreement imposes, and any future collaboration agreements or license agreements Immunovant enters into are likely to impose various development, commercialization, funding, milestone payment, royalty, diligence, sublicensing, insurance, patent prosecution and enforcement or other obligations on Immunovant. If Immunovant breaches any material obligations, or use the intellectual property licensed to Immunovant in an unauthorized manner, Immunovant may be required to pay damages and HanAll, as the licensor, may have the right to terminate the license, which could result in Immunovant being unable to develop, manufacture and sell products that are covered by the licensed technology, or having to negotiate new or reinstated licenses on less favorable terms, or enable a competitor to gain access to the licensed technology.

Moreover, disputes may arise regarding intellectual property subject to a licensing agreement, including:

- the scope of rights granted under the license agreement and other interpretation-related issues;

- the extent to which Immunovant's product candidates, technology and processes infringe on intellectual property of the licensor that is not subject to the licensing agreement;

- the sublicensing of patent and other rights under Immunovant's third-party relationships;

- Immunovant's diligence obligations under the license agreement and what activities satisfy those diligence obligations;

- the inventorship and ownership of inventions and know-how resulting from the joint creation or use of intellectual property by Immunovant, its licensors and its partners; and

- the priority of invention of patented technology.

In addition, the agreement under which Immunovant currently licenses intellectual property or technology from HanAll is complex, and certain provisions in the agreement may be susceptible to multiple interpretations. The resolution of any contract interpretation disagreement that may arise could narrow what Immunovant believes to be the scope of Immunovant's rights to the relevant intellectual property or technology, or increase what Immunovant believes to be Immunovant's financial or other obligations under the relevant agreement, either of which could have a material adverse effect on Immunovant's business, financial condition, results of operations, and prospects. Moreover, if disputes over intellectual property that Immunovant has licensed prevent or impair Immunovant's ability

55

**42**

to maintain its current licensing arrangements on commercially acceptable terms, Immunovant may be unable to successfully develop and commercialize the affected product candidate, which could have a material adverse effect on its business, financial conditions, results of operations, and prospects.

***Obtaining and maintaining Immunovant's patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and Immunovant's patent protection could be reduced or eliminated for noncompliance with these requirements.***

Periodic maintenance fees on any issued patent are due to be paid to the USPTO and other foreign patent agencies in several stages over the lifetime of the patent. The USPTO and various foreign national or international patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. While an inadvertent lapse can in many cases be cured by payment of a late fee or by other means in accordance with the applicable rules, there are situations in which noncompliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. Noncompliance events that could result in abandonment or lapse of patent rights include, but are not limited to, failure to timely file national and regional stage patent applications based on Immunovant's international patent application, failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents. If Immunovant or its licensors fail to maintain the patents and patent applications covering Immunovant's product candidate, Immunovant's competitors might be able to enter the market earlier than anticipated, which would have an adverse effect on Immunovant's business.

***Immunovant may need to license intellectual property from third parties, and such licenses may not be available or may not be available on commercially reasonable terms.***

A third party may hold intellectual property, including patent rights that are important or necessary to the development of Immunovant's product candidate. It may be necessary for Immunovant to use the patented or proprietary technology of third parties to commercialize IMVT-1401 or any future product candidates, in which case Immunovant would be required to obtain a license from these third parties on commercially reasonable terms. Such a license may not be available, or it may not be available on commercially reasonable terms. Immunovant's business would be harmed if it is not able to obtain such a license on commercially reasonable terms or at all, or if a non-exclusive license is offered and Immunovant's competitors gain access to the same technology.

The risks described elsewhere pertaining to Immunovant's intellectual property rights also apply to the intellectual property rights that Immunovant in-license, and any failure by Immunovant or Immunovant's licensors to obtain, maintain, defend and enforce these rights could have an adverse effect on Immunovant's business. In some cases Immunovant may not have control over the prosecution, maintenance or enforcement of the patents that Immunovant licenses, and may not have sufficient ability to provide input into the patent prosecution, maintenance and defense process with respect to such patents, and Immunovant's licensors may fail to take the steps that Immunovant believes are necessary or desirable in order to obtain, maintain, defend and enforce the licensed patents.

***Third-party claims or litigation alleging infringement of patents or other proprietary rights, or seeking to invalidate patents or other proprietary rights, may delay or prevent the development and commercialization of Immunovant's product candidate.***

Immunovant's commercial success depends in part on Immunovant's ability to operate while avoiding infringement and other violations of the patents and proprietary rights of third parties. However, Immunovant's research, development and commercialization activities may be subject to claims that Immunovant infringes or otherwise violate patents or other intellectual property rights owned or controlled by third parties. There is a substantial amount of litigation, both within and outside the United States, involving patent and other intellectual property rights in the biotechnology and pharmaceutical industries, including patent infringement lawsuits, interferences, derivation and administrative law proceedings, inter partes review and post-grant review before the USPTO, as well as oppositions and similar processes in foreign jurisdictions. Immunovant's competitors in both the United States and abroad, many of which have substantially greater resources and have made substantial investments in patent portfolios and competing technologies, may have applied for or obtained or may in the future apply for or obtain, patents that will prevent, limit or otherwise interfere with Immunovant's ability to make, use and sell, if approved, Immunovant's product candidate. Numerous United States and foreign issued patents and pending patent applications, which are owned by third parties, exist in the fields in which Immunovant and Immunovant's collaborators are developing a

56

**43**

product candidate. As the biotechnology and pharmaceutical industries expand and more patents are issued, and as Immunovant gains greater visibility and market exposure as a public company, the risk increases that Immunovant's product candidate or other business activities may be subject to claims of infringement of the patent and other proprietary rights of third parties. Third parties may assert that Immunovant is infringing their patents or employing their proprietary technology without authorization.

There may be third-party patents or patent applications with claims to materials, formulations, methods of manufacture or methods for treatment related to the use or manufacture of Immunovant's product candidate. Because patent applications can take many years to issue, there may be currently pending patent applications that may later result in issued patents that Immunovant's product candidate may infringe. In addition, third parties may obtain patents in the future and claim that use of Immunovant's technologies infringes upon these patents. If any third-party patents were held by a court of competent jurisdiction to cover the manufacturing process of Immunovant's product candidate, any molecules formed during the manufacturing process or any final product itself, the holders of any such patents may be able to block Immunovant's ability to commercialize such product candidate unless Immunovant obtained a license under the applicable patents, or until such patents expire. Similarly, if any third-party patent was to be held by a court of competent jurisdiction to cover aspects of Immunovant's formulations, processes for manufacture or methods of use, including combination therapy, the holders of any such patent may be able to block Immunovant's ability to develop and commercialize the applicable product candidate unless Immunovant obtained a license or until such patent expires. In either case, such a license may not be available on commercially reasonable terms or at all. In addition, Immunovant may be subject to claims that Immunovant is infringing other intellectual property rights, such as trademarks or copyrights, or misappropriating the trade secrets of others, and to the extent that Immunovant's employees, consultants or contractors use intellectual property or proprietary information owned by others in their work for Immunovant, disputes may arise as to the rights in related or resulting know-how and inventions.

Parties making claims against Immunovant may obtain injunctive or other equitable relief, which could effectively block Immunovant's ability to further develop and commercialize its product candidate. Defending these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from Immunovant's business. In the event of a successful infringement or other intellectual property claim against Immunovant, Immunovant may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, obtain one or more licenses from third parties, pay royalties or redesign Immunovant's affected products, which may be impossible or require substantial time and monetary expenditure. Immunovant cannot predict whether any such license would be available at all or whether it would be available on commercially reasonable terms. Furthermore, even in the absence of litigation, Immunovant may need to obtain licenses from third parties to advance Immunovant's research or allow commercialization of its product candidate. Immunovant may fail to obtain any of these licenses at a reasonable cost or on reasonable terms, if at all. In that event, Immunovant would be unable to further develop and commercialize its product candidate, which could harm Immunovant's business significantly. Claims that Immunovant has misappropriated the confidential information or trade secrets of third parties could have a similar negative impact on Immunovant's business.

Some of Immunovant's competitors may be able to sustain the costs of complex intellectual property litigation more effectively than Immunovant can because they have substantially greater resources. In addition, intellectual property litigation, regardless of its outcome, may cause negative publicity, adversely impact prospective customers, cause product shipment delays, or prohibit Immunovant from manufacturing, importing, marketing or otherwise commercializing Immunovant's products. Any uncertainties resulting from the initiation and continuation of any litigation could have a material adverse effect on Immunovant's ability to raise additional funds or otherwise have a material adverse effect on Immunovant's business, results of operation, financial condition or cash flows.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of Immunovant's confidential information could be compromised by disclosure during this type of litigation.

Immunovant cannot provide any assurances that third-party patents do not exist which might be enforced against Immunovant's product candidates, resulting in either an injunction prohibiting Immunovant's sales, or, with respect to its sales, an obligation on Immunovant's part to pay royalties or other forms of compensation to third parties.

57

**44**

***Immunovant may not identify relevant third-party patents or may incorrectly interpret the relevance, scope or expiration of a third-party patent, which might adversely affect Immunovant's ability to develop and market its products.***

Immunovant cannot guarantee that any of Immunovant's or its licensors' patent searches or analyses, including the identification of relevant patents, the scope of patent claims or the expiration of relevant patents, are complete or thorough, nor can Immunovant be certain that Immunovant has identified each and every third-party patent and pending application in the United States and abroad that is or may be relevant to or necessary for the commercialization of Immunovant's product candidate in any jurisdiction. Patent applications in the United States and elsewhere are not published until approximately 18 months after the earliest filing for which priority is claimed, with such earliest filing date being commonly referred to as the priority date. In addition, U.S. patent applications filed before November 29, 2000 and certain U.S. patent applications filed after that date that will not be filed outside the United States remain confidential until patents issue. Therefore, patent applications covering Immunovant's product candidate could have been filed by others without Immunovant's knowledge. Additionally, pending patent applications that have been published can, subject to certain limitations, be later amended in a manner that could cover Immunovant's product candidate or the use of its product candidate, if approved.

The scope of a patent claim is determined by an interpretation of the law, the written disclosure in a patent and the patent's prosecution history. Immunovant's interpretation of the relevance or the scope of a patent or a pending application may be incorrect, which may negatively impact Immunovant's ability to market Immunovant's product candidate, if approved. Immunovant may incorrectly determine that Immunovant's product candidate is not covered by a third-party patent or may incorrectly predict whether a third party's pending application will issue with claims of relevant scope. Immunovant's determination of the expiration date of any patent in the United States or abroad that Immunovant considers relevant may be incorrect, and Immunovant's failure to identify and correctly interpret relevant patents may negatively impact Immunovant's ability to develop and market Immunovant's product candidates, if approved.

If Immunovant fails to identify and correctly interpret relevant patents, Immunovant may be subject to infringement claims. Immunovant cannot guarantee that Immunovant will be able to successfully settle or otherwise resolve such infringement claims. If Immunovant fails in any such dispute, in addition to being forced to pay damages, Immunovant may be temporarily or permanently prohibited from commercializing any of Immunovant's products that are held to be infringing. Immunovant might, if possible, also be forced to redesign products so that Immunovant no longer infringe the third-party intellectual property rights. Any of these events, even if Immunovant were ultimately to prevail, could require Immunovant to divert substantial financial and management resources that Immunovant would otherwise be able to devote to its business.

***Immunovant may become involved in lawsuits to protect or enforce its patents, the patents of its licensors or its other intellectual property rights, which could be expensive, time consuming and unsuccessful.***

Competitors may infringe or otherwise violate Immunovant's patents, the patents of its licensors or its other intellectual property rights. To counter infringement or unauthorized use, Immunovant may be required to file legal claims, which can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of Immunovant or its licensors is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that Immunovant's patents do not cover the technology in question. The standards that courts use to interpret patents are not always applied predictably or uniformly and can change, particularly as new technologies develop. As a result, Immunovant cannot predict with certainty how much protection, if any, will be given to Immunovant's patents if Immunovant attempts to enforce them and they are challenged in court. Further, even if Immunovant prevails against an infringer in U.S. district court, there is always the risk that the infringer will file an appeal and the district court judgment will be overturned at the appeals court and/or that an adverse decision will be issued by the appeals court relating to the validity or enforceability of Immunovant's patents. An adverse result in any litigation or defense proceedings could put one or more of Immunovant's patents at risk of being invalidated or interpreted narrowly in a manner insufficient to achieve its business objectives, or could put Immunovant's patent applications at risk of not issuing. The initiation of a claim against a third party may also cause the third party to bring counter claims against Immunovant such as claims asserting that Immunovant's patents are invalid or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity or unenforceability are commonplace. Grounds for a validity challenge could be an alleged failure to meet any of several statutory requirements, including lack of novelty, obviousness, non-enablement

58

or lack of written description or statutory subject matter. Grounds for an unenforceability assertion could be an allegation that someone connected with prosecution of the patent withheld relevant material information from the USPTO, or made a materially misleading statement, during prosecution. Third parties may also raise similar validity claims before the USPTO in post-grant proceedings such as ex parte reexaminations, inter partes review, or post-grant review, or oppositions or similar proceedings outside the United States, in parallel with litigation or even outside the context of litigation. The outcome following legal assertions of invalidity and unenforceability is unpredictable. Immunovant cannot be certain that there is no invalidating prior art, of which Immunovant and the patent examiner were unaware during prosecution. For patents and patent applications that Immunovant may in-license, Immunovant may have a limited right or no right to participate in the defense of any licensed patents against challenge by a third party. If a defendant were to prevail on a legal assertion of invalidity or unenforceability, Immunovant would lose at least part, and perhaps all, of any future patent protection on IMVT-1401 or any future product candidate. Such a loss of patent protection could harm Immunovant's business.

