# Exhibit 21

**S&P Global**
Market Intelligence

# Immunovant, Inc. NasdaqGS:IMVT

# Special Call

## Wednesday, January 05, 2022 1:00 PM GMT

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Table of Contents

Call Participants ................................................................................. 3

Presentation ................................................................................. 4

Question and Answer ................................................................................. 10

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

**2**

# Call Participants

**EXECUTIVES**

**Peter Salzmann**
*CEO & Director*

**ANALYSTS**

**Danielle Catherine Brill Bongero**
*Raymond James & Associates, Inc., Research Division*

**Derek Christian Archila**
*Wells Fargo Securities, LLC, Research Division*

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

**Thomas Jonathan Smith**
*SVB Leerink LLC, Research Division*

**Yatin Suneja**
*Guggenheim Securities, LLC, Research Division*

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good morning. My name is Rob, and I'll serve as your conference call operator. [Operator Instructions]

As a reminder, this call is being recorded. Joining me on the call today will be Dr. Pete Salzmann, Chief Executive Officer of Immunovant.

Before we begin, I would like to remind everyone that today's conference call will include certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, among other things, statements regarding the potential efficacy and safety of Immunovant's product candidate and Immunovant's expectations regarding the timing, design and results of its clinical trials, including the timing of future data readouts and the announcement of future indications. All forward-looking statements are based on estimates and assumptions by Immunovant's management that, although Immunovant believes to be reasonable, are inherently uncertain.

All forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those that Immunovant expected. For more information, investors are encouraged to review Immunovant's most recent annual report on Form 10-K, its Form 10-Q filed with the SEC on November 5, 2021. Any forward-looking statement speaks only as of the date on which it was made. Immunovant undertakes no obligation to publicly update or revise any forward-looking statement whether as a result of new information, future events or otherwise.

Now I would like to turn the call over to Dr. Pete Salzmann. Thank you, Dr. Salzmann, you may begin.

**Peter Salzmann**
*CEO & Director*

Thank you, Rob. Good morning, everyone. During today's presentation, as Rob just reviewed, I'll be making forward-looking statements, and I direct investors to carefully review this slide.

Today, I'm very excited to reiterate that Immunovant achieved alignment with the FDA at the end of last year to move forward with our myasthenia gravis, or MG, program. We plan to start a Phase III study for batoclimab in MG in the first half of 2022. It's an exciting time for the MG community with a lot of innovation, and we see significant opportunity for batoclimab to offer a differentiated treatment paradigm based on its unique attributes. We've achieved an important milestone, not only for our MG development program, but also for our overall clinical development portfolio for batoclimab. Specifically, aligning on a straightforward safety and monitoring plan that is based on PK/PD modeling in addition to expert input, positions Immunovant well to study a wide variety of indications. Given the FDA alignment to move forward, plus our strong cash position, we are looking forward to executing a bold and broad development plan for batoclimab.

We remain on track to announce 2 new indications beyond MG, TED and WAIHA for batoclimab by August 2022. We now plan to begin 3 pivotal studies in 2022, of which our MG program will be the first, a very robust return to the clinic, and this is an acceleration of our overall program relative to prior commitments.

Regarding MG, we are enthusiastic about what our program may deliver for people with Myasthenia Gravis. Our market research with both physicians and patients has given us a clear idea of what people with MG need. I have previously shared some insights from this MG research, and will add a few more points today. Importantly, we believe that the anti-FcRn class will play a major role in treating MG. And we know the Phase III trial is designed to uniquely address remaining unmet needs in MG by taking advantage of batoclimab's specific product attributes, which include a broad therapeutic window and a simple subcutaneous delivery device.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

IMMUNOVANT, INC. SPECIAL CALL | JAN 05, 2023

Today, I will introduce our trial design and focus on important points of differentiation compared to other therapies for people with MG, including differentiation versus other anti-FcRns. With that, I'd like to start by reviewing the safety plan.

We've aligned with the FDA on the key elements of the safety plan required for a pivotal trial. Of course, an overall safety and monitoring plan is part of every clinical trial. In this context, we have aligned with the FDA on the required safety exposures for batoclimab at the time of filing of our BLA. This guidance was based on the ICH E1 criteria for rare diseases, and we believe this requirement is similar for other programs in MG. Our inclusion and exclusion criteria are generally very similar to other recent MG programs.

With regard to cholesterol, we introduced -- we proposed 2 LDL-related exclusion criteria shown on the slide with an LDL cutoff of 160 or 190 depending on either the presence or absence of cardiovascular disease, respectively. How did we select these cut points? While the 190 threshold represents roughly the beginning of a CT-CAE Grade 2 abnormality. CT-CAE criteria are only defined for total cholesterol, not for LDL. And CT-CAE Grade 2 begins at 300 for total cholesterol. Since LDL is generally about 65% of total cholesterol, then an LDL of 190 roughly corresponds to CT-CAE Grade 2. People with an LDL of this level should really be treated. How many such people are there?

