UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| THERESA PITMAN, Individually and on Behalf of All Others Similarly Situated, | x : : : | Civil Action No. 1:21-cv-00918-KAM-VMS |
|  | : | <u>CLASS ACTION</u> |
| Plaintiff, | : : | |
|  | : | PLAINTIFF'S OMNIBUS |
| vs. | : | OPPOSITION TO DEFENDANTS' |
|  | : | MOTIONS TO DISMISS |
| IMMUNOVANT, INC. f/k/a HEALTH SCIENCES ACQUISITIONS CORPORATION, RODERICK WONG, PETER SALZMANN, FRANK M. TORTI, ANDREW FROMKIN, DOUGLAS HUGHES, GEORGE MIGAUSKY, ATUL PANDE, ERIC VENKER, SVB LEERINK LLC, LIFESCI CAPITAL LLC, CHARDAN CAPITAL MARKETS LLC, GUGGENHEIM SECURITIES, LLC, ROBERT W. BAIRD & CO. INCORPORATED, and ROIVANT SCIENCES LTD., | : : : : : : : : : : : : : : : | |
|  | : | |
| Defendants. | : : | |

---

## TABLE OF CONTENTS

**Page**

I.   Preliminary Statement...................................................................................................1

II.  Statement of Facts.......................................................................................................3

    A.   The Company and Its Business................................................................................3

    B.   There Was an Undisclosed Risk that IMVT-1401 Would Increase
        Cholesterol and Risk of Heart Disease in Patients...................................................4

    C.   Immunovant Was Required to Assess IMVT-1401's Safety Before and
        During Clinical Trials ...............................................................................................6

    D.   Defendants Misrepresented and Omitted Material Facts About IMVT-
        1401..........................................................................................................................7

        1.   Misstatements and Omissions Regarding Completed Clinical Trial
            Results...........................................................................................................7

        2.   Misstatements and Omissions Regarding Albumin Reductions
            from IMVT-1401 .........................................................................................8

        3.   Misstatements and Omissions Regarding Compliance with Good
            Clinical Practices and Design of Clinical Trials .........................................8

        4.   Additional Misstatements and Omissions Regarding IMVT-1401 .............9

    E.   Defendants' False and Misleading Statements and Material Omissions
        Caused an Artificial Inflation in the Price of the Company's Shares.......................9

    F.   The Company's Stock Declines...............................................................................10

III. Argument ....................................................................................................................12

    A.   Legal Standard on a Motion to Dismiss.................................................................12

    B.   Defendants' Alternative Version of the Facts Are Inappropriate for a
        Motion to Dismiss and Should Be Stricken by the Court.......................................12

    C.   The AC States Claims Under the Exchange Act .....................................................17

        1.   Legal Standard .............................................................................................17

        2.   The AC Pleads Defendants' Fraud with Particularity..................................18

        3.   The AC Adequately Alleges Defendants Issued Materially False
            and Misleading Statements and Omitted Material Information.................19

**Page**

4.   The AC Alleges Numerous Reliable Facts Showing Elevated Cholesterol Was an Anticipated Risk of IMVT-1401 ...............................21

     a.   FE's Allegations About IMVT-1401's Animal Studies Are Reliable ...................................................................................22

     b.   Scientific Literature Revealed LDL and Cholesterol Elevations Were Anticipated Risks of IMVT-1401.......................26

     c.   The Monitoring of Cholesterol by Immunovant Competitors Put Defendants on Notice that Elevated Cholesterol Was an Anticipated Risk ............................................28

5.   Defendants' Materially False and Misleading Statements and Omissions Are Actionable ..........................................................29

     a.   The AC Pleads Actionable Misstatements and Omissions Regarding Clinical Trial Results.....................................................30

     b.   The AC Pleads Actionable Misstatements and Omissions Regarding the Impact of Albumin Reductions and the Existence of Studies Indicating Albumin Reductions Elevate Cholesterol .........................................................................33

     c.   The AC Pleads Actionable Misstatements and Omissions Regarding Immunovant's Compliance with Good Clinical Practices and Design of IMVT-1401's Clinical Trials ..................36

     d.   The AC Pleads Actionable Misstatements and Omissions Regarding IMVT's Nonclinical Animal Studies ...........................42

     e.   The AC Pleads Actionable Misstatements and Omissions Regarding the Timetable for the Testing and Development of IMVT-1401...............................................................................43

6.   Defendants' Arguments Challenging the Adequacy of the Alleged Misrepresentations and Omissions Are Without Merit ............................45

     a.   Defendants' Statements Are Not Nonactionable Opinion Statements ...................................................................................45

     b.   Defendants' Statements Are Not Nonactionable Puffery ..............49

**Page**

           c.      The Alleged Misrepresentations and Omissions Are Not Protected by the Bespeaks Caution Doctrine or the PSLRA Safe Harbor ............................................................................51

      7.      Plaintiff Adequately Alleges Scienter ..........................................53

            a.      The Exchange Act Defendants Acted with Conscious Misbehavior or Recklessness ............................................53

            b.      The AC Adequately Alleges Defendants' Motive and Opportunity ......................................................................60

      8.      Plaintiff Adequately Alleges Scheme Liability .........................66

   D.     The AC Adequately Alleges Defendants Violated Items 303 and 105 of Regulation S-K ...................................................................................67

      1.      Defendants Violated Item 303 ....................................................67

      2.      Defendants Violated Item 105 ....................................................69

   E.     The AC States Claims Under the Securities Act ...................................70

      1.      The Legal Standards for Stating a Claim Under the Securities Act ..........70

      2.      The Offering Documents Contained Untrue Statements of Material Fact and Omitted to Disclose Material Information .................................71

      3.      The Securities Act Defendants Were Under a Duty to Disclose the Omitted Facts ..............................................................................74

      4.      The Securities Act Claims Do Not Sound in Fraud .................76

   F.     Defendants' Purported Cautionary Language Was Inadequate ............79

   G.     The AC States Control Person Claims Under Sections 15 of the Securities Act and 20(a) of the Exchange Act ........................................................81

   H.     The AC Is Not a Puzzle Pleading .........................................................83

   I.     Leave to Replead ...................................................................................84

IV.   CONCLUSION ..............................................................................................85

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abely v. Aeterna Zentaris Inc.*,
2013 WL 2399869
(S.D.N.Y. May 29, 2013)..................................................................................................40

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...................................................................... *passim*

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
19 F.4th 145 (2d Cir. 2021) .............................................................................23

*Anderson News, L.L.C., v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)............................................................................12

*Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) .....................................................................40, 41, 47

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................12

*Benny v. City of Long Beach*,
2021 U.S. Dist. LEXIS 182305
(E.D.N.Y. Sept. 23, 2021)................................................................................14

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)..............................................................83

*Bricklayers & Masons Loc. No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)..............................................................50

*Chambers v. Time Warner*,
282 F.3d 147 (2d Cir. 2002)............................................................................14

*Christine Asia Co. Ltd. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) .......................................................................57

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013).............................................................17

**Page**

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
   2010 WL 3910265
   (S.D.N.Y. Sept. 29, 2010) ..............................................................................................79, 82

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012).............................................................................53, 56

*City of Providence v. Aeropostale, Inc.*,
   2013 U.S. Dist. LEXIS 44948
   (S.D.N.Y. Mar. 25, 2013) ....................................................................................21, 22, 23, 25

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011)......................................................................................78

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020)......................................................................................52

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
   2020 WL 248729
   (S.D.N.Y. Jan. 15, 2020)..........................................................................................................20

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020)......................................................................................84

*Crowell v. Ionics, Inc.*,
   343 F. Supp. 2d 1 (D. Mass. 2004) ..........................................................................................61

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012)......................................................................................81

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)......................................................................................................61

*Ellenburg v. JA Solar Holdings Co. Ltd.*,
   2010 WL 1983375
   (S.D.N.Y. May 17, 2010)...........................................................................................................56

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015).....................................................................................................24

*Fidel v. AK Steel Holding Corp.*,
   2002 WL 31545952
   (S.D. Ohio Sept. 19, 2002)........................................................................................................29

**Page**

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   783 F.3d 395 (2d Cir. 2015) ................................................................................... 26

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014) ..................................................................... 51

*Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ............................................................... 25, 77

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ......................................................... 29, 54, 79

*Gagnon v. Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019) ............................................................... 14, 15

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ......................................................................... 19, 49, 60

*Gauquie v. Albany Molecular Rsch., Inc.*,
   2016 U.S. Dist. LEXIS 97295
   (E.D.N.Y. July 26, 2016) ...................................................................................... 56

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..................................................................... 63

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016) ................................................................................... 13

*Gould v. Winstar Commc'ns, Inc.*,
   692 F.3d 148 (2d Cir. 2012) ................................................................................... 53

*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020) ..................................................................... 16

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018) ..................................................................... 80

*GTE Mobilnet of Cal. Ltd. P'ship v. City of Berkeley*,
   2022 U.S. Dist LEXIS 32710
   (N.D. Cal. Feb. 24, 2022) ...................................................................................... 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ............................................................................................... 17

**Page**

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus.*,
  2022 U.S. Dist. LEXIS 54272
  (E.D. Pa. Mar. 25, 2022)...............................................................................................55

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008)..................................................................58, 59

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983).............................................................................................71, 72

*Hutchins v. NBTY, Inc.*,
  2012 WL 1078823
  (E.D.N.Y. Mar. 30, 2012) .............................................................................................58

*In re Am. Int'l Grp., Inc.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010)..................................................................69, 79

*In re Apple REITs Litigation*,
  2013 WL 1386202
  (E.D.N.Y. Apr. 3, 2013)...............................................................................................77

*In re AT&T/DirecTV Now Securities Litigation*,
  480 F. Supp. 3d 507 (S.D.N.Y. 2020)..........................................................................51

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)..........................................................................56

*In re Barrick Gold Sec. Litig.*,
  2015 WL 1514597
  (S.D.N.Y. Apr. 1, 2015)...............................................................................................57

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017)......................................................................49, 50

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
  2020 WL 1950783
  (E.D.N.Y. Apr. 22, 2020)..............................................................................................68

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
  2022 WL 541891
  (E.D.N.Y. Feb. 23, 2022)..................................................................................... *passim*

*In re Citigroup, Inc. Bond Litig.*,
  723 F. Supp. 2d 568 (S.D.N.Y. 2010).........................................................................76

**Page**

*In re CPI Card Grp. Inc. Sec. Litig.*,
2017 WL 4941597
(S.D.N.Y. Oct. 27, 2017) ...................................................................................................68

*In re Delcath Sys. Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014)...............................................................................30, 33

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020)...................................................................................77

*In re EDAP TMS S.A. Sec. Litig.*,
2015 WL 5326166
(S.D.N.Y. Sept. 14, 2015) ...................................................................................................47

*In re Evci Colls. Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006)....................................................................................24

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................................................71

*In re Fibrogen, Inc. Sec. Litig.*,
2022 WL 2793032
(N.D. Cal. July 15, 2022) ..............................................................................................52, 63

*In re Fuwei Films Sec. Litig.*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009)..................................................................................72

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012)..................................................................................55

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851
(E.D.N.Y. Sept. 27, 2019)..............................................................................................50, 59

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
236 F. Supp. 3d 824 (S.D.N.Y. 2017)..................................................................................73

*In re Keryx Biopharmaceuticals, Inc. Securities Litigation*,
2014 WL 585658
(S.D.N.Y. Feb. 14, 2014) ....................................................................................................40

*In re Lehman Brothers Mortg.-Backed Sec. Litig.*,
650 F.3d 167 (2d Cir. 2011)................................................................................................76

**Page**

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W. Va. 2012)................................................................50

*In re MELA Scis., Inc. Sec. Litig.*,
2012 WL 4466604
(S.D.N.Y. Sept. 19, 2012).......................................................................................47

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013)...............................................................53, 70

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009)....................................................................58

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)...................................................................................71

*In re NIO Inc. Sec. Litig.*,
2021 WL 3566300
(E.D.N.Y. Aug. 12, 2021)...........................................................................77, 78, 81

*In re Novan, Inc.*,
2018 WL 6732990
(M.D.N.C. Nov. 30, 2018).......................................................................................40

*In re Pall Corp.*,
2009 WL 3111777
(E.D.N.Y. Sept. 21, 2009).......................................................................................54

*In re Parmalat Sec. Litig.*,
375 F. Supp. 2d 278 (S.D.N.Y. 2005).....................................................................81

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015).....................................................................49

*In re Pfizer, Inc. Sec. Litig.*,
538 F. Supp. 2d 621 (S.D.N.Y. 2008).....................................................................16

*In re Pfizer Inc. Sec. Litig.*,
584 F. Supp. 2d 621 (S.D.N.Y. 2008)...............................................................28, 38

*In re Philip Morris Int'l Inc. Sec. Litig.*,
2021 WL 4135059
(S.D.N.Y. Sept. 10, 2021).......................................................................................47

**Page**

*In re Philip Morris International Inc. Securities Litigation*,
   437 F. Supp. 3d 329 (S.D.N.Y. 2020)....................................................................38

*In re Ply Gem Holdings Sec. Litig.*,
   2016 WL 5339541
   (S.D.N.Y. Sept. 23, 2016)....................................................................70

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   930 F.Supp. 68 (S.D.N.Y. 1996)....................................................................70

*In re Refco, Inc Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)................................................ *passim*

*In re Regeneron Pharms., Inc. Sec. Litig.*,
   2005 U.S. Dist. LEXIS 1350
   (S.D.N.Y. Feb. 3, 2005)....................................................................42

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
   697 F.3d 869 (9th Cir. 2012) ....................................................................40

*In re Romeo Power Sec. Litig.*,
   2022 U.S. Dist. LEXIS 99005
   (S.D.N.Y. June 2, 2022)....................................................................63

*In re Salix Pharm., Ltd.*,
   2016 WL 1629341
   (S.D.N.Y. Apr. 22, 2016)....................................................................58, 69, 80, 81

*In re Salix Pharms., Ltd.*,
   2016 U.S. Dist. LEXIS 54202
   (S.D.N.Y. Apr. 22, 2016)....................................................................47

*In re Sanofi-Aventis Sec. Litig.*,
   774 F. Supp. 2d 549 (S.D.N.Y. 2011)....................................................................47

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)....................................................................18

*In re Sepracor, Inc., Sec. Litig.*,
   308 F. Supp. 2d 20 (D. Ma. 2004) ....................................................................43

*In re Sibanye Gold Ltd. Sec. Litig.*,
   2020 WL 6582326
   (E.D.N.Y. Nov. 10. 2020)....................................................................14

**Page**

*In re Sirrom Cap. Corp. Sec. Litig.*,
  84 F. Supp. 2d 933 (M.D. Tenn. 1999)......................................................................29

*In re Symbol Techs., Inc. Sec. Litig.*,
  2013 WL 6330665
  (E.D.N.Y. Dec. 5, 2013) ...........................................................................................51

*In re Tenaris S.A. Sec. Litig.*,
  2020 WL 6018919
  (E.D.N.Y. Oct. 9, 2020) ............................................................................................53

*In re Tommy Hilfiger Sec. Litig.*,
  2007 U.S. Dist. LEXIS 55088
  (S.D.N.Y. July 20, 2007) ..........................................................................................17

*In re Vicuron Pharms., Inc. Sec. Litig.*,
  2005 U.S. Dist. LEXIS 15613
  (E.D. Pa. July 1, 2005)..............................................................................................55

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)..........................................................................18, 32, 51

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)........................................................................12

*In re XL Fleet Corp. Sec. Litig.*,
  2022 WL 493629
  (S.D.N.Y. Feb. 17, 2022) .....................................................................................66, 67

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016).........................................................................................57

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020).....................................................................................59, 60

*Janel World Trade, Ltd. v. World Logistics Servs., Inc.*,
  2009 U.S. Dist. LEXIS 30256
  (S.D.N.Y. Mar. 20, 2009) ..........................................................................................19

*Kassover v. Essence Partners (In re OSI Pharms.)*,
  2007 U.S. Dist LEXIS 103845
  (E.D.N.Y. Mar. 31, 2007) .....................................................................................65, 75

**Page**

*Kramer v. Time Warner, Inc.*,
     937 F.2d 767 (2d Cir. 1991)......................................................................................14

*Litwin v. Blackstone Grp., L.P.*,
     634 F.3d 706 (2d Cir. 2011).....................................................................................71

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
     797 F.3d 160 (2d Cir. 2015)...............................................................................59, 84

*Manavazian v. ATEC Grp., Inc.*,
     160 F. Supp. 2d 468 (E.D.N.Y. 2001) ..............................................................12, 19

*Matrixx Initiatives, Inc. v. Siracusano*,
     563 U.S. 27 (2011)..............................................................................................19, 45

*McKenzie v. Grand Cent. P'ship*,
     2016 U.S. Dist. LEXIS 39361
     (E.D.N.Y. Mar. 25, 2016) ........................................................................................15

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
     900 F.2d 576 (2d Cir. 1990)......................................................................................18

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
     761 F.3d 245 (2d Cir. 2014)......................................................................................18

*Micholle v. Opthotech Corp.*,
     2019 U.S. Dist. LEXIS 160131
     (S.D.N.Y. Sept. 18, 2019).........................................................................................14

*Monec Holding AG v. Motorola Mobility, Inc.*,
     2014 U.S. Dist. LEXIS 123898
     (D. Del. Sept. 5, 2014) ..............................................................................................15

*Montoya v. Mamma.com, Inc.*,
     2006 U.S. Dist. LEXIS 13207
     (S.D.N.Y. Mar. 28, 2006) ..........................................................................................19

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
     693 F.3d 145 (2d Cir. 2012)................................................................................71, 79

*Nguyen v. Endologix, Inc.*,
     962 F.3d 405 (9th Cir. 2020) ....................................................................................63

**Page**

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................18, 53, 54, 57

*Nutriband, Inc. v. Kalmar*,
2020 U.S. Dist. LEXIS 126931
(E.D.N.Y. July 20, 2020) ...........................................................................................81

*Nutriband, Inc. v. Kalmar*,
2020 WL 4059657
(E.D.N.Y. July 20, 2020) ...........................................................................................61

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).............................................................................................46, 48

*Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus., Inc.*,
432 F. Supp. 3d 131 (D. Conn. 2019)........................................................................84

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010).........................................................................................33

*Padnes v. Scios Nova Inc.*,
1996 WL 539711
(N.D. Cal. Sept. 18, 1996) .........................................................................................40

*Panther Partners Inc. v. Ikanos Commc'ns., Inc.*,
681 F.3d 114 (2d Cir. 2012).................................................................................72, 76

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
2020 WL 5757628
(S.D.N.Y. Sept. 27, 2020) ..........................................................................................69

*Pasternack v. Shrader*,
863 F.3d 162 (2d Cir. 2017)........................................................................................85

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010).........................................................................60

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) ...................................................................................55

*Puddu v. 6D Glob. Techs., Inc.*,
2021 U.S. Dist. LEXIS 60905
(S.D.N.Y. Mar. 30, 2021) ...........................................................................................63

**Page**

*Raffaele v. City of N.Y.*,
   144 F. Supp. 3d 365 (E.D.N.Y. 2015) ................................................................16

*Rex & Roberta Ling Living Tr. U/A Dec. 6, 1990 v. B Commc'ns Ltd.*,
   346 F. Supp. 3d 389 (S.D.N.Y. 2018) ................................................................59

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................................50

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ...............................................................................76

*Rosi v. Aclaris Therapeutics, Inc.*,
   2021 WL 1177505
   (S.D.N.Y. Mar. 29, 2021) ...................................................................................80

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007) ..........................................................................12, 14

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) .................................................................43, 74, 80

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018) .............................................................30, 42

*SEC v. Glob. Inv. Strategy UK Ltd.*,
   2021 U.S. Dist. LEXIS 202592
   (S.D.N.Y. Oct. 19, 2021) ....................................................................................12

*SEC v. MiMedx Grp., Inc.*,
   2022 U.S. Dist. LEXIS 56055
   (S.D.N.Y. Mar. 28, 2022) ...................................................................................14

*Set Cap. LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021) .................................................................................67

*Sgalambo v. McKenzie*,
   739 F. Supp. 2d 453 (S.D.N.Y. 2010) ................................................................57

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
   348 F. Supp. 3d 313 (S.D.N.Y. 2018) ................................................................64

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
   248 F. Supp. 3d 428 (S.D.N.Y. 2017) .....................................................27, 78, 79

**Page**

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
545 F. Supp. 3d 120 (S.D.N.Y. 2021)......................................................................82

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010)...............................................................................52, 53

*Smith v. Antares Pharma, Inc.*,
2020 WL 2041752
(D.N.J. Apr. 28, 2020) ............................................................................................47

*Stadnick v. Vivint Solar, Inc.*,
861 F.3d 31 (2d Cir. 2017)......................................................................................68

*STMicroelectronics v. Credit Suisse Grp.*,
775 F. Supp. 2d 525 (E.D.N.Y. 2011) .....................................................................82

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).........................................................................................12, 53

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)....................................................................................47

*Uni-Systems, LLC v. United States Tennis Ass'n*,
350 F. Supp. 3d 143 (E.D.N.Y. 2018) .....................................................................26

*Van Dongen v. CNinsure Inc.*,
951 F. Supp. 2d 451 (S.D.N.Y. 2013)......................................................................56

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991)..............................................................................................49

*Voulgaris v. Array Biopharma Inc.*,
2020 U.S. Dist. LEXIS 249096
(D. Colo. Nov. 24, 2020) .........................................................................................44

*Wagner v. Royal Bank of Scotland Grp. PLC*,
2013 U.S. Dist. LEXIS 127551
(S.D.N.Y. Sept. 5, 2013) ..........................................................................................16

*Wyeth v. Levine*,
555 U.S. 555 (2009)...........................................................................................27, 38

