UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x
                                              :
THERESA PITMAN, Individually and on           :
Behalf of All Others Similarly Situated,      :
                                              :
                    Plaintiff,                :     Civil Action No. 1:21-cv-00918-KAM-VMS
                                              :
            v.                                :
                                              :
IMMUNOVANT, INC. f/k/a HEALTH                 :
SCIENCES ACQUISITIONS                         :
CORPORATION, RODERICK WONG,                   :
PETER SALZMANN, FRANK M. TORTI,               :
ANDREW FROMKIN, DOUGLAS HUGHES,               :
GEORGE MIGAUSKY, ATUL PANDE,                  :
ERIC VENKER, SVB LEERINK LLC,                 :
LIFESCI CAPITAL LLC, CHARDAN                  :
CAPITAL MARKETS LLC, GUGGENHEIM               :
SECURITIES, LLC, ROBERT W. BAIRD &            :
CO. INCORPORATED, and ROIVANT                 :
SCIENCES LTD.,                                :
                                              :
                    Defendants.               :
                                              :
———————————————————— x


**MEMORANDUM OF LAW IN SUPPORT OF IMMUNOVANT DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE
      FACTS ........................................................................................................ 4

      A.    Defendants. ...................................................................................... 4

      B.    Immunovant Starts Developing IMVT-1401 to Treat Autoimmune
            Diseases........................................................................................... 5

      C.    The Scientists Responsible for Analyzing the Results of Animal Studies
            Concluded that IMVT-1401 Caused Only Minor Increases in Cholesterol. ......... 6

      D.    Immunovant Submits Animal Study Results and Proposed Phase 1 Trial
            Protocol to FDA; FDA Allows Trial to Proceed Without Cholesterol
            Testing............................................................................................. 7

      E.    Immunovant Publicly Reports Detailed Results of Albumin Reductions in
            Phase 1 Clinical Trial; No One Raises Concerns About Cholesterol. .................. 7

      F.    With Knowledge that IMVT-1401 Reduces Albumin Levels in Humans,
            Two FDA Divisions Allow More Human Trials Without Monitoring
            Cholesterol. ..................................................................................... 9

      G.    Immunovant Voluntarily Monitors Cholesterol in Subsequent Trials................. 11

      H.    Immunovant Voluntarily Pauses Dosing in Its Clinical Trials. ........................... 11

      I.    Immunovant Brings in Outside Experts to Initiate a Program-Wide
            Review. ........................................................................................... 12

      J.    FDA Allows Immunovant to Move Forward with a Phase 3 Trial...................... 13

      K.    Immunovant Begins Developing IMVT-1402.............................................. 13

      L.    This Lawsuit..................................................................................... 14

III.  THE EXCHANGE ACT CLAIMS SHOULD BE DISMISSED ................................... 14

      A.    The SAC Fails to Plead a Strong Inference of Scienter..................................... 16

            1.    Plaintiff fails to plead any cognizable motive........................................ 16

            2.    Plaintiff fails to plead conscious misbehavior or recklessness. ............... 19

      B.    The SAC Also Fails to Plead a Material Misstatement or Omission
            (Falsity). .......................................................................................... 22

            1.    Plaintiff's disagreement with Immunovant's clinical trial design is
                  not actionable under the securities laws................................................. 23

            2.    The challenged statements are inactionable for additional reasons. ........ 26

            3.    None of the statements were false or misleading by omission. ............... 31

**TABLE OF CONTENTS**
(continued)

**Page**

a.    The FE's opinion about the animal study results does not demonstrate that elevated cholesterol was a "key" potential risk......................................................................................... 32

b.    The scientific literature identified in the SAC does not demonstrate that cholesterol was a "key" potential risk. ............. 34

c.    Other companies' trial designs do not demonstrate that increased cholesterol was a "key" potential risk.......................... 36

4.    Immunovant complied with its affirmative disclosure obligations under Items 303 and 105 (formerly 503) of Regulation S-K................... 36

IV.    THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED.................................... 38

V.    CONCLUSION................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abady v. Lipocine Inc.*,
2023 WL 2938210 (D. Utah Apr. 13, 2023).........................................................................22

*Abely v. Aeterna Zentaris Inc.*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) ......................................................................26

*In re Aceto Corp. Sec. Litig.*,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019).........................................................................30

*Acito v. IMCERA Grp.*,
47 F.3d 47 (2d Cir. 1995)...............................................................................................17, 18

*In re Adolor Corp. Sec. Litig.*,
616 F. Supp. 2d 551 (E.D. Pa. 2009) ...................................................................................25

*In re Agent Orange Prod. Liab. Litig.*,
611 F. Supp. 1223 (E.D.N.Y. 1985) .....................................................................................33

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y 2018)....................................................................................29

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ............................................................................................4, 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................................15

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).........................................................................................4, 16, 31

*In re Avon Prods., Inc. Sec. Litig.*,
2009 WL 848017 (S.D.N.Y. Feb. 23, 2009)...........................................................................4

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)...................................................................................38

*Bank of N.Y. Mellon Tr. v. Morgan Stanley Mortg. Cap., Inc.*,
2011 WL 2610661 (S.D.N.Y. June 27, 2011) .........................................................................4

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. v. Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011)...................................................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................................15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Born v. Quad/Graphics, Inc.*,
    521 F. Supp. 3d 469 (S.D.N.Y. 2021)......................................................................22

*Brennan v. Zafgen, Inc.*,
    199 F. Supp. 3d 444 (D. Mass. 2016) .................................................................21, 22

*Brennan v. Zafgen, Inc.*,
    853 F.3d 606 (1st Cir. 2017)...................................................................................35

*Bui v. Indus. Enters. of Am., Inc.*,
    594 F. Supp. 2d 364 (S.D.N.Y. 2009).....................................................................15

*Cachia v. Bellus Health Inc.*,
    2022 WL 4367444 (S.D.N.Y. Sept. 21, 2022)........................................24, 25, 39, 40

*In re Centerline Holdings Co. Sec. Litig.*,
    678 F. Supp. 2d 150 (S.D.N.Y. 2009).....................................................................20

*Defer LP v. Raymond James Fin., Inc.*,
    2010 WL 3452387 (S.D.N.Y. Sep. 2, 2010)............................................................17

*In re DraftKings Inc. Sec. Litig.*,
    2023 WL 145591 (S.D.N.Y. Jan. 10, 2023) .......................................................19, 37

*In re DRDGOLD Ltd. Sec. Litig.*,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007).....................................................................19

*In re Dynavax Sec. Litig.*,
    2018 WL 2554472 (N.D. Cal. June 4, 2018) ...........................................................21

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..........................................................................15, 16, 19

*In re EDAP TMS S.A. Sec. Litig.*,
    2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015).........................................................29

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008).....................................................................21

*Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v.*
    *MacroGenics, Inc.*,
    61 F.4th 369 (4th Cir. 2023) ...................................................................................27

*In re Express Scripts Holding Co. Sec. Litig.*,
    2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017)...........................................................24

iv

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*In re Fed Ex Corp. Sec. Litig.*,
  517 F. Supp. 3d 216 (S.D.N.Y. 2021)..................................................................30

*Ford v. Voxx Int'l Corp.*,
  2016 WL 3982466 (E.D.N.Y. July 22, 2016)......................................................32

*In re Fosamax Prod. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009)..................................................................33

*Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018)....................................................................4

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008)..................................................................15

*In re Gen. Elec. Sec. Litig.*,
  844 F. App'x 385 (2d Cir. 2021) .........................................................................16

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)..................................................................18

*In re HEXO Corp. Sec. Litig.*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021)..................................................................40

*Holbrook v. Trivago N.V.*,
  2019 WL 948809 (S.D.N.Y. Feb. 26, 2019)..................................................37, 38

*In re IAC/InterActiveCorp Sec. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010)..................................................................32

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................................17

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)............................................................................19, 20

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013)..........................................................................24, 29

*Lehmann v. Ohr Pharm., Inc.*,
  830 F. App'x 349 (2d Cir. 2020) .........................................................................19

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
  939 F. Supp. 2d 360 (S.D.N.Y. 2013)....................................................................4

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lopez v. CTPartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016)..................................................................................38

*In re MELA Scis., Inc. Sec. Litig.*,
2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012).............................................................19, 20, 27

*Menaldi v. Och-Ziff Cap. Mgmt. Grp.*,
277 F. Supp. 3d 500 (S.D.N.Y. 2017)................................................................................15

*In re Micro Focus Int'l Plc Sec. Litig.*,
2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020).....................................................................39

*In re Mindbody Sec. Litig.*,
489 F. Supp. 3d 188 (S.D.N.Y. 2020)................................................................................15

*Mogensen v. Body Cent. Corp.*,
15 F. Supp. 3d 1191 (M.D. Fla. 2014)................................................................................17

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)...........................................................................................39

*In re MRU Holdings Sec. Litig.*,
769 F. Supp. 2d 500 (S.D.N.Y. 2011)................................................................................18

*Murdeshwar v. Search Media Holdings Ltd.*,
2011 WL 7704347 (S.D. Fla. Aug. 8, 2011).......................................................................19

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ..........................................................................................18

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
2018 WL 3126393 (N.D. Cal. June 26, 2018).....................................................................20

*In re Novan, Inc.*,
2018 WL 6732990 (M.D.N.C. Nov. 30, 2018)................................................................26, 38

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .........................................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)...............................................................................................24, 27, 28

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010).............................................................................................14

vi

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018).................................................................................31

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012).................................................................................17

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008).................................................................................37

*Patel v. Seattle Genetics, Inc.*,
    2018 WL 2359137 (W.D. Wash. May 24, 2018)................................................................32

*Pension Plan Bd. v. Teva Pharm. Indus.*,
    432 F. Supp. 3d 131 (D. Conn. 2019).................................................................................18

*In re Pfizer, Inc. Sec. Litig.*,
    538 F. Supp. 2d 621 (S.D.N.Y. 2008)...................................................................................4

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. July 21, 2020)....................................................................29

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)...........................................................................19, 20

*In re PXRE Grp., Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................................................19

*In re Regulus Therapeutics Sec. Litig.*,
    406 F. Supp. 3d 845 (S.D. Cal. 2019).................................................................................32

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) .............................................................................................26

*In re Rockwell Med., Inc. Sec. Litig.*,
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ...................................................................19

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...................................................................................29, 39, 40

*Rose v. Rahfco Mgmt. Grp., LLC*,
    2014 WL 7389900 (S.D.N.Y. Dec. 15, 2014) ...................................................................19

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)..................................................................................................4

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*S. Cherry St., LLC v. Hennessee Grp. LLC,*
573 F.3d 98 (2d Cir. 2009)....................................................................................21

*In re Sanofi Sec. Litig.,*
87 F. Supp. 3d 510 (S.D.N.Y. 2015)......................................................................27

*In re Sanofi-Aventis Sec. Litig.,*
774 F. Supp. 2d 549 (S.D.N.Y. 2011)..............................................................27, 29

*SEC v. Rio Tinto plc,*
41 F.4th 47 (2d Cir. 2022) ....................................................................................15

*Slayton v. Am. Exp. Co.,*
604 F.3d 758 (2d Cir. 2010)..................................................................................30

*Smith v. Antares Pharma, Inc.,*
2020 WL 2041752 (D.N.J. Apr. 28, 2020) ...........................................................28

*Solomon v. Sprint Corp.,*
2022 WL 889897 (S.D.N.Y. Mar. 25, 2022) .........................................................19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
551 U.S. 308 (2007)..........................................................................................15, 16

*Tongue v. Sanofi,*
816 F.3d 199 (2d Cir. 2016)..............................................................................27, 28

*TransEnterix Inv. Grp. v. TransEnterix, Inc.,*
272 F. Supp. 3d 740 (E.D.N.C. 2017)...................................................................17