Immunovant may not be able to detect or prevent, alone or with Immunovant's licensors, misappropriation of Immunovant's intellectual property rights, particularly in countries where the laws may not protect those rights as fully as in the United States. Immunovant's business could be harmed if in litigation the prevailing party does not offer Immunovant a license on commercially reasonable terms. Any litigation or other proceedings to enforce Immunovant's intellectual property rights may fail, and even if successful, may result in substantial costs and distract its management and other employees.

Even if Immunovant establishes infringement, the court may decide not to grant an injunction against further infringing activity and instead award only monetary damages, which may or may not be an adequate remedy. Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of Immunovant's confidential information could be compromised by disclosure during this type of litigation. There could also be public announcements of the results of hearings, motions or other interim proceedings or developments.

***Because Immunovant's patents are owned by its wholly owned subsidiary, ISG, Immunovant may not be in a position to obtain a permanent injunction against a third party that is found to infringe Immunovant's patents.***

Any patents that Immunovant owns are assigned to Immunovant's wholly owned subsidiary, ISG. If a third party is found to be infringing such patents, Immunovant may not be able to permanently enjoin the third party from making, using, offering for sale or selling the infringing product or activity for the remaining life of such patent in the United States or foreign jurisdictions because the patent is assigned to Immunovant's wholly owned subsidiary, ISG, which is not the entity that would be commercializing a potentially competitive product or service.

***Because of the expense and uncertainty of litigation, Immunovant may not be in a position to enforce its intellectual property rights against third parties.***

Because of the expense and uncertainty of litigation, Immunovant may conclude that even if a third party is infringing its issued patent, any patents that may be issued as a result of Immunovant's pending or future patent applications or other intellectual property rights, the risk-adjusted cost of bringing and enforcing such a claim or action may be too high or not in the best interest of Immunovant and its stockholders. In such cases, Immunovant may decide that the more prudent course of action is to simply monitor the situation or initiate or seek some other non-litigious action or solution.

***Changes in United States patent law or the patent law of other countries or jurisdictions could diminish the value of patents in general, thereby impairing Immunovant's ability to protect its product candidate.***

As is the case with other biopharmaceutical companies, Immunovant's success is heavily dependent on intellectual property, particularly patents relating to Immunovant's research programs and IMVT-1401 and any future product candidates. Obtaining and enforcing patents in the biopharmaceutical industry involves both technological and legal complexity and is therefore costly, time consuming and inherently uncertain. Changes in either the patent laws or interpretation of the patent laws in the United States or USPTO rules and regulations could increase the uncertainties and costs.

59

46

In addition, the United States federal government retains certain rights in inventions produced with its financial assistance under the Bayh-Dole Act. The federal government retains a "nonexclusive, nontransferable, irrevocable, paid-up license" for its own benefit. The Bayh-Dole Act also provides federal agencies with "march-in rights." March-in rights allow the government, in specified circumstances, to require the contractor or successors in title to the patent to grant a "nonexclusive, partially exclusive, or exclusive license" to a "responsible applicant or applicants." If the patent owner refuses to do so, the government may grant the license itself.

The U.S. Supreme Court has ruled on several patent cases in recent years, either narrowing the scope of patent protection available in certain circumstances or weakening the rights of patent owners in certain situations. Depending on future actions by the U.S. Congress, the U.S. courts, the USPTO and the relevant law-making bodies in other countries, the laws and regulations governing patents could change in unpredictable ways that would weaken Immunovant's ability to obtain new patents or to enforce Immunovant's existing patents and patents that Immunovant might obtain in the future.

Similarly, changes in patent law and regulations in other countries or jurisdictions or changes in the governmental bodies that enforce them or changes in how the relevant governmental authority enforces patent laws or regulations may weaken Immunovant's ability to obtain new patents or to enforce patents that Immunovant has licensed or that Immunovant may obtain in the future. Immunovant cannot predict future changes in the interpretation of patent laws or changes to patent laws that might be enacted into law by United States and foreign legislative bodies. Those changes may materially affect Immunovant's patents or patent applications and its ability to obtain additional patent protection in the future.

***If Immunovant is unable to protect the confidentiality of its trade secrets and other proprietary information, including as a result of Immunovant's reliance on third parties, Immunovant's business and competitive position would be harmed.***

In addition to seeking patents for Immunovant's product candidate, Immunovant also relies on trade secrets, including unpatented know-how, technology and other proprietary information, to maintain Immunovant's competitive position. Immunovant seeks to protect Immunovant's proprietary technology in part by entering into confidentiality agreements and, if applicable, material transfer agreements, consulting agreements or other similar agreements with Immunovant's advisors, employees, third-party contractors and consultants prior to beginning research or disclosing proprietary information. Despite these efforts and the contractual provisions employed when working with third parties, the need to share trade secrets and other confidential information due to Immunovant's reliance on third parties, increases the risk that such trade secrets become known by Immunovant's competitors, are inadvertently incorporated into the technology of others, or are disclosed or used in violation of these agreements. Any disclosure, either intentional or unintentional, by Immunovant's employees, the employees of third parties with whom Immunovant shares its facilities or third-party consultants and vendors that Immunovant engages to perform research, clinical trials or manufacturing activities, or misappropriation by third parties (such as through a cybersecurity breach) of Immunovant's trade secrets or proprietary information could enable competitors to duplicate or surpass Immunovant's technological achievements, thus eroding its competitive position in the market.

Monitoring unauthorized uses and disclosures of Immunovant's intellectual property is difficult, and Immunovant does not know whether the steps Immunovant has taken to protect its intellectual property will be effective. In addition, Immunovant may not be able to obtain adequate remedies for any such breaches. Enforcing a claim that a party illegally disclosed or misappropriated a trade secret is difficult, expensive and time consuming, and the outcome is unpredictable. In addition, some courts inside and outside the United States are less willing or unwilling to protect trade secrets. Further, Immunovant's key employees, consultants, suppliers or other individuals with access to Immunovant's proprietary technology and know-how may incorporate that technology and know-how into projects and inventions developed independently or with third parties. As a result, disputes may arise regarding the ownership of the proprietary rights to such technology or know-how, and any such dispute may not be resolved in Immunovant's favor. If any of its trade secrets were to be lawfully obtained or independently developed by a competitor, Immunovant would have no right to prevent them, or those to whom they communicate it, from using that technology or information to compete with Immunovant. If any of Immunovant's trade secrets or other proprietary information were to be disclosed to or independently developed by a competitor, Immunovant's competitive position would be harmed.

***Immunovant may be subject to claims that its licensors, employees, consultants, independent contractors or Immunovant has wrongfully used or disclosed confidential information of their former employers or other third parties.***

Immunovant does and may employ individuals who were previously employed at universities or other biotechnology or pharmaceutical companies, including Immunovant's licensors, competitors or potential competitors. Although Immunovant seeks to protect its ownership of intellectual property rights by ensuring that Immunovant's agreements with Immunovant's employees, consultants, collaborators, independent contractors and other third parties with whom Immunovant does business include provisions requiring such parties to assign rights in inventions to Immunovant and to not use the know-how or confidential information of their former employer or other third parties, Immunovant may be subject to claims that Immunovant or its employees, consultants, collaborators or independent contractors have inadvertently or otherwise used or disclosed know-how or confidential information of their former employers or other third parties. Litigation may be necessary to defend against these claims. There is no guarantee of success in defending these claims, and if Immunovant fails in defending any such claims, in addition to paying monetary damages, Immunovant may lose valuable intellectual property rights or personnel, which could result in customers seeking other sources for the technology, or in ceasing from doing business with Immunovant. Such intellectual property rights could be awarded to a third party, and Immunovant could be required to obtain a license from such third party to commercialize Immunovant's technology or product candidate. Such a license may not be available on commercially reasonable terms or at all. Even if Immunovant is successful, litigation could result in substantial cost and be a distraction to Immunovant's management and other employees. Moreover, any such litigation or the threat thereof may adversely affect Immunovant's reputation, Immunovant's ability to form strategic alliances or sublicense Immunovant's rights to collaborators, engage with scientific advisors or hire employees or consultants, each of which would have an adverse effect on Immunovant's business, results of operations and financial condition.

***Immunovant may be subject to claims challenging the inventorship or ownership of Immunovant's patents and other intellectual property.***

Immunovant or its licensors may be subject to claims that former employees, collaborators or other third parties have an interest in Immunovant's owned or in-licensed patents, trade secrets, or other intellectual property as an inventor or co-inventor. For example, Immunovant or its licensors may have inventorship disputes arise from conflicting obligations of employees, consultants or others who are involved in developing Immunovant's product candidate. Litigation may be necessary to defend against these and other claims challenging inventorship or Immunovant's licensors' ownership of Immunovant's owned or in-licensed patents, trade secrets or other intellectual property.

In addition, while it is Immunovant's policy to require its employees and contractors who may be involved in the development of intellectual property to execute agreements assigning such intellectual property to Immunovant, it may be unsuccessful in executing such an agreement with each party who in fact develops intellectual property that Immunovant regards as its own. Immunovant's and their assignment agreements may not be self-executing or may be breached, and Immunovant may be forced to bring claims against third parties, or defend claims they may bring against Immunovant. Immunovant is still in the process of obtaining certain assignments for some of Immunovant's owned patent applications.

If Immunovant or its licensors fail in defending any such claims, in addition to paying monetary damages, Immunovant may lose valuable personnel or intellectual property rights, such as exclusive ownership of, or right to use, intellectual property that is important to Immunovant's product candidate. Even if Immunovant and its licensors are successful in prosecuting or defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees. Any of the foregoing could have a material adverse effect on Immunovant's business, financial condition, results of operations and prospects.

***Intellectual property litigation could cause Immunovant to spend substantial resources and distract Immunovant's personnel from their normal responsibilities and have a material adverse effect on the success of its business.***

Even if resolved in Immunovant's favor, litigation or other legal proceedings relating to intellectual property claims may cause Immunovant to incur significant expenses, and could distract its technical and management personnel from their normal responsibilities. Such litigation or proceedings could substantially increase Immunovant's operating losses and reduce the resources available for development activities or any future sales, marketing or distribution activities. Immunovant may not have sufficient financial or other resources to conduct such litigation or proceedings

61

**48**

adequately. Some of Immunovant's competitors may be able to sustain the costs of such litigation or proceedings more effectively than Immunovant can because of their greater financial resources. Accordingly, despite Immunovant's efforts, it may not be able to prevent third parties from infringing upon or misappropriating Immunovant's intellectual property. In addition, the uncertainties associated with litigation could compromise Immunovant's ability to raise the funds necessary to continue Immunovant's clinical trials and internal research programs, or in-license needed technology or other product candidates. Uncertainties resulting from the initiation and continuation of patent litigation or other proceedings could compromise Immunovant's ability to compete in the marketplace, including compromising Immunovant's ability to raise the funds necessary to continue Immunovant's clinical trials, continue Immunovant's research programs, license necessary technology from third parties, or enter into development collaborations that would help Immunovant commercialize Immunovant's product candidate, if approved.

### Any trademarks and trade names Immunovant has obtained or may obtain may be infringed or successfully challenged, resulting in harm to Immunovant's business.

Immunovant expects to rely on trademarks and trade names as one means to distinguish any of Immunovant's drug candidates that are approved for marketing from the products of Immunovant's competitors. Once Immunovant selects new trademarks and apply to register them, Immunovant's trademark applications may not be approved. Immunovant may not be able to protect its rights in these trademarks and trade names, which Immunovant needs in order to build name recognition with potential partners or customers in Immunovant's markets of interest. In addition, third parties may have used trademarks similar and identical to Immunovant's trademarks in foreign jurisdictions, and may have filed or may in the future file for registration of such trademarks. Third parties may oppose or attempt to cancel Immunovant's trademark applications or trademarks, or otherwise challenge Immunovant's use of the trademarks. In the event that Immunovant's trademarks are successfully challenged, Immunovant may not be able to use these trademarks to market its products in those countries and could be forced to rebrand Immunovant's drugs, which could result in loss of brand recognition and could require Immunovant to devote resources to advertising and marketing new brands. Immunovant's competitors may infringe Immunovant's trademarks and Immunovant may not have adequate resources to enforce Immunovant's trademarks. If Immunovant attempts to enforce its trademarks and assert trademark infringement claims, a court may determine that the marks Immunovant has asserted are invalid or unenforceable, or that the party against whom Immunovant has asserted trademark infringement has superior rights to the marks in question. In this case, Immunovant could ultimately be forced to cease use of such trademarks. In any case, if Immunovant is unable to establish name recognition based on Immunovant's trademarks and trade names, then Immunovant may not be able to compete effectively and Immunovant's business may be adversely affected.

### Immunovant's intellectual property agreements with third parties may be subject to disagreements over contract interpretation, which could narrow the scope of Immunovant's rights to the relevant intellectual property.

Certain provisions in Immunovant's intellectual property agreements may be susceptible to multiple interpretations. The resolution of any contract interpretation disagreement that may arise could affect the scope of Immunovant's rights to the relevant intellectual property, or affect financial or other obligations under the relevant agreement, either of which could have a material adverse effect on its business, financial condition, results of operations and prospects.

### Immunovant may not be successful in obtaining necessary intellectual property rights to future products through acquisitions and in-licenses.

Immunovant may seek to acquire or in-license additional product candidates or technologies to grow its product offerings and intellectual property portfolio. However, Immunovant may be unable to acquire or in-license intellectual property rights relating to, or necessary for, any such product candidates from third parties on commercially reasonable terms or at all. In that event, Immunovant may be unable to develop or commercialize such product candidates or technology. Immunovant may also be unable to identify product candidates or technology that Immunovant believes are an appropriate strategic fit for the company and protect intellectual property relating to, or necessary for, such product candidates and technology.

The in-licensing and acquisition of third-party intellectual property rights for product candidates is a competitive area, and a number of more established companies are also pursuing strategies to in-license or acquire third-party intellectual property rights for products that Immunovant may consider attractive or necessary. These established companies may have a competitive advantage over Immunovant due to their size, cash resources and greater

clinical development and commercialization capabilities. Furthermore, companies that perceive Immunovant to be a competitor may be unwilling to assign or license rights to Immunovant. If Immunovant is unable to successfully obtain rights to additional technologies or products, Immunovant's business, financial condition, results of operations and prospects for growth could suffer.