Well, an LDL of 190 also corresponds roughly to the 90th or 95th percentile of LDL levels in the population depending on the study. So this criteria may exclude 5% to 10% of otherwise eligible subjects, which really isn't very many. The percentage of MG patients with diagnosed cardiovascular disease is lower than this. And so exclusions will occur primarily via the 190 threshold and not via the 160 threshold. Patients may enter the trial on a stable statin dose, so people with a history of elevated cholesterol that is now controlled on a statin would not be excluded.

With regard to statins. It will not be newly initiated during the blinded treatment periods. This design approach not to initiate statins during blinded treatment periods, aligns with input we received from experts that short-term LDL excursions are generally not clinically significant and don't warrant intervention. However, statins may be initiated, if needed, during the long-term extension of the trial. This, too, is consistent with routine clinical guidelines and expert feedback regarding cholesterol management in the chronic setting. I should also note that prior to entering the long-term extension phase of the trial many patients will be receiving a lower maintenance dose compared to their higher induction dose. This down titration is expected to reduce any LDL excursions and for many patients will mean that anti-lipid therapy won't be needed even during the long-term extension period.

Finally, note that similar to other anti-FcRn assets -- note that similar to another anti-FcRn asset in development, we have specific exclusion criteria outlined for subjects with a recent cardiovascular event. Our study will exclude subjects with such an event in the last 6 months, which was our recommendation. For those of you who have reviewed the publicly disclosed exclusion criteria for nipocalimab's MG study available on clinicaltrials.gov. You know that this trial has a similar exclusion for recent cardiovascular event within 12 weeks. Although this is reasonable, we decided 6 months was more prudent as someone who is only 13 or 14 weeks out from a myocardial infarction may not be stable enough for enrollment into a clinical trial. Also, this exclusion criteria will likely apply to a very small number of patients. So our recommendation to the agency was a 6-month exclusion here, and this was agreed.

As I said, we don't expect that the cholesterol-specific exclusion criteria will impact the eligible population very much. Rather, these exclusions, like many other common exclusions, simply ensure that the study population is a more homogenous population that is quite impacted by their MG, but isn't suffering simultaneously from another condition that could make them a poor candidate for a controlled clinical trial or that could complicate interpretation of their study results.

Before reviewing the trial design with an eye to the efficacy analysis, I'd like to set the stage by reviewing our approach to designing this trial. First of all, every Phase III program has 2 important goals: to ensure product approval, and to differentiate versus the competition. Whereas the path to product approval is generally specified by regulatory agencies, the path to product differentiation is rooted in a deep understanding of the market. To that end, we've conducted market research with both physicians and with patients, and we're confident that we have identified meaningful opportunities, not only to improve

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

on older standard of care options, but also to further improve our newer therapies, including other anti-FcRns.

People with MG recognize many limitations with older standard of care options. Efficacy onset for some of these treatments is very slow. Other therapies like steroids and IVIg, may work quickly, but have limitations preventing chronic administration. Specifically, moderate or high dose steroids when given chronically have many well-documented side effects, and IVIg has a route of administration that many people find burdensome. When an infective therapy like steroids or IVIg has stopped due to side effects or due to logistical challenges, patients with MG may experience recurrence of their symptoms, including disease flares. Off medication, these flares can be very significant and represent a source of anxiety for people living with MG.

The lack of reliable treatment options that provide robust efficacy and long-term tolerability translates to a lot of unmet needs among people living with MG, and this bodes well for the anti-FcRn class. In fact, a large majority of respondents in our research stated that they must make moderate or major lifestyle modifications because of their condition in spite of treatment. Note that some of the respondents in our survey were taking a C5 inhibitor, but none were taking an anti-FcRn.

People living with MG do appreciate the benefits of a partial response that corresponds to a few points of improvement in the MG-ADL, or Myasthenia Gravis activities of daily living score. But what they really hope for is a deep response that would correspond to a many point improvement in MG-ADL or another scale. Of course, they don't express their needs in terms of MG-ADL, but rather, they shared with us that they really desire to live without making lifestyle modifications.

Living without lifestyle modifications would translate to a very low score on the MG-ADL, or one of the other assessment scales. A variety of anti-FcRn trials have shown that the anti-FcRn class has the potential to be a much better solution for many people with MG. For different assets, these trials have generally shown a rapid onset of action, an impressive breadth of response, and a favorable safety profile. These results align with our research and support way neurologists are quite enthusiastic about the long-term potential of the anti-FcRn class in MG.