**Page**

*Yannes v. Scworx Corp.*,
   2021 WL 2555437
   (S.D.N.Y. June 21, 2021)................................................................................................80

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77k.............................................................................................. *passim*
   §77k(a) ...................................................................................................70
   §77l ...................................................................................................72, 78
   §77l(a)(2) ...........................................................................................70, 71, 73
   §77o.......................................................................................................81
   §77o(a) ............................................................................................70, 81
   §78j(b).............................................................................................17, 19, 66, 78
   §78t(a)...............................................................................................81, 83
   §78u-4....................................................................................................19
   §78u-4(b)(1)(B)..........................................................................................18
   §78u-4(b)(2)(A) ..........................................................................................18
   §78u-4(b)(3)(B)..........................................................................................17

17 C.F.R.
   §229.303..................................................................................................67
   §240.10b-5 ............................................................................................46, 78
   §240.10b-5(a)........................................................................................19, 40
   §240.10b-5(b)........................................................................................17, 33
   §240.10b-5(c)......................................................................................19, 33, 40

Federal Rules of Civil Procedure
   Rule 8..................................................................................................76, 79
   Rule 9(b) ............................................................................................. *passim*
   Rule 15..................................................................................................84
   Rule 15(a)(2)..............................................................................................84

Private Securities Litigation Reform Act of 1995 .................................................... *passim*

Securities Act of 1933.................................................................................. *passim*

Securities Exchange Act of 1934...................................................................... *passim*

U.S. Code of Federal Regulations
   Title 21, Sec. 312.32 ....................................................................................29

## GLOSSARY OF ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| ¶__ or ¶¶__-__ | Paragraphs in the AC |
| AC | Plaintiff's Amended Complaint, filed on March 15, 2022 (ECF No. 44) |
| App. A at No. __ | Immunovant Defendants' Appendix A attached to the Speers Decl., titled "Chart of Challenged Statements" |
| Class Period | The period October 2, 2019 through February 1, 2021, inclusive |
| Defendants | Immunovant Defendants, Underwriter Defendants, and Roivant |
| Defendants' Motions to Dismiss | Immunovant Defendants' Motion to Dismiss the AC and Supportive Papers, Underwriter Defendants' Motion to Dismiss the AC and Supporting Papers, and Defendant Roivant's Motion to Dismiss the AC and Supporting Papers |
| Disputed Exhibits | Defendants' Appendix A and Exhibits 9, 13, 14, 15, 21, 22 and 23 |
| Exchange Act Claims | Plaintiff's claims under Sections 10(b) and Rule 10b-5, and 20(a) of the Securities Exchange Act of 1934 |
| Exchange Act Defendants | Immunovant, Peter Salzmann, Roderick Wong, and Roivant Sciences Ltd. |
| FDA | U.S. Food and Drug Administration |
| FE | Former Employee of Immunovant |
| HSAC | Health Sciences Acquisitions Corporation |
| Immunovant or the Company | Immunovant, Inc. |
| Immunovant Defendants | Immunovant, Roderick Wong, Peter Salzmann, Frank M. Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, and Eric Venker |

| | |
|---|---|
| IMVT MTD at __ | Citations to the Immunovant Defendants' Memorandum of Law in Support of Their Motion to Dismiss the AC |
| Kauf. Decl. | Declaration of Evan J. Kaufman in Support of Plaintiff's Omnibus Opposition to Defendants' Motions to Dismiss, dated July 26, 2022 |
| Legacy Immunovant | Immunovant, f/k/a Health Sciences Acquisitions Corporation, prior to being acquired by HSAC |
| Merger | HSAC's Acquisition of Legacy Immunovant |
| Offering Documents | Registration Statement and Prospectus filed in connection with the Sept. 2020 Offering |
| Plaintiff | Lead Plaintiff SEPTA Pension Plan Master Trust |
| Pl. App. __ | Citations to Plaintiff's Appendices attached to the Kauf. Decl. |
| Pl. Ex. __ | Citations to Plaintiff's Exhibits attached to the Kauf. Decl. |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Roivant | Defendant Roivant Sciences Ltd. |
| RTW | RTW Investments, L.P. |
| RVNT MTD at __ | Defendant Roivant's Memorandum of Law in Support of its Motion to Dismiss the AC |
| SAEs | Serious Adverse Events |
| SEA | Share Exchange Agreement entered into in connection with the Merger |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act Defendants | Immunovant, Peter Salzmann, Frank M. Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, Eric Venker, SVB Securities LLC (f/k/a SVB Leerink |

|  | LLC), LifeSci Capital LLC, Chardan Capital Markets LLC, Guggenheim Securities, LLC, and Robert W. Baird & Co. Inc., and Roivant Sciences Ltd. (Roivant is only referred to as a Securities Act Defendant for purposes of Section 15) |
|---|---|
| Sept. 2020 Offering | Immunovant's follow on stock offering on or about September 2-4, 2020 |
| Offering Documents | Registration Statement and Prospectus filed in connection with the Sept. 2020 Offering |
| SPAC | Special Purpose Acquisition Company |
| Speers Decl. | Declaration of Heather M. Speers in Support of Immunovant Defendants' Motion to Dismiss the AC, dated May 27, 2022 |
| Speers Decl. Ex. __ | Citations to Exhibits attached to the Speers Decl. |
| Securities Act Claims | Plaintiff's claims under Sections 11, 12, and 15 of the Securities Act of 1933 |
| UD MTD at __ | Citations to Underwriter Defendants' Memorandum of Law in Support of Their Motion to Dismiss the AC |
| Underwriter Defendants | SVB Securities LLC (f/k/a SVB Leerink LLC), LifeSci Capital LLC, Chardan Capital Markets LLC, Guggenheim Securities, LLC, and Robert W. Baird & Co. Inc. |

Lead Plaintiff SEPTA Pension Plan Master Trust ("Plaintiff")[1] respectfully submits this memorandum of law in opposition to Defendants' Motions to Dismiss the Amended Complaint ("AC"), dated May 27, 2022.

## I.     Preliminary Statement[2]

Even though this case involves technical medical terms and concepts, Defendants' violations of the federal securities laws are clear.  Immunovant's business depended on the development of a single drug named IMVT-1401.  The AC alleges detailed facts supported by multiple sources establishing there was a clear risk IMVT-1401 would elevate cholesterol levels in patients, including: (i) IMVT-1401's preclinical animal studies revealed substantial elevations in cholesterol of animals which received IMVT-1401; (ii) IMVT-1401 reduces a protein named serum albumin and multiple scientific studies and articles indicated albumin reductions elevate cholesterol; (iii) IMVT-1401 targets thyroid conditions and numerous scientific studies connect thyroid issues to cholesterol; and (iv) companies developing similar drugs monitored cholesterol.  Therefore, under FDA guidance and good clinical practices, Immunovant was expected to monitor, assess, and mitigate cholesterol levels.

Recognizing the disclosure of this potential side effect could negatively impact investors' perceptions of IMVT-1401's potential and disrupt its clinical trial schedule, Defendants hid this risk from investors and misrepresented the safety of IMVT-1401.  Even though the Exchange Act Defendants knew, or recklessly disregarded, that elevated LDL and cholesterol levels were anticipated risks of IMVT-1401, Defendants Immunovant and Salzmann repeatedly assured

---

[1]   For the Court's convenience, defined terms are listed in the Glossary of Abbreviations and Defined Terms.

[2]   Unless otherwise indicated, emphasis is added and internal quotations, citations and alterations are omitted.

investors that IMVT-1401 was "safe," "well-tolerated," and did not have any serious adverse events ("AEs"). Defendants Salzmann and Wong minimized any potential downside from the albumin reductions caused by IMVT-1401, claimed the effects were "asymptomatic," "reversible," and "not associated with any AEs or clinical symptoms," and falsely stated its "hard to find any published literature or expert opinion" on the negative impact of albumin reductions, even though scientific studies were readily available. And Defendants falsely represented IMVT-1401's clinical trials were conducted "in accordance with . . . accepted professional and scientific standards" though early clinical trials did not monitor cholesterol with even a basic lipid panel.

The Exchange Act Defendants reaped substantial financial rewards from their misrepresentations and omissions. The artificial inflation in Immunovant stock caused its price to hit predetermined targets enabling Defendant Roivant, entities affiliated with Defendant Wong, and others to be awarded 20 million shares of Company stock valued at more than $600 million. And Defendant Immunovant and other selling shareholders sold hundreds of millions of dollars in Company stock to investors through several follow-on stock offerings, including an offering on or about September 2, 2020, which is the subject matter of Plaintiff's Securities Act claims. In connection with that claim, the AC alleges the Securities Act Defendants are liable because the Offering Documents contained untrue statements of material fact and omitted material information.

Faced with Plaintiff's well-pled allegations, Defendants attempt to recast the facts alleged into something they are not and rely heavily on purported facts not referenced in the AC, which are inappropriate for consideration at this stage. And when Defendants do make arguments about the facts as alleged, such as that Defendants' statements are not materially false and misleading, that Plaintiff has not adequately alleged scienter, or that the AC fails to adequately allege control person liability, their arguments are without merit.

The Court should deny Defendants' Motions to Dismiss in their entirety and permit this case to proceed to discovery.

## II.     Statement of Facts

### A.     The Company and Its Business

Immunovant is a clinical-stage biopharmaceutical company that develops monoclonal antibodies for the treatment of autoimmune diseases. ¶46. Prior to and during the Class Period, Immunovant's entire business focused on the development of a single novel, fully human monoclonal antibody named IMVT-1401, formerly known as RVT-1401, for the treatment of myasthenia gravis ("MG"), thyroid eye disease ("TED") also known as Graves' Opthalmopathy ("GO"), and Warm Autoimmune Hemolytic Anemia ("WAIHA"). *Id*.

Defendants Roivant and Wong were involved with Immunovant and its sole drug in development, IMVT-1401, since before the Class Period. Immunovant began as a private business unit of Defendant Roivant ("Legacy Immunovant"), and Defendant Wong, through his investment firm RTW, acquired approximately 3% of Legacy Immunovant in December 2018. ¶¶47, 53.[3] On May 11, 2019, Defendant Wong reached out to Roivant's president to propose a merger between Legacy Immunovant and a SPAC Wong sponsored and controlled as its CEO, named HSAC, which raised $115 million from investors through an initial public offering only two days earlier. ¶¶48, 53.

After months of due diligence into Immunovant and IMVT-1401, HSAC (with Defendant Wong as CEO), and the sellers of Legacy Immunovant (including Defendants Roivant and Wong), entered into a Share Exchange Agreement ("SEA") for HSAC's acquisition of Legacy Immunovant (the "Merger"). ¶53. The Merger was approved on December 16, 2019, and HSAC changed its

---

[3]     Due to a typographical error, ¶53 of the AC states RTW acquired its shares of Legacy Immunovant on December 28, 2019 instead of December 28, 2018.

name to "Immunovant, Inc." ¶52. At that time, the price of Immunovant stock was $11.49 per share. ¶276.

The SEA provided substantial financial benefits to Defendants Roivant and Wong if the price of Immunovant stock rose to predetermined price targets within specified time periods. Specifically, Defendants Roivant and Wong, along with other Legacy Immunovant shareholders, were to receive, at no cost, 10 million shares of Immunovant stock "if the share price exceeds $17.50 by March 31, 2023" and an additional 10 million shares "if the share price exceeds $31.50 by March 31, 2025." ¶51.

Defendant Roivant exercised control over Immunovant prior to and during the Class Period since it remained Roivant's majority stockholder after the Merger. ¶294. Immunovant was a "controlled company" of Defendant Roivant under the listing rules of Nasdaq, Roivant owned all of the Company's Series A preferred stock entitling Roivant to appoint a certain number of Series A Preferred Directors, and due to Roivant's control over Immunovant, the Company was not required to have a majority of "independent directors." ¶95. According to the Sept. 2020 Offering Documents, "Roivant will be able to exercise control over all matters requiring stockholder approval, including the election of our directors and approval of significant corporate transactions." *Id*.

**B.      There Was an Undisclosed Risk that IMVT-1401 Would Increase Cholesterol and Risk of Heart Disease in Patients**

It is widely known that elevations in cholesterol are associated with an increased risk of vascular disease and overall mortality. ¶82. The AC alleges numerous facts from multiple sources establishing elevated cholesterol levels and coronary disease were anticipated and potential risks to patients who received IMVT-1401. ¶¶70-83. The AC alleges, among other things, the following:

*First*, IMVT-1401 is an FcRn inhibitor and treatment with FcRn inhibitors will potentially lower serum albumin levels. As a result of the decrease in serum albumin levels, serum cholesterol

(total and LDL) levels may increase. ¶¶73-79; 82(a). The AC alleges detailed facts and the scientific bases to support these allegations, as well as support from scientific studies from 1992, 2002, 2012, and 2015. ¶¶73-76.

*Second*, an indication for IMVT-1401 is the treatment of the thyroid condition GO. The AC details why IMVT-1401's treatment of thyroid hormone levels could impact cholesterol levels. ¶¶80-81. Since GO is a thyroid condition, and since thyroid levels are known to impact cholesterol levels, the treatment of GO would also be expected to impact cholesterol levels. ¶81. In further support of these allegations, the AC refers to scientific studies dating back to 1930 establishing connections between thyroid hormone levels and cholesterol. ¶80. A 2011 study made clear there is an inverse relationship between thyroid function and cholesterol (*id.*) and a 2020 study reported that treatment of hyperthyroidism was found to increase cholesterol levels. ¶81.

*Third*, Immunovant's preclinical animal studies revealed substantial increases in cholesterol in the animals tested with IMVT-1401. ¶¶70-72. According to a former Immunovant employee ("FE"), the underlying data from each of Immunovant's pre-clinical animal studies made it abundantly clear that animals which received IMVT-1401 experienced substantially increased levels of cholesterol compared with those which did not receive IMVT-1401. ¶70. In fact, FE described the increases for those animals as ***200 to 300 percent higher*** than the control group animals which did not receive the drug. *Id.*

*Fourth*, companies developing similar compounds, including Harbour BioMed, the license holder for 1401 in Greater China, and competitor Argenx SE, tested for cholesterol, showing that those entities recognized elevated cholesterol levels was an anticipated risk which needed to be monitored. ¶83.

### C.   Immunovant Was Required to Assess IMVT-1401's Safety Before and During Clinical Trials

Immunovant, as the sponsor of IMVT-1401's clinical trials, was required to adhere to FDA rules, guidelines, and good clinical practices.  ¶¶61-69; CFR 312.  Immunovant was expected to actively monitor and assess safety information about IMVT-1401 on an ongoing basis through a variety of methods to identify risks.  ¶¶61-62.  Among other things, Immunovant was required to determine whether risks could be identified from adverse events in IMVT-1401's animal studies or those reported from other drugs within IMVT-1401's pharmacological class.  ¶62.

According to the FDA's December 2015 Guidance for Industry and Investigators, Immunovant was required to assess safety data from *all* sources, including animal studies, clinical investigations, reports in scientific literature, unpublished scientific papers and numerous other places.  ¶64.  Immunovant was required to review the safety *data* from the IMVT-1401 animal studies, not just the executive summaries provided by the laboratories hired to perform the studies and was required to regularly *search for* and *review* potential safety issues in scientific literature and other sources.  ¶65.  And adverse events reported in other drugs within a pharmacological class or within the same drug in animal studies should have led to a *heightened level of surveillance* for anticipated risks.  ¶62.

The AC alleges numerous facts from multiple corroborating sources that by the start of the Class Period, there was a "potential" and "anticipated" risk that IMVT-1401 would negatively impact cholesterol levels and increase the risk of heart disease in humans.  ¶¶62, 66, 78-83.  Accordingly, it was a *fact* – at the time of each of Defendants' statements during the Class Period – that IMVT-1401's impact on cholesterol was a potential safety concern that needed to be monitored and assessed.  Immunovant, however, failed to monitor these risks or disclose them to investors.  ¶¶84-91.  Instead, Immunovant conducted several clinical trials of IMVT-1401 without testing

cholesterol levels, made positive statements about the results of those trials, and without a reasonable basis, reported that IMVT-1401 was safe and well-tolerated without any serious adverse events.

### D. Defendants Misrepresented and Omitted Material Facts About IMVT-1401

Defendants issued materially false and misleading statements and omitted material information in SEC filings, press releases, on conference calls, and at conferences, throughout the Class Period. Additionally, the Sept. 2020 Offering Documents contained untrue statements of material fact and omitted material information required to be disclosed therein.

Immunovant repeatedly discussed IMVT-1401 but failed to disclose elevated cholesterol was an anticipated risk or that Immunovant had not monitored or assessed that risk. Without disclosing these key facts, Defendants issued materially false and misleading statements about: (i) IMVT-1401's completed clinical trials; (ii) the potential negative impact of albumin reductions; (iii) the design of IMVT-1401's clinical trials; (iv) Immunovant's failure to comply with FDA rules and guidelines and good clinical practices; and (v) the timetable for the development of IMVT-1401. ¶¶92-94; 96-114; 170-253.

### 1. Misstatements and Omissions Regarding Completed Clinical Trial Results

Defendants made materially false and misleading statements and omitted material information concerning the results of clinical trials of IMVT-1401, throughout the Class Period. ¶¶102-113, 173-183, 187, 191-197, 211-215, 218-228, 234, 238-244, 249, 252. Defendants repeatedly declared in SEC filings and press releases that IMVT-1401 was "safe," "well-tolerated," and not the cause of any serious adverse events ("AEs") or "discontinuations due to AEs." *See, e.g.*, ¶¶84, 86, 104, 194, 224, 238. Defendant Salzmann stated, "on the safety side, importantly, there were no serious adverse events" and that "we're looking good from a safety and tolerability standpoint." ¶249. Those and other similar statements were materially false and misleading.

- 7 -

Defendants failed to disclose elevated cholesterol was a risk. A reasonable investor would have expected Defendants' statements to have been based on clinical trials which monitored all key anticipated risks, when that was not what transpired. And Defendants lacked a reasonable basis to assert that IMVT-1401 was safe, well-tolerated, and without serious AEs because it was likely that patients receiving IMVT-1401 experienced elevated cholesterol levels.

### 2. Misstatements and Omissions Regarding Albumin Reductions from IMVT-1401

Immunovant revealed that albumin reductions were observed in IMVT-1401 clinical trials. ¶¶104, 193, 238. Defendants knew, or recklessly or negligently disregarded, that medical studies indicated that albumin reductions cause elevations in LDL and cholesterol. ¶¶73-76. Nevertheless, Defendants failed to disclose these facts to investors, misrepresented the science concerning albumin reductions, and minimized the impact of the albumin reductions observed in IMVT-1401's clinical trials. ¶¶104, 193, 238. Defendants asserted the albumin reductions "were not associated with any AEs or clinical symptoms" (¶104) and minimized the reductions as "reversible" and "asymptomatic" (¶¶238, 242) even though they likely caused cholesterol elevations. When asked about the reductions, Defendant Salzmann falsely stated, "it's pretty hard to find any published literature" about the albumin reductions, even though published literature indicating albumin reductions elevate cholesterol was readily available at the time of his statement, including those alleged in the AC. *See, e.g.*, ¶¶73-76, 205.

### 3. Misstatements and Omissions Regarding Compliance with Good Clinical Practices and Design of Clinical Trials

Defendants made materially false and misleading statements about the design and purposes of IMVT-1401's clinical trials. ¶¶96, 109, 111, 189, 199, 201, 203, 213, 228, 230, 234, 249. The 11/27/19 Proxy for the Merger falsely represented IMVT-1401's clinical trials were "being conducted in all material respects in accordance with experimental protocols, procedures and

controls pursuant to accepted professional and scientific standards . . . and all applicable laws and regulations. . . ." ¶189. Even though Immunovant had not tested for the anticipated risk of elevated cholesterol, as required under FDA rules and good clinical practices, Immunovant's SEC filings misrepresented that IMVT-1401's clinical trials "asses[] the safety and tolerability of IMVT-1401" and that "primary endpoints of [the trials] are assessment of the safety and tolerability of IMVT-1401." ¶¶109, 111, 228. Indeed, contrary to the statement in the 11/27/19 Proxy for the Merger that the protocols for, and results of, IMVT-1401 clinical trials were "complete in all material respects" (¶189), the protocols and results concerning safety, tolerability, and AEs were not "complete" because Immunovant failed to monitor cholesterol. ¶71.

### 4. Additional Misstatements and Omissions Regarding IMVT-1401

Defendants made materially false and misleading statements about other items as well. Immunovant's SEC filings discussed IMVT's nonclinical animal studies, including that "Cynomolgus monkeys were selected . . . given the high degree of sequence homology to human FcRn." ¶226. While the SEC filings highlighted positive attributes of the nonclinical animal tests, they failed to disclose those tests revealed substantial elevations in cholesterol for the animals tested. Defendants discussed the rapid schedule for the release of clinical trial results, including results for the ASCEND GO-2 trial in "the first half of calendar year 2021." ¶228. Defendants, however, failed to disclose the ASCEND GO-2 trial – unlike prior clinical trials of IMVT-1401 - monitored cholesterol, and that there was a considerable risk that the trial could be delayed due to observations of elevations in cholesterol.

### E. Defendants' False and Misleading Statements and Material Omissions Caused an Artificial Inflation in the Price of the Company's Shares

By not testing cholesterol levels during early clinical trials, Immunovant was able to potentially avoid revealing to investors that IMVT-1401 elevated cholesterol. The ASCEND-GO-2

Phase 2b trial, which was not scheduled to release results until early 2021, was Immunovant's first clinical trial to monitor cholesterol.  ¶88.  By that time, Defendants were able to reap substantial gains from the public's perception of IMVT-1401 based on their statements.