*Turner v. MagicJack VocalTec, Ltd.,*
2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)............................................................18

*U.S. Educ. Loan Tr. III, LLC v. RBC Cap. Mkts. Corp.,*
2011 WL 6778480 (S.D.N.Y Dec. 21, 2011) ........................................................17

*Wyche v. Advanced Drainage Sys., Inc.,*
710 F. App'x 471 (2d Cir. 2017) ...........................................................................18

*Zagami v. Cellceutix Corp.,*
2016 WL 3199531 (S.D.N.Y. June 8, 2016) .............................................24, 25, 38

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Statutes**

15 U.S.C.
    § 78u-4 ..............................................................................................................16
    § 78u-4(b)(1)..............................................................................................15, 22
    § 78u-4(b)(2) .....................................................................................................15
    § 78u-5(c)(1) .....................................................................................................30
    § 78u-5(i)(1)(A)-(D) ........................................................................................30

**Other Authorities**

17 C.F.R.
    § 229.105(a) ......................................................................................................37
    § 229.303(b)(2)(ii) ............................................................................................37

21 C.F.R.
    § 58.1..................................................................................................................6
    § 58.33...........................................................................................................6, 33
    § 58.35(b)(6) ................................................................................................7, 33
    § 312.20..............................................................................................................7
    § 312.23(a)(6) ....................................................................................................7
    § 312.23(a)(6)(iii)(g).......................................................................................10
    § 312.23(a)(9)(i)...............................................................................................10
    § 312.30............................................................................................................10
    § 312.42(b)(iv) ..................................................................................................7

Immunovant, Inc. ("Immunovant" or the "Company"), Roderick Wong, Peter Salzmann, Frank M. Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, and Eric Venker submit this memorandum of law in support of their Motion to Dismiss the Second Amended Complaint for Violations of the Federal Securities Laws ("SAC").

## I.    PRELIMINARY STATEMENT

Since 2018, Immunovant has been developing an antibody, IMVT-1401, to help patients around the world suffering from autoimmune diseases. Based on the results of early animal studies, the FDA allowed Immunovant to begin testing IMVT-1401 in clinical (*i.e.*, human) trials. Clinical trials consist of multiple phases, each with a different purpose. The Phase 1 clinical trial was conducted in healthy volunteers to assess safety. The Phase 2a clinical trials were small, "proof-of-concept" trials for patients suffering from two debilitating autoimmune diseases: thyroid eye disease and myasthenia gravis. The next round of trials—a Phase 2b clinical trial in a larger group of patients with thyroid eye disease and a Phase 2 clinical trial in patients with warm autoimmune hemolytic anemia—were the first clinical trials that monitored patients' cholesterol levels. Although purely voluntary (as the FDA had approved the prior clinical trial protocols without cholesterol monitoring), this addition proved useful: in January 2021, Immunovant discovered elevated cholesterol in patients receiving IMVT-1401. Immunovant promptly paused dosing and updated the market on February 2, 2021.

After a four-month program-wide review aided by external experts, Immunovant determined that the elevated cholesterol was driven by reductions in albumin—a side-effect Immunovant had repeatedly disclosed. With the benefit of this information, Immunovant worked with internal and external experts to develop appropriate modifications to pre-screening and monitoring requirements for its next clinical trials. In December 2021, the FDA approved the modified safety plan, and allowed Immunovant to proceed with its proposed Phase 3 clinical trial.

Now, what should be praised as a model for the proper conduct of clinical trials has somehow become an action for securities fraud. The form is all too familiar: a securities plaintiff insists a company should have designed a trial differently or disclosed bad news earlier than it did. According to Plaintiff here, early animal studies and scientific literature demonstrated that IMVT-1401 posed a "potential risk" of elevated cholesterol in humans, and Defendants covered it up. Never mind that the FDA reviewed the same studies and allowed the Phase 1 and 2a clinical trials to proceed without cholesterol monitoring. And never mind that Immunovant chose on its own to monitor cholesterol, thereby guaranteeing discovery of the very thing Plaintiff claims Defendants sought to conceal. Like the prior complaint, the SAC is nothing more than an attempt to plead "fraud by hindsight"—and it does not even have the virtue of making sense. There are multiple grounds for dismissing the SAC.

As an initial matter, Plaintiff's theory of fraud is implausible. According to Plaintiff, Defendants knew from the outset (although no specific time is alleged) elevated cholesterol was a potential risk, but rather than design the Phase 1 and 2a studies to preemptively address this risk (through pre-screening and administration of statins to offset cholesterol increases), Defendants sought to hide this risk until they were able to cash in on their investments in Immunovant. The problems with this theory are two-fold. First, the Phase 1 and 2a clinical trials were designed before the opportunity to "cash in" materialized. Second, Defendants ***voluntarily*** added cholesterol monitoring before reaping the benefits of their investment and then ***voluntarily*** halted the trials and publicly disclosed the risk the moment it materialized. And now, despite the materialization of this risk, the FDA has allowed Immunovant to proceed with further trials with only minor modifications to pre-screening and monitoring requirements—something Immunovant could have easily implemented at the outset, had it actually known of the risk. To state Plaintiff's theory is

practically to refute it.

On top of that, the reason Plaintiff claims each of the challenged statements are false or misleading comes down to an inactionable dispute about trial design: Plaintiff contends the Phase 1 and 2a clinical trials should have monitored cholesterol, and because they did not, every public statement referring to the safety of IMVT-1401 was misleading. This theory is not cognizable under the federal securities laws. The challenged statements are also inactionable for myriad other reasons, as they consist of honestly and reasonably held opinions, corporate puffery, protected forward-looking statements, and undisputed statements of fact.

The deficiencies, however, do not end there. The linchpin of Plaintiff's theory is also missing: there are no well-pled allegations that any animal study or scientific article demonstrated that elevated cholesterol was a "key potential risk" of IMVT-1401 when the Phase 1 and 2a clinical trials were designed or when the challenged statements were made. This idea rests almost entirely on conjecture from a single unidentified former employee ("FE") who purportedly reviewed the animal study results *in January 2021—after* Immunovant was alerted that patients in one of the Phase 2b clinical trials showed elevated cholesterol levels. And although the FE purportedly believed the animal study results indicated substantial increases in cholesterol, he provides no concrete facts to support his opinion, and even admits that the "summary portion of the results" *prepared by experts in the field outside Immunovant* indicated "only minor increases in cholesterol." As for the scientific articles cited in the SAC, the majority do not address any correlation between albumin and cholesterol, and those that do make no findings on causation.

In short, like the prior complaint, the SAC fails to plead both scienter and falsity. For these reasons—and more, below—the SAC should be dismissed with prejudice.

## II.   STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS[1]

### A.   Defendants.

Immunovant is a publicly traded biopharmaceutical company focused on developing treatments for people suffering from autoimmune diseases. (¶48; Ex. 1 at 6.)[2] Prior to 2022, its sole product candidate was batoclimab ("IMVT-1401"), an antibody designed to treat autoimmune diseases by reducing immunoglobulin ("IgG").[3]

Before going public, Immunovant was a private company in which Roivant Sciences Ltd. ("Roivant"), a pharma-tech business that founds and funds pharmaceutical and health technology companies, owned a majority stake. (¶20.) Roivant remains a majority shareholder. (*Id.*)

Dr. Roderick Wong, a renowned healthcare and biopharmaceutical investor and Managing Partner and Chief Investment Officer of RTW Investments, L.P. ("RTW"), is also an Immunovant shareholder. Impressed by the potential of IMVT-1401, in December 2018, Dr. Wong (through RTW affiliates) invested around $10 million for a 3% stake in Immunovant. (¶52; Ex. 2 at 3.) The

---

[1] On a motion to dismiss, the Court may consider "documents incorporated into the complaint by reference," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), and "matters of which a Court may take judicial notice." *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (noting incorporation by reference "has its greatest applicability in cases alleging fraud"); *Bank of N.Y. Mellon Tr. v. Morgan Stanley Mortg. Cap., Inc.*, 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011) (courts may consider "documents that the plaintiff either possessed or knew about and relied upon in bringing the suit"). In addition to the documents quoted and referenced in the SAC, Plaintiff states its allegations are based on "SEC filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports, reports of securities analysts, and public data related to Immunovant's testing and development of IMVT-1401." (¶14; *see also* Exs. 1–4, 7–12, 14–29 (incorporated by reference).) The Court may take judicial notice of "public documents required to be filed with the SEC," *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 374 (S.D.N.Y. 2013), (Exs. 1–4, 8–13); "press releases," *In re Pfizer*, 538 F. Supp. 2d at 627, (Exs. 4, 8, 11); "transcripts of companies' earnings calls," *Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018), (Ex. 14); "analyst reports," *In re Avon Prods., Inc. Sec. Litig.*, 2009 WL 848017, at *24 n.10 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted,* 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009), (Exs. 5–7); and "scientific publications," *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022), (Exs. 15–29).

[2] "¶" refers to the SAC; "App." and "Ex." refer to the appendix and exhibits to the Declaration of Heather M. Speers, filed herewith. Unless otherwise noted, emphasis is added and citations, quotation marks, and alterations are omitted.

[3] IgG antibodies are helpful in healthy individuals because they defend against pathogens. In patients with autoimmune diseases, however, IgG antibodies cause the immune system to attack the patients' own organs. (Ex. 1 at 6.) IMVT-1401 reduces IgG by inhibiting neonatal fragment crystallizable receptors ("FcRn") from recycling IgG. (¶103.)

following year, in December 2019, Immunovant merged with Health Sciences Acquisitions Corporation ("HSAC"), a special purpose acquisition company ("SPAC") led by Dr. Wong as President and CEO, that went public seven months earlier.[4] (¶¶22, 55, 59.) Following the merger, Dr. Wong stepped down from his roles as President and CEO of the surviving entity. (¶22.)

Dr. Peter Salzmann, Immunovant's CEO since June 2019, continued in that role after the merger. (¶21.) Frank Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, and Eric Venker (collectively, "Immunovant Directors") served as directors of Immunovant during the putative class period. (¶¶24–29.)

## B.    Immunovant Starts Developing IMVT-1401 to Treat Autoimmune Diseases.

In December 2018 (one year before the merger), Immunovant obtained development rights to IMVT-1401 from HanAll Biopharma Co., Ltd. ("HanAll"). (¶102; Ex. 3 at 4.) Drug development, however, is a long and uncertain process. Before the FDA can even consider approving a drug, it must undergo multiple preclinical and clinical trials. (¶73.) Preclinical trials (performed in a laboratory or in animals) evaluate whether the product candidate may cause serious harm, or toxicity, if administered to humans. (¶74.) If preclinical testing shows that a product candidate is expected to be reasonably safe, it may proceed to clinical (*i.e.*, human) trials. (¶75.) Once a drug candidate moves to clinical trials, it undergoes three phases, and the scope of evaluation grows over time: Phase 1 typically evaluates initial safety in healthy volunteers or a small number of patients over a short period, Phase 2 typically evaluates safety and efficacy over a slightly longer period of time and at different dose ranges, and Phase 3 typically evaluates efficacy and safety on a larger group of patients and a longer period of time to provide a more

---

[4] A SPAC raises funds through an initial public offering and holds those funds in a trust while looking for a private company to merge with. (¶53.) SPACs typically provides a two-year window to complete a merger. For HSAC, that deadline would have been in May 2021. (*See* ¶55.)

definitive evaluation of benefit-risk profile. (¶¶76–78).[5]

Given the FDA's rigorous approval process, Immunovant continually cautioned investors throughout the putative class period that IMVT-1401 may never receive FDA approval:

- "[We] cannot be certain that IMVT-1401 will receive regulatory approval."