In addition, Immunovant expects that competition for the in-licensing or acquisition of third-party intellectual property rights for product candidates and technologies that are attractive to Immunovant may increase in the future, which may mean fewer suitable opportunities for Immunovant as well as higher acquisition or licensing costs. Immunovant may be unable to in-license or acquire the third-party intellectual property rights for product candidates or technology on terms that would allow Immunovant to make an appropriate return on Immunovant's investment.

***Intellectual property rights do not necessarily address all potential threats to Immunovant's competitive advantage.***

Once granted, patents may remain open to invalidity challenges including opposition, interference, re-examination, post-grant review, *inter partes* review, nullification or derivation action in court or before patent offices or similar proceedings for a given period after allowance or grant, during which time third parties can raise objections against such grant. In the course of such proceedings, which may continue for a protracted period of time, the patent owner may be compelled to limit the scope of the allowed or granted claims thus challenged, or may lose the allowed or granted claims altogether.

In addition, the degree of future protection afforded by Immunovant's intellectual property rights is uncertain because intellectual property rights afford only limited protection, and may not adequately protect Immunovant's business, provide a barrier to entry against Immunovant's competitors or potential competitors, or permit Immunovant to maintain its competitive advantage. Moreover, if a third party has intellectual property rights that cover the practice of Immunovant's technology, it may not be able to fully exercise or extract value from its intellectual property rights. The following examples are illustrative:

- others may be able to make formulations or compositions that are the same as or similar to Immunovant's product candidate, but that are not covered by the claims of the patents that Immunovant owns;

- others may be able to make a product that is similar to Immunovant's product candidate and not covered by the patents that Immunovant exclusively licensed and has the right to enforce;

- Immunovant, its licensor or any collaborators might not have been the first to make or reduce to practice the inventions covered by the issued patents or pending patent applications that Immunovant owns or has exclusively licensed;

- Immunovant or its licensor or any collaborators might not have been the first to file patent applications covering certain of Immunovant's inventions;

- others may independently develop similar or alternative technologies or duplicate any of Immunovant's technologies without infringing Immunovant's intellectual property rights;

- it is possible that Immunovant's pending patent applications will not lead to issued patents;

- patents that Immunovant owns or has exclusively licensed may not provide Immunovant with any competitive advantages, or may be held invalid or unenforceable as a result of legal challenges;

- Immunovant's competitors might conduct research and development activities in the United States and other countries that provide a safe harbor from patent infringement claims for certain research and development activities, as well as in countries where Immunovant does not have patent rights, and then use the information learned from such activities to develop competitive products for sale in Immunovant's major commercial markets;

- Immunovant may not develop additional proprietary technologies that are patentable;

- third parties performing manufacturing or testing for Immunovant using Immunovant's product candidate or technologies could use the intellectual property of others without obtaining a proper license;

63

**50**

- parties may assert an ownership interest in Immunovant's intellectual property and, if successful, such disputes may preclude Immunovant from exercising exclusive rights over that intellectual property;

- Immunovant may not develop or in-license additional proprietary technologies that are patentable;

- Immunovant may not be able to obtain and maintain necessary licenses on commercially reasonable terms, or at all; and

- the patents of others may have an adverse effect on Immunovant's business.

Should any of these events occur, they could harm Immunovant's business and results of operations.

**Risks Related to Taxation**

***Immunovant may become subject to unanticipated tax liabilities and higher effective tax rates.***

Immunovant is incorporated under the laws of Bermuda, where Immunovant is not subject to any income or withholding taxes. Immunovant is centrally managed and controlled in the U.K., and, under current U.K. tax law, a company which is centrally managed and controlled in the U.K. is regarded as resident in the U.K. for taxation purposes. Accordingly, Immunovant expects to be subject to U.K. taxation on Immunovant's income and gains and subject to the U.K.'s controlled foreign company rules, except where an exemption applies. Immunovant may be treated as a dual resident company for U.K. tax purposes. As a result, Immunovant's right to claim certain reliefs from U.K. tax may be restricted, and changes in law or practice in the U.K. could result in the imposition of further restrictions on Immunovant's right to claim U.K. tax reliefs. Immunovant may also become subject to income, withholding or other taxes in certain jurisdictions by reason of its activities and operations, and it is also possible that taxing authorities in any such jurisdictions could assert that Immunovant is subject to greater taxation than it currently anticipates. Any such additional tax liability could adversely affect Immunovant's results of operations.

***The intended tax effects of Immunovant's corporate structure and intercompany arrangements depend on the application of the tax laws of various jurisdictions and on how Immunovant operates its business.***

Immunovant is incorporated under the laws of Bermuda and currently has subsidiaries that are domiciled in the U.K., Switzerland and the United States. If Immunovant succeeds in growing Immunovant's business, Immunovant expects to conduct increased operations through Immunovant's subsidiaries in various countries and tax jurisdictions, in part through intercompany service agreements between Immunovant and Immunovant's subsidiaries. In that case, Immunovant's corporate structure and intercompany transactions, including the manner in which Immunovant develops and uses its intellectual property, will be organized so that Immunovant can achieve its business objectives in a tax-efficient manner and in compliance with applicable transfer pricing rules and regulations. If two or more affiliated companies are located in different countries or tax jurisdictions, the tax laws and regulations of each country generally will require that transfer prices be the same as those between unrelated companies dealing at arms' length and that appropriate documentation be maintained to support the transfer prices. While Immunovant believes that it operates in compliance with applicable transfer pricing laws and intends to continue to do so, Immunovant's transfer pricing procedures are not binding on applicable tax authorities. If tax authorities in any of these countries were to successfully challenge Immunovant's transfer prices as not reflecting arms' length transactions, they could require Immunovant to adjust Immunovant's transfer prices and thereby reallocate Immunovant's income to reflect these revised transfer prices, which could result in a higher tax liability to Immunovant. In addition, if the country from which the income is reallocated does not agree with the reallocation, both countries could tax the same income, potentially resulting in double taxation. If tax authorities were to allocate income to a higher tax jurisdiction, subject Immunovant's income to double taxation or assess interest and penalties, it would increase Immunovant's consolidated tax liability, which could adversely affect Immunovant's financial condition, results of operations and cash flows.

Significant judgment is required in evaluating Immunovant's tax positions and determining its provision for income taxes. During the ordinary course of business, there are many transactions and calculations for which the ultimate tax determination is uncertain. For example, Immunovant's effective tax rates could be adversely affected by changes in foreign currency exchange rates or by changes in the relevant tax, accounting and other laws, regulations, principles and interpretations. As Immunovant intends to operate in numerous countries and taxing jurisdictions, the application of tax laws can be subject to diverging and sometimes conflicting interpretations by tax authorities of these jurisdictions. It is not uncommon for taxing authorities in different countries to have conflicting views, for

64

51

instance, with respect to, among other things, the manner in which the arm's length standard is applied for transfer pricing purposes, or with respect to the valuation of intellectual property. In addition, tax laws are dynamic and subject to change as new laws are passed and new interpretations of the law are issued or applied. Immunovant continues to assess the impact of such changes in tax laws on the business and may determine that changes to the structure, practice or tax positions are necessary in light of such changes and developments in the tax laws of other jurisdictions in which Immunovant operates. Such changes may nevertheless be ineffective in avoiding an increase in Immunovant's consolidated tax liability, which could harm Immunovant's financial condition, results of operations and cash flows.

***Changes in Immunovant's effective tax rate may reduce Immunovant's net income in future periods.***

Immunovant's tax position could be adversely impacted by changes in tax rates, tax laws, tax practice, tax treaties or tax regulations or changes in the interpretation thereof by the tax authorities in Europe (including the U.K. and Switzerland), the United States, Bermuda and other jurisdictions as well as being affected by certain changes currently proposed by the Organisation for Economic Co-operation and Development and their action plan on Base Erosion and Profit Shifting. Such changes may become more likely as a result of recent economic trends in the jurisdictions in which Immunovant operates, particularly if such trends continue. If such a situation was to arise, it could adversely impact Immunovant's tax position and Immunovant's effective tax rate. Failure to manage the risks associated with such changes, or misinterpretation of the laws providing such changes, could result in costly audits, interest, penalties and reputational damage, which could adversely affect Immunovant's business, results of Immunovant's operations and Immunovant's financial condition.

Immunovant's actual effective tax rate may vary from Immunovant's expectation and that variance may be material. A number of factors may increase Immunovant's future effective tax rates, including: (1) the jurisdictions in which profits are determined to be earned and taxed; (2) the resolution of issues arising from any future tax audits with various tax authorities; (3) changes in the valuation of Immunovant's deferred tax assets and liabilities; (4) increases in expenses not deductible for tax purposes, including transaction costs and impairments of goodwill in connection with acquisitions; (5) changes in the taxation of share-based compensation; (6) changes in tax laws or the interpretation of such tax laws, and changes in GAAP; and (7) challenges to the transfer pricing policies related to Immunovant's structure.

***HSAC may suffer adverse tax consequences because Immunovant and its non-U.S. subsidiaries are expected to be characterized as a "controlled foreign corporation," or a CFC, under Section 957(a) of the Code.***

A non-U.S. corporation is considered a CFC if more than 50% of (1) the total combined voting power of all classes of stock of such corporation entitled to vote, or (2) the total value of the stock of such corporation, is owned, or is considered as owned by applying certain constructive ownership rules, by United States stockholders (U.S. persons who own stock representing 10% or more of the vote or, for taxable years of non-U.S. corporations beginning after December 31, 2017 and for taxable years of stockholders with or within which such taxable years of non-U.S. corporations end, 10% or more of the value) on any day during the taxable year of such non-U.S. corporation. Certain United States stockholders of a CFC generally are required to include currently in gross income such stockholders' share of the CFC's "Subpart F income," a portion of the CFC's earnings to the extent the CFC holds certain U.S. property, and a portion of the CFC's "global intangible low-taxed income" (as defined under Section 951A of the Code). Such United States stockholders are subject to current U.S. federal income tax with respect to such items, even if the CFC has not made an actual distribution to such stockholders. "Subpart F income" includes, among other things, certain passive income (such as income from dividends, interests, royalties, rents and annuities or gain from the sale of property that produces such types of income) and certain sales and services income arising in connection with transactions between the CFC and a person related to the CFC. "Global intangible low-taxed income" may include most of the remainder of a CFC's income over a deemed return on its tangible assets.

As a result of certain changes in the U.S. tax law introduced by the TCJA, Immunovant believes that it and its non-U.S. subsidiaries are classified as CFCs in the current taxable year and will continue to be classified as CFCs after the Business Combination. For HSAC, a U.S. holder that will hold 10% or more of the vote or value of the Immunovant Shares, this may result in adverse U.S. federal income tax consequences, such as current U.S. taxation of Subpart F income and of amounts treated as global intangible low-taxed income under Section 951A of the Code, and being subject to certain reporting requirements with the U.S. Internal Revenue Service.

65

**Risks Related to HSAC's Business and the Business Combination**

*HSAC will be forced to liquidate the Trust Account if it cannot consummate a business combination by the date that is 24 months from the closing of the IPO, or May 14, 2021. In the event of a liquidation, HSAC's public stockholders will receive $10.00 per share and the HSAC warrants will expire worthless.*

If HSAC is unable to complete a business combination by the date that is 24 months from the closing of the IPO, or May 14, 2021, and is forced to liquidate, the per-share liquidation distribution will be $10.00. Furthermore, there will be no distribution with respect to the HSAC Warrants, which will expire worthless as a result of HSAC's failure to complete a business combination.

*You must tender your HSAC Shares in order to validly seek redemption at the special meeting of stockholders.*

In connection with tendering your shares for redemption, you must elect either to physically tender your share certificates to HSAC's transfer agent or to deliver your common stock to the transfer agent electronically using DTC's DWAC (Deposit/Withdrawal At Custodian) System, in each case at least two business days before the special meeting. The requirement for physical or electronic delivery ensures that a redeeming holder's election to redeem is irrevocable once the Business Combination is consummated. Any failure to observe these procedures will result in your loss of redemption rights in connection with the vote on the Business Combination.

*If third parties bring claims against HSAC, the proceeds held in trust could be reduced and the per-share liquidation price received by HSAC's stockholders may be less than $10.09.*

HSAC's placing of funds in trust may not protect those funds from third party claims against HSAC. Although HSAC has received from many of the vendors, service providers (other than its independent accountants) and prospective target businesses with which it does business executed agreements waiving any right, title, interest or claim of any kind in or to any monies held in the Trust Account for the benefit of HSAC's public stockholders, they may still seek recourse against the Trust Account. Additionally, a court may not uphold the validity of such agreements. Accordingly, the proceeds held in trust could be subject to claims which could take priority over those of HSAC's public stockholders. If HSAC liquidates the Trust Account before the completion of a business combination and distributes the proceeds held therein to its public stockholders, the Sponsor has contractually agreed that it will be liable to ensure that the proceeds in the Trust Account are not reduced by the claims of target businesses or claims of vendors or other entities that are owed money by us for services rendered or contracted for or products sold to us, but only if such a vendor or prospective target business does not execute such a waiver. However, HSAC cannot assure you that they will be able to meet such obligation. Therefore, the per-share distribution from the Trust Account for our stockholders may be less than $10.09 due to such claims.

Additionally, if HSAC is forced to file a bankruptcy case or an involuntary bankruptcy case is filed against it which is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in HSAC's bankruptcy estate and subject to the claims of third parties with priority over the claims of its stockholders. To the extent any bankruptcy claims deplete the Trust Account, HSAC may not be able to return $10.09 to our public stockholders.