Finally, there's one particular need that is expressed strongly by people living with MG. Specifically, in our survey, the vast majority of people with MG indicated a desire for continuous chronic treatment versus an intermittent on and off approach to therapy. People with MG associate intermittent dosing with flares off treatment, and these flares in the case of Myasthenia Gravis can be very severe. Occasionally, they can land patients in the hospital. Consequently, the vast majority of people with MG that we surveyed prefer the peace of mind of continuous therapy. For this type of therapy, we believe that medication is delivered via a simple at-home subcutaneous self-administered route clearly have the upper hand to medications delivered via intravenous or subcutaneous infusion, and requiring administration by a health care professional.

So what does all this mean for our approach to a Phase III trial in MG? Our team focused on leveraging batoclimab's unique product attributes, in particular, its broad therapeutic window and its simple subcutaneous route of administration to address the specific and important unmet needs we identified and those I discussed on the prior slides. Thinking about a person with moderate to severe MG who is a candidate for a new medication or a clinical trial, they want a few things.

First and foremost, they want to get better. These people are quite impacted with high disease activity scores, and so they want to achieve a big improvement quickly. We designed the induction period of our trial to maximize speed and depth of batoclimab's efficacy, which we believe has the potential to be best in class. Patients will receive 12 weeks of continuous dosing during the induction period. Efgartigimod separated nicely from placebo with 4 weeks of initial dosing, but we believe continuous dosing can do even better, particularly when it comes to the percentage of subjects experiencing a deep clinical response.

Furthermore, once people with MG have improved on treatment, they want to stay better and avoid flares off treatment. At the same time, many would appreciate the option to lower their treatment dose a bit during the chronic phase to minimize potential side effects associated with immunosuppression. This is true for a wide range of medications used to treat MG. Physicians also shared with us that

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

maintaining disease control can be easier than getting the disease under control, initially. Taking all this together leads to a common approach for many immune modulating therapies, namely an induction and maintenance approach, where higher induction doses are used to maximize initial clinical control, while lower maintenance doses are then used to optimize benefit risk during the chronic phase of therapy.

In the case of batoclimab, we also expect the lower maintenance doses to reduce the impact on albumin and LDL when these changes matter most. In other words, during the chronic phase of therapy. Finally, after a period of steady disease control, often at a lower dose, many patients and their physicians would really appreciate being able to apply a data-driven approach to flexible dosing over time. Flexible dosing over time is needed by many people with MG because the symptoms of MG tend to wax and wane. Even on a stable medication dose, some patients may experience a deterioration in their clinical symptoms requiring rescue therapy. Many physicians told us that the ideal rescue therapy is a higher dose of an existing medication used for a short period of time, and that this is a simpler approach than adding a totally new medication for rescue.

I should point out that just as a simple at-home subcutaneous route of administration that enables chronic dosing, it is also ideally suited for fine-tuning the dose over time. In order for these dose adjustments, including rescue dosing to be data-driven, they need to be studied in the clinical trial, which is exactly what we plan to do during the long-term extension period of our trial.

This slide summarizes our overall program approach. We're pursuing, as I mentioned, an induction maintenance design that includes a long-term extension. This is a well-established approach for newer therapies and other autoimmune diseases, and it is a common clinical approach for many older medications used in MG. At the same time, it is actually a first among recent trials in MG. This approach provides the potential for maximum initial, and potentially best-in-class efficacy driven by deeper IgG suppression to be realized compared to other anti-FcRns that are approved or still in development. Having then achieved maximum initial efficacy, we believe that lower doses will maintain this efficacy. These lower doses will also reduce the impact on LDL. And finally, during the long-term extension of the trial, flexible dosing will be studied to optimize treatment over time as the disease waxes and wanes.

We are not aware of any other anti-FcRn program designed to generate this kind of data package. We also believe batoclimab is uniquely suited to demonstrate this differentiated patient-centered approach based on its broad therapeutic window and simple subcutaneous injection device.

Moving now from the conceptual to the specific. This slide provides more detail on our design. Approximately 200 subjects will enter the trial and be randomized to 1 of 3 blinded arms. 680 milligrams of batoclimab delivered weekly, 340 milligrams of batoclimab delivered weekly, or placebo delivered weekly.

Period 1 will last for 12 weeks, and the primary efficacy endpoint will be measured as the mean change in MG-ADL through those 12 weeks. As is common with induction and maintenance trials, subjects will then be rerandomized at the end of period 1. This rerandomization occurs into 3 new arms: 340 milligrams of batoclimab delivered weekly, 340 milligrams of batoclimab delivered every other week, and placebo.