The artificial inflation in the price of Immunovant shares enabled Wong, Roivant, and other Legacy Immunovant shareholders, to receive ***all 20 million earnout shares*** set forth in the SEA before reporting results from any clinical trials which monitored cholesterol.  They earned 10 million shares on May 12, 2020 (valued at $227 million) and another 10 million shares on September 17, 2020 (valued at $384 million).  *See* IMVT PRE 14A, dated 8/02/2021 (Pl. App. B; Pl. Ex. 2 at 34)[4]; ¶273.  The artificial inflation in the price of Immunovant shares also enabled the Company and selling shareholders to sell hundreds of millions of dollars in Immunovant shares to the public through several public follow-on offerings, including $139.4 million on April 14, 2020, and $200 million in the Sept. 2020 Offering, before having to potentially reveal that IMVT-1401 elevated cholesterol levels.  ¶¶275-276.

### F.      The Company's Stock Declines

On February 2, 2021, approximately one month after receiving results indicating trial participants experienced elevations in LDL and cholesterol, the Company announced it halted the ASCEND-GO-2 Phase 2b trial study because it had "become aware of a physiological signal consisting of elevated total cholesterol and LDL levels in IMVT-1401-treated patients."  ¶129.  Even though Immunovant described a "voluntary" pause in clinical dosing, the FDA would have likely instructed the Company to do so because the FDA may impose a partial or complete clinical hold on a drug study if a significant safety issue is identified.  ¶60.  An analyst report by UBS on February 5,

---

[4]    Declaration of Evan J. Kaufman in Support of Plaintiff's Omnibus Opposition to Defendants' Motions to Dismiss ("Kauf. Decl.").  References to the appendices and exhibits attached thereto appear herein as "Pl. App. ___" and "Pl. Ex. ___," respectively.

2021, described the cholesterol data as "a very real and meaningful increase in LDL levels (40-65%)." ¶138.

Following the Company's February 2, 2021 announcements, the price of Immunovant stock collapsed from a closing price of $43.30 per share on February 1, 2021 to a closing price of $25.08 per share on February 2, 2021, a one-day decline of $18.22 per share, or 42.08%, on extremely heavy trading volume of 11.76 million shares. ¶134. Then, on June 1, 2021, the Company released additional information about IMVT-1401's impact on cholesterol, including that "Albumin and LDL are tightly linked." ¶¶141-142. Following the Company's June 1, 2021 announcements, the price of Immunovant stock fell from a closing price of $15.16 per share on Friday, May 28, 2021, to a closing price of $9.40 per share on June 1, 2021, a one-day decline of $5.76 per share, or 38%, on extremely heavy trading volume of 16.91 million shares. ¶143.

Analysts commented that the cholesterol issue would likely reduce IMVT-1401's potential. A Guggenheim analyst report downgraded Immunovant to "Neutral" and "remov[ed] [its] PT [(price target)] based on the limited potential for IMVT-1401 given the competitive landscape (ARGX's efgartigimod, HZNP's Tepezza) and the observed lipid safety issues, which are likely to be an issue for all proposed indications." ¶144. Similarly, a Credit Suisse analyst report lowered its target price to $12 per share "to reflect the lower probability-of-success . . . in TED and the heightened uncertainty across other programs . . ." and commented, "we think IMVT-1401 may struggle to differentiate favorably to other FcRn agents that have minimal impact to albumin levels." ¶145.

The price of Immunovant stock has not recovered, closing at $4.25 per share on July 25, 2022. *See* Pl. Ex. 3.

### III.   Argument

#### A.   Legal Standard on a Motion to Dismiss

On a Rule 12(b)(6) motion, "the Court's task is 'necessarily a limited one.'" *Manavazian v. ATEC Grp., Inc.*, 160 F. Supp. 2d 468, 476 (E.D.N.Y. 2001).  In deciding a motion to dismiss, a court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must "accept all factual allegations in the complaint as true" on Rule 12(b)(6) motions).  "[F]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C., v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (alterations in original).  The question is whether a claim is plausible and, therefore, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

#### B.   Defendants' Alternative Version of the Facts Are Inappropriate for a Motion to Dismiss and Should Be Stricken by the Court

Instead of focusing on the facts as alleged in the AC, Defendants go to great lengths to distort Plaintiff's factual allegations and inappropriately introduce facts outside the four corners of the AC based on materials not relied on or integral to the AC.  This tactic is improper and an obvious attempt by Defendants to distract the Court and avoid making legal arguments directed towards the facts as alleged.  The Court must accept all well-pled facts as true and draw all reasonable inferences in favor of the Plaintiff.  *SEC v. Glob. Inv. Strategy UK Ltd.*, 2021 U.S. Dist. LEXIS 202592, at *25 (S.D.N.Y. Oct. 19, 2021).  *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 428 (S.D.N.Y. 2003) (rejecting defendants' introduction of "evidence and arguments intended to establish [their

point]" because "they will have an opportunity to do so at a later stage . . . when it is appropriate to weigh the parties' competing evidentiary submissions[,]" because "[o]n this motion, the plaintiffs' allegations are taken as true").

Defendants introduce facts based on events timed after the Class Period, discuss a purported Phase 3 trial, and base arguments on competing facts, such as describing the observed cholesterol elevations as "minor" even though those amounts were substantial enough to cause the halting of IMVT-1401's clinical trial. IMVT MTD at 5-6. Defendants raise the FDA's state of mind and argue what the FDA believed even though there are no factual allegations about the perspective of the FDA concerning Immunovant or IMVT-1401.[5]

By submitting 27 exhibits and a lengthy appendix, Defendants have inappropriately attempted to transform "the [dismissal] inquiry into a summary-judgment proceeding – one featuring a bespoke factual record, tailor-made to suit the[ir] needs[.]" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 560 (2d Cir. 2016). Defendants will have the opportunity to put forward its purported "evidence" during discovery but the Court should reject efforts to inject them at this stage.[6]

Specifically, the Immunovant Defendants ask the Court (IMVT MTD at 3 n.1) to improperly consider App. A and Speers Decl. Exs. 9, 13, 14, 15, 21, 22, and 23 (the "Disputed Exhibits").[7] The Court may consider documents incorporated by reference in the AC if the AC contains a "'clear,

---

[5]    Those facts are in the sole possession of the FDA and Immunovant and not available to Plaintiff, as shown by the FDA's refusal to provide any documents in response to Plaintiff's FOIA request. Pl. Ex. 1.

[6]    Plaintiff has addressed the substance of Defendants' exhibits and appendices herein, as appropriate.

[7]    The Immunovant Defendant's exhibits are attached to the Declaration of Heather M. Speers, dated May 27, 2022.

'definite and substantial reference' to that document" or documents integral to the AC.[8] *Micholle*, 2019 U.S. Dist. LEXIS, at \*15.  "For a document to be integral to a complaint, a plaintiff must have known of or possessed the document *and* 'relied heavily upon its terms and effect' in drafting the complaint."  *Gagnon*, 368 F. Supp. 3d at 763 (quoting *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original)).

Documents filed with the SEC may be considered "only to determine what the documents stated," and "not to prove the truth of their contents."  *Gagnon*, 368 F. Supp. 3d at 763.  "[C]ourts may consider 'the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit.'"  *In re Sibanye Gold Ltd. Sec. Litig.*, 2020 WL 6582326, at \*13 (E.D.N.Y. Nov. 10. 2020) (Matsumoto, J.).  But "[t]he Second Circuit noted that this standard is occasionally misinterpreted, and clarified that 'a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.'"  *Benny v. City of Long Beach*, 2021 U.S. Dist. LEXIS 182305, at \*23 (E.D.N.Y. Sept. 23, 2021) (Matsumoto, J) (emphasis in original).

Accordingly, the Court should strike the following documents because they are not incorporated by reference in the AC and are improperly submitted for the truth of their contents (*see Roth*, 489 F.3d at 509, 511):

---

8   "[A] court may not consider *any* materials outside of the pleadings that do not fall within one of the established exceptions without converting the motion to a Rule 56 motion[.]"  *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 762 (S.D.N.Y. 2019) (emphasis in original).  The court "must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."  *SEC v. MiMedx Grp., Inc.*, 2022 U.S. Dist. LEXIS 56055, at \*13-\*14 (S.D.N.Y. Mar. 28, 2022) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)); *Micholle v. Opthotech Corp.*, 2019 U.S. Dist. LEXIS 160131, at \*15 (S.D.N.Y. Sept. 18, 2019) (the court may consider allegations contained in the four corners of the complaint).

**Appendix A:**[9] Defendants submitted App. A, which is 63 pages and contains 210 new arguments, as an inappropriate way to exceed the page limits. *GTE Mobilnet of Cal. Ltd. P'ship v. City of Berkeley*, 2022 U.S. Dist LEXIS 32710, at *9 (N.D. Cal. Feb. 24, 2022) (attempting to incorporate by reference arguments from another brief is an "improper attempt to get around the page limits"); *Monec Holding AG v. Motorola Mobility, Inc.*, 2014 U.S. Dist. LEXIS 123898, at *3 (D. Del. Sept. 5, 2014) ("This court has recognized the impropriety of including legal analyses in charts attached as exhibits . . . as opposed to including them in the briefing itself, for purposes of circumventing page limitations.").

**Speers Decl. Exhibit 9:**   Speers Decl. Ex. 9 contains a Form 8-K filed on September 29, 2019, a press release dated October 2, 2019, and a Corporate Overview presentation from October 2019.  The Immunovant Defendants use Speers Decl. Ex. 9 to attempt to define decreases in albumin as "mild."  IMVT MTD at 7.  Whether the decreases were mild is a factual dispute that requires resolution by experts – not Defendants' counsel.  Speers Decl. Ex. 9 was not incorporated into the AC by reference.  IMVT MTD at 3 n.1.  *Gagnon*, 368 F. Supp. 3d at 762-63 (declining to consider investor presentations because they were not "attached to the Complaint and the Complaint makes no reference to the presentations[.]"); *McKenzie v. Grand Cent. P'ship*, 2016 U.S. Dist. LEXIS 39361, at *9 (E.D.N.Y. Mar. 25, 2016) (Matsumoto, J.) (declining to consider exhibits because they were not attached to the amended complaint, incorporated by reference, or relied upon for their "terms and effect").

---

[9]   If the Court decides to consider Appendix A in deciding the Motions to Dismiss, Plaintiff responds to Defendants' arguments in a chart submitted herewith attached to the Kauf. Decl., Pl. App. A.

**Speers Decl. Exhibits 13 and 14:**[10]  The court need not consider press releases.  *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 384 (S.D.N.Y. 2020) (declining "to consider or take notice" of a company's press release).  The Immunovant Defendants use Speers Decl. Ex. 14 for facts not contained in the AC for events which occurred after the Class Period ended.  *Id.* at 383-84 (declining to consider certain SEC filings not relied on in the complaint which were filed after the date of the shareholder vote on the merger at issue); *Raffaele v. City of N.Y.*, 144 F. Supp. 3d 365, 373 (E.D.N.Y. 2015) (Matsumoto, J.) (declining to consider a CCRB Investigative Report submitted by plaintiff in the opposition brief "because the [AC] did not attach the [report], the [report] was not incorporated by reference into the [AC], and the [AC] d[id[ not rely on the 'terms and effect' of the report").

**Speers Decl. Exhibit 15:**  Speers Decl. Ex. 15 contains Roderick Wong's Form 4 filings which the Immunovant Defendants use to argue that "one of Dr. Wong's entities purchased well over $9 million in shares during the putative class period."  IMVT MTD at 37.  A Form 4 cannot be considered on a motion to dismiss to establish the truth of the matters asserted therein.  *Wagner v. Royal Bank of Scotland Grp. PLC*, 2013 U.S. Dist. LEXIS 127551, at *7-*11 (S.D.N.Y. Sept. 5, 2013) (rejecting defendants reliance on a Form 4).  It is unclear how many shares other affiliated entities may have sold.

**Speers Decl. Exhibit 21:**  Speers Decl. Ex. 21 is a special call transcript held on January 5, 2022 which the Immunovant Defendants use to introduce new facts.  IMVT MTD at 12, 27, 35.  Speers Decl. Ex. 21 is not incorporated by reference (IMVT MTD at 3 n.1) or integral to the AC.  *In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 541891, at *7 (E.D.N.Y. Feb. 23, 2022)

---

[10]  The Immunovant Defendants attempt to improperly introduce press releases, but the case they rely on to support their argument was based on an agreement between the parties.  *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008).

(declining to consider earnings call transcript that plaintiffs "only briefly quote[d]"); *In re Tommy Hilfiger Sec. Litig.*, 2007 U.S. Dist. LEXIS 55088, at \*13-\*14 (S.D.N.Y. July 20, 2007).

**Speers Decl. Exhibits 22 and 23:**  Speers Decl. Ex. 22 is a Baird Equity Research Analyst Report and Speers Decl. Ex. 23 is a Credit Suisse Analyst Report.  The Immunovant Defendants cite to Speers Decl. Ex. 22 in an attempt to state that the reduction in albumin levels is not a "major area of worry."  IMVT MTD at 8.  These assertions are not in the AC.  The Immunovant Defendants place great weight on the medical opinion of financial analysts – whose job is to analyze the company's stock price.  IMVT MTD at 11.  *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 289 (S.D.N.Y. 2013) (striking analyst reports because they would be "of no assistance to [defendant] except if taken for the truth").

The Court should not consider any of the Disputed Exhibits.[11]

### C.    The AC States Claims Under the Exchange Act

#### 1.    Legal Standard

The elements of a claim under Section 10(b) and Rule 10b-5(b) are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  Defendants primarily challenge falsity and scienter and do not argue Plaintiff did not adequately allege loss causation.

Unlike their Securities Act claims (discussed in §III.E. below), Plaintiff's fraud-based claims under the Exchange Act are subject to Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Because

---

[11]  Doing so would give Defendants an unfair advantage of introducing facts outside the AC while Plaintiff's hands are tied during the PSLRA's stay on discovery.  15 U.S.C. §78u-4(b)(3)(B).

Plaintiff's Exchange Act claims are also subject to the PSLRA, the AC must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A).

### 2.    The AC Pleads Defendants' Fraud with Particularity

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). To do so, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). Although securities fraud actions are subject to the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b), the Second Circuit "do[es] not require the pleading of detailed evidentiary matter[,]" *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply facts sufficient "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak*, 216 F.3d at 314 n.1.

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). Statements of literal truth "can become, through their context and manner of presentation, devices which mislead investors." *Id.* "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly . . . be considered a material misrepresentation." *Id.* (internal quotations omitted). Thus, Defendants had "'a duty to be both accurate and complete'" in making their Class Period statements. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("'[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic.") (alteration in original).

- 18 -

An omission is actionable under Section 10(b) if it is "material." *Manavazian*, 160 F. Supp. 2d at 478. Omissions are material if there is a "substantial likelihood" that their disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). "'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

With respect to Plaintiff's Exchange Act claim for a fraudulent scheme under SEC Rules 10b-5(a) and (c), the AC alleges Defendants' fraud with particularity as discussed in §III.C.2 below.

> **3.      The AC Adequately Alleges Defendants Issued Materially False and Misleading Statements and Omitted Material Information**

Although Defendants claim to be confused as to which statements are alleged to be misleading (*e.g.*, IMVT MTD at 16 n.12), the AC properly particularizes Defendants' materially false and misleading statements and omissions in accordance with Fed. R. Civ. P. 9(b) and the PSLRA, 15 U.S.C. §78u-4, et seq. 22. The AC specifically identifies what statements are alleged to be false and misleading; "who" made the statements (*i.e.*, Immunovant (¶¶211, 217), Salzmann (¶¶191, 205), Wong (¶183)); "when" they were made (*i.e.*, October 11, 2019 (¶183), November 27, 2019 (¶189)) and "where" they were made (*i.e.*, in SEC filings, press releases, analyst calls). *See, e.g.*, ¶¶173-174, 177-178, 179-180, 183-184, 185-186, 187-188, 207-208; *see Janel World Trade, Ltd. v. World Logistics Servs., Inc.*, 2009 U.S. Dist. LEXIS 30256, at *12 (S.D.N.Y. Mar. 20, 2009); *see also Montoya v. Mamma.com, Inc.*, 2006 U.S. Dist. LEXIS 13207, at *14 (S.D.N.Y. Mar. 28, 2006).

The AC also alleges "why" the statements were materially false and misleading *i.e.*, (i) misrepresented that the primary endpoints of IMVT-1401 clinical trials were "safety and tolerability" and ongoing clinical trials were designed to examine safety even though failed to test for a key anticipated risk of elevated cholesterol (¶¶208, 214, 229); (ii) misrepresented that IMVT-1401 had been "well-tolerated" with no serious AEs because Immunovant had not assessed or monitored the anticipated risk of elevated cholesterol and therefore lacked a reasonable basis to make statements (¶194); and (iii) misrepresented that reductions in albumin were not associated with any AEs because albumin reductions were associated with elevations in cholesterol and Defendants lacked a reasonable basis to make these statements.  ¶¶206, 225.

Specifically, Plaintiff alleges Defendants issued materially false and misleading statements and omitted material facts concerning: (i) the results and descriptions of completed clinical trials of IMVT-1401; (ii) the impact of serum albumin reductions on patients and the existence of studies indicating albumin reductions causes elevations in cholesterol; (iii) the design and focus of IMVT-1401's clinical trials; (iv) preclinical animal studies of IMVT-1401; and (v) the rapid timetable for the testing and development of IMVT-1401.  ¶¶170-258.  These alleged misrepresentations and omissions were material to investors, as demonstrated by the precipitous declines in the market value of Immunovant securities when the misrepresented and concealed risks materialized or were disclosed.  ¶¶134, 143.  The AC more than adequately alleges Plaintiff's claims with particularity. *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 2020 WL 248729, at *5 (S.D.N.Y. Jan. 15, 2020) (complaint pled with particularity where it "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading").

#### 4.     The AC Alleges Numerous Reliable Facts Showing Elevated Cholesterol Was an Anticipated Risk of IMVT-1401

The AC details facts from multiple corroborating sources showing that elevated cholesterol levels and coronary disease were anticipated and potential risks of IMVT-1401 (¶¶70-83), including:

- Preclinical **animal studies of IMVT-1401** revealed substantial increases in cholesterol in the animals tested with IMVT-1401. ¶¶70-72. The cholesterol of animals which received IMVT-1401 substantially increased compared with those which did not. ¶70. FE described increases as **200 to 300 percent higher** than control group. *Id*.

- **Scientific studies** and **detailed facts** explaining albumin reductions elevate cholesterol levels. ¶¶73-79; 82(a).

- **Scientific studies** and **detailed facts** explaining why IMVT-1401's treatment of thyroid hormone could negatively impact cholesterol levels. ¶¶80-81.

- **Other companies** developing similar compounds **tested for cholesterol**, showing those entities recognized elevated cholesterol levels were an anticipated risk which needed to be monitored. ¶83. **Immunovant itself** measured for cholesterol in the ASCEND GO-2 Phase 2b trial, showing it was a risk. ¶168.

Similarly, the AC details facts supporting Plaintiff's claim that since elevated cholesterol levels and coronary disease were anticipated and potential risks, Immunovant was required to monitor, assess, and mitigate those risks pursuant to FDA regulations and guidelines and good clinical practices. ¶¶61-69.

Nevertheless, without any legitimate legal or factual basis, Defendants argue the AC "alleges no facts demonstrating that increased cholesterol was an 'anticipated risk.'" IMVT MTD at 16; UD MTD at 6-9. Defendants are wrong. Each of the categories of factual support referenced above would have been sufficient *alone* to warrant Immunovant monitoring and assessing cholesterol levels during clinical trials, and collectively there is no reasonable dispute elevated cholesterol was an anticipated risk of IMVT-1401. *City of Providence v. Aeropostale, Inc.*, 2013 U.S. Dist. LEXIS 44948, at *53-*54 (S.D.N.Y. Mar. 25, 2013) (rejecting defendants' argument that information

- 21 -

available to them was not a "magic black box" that could perfectly predict performance because plaintiff's allegations in the complaint allege that defendants had, "at a minimum" access to data).

Accepting these facts as true and drawing all reasonable inferences in favor of the Plaintiff – as the Court must – the AC establishes elevated cholesterol was an anticipated risk of IMVT-1401. *Id.* at *29 (rejecting defendants' arguments because "facts are alleged in the Amended Complaint – facts that [the court] must presume are true – that, if proved, demonstrate that defendants knew [facts contradicting their statements] at the time those statements were made").

### a.   FE's Allegations About IMVT-1401's Animal Studies Are Reliable

Plaintiff's claim that IMVT-1401's preclinical animal studies revealed substantial elevations in cholesterol is supported by facts provided by FE, a former employee who learned those facts in connection with FE's employment at Immunovant. ¶¶14, 140. The Immunovant Defendants state the "AC never specifies when the FE worked at Immunovant, only that he was there for at least one day" and argue the AC does not adequately allege FE "had the necessary context or competence to even understand the scientific results." IMVT MTD at 21, n.15. Contrary to Defendants' characterizations, the AC alleges FE worked at Immunovant during the Class Period and reviewed the animal studies during January 2021 in connection with Immunovant's internal investigation leading up to the halting of the Company's Phase 2b trial at the end of the Class Period. ¶¶14, 140. In connection with FE's employment at Immunovant, FE had direct "first-hand knowledge about Immunovant's pre-clinical and clinical testing of IMVT-1401 . . . [and] first-hand knowledge of the results of the animal testing . . . as well as the halting of the Company's Phase 2b trial" at the end of the Class Period. ¶14.