- "[R]egulatory approval is an extensive, lengthy, expensive and inherently uncertain process, and the FDA . . . may delay, limit or deny approval of IMVT-1401 for many reasons."

- "Investment in biopharmaceutical product development is highly speculative because it entails substantial upfront capital expenditures and significant risk that a product candidate will fail to gain regulatory approval or fail to become commercially viable."

(Ex. 1 at 10; Ex. 2 at 5–6; Ex. 3 at 7–8 .)

### C. The Scientists Responsible for Analyzing the Results of Animal Studies Concluded that IMVT-1401 Caused Only Minor Increases in Cholesterol.

HanAll completed five preclinical studies of IMVT-1401 in monkeys, two of which evaluated toxicity. (¶294; Ex. 3 at 75.) After obtaining the rights to develop IMVT-1401, Immunovant contracted with a third party to conduct two additional monkey studies to assess toxicity over longer dosing regimens. (Ex. 3 at 75–76.)

Although animal studies are important for evaluating toxicity, extrapolating results from animal studies to humans is not straightforward because animals and humans are different. Recognizing this challenge, the FDA has issued Good Laboratory Practice ("GLP") regulations for conducting preclinical studies. *See* 21 C.F.R. § 58.1. Among other things, the GLP regulations require that each preclinical study have "a scientist or other professional of appropriate education, training, and experience" as the study director, who shall have overall responsibility for the study as well as "interpretation, analysis, documentation and reporting of results." 21 C.F.R. § 58.33. In

---

[5] *See also* https://www.fda.gov/patients/clinical-trials-what-patients-need-know/what-are-different-types-clinical-research.

addition, the GLP regulations require each testing facility to have a "quality assurance unit" that must "review the final study report to assure that . . . the reported results accurately reflect the raw data of the nonclinical laboratory study." 21 C.F.R. § 58.35(b)(6). The SAC does not allege Immunovant failed to comply with these requirements. To the contrary, Plaintiff admits that the experts responsible for interpreting and summarizing the results of the IMVT-1401 monkey toxicology studies concluded that IMVT-1401 caused only mild increases in cholesterol. (¶97.)

> **D.      Immunovant Submits Animal Study Results and Proposed Phase 1 Trial Protocol to FDA; FDA Allows Trial to Proceed Without Cholesterol Testing.**

To initiate any clinical trial, the drug sponsor must submit to the FDA an Investigational New Drug application ("IND"), a proposed clinical trial protocol, and results of toxicology or other studies demonstrating that the drug is reasonably safe for humans. 21 C.F.R. §§ 312.20, 312.23(a)(6). Failure to provide sufficient information "to assess the risks to subjects of the proposed studies" is grounds for a clinical hold. 21 C.F.R. § 312.42(b)(iv).

Before the start of the putative class period, Immunovant conducted a Phase 1 clinical trial involving 99 healthy volunteers. (¶¶114, 133, 137, 146.) Contrary to the prior complaint, the SAC does not allege that Immunovant failed to comply with any of the above regulations, including submission to the FDA of the full animal study results and a proposed Phase 1 trial protocol identifying every parameter that would be monitored (and by extension, indicating cholesterol would not be monitored). Nor does Plaintiff allege that, upon reviewing such materials, the FDA issued a clinical hold, or otherwise raised any concerns about the toxicology results or the absence of cholesterol monitoring prior to allowing this trial to proceed. (*See* ¶75.)

> **E.      Immunovant Publicly Reports Detailed Results of Albumin Reductions in Phase 1 Clinical Trial; No One Raises Concerns About Cholesterol.**

On October 2, 2019, the start of the putative class period, Immunovant and HSAC issued a press release announcing their upcoming merger. (¶¶221–22.) The press release highlighted

development progress on IMVT-1401, including results from the Phase 1 trial (which were first reported in April 2019) demonstrating a mean IgG reduction of nearly 80%. (¶¶114, 221.) In a Form 8-K filed the same day, Immunovant provided more details on the Phase 1 study results, including that "[d]ose-dependent, reversible, and asymptomatic albumin reductions [were] observed."[6] (Ex. 4 at 33.) The decreases, however, were considered mild as patients' albumin levels remained within, or slightly below, the normal range: "At day 28, mean albumin levels were 37.5 g/L in the 340 mg cohort, and 32.4 g/L in 680mg cohort (normal range 36–51 g/L)." (*Id.*)

Throughout the putative class period, Defendants provided what additional information they knew (and did not know) about the impact of albumin reductions. (¶¶285, 287, 290.) For example, during the October 11, 2019, investor call (the "Merger Call"), Dr. Wong discussed a rare condition in which patients born with no (or very little) albumin "are generally asymptomatic with the exception of maybe a little bit of occasional edema, but they're basically healthy people." (¶285.) Expanding on this point, the following month Immunovant disclosed:

> ***The clinical relevance of isolated, <u>mild</u> hypoalbuminemia is unknown***, however, a hereditary syndrome associated with deficient albumin production has been described (Congenital Analbumenia). In this syndrome, ***despite <u>extremely low or absent levels of albumin,</u> those affected have only mild symptoms, including fatigue, low blood pressure and edema***. It is believed that compensatory mechanisms through the production of other proteins may allow for relatively normal physiologic function in this population. (¶287.)

Notably, despite repeated disclosure of the mild decreases in albumin, ***there is no allegation that anyone (analysts, investors, FDA personnel) raised any concern about decreased albumin creating a risk for increased cholesterol***. On the contrary, research analysts publicly expressed agreement with Drs. Salzmann and Wong that the mild reductions in albumin were not a known cause for concern. For example, in a January 7, 2020, analyst report, Baird Equity

---

[6] Albumin is a protein that helps keep fluid in the bloodstream from leaking into other tissues.

Research stated, "we do not view the potential for reductions in albumin levels presented by the FcRn class as a major area of worry." (Ex. 5 at 12.)

Immunovant also made clear that, despite promising results to-date, it had not established the safety of IMVT-1401, and that unforeseen safety concerns could adversely impact the development of IMVT-1401. For example, Immunovant warned that:

- "The commencement and completion of clinical trials may be delayed by several factors, including: . . . unforeseen safety issues."

- "[Our] product candidate may cause adverse events or have other properties that could . . . cause us to suspend or discontinue clinical trials."

- "A number of companies in the pharmaceutical industry, including biotechnology companies, have suffered significant setbacks in clinical trials, even after promising results in earlier nonclinical studies or clinical trials. These setbacks have been caused by, among other things, nonclinical findings made while clinical trials were underway and safety or efficacy observations made in clinical trials, including previously unreported AEs."

- "[We have] not yet succeeded and may never succeed in demonstrating efficacy and safety for IMVT-1401 in pivotal clinical trials or in obtaining marketing approval thereafter."

- "Clinical trials are very expensive, time-consuming, difficult to design and implement, and involve uncertain outcomes."

- "Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy traits despite having progressed through nonclinical studies and initial clinical trials."

(Ex. 1 at 18, 20, 24; Ex. 2 at 15, 17–18; Ex. 3 at 17–18, 20–21, 25.) Throughout the putative class period, Immunovant continued to disclose the specific decreases in albumin observed in its clinical trials. (*See, e.g.*, ¶¶133, 137, 146, 250, 266, 274.) And investors continued to invest in the development of IMVT-1401. (*See, e.g.*, ¶125.)

>     **F.      With Knowledge that IMVT-1401 Reduces Albumin Levels in Humans, Two FDA Divisions Allow More Human Trials Without Monitoring Cholesterol.**

In April 2019, Immunovant began a Phase 2a clinical trial for treatment in patients with

thyroid eye disease ("ASCEND GO-1" or "GO Phase 2a"). (¶117[7]; *see also* ¶139 (dosing began in May 2019).) The GO Phase 2a study enrolled seven patients. (¶117.) And in May 2019, Immunovant began a Phase 2a clinical trial for treatment in patients with myasthenia gravis ("ASCEND MG" or "MG Phase 2a"). (¶116; *see also* ¶139 (dosing began in August 2019).) The MG Phase 2a study enrolled 17 patients. (¶116.) Before beginning each trial, Immunovant was required to submit the proposed trial protocol to the FDA, outlining, among other things, "measures to be taken to monitor the effects of the drug in human subjects and to minimize risk." 21 C.F.R. § 312.23(a)(6)(iii)(g); *see also* 21 C.F.R. § 312.30 (procedure for amending protocol). Additionally, Immunovant was required to provide available information on "[p]revious human experience with the investigational drug," including "detailed information about such experience that is relevant to the safety of the proposed investigation or to the investigation's rationale." 21 C.F.R. § 312.23(a)(9)(i). Because these two trials targeted diseases under the purview of different FDA divisions, two different FDA divisions reviewed the information. The SAC does not allege that either division raised any concern about the albumin reductions observed to-date, or the absence of cholesterol monitoring in the proposed Phase 2a clinical trial protocols.

Immunovant announced results of the GO Phase 2a trial on March 30, 2020, and the MG Phase 2a trial on August 25, 2020. (¶¶252, 276.) Both demonstrated significant reductions in total IgG, with no observed serious adverse events or withdrawals due to adverse events. (¶¶254, 276.) Consistent with the results from the Phase 1 trial, the GO Phase 2a trial showed an average albumin reduction of 24%, which was not associated with any observed symptoms. (¶139.) Similarly, the MG Phase 2a trial showed a 16% reduction in albumin in the 340mg arm and a 26% reduction in the 680mg arm, all asymptomatic. (¶292.) Plaintiff does not allege that these results were

---

[7] The allegation the trial began on February 29, 2020, is wrong. *See* https://clinicaltrials.gov/ct2/show/NCT03922321.

inaccurate; instead, it claims they were misleading because Immunovant did not disclose that the trial design did not require monitoring patients' cholesterol levels. (¶¶140, 255, 277, 279, 293.)

G.    **Immunovant <u>Voluntarily</u> Monitors Cholesterol in Subsequent Trials.**

In two later clinical trials—the Phase 2b trial in thyroid eye disease ("ASCEND GO-2" or "GO Phase 2b") and the Phase 2 trial in patients with warm autoimmune hemolytic anemia ("ASCEND WAIHA")—Immunovant chose to and did monitor cholesterol. (¶167.) Plaintiff does not allege that the FDA even suggested (much less mandated) that Immunovant monitor cholesterol in either of these trials. Immunovant's decision to do so, however, revealed that certain patients in the GO Phase 2b trial had mildly elevated cholesterol levels.

H.    **Immunovant <u>Voluntarily</u> Pauses Dosing in Its Clinical Trials.**

Immunovant reacted immediately upon discovering the mildly elevated cholesterol levels. Based on the account of a former Immunovant employee ("FE"), Plaintiff alleges that immediately upon receiving notice from the Principal Investigator of the GO Phase 2b clinical trial that certain patients were showing signals of elevated cholesterol, Immunovant's then-Chief Medical Officer, Rita Jain, "directed FE to review each of Immunovant's completed preclinical animal studies to determine whether the studies displayed an increase in total cholesterol levels in animals." (¶94.) After purportedly performing this task, the FE "provided a summary of [his] findings to [Dr.] Jain who relayed the information to other members of senior management of Immunovant." (¶95.) Immediately thereafter, on February 2, 2021, Immunovant announced that it had voluntarily paused dosing in both of its ongoing clinical trials out of an "abundance of caution," "in order to inform patients, investigators, and regulators as well as to modify the monitoring program." (¶167.) It also disclosed, based on preliminary data, that observed mean LDL cholesterol at week 12 was moderately increased by approximately 65% in the 680mg dose group and by approximately 40% in the 340mg dose group. (*Id.*) Eight weeks after cessation of therapy, the patients' LDL cholesterol

-11-

levels in both groups returned to baseline (*i.e.*, pre-trial cholesterol levels) or lower. (*Id.*) Despite the increases in cholesterol, no patient reported any serious cardiovascular events—the risk associated with elevated cholesterol. (*Id.*) Immunovant disclosed that it intended to work "closely with regulators and scientific experts" to understand the cause of the cholesterol increase. (*Id.*)

Plaintiff does not allege that anyone—analysts, investors, or FDA personnel—suggested that the increase in cholesterol was related to decreases in albumin. To the contrary, on the February 2, 2021, conference call, an analyst suggested that the increased cholesterol could be specific to thyroid eye disease ("TED")—the disease targeted in the GO Phase 2b trial—as a result of treating the underlying disease that would normalize the patients' thyroid function. (¶170.) Dr. Salzmann responded that it was a "plausible hypothesis and one we're definitely going to look into." (*Id.*) Other analysts issued reports indicating the same. For example, a February 2, 2021 Credit Suisse analyst report noted "that this could be an on-target effect/specific to TED." (Ex. 6 at 1.) Similarly, a UBS analyst report opined that the cholesterol increase was "likely specific to TED" and "highly unlikely . . . a function of [IMVT-1401]'s impact on albumin." (¶176; Ex. 7 at 1–2.) Immunovant's stock price declined on February 2, 2021. (¶325.)