*Any distributions received by HSAC stockholders could be viewed as an unlawful payment if it was proved that immediately following the date on which the distribution was made, HSAC was unable to pay its debts as they fell due in the ordinary course of business.*

HSAC's Amended and Restated Certificate of Incorporation provides that it will continue in existence only until the date that is 24 months from the closing of the IPO, or May 14, 2021. If HSAC is unable to consummate a transaction within the required time periods, upon notice from HSAC, the trustee of the Trust Account will distribute the amount in its Trust Account to its public stockholders. Concurrently, HSAC shall pay, or reserve for payment, from funds not held in trust, its liabilities and obligations, although HSAC cannot assure you that there will be sufficient funds for such purpose. If there are insufficient funds held outside the Trust Account for such purpose, the Sponsor has contractually agreed that, if it liquidates prior to the consummation of a business combination, they will be liable to ensure that the proceeds in the Trust Account are not reduced by the claims of target businesses or claims of vendors or other entities that are owed money by HSAC for services rendered or contracted for or products sold to it, but only if such a vendor or prospective target business does not execute such a waiver. However, we may not properly assess

66

**53**

all claims that may be potentially brought against us. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend well beyond the third anniversary of the date of distribution. Accordingly, third parties may seek to recover from our stockholders amounts owed to them by us.

If, after we distribute the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. In addition, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors.

***If HSAC's due diligence investigation of Immunovant was inadequate, then stockholders of HSAC following the Business Combination could lose some or all of their investment.***

Even though HSAC conducted a due diligence investigation of Immunovant, it cannot be sure that this diligence uncovered all material issues that may be present inside Immunovant or its business, or that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of Immunovant and its business and outside of its control will not later arise.

***Stockholder litigation and regulatory inquiries and investigations are expensive and could harm HSAC's business, financial condition and operating results and could divert management attention.***

In the past, securities class action litigation and/or stockholder derivative litigation and inquiries or investigations by regulatory authorities have often followed certain significant business transactions, such as the sale of a company or announcement of any other strategic transaction, such as the Business Combination. Any stockholder litigation and/or regulatory investigations against HSAC, whether or not resolved in HSAC's favor, could result in substantial costs and divert HSAC's management's attention from other business concerns, which could adversely affect HSAC's business and cash resources and the ultimate value HSAC's stockholders receive as a result of the Business Combination.

***The Sponsor and directors own HSAC Shares which will not participate in liquidation distributions and, therefore, they may have a conflict of interest in determining whether the Business Combination is appropriate.***

As of the Record Date, the Sponsor owned an aggregate of 2,775,000 HSAC Shares. Such individuals have waived their right to redeem these shares, or to receive distributions with respect to these shares upon the liquidation of the Trust Account if HSAC is unable to consummate a business combination. Accordingly, the HSAC Shares will be worthless if HSAC does not consummate a business combination. Based on a market price of $10.35 per share of HSAC Shares on November 20, 2019, the value of these shares was $28,721,250. The HSAC Shares acquired prior to the IPO will be worthless if HSAC does not consummate a business combination. Consequently, our directors' and officers' discretion in identifying and selecting Immunovant as a suitable target business may result in a conflict of interest when determining whether the terms, conditions and timing of the Business Combination are appropriate and in HSAC's stockholders' best interest.

***HSAC is requiring stockholders who wish to redeem their HSAC Shares in connection with a proposed business combination to comply with specific requirements for redemption that may make it more difficult for them to exercise their redemption rights prior to the deadline for exercising their rights.***

HSAC is requiring stockholders who wish to redeem their common stock to either tender their certificates to our transfer agent or to deliver their shares to the transfer agent electronically using the DTC's DWAC (Deposit/Withdrawal At Custodian) System at least two business days before the special meeting. In order to obtain a physical certificate, a stockholder's broker and/or clearing broker, DTC and HSAC's transfer agent will need to act to facilitate this request. It is HSAC's understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the transfer agent. However, because we do have any control over this process or over the brokers or DTC, it may take significantly longer than two weeks to obtain a physical stock certificate. While we have been advised that it takes a short time to deliver shares through the DWAC System, we cannot assure you

67

**54**

of this fact. Accordingly, if it takes longer than HSAC anticipates for stockholders to deliver their common stock, stockholders who wish to redeem may be unable to meet the deadline for exercising their redemption rights and thus may be unable to redeem their common stock.

***HSAC will require its public stockholders who wish to redeem their HSAC Shares in connection with the Business Combination to comply with specific requirements for redemption described above, such redeeming stockholders may be unable to sell their securities when they wish to in the event that the Business Combination is not consummated.***

If HSAC requires public stockholders who wish to redeem their HSAC Shares in connection with the proposed Business Combination to comply with specific requirements for redemption as described above and the Business Combination is not consummated, HSAC will promptly return such certificates to its public stockholders. Accordingly, investors who attempted to redeem their HSAC Shares in such a circumstance will be unable to sell their securities after the failed acquisition until HSAC has returned their securities to them. The market price for HSAC Shares may decline during this time and you may not be able to sell your securities when you wish to, even while other stockholders that did not seek redemption may be able to sell their securities.

***A majority of the outstanding HSAC Shares have already agreed to vote in favor of the Business Combination.***

As of the Record Date, the Sponsor and HSAC's independent directors collectively owned approximately 20% of its issued and outstanding HSAC Shares and will therefore have a significant impact on the approval of the Business Combination. In addition, public stockholders owning 4,547,000 shares have already agreed to vote in favor of the Business Combination Proposal and related proposals. Since a majority of the outstanding HSAC Shares have agreed to vote in favor of the Business Combination Proposal and related proposals, the Business Combination will be approved.

***If HSAC's security holders exercise their registration rights with respect to their securities, it may have an adverse effect on the market price of HSAC's securities.***

HSAC's initial stockholders are entitled to make a demand that it register the resale of their insider shares at any time commencing three months prior to the date on which their shares may be released from escrow. Additionally, our initial stockholders, officers and directors are entitled to demand that HSAC register the resale of the shares underlying any securities our initial stockholders, officers, directors or their affiliates may be issued in payment of working capital loans made to us at any time after HSAC consummates a business combination. If such persons exercise their registration rights with respect to all of their securities, then there will be an additional 2,875,000 HSAC Shares eligible for trading in the public market. The presence of these additional HSAC Shares trading in the public market may have an adverse effect on the market price of HSAC's securities.

***HSAC will not obtain an opinion from an unaffiliated third party as to the fairness of the Business Combination to its stockholders.***

HSAC is not required to obtain an opinion from an unaffiliated third party that the price it is paying in the Business Combination is fair to its public stockholders from a financial point of view. HSAC's public stockholders therefore, must rely solely on the judgment of the Board.

***If the Business Combination's benefits do not meet the expectations of financial or industry analysts, the market price of HSAC's securities may decline.***

The market price of HSAC's securities may decline as a result of the Business Combination if:

- HSAC does not achieve the perceived benefits of the acquisition as rapidly as, or to the extent anticipated by, financial or industry analysts; or

- The effect of the Business Combination on the financial statements is not consistent with the expectations of financial or industry analysts.

Accordingly, investors may experience a loss as a result of decreasing stock prices.

68

**55**

***HSAC's directors and officers may have certain conflicts in determining to recommend the acquisition of Immunovant, since certain of their interests, and certain interests of their affiliates and associates, are different from, or in addition to, your interests as a shareholder.***

HSAC's management and directors have interests in and arising from the Business Combination that are different from, or in addition to, your interests as a shareholder, which could result in a real or perceived conflict of interest. These interests include the fact that certain of the HSAC Shares owned by HSAC's management and directors, or their affiliates and associates, would become worthless if the Business Combination Proposal is not approved and HSAC otherwise fails to consummate a business combination prior to its liquidation date.

***HSAC and Immunovant have incurred and expect to incur significant costs associated with the Business Combination. Whether or not the Business Combination is completed, the incurrence of these costs will reduce the amount of cash available to be used for other corporate purposes by HSAC if the Business Combination is completed or by HSAC if the Business Combination is not completed.***

HSAC and Immunovant expect to incur significant costs associated with the Business Combination. Whether or not the Business Combination is completed, HSAC expects to incur approximately $611,119.93 in expenses. These expenses will reduce the amount of cash available to be used for other corporate purposes by HSAC if the Business Combination is completed or by HSAC if the Business Combination is not completed.

***HSAC will incur significant transaction costs in connection with transactions contemplated by the Share Exchange Agreement.***

HSAC will incur significant transaction costs in connection with the Business Combination. If the Business Combination is not consummated, HSAC may not have sufficient funds to seek an alternative business combination and may be forced to liquidate and dissolve.

***The unaudited pro forma condensed combined financial information included in this proxy statement may not be indicative of what Immunovant's actual financial position or results of operations would have been.***

The unaudited pro forma condensed combined financial information in this proxy statement is presented for illustrative purposes only and is not necessarily indicative of what Combined Company's actual financial position or results of operations would have been had the Business Combination been completed on the dates indicated. See the section titled "Unaudited Pro Forma Condensed Combined Financial Information" for more information.

***In the event that a significant number of HSAC Shares are redeemed, its stock may become less liquid following the Business Combination.***

If a significant number of HSAC Shares are redeemed, HSAC may be left with a significantly smaller number of stockholders. As a result, trading in the shares of the Combined Company may be limited and your ability to sell your shares in the market could be adversely affected. The Combined Company intends to apply to list its shares on the Nasdaq Stock Market ("Nasdaq"), and Nasdaq may not list the HSAC Shares on its exchange, which could limit investors' ability to make transactions in HSAC's securities and subject HSAC to additional trading restrictions.

***The Combined Company will be required to meet the initial listing requirements to be listed on the Nasdaq Stock Market. However, the Combined Company may be unable to maintain the listing of its securities in the future.***

If the Combined Company fails to meet the continued listing requirements and Nasdaq delists its securities, HSAC could face significant material adverse consequences, including:

- a limited availability of market quotations for its securities;

- a limited amount of news and analyst coverage for the company; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

69

**56**

*HSAC may waive one or more of the conditions to the Business Combination without resoliciting shareholder approval for the Business Combination.*

HSAC may agree to waive, in whole or in part, some of the conditions to its obligations to complete the Business Combination, to the extent permitted by applicable laws. The Board will evaluate the materiality of any waiver to determine whether amendment of this proxy statement and resolicitation of proxies is warranted. In some instances, if the Board determines that a waiver is not sufficiently material to warrant resolicitation of stockholders, HSAC has the discretion to complete the Business Combination without seeking further shareholder approval. For example, it is a condition to HSAC's obligations to close the Business Combination that there be no restraining order, injunction or other order restricting Immunovant's conduct of its business, however, if the Board determines that any such order or injunction is not material to the business of Immunovant, then the Board may elect to waive that condition and close the Business Combination.

*HSAC's stockholders will experience immediate dilution as a consequence of the issuance of common stock as consideration in the Business Combination. Having a minority share position may reduce the influence that HSAC' current stockholders have on the management of HSAC.*

After the Business Combination, assuming no redemptions of HSAC Shares for cash, HSAC's current public stockholders will own approximately 21.0% of HSAC's non-redeemable shares, HSAC's current directors, officers and affiliates will own approximately 2.0% of HSAC's non-redeemable shares, and the former stockholders of Immunovant will own approximately 77.0% of HSAC's non-redeemable shares. Assuming redemption by holders of 4,578,600 outstanding HSAC Shares, HSAC public stockholders will own approximately 13.8% of HSAC's non-redeemable shares, HSAC's current directors, officers and affiliates will own approximately 2.1% of HSAC's non-redeemable shares, and the former stockholders of Immunovant will own approximately 84.1% of HSAC's non-redeemable shares. The minority position of the former HSAC stockholders will give them limited influence over the management and operations of the Combined Company.

*HSAC's selection of the federal district courts of the United States of America as the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act may be precluded by Section 22 of the Securities Act*

Article VII of HSAC's Amended Charter to be filed upon the closing of the Business Combination selects the federal district courts of the United States of America as the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, subject to and contingent upon a final adjudication in the State of Delaware of the enforceability of such exclusive forum provision. However, such provision may not be enforceable under Section 22 of the Securities Act, and it may be possible for HSAC to be sued in applicable state and local courts notwithstanding such provision.

70

**Risks Related to Combined Company's Common Stock**

***The market price of the Combined Company's common stock is likely to be highly volatile, and you may lose some or all of your investment.***

Following the Business Combination, the market price of Combined Company's common stock is likely to be highly volatile and may be subject to wide fluctuations in response to a variety of factors, including the following:

- any delay in the commencement, enrollment and ultimate completion of Immunovant's clinical trials;

- results of clinical trials for IMVT-1401 or any future product candidate or those of Immunovant's competitors;

- any delay in filing a BLA or similar application for IMVT-1401 or any future product candidate and any adverse development or perceived adverse development with respect to the FDA or other regulatory authority's review of that BLA or similar application, as the case may be;

- failure to successfully develop and commercialize IMVT-1401 or any future product candidate;

- inability to obtain additional funding;

- regulatory or legal developments in the United States or other countries or jurisdictions applicable to IMVT-1401 or any future product candidate;

- adverse regulatory decisions;

- changes in the structure of healthcare payment systems;

- inability to obtain adequate product supply for IMVT-1401 or any future product candidate, or the inability to do so at acceptable prices;

- introduction of new products, services or technologies by Immunovant's competitors;

- failure to meet or exceed financial projections Immunovant provides to the public;

- failure to meet or exceed the estimates and projections of the investment community;

- changes in the market valuations of similar companies;

- market conditions in the pharmaceutical and biotechnology sectors and the issuance of new or changed securities analysts' reports or recommendations;

- announcements of significant acquisitions, strategic partnerships, joint ventures or capital commitments by Immunovant or Immunovant's competitors;

- variations in the Combined Company's financial results or the financial results of companies that are perceived to be similar;

- changes in estimates of financial results or investment recommendations by securities analysts;

- significant lawsuits, including patent or shareholder litigation and disputes or other developments relating to Immunovant's proprietary rights, including patents, litigation matters and Immunovant's ability to obtain patent protection for its technologies;

- additions or departures of key scientific or management personnel;

- short sales of shares of the Combined Company's common stock;

- sales of a substantial number of shares of the Combined Company's common stock in the public market, or the perception in the market that the holders of a large number of shares intend to sell shares;

- sales or purchases of the Combined Company's common stock by directors or officers;

- negative coverage in the media or analyst reports, whether accurate or not;

71

**58**

- issuance of subpoenas or investigative demands, or the public fact of an investigation by a government agency, whether meritorious or not;

- size of the Combined Company's public float;

- trading liquidity of the Combined Company's common stock;

- investors' general perception of the Combined Company and its business; and

- general economic, industry and market conditions.