Periods 1 and 2 are fully blinded with all subjects in each period receiving the same number of weekly injections. Whereas period 1 tests the ability of 2 doses of batoclimab to deliver higher efficacy than placebo, period 2 tests the ability of 2 doses of batoclimab to maintain efficacy. The primary endpoint for period 1 and the key secondary endpoint for period 2 will both be restricted to AChR antibody positive patients with additional analyses run for the entire population and for ACHR antibody-negative patients.

As I mentioned previously, this design really takes advantage of batoclimab's specific attributes, namely the broad therapeutic window and simple subcutaneous device. The trial was designed around 340-milligram as the anchor dose but also test a higher dose in the induction period and a lower dose in the maintenance period. As mentioned previously, the long-term extension will also allow for protocolized or standardized dosing flexibility up and down. Ultimately, we believe this will deliver a very rich data package. And if approved, batoclimab will have a unique and differentiating data for clinicians to optimize the treatment of their patients with MG.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Now I'd like to reiterate a few points in terms of how the approach we've taken with batoclimab differs from other therapeutics in clinical trials in MG. As I mentioned, our team listened to individuals living with MG, and we believe we've designed our pivotal trial to uniquely address their unmet needs, including those not fully addressed with other anti-FcRn programs.

As you know, Oragenics gained FDA approval for efgartigimod last month based on the results of their single Phase III trial in patients with MG. Their protocol followed an IVIg treatment paradigm of treating for 4 weeks and then having responding patients wait until their disease relapse prior to receiving another 4-week cycle. Intermittent treatment for many patients is not a return to normal, so a better solution is still needed. Also, the efgartigimod Phase III trial was conducted with an IV infusion route of administration. They've reported ongoing work to bridge to a 5CC Halozyme-enabled subcu formulation. But this formulation could still be burdensome.

Moving on, Janssen announced the design of their Phase III trial for nipocalimab in MG. The design, unlike the Argenx program, does offer continuous dosing but at a single fixed dose through to their 24-week primary endpoint. They do offer step down in dose, but only during the open-label long-term extension. Like efgartigimod, nipocalimab is administered intravenously. And as a Q2-week chronic therapy, the intravenous route for nipocalimab may be challenging physically and logistically. And neither the fixed dosing or the IV route of administration is consistent with the desire we've noted for people with MG to just feel like they're back to normal.

Our clinical trial seeks to optimize all 3 dimensions shown here. Dosing will be continuous and flexible tailored to the stage of disease, higher in the induction period, lower in the maintenance period, and tailored to the individual patient's clinical response during the long-term extension. To this last point, both down titration and rescue therapy will be studied in the long-term extension to match the waxing and waning course of MG. Finally, as you know, the route of administration is via a simple subcutaneous injection.

The bottom line is that our design is intended to demonstrate potentially best-in-class efficacy of a treatment that is continuous and easily administered. The goal is to provide patients with a flexible chronic therapy that can be fine-tuned to meet the variable symptoms associated with MG rather than delivering a one-size-fits-all dosing solution. Based on expert feedback, our team is confident that this design will provide a robust data package that has the potential to differentiate batoclimab as a best-in-class offering for people with MG.

Although today's discussion is primarily focused on MG, I do want to briefly remind everyone of the potential for batoclimab to have a broad impact across many autoimmune diseases driven by pathogenic IgG. Argenx and Janssen have already announced intentions to pursue a double-digit portfolio of indications. And with batoclimab's unique product attributes, we're excited to also pursue a bold development program. Janssen has recently announced a significant expansion of indications beyond the pure autoantibody conditions, which characterized the first indication study within the anti-FcRn class. We're very excited about these programs and believe that Janssen is very well positioned to expand the set of conditions available -- or amenable to anti-FcRn therapy. We look forward to seeing results from their programs across a wide variety of these newer indications that they've announced, and believe that our potentially best-in-class profile can then allow us to follow where they have positive data.

We believe the potential of the anti-FcRn mechanism and the potential for batoclimab specifically are both very large. We'll be covering other indications, including TED and WAIHA at an upcoming R&D Day later this quarter.

Finally, just to summarize, given the broad opportunity to make a meaningful impact on patients' lives and given our alignment with the FDA with regard to our MG program, we're excited to announce, as I mentioned earlier, that we're accelerating our overall development program for batoclimab. In parallel to MG, we're planning to initiate pivotal trials in 2 other indications, bringing the total number of pivotal trials that we plan to initiate in 2022 to 3 trials. This aggressive development plan reflects the confidence our team has in batoclimab. We'll also be announcing 2 new indications by August of 2022.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The beginning of 2022 will be a busy time as we'll be working to get clinical trial sites up and running, and expect a first patient visit in the MG program in the first half of 2022. We're also planning, as I mentioned, an R&D Day in the first quarter of 2022 where we'll cover details of programs beyond MG.