The Immunovant Defendants are wrong that facts attributed to FE are "vague," not "concrete" or not sufficiently detailed to support Plaintiff's claim. IMVT MTD at 20-23. FE

recalled that: (i) Immunovant measured the cholesterol levels in the animals in the study; (ii) the written studies listed the animals' cholesterol levels at the start and end of the test; and (iii) a comparison of those figures clearly showed substantial increases in cholesterol for animals which received IMVT-1401 compared to those which did not, such that cholesterol was elevated for all animals which received IMVT-1401. ¶¶70, 140. FE recalled that some animals showed increases of 200 to 300 percent compared with the control group. ¶70. Furthermore, FE recalled that each of the studies revealed substantial increases in cholesterol. *Id*. These allegations are reliable and amply support Plaintiff's claim. *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 151 (2d Cir. 2021) ("even securities plaintiffs need not prove their entire case within the confines of the complaint").[12]

Even though the facts attributed to FE are reliable, in the event the Court determines additional information is necessary, Plaintiff respectfully requests leave to amend the AC to include additional facts about FE. For example, Plaintiff can allege FE was hired by Immunovant after two-decades of experience in preclinical drug development, and worked as a senior employee in Immunovant's Non-Clinical Development group from the end of 2019 until after the Class Period. FE has a pathology background with a specialization in cardiovascular diseases and is a board-certified toxicologist. Immunovant hired FE to be involved with non-clinical strategies and the design of non-clinical study profiles.

FE had oversight regarding the design, monitoring, data analysis, and reporting of non-clinical study profiles and directed nonclinical strategies necessary to progress drug candidates from preclinical development to clinical trials. FE paid attention to whether a drug candidate had negative

---

[12]   *City of Providence*, 2013 U.S. Dist. LEXIS 44948, at *54-*55 ("We are only at the pleading stage, and discovery may well undermine . . . Plaintiff's position[,] [b]ut precisely because we are at the pleading stage, where – even under the PSLRA – we have to assume the truth of well-pleaded facts, it would be inappropriate to grant the motion to dismiss.").

- 23 -

impacts.   FE had experience with regulatory submissions, general toxicology, and safety pharmacology.

In early January 2021, patients treated with IMVT-1401 during a Phase 2b clinical trial displayed increased cholesterol levels and the Principal Investigator notified IMVT-1401's clinical trial doctor regarding this issue.  The Principal Investigator initiated an alert and the Internal Monitor advised the rest of the team and Defendant Salzmann.  FE was tasked with reviewing each of Immunovant's completed preclinical animal studies to determine whether they showed an increase in total cholesterol levels in animals.

FE reviewed the toxicology studies obtained from the animals, reports, and data and observed significant increases in cholesterol levels in animals which received the drug compared to the control group – some animals displaying increases 200-300% higher than normal.  FE provided a summary of findings to the then-Chief Medical Officer who relayed the information to other members of senior management of Immunovant.  There can be no dispute the facts provided by FE are reliable and more than plausibly establish that Immunovant's animal studies clearly revealed substantial elevations in cholesterol.  "A complaint may rely on information from confidential witnesses if "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).[13]

The Immunovant Defendants complain FE has not provided enough specific information such as the number of animals which received IMVT-1401 or the precise cholesterol reading for individual animals.  IMVT MTD at 21-22.  Plaintiff is not required to plead evidence and the level of

---

[13]   *See also In re Evci Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 96 (S.D.N.Y. 2006).

detail sought by Defendants is not necessary at this stage. *See, supra*, *City of Providence*, 2013 U.S. Dist. LEXIS 44948, at \*21-\*23, \*28-\*29, \*40, \*54-\*55.

Adding to the reliability of the facts attributed to FE, the AC alleges FE recalled that even though the underlying data for the animal studies *clearly* showed substantial increases in cholesterol of animals which received IMVT-1401, the summary of findings at the beginning of the reports *incorrectly* failed to reflect these increases. ¶140.  Thus, according to FE, the summary of findings was wrong and false (*id.*), and not the result of a scientific disagreement, as posited by Defendants. IMVT MTD at 16-20; UD MTD at 9-11.  The Exchange Act Defendants knew, or recklessly disregarded, the animal studies revealed substantial elevations in cholesterol even though the summary of findings may have contained false information.  ¶171(b)(i).  The Securities Act Defendants, at minimum, were negligent.  ¶¶94(b)(i),147, 150-151, 156-158.

Instead of addressing the facts as alleged in the AC, the Immunovant Defendants distort Plaintiff's allegations by arguing the false information in the summary of findings "confirm[s] that the alleged results were insignificant," somehow shows the increased cholesterol was not statistically significant, or serves as support for their argument that experts did not conclude there were substantial increases in cholesterol.  IMVT MTD at 22.  Defendants' argument blatantly ignores that the AC alleges the summary of findings was wrong, and asks the Court to accept facts which are directly at odds with the AC.  *Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 535 (S.D.N.Y. 2017) ("The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial[.]").

Finally, even though Immunovant's SEC filings repeatedly highlight similarities between the monkeys in the animal studies and humans, the Immunovant Defendants argue the elevations in cholesterol from the animal studies have no impact on whether there would be a similar risk to

humans.  IMVT MTD at 22-23.  That argument, however, is directly at odds with FDA guidance and good clinical practices, which, among other things, requires a sponsor under CFR 312.32 to assess safety data from all sources, including animal studies.  ¶¶64, 68.

> **b.      Scientific Literature Revealed LDL and Cholesterol Elevations Were Anticipated Risks of IMVT-1401**

The AC also establishes elevated cholesterol was an anticipated risk of IMVT-1401 by describing the science in detail and referencing scientific studies supporting those allegations.  ¶¶73-81.  Those facts are not conclusory, as contended by Defendants, and more than adequately allege elevated cholesterol and heart disease were anticipated risks of IMVT-1401.  Unsupported by any legal authority, the Immunovant Defendants argue these facts are insufficient by inappropriately disputing the factual basis of the allegations and creating factual issues in dispute.  IMVT MTD at 24-25; *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015) (refusing to consider defendant's argument because it "raise[d] a factual dispute that is inappropriate for resolution on a motion to dismiss").

According to the Immunovant Defendants, the Court should disregard Plaintiff's well-pled allegations because it is somehow important the referenced medical journals and studies do not distinguish between albumin reductions and "mild" albumin reductions.  IMVT MTD at 24-25.  First, the Immunovant Defendants have not provided any basis for distinguishing between albumin reductions and "mild" albumin reductions, and in any event, any purported distinction is another factual issue.  *Uni-Systems, LLC v. United States Tennis Ass'n*, 350 F. Supp. 3d 143, 166 (E.D.N.Y. 2018) (Matsumoto, J.) (declining to adjudicate material factual disputes because "the substance and merits of plaintiff's factual allegations [] is improper on a motion to dismiss").

Second, Plaintiff alleges Defendants' statements about albumin reductions were misleading because they minimized the decreases and resultant impact.[14]  The Immunovant Defendants cannot rely on those same misrepresentations to rebut factual allegations from the AC.  *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 450 (S.D.N.Y. 2017) (denying to consider defendants' argument because "its objections only raise questions of fact and are thus not sufficient to prevail at the motion-to-dismiss stage").

The Immunovant Defendants seek to be relieved of their obligations under the securities laws by asserting that investment analysts and the FDA did not publicly raise concerns about elevated cholesterol levels.  IMVT MTD at 25.  First, it was Defendants' obligation to disclose all material information and not misrepresent facts.  Second, these are highly technical scientific issues and Plaintiff's allegations were formulated with the assistance of consultants with extensive clinical, drug development, pharmacovigilance, and protocol development experience.  ¶13.  Investment analysts focus on how facts impact the financial condition of a Company and its stock price and are not scientists specializing in developing an autoimmune deficiency drug, as is Immunovant.  On the one hand Defendants argue that they could not have known that elevated cholesterol was an anticipated risk of albumin reductions but on the other hand argue that since investment analysts did not alert them they should not have known about it either.  Defendants cannot have it both ways.

Similarly, the Immunovant Defendants' attempt to blame the FDA for their failures should be rejected.  First, whether the FDA raised concerns about cholesterol and Immunovant's response are non-public factual issues.  Regardless, it is Immunovant's – and not the FDA's - responsibility to monitor, assess, and mitigate anticipated risks.  *Wyeth v. Levine*, 555 U.S. 555, 570-71 (2009) (rejecting defendants' argument that "the FDA, rather than the manufacturer, bears primary

---

[14]   ¶¶178, 184, 188, 206, 225, 239.

responsibility" for making sure its drug is properly labeled because it is the drug manufacturer's responsibility to ensure its drug warnings are accurate); *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 636 (S.D.N.Y. 2008) (rejecting defendants' argument that disclosure to the FDA preempted concealing the information from investors because defendants "incorrectly presume[d] that disclosure to the FDA is equivalent to disclosure to the market"). Indeed, "the FDA is not the arbiter of materiality for purposes of the securities laws." *Id*.

Additionally, there could be numerous reasons why the FDA did not require cholesterol monitoring. If the Court were to entertain plausible inferences about the FDA, the most plausible is that Immunovant provided the FDA with the false summary of findings from the animal studies and failed to inform the FDA of the substantial increases in cholesterol reflected in the underlying data. ¶72. The FDA was extremely busy during the Class Period dealing with the COVID-19 pandemic and it is plausible the FDA relied upon Immunovant's description of the results of the animal studies without double-checking the underlying data. Finally, according to the Immunovant Defendants, the FDA "could have issued a clinical hold," but not that the FDA was required to issue a clinical hold, thereby raising another inappropriate factual issue. IMVT MTD at 24.

> **c.** **The Monitoring of Cholesterol by Immunovant Competitors Put Defendants on Notice that Elevated Cholesterol Was an Anticipated Risk**

The Immunovant Defendants do not dispute Immunovant competitors tested for cholesterol but challenge the significance of those facts (IMVT MTD at 25 n.18), even though clinical guidelines suggest such information, including the "effects related to the therapeutic class of the test substance," be considered. ¶68. The Immunovant Defendants argue Argenx's drug has "no effect on albumin" and that Harbour disclosed that it had not observed elevated cholesterol. *Id*. First, the Immunovant Defendants ignore the AC pleads the treatment of thyroid conditions could negatively impact cholesterol levels, such as MG being addressed by Argenx. ¶¶77-79. Second, even though

- 28 -

Harbour may not have observed elevated cholesterol does not mean it was not correct to monitor cholesterol. Indeed, the AC does not plead that Defendants knew IMVT-1401 **would** elevate cholesterol, it alleges there was a **risk** IMVT-1401 would elevate cholesterol. ¶82. Not until Immunovant complied with good clinical practices and measured cholesterol levels would it know whether IMVT-1401 elevated cholesterol. ¶¶84-91; U.S. Code of Federal Regulations, Title 21, Sec. 312.32.

### 5. Defendants' Materially False and Misleading Statements and Omissions Are Actionable

One of Defendants' primary arguments is they did not issue materially false and misleading statements because – according to Defendants – elevated cholesterol was not an anticipated risk of IMVT-1401. IMVT MTD at 20-25; UD MTD at 6-9. This should be rejected because, as discussed in §II.B., Plaintiff has more than plausibly alleged facts showing elevated cholesterol was an anticipated risk of IMVT-1401. Additionally, this case is not, as Defendants contend, about criticisms over the type of statistical analysis used to interpret data or disagreements over how Immunovant managed its clinical trial process. IMVT MTD at 17-20; UD MTD at 9-10. Rather, this case centers on Defendants' misrepresentations and omissions, and even if they concern Immunovant's failure to monitor and assess an anticipated risk during clinical trials, they constitute securities fraud. *See, e.g.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) ("Because Plaintiffs allege that Defendants intentionally misled the public, rather than simply making bad business decisions, Plaintiffs have pled more than mere mismanagement."); *accord Fidel v. AK Steel Holding Corp.*, 2002 WL 31545952, at *5 (S.D. Ohio Sept. 19, 2002).[15] Defendants also contend that most of the alleged misstatements are nonactionable puffery or

---

[15] *In re Sirrom Cap. Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 941 (M.D. Tenn. 1999) (same).

opinions and that the remaining alleged misrepresentations are not false or misleading.  IMVT MTD

at 25-32; UD MTD at 17-30.  As discussed more fully below, Defendants' arguments are meritless.

### a.   The AC Pleads Actionable Misstatements and Omissions Regarding Clinical Trial Results

Defendants made materially untrue, false, and misleading statements and omitted material

information concerning the results of IMVT-1401 clinical trials.  ¶¶98, 100, 109, 111, 113, 179, 191-

192, 197, 203, 209, 211, 213, 218, 228, 234, 240, 242, 244, 247.  Defendants emphasized positive

results relating to efficacy, safety and tolerability, but failed to disclose those results, and the

descriptions of the results, were untrue, incomplete or misleading because the clinical trials did not

monitor or assess cholesterol levels, which was an anticipated risk with potentially serious long term

negative implications for patients.  ¶¶70-91.

Class Period statements, such as in the Offering Documents, represented that "[c]ompleted

clinical trials of Immunovant . . . have generated promising results" (¶98) but failed to disclose

material negative information existing at the time.  *In re Delcath Sys. Inc. Sec. Litig.*, 36 F. Supp. 3d

320, 333 (S.D.N.Y. 2014) ("Defendants made statements about their Phase III trial results, which

given the allegations in the Complaint, were misleading without the disclosure of additional facts

that would cast those results in a more negative light."); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351

F. Supp. 3d 874, 897 (E.D. Pa. 2018) ("Affirmative statements about a drug's efficacy and safety

may be actionable if the underlying clinical data contradicts or does not support them.").

The Offering Documents, Immunovant's SEC filings, and other Company statements

discussed IMVT-1401 clinical trial results and "safety data," that IMVT-1401 was "generally safe"

and did not cause any "treatment-related serious AEs," and that IMVT-1401 was "well-tolerated."[16]

---

[16]   *See, e.g.*, ¶¶84, 86, 98, 102, 104, 106, 193, 209, 211, 213, 215, 224, 234, 238, 240, 242.

The Offering Documents and Company SEC filings described IMVT-1401's "Safety Data," stating in part:

> "In our multi-part, placebo-controlled Phase 1 clinical trial, IMVT-1401 has been *observed to be well-tolerated* with no *Grade 3 or Grade 4 AEs* and no discontinuations due to AEs. The most commonly reported AE has been mild erythema and swelling at the injection site, which typically resolved within hours. . . . To date, *two serious AEs* have been reported, both of which have been assessed as *unrelated to IMVT-1401* by the study investigator. *There have been no treatment-related serious AEs reported*. ¶¶104, 224. *See also* ¶98.

The above statements and others like them during the Class Period were materially false and misleading because they highlighted positive information about the safety and tolerability of IMVT-1401 but failed to disclose the results did not include assessments of the key anticipated risk of elevated cholesterol levels. Defendants' statements made it appear as if IMVT-1401's clinical trials had been progressing smoothly and that the results of clinical trials had reinforced the results from earlier trials. Additionally, Defendants lacked a reasonable basis to represent there had been "no treatment-related serious AEs" because patients may have experienced elevated cholesterol.

Defendants repeatedly made similar types of statements during the Class Period in the Offering Documents, Immunovant's SEC filings, press releases, and during conference calls and conferences, including:

- The 1/17/20 Registration Statement (¶193) and the 2020 Form 10-K (¶238) discussed the "Safety Data" from a Phase 1 clinical trial of IMVT-1401 and stated, "[t]here have been *no treatment-related serious AEs* reported" and that "IMVT-1401 has been observed to be *well-tolerated* with no Grade 3 or Grade 4 AEs and no discontinuations due to AEs." ¶¶193, 224;

- On the March 30, 2020 Conference Call, Defendant Salzmann discussed results of the ASCEND GO-1 clinical trial: "We are also pleased to report that the safety and tolerability profile we observed in ASCEND GO-1 was in line with our expectations from our Phase 1 study in 99 healthy volunteers. We saw *no serious adverse events or SAEs, no withdrawals due to adverse events* and no headaches were reported in this trial. *All adverse events were mild or moderate*." ¶¶211, 213, 215;

- On April 9, 2019, Immunovant discussed adverse events from a phase 1 study: "*[a]ll adverse events (AEs) were mild to moderate* in severity, with no subjects requiring premature discontinuation due to AEs." ¶84; and

- On August 25, 2020, Immunovant reported the results of a clinical study and stressed that IMVT-1401 was "*generally safe and well tolerated with no serious adverse events*." ¶86.

Defendant Salzmann made similar statements during conference calls with analysts and during conferences. *E.g.*, ¶213. In a March 30, 2020 press release he was quoted as stating, "[w]e look forward to reporting the study's full results, *including detailed lab observations* and 12 weeks of follow up data, at an upcoming medical meeting." ¶209; ¶249 (Salzmann: "On the *safety side*, importantly, there were *no serious adverse events*."). Defendant Salzmann's statements about "no serious adverse events," "safety" and "detailed lab observations" were materially false and misleading because there was an anticipated risk of substantially elevated cholesterol levels and Immunovant failed to test for cholesterol.

The Immunovant and Underwriter Defendants argue that statements about the trial results are not actionable because they disclosed accurate results, the statements are opinions and puffery, and they were under no duty to disclose that cholesterol was an anticipated risk or that Immunovant decided to not test cholesterol levels. IMVT MTD at 26-32; UD MTD at 11-28. Defendants are wrong. "The law is well settled . . . that so-called half-truths - literally true statements that create a materially misleading impression - will support claims for securities fraud." *Vivendi*, 838 F.3d at 240. Defendants chose to make statements about IMVT-1401's clinical trials, including that IMVT-1401 was safe, well tolerated and without serious AEs, so Defendants were under a duty to fully disclose all material information. "The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir.

2010).[17]  Where, as alleged here, Defendants knew or recklessly disregarded that IMVT-1401's clinical trials were not reliable indicators of safety, tolerability or AEs because Immunovant had failed to monitor or assess cholesterol, Defendants' statements assuring investors that clinical trial results showed IMVT-1401 was safe, well tolerated and without serious AEs, were materially false and misleading when made.

Furthermore, under good clinical practices, IMVT-1401 clinical trials were required to monitor and assess anticipated risks, including cholesterol. ¶¶56-60, 89, 168.  A reasonable investor would have expected Immunovant to comply with good clinical practices, and therefore, would have expected that IMVT-1401 clinical trial results incorporated assessments of key anticipated risks, including cholesterol. ¶¶64-69, 82.  Defendants, therefore, were required – but failed - to disclose that elevated cholesterol was an anticipated risk and that Immunovant's clinical trials did not monitor or assess cholesterol.  *Delcath*, 36 F. Supp. 3d at 332 (holding that defendants' alleged omissions were sufficient to show that investors were misled about the product's safety).

> **b.   The AC Pleads Actionable Misstatements and Omissions Regarding the Impact of Albumin Reductions and the Existence of Studies Indicating Albumin Reductions Elevate Cholesterol**

When Immunovant reported clinical trial results it disclosed that patients experienced reductions in albumin.  The Offering Documents, 1/17/20 Registration Statement, 2020 Form 10-K, and other SEC filings reported that "[d]ose-dependent and reversible albumin reductions were observed" in IMVT-1401's Phase 1 clinical trial of IMVT-1401, with "[m]ean reduction in albumin levels" of "20% in the 340 mg multiple-dose cohort, and 31% in the 680 mg multiple-dose cohort." ¶¶104, 109, 193, 224, 238; *see also* ¶109 (Offering Documents: "Mean albumin reduction from

---

[17]  *See also* 17 C.F.R. §240.10b-5(b) (prohibiting "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading").

baseline to end of treatment was 24%.").  At the time Defendants made these statements, numerous studies and other reports had indicated that albumin reductions caused elevations in cholesterol, and Immunovant's preclinical animal studies showed substantial increases in cholesterol.  ¶¶70-79.

Instead of apprising investors of the potential downside of albumin reductions, or that IMVT-1401's clinical trials did not measure or assess an important potential side effect of albumin reductions, Defendants minimized the impact and stated that the albumin reductions "were not associated with any AEs or clinical symptoms and did not lead to any study discontinuations." ¶104 (Offering Documents), ¶193 (1/17/20 Registration Statement), ¶224 (4/10/20 Registration Statement).  Those statements were materially misleading and lacked any reasonable basis because while the phase 1 clinical trial may not have revealed "any AEs or clinical symptoms," that trial had not monitored or assessed the likely adverse event of elevated LDL and cholesterol levels.  ¶104. Defendants lacked a reasonable basis to represent the "reductions were not associated with any AEs" (*id*.) because the reductions could have been - and likely were - associated with elevated LDL and cholesterol levels.  Furthermore, the statement gave the false impression that the clinical trial tested for all anticipated risks, as required under FDA rules and regulations and good clinical practices. ¶¶60-69.

The 1/17/20 and 4/10/20 Registration Statements also minimized the potential negative consequences of albumin reductions by characterizing them as "minor" and "reversible" and by discussing them only in the context of an unrelated and extremely rare condition known as Congenital Analbumenia, which causes, according to the 1/17/20 and 4/10/20 Registration Statements, "only mild symptoms."  ¶193.  During the 8/25/20 Conf Call, Defendant Salzmann stated, "[a]ll albumin reductions were asymptomatic." ¶242.  The 1/17/20 and 4/10/20 Registration Statements, and Defendant Salzmann, however, failed to disclose that there was an anticipated risk

that albumin reductions would cause elevations in LDL and cholesterol and increase the risk of heart disease.

On February 25, 2020 at the SVB Leerink Global Healthcare Conference (the "SVB Conference"), Defendant Salzmann discussed the "20% to 30% reduction in albumin" and acknowledged it was caused by IMVT-1401, stating, "we know what's causing the low albumin, which is a direct hindrance at the binding site." ¶205. Defendant Salzmann again minimized the albumin reduction by stating that it was not "associated with any adverse events or edema in the Phase 1 trial." *Id.* During the 3/30/20 Conf Call, Defendant Salzmann acknowledged there was "an average reduction of 24%" in albumin but minimized the impact by stating, "[a]lbumin changes were asymptomatic in this trial as they were in Phase I." ¶213.