## I.      Immunovant Brings in Outside Experts to Initiate a Program-Wide Review.

Immediately after pausing dosing, Immunovant undertook a program-wide data review, with the help of external experts, to determine the cause of the elevated cholesterol levels. (¶178.) On June 1, 2021, Immunovant reported the results of this review, informing investors that the LDL cholesterol increases were dose-related and appeared to be driven by reductions in albumin. (*Id.*) Immunovant confirmed that both were reversible upon cessation of dosing, and no major adverse cardiovascular events had been reported. (*Id.*) Immunovant did not find a relationship between levels of thyroid hormone and the increases in LDL cholesterol. (*Id.*) Immunovant announced that, after consulting with expert medical advisors, it believed it could resume clinical development of

IMVT-1401 with minor protocol changes. (Ex. 8 at 4.)

### J.   FDA Allows Immunovant to Move Forward with a Phase 3 Trial.

In December 2021, Immunovant announced that the FDA would allow it to move forward with a Phase 3 trial in myasthenia gravis ("MG"). (Ex. 9 at 7.) In a March 30, 2022, presentation (¶¶186–87), Immunovant provided a further update on the Phase 3 trial and cholesterol management, noting the Phase 3 trial in MG was scheduled to begin in the first half of 2022, and that "[c]holesterol changes [are] expected to be manageable." (Ex. 10 at 18, 84.) And, in June 2022, Immunovant reported that based on these preliminary data and feedback from physicians in its ongoing Phase 1 clinical trial in healthy volunteers, it believed that the increase in cholesterol caused by IMVT-1401 could be managed with anti-lipid therapy, as needed. (Ex. 9 at 10.) Immunovant also reported that the FDA would allow it to move forward with Phase 3 trials in TED. (Ex. 9 at 9.)

### K.   Immunovant Begins Developing IMVT-1402.

In September 2022, Immunovant announced that it was developing a next generation anti-FcRn, IMVT-1402, to complement IMVT-1401. (¶¶188–89; Ex. 11 at 4; *see also* Ex. 11 at 22 ("We believe franchise value is maximized by developing both [IMVT-1401] and IMVT-1402.").) Among other things, Immunovant announced that "IMVT-1402 has been observed to have minimal or no impact on levels of albumin and LDL in animal studies," but reminded investors that "results of animal studies may not be predictive of results in humans." (¶188; Ex. 11 at 4–5.) Immunovant has continued to issue similar warnings in its SEC filings. (*See, e.g.*, ¶193 ("[IMVT-1402] has not affected lipid or albumin levels in current completed nonclinical studies, it may do so in human clinical trials.").)

**L.  This Lawsuit.**

On March 15, 2022, Plaintiff filed a First Amended Complaint ("FAC"), asserting claims under the Exchange Act against Immunovant, Dr. Salzmann, and Dr. Wong, and claims under the Securities Act against Immunovant, Dr. Salzmann, and Immunovant Directors. (ECF No. 44.)[8] On September 9, 2022, Defendants filed their fully briefed motions to dismiss. (ECF Nos. 59–76.) In light of Plaintiff's representations that it could add additional allegations to cure deficiencies in the FAC, on February 14, 2023, the Court granted Plaintiff leave to amend and denied the motions to dismiss as moot. (ECF No. 80). On March 17, 2023, Plaintiff filed the SAC, which asserts the same claims against the same Defendants. (ECF No. 82.) It does, however, include a slightly revised set of challenged statements, and proceeds on a slightly different theory of liability. Whereas the FAC alleged that elevated cholesterol was an "anticipated risk," the SAC alleges it was merely a "potential risk." Despite the change in terminology, Plaintiff's claims remain premised on the same basic theory: that "elevated cholesterol levels were a potential risk, and since the cholesterol levels of clinical trial participants were not being tested prior to Immunovant's ASCEND GO-2 Phase 2b clinical trial, statements about the safety and viability of IMVT-1401 prior to this time omitted material information and were misleading." (¶121.)

## III.  THE EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

To state a Section 10(b) claim, Plaintiff must allege: (1) a material misrepresentation or omission ("falsity"), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) loss causation, and (6) economic loss. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010). In pleading these elements, Plaintiff must clear three hurdles.

---

[8] Plaintiff also asserts claims against Roivant and the Underwriter Defendants, as addressed in their respective briefs.

*First*, Plaintiff must satisfy Rule 8 and allege enough facts to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must not accept "conclusory statements" as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor should it accept unwarranted deductions, unreasonable inferences, or allegations that contradict matters properly subject to judicial notice. *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008).

*Second*, Plaintiff must satisfy Rule 9(b), which requires the SAC to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This means the SAC must "(1) specify the statements that the plaintiff alleges were fraudulent, (2) identify the speaker, (3) indicate when and where the statements were made, and (4) explain why the statements were fraudulent." *Bui v. Indus. Enters. of Am., Inc.*, 594 F. Supp. 2d 364, 370 (S.D.N.Y. 2009).

*Third*, Plaintiff must satisfy the PSLRA, which imposes "exacting pleading requirements" for falsity and scienter. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). As to falsity, the SAC must identify each allegedly false statement and specify with particularity the reasons why the statement was false when made. 15 U.S.C. § 78u-4(b)(1). As to scienter, the SAC must plead "with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (emphasis in original); 15 U.S.C. § 78u-4(b)(2).

The SAC fails to plead both scienter and falsity, each an independent basis for dismissal.[9]

---

[9] Plaintiff also fails to plead a separate scheme claim. (*See* ¶¶217–18.) Although "misstatements and omissions can form *part* of a scheme liability claim, . . . an actionable scheme liability claim also requires something *beyond* misstatements and omissions." *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022). It does not suffice to "merely repackage the misrepresentation allegations" into a scheme-liability claim. *Menaldi v. Och-Ziff Cap. Mgmt. Grp.*, 277 F. Supp. 3d 500, 520 (S.D.N.Y. 2017). Yet, that is precisely what Plaintiff attempts to do here. (¶217 ("Instead of disclosing this potential risk to investors, Defendants engaged in a fraudulent scheme and hid that risk from investors . . . .").) Because the alleged scheme is "indistinguishable from the misstatements and omissions," it fails as a matter of law. *In re Mindbody Sec. Litig.*, 489 F. Supp. 3d 188, 217 (S.D.N.Y. 2020) (dismissing scheme claim).

A.        **The SAC Fails to Plead a Strong Inference of Scienter.**

Pleading scienter in a securities fraud case is no small feat. The PSLRA imposes exacting pleading requirements, requiring Plaintiff to state "***with particularity***" facts giving rise to a "***strong inference***" that each Defendant acted with the intent "to deceive, manipulate, or defraud." 15 U.S.C. § 78u-4. Plaintiff can satisfy this requirement by pleading facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. However, to qualify as "strong," the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. ***Unlike a standard 12(b)(6) analysis, the Court does*** <u>***not***</u> ***draw all inferences in Plaintiff's favor when assessing scienter under the PSLRA***; rather it "***must consider plausible, nonculpable explanations***" for Defendants' conduct. *Id.* at 323–24; *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 389 (2d Cir. 2021).

The SAC fails to plead facts supporting a strong inference of scienter under either prong.

1.        **Plaintiff fails to plead any cognizable motive.**

To plead scienter through motive and opportunity, Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198. The SAC fails to meet this standard. Rather, Plaintiff alleges that Defendants knew increased cholesterol was a potential risk of IMVT-1401 but chose not to monitor it in the Phase 1 and 2a clinical trials because the realization of this risk could jeopardize Immunovant's merger with HSAC and prevent Immunovant's stock price from reaching the levels necessary to receive the earnout shares contemplated in the Share Exchange Agreement ("SEA"). (¶¶56, 217–18, 314–19.) This theory falls apart under even the slightest scrutiny.

First, the chronology of events undermines the plausibility of this theory. As alleged, the

Phase 1 clinical trial was already *complete well before merger discussions even began*, and the Phase 2a clinical trials were *initiated well before the SEA (and its provision for earnout shares) was executed*. (¶¶114 (Phase 1 trial results published in April 2019), 131 (dosing in GO Phase 2a began in May 2019 and dosing in MG Phase 2a began in August 2019), 56 (SEA executed on September 29, 2019).) "[A] theory in which fraudulent conduct predates motive is not plausible." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 358 (S.D.N.Y. 2012). And here, the decision about what monitoring criteria to include in the Phase 1 and 2a clinical trial protocols was made well before any possible motive based on earnout shares could have arisen. *See U.S. Educ. Loan Tr. III, LLC v. RBC Cap. Mkts. Corp.*, 2011 WL 6778480, at *10 (S.D.N.Y Dec. 21, 2011) (rejecting motive where alleged fraudulent scheme predated the alleged motive); *Defer LP v. Raymond James Fin., Inc.*, 2010 WL 3452387, at *5 (S.D.N.Y. Sept. 2, 2010) ("A motive must antedate the alleged fraud.").

Second, Plaintiff does not allege that any Defendant actually profited from the receipt of earnout shares, which is necessary to plead motive. (¶319.) *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 367 (S.D.N.Y. 2003) ("Mere ownership in the absence of profit-taking does not establish a motive that would support a strong inference that the defendant acted with the required state of mind."). In fact, Plaintiff does not allege that Dr. Salzmann received *any* earnout shares or sold *any* stock during the putative class period, thus negating an inference of scienter.[10] *See Acito v. IMCERA Grp.*, 47 F.3d 47, 54 (2d Cir. 1995) ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants

---

[10] There are no motive allegations as to Dr. Salzmann. Instead, Plaintiff simply claims he "was not harmed by the decline in the Company's shares" because Immunovant's shareholders voted to reprice his stock options *seven months after the end of the putative class period*. (¶319; Ex. 12 at 2, 21, 23.) Even if lack of harm could support motive (it cannot), both the timing of this vote and Dr. Salzmann's lack of control over the outcome negate any inference of scienter. *See TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 756 (E.D.N.C. 2017) (post-class period stock transactions); *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1222 (M.D. Fla. 2014) (lack of control).

delayed notifying the public so that they could sell their stock at a huge profit."). And although Plaintiff alleges that Dr. Wong and his entities *registered* shares, thereby *enabling* them to sell (¶¶320–21), Plaintiff does not allege that Dr. Wong *actually sold* any shares, let alone at suspicious times or for a profit.[11] *See Acito*, 47 F.3d at 54; *Wyche v. Advanced Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (stock sales must be "unusual" to support motive).