In addition, the stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies. These fluctuations have often been unrelated or disproportionate to the operating performance of those companies. Broad market and industry factors, as well as general economic, political, regulatory and market conditions, may negatively affect the market price of the Combined Company's common stock, regardless of the Combined Company's actual operating performance.

***Volatility in the Combined Company's share price could subject the Combined Company to securities class action litigation.***

In the past, securities class action litigation has often been brought against a company following a decline in the market price of its securities. This risk is especially relevant for Immunovant because pharmaceutical companies have experienced significant share price volatility in recent years. If the Combined Company faces such litigation, it could result in substantial costs and a diversion of management's attention and resources, which could harm its business.

***The Combined Company will be a "controlled company" within the meaning of the applicable Nasdaq listing rules and, as a result, will qualify for exemptions from certain corporate governance requirements. If the Combined Company relies on these exemptions, you will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

Upon the closing of the Business Combination, RSL will continue to control a majority of the voting power of the Combined Company's outstanding shares of common stock. As a result, the Combined Company will be a "controlled company" within the meaning of applicable Nasdaq listing rules. Under these rules, a company of which more than 50% of the voting power for the election of directors is held by an individual, group or another company is a "controlled company." In addition, for so long as the RSL designated directors control all matters presented to the Combined Company's board of directors for a vote, the Combined Company will be a "controlled company." For so long as the Combined Company remains a "controlled company," the Combined Company may elect not to comply with certain corporate governance requirements, including the requirements:

- that a majority of the board of directors consists of independent directors;

- for an annual performance evaluation of the nominating and corporate governance and compensation committees;

- that the Combined Company has a nominating and corporate governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

- that the Combined Company has a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibility.

The Combined Company intends to use these exemptions upon the closing of the Business Combination and the Combined Company may continue to use all or some of these exemptions in the future. As a result, you may not have the same protections afforded to stockholders of companies that are subject to all of the Nasdaq corporate governance requirements.

***RSL will continue to own a significant percentage of the Combined Company's shares of common stock and will be able to exert significant control over matters subject to stockholder approval.***

RSL is currently Immunovant's controlling shareholder and, after the Business Combination is completed, the Combined Company will continue to be controlled by RSL. Upon the closing of the Business Combination, based on HSAC Shares outstanding as of September 30, 2019, RSL will beneficially own approximately 73.8% of the voting power of the Combined Company's non-redeemable outstanding shares of common stock, assuming that the maximum number of holders of HSAC Shares have properly exercised their redemption rights. RSL will have the ability to substantially influence the Combined Company and exert significant control through this ownership position. For example, RSL and its stockholders may be able to control elections of directors, issuance of equity, including to the Combined Company's employees under equity incentive plans, amendments of the Combined Company's organizational documents, or approval of any merger, amalgamation, sale of assets or other major corporate transaction. RSL's interests may not always coincide with the Combined Company's corporate interests or the interests of other stockholders, and it may exercise its voting and other rights in a manner with which you may not agree or that may not be in the best interests of the Combined Company's other stockholders. Further, RSL is a privately held company whose ownership and governance structure is not transparent to the Combined Company's other stockholders. There may be changes to the management or ownership of RSL, or to RSL's business model, that could impact RSL's interests in a way that may not coincide with the Combined Company's corporate interests or the interests of other stockholders. So long as RSL continues to own a significant amount of the Combined Company's equity, it will continue to be able to strongly influence and effectively control the Combined Company's decisions.

***RSL will have the right to appoint a majority of the directors to the Combined Company's board of directors.***

Pursuant to the Amended Charter, immediately after the closing of the Business Combination, RSL will have the right to appoint four of seven directors to the Combined Company's board of directors and as a result, will control all matters presented to the Combined Company's board of directors. While the directors appointed by RSL are obligated to act in accordance with their applicable fiduciary duties, they may have equity or other interests in RSL and, accordingly, their interests may be aligned with RSL's interests, which may not always coincide with the Combined Company's corporate interests or the interests of the Combined Company's other stockholders.

***The anticipated organizational and ownership structure of the Combined Company may create significant conflicts of interests.***

The anticipated organizational and ownership structure of the Combined Company involves a number of relationships that may give rise to certain conflicts of interest between the Combined Company and minority Immunovant and minority holders of the Combined Company shares, on the one hand, and RSL and its stockholders, on the other hand. Certain of the Combined Company's directors and employees will have equity interests in RSL and, accordingly, their interests may be aligned with RSL's interests, which may not always coincide with the Combined Company's corporate interests or the interests of the Combined Company's other stockholders. Further, the Combined Company's other stockholders may not have visibility into the RSL ownership of any of the Combined Company's directors or officers, which may change at any time through acquisition, disposition, dilution, or otherwise. Any change in the Combined Company's directors' or officers' RSL ownership could impact the interests of those holders.

In addition, Immunovant is, and will remain after the Business Combination, party to certain related party agreements with RSL, RSI and RSG. These entities and their stockholders, including certain of the Combined Company's directors and employees, may have interests which differ from the Combined Company's interests or those of the minority holders of the Combined Company's shares. Any material transaction between Combined Company and RSL, RSI, RSG or any other affiliate of RSL will be subject to the Combined Company's related party transaction policy, which requires prior approval of such transaction by the Combined Company's audit committee. To the extent the Combined Company fails to appropriately deal with any such conflicts of interests, it could negatively impact its reputation and ability to raise additional funds and the willingness of counterparties to do business with the Combined Company, all of which could have an adverse effect on Immunovant's business, financial condition, results of operations, and cash flows.

***If securities or industry analysts do not publish research or reports about the Combined Company, or publish negative reports, the Combined Company's stock price and trading volume could decline.***

The trading market for the Combined Company's common stock will depend, in part, on the research and reports that securities or industry analysts publish about the Combined Company. The Combined Company does not have any control over these analysts. If the Combined Company's financial performance fails to meet analyst estimates or one or more of the analysts who cover the Combined Company downgrade its common stock or change their opinion, the Combined Company's stock price would likely decline. If one or more of these analysts cease coverage of the Combined Company or fail to regularly publish reports on the Combined Company, it could lose visibility in the financial markets, which could cause the Combined Company's stock price or trading volume to decline.

***Because the Combined Company does not anticipate paying any cash dividends in the foreseeable future, capital appreciation, if any, would be your sole source of gain.***

The Combined Company currently anticipates that it will retain future earnings for the development, operation and expansion of its business and do not anticipate declaring or paying any cash dividends for the foreseeable future. As a result, capital appreciation, if any, of the Combined Company's shares of common stock would be your sole source of gain on an investment in such shares for the foreseeable future.

***Future sales of shares of the Combined Company's common stock may depress its stock price.***

Sales of a substantial number of the Combined Company's common stock in the public market after the closing of the Business Combination, or the perception that these sales might occur, could depress the market price of the Combined Company's common stock and could impair its ability to raise capital through the sale of additional equity securities.

***The Combined Company is an emerging growth company, and the Combined Company cannot be certain if the reduced reporting requirements applicable to emerging growth companies will make its shares less attractive to investors.***

After the completion of the Business Combination, the Combined Company will be an emerging growth company, as defined in the JOBS Act. For as long as the Combined Company continues to be an emerging growth company, it may take advantage of exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies," including exemption from compliance with the auditor attestation requirements of Section 404, reduced disclosure obligations regarding executive compensation and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. The Combined Company will remain an emerging growth company until the earlier of (1) the date (a) March 31, 2025, (b) in which the Combined Company has total annual gross revenue of at least $1.07 billion or (c) in which the Combined Company is deemed to be a large accelerated filer, which means the market value of shares of the Combined Company's common stock that are held by non-affiliates exceeds $700 million as of the prior September 30th, and (2) the date on which the Combined Company has issued more than $1.0 billion in non-convertible debt during the prior three-year period.

In addition, under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards until such time as those standards apply to private companies. The Combined Company has irrevocably elected not to avail itself of this exemption from new or revised accounting standards and, therefore, the Combined Company will be subject to the same new or revised accounting standards as other public companies that are not emerging growth companies.

Even after the Combined Company no longer qualifies as an emerging growth company, it may still qualify as a "smaller reporting company," which would allow it to take advantage of many of the same exemptions from disclosure requirements including exemption from compliance with the auditor attestation requirements of Section 404 and reduced disclosure obligations regarding executive compensation in this proxy statement and the Combined Company's periodic reports and proxy statements.

The Combined Company cannot predict if investors will find its common stock less attractive because the Combined Company may rely on these exemptions. If some investors find the Combined Company's common stock less attractive as a result, there may be a less active trading market for the common stock and its market price may be more volatile.

74

**61**

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This proxy statement contains forward-looking statements. Forward-looking statements provide our current expectations or forecasts of future events. Forward-looking statements include statements about our expectations, beliefs, plans, objectives, intentions, assumptions and other statements that are not historical facts. Words or phrases such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "objective," "ongoing," "plan," "potential," "predict," "project," "should," "will" and "would," or similar words or phrases, or the negatives of those words or phrases, may identify forward-looking statements, but the absence of these words does not necessarily mean that a statement is not forward-looking. Examples of forward-looking statements in this proxy statement include, but are not limited to, statements regarding our disclosure concerning Immunovant's operations, cash flows, financial position and dividend policy.

Forward-looking statements appear in a number of places in this proxy statement including, without limitation, in the sections titled "Trading Market and Dividends," "Management's Discussion and Analysis of Financial Conditions and Results of Operations of Immunovant Sciences Ltd.," and "Immunovant Sciences Ltd.'s Business." The risks and uncertainties include, but are not limited to:

- future operating or financial results;

- future payments of dividends and the availability of cash for payment of dividends;

- Immunovant's expectations relating to dividend payments and forecasts of its ability to make such payments;

- future acquisitions, business strategy and expected capital spending;

- assumptions regarding interest rates and inflation;

- the combined company's financial condition and liquidity, including its ability to obtain additional financing in the future to fund capital expenditures, acquisitions and other general corporate activities;

- estimated future capital expenditures needed to preserve HSAC's capital base;

- ability of the combined company to effect future acquisitions and to meet target returns;

- the initiation, timing, progress, costs and results of Immunovant's clinical trials for IMVT-1401, including its ASCEND-MG, ASCEND-GO and ASCEND-WAIHA trials;

- the timing of meetings with and feedback from regulatory authorities as well as any submission of filings for regulatory approval of IMVT-1401;

- the potential advantages and differentiated profile of IMVT-1401 compared to existing therapies for the applicable indications;

- Immunovant's ability to successfully manufacture or have manufactured drug product for clinical trials and commercialization;

- Immunovant's ability to successfully commercialize IMVT-1401, if approved;

- the rate and degree of market acceptance of IMVT-1401, if approved;

- Immunovant's expectations regarding the size of the patient populations for and opportunity for and clinical utility of IMVT-1401, if approved for commercial use;

- Immunovant's estimates of its expenses, ongoing losses, future revenue, capital requirements and needs for or ability to obtain additional financing;

- Immunovant's ability to maintain intellectual property protection for IMVT-1401;

- Immunovant's ability to identify, acquire or in-license and develop new product candidates;

75

**62**

- Immunovant's ability to identify, recruit and retain key personnel;

- developments and projections relating to Immunovant's competitors or industry; and

- other factors discussed in "Risk Factors."

Forward-looking statements are subject to known and unknown risks and uncertainties and are based on potentially inaccurate assumptions that could cause actual results to differ materially from those expected or implied by the forward-looking statements. Actual results could differ materially from those anticipated in forward-looking statements for many reasons, including the factors described in "Risk Factors" in this proxy statement. Accordingly, you should not rely on these forward-looking statements, which speak only as of the date of this proxy statement. HSAC undertakes no obligation to publicly revise any forward-looking statement to reflect circumstances or events after the date of this proxy statement or to reflect the occurrence of unanticipated events. You should, however, review the factors and risks HSAC describes in the reports it will file from time to time with the Securities and Exchange Commission after the date of this proxy statement.

In addition, statements that "HSAC believes" and similar statements reflect HSAC's beliefs and opinions on the relevant subject. These statements are based on information available to HSAC as of the date of this proxy statement. And while HSAC believes that information provides a reasonable basis for these statements, that information may be limited or incomplete. HSAC's statements should not be read to indicate that it has conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain, and you are cautioned not to unduly rely on these statements.

Although HSAC believes the expectations reflected in the forward-looking statements were reasonable at the time made, it cannot guarantee future results, level of activity, performance or achievements. Moreover, neither HSAC nor any other person assumes responsibility for the accuracy or completeness of any of these forward-looking statements. You should carefully consider the cautionary statements contained or referred to in this section in connection with the forward looking statements contained in this proxy statement and any subsequent written or oral forward-looking statements that may be issued by us or persons acting on our behalf.