With that, I'd like to thank you, and offer to open the line up for questions.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

IMMUNOVANT, INC. SPECIAL CALL | JAN 05 2022

# Question and Answer

**Operator**

[Operator Instructions] Our first question is coming from the line of Thomas Smith with SVB Leerink.

**Thomas Jonathan Smith**
*SVB Leerink LLC, Research Division*

Congrats on the regulatory progress. I guess just starting off, if you could talk a little bit about, I guess, how much FDA feedback there was on the dosing that you're proposing. Was there any consideration for a 340 mg once every 2-week dose, or perhaps a lower dose in the induction period? Or I guess, how much feedback do they actually provide in terms of your proposed induction dosing regimens?

**Peter Salzmann**
*CEO & Director*

Thanks, Tom. I appreciate that question. So our approach to dosing for the MG trial and then this will set a precedent for other trials, particularly those where chronic dosing is expected, which is most other indications other than thyroid eye disease. Our approach to setting the dosing was first to do extensive PK/PD modeling. And we worked with a variety of consultants who are former FDA officials to really get their perspective on the data package that the FDA would like to see from any sponsor based on the doses that they're proposing.

So a lot of our feedback came from those regulatory consultants, and they recommended that we really get our data package very finely tuned and have a strong recommendation that we believed in from a scientific and medical standpoint, and then propose to the FDA our thoughts. And in that case, their feedback would primarily be, yes, we agree, or no, we don't agree. So that's what we did, and they agreed. We decided that, for example, the 340mg every other week was not a good induction dose because that particular dosing regimen is modeled to much more slowly achieve steady-state in IgG reduction.

So it's a good maintenance dose once someone has already achieved reduction in their IgG then to titrate them down a little bit from 340mg to 340mg every other week, for example, it could be a good approach to maintenance. But we didn't see that as a good approach to induction. So we proposed the 680mg and the 340mg weekly as induction doses, and the FDA agreed.

**Thomas Jonathan Smith**
*SVB Leerink LLC, Research Division*

Okay. Great. Yes. That's helpful color, Pete. And then just in terms of the patient population. It sounds like a pretty rational inclusion/exclusion criteria in terms of baseline lipids and history of cardiovascular disease. Can you just help frame, I guess, what your research suggests, what proportion of the MG population you think would be excluded based on those inclusion/exclusion criteria?

**Peter Salzmann**
*CEO & Director*

Right. Right. Yes, for sure. So as I mentioned, the primary -- of those 3 criteria, the 190 LDL cutoff for patients without cardiovascular disease, the 160 for those with cardiovascular diseases. And that, by the way, would be they had a prior cardiac event or they had like an imaging study that documented cardiovascular abnormalities or patients who have had a recent cardiac event. Of those 3, I think the only one that will have any meaningful impact on the population will be the 190 cutoff. The reason for that is the vast majority of patients with MG, particularly those being considered for a trial, are not going to have active or recent cardiovascular disease.

So in the general population, an LDL of 190, depending on what data source you look at, represents the 90th or 95th percentile. So that would mean that 5% or 10% of people have an LDL higher than 190.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Most of those databases come from untreated populations. So someone who has an LDL of 190, hopefully, they've been seeing a physician, will have -- that abnormality will have been identified, and they will be treated with an anti-lipid therapy. And by the time they get to enrolling in our trial, their LDL could be lower.

So the actual number of people who would be excluded, I think, the 5% or 10% is sort of the upper bound. And again, frankly, as I said, somebody with an LDL at that level really needs to be treated regardless of whether they're entering our trial or not. So we don't see that exclusion criteria as meaningfully impacting the eligible patients for the trial.

**Thomas Jonathan Smith**
*SVB Leerink LLC, Research Division*

Got it. That makes sense. And then I guess, just in terms of your analysis of the LDL data to date in some of your modeling, what proportion of patients do you expect will be initiating statin therapy in the study, given those inclusion/exclusion criteria, and some of the modeling work that you've done.

**Peter Salzmann**
*CEO & Director*

Right. So as I mentioned, just kind of rehash a little bit, and then I'll get to your question specifically. The -- during the blinded period, so period 1 and period 2, we won't initiate statin therapy and neither will people be removed from the trial because of LDL excursion. So all LDL monitoring will occur in the background and in a blinded fashion. We expect that there will be some excursions consistent with what we've previously reported during particularly period 1. And then in period 2, the LDLs for many patients will come down as their doses down titrated then for people who get to the long-term extension, the recommendation for statin therapy will be based on routine clinical guidelines.