Defendant Salzmann lacked a reasonable basis to claim the albumin reductions were not "associated with any adverse events" or "asymptomatic" because patients were likely experiencing elevated cholesterol levels which were going undetected because Immunovant failed to measure cholesterol levels. ¶¶205-206. Defendant Salzmann then falsely stated, "it's pretty hard to find any published literature or expert opinion on what the sequelae of a mild albumin reduction would be. So, we're not seeing any issues to date." ¶205. Contrary to Defendant Salzmann's statements, there were numerous articles indicating albumin reductions cause elevated LDL and cholesterol levels, and Immunovant's animal studies of IMVT-1401 revealed substantial elevations in cholesterol.

The Underwriter Defendants contend that statements concerning the albumin reductions are opinions and puffery and therefore not actionable. UD MTD at 25-26. As discussed more fully in §§III.C.6.(a)-(b), the statements challenged as opinion statements and puffery are actionable. Additionally, the statements regarding albumin reductions are not puffery because they discuss

objective concrete facts upon which investors relied.  In fact, Defendant Salzmann discussed the albumin reductions in response to a question from an analyst, establishing their materiality.  ¶183.

**c.      The AC Pleads Actionable Misstatements and Omissions Regarding Immunovant's Compliance with Good Clinical Practices and Design of IMVT-1401's Clinical Trials**

**Compliance with Good Clinical Practices:**  The SEA, which was attached to the 11/27/19 Proxy, stated that clinical trials are "being conducted in all material respects in accordance with experimental protocols, procedures and controls pursuant to accepted professional and scientific standards for products or product candidates comparable to those being developed by the Company and all applicable laws and regulations. . . ."  ¶189.  Those statements were materially false and misleading because Immunovant failed to adhere to, among other things, good clinical practices and procedures set forth in: (i) Council for International Organizations of Medical Sciences ("CIOMS") VI; (ii) CFR 312.32; (iii) the Guidance for Industry describing ICH M3 (R2) (Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals); and (iv) the FDA Guidance for Industry regarding ICH S7a (Safety Pharmacology Studies for Human Pharmaceuticals).  *See* ¶¶61-69, 94(d), 171(d).

The statements were materially false because Immunovant should have – but failed to – monitor, assess, and attempt to mitigate all anticipated risks, including cholesterol.  ¶¶189-190. Specifically, Immunovant failed to follow FDA regulations and good clinical practices in connection with IMVT-1401 because: (i) it failed to perform ongoing surveillance of the adverse events and suspected adverse reactions of elevated LDL and total cholesterol levels; and (ii) upon information and belief, failed to report to the FDA that its animal studies showed a substantial increase in cholesterol levels for animals which received IMVT-1401.  ¶¶94(d), 171(d), 190.

Additionally, the 11/27/19 Proxy falsely represented that Immunovant was "not aware of any studies, tests, development or trials the results of which reasonably *call into question the results* of the studies, tests, development and trials conducted by or on behalf of the Company."   ¶189. Contrary to this statement, numerous studies, tests and trials called into question the results of IMVT-1401's clinical trials, including the IMVT-1401 animal studies, scientific literature indicating that elevations in cholesterol was an anticipated risk of IMVT-1401, and the fact that other companies developing compounds similar to IMVT-1401 monitored cholesterol levels.  ¶¶70-83. Those studies and results plainly "call[ed] into question the results" (¶189) of Immunovant's clinical studies for IMVT-1401 because Immunovant lacked a reasonable basis to describe IMVT-1401 as "safe," "well-tolerated," or without serious "AEs."  ¶¶70-83.  Since Immunovant had not monitored the anticipated risk of elevated cholesterol levels, those statements were false and misleading. *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020).

The Immunovant Defendants argue the statements about Immunovant's compliance with good clinical practices and standards are not actionable because "Plaintiff has not plausibly pled that increased cholesterol was an 'anticipated risk,' nor that good clinical practices ('GCP') require such testing", and that "Plaintiff does not allege that the FDA raised any concerns about Immunovant's clinical trial designs."  IMVT MTD at 18-19.  Defendants are wrong.  First, the AC more than plausibly alleges Immunovant was required to monitor, assess and mitigate the anticipated risk of elevated cholesterol.  ¶¶54-69; §II.C.  Second, the FDA's communications with Immunovant are not public so it's an issue of fact as to what the FDA communicated to Immunovant concerning cholesterol and there is no basis in the record to conclude the FDA had not raised any concerns. Regardless, it was Immunovant's responsibility to comply with good clinical practices and Defendants cannot blame the FDA for its failure to comply with good clinical practices or make

accurate disclosures. *Wyeth*, 555 U.S. at 570-71; *Pfizer*, 584 F. Supp. 2d at 637 ("Disclosure to the FDA does not by itself provide a safe harbor under the securities laws.").

The Immunovant Defendants' citation to *In re Philip Morris International Inc. Securities Litigation*, 437 F. Supp. 3d 329, 353 (S.D.N.Y. 2020) does not help their argument. IMVT MTD at 19. The court in *Philip Morris* found the alleged statements were not actionable because the plaintiffs' argument "amounts to 'little more than a dispute about the proper interpretation of data.'" *Philip Morris*, 437 F. Supp. 3d at 353. Plaintiff here does not dispute how Immunovant interpreted data from IMVT-1401 clinical trials.

**Trial Design Statements:** Defendants misrepresented that the clinical trials had been designed to test safety and tolerability even though Immunovant had not designed its trials to monitor or assess the anticipated risk of elevated LDL and cholesterol levels. In the Offering Documents, Company SEC filings, press releases, and during analyst calls and conferences, Defendants repeatedly stated the IMVT-1401 clinical trials were designed to test safety and tolerability. ¶¶109, 111, 197, 207, 213, 228, 242, 249. During the SVB Conference on February 25, 2020, Defendant Salzmann stated, "the primary endpoints are safety and tolerability and change in IgG level." ¶207. During the 3/30/20 Conf Call, Defendant Salzmann stated the ADCEND GO-1 study "was designed to examine the initial safety and efficacy of IMVT-1401 in thyroid eye disease." ¶213. The 4/10/20 Registration Statement and Offering Documents discussed the ASCEND MG trial and represented it "assesses safety and efficacy of IMVT-1401," and the "primary endpoints of this trial are assessment of the safety and tolerability of IMVT-1401." ¶¶109,

228. Those and other Company filings described the other clinical trials of IMVT-1401 in the same manner.  ¶¶111, 228.[18]

The Offering Documents and other Company filings described the purposes of Phase 1, 2 and 3 trials, including that Phase 1 studies "are designed to test the safety . . . tolerance . . . [and] side effects" (¶96), and that Phase 2 trials are supposed to "identify possible adverse side effects and safety risks." *Id*.  By including these descriptions, the Offering Documents created the impression that Immunovant complied with those descriptions even thought it had not.  As alleged in the AC, Immunovant did not design its Phase 1 trials to evaluate safety and tolerance, or its Phase 2 trials to evaluate possible adverse side effects and safety risks, in connection with the anticipated risk of elevated cholesterol levels.  ¶¶84-91.

The Immunovant and Underwriter Defendants argue that statements concerning the design of the IMVT-1401 trials are not actionable under the securities law.  IMVT MTD at 17-20; UD MTD at 9-11.  Defendants are mistaken.  The Immunovant Defendants mischaracterize the AC as alleging "first and foremost that Immunovant should have designed its trials to include – and that the FDA should not have allowed such trials to proceed without – monitoring cholesterol."  IMVT MTD at 17-18.  This is a strawman argument that has no bearing on whether Plaintiff has adequately alleged a claim.  First, the AC alleges nothing about what the FDA should or should not have done or allowed.  Second, the AC alleges claims based on Defendants' ***descriptions*** of the design of IMVT-

---

[18]  ¶228 (4/10/20 Registration Statement and Sept. 2020 Offering Documents discussed the ASCEND GO-2 Trial); ¶¶109, 228 (4/10/20 Registration Statement and Sept. 2020 Offering Documents discussed the "ASCEND WAIHA trial); ¶232 (4/14/20 Prospectus filed by the Company in connection with a follow-on offering of approximately $139.4 million in Immunovant common stock contained nearly identical representations about the Company, the testing of IMVT-1401, and the prospects and safety of IMVT-1401 as contained in the 4/10/20 Registration Statement).

1401 clinical trials and not whether the trials were **designed** correctly.[19]  *See, e.g.*, ¶¶97, 200, 202, 204.

The cases relied upon by Defendants are inapposite.  IMVT MTD at 17-20; UD MTD at 9-11, 22.  The plaintiffs in *In re Keryx Biopharmaceuticals, Inc. Securities Litigation*, 2014 WL 585658, at *7 (S.D.N.Y. Feb. 14, 2014), *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869, 878 (9th Cir. 2012), *Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996), and *In re Novan, Inc.*, 2018 WL 6732990 (M.D.N.C. Nov. 30, 2018) alleged misrepresentations and omissions relating to scientific disputes over the statistical methodology or scientific trial design used by the defendants in connection with the analysis or reporting of clinical trial data and whether precise details of a methodology need to be disclosed.  IMVT MTD at 17-20.

Similarly, the plaintiff in *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *8 (S.D.N.Y. May 29, 2013) alleged "the use of multiple research arms" enabled the defendants "to identify a statistically significant benefit and heightened the likelihood of finding a false positive."  *Id*. at *9; IMVT MTD at 18.  The court in *Abely* stated the plaintiff "does not allege that the existence of these multiple research arms was undisclosed or misleadingly described" and therefore, the allegations "merely amount to a competing view of how the trial should have been designed, not an allegation of material misstatement or omission."  *Abely*, 2013 WL 2399868, at *9-*10.  The Underwriter Defendants cite *Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022) and argue that Immunovant did not need to disclose detailed information about its trial design.  UD MTD at 21.  The facts of *Bristol-Myers Squibb*, however, are distinguishable.  Bristol-Meyer, which made clear "it would not disclose the exact threshold or

---

[19]   Plaintiff's claim under SEC Rule 10b-5(a) and (c) are based on a fraudulent scheme as opposed to Defendants' statements but also are not based on a disagreement about the design of the IMVT-1401 clinical trial.  ¶¶167-169; §III.C.8. herein.

confirm speculation or predictions," stated its study "would target patients 'strongly expressing' PD-L1," but did not disclose the exact percentage PD-L1 threshold targeted. *Id*. at 347, 353. The court held that "Bristol Myers had no obligation to disclose the precise percentage" and doing so "would allow competitors to copy or undercut" the target patient population. *Id*. at 353. This starkly contrasts from the facts here because Plaintiff does not allege Defendants were required to disclose every detail about its clinical trials, and disclosures about the anticipated risk of elevated cholesterol would not have put Immunovant at a disadvantage. To the contrary, Immunovant's competitors *did* test for cholesterol.

Here, unlike in the cases relied upon by Defendants, there is no scientific dispute over how Immunovant designed its trials, interpreted data or used a statistical methodology to conduct trials. Plaintiff alleges that descriptions of the design of the trials and the results of the trials were misleading because Immunovant failed to conduct a basic lipid screen and had not advised investors of this fact. And none of the cases cited by Defendants relate to the failure to monitor a key anticipated risk or how the failure caused statements to be misleading. Since Immunovant had not monitored the anticipated risk of elevated cholesterol levels, those statements were false and misleading. *Abramson*, 965 F.3d at 175.

The Immunovant and Underwriter Defendants make the conclusory argument that "[n]o reasonable investor would interpret [statements about clinical trial results] as representations about something that Immunovant did not test and therefore did not observe." IMVT MTD at 19; *see also* UD MTD at 22. Contrary to Defendants' argument, Immunovant represented that it complied with good clinical practices so it is more than plausible that a reasonable investor would have expected that to be the case. Had Immunovant complied with good clinical practices it would have monitored, assessed, and mitigated anticipated risks, including cholesterol. ¶¶54-69. Therefore, a reasonable

- 41 -

investor would have expected statements describing clinical trial results about safety, tolerability, and AEs to have included the results of tests of key anticipated risks, including cholesterol. "It would be a sad day when [a] court could determine that misstatements about whether a company's [drug] worked did not alter the 'total mix' of information available to the market." *In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 1350, at *62 (S.D.N.Y. Feb. 3, 2005).[20]

The Immunovant Defendants also mischaracterize the AC by stating that Plaintiff does not dispute the Company "promptly" shared the results of elevated cholesterol with investors after the elevations were brought to their attention by the outside monitor. IMVT MTD at 19-20. Defendants' argument is contrary to the facts as alleged in the AC because Plaintiff alleges that it took approximately one month for Immunovant to inform investors of the cholesterol issue. ¶140. Regardless, the length of time it took Immunovant to disclose the elevations in cholesterol has no impact on whether Defendants' statements were materially false and misleading.

> **d.**      **The AC Pleads Actionable Misstatements and Omissions Regarding IMVT's Nonclinical Animal Studies**

The Offering Documents stated that "several nonclinical studies . . . demonstrated dose-dependent IgG antibody reductions and was observed to be well tolerated." ¶98. That statement was untrue because the nonclinical studies were not observed to be "well tolerated" because animals experienced substantial elevations in cholesterol. The Offering Documents contained a section titled, "Nonclinical Studies of IMVT-1401," which stated in part:

> Overall, in these nonclinical studies, there was a robust PK/TK and PD correlation in cynomolgus monkeys after removing the confounding element of ADA. The immunogenicity response to human proteins generated in nonclinical species is generally not predictive of that in the human. Nevertheless, subjects in clinical trials

---

[20]   *SEB*, 351 F.3d at 897 (a "company's failure to accurately disclose clinical data may be actionable where [defendants] made affirmative false statements about a drug's safety").

with IMVT-1401 will be carefully monitored for any AEs, including those related to immunogenicity.  ¶107.

The 4/10/20 Registration Statement stressed that "Cynomolgus monkeys were selected as the primary species for nonclinical testing, given the high degree of sequence homology to human FcRn and IMVT-1401's strong binding affinity for monkey FcRn."  *See, e.g.*, ¶226.  Defendants made positive statements about the nonclinical studies, including about the similarities between the monkeys and humans, but failed to disclose the negative information about cholesterol.  Since the Offering Documents and other Company SEC filings discussed the nonclinical animal studies, Defendants were under a duty to speak fully and truthfully about those studies, including that the studies had detected substantial elevations in cholesterol.  ¶107.  *In re Sepracor, Inc., Sec. Litig.*, 308 F. Supp. 2d 20, 25, 29 (D. Ma. 2004) (finding statements like, "[p]reclinical studies of [the drug] are very promising" material where defendants omitted information about cardiac effects and liver damage seen in the animal studies).[21]

> e.    **The AC Pleads Actionable Misstatements and Omissions Regarding the Timetable for the Testing and Development of IMVT-1401**

Since IMVT-1401 was Immunovant's only drug in development, the timetable for development and determination of viability were important to investors because the sooner IMVT-1401 is approved, the sooner Immunovant could generate sales and earnings.  ¶2.  Defendants repeatedly discussed the timetable for the development of IMVT-1401, which made it appear as if clinical trials were moving smoothly and rapidly.  *See, e.g.*, ¶¶244, 252.  The 4/10/20 Registration

---

[21]    *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 700, 704 (9th Cir. 2016) ("Defendants touted the safety and likely approval of [the drug]" while referring to the animal studies.  "But once they raised the animal studies, Defendants were obligated to disclose the Rat Study's existence to the market." ).

Statement discussed the timetable of the ASCEND MG Trial and stated, "[w]e anticipate reporting top-line results from this trial in the third quarter of calendar year 2020." ¶228.

The 6/29/20 Press Release stated:

With proof-of-biology now established for anti-FcRn agents in MG, Immunovant has **chosen to accelerate Phase 3 development** of IMVT-1401 in MG. "Immunovant expects to engage the FDA on the design and conduct of the pivotal program and we expect the Agency's feedback to be an important part of the final plan," said Dr. Salzmann. ¶234.

The Offering Documents stated, "[w]e currently remain on track to report initial results from our ASCEND GO-2 trial in the first half of calendar year 2021." ¶111. Since Defendants chose to speak about the schedule and timetable for its clinical trials, they were under a duty to disclose full and complete information, including items which could negatively impact the schedule. For example, the Offering Documents were misleading because they failed to disclose to investors Immunovant was assessing and monitoring an anticipated risk of elevated cholesterol in the ASCEND GO-2 trial which had not been monitored previously. Additionally, the statements in the 6/29/20 Press Release were misleading because "proof-of-biology" had not been established because Immunovant had not reported results of the impact of IMVT-1401 on cholesterol levels, and therefore, the statement about the acceleration of "Phase 3 development" was misleading. Defendants failed to disclose that the timeline for the development of IMVT-1401 could be impacted when Immunovant eventually assesses and monitors cholesterol levels.

The Underwriter Defendants argue these statements are forward-looking and therefore not actionable. UD MTD at 19-20. As discussed in §III.C.6(c) below, those statements were mixed statements of present and historical fact and Plaintiff is challenging the present and historical portions of those statements. *Voulgaris v. Array Biopharma Inc.*, 2020 U.S. Dist. LEXIS 249096, at *66-*67 (D. Colo. Nov. 24, 2020) (rejecting defendants' argument that statements about the FDA were protected because they were statements of present and future facts). "Viewing the [AC]'s

- 44 -

allegations as a whole, the [AC] alleges facts suggesting a significant risk to the commercial viability of [Immunovant's *only*] leading product[,]" and these positive statements regarding the results of clinical trials and the accelerated Phase 3 schedule were rendered misleading by the failure to disclose the known significant risks to the viability and timetable for the development of IMVT-1401. *Matrixx*, 563 U.S. at 47 (finding omissions material where product expected to drive significant revenue growth was at risk, but specific risk was not disclosed).

**6.      Defendants' Arguments Challenging the Adequacy of the Alleged Misrepresentations and Omissions Are Without Merit**

**a.      Defendants' Statements Are Not Nonactionable Opinion Statements**

Defendants argue certain statements are not actionable because – according to Defendants – they are opinions. IMVT MTD at 26-27; UD MTD at 18-19. Defendants are wrong on the law and the facts. The statements challenged as opinions by Defendants, including the following, are actionable:

- "Consistent with previously reported Phase 1 results, IMVT-1401 was observed to be generally safe and well-tolerated with no serious adverse events (SAEs), no withdrawals due to adverse events (AEs)." ¶240; App. A at No. 195;

- "There have been no treatment-related serious AEs reported." ¶104; App. A at No. 19;

- "These reductions were not associated with any AEs or clinical symptoms" (¶104; App. A at No. 22); "subjects in clinical trials with IMVT-1401 will be carefully monitored for any AEs, including those related to immunogenicity." ¶107; App. A at No. 26;

- "IMVT-1401 is a uniquely compelling asset within the FcRn drug class." ¶170; App. A at No. 54;

- "comprehensive Phase 1 program demonstrating robust IgG reductions . . . [and] a broad Phase 2 program with both first-in-class and best-in-class potential." ¶173; App. A at No. 57;

- "[Albumin] reductions were not associated with any AEs or clinical symptoms, and did not lead to any study discontinuations." ¶187; App. A at No. 76;

- 45 -

- "subjects in clinical trials with IMVT-1401 will be carefully monitored for any AEs, including those related to immunogenicity."  ¶107; App. A at No. 26; and

- "dose-dependent and reversible albumin reductions were observed." ¶104; App. A at No. 20.

IMVT MTD at 26-27; UD MTD at 18-19, 21-27.

The Supreme Court in *Omnicare* "rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made" and provided two methods of alleging opinion statements are actionable.  *Abramson*, 965 F.3d at 175 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185 (2015)).  First, a plaintiff "can allege that a statement of opinion contained one or more embedded factual statements that can be proven false."  *Abramson*, 965 F.3d at 175.  Second, a plaintiff "can allege that a statement of opinion, without providing critical context, implied facts that can be proven false."  *Id*.

With respect to the second method, *Omnicare* provided as an example the statement, "[w]e believe our conduct is lawful."  575 U.S. at 188.  As discussed in *Abramson*, "this statement implies, if investors are not informed otherwise, that the speaker has so concluded after investigating the governing law."  965 F.3d at 175.  And if the speaker "has not investigated the governing law, and has omitted this critical context, the statement of opinion, although literally true (assuming the speaker believed it) . . . may be misleading by omission and thus actionable under the second part of Rule 10b-5."  *Id.*  As summed up in *Abramson*, "[i]n other words, when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow."  *Id.*

The Immunovant Defendants describe the law on opinion statements as limited to the first method discussed in *Omnicare* and appear to ignore the second method, which relates to Defendants' statements here.  IMVT MTD at 26-27 (arguing "Plaintiff must plausibly allege that these

- 46 -

'statements of opinion contained one or more embedded factual statements that can be proven false'"). The Immunovant Defendants also cite several cases for the proposition that "publicly stated interpretations of the results of various clinical studies" are opinions because "reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions." IMVT MTD at 26[22] (citing *Bristol-Myers Squibb*, 28 F.4th at 355; *Smith v. Antares Pharma, Inc.*, 2020 WL 2041752, at *5 (D.N.J. Apr. 28, 2020)). The reasoning in those cases, however, does not apply here because Plaintiff does not dispute how Immunovant interpreted or described data obtained from IMVT-1401 clinical trials. Rather, Plaintiff alleges Immunovant failed to even ***obtain*** data to be interpreted or described so Defendants' statements were materially incomplete and misleading.

Defendants' statements were materially false and misleading because they imply that Immunovant monitored and assessed the anticipated risks which should have been monitored and which could have impacted "safety data," including whether IMVT-1401 was "well-tolerated" or caused any serious AEs. Since Defendants knew, or reasonably should have known, that Immunovant had not tested for the key anticipated risk of elevated cholesterol, Defendants' statements were misleading. *Abramson*, 965 F.3d at 175. Additionally, Defendants lacked a reasonable basis to claim that IMVT-1401 was "safe" or "well tolerated" or did not cause any AEs.