Third, Plaintiff's theory cannot be squared with the decision to voluntarily add cholesterol monitoring to the GO Phase 2b clinical trial, which *began over six months before any earnout milestone had been achieved*. (¶144 (dosing began October 2019); ¶317 (earnout milestones achieved in May and September 2020).) The notion that Defendants intentionally delayed monitoring cholesterol to secure earnout shares, only to then risk it all by monitoring cholesterol in the next round of trials before achieving those earnout shares is illogical. And "courts regularly refuse to infer scienter when confronted with such illogical allegations." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 601 (S.D.N.Y. 2016) (rejecting plaintiffs' theory that defendants knew the company's leading drug product would never receive FDA approval but nonetheless invested substantial time and resources in clinical studies they knew were doomed to fail, all while assuring the public that approval was likely; noting that such a "scheme" "lacks a coherent rationale objective" and was "implausible"); *see also Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (rejecting similar theory because it did "not make a whole lot of sense").[12]

---

[11] One of Dr. Wong's entities, however, did purchase over $9 million of Immunovant shares during the putative class period (Speers Decl. ¶15; Ex. 13), which negates an inference of scienter. *See Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("[T]wo of these Defendants instead purchased stock during the relevant period, [which] rebuts an inference of scienter."); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (noting defendants' purchase of stock "signals only confidence in the future of their company").

[12] Plaintiff's remaining motive allegations are equally unavailing as each is "common to most corporate officers." *Ontario Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus.*, 432 F. Supp. 3d 131, 169 (D. Conn. 2019) ("Four cubic zirconias will never add up to one real diamond and neither will four generic motives add up to one specific motive."). Plaintiff suggests that Dr. Wong was motivated to ensure HSAC merged within two years of IPO to avoid dissolution. (¶314.) Setting aside that the merger occurred seven months into HSAC's two-year merger window (¶¶55, 59)—

**2.      Plaintiff fails to plead conscious misbehavior or recklessness.**

Having failed to plead motive, Plaintiff's allegations of conscious misbehavior or recklessness "must be correspondingly greater" to support a strong inference of scienter. *ECA*, 553 F.3d at 198–99. The SAC must plead conduct that is "highly unreasonable and represent[s] an ***extreme departure*** from the standards of ordinary care to the extent that ***the danger was either known to the defendant or so obvious that the defendant must have been aware of it***." *Lehmann v. Ohr Pharm., Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020).

Plaintiff comes nowhere close to meeting this standard. Instead, it relies on speculative allegations that, based on Dr. Salzmann's and Dr. Wong's backgrounds and roles, they "would have" or "should have" had "access to information"—such as animal study results and scientific literature—that purportedly indicated increased cholesterol was a "key potential risk."[13] (¶¶305–09, 311–12.) Even if Plaintiff could establish that such materials indicated a key potential risk (which, as discussed in Section III.B.3. below, it does not), there is no allegation that any Individual

---

undermining the notion of any exigency—the desire to consummate a merger is common to all SPACs and does not support a cognizable motive. *See Solomon v. Sprint Corp.*, 2022 WL 889897, at *9 (S.D.N.Y. Mar. 25, 2022) ("Second Circuit law is clear that a generalized desire to achieve a lucrative acquisition proposal, does not support an inference of fraud."); *Murdeshwar v. Search Media Holdings Ltd.*, 2011 WL 7704347, at *15–18 (S.D. Fla. Aug. 8, 2011) (rejecting scienter allegation based on "financial motivation" of the SPAC sponsor's directors and officers to consummate a merger). Likewise, Plaintiff's allegations regarding Immunovant's secondary offerings (¶¶320–21) are routinely rejected by courts because they are "too generalized." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532–33 (S.D.N.Y. 2009) (raising capital to stave off a company's collapse insufficient to establish scienter), *aff'd*, 357 F. App'x 393 (2d Cir. 2009); *see also In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007) (reliance on capital raise inadequate); *In re MELA Scis., Inc. Sec. Litig.*, 2012 WL 4466604, at *5 (S.D.N.Y. Sept. 19, 2012) (same). In any event, Plaintiff does not (and cannot) allege that Immunovant sold any shares under its January 15, 2021, shelf offering. (*See* ¶321.)

[13] "Courts in this circuit have long held" that allegations based on title and background "are entitled to no weight." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); *see also Rose v. Rahfco Mgmt. Grp., LLC*, 2014 WL 7389900, at *4 (S.D.N.Y. Dec. 15, 2014) (rejecting "must have known" scienter allegations based on job title); *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011) (finding "generalized allegations" about defendants' "educational backgrounds" and "extensive experience" in the industry insufficient); *In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at *36 (S.D.N.Y. Jan. 10, 2023) (SPAC's "extensive due diligence" on the target does not support scienter). Likewise, Plaintiff's attempt to invoke the core operations doctrine, arguing scienter can be "imputed to Defendants" due to the importance of IMVT-1401 (¶310) is "plainly insufficient." *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020); *see also In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018) (noting core operations is "not independently sufficient to raise a strong inference of scienter").

Defendant *actually* received or reviewed such materials, or that the alleged "key potential risk" was so obvious from the face of such materials.[14] *See Plumbers*, 694 F. Supp. 2d at 299 (no scienter where plaintiffs failed to "provide specific instances in which Defendants received information that was contrary to their public declarations"); *Jackson*, 960 F.3d at 98–99 (addressing requirements to plead corporate scienter).

Take the animal studies, for example. According to Plaintiff, the animal study results consisted of two parts: (i) the full detailed results, and (ii) a summary portion which "indicated that there were only minor increases in cholesterol." (¶97.) According to the FE, the first time he reviewed the full detailed results was in January 2021.[15] (¶94.) And he did so at the direction of Immunovant management with the specific directive to identify whether the full detailed results showed indications of elevated cholesterol. (*Id.*) He then "provided a summary of [his] findings to the then-Chief Medical Officer Rita Jain who relayed the information to other members of senior management of Immunovant." (¶95.) There is no allegation that, prior to Dr. Jain passing along the FE's analysis, the FE or any Defendant was aware that the animal studies purportedly indicated a key potential risk of increased cholesterol. *See Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at *8 (N.D. Cal. June 26, 2018) (confidential witness allegations did not support scienter because they do not allege anyone "shared the purportedly contradictory information with the Defendants *before they made the challenged statements*"); *In re Centerline Holdings Co. Sec. Litig.*, 678 F. Supp. 2d 150, 159 (S.D.N.Y. 2009) (no scienter where allegations of knowledge

---

[14] Likewise, although Plaintiff alleges Immunovant "had agreements and shared information with Harbour" (¶91(d)), implying Immunovant could have known that Harbour was monitoring cholesterol, Plaintiff does not allege that any Defendant actually reviewed Harbour's clinical trial protocols prior to making the challenged statements, much less that any Defendant knew why Harbour monitored cholesterol. *See In re MELA*, 2012 WL 4466604, at *7 (allegation that "defendants conducted a clinical trial and should have known it was flawed" inadequate to plead scienter).

[15] The SAC does not provide a specific date, but given the allegation that Rita Jain instructed FE to review the animal study reports (¶94), it had to be after January 12, 2021 (¶283).

-20-

post-date the alleged misstatements).

Likewise, the SAC identifies a handful of scientific articles that Plaintiff claims demonstrate increased cholesterol was a key potential risk. (¶¶106–09, 111–13.) But again, there is no allegation that any Individual Defendant was aware of the articles Plaintiff identifies, much less that the conclusions Plaintiff draws therefrom—which Defendants dispute (*see* Section III.B.3.b.)—were "so obvious that the defendant must have been aware of it." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *see also In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (plaintiffs failed to allege "what information was actually communicated and what conclusions any defendant actually reached"); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1059–60 (9th Cir. 2014) (articles that did not reflect defendants' knowledge as of the date of the alleged misstatements did not support scienter); *In re Dynavax Sec. Litig.*, 2018 WL 2554472, at *9 (N.D. Cal. June 4, 2018) (rejecting scienter allegation based on scientific article when "[t]here are no allegations that defendants were aware of the [article]").

*Brennan v. Zafgen, Inc.* is particularly instructive on this point. 199 F. Supp. 3d 444 (D. Mass. 2016), *aff'd*, 853 F.3d 606 (1st Cir. 2017). There, the plaintiffs alleged that scientific articles demonstrated defendants' knowledge of a causal relationship between the company's drug and certain adverse events. *Id.* at 457. The court rejected that allegation, reasoning that "even assuming that plaintiffs' subjective, after-the-fact interpretation of the articles is accurate, which is doubtful at least to some extent," the articles do not support an inference of scienter because none of the defendants were "alleged to have discussed or even read the articles." *Id.* at 466. The court also noted that articles demonstrating only a "potential" connection between a drug and certain adverse events do not establish a "strong inference of scienter," especially when plaintiffs do not allege that "anyone advised defendants to disclose the [adverse events] in light of the articles, that

-21-

defendants rejected or ignored that advice, or even that there was an internal debate concerning disclosure." *Id.* at 466–67. That is precisely what happened here. Plaintiff does not allege that Defendants were aware of any articles cited in the SAC, that anyone raised a concern about any connection between observed albumin reductions and either elevated cholesterol or increased cardiovascular risk, or that there was any internal debate about whether to disclose that cholesterol was not monitored in the Phase 1 and 2a clinical trials.[16]

Finally, there is no dispute that Immunovant ***voluntarily*** added cholesterol monitoring to its Phase 2b clinical trials, ***voluntarily*** paused its clinical trials, and ***promptly*** disclosed the elevated cholesterol levels upon learning the results (*see, e.g.*, ¶167), none of which supports an inference of fraud.

Plaintiff's failure to plead scienter mandates dismissal of the Exchange Act claims.

**B.      The SAC Also Fails to Plead a Material Misstatement or Omission (Falsity).**

Plaintiff also fails to plead falsity—an independent basis for dismissal—for four reasons.[17]

***First***, at their core, Plaintiff's falsity allegations amount to nothing more than a dispute about

---

[16] Plaintiff's attempt to impute knowledge of articles to Dr. Wong because he "acknowledged" that he "reviewed scientific literature about potential side effects of albumin reductions" (¶309), mischaracterizes his statements: he discussed literature on "patients born with close to 0% albumin," not the mild albumin reductions seen in the IMVT-1401 trials. (¶285.) And there are no well-pled facts that Dr. Wong mischaracterized the literature he referenced.

[17] Although an improvement over the FAC, the SAC remains a puzzle pleading. For example, Plaintiff identifies a handful of documents that allegedly contain false and misleading statements, but rather than specify which statements are allegedly misleading and why, Plaintiff instead alleges the documents "contain[] nearly identical representations" as other documents cited in the SAC and are "false and misleading when made for the reasons" stated elsewhere in the SAC. (¶¶268–69, 272–73, 289.) This fails to meet Rule 8's basic requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief" based on factual allegations that are "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) and (d)(1). Not to mention Rule 9(b)'s requirement that Plaintiff "state with particularity the circumstances constituting fraud" and the PSLRA's mandate that the SAC "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). *See Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478–79 (S.D.N.Y. 2021) (dismissing puzzle pleading that "plac[ed] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts"); *see also Abady v. Lipocine Inc.*, 2023 WL 2938210, at *12–13 (D. Utah Apr. 13, 2023) (concluding puzzle pled allegations failed under both Rule 8 and the PSLRA, noting such failure is "sufficient, by itself, to warrant dismissal" because it "places the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting plaintiffs' claims" and "places an unwelcome and wholly unnecessary strain on defendants and the court").

proper clinical trial design, which is not actionable under the securities laws. ***Second***, the challenged statements are otherwise inactionable opinions, corporate puffery, protected forward-looking statements, and undisputedly accurate statements of fact. ***Third***, none of the challenged statements were misleading by the omission that cholesterol was not monitored because the SAC alleges no facts demonstrating that increased cholesterol was a "key potential risk." ***Fourth***, Plaintiff fails to plead an omission under Items 303 and 105 of Regulation S-K.