**IMMUNOVANT SCIENCES LTD.'S BUSINESS**

**Overview**

Immunovant is a clinical-stage biopharmaceutical company focused on enabling normal lives for patients with autoimmune diseases. Immunovant is developing a novel, fully human monoclonal antibody, IMVT-1401 (formerly referred to as RVT-1401), that selectively binds to and inhibits FcRn. IMVT-1401 is the product of a multi-step, multi-year research program to design a highly potent FcRn antibody optimized for subcutaneous delivery. These efforts have resulted in a product candidate that has been dosed at small volumes (2 mL or less) and with a small gauge needle, while still generating therapeutically relevant pharmacodynamic activity, important attributes that Immunovant believes will drive patient preference and market adoption. In preclinical studies and in clinical trials conducted to date, IMVT-1401 has been observed to reduce IgG antibody levels. High levels of pathogenic IgG antibodies drive a variety of autoimmune diseases and, as a result, Immunovant believes IMVT-1401 has the potential for broad application in these disease areas. Immunovant intends to develop IMVT-1401 for debilitating autoimmune diseases in which there is robust evidence that pathogenic IgG antibodies drive disease manifestation and in which reduction of IgG antibodies should lead to clinical benefit.

Autoimmune diseases are conditions where an immune response is inappropriately directed against the body's own healthy cells and tissues. Approximately 50 million people in the United States suffer from one of more than 100 diagnosed autoimmune diseases according to the American Autoimmune Related Diseases Association, Inc. Predisposing factors may include genetic susceptibility, environmental triggers and other factors not yet known. Many of these diseases are associated with high levels of pathogenic IgG antibodies, which are the most abundant type of antibody produced by the human immune system, accounting for approximately 75% of antibodies in the plasma of healthy people. IgG antibodies are important in the defense against pathogens, such as viruses and bacteria. In many autoimmune diseases, IgG antibodies inappropriately develop against normal proteins found in the body, directing the immune system to attack specific organs or organ systems. Current treatment regimens for IgG-mediated autoimmune diseases include corticosteroids and immunosuppressants in early stage disease, followed by more invasive treatments, such as IVIg, and plasma exchange, as the disease progresses. Such treatments are often limited by delayed onset of action, waning therapeutic benefit over time and unfavorable safety profiles.

FcRn plays a pivotal role in preventing the degradation of IgG antibodies. The physiologic function of FcRn is to modulate the catabolism of IgG antibodies, and inhibition of FcRn, such as through use of an FcRn targeting antibody, has been shown to reduce levels of pathogenic IgG antibodies. Completed clinical trials of other anti-FcRn antibodies in IgG-mediated autoimmune diseases have generated promising results, suggesting that FcRn is a therapeutically important pharmaceutical target to reduce levels of these disease-causing IgG antibodies.

In several preclinical studies and Phase 1 clinical trials in healthy volunteers, intravenous and subcutaneous delivery of IMVT-1401 demonstrated dose-dependent IgG antibody reductions and was observed to be well tolerated. In the highest dose cohort from the multiple-ascending dose portion of the Phase 1 clinical trial, four weekly subcutaneous administrations of 680 mg resulted in a mean maximum reduction of serum IgG levels of 78%, and the standard deviation of the reduction was 2%. In addition, no headaches, an adverse event seen with some FcRn agents, have been noted to date in any of the subjects receiving IMVT-1401 in the 680 mg multiple-dose cohort.

Immunovant intends to develop IMVT-1401 as a fixed-dose, self-administered subcutaneous injection on a convenient weekly, or less frequent, dosing schedule. As a result of Immunovant's rational design, it believes that IMVT-1401, if approved for commercial sale, would be differentiated from currently available, more invasive treatments for advanced IgG-mediated autoimmune diseases, (e.g., MG, GO, WAIHA, idiopathic thrombocytopenic purpura, pemphigus vulgaris, chronic inflammatory demyelinating polyneuropathy, bullous pemphigoid, neuromyelitis optica, pemphigus foliaceus, Guillain-Barré syndrome and PLA2R+ membranous nephropathy). In 2017, these diseases had an aggregate prevalence of over 240,000 patients in the United States and 380,000 patients in Europe. To the extent Immunovant chooses to develop IMVT-1401 for certain of these rare diseases, Immunovant plans to seek orphan designation in the United States and Europe. Such designations would primarily provide financial and exclusivity incentives intended to make the development of orphan drugs financially viable. However, Immunovant has not yet sought such designation for any of its three target indications, and there is no certainty that it would obtain such designation, or maintain the benefits associated with such designation, if or when it does.

Immunovant's first target indication for IMVT-1401 is MG, an autoimmune disease associated with muscle weakness with an estimated prevalence of one in 5,000, with up to 65,000 cases in the United States. In MG, patients

147

**64**

develop pathogenic IgG antibodies that attack critical signaling proteins at the junction between nerve and muscle cells. The majority of MG patients suffer from progressive muscle weakness, with maximum weakness occurring within six months of disease onset in most patients. In severe cases, MG patients can experience myasthenic crisis, in which respiratory function is weakened to the point where it becomes life-threatening, requiring intubation and mechanical ventilation.

In August 2019, Immunovant initiated dosing in its ASCEND-MG trial, a Phase 2a clinical trial in patients with MG. Immunovant plans to report top-line results from this trial in the first half of 2020.

Immunovant's second target indication for IMVT-1401 is GO, an autoimmune inflammatory disorder that affects the muscles and other tissues around the eyes, which can be sight-threatening. GO has an estimated annual incidence of 16 in 100,000 women and 2.9 in 100,000 men in North America and Europe. Initial symptoms may include a dry and gritty ocular sensation, sensitivity to light, excessive tearing, double vision and a sensation of pressure behind the eyes.

In May 2019, Immunovant initiated dosing in its ASCEND-GO 1 trial, a Phase 2a clinical trial in Canada in patients with GO. Immunovant anticipates reporting initial results from this trial in the first quarter of 2020. In October 2019, Immunovant initiated dosing in its ASCEND-GO 2 trial, a Phase 2b clinical trial for GO in the United States, Canada and Europe. Immunovant plans to report initial results from this trial in early 2021.

Immunovant is also developing IMVT-1401 for the treatment of WAIHA, a rare hematologic disease in which autoantibodies mediate hemolysis, or the destruction of RBCs. Based on published estimates, Immunovant believes that there are approximately 42,000 patients in the United States and 66,000 patients in Europe living with WAIHA. The clinical presentation is variable and most commonly includes symptoms of anemia, such as fatigue, weakness, skin paleness and shortness of breath. In severe cases, hemoglobin levels are unable to meet the body's oxygen demand, which can lead to heart attacks, heart failure and even death.

In November 2019, Immunovant submitted its IND to the FDA for WAIHA and plans to report initial results from the Phase 2a WAIHA study in the fourth quarter of 2020.

Immunovant obtained rights to IMVT-1401 pursuant to the HanAll Agreement. Pursuant to the HanAll Agreement, Immunovant will be responsible for future contingent payments and royalties, including up to an aggregate of $452.5 million upon the achievement of certain development, regulatory and sales milestone events. Immunovant is also obligated to pay HanAll tiered royalties ranging from the mid-single digits to mid-teens on net sales of licensed products, subject to standard offsets and reductions as set forth in the HanAll Agreement.

Immunovant's goal is to become a leading biopharmaceutical company in the development and commercialization of innovative therapies for autoimmune diseases with significant unmet need. To execute Immunovant's strategy, it plans to:

- *Maximize the probability of success of IMVT-1401.* Immunovant plans to leverage IMVT-1401's differentiated profile in target indications where the anti-FcRn mechanism has already established clinical proof-of-concept. Immunovant intends to identify and target a variety of IgG-mediated autoimmune indications based on the following factors:

  - Inadequacy of the standard of care;

  - Disease severity that warrants novel therapies;

  - Ability to rapidly establish proof-of-concept through comparatively short duration clinical trials using validated clinical endpoints; and

  - Ability to rapidly initiate pivotal trial programs and potentially receive regulatory approval.

- *Strategically target indications for IMVT-1401.* Immunovant intends to be the first to study FcRn inhibition in target indications with clear biologic rationale and no known in-class competitors in clinical development.

148

**65**

- *Rapidly advance development of IMVT-1401 for the treatment of MG, GO and WAIHA.* Immunovant is currently developing IMVT-1401 for the treatment of MG, GO and WAIHA by leveraging the strong biologic rationale of targeting FcRn to reduce IgG antibody levels and the clinical and regulatory insights gained from other FcRn-targeted therapies in MG. In August 2019, Immunovant initiated its dose-confirmation ASCEND-MG trial of IMVT-1401 for the treatment of MG. Immunovant expects to report top-line data from this trial by the first half of 2020, following which Immunovant aims to commence a pivotal Phase 3 clinical trial of IMVT-1401 for the treatment of MG in 2020. In May 2019, Immunovant initiated dosing its ASCEND-GO 1 trial in Canada in patients with GO. In October 2019, Immunovant initiated dosing in its ASCEND-GO 2 trial in the United States, Canada and Europe. Immunovant expects to report initial results of its ASCEND-GO 1 and ASCEND-GO 2 trials in the first quarter of 2020 and in early 2021, respectively. In November 2019, Immunovant submitted its IND to the FDA for WAIHA and plans to report initial results from the Phase 2a WAIHA study in the fourth quarter of 2020.

- *Identify and acquire or in-license additional innovative therapies for autoimmune diseases.* Immunovant's parent company, RSL, and its subsidiaries have a track record of acquiring or in-licensing products in a range of therapeutic areas and Immunovant expects that RSL will continue to support Immunovant in identifying and evaluating potential acquisition and in-licensing opportunities in support of its goal to develop and commercialize innovative therapies for autoimmune diseases with significant unmet need.

The prevalence of certain IgG-mediated autoimmune diseases are set forth in the following table:

|  | ESTIMATED PREVALENCE (2017) | |
| --- | --- | --- |
| **INDICATION** | **U.S.** | **EUROPE** |
| Myasthenia Gravis | 65,000 | 104,000 |
| Warm Autoimmune Hemolytic Anemia | 42,000 | 66,000 |
| Graves' Ophthalmopathy | 33,000 | 52,000 |
| Idiopathic Thrombocytopenic Purpura | 31,000 | 49,000 |
| Pemphigus Vulgaris | 28,000 | 45,000 |
| Chronic Inflammatory Demyelinating Polyneuropathy | 16,000 | 25,000 |
| Bullous Pemphigoid | 8,000 | 13,000 |
| Neuromyelitis Optica | 7,000 | 12,000 |
| Pemphigus Foliaceus | 7,000 | 11,000 |
| Guillain-Barré Syndrome | 3,000 | 5,000 |
| PLA2R+ Membranous Nephropathy | 2,000 | 4,000 |
| **Total** | **242,000** | **386,000** |

---

\*    Europe includes all E.U. countries, U.K. and Switzerland

149

**66**

**FcRn, IgG Antibody Recycling and IMVT-1401 Mechanism of Action**

The neonatal fragment crystallizable receptor is a cellular receptor that can bind IgG antibodies and guide their transport through cells. FcRn is named as such given its critical role in transferring maternal IgG antibodies contained in breast milk across the gut into the neonate's bloodstream, providing passive immunity until such time as the child is sufficiently mature to produce its own antibodies. FcRn is also involved in the transfer of maternal IgG antibodies across the placenta in the developing fetus.

In adults, FcRn is the primary protein responsible for preventing the degradation of IgG antibodies and albumin, the most abundant protein found in the blood. IgG antibodies are constantly being removed from circulation and internalized in cellular organelles called endosomes. The role of FcRn is to bind to the IgG antibodies under the more acidic conditions of the endosome and transport them to the cell surface, where the neutral pH causes them to be released back into circulation. This FcRn mechanism of action and IgG antibody recycling is depicted in the graphic below.

**FcRn and IgG Antibody Recycling**



150

67

Immunovant's product candidate, IMVT-1401, is designed to block the recycling of IgG antibodies, resulting in their removal from circulation. IMVT-1401 binds to FcRn, blocking the ability of FcRn to bind to IgG antibodies under the more acidic conditions of the endosome. As a result, the bound IMVT-1401 and FcRn are transported to the cell surface, where FcRn is prevented from further recycling IgG antibodies as IMVT-1401 remains bound to FcRn even in the pH neutral environment outside the endosome. Meanwhile, the unbound IgG antibodies are degraded in the lysosome rather than being transported by FcRn for release back into circulation. This IMVT-1401 mechanism of action is depicted in the graphic below.

**IMVT-1401's Mechanism of Action**



## IMVT-1401

### Overview

IMVT-1401 is a novel, fully human monoclonal antibody that selectively binds to and inhibits FcRn. In Phase 1 clinical trials, IMVT-1401 has demonstrated dose-dependent reductions in serum levels of IgG antibodies and was well-tolerated following subcutaneous and intravenous administration to healthy volunteers. In addition, completed clinical trials of other anti-FcRn antibodies have produced positive proof-of-concept activity in multiple IgG-mediated autoimmune diseases. Immunovant believes that these data support FcRn as a viable pharmaceutical target with the potential to address multiple IgG-mediated autoimmune diseases. Immunovant intends to develop IMVT-1401 as a fixed-dose, self-administered subcutaneous injection on a convenient weekly, or less frequent, dosing schedule.

### Generation of IMVT-1401 and In Vitro Properties

IMVT-1401 is the result of a multi-step, multi-year research program conducted by Immunovant's partner, HanAll Biopharma Co., Ltd. ("HanAll") to engineer an antibody with the potency, specificity, safety, and pharmacokinetic ("PK") properties optimized for subcutaneous administration. The selection of initial candidates was the result of screening a library of nearly 10,000 antibodies generated from both transgenic animal systems as well as phage-display libraries. These initial candidates were prioritized based on:

- Potency and specificity for FcRn;

- Ability to block the IgG-FcRn interaction;

151

**68**

- Ability to remain bound to FcRn regardless of pH;

- High production and stability in standard antibody production cell lines;

- Ability to achieve high concentrations appropriate for subcutaneous delivery; and

- Lack of immunogenicity.