Some people will have already entered the trial on statins because they'll have been treated previously. And some percentage of people whose LDL is maybe on the upper end of normal and who had a little bit of an excursion in their LDL that didn't come down with titrating their dose may start a statin. But we don't anticipate that it will be a very large percentage incremental to the people who would already be at a statin anyway. So maybe an additional 10% or 15% of people, given that 10%, 20%, 30% of people might be on a statin anyway, again, regardless of our trial.

**Operator**

Our next question comes from the line of Yatin Suneja with Guggenheim Partners.

**Yatin Suneja**
*Guggenheim Securities, LLC, Research Division*

Happy New Year. A couple of questions from me. And the first one is a real basic one, and if you can remind us also, can you just talk about what target -- or what level of target engagement you achieve with 680mg versus 340mg? The reason I ask is because I think for the ASCEND GO-2 study in thyroid eye disease, it's not clear to me if you maintain target saturation throughout the dosing interval with the 340 milligram dose, because I think there was some disclosure around that. So can you just remind us what is that threshold for both the doses? And then I do have one more question.

**Peter Salzmann**
*CEO & Director*

Yes. Sure, Yatin. So this is a really interesting question. And the 680mg dose, as you pointed out, and we may have discussed in the past is definitely a saturation dose. So it's on the -- what the modelers call the flat part of the PK/PD curve, and therefore, yields that maximum IgG suppression, which we saw in the thyroid eye disease trial of around 80% with the 680mg dose. For the lower doses, there's -- they're not on the flat part of the PK/PD curve. And generally, for most medications, the sort of anchor dose or main dose is not usually on the flat part of a PK/PD curve but rather on the top part of the -- the ascending part of the PK/PD curve, and that's where 340mg sits.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

So I think maybe the more important and easy to understand point for 340mg is what was the steady-state IgG reduction relative to the steady-state IgG reduction with 680mg. Because the target saturation is just kind of a harder concept to get your head around, with the average IgG suppression that's an easier concept to get your head around. So for 340mg dose in the thyroid eye disease trial with 12 weeks of dosing, we saw 68%, 69% reduction in IgG, which is substantial, and a little bit less than the 80% we saw with the 680mg. So we do think that there's difference between those 2 doses.

**Yatin Suneja**
*Guggenheim Securities, LLC, Research Division*

Got it. Very, very helpful. Okay. Then just one like a multipart question. So question is, are there a subset of MG patients that are less sensitive to albumin or lipid change? That's one. And then with all these modification, are there a threshold for albumin reduction in LDL increase that you are aiming for using these alternative dosing? Just trying to get a sense of, if there is any optimal ratio of IgG reduction versus albumin and lipid changes?

**Peter Salzmann**
*CEO & Director*

Yes. That is a super interesting multipart question, Yatin. So first of all, with regard to albumin, we've had albumin monitoring as part of our clinical trial program ever since the very beginning. And patients haven't made it to the threshold of requiring a dose to be stopped even with the 680 arm. Also, with regard to albumin, beyond the changes in LDL, there really isn't any untoward clinical effect that we're aware of for the modest changes that we expect to see in some patients on the chronic doses that we plan to study with 340mg or 340mg every other week. So the albumin is not really an issue in general, beyond the LDL. And there's nothing particular about MG patients that would make that more or less the case. So the albumin I think, is just only an issue because of the LDL.

With regard to the LDL, the excursions that patients might experience, I think don't relate so much to whether they have MG or not, it relates more just to where did they start, meaning what was their baseline LDL. And there, there's a variety in the population -- or there's variability in the population. Somebody who has a higher LDL, I mentioned the one -- the patient with 190, they need to be treated. Whether or not they're going to receive batoclimab based on normal clinical guidelines.

On the other hand, there's people who have very low LDLs. And for somebody like that, an increase of the percentages we saw with the 340mg dose, will still land them squarely within the normal range. And so they wouldn't be someone for whom anti-lipid therapy would be recommended. So bottom line, I don't see a lot of interplay between the LDL and albumin and MG specifically, but rather it's just more where is the individual patient with regard to their LDL and baseline.

**Yatin Suneja**
*Guggenheim Securities, LLC, Research Division*

Got it. Sorry, if I can excuse one more, just a clarification here. This study is going to be just AChR positive, right, not including the seronegative patients.

**Peter Salzmann**
*CEO & Director*

Right. No, we will allow enrollment of patients who are negative to the AChR antibody, but we will have a -- the primary analysis is going to be done on AChR-positive patients, and we'll ensure that we have sufficient sample size of AChR antibody-positive patients. As you know, the AChR-negative patients represent a smaller and more heterogeneous group. We don't want to exclude them from the trial. We think that there's a meaningful opportunity to help them.