---

[22] The Immunovant Defendants cite *In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *9 (S.D.N.Y. Sept. 10, 2021); *Tongue v. Sanofi*, 816 F.3d 199, 213–14 (2d Cir. 2016); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 566-67 (S.D.N.Y. 2011); *In re MELA Scis., Inc. Sec. Litig.*, 2012 WL 4466604, at *13 (S.D.N.Y. Sept. 19, 2012); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015). Those cases are inapplicable because Defendants' statements are not protected statements of opinion. *See In re Salix Pharms., Ltd.*, 2016 U.S. Dist. LEXIS 54202, at *38-*39 (S.D.N.Y. Apr. 22, 2016) (holding that defendants' statements are not opinions because they are "predicated upon untrue supporting statements of fact," or "omit material facts about the speaker's inquiry into or knowledge of facts that would support the stated opinion").

There was a substantial risk that IMVT-1401 was not well-tolerated and caused serious AEs but the data and results did not reflect those facts because Immunovant failed to monitor cholesterol.

Furthermore, "*Omnicare* held that the appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor." *Abramson*, 965 F.3d at 175. When "assessing what a reasonable investor would expect, the Supreme Court stressed the importance of context, such as 'the customs and practices of the relevant industry' and whether the opinion was expressed in a formal statement such as an S.E.C. filing or instead was a 'baseless, off-the-cuff judgment[ ], of the kind that an individual might communicate in daily life.'" *Id.*, quoting *Omnicare*. Here, the statements were formally made in SEC filings and during analyst conference calls and a reasonable investor would have expected that Immunovant complied with good clinical practices and tested for all anticipated risks, including a basic cholesterol test. Since that was not true, Defendants' statements were materially false and misleading.

Finally, the Immunovant Defendants inappropriately base arguments on facts from outside the AC concerning Immunovant's purported plans to "resume clinical development" of IMVT-1401 and facts about the FDA purportedly allowing the Company to continue clinical trials with modifications. IMVT MTD at 27. Defendants are seeking to minimize the materiality of the cholesterol elevations but there can be no serious dispute that the elevations in cholesterol were material. Those elevations caused Immunovant to halt its clinical trials, prompted negative comments from analysts, and caused a substantial decline in the price of Immunovant shares. ¶¶129-145. Even after these purportedly positive announcements from Immunovant about the continuation of the IMVT-1401 clinical trials, Immunovant stock has not recovered from the declines suffered when the risks materialized at the end of the Class Period. Pl. Ex. 3. Even if IMVT-1401 were to

continue the clinical trials, cholesterol must be monitored and mitigated to ensure patients are not at risk.

#### b.      Defendants' Statements Are Not Nonactionable Puffery

Defendants argue a number of alleged misrepresentations are puffery and therefore not actionable.  IMVT MTD at 27-29; UD MTD at 24-27.  The Immunovant Defendants argue that statements such as describing IMVT-1401 as "well-tolerated with no Grade 3 or Grade 4 AEs and no discontinuations due to AEs," that "subjects in clinical trials . . . will be carefully monitored for any AEs" (App. A at Nos. 26, 86), and Immunovant's "completion of a comprehensive Phase 1 program" are inactionable puffery.  App. A at No. 57; IMVT MTD at 28-29.  Misstatements such as these "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."  *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991).  Additionally, similar type of statements have frequently been held actionable where, as here, "the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors."  *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (citing *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015)).

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made."  *Petrobras*, 116 F. Supp. 3d at 381; *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("[W]hether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case.").  Even where the alleged statements are "general enough that, had they been made in isolation, they might not be actionable," numerous courts have found that the repeated touting of such statements "over and over and over" precludes finding the statements immaterial as a matter of law.  *In re BHP Billiton*, 276 F. Supp. 3d at 80 (finding actionable statements regarding BHP's "relentless focus on the health and safety of our

people and the communities in which we operate" and its "overriding commitment . . . to ensuring the safety of our people, and respecting our environment and the communities in which we work"); *Bricklayers & Masons Loc. No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (upholding alleged misrepresentations because "[t]he Court cannot say, as a matter of law, that Transocean's representation that [safety and training] efforts were extensive was 'obviously unimportant'" to shareholders).[23]

The alleged misrepresentations and omissions regarding the safety, tolerability and lack of AEs fall squarely within these precedents. As do Defendants' statements about compliance with good clinical practices and procedures. Defendants repeatedly asserted, in conference calls with analysts (¶¶211, 242), during conferences (¶¶205, 207, 249), and in SEC filings (¶¶98, 104, 109, 224) that IMVT-1401 was being tested for safety, tolerability and AEs even though Immunovant had failed to test for a key anticipated risk of elevated cholesterol levels. Thus, "safety [tolerability and AEs were] obviously a major concern" to investors here, as demonstrated by the "extensive, frequent, and prominent discussions of the topic" in Immunovant disclosures. *In re BHP Billiton*, 276 F. Supp. 3d at 80. And statements pointed to by the Immunovant Defendants, such as "no withdrawals due to adverse events" are objectively verifiable facts which are not puffery (App. A at No. 195).[24]

---

[23]  *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279-80 (S.D.N.Y. 2012) (finding actionable Goldman's "repeated assertions that it complies with the letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest"); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D. W. Va. 2012) (statements of defendants' commitment to safety and that company was an "industry leader in safety" were actionable).

[24]  Statements describing IMVT-1401 as a "uniquely compelling asset within the FcRn drug class" (¶170) were misleading because if IMVT-1401 elevates cholesterol, which could be a long-term issue for patients, would render IMVT-1401 to not be a "uniquely compelling asset." *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *12 (E.D.N.Y. Sept. 27, 2019) (properly "viewed in the context of Plaintiff's allegations," statements about competition were not puffery, and statements about sources of company's success that were framed as opinions omitted relevant information

Additionally, Defendants' statements concerning the impact of albumin reductions, which is directly related to the science behind IMVT-1401 and was discussed in SEC filings and on analyst conference calls, were reasonably understood to rest on a factual basis. In fact, Defendant Salzmann even responded to a question on an analyst conference call about albumin reductions and discussed searches for scientific literature. The Underwriter Defendants, therefore, are wrong that the statements about albumin reductions were puffery. UD MTD at 25. None of Defendants cases warrant a different conclusion.[25]

<strong>c.     The Alleged Misrepresentations and Omissions Are Not Protected by the Bespeaks Caution Doctrine or the PSLRA Safe Harbor</strong>

The Immunovant Defendants argue that 38 (and the Underwriter Defendants with respect to statements in the Offering Documents) of the alleged misstatements are protected under the PSLRA safe-harbor and bespeak caution doctrine (IMVT MTD at 29-30 and App. A), but those protections only apply to statements that are "forward-looking" and: (1) identified as such and accompanied by meaningful cautionary statements; (2) immaterial; or (3) made without actual knowledge that the statements were false or misleading. *Vivendi*, 838 F.3d at 245. The protections do not apply here because many of the challenged misstatements are mixed statements of present or historical fact, none of them are accompanied by "meaningful" cautionary language, and Defendants had actual knowledge that the statements were false or misleading.

---

which made them materially misleading and therefore actionable); *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *7 (E.D.N.Y. Dec. 5, 2013).

[25] For example, *In re AT&T/DirecTV Now Securities Litigation*, 480 F. Supp. 3d 507, 523 (S.D.N.Y. 2020) (UD MTD at 25) found that "statements describing a product as 'encouraging' are not actionable unless the speaker 'disbelieved' his [] own pitch." In fact, Defendant Salzmann could not have believed his own pitch when he knew or recklessly disregarded multiple facts to the contrary. *See Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 347, 349 (E.D. Pa. 2014) (rejecting defendants' puffery argument and finding defendants' statements about its "flagship drug" actionable and "an attentive investor would find [the] statements and misstatements material").

For example, Defendants challenge the following statements, which are mixed statements of present or historical fact and the AC alleges the present or historical portions of those statements as being misleading:

- "*we intend* to announce three new indications for IMVT-1401 over the next 12 months." ¶98; App. A at No. 10.

- "We *currently remain* on track to report initial results from our ASCEND GO-2 trial in the first half of calendar year 2021." ¶111; App. A at No. 43.

- "Top-line data from ongoing Phase 2a trial in Graves' ophthalmopathy *expected by* Q1 2020." ¶170; App. A at No. 51.

- IMVT-1401 *is currently being tested* in a Phase 2a trial for Graves' ophthalmopathy (potentially a first-in-class anti-FcRn), with *top-line data expected by Q1 2020*, and in a Phase 2a trial for myasthenia gravis, with *top-line data expected by Q2 2020*. ¶175; App. A at No. 60.

Statements such as "we intend," "currently remain," and "expected by" are each statements of present facts and Plaintiff does not challenge the forward looking portions of those statements. *In re Fibrogen, Inc. Sec. Litig.*, 2022 WL 2793032, at *8 (N.D. Cal. July 15, 2022) ("Statements that mix past or current facts with forward-looking optimistic statements do not qualify for safe harbor protection."); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*, 477 F. Supp. 3d 123, 135 (S.D.N.Y. 2020) (finding statements that defendants were "working on" a "rights renewal process" actionable). For example, Plaintiff alleges the statement "currently remain on track" is misleading because *at that time* Defendants knew, or recklessly disregarded, that Immunovant had not tested for cholesterol and that if cholesterol is tested it could disrupt the overall schedule for the development of IMVT-1401. Plaintiff is not alleging that the top-line data was not expected to be or would not be released on those dates.

Even if the broad array of statements identified by Defendants as "forward-looking" are, in fact, forward-looking (they are not), such statements are shielded from liability only when accompanied by "meaningful cautionary language." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d

- 52 -

Cir. 2010). "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.* at 772; *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013). As discussed in §III.D.2. concerning Defendants' violation of Item 105, and §III.F. Immunovant's purported cautionary language was not adequate.

### 7.     Plaintiff Adequately Alleges Scienter

Scienter may be established by pleading *either* of the following: (1) that defendants had the "motive and opportunity" to commit fraud; *or* (2) "strong circumstantial evidence of recklessness or conscious misbehavior." *Novak*, 216 F.3d at 309; *In re Tenaris S.A. Sec. Litig.*, 2020 WL 6018919, at \*10 (E.D.N.Y. Oct. 9, 2020). A "strong inference" of scienter is raised when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The Court must "consider the complaint in its entirety" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. The inference "need not be irrefutable" and any "tie on scienter goes to the plaintiff." *Id.* at 324; *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). In accordance with these standards, the AC alleges a strong inference of scienter for each of the Exchange Act Defendants. ¶¶259-277.

#### a.     The Exchange Act Defendants Acted with Conscious Misbehavior or Recklessness

Recklessness is "conduct that [i]s 'highly unreasonable, representing an extreme departure from the standards of ordinary care . . . [such] that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158-59 (2d Cir. 2012). "[S]ecurities fraud claims typically have sufficed to state a claim

based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. Allegations that Defendants "failed to check information they had a duty to monitor" or that Defendants "ignored obvious signs of fraud," sufficiently allege scienter. *Id*. at 308, 311. The key question is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id*. at 308.

By the start of the Class Period, each of the Exchange Act Defendants had access to: (i) the results of the IMVT-1401 animal studies revealing substantial elevations in cholesterol; (ii) the medical studies and literature indicating albumin reductions and IMVT-1401 elevates cholesterol levels; and (iii) information concerning the testing procedures of other companies developing compounds similar to IMVT-1401. ¶¶70-83. And each of the Exchange Act Defendants had the scientific expertise and knowledge to understand those facts indicated elevated LDL and cholesterol levels were anticipated risks of IMVT-1401, that Immunovant's clinical trials had not monitored or assessed cholesterol, and that Defendants made materially false and misleading statements or omitted material information.

Plaintiff has alleged a host of facts demonstrating that Defendants acted with scienter when they misrepresented and omitted facts as described above and alleged in the AC. Moreover, because the matters in question concern the primary "core" and only product of the Company, Defendants Salzmann and Wong are presumed to have that knowledge. *See, e.g., E\*Trade*, 712 F. Supp. 2d at 195 (information at core of a company's business may be properly ascribable to senior officers; collecting cases).[26]

---

[26]  *In re Pall Corp.*, 2009 WL 3111777, at \*7 (E.D.N.Y. Sept. 21, 2009) (same).

**Defendant Salzmann:**  There can be no reasonable dispute that the AC adequately alleges Defendant Salzmann knew facts or had access to information contradicting his and Immunovant's statements.  In addition to serving as the Company's CEO, Salzmann is a highly experienced and knowledgeable professional in the biopharmaceutical industry with extensive knowledge of clinical trials of drugs generally, and IMVT-1401 specifically.  ¶261.  Defendant Salzmann therefore was knowledgeable about good clinical practices and procedures, including that the clinical trials of IMVT-1401 should monitor, assess, and mitigate anticipated risks.  He was also in position to learn, and had access to the facts alleged raising red flags, that there was a risk IMVT-1401 elevated cholesterol.  As the highest-level officer of a small company whose prospects hinged entirely upon the development and eventual commercialization of IMVT-1401 (¶¶261-263), "it would be 'absurd to suggest that . . . [Defendant Salzmann was] without knowledge of the[se] matter[s].'"  *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012); *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021).  Plaintiff does not, as the Immunovant Defendants contend, allege Salzmann's scienter based merely on his "corporate position[]."  IMVT MTD at 39 (discussing cases where plaintiff based scienter on job titles).

The Immunovant Defendants rely on several cases to support their argument, but because Plaintiff does not solely rely on corporate position, they are distinguishable.  In any event, "[t]he fact that [defendant] was CEO and held himself out as an expert on [the drug] supports a finding of scienter."  *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus.*, 2022 U.S. Dist. LEXIS 54272, at *40 (E.D. Pa. Mar. 25, 2022) (finding scienter where corporate defendant had more than 30 years' experience in the pharmaceutical industry); *see also In re Vicuron Pharms., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 15613, at *28 (E.D. Pa. July 1, 2005) (finding a strong inference of scienter against the individual defendants who "had special roles and responsibilities in

- 55 -

communicating information to the investment community" about a drug that was the company's lead product in development).

Furthermore, Defendant Salzmann held himself out as knowledgeable about the facts at the center of this case. Salzmann was the primary person speaking on behalf of the Company about IMVT-1401, including during analyst conference calls and at medical conferences. *See, e.g.*, Speers Decl. Ex. 17 at 5 (Salzmann discussing IMVT-1401 clinical trials, clinical trial results, and the science of IMVT-1401); Speers Decl. Ex. 18 at 5 (same); ¶¶179, 181, 183, 207, 211, 213, 215, 242, 244, 249. He regularly discussed the science behind IMVT-1401, reported details about clinical trials, and compared IMVT-1401 with competing products in development by other companies. *See, e.g., Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 451, 473 (S.D.N.Y. 2013) ("find[ing] a strong inference of scienter" where plaintiffs "adequately alleged that defendants were aware of information that contradicted their statements"); *Ellenburg v. JA Solar Holdings Co. Ltd.*, 2010 WL 1983375, at *6 (S.D.N.Y. May 17, 2010) (same). That Defendant Salzmann frequently spoke about these topics supports an inference that he (and Immunovant) "had intimate knowledge of those facts or should have known of them." *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *see also Gauquie v. Albany Molecular Rsch., Inc.*, 2016 U.S. Dist. LEXIS 97295, at *5-*6 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it").

Furthermore, the animal studies were used to support Immunovant's INDs for clinical trials as well as to evaluate potential risks which supports scienter. ¶¶61-69. *In re Refco, Inc Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("[S]cienter may be found where there are 'specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice' that the public statements were false."); *Lockheed Martin Corp.*, 875 F. Supp. 2d at 371

("[W]hen contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company.").[27]

Defendant Salzmann "had a duty to monitor" and be aware of the details of the animal studies and scientific studies and literature about albumin reductions under FDA guidelines and good clinical practices, and therefore either knew about or "ignored obvious signs of fraud." *Novak*, 216 F.3d at 308, 311.  ¶¶261, 268.  Nevertheless, Defendant Salzmann failed to disclose these risks to investors and minimized the impact of serum albumin reductions. *See, e.g., Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23-24 (2d Cir. 2017) ("failure to disclose . . . true facts about the threat to the company" constituted "at least 'a reckless disregard of a known or obvious duty to disclose,' and thus powerfully support[ed] a strong inference that the [d]efendants acted with scienter") (internal citations omitted); *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (allegations that defendants "acted with at least a reckless disregard of a known or obvious duty to disclose" gave rise to a strong inference of scienter); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 483-84 (S.D.N.Y. 2010) (defendant acted with scienter by "issu[ing] unguardedly optimistic statements" about joint venture while failing to disclose risks).

**Defendant Wong:**  Similarly, the AC adequately alleges recklessness against Defendant Wong.  Defendant Wong acknowledged he was extremely familiar with the science behind IMVT-1401 and the progress of development, stating on the Merger conference call, as HSAC's CEO,

---

27   The Immunovant Defendants argue Plaintiff's allegations are insufficient because Plaintiff is required to allege that a particular defendant reviewed a particular report.  IMVT MTD at 37-38.  That is not the law.  Courts in this circuit have repeatedly held that a plaintiff can plead scienter by alleging the existence of circumstantial evidence that the information reached or was accessible to defendants. *See In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *11 (S.D.N.Y. Apr. 1, 2015) (allegations sufficient where "defendants had access to information in the form of monthly progress reports and statements from the Project Manager").

"we've been tracking the development of IMVT-1401 for several years now as part of our competitive analysis of the FcRn drug class, which we expect will become a cornerstone therapy in autoantibody-driven disease." ¶177; Speers Decl. Ex. 17 at 4; *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (scienter adequately alleged by CFO's statement that "we have visibility in the inventories because we know what we ship, we know what pulls through, we know what returns are").

Defendant Wong was an investor in Legacy Immunovant and performed due diligence of IMVT-1401 for months prior to the Merger with HSAC. ¶¶265, 293. In fact, Wong approached Roivant to propose the sale of Legacy Immunovant to HSAC. ¶53. Defendant Wong was aware IMVT-1401 reduced albumin levels and acknowledged he reviewed scientific literature about potential side effects of albumin reductions. Speers Decl. Ex. 17 at 7 (Wong responding to a question about albumin reductions and discussing "people in the literature are generally asymptomatic"). ¶183. These facts raise a strong inference Defendant Wong knew, or recklessly disregarded, the undisclosed risks of IMVT-1401.

Nevertheless, during the Merger conference call, Defendant Wong minimized the negative impact of albumin reductions and failed to disclose the material risks of IMVT-1401 to investors. *See Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *6 (E.D.N.Y. Mar. 30, 2012) (finding strong circumstantial evidence of conscious misbehavior or recklessness by the defendants, given their failure to disclose material adverse information concerning the company's largest source of business and "the potential resulting adverse impact on costs, sales, pricing, operating leverage and profitability"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009) (allegations that defendant "had 'information suggesting that [his] public statements were not accurate'" were "sufficient to allege . . . scienter"); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F.

Supp. 2d 603, 622 (S.D.N.Y. 2008) (allegations "that [d]efendants had knowledge of facts . . . that explicitly contradicted their public statements" were "alone are enough to satisfy the pleading requirement for scienter").

**Immunovant:** Where the defendant is a corporation, a plaintiff can "plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Henry Schein*, 2019 WL 8638851, at *22 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)). While there must be "some connection at the corporation between a misstatement and the requisite quantum of knowledge of its falsity" for corporate scienter to attach, this requirement is "generally satisfied where the employee with knowledge of the facts that make a corporate statement misleading occupies a position likely to enjoy some oversight over the company's public-facing representations." *Rex & Roberta Ling Living Tr. U/A Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 409-10 (S.D.N.Y. 2018).

The Second Circuit has stated that "the 'most straightforward' way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).[28]  Here, there can be no serious dispute that Defendant Salzmann's scienter can be imputed to Immunovant. *Loreley Fin.*, 797 F.3d at 177.

---

[28]   The Immunovant Defendants' reliance on *Jackson* is misplaced.  IMVT MTD at 34, 38-40.  In *Jackson*, the plaintiffs' allegations of knowledge focused on "a handful of employees" but did not connect their knowledge to more senior executives.  960 F.3d at 96.

**Defendants' Remaining Arguments:**  The Immunovant Defendants argue the AC doesn't allege the animal studies were "provided to any individual defendant."  IMVT MTD at 37-38.  No one needed to provide the animal studies to Defendant Salzmann or Immunovant because they were already in possession of them - they were animal studies of Immunovant's sole product. Immunovant's SEC filings discussed the animal studies, Defendant Salzmann signed those filings, and Immunovant was obligated to review its animal studies for potential risks.  ¶¶168, 261, 263, 268. It is not believable that Defendant Salzmann and other senior Immunovant employees did not carefully review and discuss those animal studies.

The facts here are very different from the cases cited by the Immunovant Defendants. IMVT MTD at 37-38.  The plaintiff in *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) simply made a "broad reference to raw data" while Plaintiff here alleges specific facts about the IMVT-1401 animal studies, including details about the results of those studies, as provided by FE. *Jackson*, cited by the Immunovant Defendants, rejected scienter because the complaint did not "identify any individual whose scienter may be imputed to the Corporate Defendants."  960 F. 3d at 98.  As discussed above, Salzmann's scienter can be imputed to Immunovant.  Additionally, his scienter can be attributed to Roivant since Legacy Immunovant was a division of Roivant prior to the Merger and because it remained in control after the Merger.