> **1.    Plaintiff's disagreement with Immunovant's clinical trial design is not actionable under the securities laws.**

The sheer number of challenged statements gives the false impression that this case is far more complex than it really is. Despite variations in phrasing, the reason Plaintiff claims every challenged statement and alleged omission is misleading boils down to an inactionable dispute over whether Immunovant's Phase 1 and 2a clinical trials were properly designed.

The most obvious examples, of course, are the challenges to statements directly implicating the trial design. (¶¶139, 144, 149, 231, 235, 237, 240, 248, 254, 259.) For example, that the "***study was designed to examine the initial safety***" (¶254), the "***primary endpoints of this trial are safety*** and tolerability" (¶¶139, 144, 259), or the "trial ***assesses safety*** and efficacy" (¶248). Plaintiff alleges that such statements were materially misleading because the Phase 1 and 2a clinical trials "did not assess or monitor the key potential risk of elevated cholesterol levels." (¶140; *see also* ¶¶145, 150, 232, 236, 238, 241, 249, 255, 260.) The implication, of course, is that a clinical trial cannot adequately assess safety if it does not monitor every "key potential risk," which is unequivocally a dispute about trial design.[18]

---

[18] To be clear, there is no basis to suggest that cholesterol testing is the be-all and end-all of safety. Nor that each phase of a clinical trial must monitor every key potential risk. And the SAC contains no facts suggesting that mild cholesterol increases—such as those observed in the GO Phase 2b trial—make IMVT-1401 unsafe. To the contrary, Plaintiff admits that despite mild cholesterol increases, no patients experienced a "major adverse cardiovascular event." (¶178.)

The law, however, is clear that disputes about trial design are not actionable under the federal securities laws. *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 154 (2d Cir. 2013) (finding plaintiffs' disagreement with drug trial methodology insufficient to allege falsity); *Cachia v. Bellus Health Inc.*, 2022 WL 4367444, at \*5 (S.D.N.Y. Sept. 21, 2022) ("Certain statements in fact cannot ever be the proper basis for fraud, such as statements about how clinical trials are designed or managed."); *Zagami v. Cellceutix Corp.*, 2016 WL 3199531, at \*12 (S.D.N.Y. June 8, 2016) ("Put simply, securities law is not a tool to second guess how clinical trials are designed and managed.").

Other statements may be a step removed, but at their core are premised on the same dispute about trial design. For example, Plaintiff challenges statements describing the trial results as "positive" and "promising" (¶¶141, 254, 270), noting IMVT-1401 was "well-tolerated," (¶¶133, 134, 137, 139, 141, 225, 227, 246, 250, 264, 266, 274, 276, 278), and that adverse events were "mild" or "moderate" (¶¶139, 141, 227, 254, 256, 259). Plaintiff claims these statements were misleading because the Phase 1 and 2a clinical trials did not monitor cholesterol, and thus, by extension, Defendants' opinions about the trial results necessarily did not include an assessment of cholesterol levels. (¶¶135, 138, 140, 142–43, 226, 228, 247, 251, 255, 257, 260, 265, 267, 271, 275, 277, 279.)

But, as the Supreme Court has made clear, "[s]ecurities law only requires Defendants to make statements that 'fairly align with the ***information in the [Defendant]'s possession*** at the time'" the statement is made. *Cachia*, 2022 WL 4367444, at \*5 (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)); *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at \*17 (S.D.N.Y. Aug. 1, 2017) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them"). And here, there is no dispute that Defendants did not have

information about patients' cholesterol levels when the challenged statements were made because the Phase 1 and 2a clinical trials were not designed to provide that information. Stated differently, "Plaintiff cannot disaggregate the parameters of the [Phase 1 and 2a] clinical trial[s] from [the] results in the manner that [it] suggests; the two are inextricably intertwined." *Zagami*, 2016 WL 3199531, at *12.

Nor is there any merit to the notion that Defendants were obligated to proactively inform investors that the clinical trial results did not take into account cholesterol levels, when no contrary representation was ever made. (*See, e.g.*, ¶¶135, 136, 242, 251.) Despite Plaintiff's attempt to characterize this as a material omission, it is merely a roundabout way of arguing that the Phase 1 and 2a clinical trials should have monitored cholesterol: the "design of the clinical trial is essentially what Plaintiff challenges." *Cachia*, 2022 WL 4367444, at *5 (rejecting plaintiff's attempt to distinguish a dispute about clinical trial design from the "failure to inform investors" about the design). In any event, "the securities laws do not impose a requirement that companies report only information from optimal studies, even if scientists could agree on what is optimal. Nor do they require that companies who report information from imperfect studies include disclosures of procedures used, including alternatives that were not utilized and various opinions with respect to those choices on the interpretation of the outcome data." *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 576 (E.D. Pa. 2009).

In a similar vein, Plaintiff alleges that Immunovant's statement that its preclinical and clinical trials were "conducted in all material respects in accordance with experimental protocols, procedures and controls pursuant to accepted professional and scientific standards" was false because Immunovant "failed to adhere to good clinical practices" by not monitoring cholesterol. (¶¶240–41; *see also* ¶¶122, 123, 147, 151, 157.) But the SAC contains no well-pled facts that good

-25-

clinical practices (or any other accepted professional or scientific standards) require ***testing*** all "potential risks." At most, the SAC pleads that Immunovant was required "to ***assess*** safety data from all [available] sources" to "identify parameters for clinical monitoring for potential adverse events." (¶¶82, 85, 87.) And here, there is no well-pled allegation that Immunovant failed to take such steps. The fact that its assessment resulted in a determination that cholesterol monitoring was not necessary in the Phase 1 or 2a trials is, again, nothing more than an inactionable dispute about trial design. *See Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *8 (S.D.N.Y. May 29, 2013) ("[P]laintiff's allegations amount to a non-actionable critique of defendants' study design"); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 878 (9th Cir. 2012) (dismissing "allegations of 'falsity'" that "essentially are disagreements with the statistical methodology adopted by the doctors and scientists who designed and conducted the study"); *In re Novan, Inc.*, 2018 WL 6732990, at *12 (M.D.N.C. Nov. 30, 2018) ("Plaintiffs may not utilize securities litigation to second guess the decisions by scientists and company officials in how they approached the clinical trials."), *report and recommendation adopted*, No. 17-cv-00999, No. 65 (M.D.N.C. Jan. 28, 2019).

In short, because Plaintiff's entire theory of falsity is premised on a dispute about trial design, none of the challenged statements or omissions is actionable.

<blockquote><strong>2.      The challenged statements are inactionable for additional reasons.</strong></blockquote>

The challenged statements are also inactionable as a matter of law because they are: (i) opinions, (ii) puffery, (iii) forward-looking, and (iv) demonstrably true.

**Statements of Opinion.** Many of the challenged statements are opinions about Immunovant's clinical and preclinical trial results, including observations that the trials generated "positive," "promising," or "robust" results (¶¶141, 149, 222, 244, 246, 254, 270), that IMVT-1401 was "well-tolerated" (¶¶133, 134, 137, 139, 141, 225, 227, 246, 250, 264, 266, 274, 276, 278), that the observed adverse events were "mild or moderate" and none rose to the level of

"serious adverse events" (¶¶139, 141, 225, 227, 254, 256, 259, 276, 281; *see also* ¶136), that the albumin reductions were "mild," "reversible," and not associated with any adverse events (¶¶146, 285, 287, 290, 292), addressing limited treatment options and unmet need for the relevant patient populations (¶¶229, 233), and expressing optimism about the "potential" for IMVT-1401 to become a "best-in-class" or "cornerstone therapy" (¶¶222, 246, 252, 276, 283). (*See* App. A (cataloging challenged statements).)

It is well-established that "interpretations of the results of various clinical studies . . . are opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015); *see also Tongue v. Sanofi*, 816 F.3d 199, 213–14 (2d Cir. 2016); *In re MELA* , 2012 WL 4466604, at *13; *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 566–67 (S.D.N.Y. 2011). As the Fourth Circuit recently recognized:

> Biopharmaceutical clinical trial drug companies constantly find themselves in the hot seat. Not only does their longevity depend on the creation of ground-breaking, experimental drugs designed to combat the world's deadliest illnesses . . . , but also a significant portion of their success turns on the amount of capital raised to explore these unchartered waters, making investors an integral part of the equation. Therefore, we cannot admonish these companies for issuing positive and accurate opinions while weighing competing facts, and must remind investors to not expect that ***every*** fact known to an issuer supports its opinion statement. It would be a great disservice to stifle biopharmaceutical companies' pursuit of medical advancements by failing to safeguard against an inundation of lawsuits alleging securities-law violations.

*Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 388 (4th Cir. 2023) (emphasis in original).

As opinions, such statements are actionable only if they are both objectively false and disbelieved by a defendant when made, or if they omit "particular (and material) facts going to the basis for the issuer's opinion" such that the statement is misleading when read "fairly and in context." *Omnicare*, 575 U.S. at 194. "An opinion statement, however, is not necessarily

-27-

misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189. Rather, "[t]he core inquiry is whether the omitted facts would conflict with what a reasonable investor would take from the statement itself." *Tongue*, 816 F.3d at 210. Thus, pleading the falsity of an opinion statement "is no small task for an investor." *Omnicare*, 575 U.S. at 194.

Here, Plaintiff alleges that *every* positive opinion about the safety and tolerability of IMVT-1401 was misleading because Defendants did not disclose that cholesterol was not monitored in the Phase 1 and 2a clinical trials. Critically, however, there is not a single well-pled fact in the SAC alleging that, at the time these opinions were expressed, any Defendant knew IMVT-1401 could increase cholesterol levels, let alone that any Defendant subjectively believed their opinions about the safety and tolerability of IMVT-1401 were false.[19] (*See* Section III.A.) In essence, Plaintiff faults Defendants for failing to detail every clinical metric considered (and not considered) in forming their opinions. (*See*, *e.g.*, ¶¶135, 138, 140.) The law, however, does not require such detail. *See Omnicare*, 575 U.S. at 189–90; *Tongue*, 816 F.3d at 210. In any event, because Plaintiff fails to plead that Defendants were even aware IMVT-1401 could increase cholesterol (*see* Section III.A.), the absence of such monitoring was not a material fact going to Defendants' basis for their opinions. *See Smith v. Antares Pharma, Inc.*, 2020 WL 2041752, at *6 (D.N.J. Apr. 28, 2020) (opinion statements inactionable because plaintiff did not allege that defendants were aware of the allegedly omitted data, or that the data would contradict their opinions that the drug was safe); *Bristol-Myers Squibb Co.*, 28 F.4th at 355 (rejecting plaintiffs' hindsight-based arguments that defendants' opinions about the strength of the clinical trial design

---

[19] Instead, Plaintiff simply concludes that because cholesterol was not monitored, Defendants had no basis to opine that the trial results were "positive" or that IMVT-1401 was "well-tolerated." (*See, e.g.,* ¶¶247, 277.) But Plaintiff does not (and cannot) dispute that even after discovering the elevated cholesterol levels, Immunovant announced "plans to resume clinical development of IMVT-1401," noting that "lipid elevations are predictable [and] manageable." (Ex. 8 at 4.) And, thereafter, the FDA allowed the Company to continue clinical trials with minor modifications. (Ex. 9 at 4.)

were materially false or misleading).