IMVT-1401 was generated using the OmniAb transgenic rat platform from Open Monoclonal Technology ("OMT"). OMT was later acquired by Ligand Pharmaceuticals in 2015. As of May 2019, there are 12 OmniAb-derived clinical-stage antibody programs and greater than 300 active research programs.

IMVT-1401 has been engineered to express specific known mutations that eliminate effector function. Traditional antibodies contain amino acid sequences that can trigger antibody-dependent cell-mediated cytotoxicity ("ADCC") or complement-dependent cytotoxicity ("CDC") in which bound antibodies are recognized by effector components of the immune system which leads to inflammation. While this is an important mechanism for elimination of pathogens, triggering ADCC or CDC can lead to unintended immune activation and side effects. For this reason, IMVT-1401 was engineered with specific and validated mutations known to reduce ADCC and CDC.

### *Potential Benefits of IMVT-1401*

As a result of Immunovant's rational design for IMVT-1401, Immunovant believes that IMVT-1401, if approved for use, could provide the following benefits:

- *Subcutaneous delivery.* Based on clinical data, Immunovant believes it will be able to obtain therapeutically relevant levels of IgG reduction using one or two mL volume subcutaneous injections. Immunovant's current formulation is concentrated at 170 mg/mL.

- *Simple dosing schedule.* Immunovant is developing IMVT-1401 as a fixed-dose subcutaneous administered regimen without the need for preceding intravenous induction doses or lengthy subcutaneous infusions. If approved, Immunovant intends to market IMVT-1401 as a fixed-dose pre-filled syringe, which would allow for convenient self-administration, eliminating the need for frequent and costly clinic visits, and reduce complexity and errors associated with calculating individual doses.

- *Low immunogenicity risk.* IMVT-1401 is a fully human monoclonal antibody, and therefore contains only amino acid sequences native to humans. Preliminary data from the Phase 1 multiple ascending dose study showed no treatment emergent anti-drug antibodies.

- *Low effector function.* IMVT-1401 has been engineered to prevent activation of other components of the immune system, and, as a result, unintended immune response to IMVT-1401. Specifically, well-characterized and validated mutations introduced into the fragment crystallizable domain of IMVT-1401 have reduced its ability to cause ADCC and CDC. There have been no reports of severe systemic allergic reactions to study therapy.

### *Clinical Development for IMVT-1401*

Immunovant is developing IMVT-1401 as a fixed-dose subcutaneous injection for a variety of IgG-mediated autoimmune diseases, with an initial focus on the treatment of MG, GO and WAIHA.

### *Phase 1 Clinical Trials of IMVT-1401 in Healthy Volunteers*

As of June 30, 2019, Immunovant has dosed 99 healthy volunteers in multi-part, placebo-controlled Phase 1 clinical trials conducted in Australia and Canada, both as an intravenous infusion and as a subcutaneous injection. In these trials, 77 subjects received at least one dose of IMVT-1401 and 22 subjects received placebo. Immunovant

152

expects this multi-part, placebo-controlled Phase 1 clinical trial in healthy volunteers to continue to support its IND submissions to the FDA for IMVT-1401 in each of Immunovant's current target indications, MG, GO and WAIHA. The preliminary results of this trial are presented below.

**Trial Design of Multi-Part Phase 1 Clinical Trial of IMVT-1401**



*Pharmacokinetic Data*

In the single-ascending dose portion of Immunovant's Phase 1 clinical trial, IMVT-1401 demonstrated a PK profile that varies with increase in dose, consistent with the characteristics expected of a drug exhibiting target-mediated disposition. Following subcutaneous administration of IMVT-1401, the median time to peak concentrations ranged from less than a day for the lowest dose administered to approximately three days for the highest dose of 765 mg.

*Pharmacodynamic Data*

Immunovant tested single administrations of fixed intravenous doses of IMVT-1401, ranging from 0.1 mg/kg to 1530 mg as a fixed dose. The 1530 mg fixed intravenous dose resulted in mean maximum reduction of serum IgG antibody levels of 67%. Maximal reductions were observed between 10 and 14 days after dose administration. In addition, single administrations of per kilogram and fixed subcutaneous doses of IMVT-1401, ranging from 0.5 to 5 mg/kg and 340 mg to 765 mg, respectively, led to dose-dependent mean maximum reductions in serum IgG antibody levels of between 14% and 47%. Maximal reductions were observed between seven and 14 days after dose administration.

153

**Total Mean Reduction of IgG Levels in Phase 1 Clinical Trial of IMVT-1401**
**After Single Dose in Healthy Volunteers**



In the multiple-ascending dose portion of Immunovant's Phase 1 clinical trial, two dose levels were tested. After four weekly subcutaneous administrations of 340 mg, a mean maximum reduction of serum IgG levels of 63% was observed during the treatment period, and the standard deviation of the reduction was 11%. In the second and final multiple-dose cohort, four weekly subcutaneous administrations resulted in a mean maximum reduction of serum IgG levels of 78% during the treatment period, and the standard deviation of the reduction was 2%.

154

71

**Total Mean Reduction of IgG Levels in Phase 1 Clinical Trial of IMVT-1401**
**After Four Weekly Doses in Healthy Volunteers**



In this Phase 1 clinical trial, Immunovant also analyzed reductions in lgG antibodies by subclasses. The lgG class of antibodies is composed of four different subtypes of lgG molecules, called the lgG subclasses, which are designated lgG1, lgG2, lgG3 and lgG4. In the multiple-dose cohorts, administration of IMVT-1401 resulted in dose-dependent reductions across all lgG subclasses. Immunovant observed mean maximal reductions of greater than 78% and 63% for the lgG1, lgG3 and lgG4 subclasses in subjects receiving the 680 mg and 340 mg fixed subcutaneous doses, respectively. lgG2 was reduced from baseline following 680 mg and 340 mg fixed subcutaneous doses with observed mean maximum reductions of 70% and 50%, respectively.

155

**72**

The IgG reductions Immunovant observed in this multi-part, placebo-controlled Phase 1 clinical trial support the continued development of IMVT-1401, however, this trial did not include pre-specified endpoints for IgG reduction, and Immunovant cannot be certain that similar IgG reductions will be observed in any future clinical trials.

*Safety Data*

In Immunovant's multi-part, placebo-controlled Phase 1 clinical trial, IMVT-1401 has been observed to be well-tolerated with no Grade 3 or Grade 4 AEs and no discontinuations due to AEs. The most commonly reported AE has been mild erythema and swelling at the injection site, which typically resolved within hours and had a similar incidence between subjects receiving IMVT-1401 and placebo. These reactions at the injection site were not considered dose-related and did not increase with multiple administrations of IMVT-1401 in the multiple-dose cohorts. To date, two serious AEs have been reported, both of which have been assessed as unrelated to IMVT-1401 by the study investigator. There have been no treatment-related serious AEs reported.

156

73

A summary of the most commonly reported AEs, meaning the AE reported occurred in more than one subject, is set forth in the table below.

**Most Common Adverse Events Reported in Phase 1 Clinical Trial of IMVT-1401**

Column groups: SINGLE ASCENDING DOSE — INTRAVENOUS INFUSION (columns 1–6) and SUBCUTANEOUS INJECTION (columns 7–12); MULTIPLE ASCENDING DOSE SUBCUTANEOUS INJECTION (columns 13–16).

| NUMBER OF SUBJECTS / MedDRA Preferred Term | IV 0.1 MG/KG N=4 | IV 100 MG N=6 | IV 340 MG N=6 | IV 765 MG N=6 | IV 1530 MG N=6 | IV PLACEBO N=8 | SC 0.5 MG/KG N=3 | SC 1.5 MG/KG N=6 | SC 5 MG/KG N=6 | SC 340 MG N=6 | SC 500 MG N=6 | SC 765 MG N=6 | MAD PLACEBO N=10 | MAD 340 MG N=8 | MAD 680 MG N=8 | MAD PLACEBO N=4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abdominal pain | | | | | | | | | 1 | | | | | 1 | | |
| Abdominal pain upper | | | | | | | | | | | | | | 2 | 1 | |
| Abnormal sensation in eye | | | | 1 | | | | | | 1 | | | | | | |
| Back pain | | | | | | 2 | | | | | 1 | | 1 | 1 | | |
| Constipation | | | | | | | 1 | | | | | | | 1 | | |
| Cough | | | | | | | | | | | 1 | | 2 | | | |
| Diarrhea | | | | | | | | | | | | | | 2 | | |
| Dizziness | | | | | | | 1 | | | | | | 1 | | | 1 |
| Dry skin | | | | | | | | | | | | | 1 | | 1 | |
| Erythema | | | | | | | | 1 | | | | | | | 1 | |
| Fatigue | 1 | | | 1 | 1 | 1 | 1 | | | 1 | | | 1 | | | |
| Headache | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 4 | 1 | | 1 | 2 | | |
| Injection site erythema | | | | | | | | | 5 | 1 | 5 | 6 | 7 | 8 | 7 | 4 |
| Injection site pain | | | | | | | | | | | 1 | | | 2 | | 1 |
| Injection site swelling | | | | | | | | | 3 | | 2 | 4 | 3 | 7 | 6 | 2 |
| Insomnia | | | | | | | | | | 1 | | | | 4 | | |
| Myalgia | | | | | | | | | | | | | | 1 | 1 | |
| Nasal congestion | | | | | | | | | | 1 | | 1 | 1 | 1 | | |
| Nausea | | | | | | | | | 1 | 1 | | | 1 | | 1 | 1 |
| Ocular hyperaemia | | | | | | | | | | | | | | | 2 | |
| Oropharyngeal pain | 1 | | 1 | 2 | | | | | 1 | | 1 | | 1 | 2 | | |
| Pain in extremity | | | | | | | 1 | | | | | | 1 | | | |
| Procedural complication | | | | | | | | 1 | | 1 | | | | | | |
| Procedural dizziness | | | | | 2 | | | | | | 1 | | | | | |
| Pyrexia | | | 1 | 1 | | | | | 1 | | | | | | | |
| Rash | | | | | 2 | | | | 2 | | | | | 2 | 1 | |
| Rhinorrhoea | | | | | | | | | | 1 | | | 2 | | | |
| Sinusitis | | | 1 | | | | | | | | | | 1 | | | |
| Somnolence | | 1 | | | | | | | 1 | | | | | | | |
| Upper respiratory tract infection | 1 | 1 | 1 | | | | 3 | | | 1 | 1 | | | 1 | | |
| Vision blurred | | | | 1 | | | | | | 1 | | | | | | |

In November 2018, one serious AE (malpighian carcinoma) occurred in a 51-year-old subject who had received a single 765 mg subcutaneous administration of IMVT-1401. Fifty-five days after study drug administration, the subject presented to his personal physician with a left-sided neck mass. Biopsy results determined the mass to be a poorly differentiated malpighian carcinoma, which was assessed as unrelated to IMVT-1401 by the study investigator. In February 2019, a 25-year-old subject who received a single dose 1530 mg of IMVT-1401 by intravenous infusion presented five days later with uncomplicated acute appendicitis and the presence of an appendiceal stone. The subject underwent laparoscopic appendectomy and recovered with an uneventful post-operative course. The event was considered unrelated to study drug by the study investigator.

While headaches, some of which have been considered severe, have been reported in third-party clinical trials of some other anti-FcRn antibodies, no headaches have been noted in any of the subjects receiving IMVT-1401 in the 680 mg multiple-dose cohort. In the 340 mg cohort, two of eight subjects experienced headaches, one mild and one moderate. The moderate headache occurred six days after the final dose of IMVT-1401 was

administered.

Dose-dependent and reversible albumin reductions were observed in the single-ascending and multiple-ascending dose cohorts. In the 680 mg multiple-ascending dose cohort, most subjects reached nadir before administration of the final dose. Mean reduction in albumin levels at day 28 were 20% in the 340 mg multiple-dose cohort, and 31% in the 680 mg multiple-dose cohort. For subjects in the 340 mg and 680 mg cohorts, the mean albumin levels at day 28 were 37.5 g/L and 32.4 g/L, respectively (normal range 36-51 g/L). These reductions were not associated with

157

**75**

any AEs or clinical symptoms, and did not lead to any study discontinuations. The clinical relevance of isolated, mild hypoalbuminemia is unknown, however, a hereditary syndrome associated with deficient albumin production has been described (Congenital Analbumenia). In this syndrome, despite extremely low or absent levels of albumin, those affected have only mild symptoms, including fatigue, low blood pressure and edema. It is believed that compensatory mechanisms through the production of other proteins may allow for relatively normal physiologic function in this population.

*Immunogenicity Data*

The development of anti-drug antibodies (ADA) to IMVT-1401 was assessed across all dosed cohorts following single (IV and SC formulations) and multiple (SC formulation) administrations of IMVT-1401. Preliminary data show a similar frequency of treatment-emergent ADA development among subjects who received at least one administration of IMVT-1401 or placebo (8% and 6%, respectively). The antibody titers were low ($\leq$ 1:16) consistent with the high sensitivity of the ADA assay. All ADAs had resolved by the end of the monitoring period. No subjects in either the 340 mg or 680 mg multiple ascending dose (MAD) cohorts developed ADAs with treatment. ADAs will continue to be monitored throughout the development program.