And by the way, batoclimab has previously shown a particularly good knockdown of IgG4 subtype, which is the subtype for at least the MuSK-positive patients, which are a subset of the AChR-negative patients. But because of the variability in disease course for some of these more minor antibody subtypes, we -- I think

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**IMMUNOVANT, INC. SPECIAL CALL | JAN 05, 2022**

like pretty much every other program, is doing our primary analysis just on the AChR antibody-positive patients.

**Operator**

The next question is from the line of Sam Slutsky with LifeSci Capital.

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

Just 2 for me. First, any details that you're able to provide on the lipid monitoring program within the study? And then at what point would you expect statins to be implemented for LDL increases, if needed?

**Peter Salzmann**
*CEO & Director*

Yes. For sure, Sam. Thanks for that question. So the monitoring is very, very straightforward. So first of all, LDL is obviously in total cholesterol and the HDL, the simple subtypes, that's very easy blood test to do. We hadn't previously been measuring that on a frequent basis in our prior trials, but just because we didn't anticipate this. But now having anticipated the issue, it's very easy to measure those labs. Those labs will be reviewed only by the unblinded safety monitor. So the investigators won't get access to LDL or albumin. In the past, we did not provide investigators access to the albumin data because that could be unblinding unless it reached a very significant threshold where discontinuation might have been required, and that didn't happen in the past.

So the monitoring will be done in the background, and there aren't any requirements to trigger therapy for LDL excursions during period 1 and period 2. Again, that's consistent with the advice we got from experts that short-term excursions in LDL don't need to be treated. And since we'll be down-titrating the batoclimab in period 2, many people who do experience an upward excursion in period 1, will experience some normalization in period 2. So it's only in period 3 in the long-term extension where the LDLs will begin to be shared with the principal investigators. And then they will make decisions for anti-lipid therapy based on routine clinical guidance, and we'll sort of standardize that in the protocol. So that's the monitoring plan for LDL, Sam.

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

Got it. And I guess for LDLs being looked at, would that be at each visit, or how frequently?

**Peter Salzmann**
*CEO & Director*

Yes. That's -- to be honest, I don't have the schedule of events right in front of me, and there'll be bloods drawn almost every week. It's not exactly every week throughout the entire trial, but there'll be a robust set of data that we'll ultimately have to describe the time course of LDL changes.

**Samuel Evan Slutsky**
*LifeSci Capital, LLC, Research Division*

Okay. And then just lastly, in terms of the lipid exclusion criteria being used, I guess, is the expectation for that to be consistent across indications? And then for WAIHA and TED, I guess any differences in the proportion of patients that might be excluded for MG as a result in terms of that 5% to 10%?

**Peter Salzmann**
*CEO & Director*

Right. So to your first question, I think, absolutely. I think when a well-run program ideally, your inclusion and exclusion criteria that are not disease-specific are ideally standardized across the program. And the criteria related to LDL are not disease-specific. So we would definitely seek to align those across our program.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And then in terms of the population impacted for thyroid eye disease and warm autoimmune hemolytic anemia, there aren't there aren't any big differences with regard to the MG population in terms of those percentages I quoted from the population, the percentage of people who have an LDL greater than 190. So it would be similar.

**Operator**

Our next question comes from the line of Derek Archila with Wells Fargo.

**Derek Christian Archila**
*Wells Fargo Securities, LLC, Research Division*

Pete, happy new year. Just a couple of questions, just to follow up to the last question from Sam actually, and then a follow-up on that. So just in terms of the LDL exclusion criteria, meaning is that something that likely makes the label overall for all the indications.

And then the second indication -- I'm sorry, the second question is in terms of the [ MuSK ] patients that you would have in the trial, what percent of the patients overall will be enrolled will be AChR negative? And what's kind of the discussion you've had with the FDA about potentially getting that on the label?

**Peter Salzmann**
*CEO & Director*

Right. So 2 important questions, Derek. Thank you. With regard to kind of exclusion criteria could impact labeling. There's a lot of variability across programs and diseases in terms of how something like that plays out. Every clinical trial includes much more restrictive criteria that is ultimately in the label because trials are obviously done on the most homogeneous population possible. So not every restriction necessarily pulls through to a label. If this restriction did pull through to a label, what it might say is the safety of batoclimab in patients with the baseline LDL greater than 190 hasn't been studied. Or it could -- there could be a warning and precaution for that group.

Again, that's a small group of people. And we are allowing people on a stable statin dose to start the trial. So somebody who in a commercial setting had an LDL of 190 even in the setting where the label specifications should be treated, they could start a statin in advance. And if their LDL came down, which it almost certainly would, then they would meet the inclusion/exclusion criteria for our trial and therefore, probably be within the context of the label. Again, there's a moderate amount of speculation in all those statements because the final labeling is a ways off. And -- but just conceptually, we don't see this as a barrier neither in the clinical trial setting or in the commercial setting.