> **b.** **The AC Adequately Alleges Defendants' Motive and Opportunity**

Although Plaintiff satisfies the Second Circuit's pleading requirements for scienter under a recklessness theory, the AC also pleads motive and opportunity as another basis to find scienter.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("[I]f the court decides . . . that the Complaint successfully pleaded the defendants engaged in conscious or reckless misbehavior, it need

not also consider the motive and opportunity prong of scienter."). There can be little dispute over the opportunity analysis (and rarely is in these cases). *Nutriband, Inc. v. Kalmar*, 2020 WL 4059657, at *11 (E.D.N.Y. July 20, 2020) (stating Defendants are "corporate insiders at the highest level, which gives rise to the presumption of an opportunity to commit fraud").

To demonstrate motive, a plaintiff "must allege that the corporate defendant or its officers benefitted in some concrete and personal way from the purported fraud," typically by alleging corporate insiders "made a misrepresentation in order to sell their own shares at a profit." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *Nutriband*, 2020 WL 4059657, at *11. While stock sales are **typical**, they are not required to show motive. *See id*. The lack of stock sales also does not "establish the absence of a scheme to profit from insider trading[,]" but only establishes the "absence of a successful scheme[,]" or a desire to avoid criminal liability. *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 15 (D. Mass. 2004) ("Defendants could have commenced a fraudulent scheme, in hopes of profiting from insider trading, but simply have waited too long to sell, such that by the time it became apparent that full disclosure would be necessary, massive trades would expose them to potential criminal liability.").

The Exchange Act Defendants knew, or recklessly disregarded, that if Immunovant included a lipid panel in clinical trials, there was a substantial risk that Immunovant would observe elevations in cholesterol of patients who receive IMVT-1401. ¶168. Even if clinical trials showed the efficacy of the drug, the disclosure of those negative facts would damage the market's perception of IMVT-1401, cause a decline in Immunovant's stock price, and make it more difficult for the Company, large shareholders, and insiders to monetize their investments in IMVT-1401. As a result, the Exchange Act Defendants engaged in a fraudulent scheme which enabled them to monetize the potential of IMVT-1401 without revealing to investors the anticipated risk that IMVT-1401 elevates

- 61 -

cholesterol levels. Even though the Exchange Act Defendants may have known they would not be able to avoid testing cholesterol levels indefinitely, they were able to delay having to address that potential issue by not including lipid panels in early IMVT-1401 clinical trials. ¶169. That would create enough time for the Exchange Act Defendants to benefit.

Defendants Wong and Roivant had substantial motives for hiding the risk of elevated cholesterol levels from investors. This scheme enabled them to generate hundreds of millions of dollars for themselves and affiliated entities in connection with several transactions. ¶¶273-276. *First*, Defendants Roivant and Wong benefitted when HSAC (sponsored and controlled by Wong) acquired Legacy Immunovant in the Merger, since both owned interests in Legacy Immunovant. ¶50 (aggregate value of consideration paid by HSAC for Legacy Immunovant was $421 million). *Second*, Roivant and Wong structured the terms of the Merger in a SEA under which Roivant, Wong (and affiliated entities) and other Legacy Immunovant shareholders were entitled to receive 20 million shares in Immunovant at zero cost if the share price of Immunovant exceeds certain targets by certain dates. ¶51.

Defendants Roivant and Wong were motivated to artificially inflate the price of Immunovant shares and delay disclosing to investors that elevated cholesterol levels were an anticipated risk of IMVT-1401 until after they received their lucrative earnout shares. And contrary to the Immunovant Defendants' argument that this motive is "absurd," it turned out to be very lucrative. IMVT MTD at 34. The artificial inflation in the price of Immunovant shares enabled Roivant, Wong and others to earn the first tranche of 10 million earnout shares on May 12, 2020 when the price of Immunovant stock was at $22.70 per share (valued at $227 million) and earn the second tranche of 10 million earnout shares when the price of Immunovant was $38.43 per share ($384 million). Pl. App. B; Pl. Ex. 2 at 34. Collectively, Defendants Roivant, Wong and other Legacy Immunovant shareholders

received 20 million earnout shares valued at more than ***$611 million*** on the dates they were earned. Pl. App. B; Pl. Ex. 2 at 34. These motive allegations raise a strong inference of scienter. *In re Romeo Power Sec. Litig.*, 2022 U.S. Dist. LEXIS 99005, at *13 (S.D.N.Y. June 2, 2022) (finding an inference of scienter, rejecting defendants' argument that increasing stock during the class period undermined scienter, and noting that the individual defendants "appear[ed] to have received shares as part of a compensation or incentive package").

The Immunovant Defendants argue that Plaintiff's claim is "preposterous" because Immunovant eventually included lipid panels in its clinical trials, which – according to Defendants – "ensured the risk would be discovered." IMVT MTD at 35. Defendants misstate the AC and the law. Even when Immunovant began monitoring cholesterol it was not assured the risk would be revealed. Elevated cholesterol levels from IMVT-1401 were only a ***risk*** and not a ***certainty*** so there was a possibility that IMVT-1401 would not elevate cholesterol levels during clinical trials. Even if the fraud was not successful, Plaintiff's claim would still raise a strong inference of scienter. *Puddu v. 6D Glob. Techs., Inc.*, 2021 U.S. Dist. LEXIS 60905, at *35 (S.D.N.Y. Mar. 30, 2021) ("Plaintiffs need not show that the fraud succeeded, but [] that the false materially misleading statements, or material omissions, 'reasonably could have been expected' to result in a benefit."); *In re Fibrogen Inc. Sec. Litig.*, 2022 WL 2793032, at *18-*21 (N.D. Cal. July 15, 2022) (finding an inference of scienter and rejecting defendants' argument that plaintiff's theory is "nonsensical" like that in *Nguyen*).

Plaintiff's claims are not like the facts in *Gillis* or *Nguyen* (cited by Defendants) because, unlike those cases, here there was a chance Defendants' fraud would not be revealed. *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557 (S.D.N.Y. 2016); *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020). Elevated cholesterol levels from IMVT-1401 were only a ***risk*** and not a ***certainty*** so

there was a possibility that IMVT-1401 would not elevate cholesterol levels during clinical trials. And Plaintiff here does not allege that the cholesterol issue would result in a denial of FDA approval, only that it would make IMVT-1401 less lucrative and negatively impact Immunovant's stock price and potentially disrupt the clinical trial schedule.

The Immunovant Defendants argue that the AC does not allege that Wong sold "any meaningful number of those shares."  IMVT MTD at 37.  As the Immunovant Defendants are certainly aware, Wong's earnout shares were obtained by various entities affiliated with Wong and those transactions may not be reflected on Wong's Form 4 filings.  Pl. Ex. 4 at 139.  Whether those entities sold shares and how many they may have sold are factual issues for discovery.  Importantly, even if Roivant and Wong's affiliated entities sold zero shares, the fraud was still profitable.  On February 2, 2021, *after* Immunovant announced the halting of the clinical trial at the end of the Class Period which caused a 42% decline in the price of Immunovant shares, the earnout shares were valued at more than ***$500 million***.  ¶280; Pl. App. B.  Therefore, on the day that Plaintiff and the Class suffered losses because of Defendants' fraud, Roivant, Wong and others had a $500 million profit.  Moreover, Defendant Salzmann was not harmed by the decline in the Company's shares because as reflected in Immunovant's Form Def. 14A filed with the SEC, the Company repriced his options in the Company so that those options would still be valuable even after the decline in Immunovant stock.  Pl. Ex. 2 at 18-21 (reflecting Salzmann's shares that were repriced), at 20; *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018) (rejecting defendants argument that plaintiff's motive allegations "paints a picture of typical pharmaceutical business practices and executive incentive packages" because the question is if all the collective facts "raise a strong inference of scienter").

According to another set of facts the Immunovant Defendants inappropriately ask the Court to consider (from nearly a year after the end of the Class Period), Immunovant purportedly resumed "clinical trials with only minor modifications to pre-screening requirements and monitoring—something they could easily have implemented at the outset, had they really known of the risk." IMVT MTD at 35. Even if the Court considers these facts – which it should not – they do not assist Defendants' argument. First, the AC does not allege that the risk of cholesterol elevations doomed IMVT-1401 to fail but would disrupt its development. ¶¶94(e), 171(e). *See supra* §II.F. at 11 (commenting that the lipid safety issues are likely going to be an issue for all indications). And even though – according to the Immunovant Defendants – clinical trials resumed, Immunovant's stock price has not recovered. Pl. Ex. 3 (Immunovant stock price closed at $4.25 / share on July 25, 2022).

Finally, the AC alleges that the fraud enabled Defendant Immunovant and various selling shareholders, including entities controlled and owned by Defendant Wong, to sell hundreds of millions of dollars of Immunovant common stock to investors through several public follow-on offerings and shelf registrations, including on or about April 9, 2020, April 14, 2020, and September 2, 2020. ¶¶275-276. These are not "[m]otives that are common to most corporate officers" as discussed in the cases cited by Defendants because the offerings were timed to occur before the Company might need to reveal the omitted risk. IMVT MTD at 36; *Kassover v. Essence Partners (In re OSI Pharms.)*, 2007 U.S. Dist LEXIS 103845, at *38-*39 (E.D.N.Y. Mar. 31, 2007) (finding scienter and rejecting defendants' argument that a stock offering "was not a valid motive because all companies may validly act to 'maximize profits from a stock offering'"). And on or about January 15, 2021, Immunovant filed a registration statement for a shelf offering for $150 million worth of common stock and selling stockholders, including entities controlled by Defendant Wong, filed a prospectus for the sale of nearly one million shares of Immunovant common stock.

¶275. And, as the Immunovant Defendants point out, those shares were not sold because of the revelations two-weeks later about the halting of the clinical trial. But, had the trial not revealed elevations in cholesterol, or had it taken the Principal Investigator longer to contact Immunovant about the issue, those shares may have been sold. IMVT MTD at 37.

The AC more adequately alleges a strong inference of scienter based on motive and opportunity alone, and when taken holistically with the allegations of recklessness, more than adequately allege scienter.

### 8.     Plaintiff Adequately Alleges Scheme Liability

The AC adequately pleads scheme liability. Section 10(b) makes it unlawful "[t]o employ any device, scheme or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *6-*7 (S.D.N.Y. Feb. 17, 2022).[29]

Here, Defendants engaged in a fraudulent scheme to delay monitoring cholesterol in early IMVT-1401 clinical trials. Defendants knew, or recklessly disregarded, there was a risk that the IMVT-1401 clinical trials would observe elevations in cholesterol and that the disclosure of that risk could negatively impact the Company's stock price. The Exchange Act Defendants delayed the monitoring of cholesterol in order to give them time to monetize their interests in Immunovant. Even though it was not a certainty IMVT-1401 would elevate cholesterol levels, delaying the monitoring of cholesterol made it a certainty that the clinical trials would not observe cholesterol elevations. Specifically, the Exchange Act Defendants delayed the monitoring of cholesterol to

---

[29]   The elements of a scheme liability claim are "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Id*. at *7.

enable Wong and Roivant to obtain their earnout shares and for Immunovant to sell shares and raise money through several public offerings.

A manipulative act "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021). Indeed, "[d]eception is the gravaman of a claim for market manipulation, and 'the market is not misled when a transaction's terms are fully disclosed.'" *Id*. at 77. *XL Fleet*, 2022 WL 493629, at *7 (finding defendant employed a scheme to defraud investors).

### D. The AC Adequately Alleges Defendants Violated Items 303 and 105 of Regulation S-K

Immunovant's SEC filings, including the September 2020 Offering Documents, the 1/17/20 Registration Statement, the 3Q19 Form 10-Q, the 4/10/20 Registration Statement, the 4/14/20 Prospectus, the 2020 Form 10-K, and the 2Q20 Form 10-Q (collectively, the "SEC filings") violated Items 303 and 105 (formerly Item 503) of Regulation S-K because they omitted to inform investors that: (i) there was an increase in cholesterol levels in animals which received IMVT-1401 during preclinical studies; (ii) there was an anticipated risk IMVT-1401 would increase cholesterol levels in patients; (iii) IMVT-1401's early clinical studies in humans failed to monitor cholesterol levels; and (iv) the ASCEND GO-2 Phase 2b trial was the first clinical trial that tested for cholesterol levels. These omissions were known events and uncertainties about IMVT-1401 that were reasonably likely to impact Immunovant's continuing operations and were required to be disclosed in the SEC filings.

### 1. Defendants Violated Item 303

Item 303 requires disclosure of any known trends, events or uncertainties that have caused or are reasonably likely to cause defendants' financial information not to be indicative of future operating results. 17 C.F.R. §229.303. It was a known uncertainty that elevated cholesterol levels

was an anticipated risk of IMVT-1401. *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 27, 2017) (holding that defendants violated Item 303 because "plaintiffs have pleaded specific facts that, at least when taken as a whole, raise a plausible inference that [defendants] knew of the [uncertainty] before the IPO").

The Underwriter Defendants' reliance on *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39-40 (2d Cir. 2017) for the proposition that the Offering Documents "contained extensive disclosures about the inherent uncertainty of the clinical trial process generally and the risks associated with adverse events specifically" is misplaced. UD MTD at 15. The disclosures warned of "unforeseen safety issues," but failed to advise investors of the foreseeable risk that cholesterol levels in clinical trials would likely increase and that Defendants chose not to include a standard cholesterol panel in clinical trials until the Phase 2b trial. *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *8 (E.D.N.Y. Apr. 22, 2020) (holding defendants violated Item 303 where plaintiffs alleged factual content allowing the court to draw a reasonable inference that defendants knew of delays at its facility prior to its IPO).

Defendants argue that Plaintiff does not plead facts showing that there was an "anticipated risk" that IMVT-1401 would cause heightened cholesterol and that Plaintiff bases its claim on hindsight. IMVT MTD at 32; UW MTD at 16. This argument is without merit because the AC alleges numerous facts showing elevated cholesterol was an anticipated risk at the time of the Sept. 2020 Offering. IMVT MTD at 32; ¶116; *SAIC*, 818 F.3d at 96 (holding defendants required under Item 303 to disclose a then-known trend, event, or uncertainty despite being "uncertain about its likely effect on [defendant's] current and future revenues). Defendants were in possession of data that contradicted the safety of IMVT-1401. ¶119. Instead of disclosing this to investors, Defendants

merely warned of potential "unforeseen safety issues." Immunovant's SEC filings were not "accurate and sufficiently candid." *Chembio*, 2022 WL 541891, at *16.

### 2.      Defendants Violated Item 105

Defendants violated Item 105 because the SEC Filings failed to include a "discussion of the most significant factors that make the offering risky or speculative[.]" ¶119. *Chembio*, 2022 WL 541891, at *1. "The same facts underlying an Item 303 violation may also support an Item [105] violation, and a court's rationale for determining the former may also support the same determination of the latter." *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020).

The "meaningful cautionary language" on which Defendants principally rely, including that IMVT-1401 may never receive FDA approval or be commercially successful (IMVT MTD at 30, 33), and "a side effect of IMVT-1401 [] could delay the clinical studies and threaten the FDA approval process" (UD MTD at 4-5, 14) are the definition of boilerplate and contain no warnings concerning the risk and uncertainty associated with IMVT-1401 increasing cholesterol levels in humans. *Jianpu*, 2020 WL 5757268, at *12 (rejecting defendants' argument that they disclosed certain risks because the "statements [were] all framed as mere hypotheticals"). Despite Defendants' statements to the contrary, general disclosure of "unforeseen safety issues" and "risks inherent in drug development" alone is insufficient. UD MTD at 5; IMVT MTD at 33. *Salix*, 2016 WL 1629341, at *11 (finding defendants' cautionary language "brief and generic" because "broad disclaimer[s] fail[] to alert investors to the specific risks they are facing").[30]

Further, none of the purported risk disclosure statements provide a specific warning of the potential cholesterol safety issue or that Defendants decided not to test for cholesterol in early

---

[30]   *In re Am. Int'l Grp., Inc.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("[G]eneric risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.").

clinical trials.  UD MTD at 4-5 ("Failures can occur at any stage of clinical trials." . . . "If we experience delays in the commencement or completion of our clinical trials, or if we terminate a clinical trial prior to completion, the commercial prospects of our product candidate could be harmed[.]"); *In re Ply Gem Holdings Sec. Litig.*, 2016 WL 5339541, at *6 (S.D.N.Y. Sept. 23, 2016) (holding that the potential future impact of a particular known trend, event, or uncertainty on defendant's business was "certainly not public knowledge" even where defendants disclosed the existence of certain issues).  Defendants did not disclose the specific risks that unquestionably materialized once Immunovant announced the halting of the IMVT-1401 clinical trial; that IMVT-1401 caused elevations in cholesterol.  ¶¶130-134.

"By superficially warning of [the] possible risk[] [of unforeseen safety issues] while failing to disclose [the] critical fact[]" that there was a substantial risk that IMVT-1401 was unsafe because it elevates cholesterol levels "was akin 'to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *MF Glob.*, 982 F. Supp. 2d at 318 (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y. 1996)).  Defendants knew, recklessly, or negligently (with respect to Plaintiff's Securities Act claim) disregarded that the risk of elevations in cholesterol was a present and material risk and therefore cannot hide behind their boilerplate disclaimers.

### E.  The AC States Claims Under the Securities Act

#### 1.  The Legal Standards for Stating a Claim Under the Securities Act

Sections 11, 12(a)(2), and 15 of the Securities Act allow plaintiffs to sue for and recover damages for false statements or omissions of material facts made in connection with the offering of securities.  15 U.S.C. §77k(a) (establishing action based on false statements or omissions in registration statements); 15 U.S.C. §77l(a)(2) (establishing action based on false statements or

omissions made by seller orally or in prospectuses); 15 U.S.C. §77o(a) (establishing action against persons controlling those liable under Sections 11 and 12(a)(2)); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011). The Securities Act imposes "a stringent standard of liability," and plaintiffs "need only show a material misstatement or omission to establish his *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

An actionable misstatement or omission takes the form of "(1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; [or] (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). Unlike claims brought under the Exchange Act, a plaintiff bringing claims arising under Sections 11 and 12(a)(2) of the Securities Act "need not allege scienter, reliance, or loss causation." *Id*. at 359. The "heightened pleading standards" of the Private Securities Litigation Reform Act of 1995 ("PSLRA") do not apply. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 157 (2d Cir. 2012). Rather, a Securities Act plaintiff only needs to allege falsity, which is a "fact-specific" inquiry that does not focus on whether statements are "literally true" but instead on whether the statements, "taken together and in context, would have mislead a reasonable investor[.]" *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013). Under Section 11, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence." *Herman & MacLean*, 459 U.S. at 382.

Plaintiff has adequately met the applicable standard.

### 2.   The Offering Documents Contained Untrue Statements of Material Fact and Omitted to Disclose Material Information

The Offering Documents contained untrue statements of material fact and omitted material information because they failed to disclose: (i) IMVT-1401 was less safe than the Company had led

investors to believe; (ii) there was an anticipated risk that IMVT-1401 would substantially increase LDL and cholesterol levels; (iii) Immunovant failed to test for the anticipated risks and adverse events of elevated LDL or cholesterol levels in any of its phase 1 or 2 clinical trials conducted prior to its ASCEND GO-2 Phase 2b trial which was halted, as announced on February 2, 2021; (iv) Immunovant failed to follow FDA regulations and good clinical practices in connection with IMVT-1401; (v) the undisclosed safety issues of substantially elevated LDL and total cholesterol levels, if publicly disclosed, threatened to delay and/or derail IMVT-1401's clinical trial schedule and therefore, prospects for commercial viability and profitability; and (vi) Immunovant's business, operations and financial condition was not as represented.  ¶94.

As described in §III.C.4. above, Plaintiff's allegations that elevated LDL and cholesterol levels were anticipated risk of IMVT-1401 are supported by many detailed facts.  As are Plaintiff's allegations that Immunovant failed to follow FDA regulations and good clinical practices.  ¶¶61-69.

The Underwriter Defendants misstate the law by arguing Plaintiff must allege Defendants "knew" that elevations in cholesterol were an anticipated risk.  UD MTD at 6-9.  *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 434-35 (S.D.N.Y. 2009) (discussing how knowledge is not an element of Sections 11 and 12).  Plaintiff simply needs to allege the Offering Documents contained an untrue statement of material fact, a misleading statement, or omitted material information.  An issuer is strictly liable and a negligence standard applies to the other defendants. *Herman & MacLean*, 459 U.S. at 382; *Panther Partners Inc. v. Ikanos Commc'ns., Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) ("Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters[.]").  The Underwriter Defendants apparently base their argument on Plaintiff's use of the term "anticipated risk" and apply their own definition to conclude that an anticipated risk is a risk

"known to the issuer" and therefore the AC must allege the issuer knew of the risk to state a claim. UD MTD at 1.  The Underwriter Defendants are wrong on the facts and the law.

First, as alleged, an anticipated risk is not a "known risk." ¶62.  In fact, the AC specifically alleges that the CIOMS VI Working Group defines a "known risk" and an "anticipated risk" as different types of risks.  *Id*.  A "known risk" refers to "a risk that has been observed and is reasonably established for the investigational product itself." *Id*.  On the other hand, an "anticipated risk" refers to a risk "that has not yet been observed or established for the product but is expected to occur based on knowledge of the class of drugs" or a type of "potential risk" for which "there is reason to suspect it might occur." *Id*.  The AC more than adequately alleges elevated cholesterol was an anticipated risk and therefore Immunovant is strictly liable and the other Securities Act Defendants negligently issued materially untrue and misleading statements and omitted material information. *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 830-32 (S.D.N.Y. 2017) (Sections 11 and 12(a)(2) claims upheld where defendants omitted the existence of certain risks which it knew about at the time of the IPO).