**Corporate Optimism.** Plaintiff also challenges a number of statements that are nothing more than "expressions of puffery and optimism" which "do not give rise to securities violations," *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004), because such statements "make[] no specific claims on which reasonable persons can rely," *Sanofi-Aventis*, 774 F. Supp. 2d at 565. (¶¶141, 144, 149, 222, 224, 225, 244, 246, 254, 270, 276, 283; *see also* App. A.) For example, Plaintiff challenges statements describing IMVT-1401 as a "***uniquely compelling asset***" (¶222), that the completed clinical trials have generated "***promising results***" (¶141), describing the Phase 1 program as "***comprehensive***" and the Phase 2 program as "***broad***" (¶¶222, 244, 246) with "***best-in-class*** potential" (¶¶222, 246), and stating the Company was "***on track***" to report clinical trial results (¶¶144, 283).

Courts routinely find such statements to be inactionable puffery. *See Kleinman*, 706 F.3d at 153 (describing clinical trial results as "***encouraging***" was inactionable puffery); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757–58 (S.D.N.Y 2018) (statement that company had "***made remarkable progress*** towards our stated goal" and was "proud" to be "***on track*** to have these products reach the market in 2016" were inactionable); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015) (statements indicating FDA approval process was "***on track***" and continued to make "***progress***" were inactionable); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *14 (N.D. Cal. July 21, 2020) (statements that products were "'***uniquely position[ed]***,' '***strong*** across sectors,' '***best-in-class***,'" were inactionable puffery).

**Forward-Looking Statements.** Plaintiff also challenges a handful of forward-looking statements (¶¶134, 144, 221, 222, 224, 248, 252, 256, 259, 276, 283; *see also* App. A), which are

inactionable under the PSLRA's safe harbor provision if (i) identified as forward-looking and accompanied by meaningful cautionary language *or* (ii) Plaintiff fails to plead that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1). For example, Plaintiff challenges statements such as:

- "We *anticipate reporting* initial results from this trial in early 2021." (¶248.)

- "IMVT-1401 *might ultimately become* a best-in-class anti-FcRn agent for MG patients." (¶276.)

- "We remain *on track to announce* three new indications by August of 2021." (¶283.)

These statements are, by definition, forward-looking as they predict the timing and occurrence of future events.[20] *See* 15 U.S.C. § 78u-5(i)(1)(A)-(D). And they were accompanied by meaningful cautionary language, which includes risk warnings conveying "substantive information about factors that realistically could cause results to differ."[21] *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 233 (S.D.N.Y. 2021). (*See also* Section III.B.4 (addressing adequacy of risk disclosures).) Even apart from the cautionary language, Plaintiff has not alleged facts sufficient to create a "strong inference" that Defendants had *actual knowledge* that IMVT-1401 could raise cholesterol, or that Immunovant would choose to voluntarily suspend dosing in its ongoing clinical trials. (*See* Section III.A.) *See also Slayton*, 604 F.3d at 773 (noting the "scienter requirement for forward-looking statements is [even] stricter than for statements of current fact").)

**Undisputedly Accurate Statements of Fact.** The remainder of the challenged statements consist of concrete assertions about the initiation of clinical trials, trial design, and observed

---

[20] The language of the statements identifies them as forward looking. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 769 (2d Cir. 2010) ("facts," "circumstances," and "linguistic cues" can identify a forward-looking statement).

[21] Each call, press release, or SEC filing in which the statements were made cautioned investors about risks, including those contained in SEC filings. (*See, e.g.,* Ex. 3 at 62; Ex. 4 at 14; Ex. 14 at 4.) *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *6 (E.D.N.Y. Aug. 6, 2019) ("Cautionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as the forward-looking statements.").

clinical trial results, and FDA approval process, that do not conflict with a single well-pled fact. (¶¶133, 134, 136, 137, 139, 141, 144, 146, 149, 151, 221, 225, 227, 229, 231, 233, 235, 237, 240, 248, 250, 254, 256, 259, 262, 264, 266, 274, 276, 278, 281, 287, 290, 292, 294; *see also* App. A.) For example:

- "In our multi-part, placebo-controlled Phase 1 clinical trial, IMVT-1401 has been ***observed*** to be well-tolerated with no Grade 3 or Grade 4 treatment emergent AEs and no discontinuations due to AEs. The most commonly ***reported*** AE has been mild erythema and swelling at the injection site, . . . To date, two serious AEs have been ***reported***, both of which have been assessed as unrelated to IMVT-1401 by the study investigator. There have been no treatment-related serious AEs ***reported***." (¶¶137, 250.)

- "IMVT-1401 was ***observed*** to be well-tolerated with no SAEs ***reported***, no withdrawals due to AEs, and no imbalance in headaches." (¶139.)

Such statements cannot support a claim where, as here, Plaintiff alleges zero facts demonstrating they were inaccurate or untrue at the time they were made. *See ATSI*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (dismissing complaint because "the alleged misstatements at issue are [] not demonstrably false").

### 3.     None of the statements were false or misleading by omission.

Unable to plead that any challenged statement is affirmatively false, Plaintiff instead relies primarily on an omission-based theory. Although the SAC abandons Plaintiff's prior allegations that elevated cholesterol was an "***anticipated*** risk" and now alleges that it was merely a "***potential*** risk" (¶¶119, 121, 127, 219), this watered-down theory fares no better than the last. The SAC adds some additional details but relies on the same three sources—(i) a single FE's hindsight opinion about the results of animal studies testing IMVT-1401, (ii) a handful of inapposite scientific articles, and (iii) hindsight knowledge about other companies' clinical trial designs—none of which demonstrate that elevated cholesterol was a "key potential risk" that investors would have expected Immunovant to monitor in its Phase 1 and 2a clinical trials. (*Cf.* ¶¶123–24, 135, 140, 226,

228, 247, 251, 282, 330 (conclusory allegations about a reasonable investor's expectations).)

> ### a. The FE's opinion about the animal study results does not demonstrate that elevated cholesterol was a "key" potential risk.

Plaintiff relies on the account of one FE to support its allegation that the animal study results indicated cholesterol was a key potential risk (¶¶92–97), which according to Plaintiff, means it should have been monitored in *every* clinical trial, regardless of phase. (¶¶116–17.)

"As a general matter, the mere opinions of confidential witnesses," "cannot, without more detail, support a fraud claim." *Ford v. Voxx Int'l Corp.*, 2016 WL 3982466, at *6 (E.D.N.Y. July 22, 2016). The witness must offer "concrete facts," not "vague terms." *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 120–21 (S.D.N.Y. 2010) (dismissing Section 11 claim).

Here, all that the FE offers is his hindsight *opinion* that the animal study results indicated "significant" or "substantial" increases in cholesterol in the animals dosed with IMVT-1401. (¶¶93, 95, 97.) But the *only concrete fact* provided to support his opinion is that "*some* animals showed 200 to 300 percent increases in cholesterol levels compared with the control group." (¶93.) This is woefully inadequate. How many is "some"? How many animals were included in the studies? What percentage of the total does "some" represent? Without these details, it is impossible to discern why a few animals' results bear any significance whatsoever. *See, e.g.*, *In re Regulus Therapeutics Sec. Litig.*, 406 F. Supp. 3d 845, 857 (S.D. Cal. 2019) (allegations inadequate where plaintiff failed to provide "a particularized description of the relevant analysis and findings of the purported contradictory preclinical and nonclinical studies"); *Patel v. Seattle Genetics, Inc.*, 2018 WL 2359137, at *5 (W.D. Wash. May 24, 2018) (rejecting confidential witness allegations regarding animal studies that "lack[ed] detail").

These details are even more important here because the FE admits that the summary portion of the animal study reports—prepared by the experts responsible for overseeing the animal

studies—concluded "there were only ***minor*** increases in cholesterol." (¶97.) That would make perfect sense, of course, if the number of animals with increased cholesterol was not statistically significant or otherwise meaningful. The SAC, however, provides no concrete facts that would enable this assessment, without which there is no basis to assess the reliability of FE's opinion that the summary portion of the animal study reports was somehow "erroneous[]." (¶97.)

But even putting all that aside, the FE's allegations fail for another, more fundamental reason: the SAC provides absolutely no basis to conclude that medical experts would expect cholesterol increases of 200–300% in "some" monkeys to translate to a "key" potential risk in humans.[22] (*Cf.* ¶98.) In fact, courts in the Second Circuit have long recognized that "laboratory animal studies are generally viewed with more suspicion than epidemiological studies, because they require making the assumption that chemicals behave similarly in different species." *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1241 (E.D.N.Y. 1985); *see also In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 186 (S.D.N.Y. 2009) ("[E]xtrapolation from animal studies to humans entails some risks, as physiological differences and dosage differences can complicate comparisons."). Indeed, that is precisely why GLP regulations require animal studies to have a study director with "appropriate education, training, and experience," who is responsible for the "interpretation, analysis, documentation and reporting of results," 21 C.F.R. § 58.33, and a "quality assurance unit" to ensure "the reported results accurately reflect the raw data of the nonclinical laboratory study," 21 C.F.R. § 58.35(b)(6). As Plaintiff concedes, the experts who summarized the animal study results here concluded "there were only minor increases in cholesterol." (¶97.)

Thus, even accepting FE's conclusory allegations wholesale, they do not demonstrate that

---

[22] As Immunovant disclosed, "cynomolgus monkeys were selected as the primary species for nonclinical testing, given the high degree of sequence homology to human FcRn and IMVT-1401's strong binding affinity for monkey FcRn." (¶¶149, 294.) Not because of shared attributes for cholesterol.

cholesterol was a "key" potential risk that required monitoring in the Phase 1 and 2a clinical trials.

        **b.**      **The scientific literature identified in the SAC does not demonstrate that cholesterol was a "key" potential risk.**

Plaintiff also identifies a handful of scientific articles that it claims support the notion that increased cholesterol was a "key" potential risk of IMVT-1401. Plaintiff is wrong.

**Articles relating to albumin.** The SAC identifies 10 articles about albumin, but none indicate that *mild* decreases in serum albumin (like those observed in Immunovant's preclinical and clinical trials) *cause* increases in cholesterol. (*See* ¶106 and Ex. 15 (researching link between lower levels of albumin and increased risk of heart attack while *controlling for cholesterol* levels); ¶107 and Ex. 16 (finding that mice without murine FcRn have lower levels of albumin and higher levels of cholesterol but making *no finding regarding causation*); ¶108 and Ex. 17 (observing that genetically modified mice that lack *any* albumin showed elevated levels of total cholesterol); ¶109(a) and Ex. 18 (examining hypoalbuminemia as a risk factor for cardiovascular disease, *without addressing cholesterol*); ¶109(a) and Ex. 19 (noting patients with a certain kidney disorder have low albumin and high cholesterol, *without addressing any relationship between the two*); ¶109(b) and Ex. 20 (discussing serum albumin as potential "prognostic factor" for cardiovascular disease and hypothesizing that serum albumin regulates cholesterol transport, but *making no finding regarding the impact of mild decreases in albumin on cholesterol*); ¶109(c) and Ex. 21 (studying the degree of albuminuria (abnormal presence of albumin in urine) as a risk factor for cardiovascular disease while controlling for cholesterol, but *making no finding regarding relationship between albumin and cholesterol*); ¶109(c) and Ex. 22 (concluding that "microalbuminuria is a strong and independent indicator of increased cardiovascular risk" and noting that *microalbuminuria is not clearly associated with "high LDL cholesterol"*); ¶109(c) and Ex. 23 (finding *no correlation* between albuminuria and LDL cholesterol); ¶109(d) and Ex.

24 (studying association between low albumin and longer hospitalization and increased mortality, *without addressing cholesterol*).)