***Preclinical Studies of IMVT-1401***

Cynomolgus monkeys were selected as the primary species for preclinical testing, given the high degree of sequence homology to human FcRn and IMVT-1401's strong binding affinity for monkey FcRn. Immunovant's partner, HanAll, completed five preclinical studies of IMVT-1401 (referred as HL161BKN for the purposes of these studies) in cynomolgus monkeys. Immunovant is conducting two additional studies in cynomolgus monkeys. These studies are listed in the table below.

| NAME OF STUDY | DURATION | ANIMALS TESTED | ROUTE OF ADMINISTRATION: DOSE (FREQUENCY) |
|---|---|---|---|
| Evaluation of IgG Catabolism and PK of HL161 Candidates (HL161AN and HL161BKN) in Cynomolgus Monkey (Study TR-127-161) | 4 weeks | N = 20[a] | IV: 5, 20 mg/kg/dose (Days 0, 7, 14, 21) |
| Evaluation of IgG Catabolism and PK of HL161AN and HL161BKN Following IV and SC Administration (Study TR-140-161) | 2 weeks | N = 36[a] | IV: 5, 10 mg/kg/dose; SC: 5, 10 mg/kg/dose (Days 0, 3, 7, 10) |
| Evaluation of Low-dose PK-PD Cynomolgus Monkey for Selection of Maximum Recommended Start Dose (MRSD) of HL161BKN in Humans (Study TR-166-161) | 2 weeks | N = 12 | IV: 0.5, 1.5, 5 mg/kg/dose (Days 0, 3, 7, 10) |
| HL161BKN 1-Week Repeat-Dose Range-Finding Toxicity, PK, and PD Study in the Cynomolgus Monkey (Study 8348379) | 1 week | N = 16[a] | SC: 25, 100 mg/kg/dose IV: 100 mg/kg/dose (Days 1, 4, 8) |
| HL161BKN A Six-Week Subcutaneous and Intravenous Administration Toxicity Study in Cynomolgus Monkeys with a Nine-Week Treatment-Free Period (Study 8348381) | 6 weeks | N = 48[a] | SC: 25, 50, 100 mg/kg/dose; IV: 25, 100 mg/kg/dose (twice weekly) |
| 12-Week Subcutaneous Injection and Intravenous Infusion Toxicity and Toxicokinetic Study with RVT-1401 in Cynomolgus Monkeys Followed by a 10-Week Recovery Period (Study 8386882) | 12 weeks | N = 60[a] | SC: 10, 25, 100 mg/kg/dose; IV: 10, 100 mg/kg/dose |
| 26-Week Subcutaneous Injection and Intravenous Infusion Toxicity and Toxicokinetic Study with RVT-1401 in Cynomolgus Monkeys Followed by a 10-Week Recovery Phase (Study 8391434)[b] | 26 weeks | N = 40[a] | SC: 100 mg/kg/dose (twice weekly); IV: 50, 100 mg/kg/dose |

———————

a:      includes vehicle control group animals.
b:      final study report will be available in January 2020

158

**76**

Three pharmacology studies were performed to screen molecules and to define the efficacious dose based on the PK and pharmacodynamics ("PD"), profile, and two toxicology studies were performed. In the pharmacology studies, IMVT-1401 demonstrated a consistent PD response of reduced IgG levels that correlated with the PK of IMVT-1401 with observed IgG reductions ranging between approximately 53%, and 78% across all three studies. The following chart sets forth the range of trough IgG levels from percentage of baseline.

| PHARMACOLOGY STUDIES | TROUGH IgG % OF BASELINE (MEAN ± SD) |
|---|---|
| Evaluation of IgG Catabolism and PK of HL161 Candidates (HL161AN and HL161BKN) in Cynomolgus Monkey (Study TR-127-161) | IV 5 mg/kg: -57 ± 5 IV 20 mg/kg: -74 ± 7 |
| Evaluation of IgG Catabolism and PK of HL161AN and HL161BKN Following IV and SC Administration (Study TR-140-161) | IV 5 mg/kg: -78 ± 7 IV 10 mg/kg: -73 ± 10 SC 5 mg/kg: -74 ± 4 SC 10 mg/kg: -77 ± 10 |
| Evaluation of Low-dose PK-PD Cynomolgus Monkey for Selection of Maximum Recommended Start Dose (MRSD) of HL161BKN in Humans (Study TR-166-161) | IV 0.5 mg/kg: -53 ± 16 IV 1.5 mg/kg: -58 ± 9 IV 5 mg/kg: -75 ± 13 |

In the six-week and 12-week toxicology studies (Study 8348381, Study 8386882, respectively), exposure to IMVT-1401, a fully human monoclonal antibody, resulted in the development of an ADA response that led to immune complex formation in isolated animals. In the six-week study, at least one sampling point tested positive for ADA in 37 of the 38 animals that received IMVT-1401 twice weekly by subcutaneous or intravenous administration. Some animals with ADA had reduced PK and PD responses. However, the majority of animals still had measurable circulating levels of IMVT-1401 that translated to reduced IgG levels. In the 12-week toxicology study all animals developed ADA by Day 22 of the treatment phase of the study, and IMVT-1401 exposures on Days 43 and 78 were generally lower compared to Day 1, particularly with low subcutaneous doses. An abrogation of the PD response was observed following development of ADA in the lower dose cohorts but was maintained in the higher dose cohorts. Overall, in these preclinical studies, there was a robust PK and PD correlation in cynomolgus monkeys after removing the confounding element of ADA.

The immunogenicity response to human proteins generated in nonclinical species is generally not predictive of that in the human. This was confirmed in the multiple dose cohorts of the on-going Phase 1 clinical trial, where after 4 weeks of IMVT-1401 treatment, no subject in either dose cohort developed a confirmed ADA response. Nevertheless, subjects in clinical trials with IMVT-1401 will be carefully monitored for any AEs, including those related to immunogenicity.

**IMVT-1401 for the Treatment of Myasthenia Gravis**

*Myasthenia Gravis Overview*

MG is an autoimmune disorder associated with muscle weakness. MG patients develop antibodies that lead to an immunological attack on critical signaling proteins at the junction between nerve and muscle cells, thereby inhibiting the ability of nerves to communicate properly with muscles. This leads to muscle weakness, which can be localized to the ocular muscles or which can be more generalized throughout the body. Patients with localized disease suffer from the mildest symptoms, including droopy eyelids and blurred or double vision due to partial paralysis of eye movements. The majority of MG patients demonstrate elevated serum levels of acetylcholine receptor ("AChR"), antibodies, which disrupt signal transmission between neurons and muscle fibers, ultimately leading to muscle weakness and fatigue.

The prevalence of MG is estimated to be one in 5,000, with up to 65,000 cases in the United States. MG can occur at any age; however, the age of onset tends to follow a bimodal distribution. Early onset disease usually occurs in individuals between 10 to 30 years old and predominantly affects females. Later onset disease usually occurs in individuals over 50 years old and predominantly affects males. As with many autoimmune diseases, there are no known genetic alterations that specifically cause MG, and in most patients, it arises spontaneously. Approximately 3% of patients have a primary relative with MG, suggesting that there are genetic factors that may predispose development of the disease, but these genes have yet to be identified.

The symptoms of the disease can be transient and in the early stages of the disease can remit spontaneously. However, as the disease progresses, symptom-free periods become less frequent and disease exacerbations can last

159

77

the Share Exchange, from qualifying as a "reorganization" for U.S. federal income tax purposes within the meaning of Section 368(a)(1) of the Code.

4.25   Environmental Laws.

(a)   The Company Group has not (i) received any written notice of any alleged claim, violation of or liability under any Environmental Law which has not heretofore been cured or for which there is any remaining liability; (ii) disposed of, emitted, discharged, handled, stored, transported, used or released any Hazardous Materials, arranged for the disposal, discharge, storage or release of any Hazardous Materials, or exposed any Company Employee or other individual to any Hazardous Materials so as to give rise to any liability or corrective or remedial obligation under any Environmental Laws; or (iii) entered into any agreement that may require it to guarantee, reimburse, pledge, defend, hold harmless or indemnify any other Person with respect to liabilities arising out of Environmental Laws.

(b)   Except as would not be, individually or in the aggregate, reasonably likely to have a Material Adverse Effect, there are no Hazardous Materials in, on, or under any properties owned, leased or used at any time by the Company Group such as could give rise to any material liability or corrective or remedial obligation of the Company Group under any Environmental Laws.

4.26   Finders' Fees. There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Company Group or any of Affiliates who might be entitled to any fee or commission from the Company, Purchaser or any of their Affiliates upon consummation of the transactions contemplated by this Agreement.

4.27   Preclinical Development and Clinical Trials. The studies, tests, preclinical development and clinical trials, if any, conducted by or on behalf of the Company are being conducted in all material respects in accordance with experimental protocols, procedures and controls pursuant to accepted professional and scientific standards for products or product candidates comparable to those being developed by the Company and all applicable laws and regulations, including the Federal Food, Drug, and Cosmetic Act and 21 C.F.R. parts 50, 54, 56, 58, 312, and 812. The descriptions of, protocols for, and data and other results of, the studies, tests, development and trials conducted by or on behalf of the Company that have been furnished or made available to the Purchaser or as provided in the Proxy Statement are accurate and complete in all material respects (other than to the extent certain portions thereof were redacted by the Company). The Company is not aware of any studies, tests, development or trials the results of which reasonably call into question the results of the studies, tests, development and trials conducted by or on behalf of the Company, and the Company has not received any notices or correspondence from the FDA or any other governmental Authority or any Institutional Review Board or comparable authority requiring the termination, suspension or material modification of any studies, tests, preclinical development or clinical trials conducted by or on behalf of the Company.

4.28   FDA Approvals. Except as would not be, individually or in the aggregate, reasonably likely to have a Material Adverse Effect, the Company possesses all permits, licenses, registrations, certificates, authorizations, orders and approvals from the appropriate federal, state or foreign regulatory authorities necessary to conduct its business as now conducted, including all such permits, licenses, registrations, certificates, authorizations, orders and approvals required by the U.S. Food and Drug Administration ("FDA") or any other federal, state or foreign agencies or bodies engaged in the regulation of drugs, pharmaceuticals, medical devices or biohazardous materials. The Company has not received any written notice of proceedings relating to the suspension, modification, revocation or cancellation of any such permit, license, registration, certificate, authorization, order or approval. Neither the Company nor, to the Company's knowledge, any officer, employee or agent of the Company has been convicted of any crime or engaged in any conduct that has caused or would reasonably be expected to result in (A) disqualification or debarment by the FDA under 21 U.S.C. Sections 335(a) or (b), or any similar law, rule or regulation of any other governmental Authorities, (B) debarment, suspension, or exclusion under any Federal Healthcare Programs or by the General Services Administration, or (C) exclusion under 42 U.S.C. Section 1320a-7 or any similar law, rule or regulation of any governmental Authorities. Neither the Company nor to the knowledge of the Company, any of its officers, employees, contractors or agents, is the subject of any investigation by FDA pursuant to its "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities" policy as stated at 56 Fed. Reg. 46191 (September 10, 1991) (the "FDA Application Integrity Policy") and any amendments thereto, or by any other similar governmental Authority pursuant to any similar policy. Neither the Company nor, to the Company's knowledge, any of its officers, employees, contractors, and agents has committed any act, made any

Annex A-22

statement or failed to make any statement that would reasonably be expected to provide a basis for FDA to invoke the FDA Application Integrity Policy or for any similar governmental Authority to invoke a similar policy. Neither the Company nor to the Company's knowledge, any of its officers, employees, contractors or agents has made any materially false statements on, or material omissions from, any notifications, applications, approvals, reports and other submissions to FDA or any similar governmental Authority.

4.29    FDA Regulation. The Company is and has been in compliance with all applicable Laws administered or issued by FDA or any similar governmental entity, including the Federal Food, Drug, and Cosmetic Act and all other Laws regarding developing, testing, manufacturing, marketing, distributing or promoting the products of the Company, or complaint handling or adverse event reporting, except as would not reasonably be expected to have a Material Adverse Effect.

4.30    Information Supplied. None of the information supplied by Company at the request of the Purchaser for inclusion or incorporation by reference: (a) in any current report of the Purchaser on Form 8-K, and any exhibits thereto or any other report, form, registration or other filing made with any governmental Authority with respect to the transactions contemplated hereby; (b) in the Proxy Statement; or (c) in the mailings or other distributions to Purchaser's stockholders and/or prospective investors with respect to the consummation of the transactions contemplated hereby or in any amendment to any of documents identified in clauses (a) through (c), will, when filed, made available, mailed or distributed, as the case may be, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading, but in each case only to the extent that the untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with the information provided by the Company for inclusion in such documents identified in clauses (a) through (c) above to be publicly filed with the SEC. Notwithstanding the foregoing, Company makes no representation, warranty or covenant with respect to any information supplied by or on behalf of Purchaser or its Affiliates.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Except as disclosed in the Purchaser SEC Documents filed with or furnished to the SEC prior to the date of this Agreement (other than disclosures in the "Risk Factors" or "Forward Looking Statements" sections of any Purchaser SEC Document and other disclosures to the extent that such disclosure is predictive or forward-looking in nature), Purchaser hereby represents and warrants to the Company that each of the following representations and warranties are true, correct and complete as of the date of this Agreement and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be so true, correct and complete as of such earlier date):

5.1    Corporate Existence and Power. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware and has all necessary power and authority: (a) to conduct its business in the manner in which its business is currently being conducted; (b) to own and use its assets in the manner in which its assets are currently owned and used; and (c) to perform its obligations under all Contracts by which it is bound, except where any such failure would not reasonably be expected to have a Purchaser Material Adverse Effect. Purchaser has either delivered or made available to Company, including via the SEC's Electronic Data Gathering Analysis and Retrieval ("EDGAR") system database, accurate and complete copies of the certificate of incorporation, bylaws and other charter and organizational documents of Purchaser, including all amendments thereto. Purchaser has no subsidiaries.

5.2    Corporate Authorization. The execution, delivery and performance by the Purchaser of this Agreement and the Additional Agreements and the consummation by the Purchaser of the transactions contemplated hereby and thereby are within the corporate powers of the Purchaser and have been duly authorized by all necessary corporate action on the part of the Purchaser. This Agreement has been duly executed and delivered by the Purchaser and, assuming due authorization, execution and delivery by each other party hereto and to the Additional Agreements, constitutes, and upon their execution and delivery, the Additional Agreements will constitute, a valid and legally binding agreement of the Purchaser, enforceable against it in accordance with its and their terms, except as may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity. (i) The affirmative vote of holders of a majority of the

Annex A-23

**79**