With regard to the MuSK patients or somebody who's MuSK-negative and AChR-negative, so more just in general negative patients. As you know, they make up a small percentage of the total population of patients with MG, maybe 15% of patients are AChR antibody-negative, and maybe half of those are MuSK-positive. They do sometimes represent a little bit larger percentage of people interested in clinical trials. Because historically, some of those patients were excluded from clinical trials, and so therefore, they're more maybe apt to seek out a trial where they're not excluded.

At the end of the day, the important thing for us is to ensure that we have sufficient numbers of AChR antibody-positive patients rather than restricting the number of AChR-negative patients. I think we'll have some, probably, camp on that. But the more important point is that we just get a sufficient number of AChR-positive patients.

In terms of how labeling might play out in that population, that's the kind of thing that really you can't have a meaningful discussion with the FDA until you've got data because the numbers are so small. They're not in a good position to kind of predict a priority, what would or would not result in those patients getting into the label. Clearly, there's not a possibility to have a gated endpoint on AChR-negative patients because it's just too small of a population.

So typically, what will happen is just to see what plays out in the case of the efgartigimod trial, as you're aware, the placebo response was very high in the AChR-negative. There wasn't much of a placebo-

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

IMMUNOVANT, INC. SPECIAL CALL | JAN 05, 2022

corrected delta between the treated and placebo patients. And they didn't get the AChR-negative patients and label based on that data. How things will play out for us, I think, depends on how the data shows up in our trial.

**Operator**

[Operator Instructions] Our next question comes from the line of Danielle Brill with Raymond James.

**Danielle Catherine Brill Bongero**
*Raymond James & Associates, Inc., Research Division*

So Pete, I guess, do you have -- sorry if I missed this, but any plans to include patients who already been exposed to an anti-FcRn in the past? And then also, how are you thinking about facilitating enrollment given the competing trials in the space, and the fact that we now have an argenx drug on the market?

**Peter Salzmann**
*CEO & Director*

Yes. Thanks, Danielle. I think we'll likely exclude people who have prior treatment with an anti-FcRn. That will be a pretty small group of patients. And it just adds heterogeneity to the trial. We haven't made a final, final decision there, but that's where we're leaning. And then with regard to trial enrollment, this will be a trial with trial sites around the world. In the U.S. with the approval of efgartigimod, that offers a commercial opportunity for patients with MG who are seeking a new opportunity. And when you have such a situation, obviously, there's -- the enrollment for ongoing clinical trials becomes a little bit more competitive.

On the other hand, I think the -- as I mentioned upfront, I think the -- there's a lot of innovation in MG right now, and the approval of efgartigimod is really exciting for patients and clinicians treating MG. And that type of enthusiasm and excitement can lead to more people asking their physician if there's a better option for them when they're only moderately well-served by their current therapies, which is the case for many, many people. So in some ways, I think there'll be more people coming into clinics, and some of them will be good candidates for efgartigimod, some may be better candidates for different reasons for enrollment in the clinical trial. And those 2 forces can balance out a little bit, the extra competitiveness of just having a commercially available product in the U.S.

**Operator**

At this time, we have reached the end of the question-and-answer session. And I'll turn the call over to Pete Salzmann for closing remarks.

**Peter Salzmann**
*CEO & Director*

Thanks, Rob. I really appreciate all the questions, and a lot of them related to cholesterol and LDL monitoring, and that is an important point that we're really very happy to have achieved, alignment on with the FDA. And we believe the overall plan, as I've kind of outlined hopefully, satisfactory with a lot of details here is really a good one, and puts us in a strong position to get started again.

But I want to close by emphasizing the real reason we're excited about getting back into the clinic with batoclimab. And that is that we see batoclimab's profile as being able to offer a differentiated potential best-in-class solution for patients, not only with MG, but with other conditions: the broad therapeutic window, the ability to achieve deep IgG reductions quickly with a simple subcutaneous injection during an induction phase, and then maintain patients at a more modest IgG level that's likely to be good for maintenance of efficacy across a range of conditions, just puts us in a really great position to compete strongly across a wide range of indications that I -- where I think anti-FcRns will play a big, big, big role.

So we're really excited about the potential of batoclimab primarily for those reasons, although I understand the questions on the other topics. Thanks, everybody, for listening today, and have a good day.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

**Operator**

This will conclude today's conference. You may disconnect your lines at this time. Thank you for your participation.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

IMMUNOVANT, INC. SPECIAL CALL | JAN 05, 2022

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2022 S&P Global Market Intelligence.