The Underwriter Defendants are mistaken that Plaintiff has not met the pleading standard because a third-party may have physically conducted the IMVT-1401 animal studies and the FE learned about the substantial elevations of cholesterol during January 2021.  Each of the IMVT-1401 animal studies reviewed by FE were provided to Immunovant prior to the Class Period and the Underwriter Defendants had access to those reports in connection with the due diligence for the Sept. 2020 Offering. ¶¶140, 151.  Under CFR 312.32, Immunovant was to "examin[e] data from all sources" including "[a]nimal studies" and "[r]eports in the scientific literature," such as those alleged in the AC as indicating albumin reductions (and therefore IMVT-1401) would likely elevate cholesterol levels in humans. ¶64.  The Underwriter Defendants simply ignore the detailed facts in

the AC to argue they had no indication elevated cholesterol was an anticipated risk because elevated cholesterol had not yet been observed in human trials of IMVT-1401.  UD MTD at 7.  Indeed, FDA guidance ICH M3 (R2) states that nonclinical safety studies "should be adequate to characterize potential adverse effects that might occur under the conditions of the clinical trial to be supported." ¶66.  Based on the results of the animal studies alone, there was sufficient basis for Defendants to learn about the risk.  And the AC alleges much more than just facts about the animal studies.

Finally, the Underwriter Defendants incorrectly describe the AC as asserting corporate mismanagement or challenging Immunovant's scientific judgment.  UD MTD at 9-11.  As discussed in §III.C.5(c) above, Plaintiff's claims are not like those in the cases cited by Defendants where the Plaintiff alleged claims based on differing statistical methods of reviewing or analyzing clinical trial data.  UD MTD at 9-10.  Plaintiff does not criticize the scientific methodology used by Immunovant but rather alleges that the Offering Documents failed to disclose an anticipated risk of IMVT-1401, and the omission of related facts rendered statements in the Offering Documents untrue and misleading.  ¶¶92-145.  *Arena Pharms.*, 840 F. 3d at 709 (holding the failure to disclose issues and concerns with the animal study – "not who was ultimately right about the underlying science – that matters").

### 3.   The Securities Act Defendants Were Under a Duty to Disclose the Omitted Facts

The Underwriter Defendants argue that there was no duty to disclose the omitted facts as alleged in the AC.  UD MTD at 11-16.  The Underwriter Defendants erroneously argue that "Plaintiff does not identify any misleading statement in the Offering Documents," has not alleged any facts were untrue, and the Offering Documents "could not mislead investors about IMVT-1401's alleged risk of heightened cholesterol . . . because the Offering Documents" did not contain "a single word about cholesterol."  UD MTD at 12.

- 74 -

First, there can be no dispute that the Securities Act Defendants have a duty to disclose accurate and complete information in the Offering Documents. *Essence Partners*, 2007 U.S. Dist. LEXIS 103845, at *30-*31 (holding that defendants had a duty to disclose material and adverse facts that altered the total mix of information because they "could have easily and accurately qualified or softened their broad, positive statements"). Statements in the Offering Documents, such as, "several nonclinical studies . . . demonstrated . . . [IMVT-1401] was observed to be well tolerated" were affirmative statements about IMVT-1401's nonclinical studies and the tolerability of IMVT-1401. ¶98. Defendants, therefore, were under a duty to speak fully and accurately. The statement was materially untrue and misleading because contrary to the statement, animals given IMVT-1401 experienced substantial elevations in cholesterol. ¶99.

Second, the Offering Documents represented "[d]ose-dependent and reversible albumin reductions were observed" with mean albumin reductions of 20% and 31%" but that the "reductions were not associated with any AEs or clinical symptoms and did not lead to any study discontinuations." ¶104. Since the Offering Documents discussed the albumin reductions and since a key risk of albumin reductions is cholesterol elevation, the Securities Act Defendants were under a duty to fully disclose the risks associated with albumin reductions and IMVT-1401. The Underwriter Defendants miss the point by arguing that the lack of statements about cholesterol indicate the Offering Documents "could not mislead investors about IMVT-1401's alleged risk of heightened cholesterol." UD MTD at 12. The Offering Documents discussed albumin reductions so they were misleading about the risks of albumin reductions. *Id*. The lack of any mention of any risks of albumin reductions, such as elevated cholesterol, or that there was a risk IMVT-1401 elevated cholesterol, are a key reason the Offering Documents were misleading.

For a similar reason, the statements about IMVT-1401 clinical trials showing the drug was "safe," "well-tolerated" and without any "serious AEs," were materially misleading. The Offering Documents failed to disclose material facts about the potential risk to IMVT-1401 being safe, well-tolerated or without any serious AEs. ¶104. The Underwriter Defendants argue that certain statements from the Offering Documents are opinions or forward-looking statements, and therefore not actionable. As discussed in §III.C.6(a) above, the purported opinion statements are actionable and as discussed in §III.C.6(c) above, the purported forward-looking statements are mixed statements or present or historical fact, and therefore actionable. Additionally, the purportedly cautionary language referenced by Defendants was boilerplate and not tailored to the risks experienced by Immunovant.

### 4. The Securities Act Claims Do Not Sound in Fraud

The Immunovant and Underwriter Defendants contend that the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure should apply to Plaintiff's Securities Act allegations. IMVT MTD at 14 n.11; UD MTD at 8 n.5, 20 n.10. Not so. The Securities Act Claims, which sound in strict liability and negligence, are only subject to the notice pleading standard of Rule 8. *Ikanos*, 681 F.3d at 120; *In re Lehman Brothers Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 174 (2d Cir. 2011) (concluding that Rule 9(b) does not apply to securities act claims because plaintiff expressly disclaimed allegations of fraud). *In re Citigroup, Inc. Bond Litig.*, 723 F. Supp. 2d 568, 586 (S.D.N.Y. 2010); *Refco*, 503 F. Supp. 2d at 631-32.

The Immunovant and Underwriter Defendants' reliance on *Rombach v. Chang*, 355 F.3d 164, 171-72 (2d Cir. 2004) is misplaced. IMVT MTD at 14-15 n.11; UD MTD at 8 n.5. "It is clear that the Second Circuit did not intend *Rombach* as an instruction that all §11 pleadings should be subjected to the Rule 9(b) standard." *Refco*, 503 F. Supp. 2d at 632. Courts in this district have

considered four factors to determine if claims sound in fraud and each of those factors weighs in favor of not applying Rule 9(b) to Plaintiff's Securities Act Claims.[31]

The AC does not rely on a blanket disclaimer that Plaintiff does not allege fraud. IMVT MTD at 14 n.11. Even the most superficial review of the AC illustrates that Plaintiff's Securities Act claims are explicitly based on the principles of strict liability or negligence (*see, e.g.*, ¶¶94, 147, 155, 164) and are pled separately from the Exchange Act claims (*compare* ¶¶146-166 *with* ¶¶288-307).[32]

While the Securities Act claims allege the Offering Documents contained untrue or inaccurate statements of material fact and omitted material information (*e.g.*, ¶¶94, 97), the Exchange Act claims allege that statements made during the Class Period were materially false and misleading and that the Exchange Act Defendants knew, or recklessly disregarded undisclosed adverse facts. ¶¶174, 176, 178. Plaintiff does not use classic fraud language for the Securities Act claims. *Refco*, 503 F. Supp. 2d at 631-32 ("Fraud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent."); *comScore*, 268 F. Supp. 3d at 559 (rejecting defendants' argument "materially false and misleading" is "couched in fraud").

The Underwriter Defendants rely on *In re Apple REITs Litigation*, 2013 WL 1386202 (E.D.N.Y. Apr. 3, 2013), for the proposition that Plaintiff plead "actual knowledge," thus its Securities Act Claims sound in fraud. UD MTD at 8. As discussed above in §III.E., the Underwriter

---

[31]  If "(1) the complaint contains merely a blanket disclaimer that the plaintiffs do not allege fraud . . . (2) the allegations themselves include classic fraud language; (3) the complaint does not show any basis for the claims that is non-fraudulent; and (4) the plaintiffs do not separate the factual allegations supporting the fraud claims and negligence claims, but rather require the courts to parse the complaints." *In re NIO Inc. Sec. Litig.*, 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021).

[32]  *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 326 (S.D.N.Y. 2020) (refusing to apply Rule 9(b) to Securities Act claims where plaintiffs expressly disclaimed fraud).

Defendants misstate that an anticipated risk is a known risk. Regardless, even if the Securities Act Defendants are alleged to have known some facts does not convert Plaintiff's claim into one alleging Defendants engaged in intentional or reckless conduct. *Silvercreek*, 248 F. Supp. 3d at 448 ("Where a plaintiff expressly disclaims allegations of fraud and affirmatively alleges negligence, this is generally sufficient to relieve the plaintiff of Rule 9(b)'s requirements.").

Even if Plaintiff's Securities Act and Exchange Act claims are based on certain facts in common, that "does not take away plaintiff's right to plead in the alternative that defendants violated provisions requiring only negligence." *Refco*, 503 F. Supp. 2d at 632-33 (holding that the same course of conduct can support both a Rule 10b-5 claim and Securities Act claims). For the Securities Act claim, Plaintiff alleges that at the time of the Sept. 2020 Offering, elevated cholesterol was an anticipated risk of IMVT-1401, and describes why Defendants' statements in the Offering Documents were untrue; it does not allege that Defendants recklessly or intentionally acted.[33] Plaintiff's Exchange Act claim alleges a fraudulent scheme based on facts not contained in the Securities Act Section of the AC, which caused the artificial inflation in the price of Immunovant securities. ¶¶259-277; *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 424-25 (S.D.N.Y. 2011) (finding that plaintiffs "specifically pled alternate theories of fraud and negligence" because they "framed their allegations with regard to the Securities Act counts in terms of negligence").[34]

Plaintiff does not require the Court to parse through the AC to figure out which claims are which. ¶¶92-166; *Refco*, 503 F. Supp. 2d at 632 ("The complaint in this case is carefully structured

---

[33]   ¶¶94, 97, 99, 101, 103, 105, 108, 110, 112, 114 (explaining how Defendants' statements were untrue based on contrary facts that existed at the time).

[34]   *NIO*, 2021 WL 3566300, at *5 (finding that plaintiff's Section 11 and Section 10(b) claims were separate because "alternative grounds of liability, requiring different proof" were asserted).

so as to draw a clear distinction between negligence and fraud claims."); *In re Am. Int'l Grp.*, 741 F. Supp. 2d at 537. Plaintiff's Securities Act allegations are distinguishable from *In re Chembio Diagnostics, Inc. Securities Litigation*, 2022 WL 541891, because plaintiffs in that case did not "adhere to the clear division of pleading in *Refco*[.]" *Id*. at *13. "[T]he mere presence of fraud allegations elsewhere in the complaint does not poison the well." *Silvercreek*, 248 F. Supp. 3d at 448.[35]

### F.      Defendants' Purported Cautionary Language Was Inadequate

As discussed in §III.D.2. above discussing Defendants' failure to comply with Item 105, the purported cautionary language and risk disclosures referenced by Defendants did not sufficiently warn investors of the risks of investing in Immunovant. UD MTD at 13-17; IMVT MTD at 32-33; *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 2010 WL 3910265, at *2-*3 (S.D.N.Y. Sept. 29, 2010). Plaintiff does not, as the Underwriter Defendants contend, allege Immunovant was required to "list every potential side effect of IMVT-1401." UD MTD at 28. Even though the Offering Documents may have had nearly 60 pages of risk disclosures as the Underwriter Defendants contend, it is the *quality* and not *quantity* of those disclosures which matters under the federal securities laws. *E\*Trade*, 712 F. Supp. 2d at 171, 193-94 (S.D.N.Y. 2010) (finding that defendants' misleading statements "nullified any risk disclosures" and "their risk disclosures were insufficient to counterbalance their . . . misleading statements").

---

[35]   Plaintiff's Securities Act Claims should be subject to the pleading requirements of Rule 8, but even if they are not, Plaintiff's claims meet the heightened pleading standard of Rule 9(b). Plaintiff adequately plead, with particularity, the falsity of the statements in the Offering Documents: who made each statement; what the statement was; when each statement was made; where the statement was made; and why the statement was false and misleading. Even if Plaintiff's claims are subject to Rule 9(b) – scienter, reliance and causation are not elements under Securities Act Claims, and need not be plead. *NECA-IBEW*, 693 F.3d at 156-57.

At the time of Defendants' statements, it was a ***fact*** that there was an anticipated risk that albumin reductions cause elevations in cholesterol. Immunovant was required to monitor, assess, and mitigate all anticipated risks during clinical trials so a reasonable investor would have expected that all anticipated risks were monitored. Immunovant's generic and boilerplate risk disclosures failed to warn investors that its clinical trial results should be viewed from the perspective of the fact that the IMVT-1401 clinical trials did not monitor, assess or mitigate a key anticipated risk. ¶¶120-128; *Salix*, 2016 WL 1629341, at *11 ("broad disclaimer[s] fail[] to alert investors to the specific risks they are facing").

The Underwriter Defendants cite *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) and *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372 (S.D.N.Y. 2018) to support their argument that "the Offering Documents were not required to disclose that IMVT-1401 already had 'safety issues' due to the animal study data" because the risk of heightened cholesterol in humans had not yet materialized. UW MTD at 29. Defendant's cases are inapposite because the risk of increased cholesterol levels had, in fact, come to pass by the time of the Sept. 2020 Offering. *Arena Pharms.*, 840 F.3d at 704 (finding that defendants touted the safety of their drug while referring to the animal studies and once they raised the animal studies, they were "obligated to disclose" that rat studies showed the drug could cause cancer). The Underwriters' argument that there was no link between IMVT-1401's preclinical animal studies and clinical studies is contrary to FDA guidelines and good clinical practices, ignores that Immunovant discussed its animal studies, and is illogical. In fact, Immunovant re-reviewed its animal studies as part of its internal review before halting the Phase 2b clinical trial at the end of the Class Period.

Contrary to the cases cited by the Underwriters, Plaintiff's argument is not "hindsight." UD MTD at 30. *Yannes v. Scworx Corp.*, 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021) (rejecting

defendants' fraud-by-hindsight argument where plaintiff alleged that publicly accessible information was available to defendants prior to their announcement); *Salix*, 2016 WL 1629341, at *17 (rejecting defendants' fraud by hindsight claim because plaintiffs alleged that defendants "failed to take into account information that was available to [them]" when they made incorrect statements or omissions). The AC alleges numerous facts existing at the time of Defendants' statements indicating elevated cholesterol was an anticipated risk of IMVT-1401.

### G. The AC States Control Person Claims Under Sections 15 of the Securities Act and 20(a) of the Exchange Act

Under Section 20(a), "[e]very person, who directly or indirectly, controls any person liable under any provision of this chapter shall be liable to the same extent as the controlled person for the underlying violation." *NIO*, 2021 WL 3566300, at *12. Section 15 attaches liability to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under section[s] [11 or 12 of the Securities Act]." 15 U.S.C. §77o(a).

The AC states a claim for primary violations so Plaintiff's control person liability claims should succeed. *Nutriband, Inc. v. Kalmar*, 2020 U.S. Dist. LEXIS 126931, at *40-*41 (E.D.N.Y. July 20, 2020). Salzmann managed Immunovant and Wong managed HSAC as CEO and Chairman of the Board, so their control cannot seriously be disputed. *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 257 (S.D.N.Y. 2012).

Additionally, Roivant is liable under Sections 15 and 20(a). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005). The AC satisfies that standard for Roivant and Roivant is wrong that Plaintiff's

allegations "rest entirely on Roivant's status as a controlling shareholder of Immunovant." RVNT MTD at 6. As admitted in the Sept. 2020 Offering Documents:

> Roivant is currently our majority stockholder… we are a "controlled company" …We will remain a "controlled company" so long as 50% of the voting power for the election of directors is held by Roivant . . . ***Roivant will be able to exercise control over all matters requiring stockholder approval, including the election of our directors and approval of significant corporate transactions*** . . . Roivant, as the holder of Series A preferred stock, has the right to elect a certain number of Series A Preferred Directors in accordance with the provisions of our amended and restated charter. ¶95.

Therefore, Roivant had and exercised control over Immunovant throughout the Class Period, including by placing individuals on its board of directors. Even if Plaintiff's allegations rested solely on Roivant's status as a controlling shareholder (which they do not), "[i]n cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership and common principals." *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 150 (S.D.N.Y. 2021) (control person is a factual issue).

Roivant's argument that its role was only in "the early stages of IMVT-1401's development" and is irrelevant to "actual control" ignores the facts and Immunovant's statements in its SEC filings. RVNT MTD at 7. Additionally, Plaintiff alleges statements in the 11/27/19 Proxy, which Roivant signed, were materially false and misleading, which clearly demonstrates control.[36] ¶¶187-190. Although not necessary, Plaintiff adequately pleads culpable participation. *City of Livonia*, 2010 WL 3910265, at *8 (plaintiff adequately alleged culpable participation "at least approximating recklessness" where defendants failed to disclose serious adverse events about its drug). Roivant is also closely involved with Immunovant's business. As acknowledged in Immunovant's SEC filings,

---

[36] Roivant's SEC filings tell investors to "carefully consider . . . other materials filed or furnished by our majority-controlled subsidiary Immunovant, Inc. [] with the SEC." *See* Roivant's 10-Q filed on September 21, 2021 at 41.

Roivant provides Immunovant with "operational functions as well as access to Roivant's proprietary technology and digital innovation platforms . . . an embedded team of scientific experts, physicians and technologists to help optimize clinical development and commercial strategies." Speers Decl. Ex. 1 at 4. Roivant provides "services related to development, administrative and financial activities [to Immunovant.]" Speers Decl. Ex. 1 at 4. Further, "Immunovant relies on the administrative support, business development, clinical development and other services provided by [Roivant][,]" and "currently rel[ies] and expect to continue to rely on [Roivant] to support [its] nonclinical and clinical development programs." Speers Decl. Ex. 3 at 11; Speers Decl. Ex. 1 at 13. In fact, Immunovant relied on "[Roivant] to assist Immunovant in filing and supporting the applications necessary to gain marketing approvals" by establishing "the safety and efficacy of [IMVT-1401]." Speers Decl. Ex. 3 at 23. Without Roivant's team and services, Immunovant would not be able to clinically develop IMVT-1401. Speers Decl. Ex. 1 at 68.[37]

Furthermore, as discussed in III.C.7., Plaintiff adequately alleges scienter, which satisfies culpable participation. Even if Plaintiff's allegations do not give rise to scienter – which they do – Roivant was still a culpable participant. *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 144-45 (D. Conn. 2021) (defendant was a culpable participant for purposes of Section 20(a) even though the factual allegations did not give rise to scienter).

## H.     The AC Is Not a Puzzle Pleading

Defendants are wrong that the AC is a "puzzle pleading." The AC states who made each statement, where the statement was made, when it was made, and provides a specific reason for why

---

[37] "[W]e will continue to partner and collaborate with RSL in identifying and evaluating potential acquisition and in-licensing opportunities in support of our goal to develop and commercialize innovative therapies for autoimmune diseases[.]" Also, Immunovant is equally important to Roivant, which lists Immunovant first on its website. Roivant Sciences, https://roivant.com/ (last visited July 25, 2022).

it was false and misleading.[38] *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (discussing how the complaint need not be a "model of clarity"). Many of Defendants' statements were false and misleading for the same reasons, so Plaintiff included a description of those reasons and referred back to them in an effort to cut down on pages. The AC specifically referenced which parts of statements are misleading and why. *See, e.g.*, ¶¶172, 173-174, 177-178. The Immunovant Defendants are wrong that their statements describing how clinical trials are conducted, including protocols and safety parameters (¶¶96, 199, 230), are "untethered" (IMVT MTD at 16 n.12) to the anticipated risk of elevated cholesterol levels. As discussed in §III.C.5(c) above, Defendants' statements about trial design were misleading because the clinical trials were not designed to test for a key anticipated risk of elevated cholesterol.[39] ¶¶97, 200, 231.

## I.      Leave to Replead

Should the Court find any defects in the AC, Plaintiff respectfully requests leave to amend. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15 is a permissive standard "consistent with our strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (holding that the district court abused its discretion in denying plaintiff leave to amend the

---

[38] *Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus., Inc.*, 432 F. Supp. 3d 131, 153 (D. Conn. 2019) (a complaint is sufficiently particular if it "identif[ies] the date, publication, and speaker of each of the alleged [statements] and contain[s] facts supporting the existence and materiality of these problems and highlights in some way the particular aspects of the statements alleged to be misleading").

[39] The Immunovant Defendants make the same argument about ¶¶203-204 where Defendant Salzmann discussed receiving IND clearance for a Phase 2 trial initiation. Plaintiff explained that this statement was false and misleading because Defendants did not disclose that it failed to inform the FDA, when it applied for IND clearance, that the animal studies showed substantial increases in cholesterol levels and that its early clinical trials failed to test for cholesterol levels.

complaint); *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (same).  Plaintiff has only amended the complaint once, and if granted leave to amend, Plaintiff would include additional facts showing elevated cholesterol was an anticipated risk of IMVT-1401 including details about the FE, such as those discussed in §III.C.4(a).  Plaintiff can include additional facts showing a reasonable investor would have expected Immunovant to monitor all anticipated risks.  If necessary, Plaintiff can also include additional facts to support scienter, including facts quantifying the benefit of the earnout shares, such as those included in Pl. App. B.

## IV.   CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' Motions to Dismiss the AC in their entirety.

DATED:  July 26, 2022

Respectfully Submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
NATALIE BONO

*/s/ Evan J. Kaufman*

EVAN J. KAUFMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
nbono@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

- 85 -

<u>CERTIFICATE OF SERVICE</u>

I, Evan J. Kaufman, hereby certify that on July 26, 2022, I caused a true and correct copy of the foregoing document to be served on all counsel of record by providing them with copies via electronic mail.

_____
*/s/ Evan J. Kaufman*
EVAN J. KAUFMAN