**Articles relating to thyroid hormone levels**. Plaintiff also alleges that it was "well established" that the treatment of thyroid conditions, such as GO, would be expected to increase cholesterol levels because, according to Plaintiff, certain thyroid conditions decrease cholesterol levels. (¶¶111–12.)[23] But Plaintiff does not allege that GO was the type of thyroid conditions that were expected to decrease cholesterol levels. In fact, none of the studies cited by Plaintiff address GO; rather, they address hypothyroidism (associated with higher levels of cholesterol) and hyperthyroidism (associated with lower levels of cholesterol) more generally. (*See* ¶111 and Ex. 25 (concluding that hyperthyroid conditions "tend to diminish the level of the cholesterol in the blood"); ¶111 and Ex. 26 (noting that hypothyroidism is associated with higher LDL cholesterol and hyperthyroidism is associated with decreased LDL cholesterol); ¶112 and Ex. 27 (treatment of overt hyperthyroidism is associated with increase in total cholesterol, and treatment of overt hypothyroidism showed significant decrease in total cholesterol).) *See, e.g.*, *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 614–15 (1st Cir. 2017) (rejecting allegations based on scientific articles that analyze other drugs that were used to treat different diseases). However, as Immunovant disclosed, patients in the GO Phase 2a and 2b trials were "euthyroid with the baseline disease under control or have mild hypo- or hyperthyroidism." (Ex. 3 at 83–84.) In other words, patients in the GO Phase 2a and 2b trials are *not* the type of patients that Plaintiff's thyroid articles address, and Plaintiff fails to allege that increased cholesterol would be a "potential risk" for the patients in those trials.

As to MG, Plaintiff cites two articles that purportedly show MG patients are frequently

---

[23] A motion to dismiss is not the venue to dispute facts; however, it is worth noting that Immunovant later disclosed that it found the cholesterol increases caused by IMVT-1401 were unrelated to thyroid hormone levels. (¶178.) Plaintiff does not allege that this finding was incorrect, nor does it explain why an alleged risk factor that is specific to treatment of thyroid conditions would be relevant for a Phase 1 clinical trial in healthy volunteers.

treated for "dyslipidemia," *i.e.*, an imbalance of lipids (¶113), but neither indicates that treatment of MG increases cholesterol. (*See* ¶113 and Ex. 28 (discussing limitations in statin treatment for patients with mixed dyslipidemia *without addressing MG*); ¶113 and Ex. 29 (observing that 60% of the MG patients in the study were diagnosed with dyslipidemia *without addressing cholesterol*.)

In short, none of the articles Plaintiff cites indicate that increased cholesterol was a "key potential risk" of IMVT-1401. The notion that any such link was common knowledge is further belied by the fact that, despite Immunovant's robust disclosures about decreased albumin, Plaintiff does not allege that *anyone* (internal or external) raised concerns about cholesterol.

### c. Other companies' trial designs do not demonstrate that increased cholesterol was a "key" potential risk.

Finally, Plaintiff's reliance on the fact that Argenx SE and Harbour BioMed—two other companies that were "developing similar compounds"—monitored cholesterol in their clinical trials is equally misguided. (¶91(d).) The relevant issue is not whether they monitored cholesterol (Immunovant also monitored cholesterol); it is when and why they did so. The SAC does not allege that either company monitored cholesterol because of decreases in albumin. In fact, Argenx reported that its drug candidate has "no effect on albumin" levels.[24] As such, it is not plausible that Argenx monitored cholesterol based on a "key" potential risk linked to mild decreases in albumin. Plaintiff's allegations as to Harbour are equally unavailing; Harbour did *not* pause dosing in its trials of IMVT-1401 because it had *not* observed cholesterol elevations. (¶¶167, 176).

### 4. Immunovant complied with its affirmative disclosure obligations under Items 303 and 105 (formerly 503) of Regulation S-K.

Plaintiff also fails to plead an independent duty to disclose that cholesterol was not monitored in the Phase 1 and 2a clinical trials. (¶¶153, 156, 157, 297, 299, 300.) Item 303 requires

---

[24] *Efgartigimod reaches phase III in myasthenia gravis*, Institute of Myology (September 6, 2021), https://www.institut-myologie.org/en/2021/09/06/efgartigimod-reaches-phase-iii-in-myasthenia-gravis/.

issuers to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). To violate Item 303, Defendants must have "actual knowledge" of both (i) "the relevant trend or uncertainty," and (ii) "a fairly substantial probability that the known risk at issue will materialize and have a material impact." *Holbrook v. Trivago N.V.*, 2019 WL 948809, at *12 (S.D.N.Y. Feb. 26, 2019). Item 105 requires disclosure of "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). Courts have interpreted this to mean that registrants must disclose "the most significant risk factors associated with the security." *DraftKings*, 2023 WL 145591, at *37. Allegations of "actual knowledge" are also required for Item 105. *Id.* at *17, *38. The SAC fails to meet these pleading hurdles.

First, as discussed above, the SAC fails to allege that increased cholesterol was a "key potential risk" (¶156), let alone that it qualifies as a "most significant risk factor" for which disclosure is required. *DraftKings*, 2023 WL 145591, at *37. (*See* Section III.B.3.)

Second, the SAC contains no well-pled facts demonstrating that any Defendant ***actually knew*** at the time the relevant SEC filings were issued that IMVT-1401 might cause elevated cholesterol. (*See* Section III.A.) *See DraftKings*, 2023 WL 145591, at *38 (Item 303 and 105 allegations inadequate where the complaint "fail[ed] to plead ***actual*** knowledge of an existing trend, event, or risk" (emphasis in original)); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008) (allegations about what "Defendants ***must*** have known" inadequate for Items 105 and 303" (emphasis in original)).

Third, Plaintiff has not identified how a "potential risk" of elevated cholesterol qualifies as a "trend" or "uncertainty" under Item 303. The SAC's allegation on this point is threadbare: it

-37-

merely speculates (with the benefit of hindsight) that *if* IMVT-1401 increased cholesterol, the clinical trials "*could* be disrupted," which could, in turn, impact Immunovant's ability to fund operations "into the first half of 2022." (¶156.) That tenuous chain of events does not demonstrate a "fairly substantial probability that the known risk at issue will materialize and have a material impact." *Holbrook*, 2019 WL 948809, at *12; *see Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 34 (S.D.N.Y. 2016) (rejecting scenario that was "speculative and conjectural" "except with the benefit of hindsight" as basis for Item 303 violation). Indeed, even Plaintiff acknowledges that "there was a chance cholesterol would not be elevated" in the GO Phase 2b trial. (¶218.) Moreover, in addition to other risk warnings,[25] Immunovant expressly stated that its funding estimate was based "on assumptions that may prove to be wrong, and we could use our capital resources sooner than we expect." (Ex. 3 at 65; *see also* Ex. 1 at 53.) Thus, to the extent disclosure was required, it was made. *See Zagami*, 2016 WL 3199531, at *14 (no violation of Item 303 where defendants "warned investors of the worst-case-scenario outcome"); *In re Novan*, 2018 WL 6732990, at *17 (no Item 105 violation where the company "disclosed the uncertainty and complexity of the clinical trial process").

## IV.   THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED

Plaintiff also fails to plead violations of Sections 11 and 12(a)(2), which create "three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure

---

[25] Immunovant warned that its clinical trials may be "delay[ed]" or "discontinue[d]" due to "unforeseen safety issues," which could adversely impact IMVT-1401's "regulatory approval" and "commercialization," and thus have a "material adverse effect on [Immunovant's business.]" (¶¶159, 161, 163.) Plaintiff claims that those warnings were "misleading" and "not meaningful" because they did not specifically identify the "potential risk" of elevated cholesterol. (¶¶160, 162, 164.) But "where there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). Accordingly, "two issues are central to claims under sections 11 and 12(a)(2): (1) the existence of either a misstatement or an unlawful omission; and (2) materiality. The definition of materiality is the same for these provisions as it is under section 10(b) of the Exchange Act." *Id.*

Only a subset of the statements challenged under the Exchange Act are alleged to run afoul of Sections 11 and 12(a)(2). (¶¶133–34, 136–37, 139, 141, 144, 146, 149, 151.) And each one is inactionable as a matter of law for the reasons discussed above in Sections III.B.1 (inactionable dispute about trial design) and III.B.2 (inactionable opinion, puffery, forward-looking statement, or demonstrably true), which apply equally to Securities Act claims. *See Cachia*, 2022 WL 4367444, at *4 n.3 ("The same standards apply under either statute because the allegations challenge the same set of misstatements."); *In re Micro Focus Int'l Plc Sec. Litig.*, 2020 WL 5817275, at *1 (S.D.N.Y. Sept. 29, 2020) ("Plaintiff's Section 11 or 12(a)(c) claims, which are based on the same alleged misstatements and omissions as the Section 10-b claim, must therefore be dismissed for the same failure to plead actionable misstatements and omissions.").

Plaintiff also alleges that Defendants had an independent duty under Items 303 and 105 to disclose that cholesterol was not monitored in the Phase 1 and 2a clinical trials. (¶¶152–64.) These allegations fail for all the reasons discussed above in Sections III.B.4.

Finally, although the Court need not reach this issue given the pleading deficiencies noted above, because the Securities Act claims are "premised on allegations of fraud," Plaintiff must also comply with "the heightened pleading standard of Rule 9(b)." *Rombach*, 355 F.3d at 171–72. Plaintiff cannot circumvent this requirement by merely "separat[ing] [its] claims under the Securities Act and the Exchange Act and disclaim[ing] fraud as a basis for [its] Securities Act

-39-

claims." *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 n.17 (S.D.N.Y. 2021) (applying Rule 9(b) to plaintiffs' Securities Act claims when they "rest on the same theory" as plaintiffs' Exchange Act claims). Every statement challenged under Sections 11 and 12(a)(2) as "inaccurate statements of material fact" is also challenged under Section 10(b) as "materially false and misleading" for the same exact reasons. (*Compare, e.g.*, ¶¶133–35 *with* ¶280.) *See Cachia*, 2022 WL 4367444, at *4 n.3 (applying Rule 9(b) to Securities Act claims when "the allegations challenge the same set of misstatements" as the Exchange Act claims). And the SAC repeatedly characterizes statements as "misleading" to support Plaintiff's Securities Act claims. (*See, e.g.*, ¶¶135, 136, 138, 140.) *See Rombach*, 355 F.3d at 171–72 (noting phrases such as "inaccurate and misleading" "are classically associated with fraud"). As such, Rule 9(b) applies to the Securities Act claims, as do Defendants' arguments under that standard as set forth in Section III.B.3 (Plaintiff fails to plead **with particularity** facts demonstrating that elevated cholesterol was "key potential risk" at the time the September 2020 Offering Documents were issued).

## V.      CONCLUSION

For the reasons discussed above, the Court should dismiss the entire SAC with prejudice.[26]

---

[26] Because the SAC does not state a primary violation, the §§15 and 20(a) claims fail. *Rombach*, 355 F.3d at 177–78.

Dated: April 28, 2023

COOLEY LLP

By */s/ Koji F. Fukumura*
   Koji F. Fukumura

Koji F. Fukumura (*pro hac vice*)
Heather M. Speers (*pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121
Tel: (858) 550-6000
Fax: (858) 550-6420
Email: kfukumura@cooley.com
     hspeers@cooley.com

Shannon M. Eagan (*pro hac vice*)
Tijana M. Brien (*pro hac vice*)
3175 Hanover St
Palo Alto, CA 94304
Tel: (650) 843-5000
Fax: (650) 849-7400
Email: seagan@cooley.com
     tbrien@cooley.com

Aric H. Wu
55 Hudson Yards
New York, NY 10001-2157
Tel: (212) 479-6000
Fax: (212) 479-6275
Email: ahwu@cooley.com

*Attorneys for Immunovant, Roderick Wong, Peter Salzmann, Frank M. Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, and Eric Venker*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 28, 2023, true and correct copies of the Notice of Immunovant Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, Memorandum of Law in Support of Immunovant Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, and the Declaration of Heather M. Speers in Support of Immunovant Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint and the Appendix and Exhibits attached thereto were served on all counsel of record via electronic mail.

*/s/ Koji F. Fukumura*
Koji F. Fukumura