# Exhibit 4

## Excerpted

**United States**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**Form 8-K**
**Current Report**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**
**September 29, 2019**
Date of Report (Date of earliest event reported)
**Health Sciences Acquisitions Corporation**
(Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **001-38906** | **83-2771572** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **412 West 15th Street, Floor 9 New York, NY** | **10011** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(646) 343-9280**

N/A

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act
☒ Soliciting material pursuant to Rule 14a-12 under the Exchange Act
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Units, each consisting of one share of Common Stock, $0.0001 par value, and one Warrant entitling the holder to receive one half share of Common Stock | HSACU | The Nasdaq Stock Market LLC |
| Shares of Common Stock, $0.0001 par value, included as part of the Units | HSAC | The Nasdaq Stock Market LLC |
| Warrants included as part of the Units | HSACW | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**IMPORTANT NOTICES**

**Participants in the Solicitation**

Immunovant Sciences Ltd. ("Immunovant"), Health Sciences Acquisitions Corporation ("HSAC"), and their respective directors, executive officers and employees and other persons may be deemed to be participants in the solicitation of proxies from the holders of shares of HSAC common stock in respect of the proposed transaction described herein. Information about HSAC's directors and executive officers and their ownership of HSAC common stock is set forth in HSAC's Prospectus dated May 9, 2019 (the "Prospectus") filed with the Securities and Exchange Commission (the "SEC"), as modified or supplemented by any Form 3 or Form 4 filed with the SEC since the date of such filing. Other information regarding the interests of the participants in the proxy solicitation will be included in the proxy statement pertaining to the proposed transaction when it becomes available. These documents can be obtained free of charge from the sources indicated below.

**Additional Information and Where To Find It**

In connection with the transaction described herein, HSAC will file relevant materials with the SEC, including a proxy statement on Schedule 14A. Promptly after filing its definitive proxy statement with the SEC, HSAC will mail the definitive proxy statement and a proxy card to each stockholder entitled to vote at the special meeting relating to the transaction. INVESTORS AND SECURITY HOLDERS OF HSAC ARE URGED TO READ THESE MATERIALS (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS IN CONNECTION WITH THE TRANSACTION THAT HSAC WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT HSAC, IMMUNOVANT AND THE TRANSACTION. The definitive proxy statement, the preliminary proxy statement and other relevant materials in connection with the transaction (when they become available), and any other documents filed by HSAC with the SEC, may be obtained free of charge at the SEC's website (www.sec.gov) or by writing to Health Sciences Acquisitions Corporation, 412 West 15th Street, Floor 9, New York, NY 10011.

**Forward-Looking Statements**

This Current Report on Form 8-K and the documents incorporated by reference herein (this "Current Report") contain certain "forward-looking statements" within the meaning of "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements can be identified by words such as: "target," "believe," "expect," "will," "shall," "may," "anticipate," "estimate," "would," "positioned," "future," "forecast," "intend," "plan," "project" and other similar expressions that predict or indicate future events or trends or that are not statements of historical matters. Examples of forward-looking statements include, among others, statements made in this Current Report regarding the proposed transactions contemplated by the share exchange agreement (the "Share Exchange Agreement") among HSAC, Immunovant, Roivant Sciences Ltd., and the stockholders of HSAC (the "Business Combination"), including the anticipated initial enterprise value and post-closing equity value, the benefits of the Business Combination, integration plans, expected synergies and revenue opportunities, anticipated future financial and operating performance and results, including estimates for growth, the expected management and governance of the combined company, and the expected timing of the Business Combination. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on HSAC and Immunovant managements' current beliefs, expectations and assumptions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside of our control. Actual results and outcomes may differ materially from those indicated in the forward-looking statements. Therefore, you should not rely on any of these forward-looking statements. Important factors that could cause actual results and outcomes to differ materially from those indicated in the forward-looking statements include, among others, the following: (1) the occurrence of any event that could give rise to the termination of the Share Exchange Agreement; (2) the outcome of any legal proceedings that may be instituted against HSAC, the combined company, or others following the announcement of the Business Combination and the Share Exchange Agreement; (3) the inability to complete the Business Combination due to the failure to obtain approval of HSAC's stockholders or to satisfy other conditions to closing in the Share Exchange Agreement; (4) changes to the proposed structure of the Business Combination that may be required or appropriate as a result of applicable laws; (5) the ability to meet the Nasdaq Stock Market LLC ("Nasdaq") listing standards following the consummation of the Business Combination; (6) the risk that the Business Combination disrupts current plans and operations of Immunovant as a result of the announcement and consummation of the Business Combination; (7) the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition, the ability of the combined company to grow and manage growth profitably, maintain relationships with third parties and partners, obtain adequate supply of raw materials and retain its management and key employees; (8) costs related to the Business Combination; (9) changes in applicable laws or regulations; (10) the possibility that Immunovant or the combined company may be adversely affected by other economic, business, regulatory, and/or competitive factors; (11) Immunovant's estimates of expenses; (12) the impact of foreign currency exchange rates and interest rates fluctuations on the results of Immunovant or the combined company; and (13) other risks and uncertainties indicated in the proxy statement of HSAC to be filed by HSAC with the SEC in connection with the Business Combination, including those under "Risk Factors" therein, and other documents filed or to be filed from time to time with the SEC by HSAC.

1

A further list and description of risks and uncertainties can be found in HSAC's Prospectus dated May 9, 2019 filed with the SEC and in the proxy statement on Schedule 14A that will be filed with the SEC by HSAC in connection with the proposed transaction, and other documents that the parties may file or furnish with the SEC, which you are encouraged to read. Any forward-looking statement made by us in this Current Report is based only on information currently available to HSAC and Immunovant and speaks only as of the date on which it is made. HSAC and Immunovant undertake no obligation to publicly update any forward-looking statement, whether written or oral, that may be made from time to time, whether as a result of new information, future developments or otherwise, except as required by law.

**Item 1.01. Entry Into a Material Definitive Agreement**

On September 29, 2019, Health Sciences Acquisitions Corporation ("HSAC") entered into a share exchange agreement (the "Share Exchange Agreement") with Immunovant Sciences Ltd. ("Immunovant"), a biopharmaceutical company focused on enabling normal lives for patients with autoimmune diseases, and shareholders of Immunovant, including Roivant Sciences Ltd. ("Roivant").

*Acquisition of Immunovant; Acquisition Consideration*

Upon the closing of the transactions contemplated in the Share Exchange Agreement (the "Closing"), HSAC will acquire all of the issued and outstanding shares of Immunovant, and Immunovant will become a wholly owned subsidiary of HSAC (the "Business Combination"). Upon the Closing, HSAC will change its name to "Immunovant, Inc."

As a result of the Business Combination, an aggregate of approximately 43,000,000 shares of HSAC common stock will be issued (or reserved for issuance pursuant to currently exercisable options (on a treasury stock method basis)) and 10,000 shares of Series A preferred stock of HSAC to be issued to Roivant) in respect of shares of Immunovant capital stock and exercisable options (on a treasury stock method basis) that are issued and outstanding as of immediately prior to the Closing, subject to pre-closing adjustment for certain indebtedness of Immunovant (other than indebtedness convertible into Immunovant capital stock).

On the closing date of the Business Combination, each option to purchase Immunovant's common shares (each, a "Company Option") that is outstanding under Immunovant's equity incentive plan immediately prior to the Closing, and each option or restricted stock units, whether vested or unvested, will, automatically and without any required action on the part of any holder or beneficiary thereof, be assumed by HSAC and converted into an option to purchase shares of HSAC common stock (each, a "Converted Option"), subject to pre-closing adjustment for certain indebtedness of Immunovant (other than indebtedness convertible into Immunovant's common shares). Each Converted Option shall continue to have and be subject to the same terms and conditions as were applicable to such Company Option immediately before the Closing (including expiration date, vesting conditions, and exercise provisions).

Immediately after the Closing, the combined company's board of directors will consist of seven directors, with six directors identified by Roivant and one director identified by HSAC.

The holder(s) of a majority of outstanding shares of Series A Preferred Stock will be entitled to elect: (i) four directors (the "Series A Preferred Directors"), as long as the holder(s) of Series A Preferred Stock hold 50% or more of the voting power of all then-outstanding shares of capital stock of the combined company entitled to vote generally at an election of directors, (ii) three Series A Preferred Directors, as long as the holder(s) of Series A Preferred Stock hold 40% or more but less than 50% of the voting power of all then-outstanding shares of capital stock of the combined company entitled to vote generally at an election of directors, and (iii) two Series A Preferred Directors, as long as the holder(s) of Series A Preferred Stock hold 25% or more but less than 40% of the voting power of all then-outstanding shares of capital stock of the combined company entitled to vote generally at an election of directors;

### Earnout Shares

Pursuant to the Share Exchange Agreement, HSAC agreed to issue Immunovant shareholders the following number of additional earnout shares in the aggregate subject to the achievement of the conditions specified below (each, a "Milestone"):

    a. Following the Closing, if the daily volume-weighted average price of a share of HSAC common stock in any 20 trading days within a 30-trading day period prior to March 31, 2023 is greater than or equal to $17.50 per share, then HSAC shall issue 10,000,000 shares of HSAC common stock to Immunovant shareholders.

    b. Following the Closing, if the daily volume-weighted average price of a share of HSAC common stock in any 20 trading days within a 30-trading day period prior to March 31, 2025 is greater than or equal to $31.50 per share, then HSAC shall issue 10,000,000 shares of HSAC common stock Immunovant shareholders.

In the event that after Closing and prior to March 31, 2025 there is an Acceleration Event (as defined in the Share Exchange Agreement), then any earnout shares that have not been previously issued by HSAC (whether or not previously earned) shall be deemed earned and due by HSAC to the Immunovant shareholders, unless in a change of control, the value of the consideration to be received in exchange for a share of HSAC common stock is lower than the applicable Milestone share price thresholds described above.

### HSAC Stockholder Approval

Prior to the Closing, the holders of (i) a majority of the issued and outstanding shares of HSAC common stock must approve HSAC's charter amendment and (ii) a majority of the issued and outstanding shares of HSAC common stock present in person or by proxy and entitled to vote at the HSAC special meeting must approve the Business Combination and the 2019 HSAC Equity Incentive Plan and the issuance of more than 20% of the issued and outstanding shares of HSAC common stock pursuant to the Share Exchange Agreement, pursuant to Nasdaq requirements (collectively, the "Stockholder Approval").

In addition, HSAC must prepare and file with the SEC a Proxy Statement on Schedule 14A (the "Proxy Statement") that will be mailed to all stockholders entitled to vote at the HSAC special meeting. HSAC must call a special meeting of its common stockholders as promptly as reasonably practicable following the filing of the definitive Proxy Statement.

### Representations and Warranties and Covenants

The Share Exchange Agreement contains customary representations, warranties and covenants made by the each party, including covenants relating to obtaining the requisite Stockholder Approval, indemnification of directors and officers, limitations on the solicitation of alternative proposals and change of board recommendations, and HSAC's and Immunovant's conduct of their respective businesses between the date of signing of the Share Exchange Agreement and the Closing (or the termination of the Share Exchange Agreement). In addition, between the date of the signing of the Share Exchange Agreement and the Closing (or the termination of the Share Exchange Agreement), neither Immunovant nor HSAC is allowed to enter into a financing transaction or any agreement relating to the sale of such party's assets or equity securities, or a merger or change of control agreement with respect to such party or its assets, without the prior written consent of the other party, other than certain Immunovant permitted financings and licensing by Immunovant in the ordinary course of business.

The representation and warranties contained in the Share Exchange Agreement will not survive the Closing, other than for the sole purpose of recovery under the representation and warranty insurance policy further described below.

***Conditions to Closing***

*General Conditions*

The obligation of HSAC and Immunovant to consummate the Business Combination is conditioned on, among other things: (a) the absence of any law, order, stay, judgment or decree by any government agency restraining or prohibiting or imposing any condition on the closing of the Business Combination; (b) the absence of any action brought by a governmental agency seeking to enjoin or otherwise restrict the consummation of the Business Combination; (c) expiration of any waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder; and (d) payment of the transaction expenses of each of HSAC and Immunovant.

*HSAC's Additional Conditions to Closing*

In addition, the obligation of HSAC to consummate the Business Combination is conditioned upon, among other things: (a) Immunovant's performance its obligations under the Share Exchange Agreement in all material respects; (b) accuracy of the representations and warranties of Immunovant subject to material adverse effect qualification; (c) absence of a material adverse effective on Immunovant that is continuing; (d) HSAC's receipt of any updated schedules from Immunovant; and (e) the effectiveness of the representation and warranties insurance policy pursuant to its terms.

*Immunovant's Additional Conditions to Closing*

In addition, the obligation of Immunovant to consummate the Business Combination is conditioned upon, among other things: (a) HSAC's performance of its obligations under the Share Exchange Agreement in all material respects and the accuracy of the representations and warranties of HSAC; (b) forfeiture and cancellation of HSAC's private warrants; (c) a minimum of $65 million cash on HSAC's balance sheet after any redemption of shares of HSAC common stock; (d) receipt of a letter from Nasdaq indicating that the combined company and the transaction securities have been approved for listing; (e) appointment of the post-Closing board of directors; (f) amendment of the certificate of incorporation of HSAC; and (g) the Stockholder Approval.

***Representation and Warranty Insurance Policy***

In conjunction with entering into the Share Exchange Agreement, HSAC entered into a binder agreement for a representation and warranty insurance policy concurrently with executing the Share Exchange Agreement. The insurance policy was bound by Indian Harbor Insurance Company, with a policy limit of no less than $10 million and a retention amount no greater than approximately $900,000.

*Termination*

The Share Exchange Agreement may be terminated at any time prior to the closing by:

- HSAC or Immunovant, if the closing has not occurred on or prior to January 31, 2020 (the "Outside Closing Date"); provided, however, that a party shall not be permitted to provide notice of termination if the failure of the closing to occur prior to the Outside Closing Date is attributable to the failure on the part of such party to perform in any material respect any covenant or obligation in the Share Exchange Agreement required to be performed by such party;

- HSAC or Immunovant, in the event an governmental authority shall have issued an order, having the effect of permanently restraining, enjoining or otherwise prohibiting the Business Combination, which order is final and non-appealable; provided, however, that a party shall not be permitted to so terminate if such event is attributable to the failure on the part of such party to perform in any material respect any covenant or obligation in the Share Exchange Agreement required to be performed by such party;

- HSAC or Immunovant, in the event that HSAC fails to receive the Stockholder Approval at the HSAC stockholder meeting (subject to any adjournment or recess of such special meeting); provided that HSAC shall not be permitted to terminate if the failure to obtain such Stockholder Approval is proximately caused by any action or failure to act of HSAC that constitutes a breach of the Share Exchange Agreement;

- the mutual written agreement of Immunovant and HSAC;

- HSAC, if: (i) Immunovant shall have breached any representation, warranty, agreement or covenant contained in the Share Exchange Agreement to be performed on or prior to the Outside Closing Date, which has rendered the satisfaction of any of the applicable closing conditions impossible; and (ii) such breach shall not be cured by the earlier of the Outside Closing Date and thirty (30) days following receipt by Immunovant of a written notice from HSAC describing in reasonable detail the nature of such breach, except HSAC will not be allowed to so terminate if it is then in material breach of any representation, warranty, agreement or covenant;

- Immunovant, if: (i) HSAC shall have breached any of its covenants, agreements, representations, and warranties contained herein to be performed on or prior to the Outside Closing Date, which has rendered the satisfaction of any of the applicable closing conditions impossible; and (ii) such breach shall not be cured by the earlier of the Outside Closing Date and thirty (30) days following receipt by HSAC of a written notice from Immunovant describing in reasonable detail the nature of such breach, except Immunovant will not be allowed to so terminate if it is then in material breach of any representation, warranty, agreement or covenant; or

- Immunovant or HSAC, if a Triggering Event with respect to the other party shall have occurred. A "Triggering Event" shall include (i) a change of board recommendation, (ii) HSAC failing to convene or hold the HSAC stockholder meeting, (iii) breach of the non-solicitation clause; and (iv) failure of the HSAC board of directors to reaffirm the its recommendation under certain circumstances.

The foregoing summary of the Share Exchange Agreement does not purport to be complete and is qualified in its entirety by reference to the actual Share Exchange Agreement, which is filed as Exhibit 2.1 hereto, and which is incorporated by reference into this Current Report. Terms used herein as defined terms and not otherwise defined herein shall have the meanings ascribed to them in the Share Exchange Agreement.

The Share Exchange Agreement has been included to provide investors and stockholders with information regarding its terms. It is not intended to provide any other factual information about HSAC, Immunovant or any other parties thereto. The Share Exchange Agreement contains representations and warranties that the parties thereto made to, and solely for the benefit of, each other. The assertions embodied in such representations and warranties are qualified by information contained in the confidential disclosure schedules that each may have delivered to the other party in connection with signing the Share Exchange Agreement. Accordingly, investors and stockholders should not rely on such representations and warranties as characterizations of the actual state of facts or circumstances, since they were only made as of the date of the Share Exchange Agreement and are modified in important part by the underlying disclosure schedules. Moreover, information concerning the subject matter of such representations and warranties may change after the date of the Share Exchange Agreement, which subsequent information may or may not be fully reflected in HSAC's public disclosures.

*Additional Agreements*

In addition to the Share Exchange Agreement:

1.  HSAC and its sponsor, Health Sciences Holdings, LLC ("Sponsor") entered into a Sponsor Restricted Stock Agreement pursuant to which concurrently with the Closing, the Sponsor will (a) forfeit a number of shares of HSAC common stock equal to: (A) 1,800,000, multiplied by (B) (i) the number of shares of HSAC common stock validly redeemed by holders thereof in connection with the Business Combination as reflected in the records of HSAC's transfer agent, divided by (ii) 11,500,000 (such number of shares, the "Canceled Shares"), and (b) subject a number of shares of HSAC common stock equal to 1,800,000 minus the Canceled Shares (the "Sponsor Earnout Shares") to potential forfeiture in the event that the Milestones are not achieved. In the event of an Acceleration Event (as defined in the Share Exchange Agreement), all of the Sponsor Earnout Shares shall vest and no longer be subject to forfeiture, unless in a change of control, the value of the consideration to be received in exchange for a share of HSAC common stock is lower than the applicable Milestone share price thresholds described above. Any Sponsor Earnout Shares that have not vested on or prior to March 31, 2025 will be forfeited by the Sponsor after such date.

2.  Each Immunovant shareholder has entered into a Lock-up Agreement with HSAC, in substantially the form attached to the Share Exchange Agreement, with respect to shares of HSAC common stock (or any securities convertible into, or exchangeable for, or representing the rights to receive shares of HSAC common stock) to be received by it in the Business Combination or during the Lock-up Period (as defined below) (such shares, the "Lockup Shares"). In such Lock-up Agreement, each Immunovant shareholder has agreed that during the Lock-up Period, it will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any Lock-up Shares), enter into a transaction that would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of Lock-up Shares, whether any of these transactions are to be settled by delivery of any Lock-up Shares, in cash or otherwise, publicly disclose the intention to make any offer, sale, pledge or disposition, or to enter into any transaction, swap, hedge or other arrangement, or engage in any short sales with respect to any security of HSAC.

    The "Lock-up Period" means: (i) with respect to 50% of the Lock-up Shares, the shorter of (A) the period commencing on the date of Closing and ending on the date that is six months thereafter; and (B) the period commencing on the date of Closing and ending on the date on which the last reported closing price of the HSAC Shares on the Nasdaq (or such other exchange on which the HSAC Shares are then listed) equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations and recapitalizations) for any 20 trading days during any 30 trading day period thereafter; and (ii) with respect to the remaining 50% of the Lock-up Shares, the period commencing on the date of Closing and ending on the date that is six months thereafter. In addition, if within six months after the date of Closing , there is a Change of Control (as defined in the Share Exchange Agreement), then upon the consummation of such Change of Control, all Lock-up Shares shall be released from the foregoing restrictions.

6

**7**

3.     HSAC and Immunovant stockholders and the Sponsor have entered into an amended and restated registration rights agreement, in substantially the form attached to the Share Exchange Agreement (the "Registration Rights Agreement"). Under the Registration Rights Agreement, the Immunovant shareholders and the Sponsor hold registration rights that obligate HSAC to register for resale under the Securities Act, all or any portion of the HSAC Shares issued under the Share Exchange Agreement, including any Earnout Payments, as well as HSAC Shares held by the Sponsor or issuable upon the exercise of warrants held by the Sponsor. Each of the Sponsor and Roivant, as well as the stockholders holding a majority-in-interest of all such registrable securities will be entitled to make a written demand for registration under the Securities Act of all or part of their registrable securities, so long as such shares are not then restricted under the Lock-Up Agreement. Subject to certain exceptions, if any time after the Closing, the combined company proposes to file a registration statement under the Securities Act with respect to its securities, under the Registration Rights Agreement, the combined company after the Business Combination shall give notice to the Immunovant shareholders and the Sponsor as to the proposed filing and offer such stockholders an opportunity to register the sale of such number of their registrable securities as they request in writing. In addition, subject to certain exceptions, such stockholders are entitled under the Registration Rights Agreement to request in writing that HSAC register the resale of any or all of their registrable securities on Form S-3 and any similar short-form registration statement that may be available at such time.

Except as described above, no consideration was paid by HSAC in connection with the agreements described above.

In addition:

1. HSAC entered into voting agreements with holders of 4,547,000 shares of HSAC common stock pursuant to which such stockholders, including but not limited to the RTW Investments, LP, Adage Capital Management, Cormorant Asset Management, Eventide Asset Management, LLC, and Perceptive Advisors, agreed to vote in favor of the transactions contemplated by the Share Exchange Agreement and to not redeem or sell their shares.

2. HSAC entered into agreements with other investors that agreed to purchase up to 2,374,400 shares of HSAC common stock at HSAC's request and not to redeem such shares of HSAC common stock in connection with the closing of the Business Combination.

**Item 3.02. Unregistered Sales of Equity Securities**

The disclosure set forth above in Item 1.01 of this Current Report on Form 8-K is incorporated by reference herein. The securities of HSAC to be issued in connection with the Business Combination and additional agreements will not be registered under the Securities Act in reliance upon the exemption provided in Section 4(a)(2) of the Securities Act.

**Item 7.01. Regulation FD Disclosure**

Attached as Exhibit 99.1 to this Current Report on Form 8-K and incorporated into this Item 7.01 by reference is a copy of the press release issued October 2, 2019 announcing the proposed transaction.

Attached as Exhibit 99.2 to this Current Report on Form 8-K and incorporated into this Item 7.01 by reference is the investor presentation dated October 2, 2019 that will be used by HSAC in making presentations to certain existing and potential stockholders of HSAC with respect to the proposed transaction.

Exhibits 99.1 and 99.2 are being furnished pursuant to Item 7.01 and shall not be deemed to be filed for purposes of Section 18 of the Exchange Act or otherwise be subject to the liabilities of that section, nor shall it be deemed to be incorporated by reference in any filing under the Securities Act or the Exchange Act.

**Item 9.01. Financial Statements and Exhibits**

        (d)        Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 2.1* | Share Exchange Agreement, dated as of September 29, 2019, by and among Immunovant Sciences Ltd., the stockholders of Immunovant Sciences Ltd., Roivant Sciences Ltd., and Health Sciences Acquisitions Corporation. |
| 99.1** | Press Release dated October 2, 2019 |
| 99.2** | Investor Presentation dated October 2, 2019 |

*Schedules and exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The registrant hereby undertakes to furnish copies of any of the omitted schedules and exhibits upon request by the U.S. Securities and Exchange Commission.
**Furnished but not filed.

8

9

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated October 2, 2019

HEALTH SCIENCES ACQUISITIONS CORPORATION
By:     /s/ Roderick Wong
Name:   Roderick Wong, MD
Title:    Chief Executive Officer

9

**Exhibit 99.1**

**Immunovant to Merge with Health Sciences Acquisitions Corporation,**
**Creating New Publicly Listed FcRn-Focused Company**

- Top shareholders of Immunovant post-closing to include Roivant Sciences and blue-chip biotech investors, including RTW Investments, BVF Partners, Adage Capital Management, Cormorant Asset Management, Eventide Asset Management, and Perceptive Advisors
- Immunovant is developing IMVT-1401, a fully human antibody to FcRn that delivered a mean IgG reduction of nearly 80% in a Phase 1 study of healthy volunteers receiving 4 weekly 680 mg subcutaneous injections
- Immunovant is expected to have more than $100 million at closing to fund development of IMVT-1401 into 2H 2021
- Top-line data from ongoing Phase 2a trial in Graves' ophthalmopathy expected by Q1 2020
- Top-line data from ongoing Phase 2a trial in myasthenia gravis expected by Q2 2020

NEW YORK and LONDON, October 2, 2019 /PRNewswire/ – Health Sciences Acquisitions Corporation ("HSAC," NASDAQ: HSAC), a special purpose acquisition company sponsored by RTW Investments, and Immunovant Sciences Ltd. ("Immunovant"), a clinical-stage biopharmaceutical company focused on enabling normal lives for patients with autoimmune diseases, today announced that they have entered into a definitive share exchange agreement ("SEA"). HSAC will acquire 100% of the issued and outstanding shares in Immunovant. Upon closing, the combined company will be called Immunovant, Inc.

"We are thrilled to have the opportunity to partner with the team at Immunovant. We believe IMVT-1401 is a uniquely compelling asset within the FcRn drug class, which we expect will become a cornerstone therapy for treating many auto-antibody driven diseases," said Roderick T. Wong, M.D., President, Chief Executive Officer and Chairman of HSAC and Managing Partner and Chief Investment Officer of RTW Investments.

In addition to the merger described above, Immunovant also announced today that it completed a $35 million private bridge financing with RTW Investments, BVF Partners, and Roivant Sciences Ltd. ("Roivant"). The notes issued in this financing will convert into common shares of Immunovant immediately prior to the closing of the business combination.

The combined company is expected to have more than $100 million at closing and will be led by Immunovant's experienced management team, headed by Chief Executive Officer Pete Salzmann, M.D. HSAC has received written commitments from certain HSAC shareholders to vote in favor of the transaction and to not redeem their shares, which, in aggregate, more than satisfies the minimum cash closing condition set forth in the SEA. Current HSAC shareholders supporting the transaction include RTW Investments, Adage Capital Management, Cormorant Asset Management, Eventide Asset Management, and Perceptive Advisors.

"I am proud of the many milestones delivered by the Immunovant team this year, including completion of a comprehensive Phase 1 program demonstrating robust IgG reductions with simple subcutaneous injections and initiation of a broad Phase 2 program with both first-in-class and best-in-class potential in multiple diseases with high unmet patient need. We believe the potency of IMVT-1401 and the ability to administer IMVT-1401 as a simple subcutaneous injection represent important potentially differentiating features of this product candidate. Today's financing transaction will allow us to continue to pursue our vision of enabling normal lives for patients with autoimmune diseases," said Pete Salzmann, M.D., Chief Executive Officer of Immunovant.

Immunovant is developing IMVT-1401, a fully human anti-FcRn monoclonal antibody with the potential to treat IgG-mediated autoimmune diseases. IMVT-1401 is the result of a multi-year research program by Immunovant's partner, HanAll Biopharma, to engineer a highly potent anti-FcRn antibody specifically optimized for subcutaneous injection with a small gauge needle. In a Phase 1 study of healthy volunteers receiving 4 weekly subcutaneous injections, IMVT-1401 delivered a mean IgG reduction of 63% at a dose of 340 mg and a mean IgG reduction of 78% at a dose of 680 mg.

Proceeds from this transaction are expected to finance Phase 2 development of IMVT-1401 in three indications. IMVT-1401 is currently being tested in a Phase 2a trial for Graves' ophthalmopathy (potentially a first-in-class anti-FcRn), with top-line data expected by Q1 2020, and in a Phase 2a trial for myasthenia gravis, with top-line data expected by Q2 2020. Immunovant plans to file an IND for a third indication, warm autoimmune hemolytic anemia, later this year. The company also intends to pursue additional indications in the future.

A corporate presentation describing Immunovant's development plans can be found at www.immunovant.com.

**Summary of Transaction**

On September 29, 2019, HSAC entered into the SEA with Immunovant and its shareholders, including Roivant. Upon the closing of the transactions contemplated in the SEA, HSAC will acquire all of the shares of Immunovant for the consideration described below, and Immunovant will become a wholly owned subsidiary of HSAC.

Upon the closing of the transactions, the current Immunovant shareholders will sell to HSAC, and HSAC will purchase from the current Immunovant shareholders, all of the issued and outstanding Immunovant shares, and HSAC will issue (or reserve for issuance upon the exercise of options) approximately 43 million HSAC shares to the current Immunovant shareholders. The aggregate value of the consideration to be paid by HSAC in the business combination is $395 million, before giving effect to Immunovant's bridge financing.

Assuming no redemption from HSAC shareholders, it is estimated that the current security holders of Immunovant will own approximately 77% of the combined company.

Immunovant shareholders may, subject to the terms of the SEA, receive up to an additional 20 million HSAC shares (the "Earnout Shares"): 10 million shares if the share price exceeds $17.50 by March 31, 2023 and an additional 10 million shares if the share price exceeds $31.50 by March 31, 2025.

In connection with the transactions, HSAC's sponsor has agreed to cancel all 10 million of its private warrants. Furthermore, subject to terms of the SEA, 1.8 million of the sponsor's founder shares will be cancelled unless HSAC's common stock exceeds certain stock prices on substantially identical terms and conditions as the Earnout Shares.

The description of the transaction contained herein is only a high-level summary and is qualified in its entirety by reference to the definitive agreement relating to the transaction. A copy of the definitive agreement, this press release and a corporate presentation will be filed today by HSAC with the Securities and Exchange Commission (the "SEC") as exhibits to a Current Report on Form 8-K, which can be accessed through the SEC's website at www.sec.gov.

Chardan is acting as HSAC's M&A and capital markets advisor. Leerink is acting as financial advisor to Immunovant. Loeb & Loeb LLP is representing HSAC. Cooley LLP is representing Immunovant.

**About Immunovant**

Immunovant, a member of the Roivant family of companies, is a clinical-stage biopharmaceutical company focused on enabling normal lives for patients with autoimmune diseases. Immunovant is developing IMVT-1401, a novel, fully human anti-FcRn monoclonal antibody, as a subcutaneous injection for the treatment of autoimmune diseases mediated by pathogenic IgG antibodies. For further information about Immunovant, please visit www.immunovant.com.

**About Roivant**

Roivant Sciences aims to improve health by rapidly delivering innovative medicines and technologies to patients. Roivant does this by building Vants – nimble, entrepreneurial biotech, and healthcare technology companies with a unique approach to sourcing talent, aligning incentives, and deploying technology to drive greater efficiency in R&D and commercialization. For further information about Roivant, please visit www.roivant.com.

**About Health Sciences Acquisitions Corporation**

HSAC is a Delaware company established for the purpose of entering into a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization or similar business combination with one or more businesses or entities. On May 14, 2019, HSAC raised $115 million to achieve this goal. As of June 30, 2019, there was approximately $115.3 million in HSAC's trust account. HSAC is sponsored by RTW Investments.

**About RTW Investments**

RTW Investments, LP ("RTW") is a New York-based investment firm that focuses on identifying transformational and disruptive innovations in biopharmaceutical and medical technologies. As a leading partner of industry and academia, RTW utilizes deep scientific expertise and a rigorous and comprehensive process to support emerging medical therapies. For further information about RTW, please visit www.rtwfunds.com.

**Important Notice Regarding Forward-Looking Statements**

This press release contains certain "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, both as amended. Statements that are not historical facts, including statements about the pending business combination between HSAC and the stockholders of Immunovant and the transactions contemplated thereby, and the parties' perspectives and expectations, are forward-looking statements. Such statements include, but are not limited to, statements regarding the proposed transaction, including the anticipated initial enterprise value, cash available at closing, the anticipated use of the combined company's cash and cash equivalents, initiation, timing, progress, and reporting of results of Immunovant's development programs, the potential benefits of Immunovant's product candidates, the benefits of the proposed transaction, integration plans, anticipated future financial and operating performance and results, including estimates for growth, the expected management and governance of the combined company, and the expected timing of the transactions. The words "expect," "believe," "estimate," "intend," "plan" and similar expressions indicate forward-looking statements. These forward-looking statements are not guarantees of future performance and are subject to various risks and uncertainties, assumptions (including assumptions about general economic, market, industry and operational factors), known or unknown, which could cause the actual results to vary materially from those indicated or anticipated. Such risks and uncertainties include, but are not limited to: (i) risks related to the expected timing and likelihood of completion of the pending transaction, including the risk that the transaction may not close due to one or more closing conditions to the transaction not being satisfied or waived, such as regulatory approvals not being obtained, on a timely basis or otherwise, or that a governmental entity prohibited, delayed or refused to grant approval for the consummation of the transaction or required certain conditions, limitations or restrictions in connection with such approvals; (ii) risks related to the ability of HSAC and Immunovant to successfully integrate the businesses; (iii) the occurrence of any event, change or other circumstances that could give rise to the termination of the applicable transaction agreements; (iv) the risk that there may be a material adverse change with respect to the financial position, performance, operations or prospects of Immunovant or HSAC; (v) risks related to disruption of management time from ongoing business operations due to the proposed transaction; (vi) the risk that any announcements relating to the proposed transaction could have adverse effects on the market price of HSAC's common stock; (vii) risks associated with the financing of the proposed transaction; and (viii) risks related to the timing, cost and results of Immunovant's clinical trials and regulatory submissions. A further list and description of risks and uncertainties can be found in HSAC's Registration Statement filed on Form S-1 filed with the Securities and Exchange Commission (the "SEC") on May 3, 2019, in HSAC's quarterly reports on Form 10-Q filed with the SEC subsequent thereto and in the proxy statement on Schedule 14A that will be filed with the SEC by HSAC in connection with the proposed business combination, and other documents that the parties may file or furnish with the SEC, which you are encouraged to read. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those indicated or anticipated by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on these forward-looking statements. Forward-looking statements relate only to the date they were made, and HSAC, Immunovant, and their subsidiaries undertake no obligation to update forward-looking statements to reflect events or circumstances after the date they were made except as required by law or applicable regulation.

**Disclaimer**

This communication shall neither constitute an offer to sell or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any jurisdiction in which the offer, solicitation, or sale would be unlawful prior to the registration or qualification under the securities laws of any such jurisdiction.

**14**

**Participants in Solicitation**

HSAC, Immunovant, and their respective directors, executive officers and employees and other persons may be deemed to be participants in the solicitation of proxies from the holders of HSAC common stock in respect of the proposed transaction. Information about HSAC's directors and executive officers and their ownership of HSAC's common stock is set forth in HSAC's Registration Statement filed on Form S-1 filed with the SEC on May 3, 2019, as modified or supplemented by any Form 3 or Form 4 filed with the SEC since the date of such filing. Other information regarding the interests of the participants in the proxy solicitation will be included in the proxy statement pertaining to the proposed transaction when it becomes available. These documents can be obtained free of charge from the sources indicated below.

**Additional Information and Where to Find It**

In connection with the transaction described herein, HSAC has filed and will file relevant materials with the SEC, including a proxy statement on Schedule 14A. Promptly after filing its definitive proxy statement with the SEC, HSAC will mail the definitive proxy statement and a proxy card to each stockholder entitled to vote at the special meeting relating to the transaction. Investors and security holders of HSAC are urged to read these materials (including any amendments or supplements thereto) and any other relevant documents in connection with the transaction that HSAC will file with the SEC when they become available because they will contain important information about HSAC, Immunovant and the transaction. The preliminary proxy statement, the definitive proxy statement and other relevant materials in connection with the transaction (when they become available), and any other documents filed by HSAC with the SEC, may be obtained free of charge at the SEC's website (www.sec.gov) or by writing to HSAC at 412 West 15th Street, Floor 9. New York, NY 10011.

**Contacts:**

Sandeep Kulkarni, M.D.
Chief Operating Officer
Immunovant, Inc.
info@immunovant.com
Stephanie A. Sirota
Vice President of Corporate Strategy and Corporate Communications
Health Sciences Acquisitions Corporation
hsac@rtwfunds.com

**Exhibit 99.2**

**16**



## Corporate Overview

October 2019

This presentation has been prepared by Immunovant Sciences Ltd. ("we," "us," "our," "Immunovant" or the "Company") and contains forward-looking statements. In some cases, you can identify forward-looking statements by the words "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "objective," "ongoing," "plan," "potential," "predict," "project," "should," "will," and "would," or the negative of these terms, or other comparable terminology intended to identify statements about the future. These statements are based on management's current beliefs and expectations. These statements include but are not limited to statements regarding our business strategy, our plans to develop and commercialize our product candidates, our plans to enter into commercial transactions or strategic partnerships, the safety and efficacy of our product candidates, our expectations regarding timing, the design and results of clinical trials of our product candidates, our plans and expected timing with respect to regulatory filings and approvals, the size and growth potential of the markets for our product candidates, and our ability to serve those markets, and our plans and expected timing with respect to regulatory filings and approvals. These statements involve substantial known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from the information expressed or implied by these forward-looking statements. We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make as a result of various important factors, including, without limitation, those inherent in the preclinical and clinical development process and the regulatory approval process, the risks and uncertainties in commercialization and gaining market acceptance, the risks associated with protecting and defending our intellectual property rights, our reliance on third-parties to conduct clinical and preclinical trials, our reliance on third-party suppliers to manufacture clinical, preclinical and any future commercial supplies of our product candidates, increased regulatory requirements, our ability to provide the financial support and resources necessary to develop our product candidate on the expected timeline, our ability to identify and acquire or in-license new product candidates and competition from others developing products for similar uses. These statements are subject to the risk that clinical study data are subject to differing interpretations, and regulatory agencies, medical and scientific experts and others may not share our view of the clinical study data. There can be no assurance that the clinical programs for our product candidate will be successful in demonstrating safety and/or efficacy, that we will not encounter problems or delays in clinical development, or that any of our product candidates will ever receive regulatory approval or be successfully commercialized. The forward-looking statements in this presentation represent our views as of the date of this presentation. We anticipate that subsequent events and developments will cause our views to change. While we may elect to update these forward-looking statements at some point in the future, we have no current intention of doing so except to the extent required by applicable law. You should, therefore, not rely on these forward-looking statements as representing our views as of any date subsequent to the date of this presentation.

HSAC, Immunovant, and their respective directors, executive officers and employees and other persons may be deemed to be participants in the solicitation of proxies from the holders of HSAC common stock in respect of the proposed transaction. Information about HSAC's directors and executive officers and their ownership of HSAC's common stock is set forth in HSAC's Registration Statement filed on Form S-1 filed with the SEC on May 3, 2019, as modified or supplemented by any Form 3 or Form 4 filed with the SEC since the date of such filing. Other information regarding the interests of the participants in the proxy solicitation will be included in the proxy statement pertaining to the proposed transaction when it becomes available. These documents can be obtained free of charge from the sources indicated below.

In connection with the transaction described herein, HSAC has filed and will file relevant materials with the SEC, including a proxy statement on Schedule 14A. Promptly after filing its definitive proxy statement with the SEC, HSAC will mail the definitive proxy statement and a proxy card to each stockholder entitled to vote at the special meeting relating to the transaction. Investors and security holders of HSAC are urged to read these materials (including any amendments or supplements thereto) and any other relevant documents in connection with the transaction that HSAC will file with the SEC when they become available because they will contain important information about HSAC, Immunovant and the transaction. The preliminary proxy statement, the definitive proxy statement and other relevant materials in connection with the transaction (when they become available), and any other documents filed by HSAC with the SEC, may be obtained free of charge at the SEC's website (www.sec.gov) or by writing to HSAC at 412 West 15th Street, Floor 9. New York, NY 10011.

By attending or receiving this presentation you acknowledge that you will be solely responsible for your own assessment of the market and our market position and that you will conduct your own analysis and be solely responsible for forming your own view of the potential future performance of our business and the transactions. The information herein does not purport to be all-inclusive. The data and estimates contained herein was derived from various internal and external sources, and involves a number of assumptions and limitations. You are cautioned not to give undue weight to such data or estimates. Neither HSAC nor Immunovant nor any other person makes any representation as to the accuracy or completeness of such data or undertakes any obligation to update such data after the date of this presentation. This presentation does not constitute an offer to sell or the solicitation of an offer buy securities, nor is it a solicitation of any vote or approval of the transactions, nor will there be any sale of these securities in, any state or jurisdiction in which such offer, solicitation or sale would be unlawful. Any offering of securities or solicitation to vote regarding the proposed transactions described herein will be made only by means of a proxy statement on Schedule 14A filed with the SEC.

2

**17**



# Immunovant and HSAC to merge

| | |
|---|---|
| **TRANSACTION SUMMARY** | • Immunovant Sciences Ltd. ("Immunovant") and Health Sciences Acquisitions Corporation ("HSAC," Nasdaq: HSAC) have entered into a definitive business combination agreement<br>  – Immunovant is a clinical-stage biopharmaceutical company focused on enabling normal lives for patients with autoimmune diseases<br>  – HSAC is a special purpose acquisition company sponsored by RTW Investments<br>  – Upon the closing of the transactions, HSAC will change its name to **Immunovant, Inc.**<br>• Expected post transaction equity value of $556 million, assuming HSAC share price of $10/share and no redemptions from the HSAC shareholders<br>• Transaction expected to close in December 2019 |
| **PREMIER INVESTORS AND ALIGNMENT OF INTEREST** | • Provides Immunovant with a blue-chip investor base and cash resources to continue development of IMVT-1401, a compelling asset within the FcRn drug class<br>• Shareholders of the combined company expected to include Roivant Sciences, RTW Investments, and leading biotech investors including BVF Partners, Adage Capital Management, Cormorant Asset Management, Eventide Asset Management, and Perceptive Advisors |
| **USE OF PROCEEDS** | • At the time of closing, the combined company is expected to have more than $100 million in cash and cash equivalents, including proceeds from the completed $35 million private bridge financing<br>  – Funding expected to enable completion of Phase 2 program in myasthenia gravis, Graves' ophthalmopathy, and warm autoimmune hemolytic anemia<br>  – Expected to provide runway into second half of 2021 |
| **KEY MANAGEMENT AND BOARD** | • Combined company to be led by Immunovant Chief Executive Officer, Pete Salzmann, M.D., M.B.A.<br>• Anticipated directors: Frank Torti (Chairperson), Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, Myrtle Potter, Pete Salzmann |

 IMMUNOVANT

4

**19**

# At a glance: terms of transaction



| Pro forma valuation | | |
|---|---|---|
| Illustrative share price (per share) | $ | 10.00 |
| Non-redeemable shares outstanding[2] | | 55,575,000 |
| **Equity Value** | | **$ 555,750,000** |
| Cash provided by transaction | | $ 115,341,558[1] |

| Sources of funds | |
|---|---|
| HSAC Cash in Trust | $115,341,558[1] |
| Immunovant Shareholder Equity Rollover | $395,000,000 |
| Bridge Financing | $35,000,000 |
| Sponsor Promote | $10,750,000 |
| **Total Sources** | **$556,091,558** |

| Uses of funds | |
|---|---|
| Equity Issued to Immunovant Shareholders (inclusive of bridge financing) | $430,000,000 |
| Cash to Balance Sheet | $106,989,301[1] |
| Estimated Transaction Costs | $8,352,257 |
| Sponsor Promote | $10,750,000 |
| **Total Uses** | **$556,091,558** |

## Pro forma ownership with earn out to Immunovant and % total ownership

| | Pro forma share price, per share | | | | | |
|---|---|---|---|---|---|---|
| | $10.00 | | $17.50 | | $31.50 | |
| **Immunovant** | Shares | % | Shares | % | Shares | % |
| • Immunovant Shareholders and Employees[2] | 39,500,000 | | 40,688,136 | | 41,392,216 | |
| • Bridge Financing Investors | 3,500,000 | | 3,500,000 | | 3,500,000 | |
| • Earnout Shares, cumulative[3] | | | 10,000,000 | | 20,000,000 | |
| Immunovant Total | 43,000,000 | 77% | 54,188,136 | 78% | 64,892,216 | 78% |
| HSAC Sponsors[4] | 1,075,000 | 2% | 1,975,000 | 3% | 2,875,000 | 3% |
| HSAC Public Shareholders | 11,500,000 | 21% | 13,471,429[5] | 19% | 15,150,794[5] | 18% |
| **Pro Forma Diluted Shares Outstanding** | 55,575,000 | 100% | 69,634,565 | 100% | 82,918,010 | 100% |

 IMMUNOVANT

1. Assuming no redemptions from the HSAC shareholders
2. Calculated using $395M pre-money equity value, on a fully-diluted basis. Includes imputed dilution from employee stock options and 10,000 shares of Series A Preferred Stock. Roivant Sciences will receive shares of Series A Preferred Stock that provides for certain proportional voting rights for the election of directors.
3. Bridge investors and Immunovant current shareholders, but not employees, are entitled to receive a pro rata portion of earnouts.
4. 1.8M sponsor shares are cancelled at $10.00; 900,000 shares are cancelled at $17.50; no shares are cancelled at $31.50
5. Giving effect to warrant exercisable at $11.50 per share, using treasury stock method to calculate fully diluted shares outstanding

5

**20**



**21**



**Our vision:** Normal lives for patients with autoimmune diseases

**Our asset:** IMVT-1401, a novel, fully human monoclonal antibody inhibiting FcRn-mediated recycling of IgG

**Our strategy for IMVT-1401:**
- **Be best-in-class** in target indications where anti-FcRn mechanism has already established clinical proof-of-concept
- **Be first-in-class** in target indications with clear biologic rationale and no known in-class competition

**Our near-term value drivers:** Four anticipated data readouts over the next 20 months



7

**22**

# Immunovant Leadership

## Management Team



**Pete Salzmann, MD, MBA**
*Chief Executive Officer*





**Robert Zeldin, MD**
*Chief Medical Officer*





**Sandeep Kulkarni, MD**
*Chief Operating Officer*

 



**Brad Middlekauff, JD**
*General Counsel*



## Board

- **Frank Torti, MD, MBA** Immunovant Chairperson, Vant Investment Chair, Roivant Pharma
- **Myrtle Potter** Vant Operating Chair, Roivant Pharma
- **Andrew Fromkin**

- **Douglas Hughes**
- **George Migausky**
- **Atul Pande, MD**

 IMMUNOVANT

8

23

# IMVT-1401: Program Highlights

**IMVT-1401: A novel, fully human monoclonal antibody inhibiting FcRn**
- Early evidence suggests that anti-FcRn agents could transform the treatment of autoimmune diseases mediated by pathogenic IgG antibodies

**In Phase 1, IMVT-1401 generated compelling pharmacodynamic activity**
- Clinically meaningful IgG reductions observed (78% IgG reduction at 680mg dose level)
- No difference observed between intravenous and subcutaneous formulations at equivalent doses

**IMVT-1401 has been well tolerated to date**
- No headaches reported in the highest dose multiple dose cohort tested
- No treatment-related serious adverse events (SAEs) or dose limiting toxicities reported
- No confirmed cases of anti-drug antibodies in any subject in multiple dose cohorts

**IMVT-1401 was designed from inception for subcutaneous (SC) injection**
- Requirement during development process
- Phase 1 data suggest every other week or less frequent dosing achievable for chronic use

 IMMUNOVANT

9

**24**

# IMVT-1401: A Pipeline in a Product

| Target Indication | Pre-clinical | Phase 1 | Phase 2 | Phase 3 | Status |
|---|---|---|---|---|---|
| Myasthenia Gravis (MG) | ASCEND-MG | | | | • Phase 2a open for enrollment |
| Graves' Ophthalmopathy (GO) | ASCEND-GO | | | | • Phase 2a open for enrollment<br>• Phase 2b open for enrollment |
| Warm Autoimmune Hemolytic Anemia (WAIHA) | ASCEND-WAIHA | | | | • IND submission expected in 2H 2019 |

 IMMUNOVANT

10

**25**



26

# IgG antibodies implicated in certain autoimmune diseases

## Antibodies in healthy individuals

- Antibodies play an important role in immune defense against pathogens[1]
  - Clearing bacteria, viruses, and other harmful organisms and substances
  - Eliciting an immune response that leads to inflammation
- IgG antibody subclass accounts for ~75% of antibodies in the plasma of healthy people[1]

## Antibodies in autoimmune disease

- In many autoimmune diseases, IgG antibodies develop that can recognize and bind to normal tissues[2]
  - Targets may include cell-surface receptors or circulating proteins
  - Result is a harmful immune response that damages critical tissues and organs
- Predisposing factors may include genetic susceptibility, environmental triggers, and factors not yet known[3]



| IgG | IgE | IgD | IgA | IgM |

 IMMUNOVANT

1. Leusen J.H.W., The Role of IgG in Immune Responses. Molecular and Cellular Mechanisms of Antibody Activity, 2013
2. Isabela S., et al. The role of autoantibodies in health and disease. romanian journal of morphology and embryology, 2016
3. Mariani SM. Genes and autoimmune diseases - a complex inheritance. Med Gen Med, 2004

12

# IMVT-1401's mechanism shown to promote IgG degradation[1]

## FcRn prolongs the half-life of IgG[2]

- **FcRn intercepts IgG**, which would otherwise be degraded in lysosomes
- The FcRn–IgG complex is then recycled to the cell surface and free IgG is **released back into circulation**

## Inhibiting FcRn promotes IgG degradation[2]

- **IMVT-1401 binds to FcRn**, thereby preventing it from recycling IgG antibodies back to circulation
- As a result, IgG is **increasingly delivered to lysosomes** for degradation







 IMMUNOVANT

1. See Phase 1 MAD/SAD data on slide 16
2. Derry C., et al. FcRn: the neonatal Fc receptor comes of age. Nat Rev Immunol, 2007

13

**28**



# Broad range of potential applications for anti-FcRn mechanism

IgG-mediated autoimmune diseases where FcRn mechanism may be relevant:

| | | |
|---|---|---|
| Myasthenia Gravis | Graves' Ophthalmopathy | Warm Autoimmune Hemolytic Anemia |
| Chronic Inflammatory Demyelinating Polyneuropathy | Neuromyelitis Optica | Idiopathic Thrombocytopenic Purpura |
| Guillain-Barré Syndrome | PLA2R+ Membranous Nephropathy | Pemphigus Vulgaris |

Additional IgG-mediated autoimmune diseases

Note: List of diseases is illustrative only and does not necessarily represent our targeted indications

IMMUNOVANT

14

**29**



# IMVT-1401 produced clinically meaningful IgG reductions in Phase 1 study

**Preliminary results from Phase 1 SAD/MAD cohorts**

**Single-dose administration produced dose-dependent IgG reductions**

**Repeat dosing at 680mg SC resulted in a 78% IgG reduction without the need for IV induction**

Mean total IgG reduction after single dose in healthy volunteers



Mean total IgG reduction after 4 weekly doses in healthy volunteers





16

**31**



# Generally well-tolerated in Phase 1 study

**Preliminary results from Phase 1 SAD/MAD cohorts**

- 99 subjects dosed to date through SAD and MAD portions of Phase 1
    - IMVT-1401: 77 subjects
    - Placebo: 22 subjects
- Most common AEs were mild erythema and swelling at injection site
    - Injection site reactions were not dose or frequency related
    - Occurred at similar incidence for drug and placebo treated subjects
- No headaches observed in 680mg SC MAD cohort
- Albumin changes:
    - Dose-dependent, reversible, and asymptomatic albumin reductions observed
    - At day 28, mean albumin levels were 37.5 g/L in the 340 mg cohort, and 32.4 g/L in 680mg cohort (normal range 36-51 g/L)
- 2 SAEs observed in two separate SAD cohorts, both ruled unrelated to treatment by study investigator (cancer, appendicitis)
- Treatment-emergent ADA confirmed in 8% of IMVT-1401-treated subjects and 6% of placebo-treated subjects
    - No subject in MAD cohorts has developed a confirmed ADA response to IMVT-1401

 IMMUNOVANT

18

**33**

# Adverse events reported in Phase 1

## Preliminary results from Phase 1 SAD/MAD cohorts

| MedDRA Preferred Term | Single-Ascending Dose | | | | | | | | | | | | | Multiple-Ascending Dose | | |
| | Intravenous Infusion | | | | | | Subcutaneous Injection | | | | | | | Subcutaneous Injection | | |
| | 0.1 mg/kg n=4 | 100 mg n=6 | 340 mg n=6 | 765 mg n=6 | 1530 mg n=6 | Placebo n=8 | 0.5 mg/kg n=3 | 1.5 mg/kg n=6 | 5 mg/kg n=6 | 340 mg n=6 | 500 mg n=6 | 765 mg n=6 | Placebo n=10 | 340 mg n=8 | 680 mg n=8 | Placebo n=4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abdominal pain | | | | | | | | | 1 | | | | | 1 | | |
| Abdominal pain upper | | | | | | | | | | | | | 2 | 1 | | |
| Abnormal sensation in eye | | | | 1 | | | | | | 1 | | | | | | |
| Back pain | | | | | | 2 | | | | | 1 | | 1 | 1 | | |
| Constipation | | | | | | 1 | | | | | | | | 1 | | |
| Cough | | | | | | | | | | | 1 | | 2 | | | |
| Diarrhea | | | | | | | | | | | | | | 2 | | |
| Dizziness | | | | | | 1 | | | | | | | 1 | | | 1 |
| Dry skin | | | | | | | | | | | | | 1 | | 1 | |
| Erythema | | | | | | | 1 | | | | | | | | 1 | |
| Fatigue | 1 | | | 1 | 1 | 1 | 1 | | | 1 | | | 1 | | | |
| Headache | 1 | 1 | 1 | 1 | 1 | | | 1 | 1 | 4 | 1 | | 1 | 2 | | |
| Injection site erythema | | | | | | | | | 5 | 1 | 5 | 6 | 7 | 8 | 7 | 4 |
| Injection site pain | | | | | | | | | | | 1 | | | 2 | | 1 |
| Injection site swelling | | | | | | | | | 3 | | 2 | 4 | 3 | 7 | 6 | 2 |
| Insomnia | | | | | | | | | 1 | | | | | 4 | | |
| Myalgia | | | | | | | | | | | | | | 1 | 1 | |
| Nasal congestion | | | | | | | | | 1 | | 1 | | 1 | 1 | | |
| Nausea | | | | | | | | | 1 | 1 | | | 1 | | 1 | 1 |
| Ocular hyperaemia | | | | | | | | | | | | | | | 2 | |
| Oropharyngeal pain | 1 | | | 1 | 2 | | | | 1 | | 1 | | 1 | 2 | | |
| Pain in extremity | | | | | 1 | | | | | | | | 1 | | | |
| Procedural complication | | | | | | | | 1 | | 1 | | | | | | |
| Procedural dizziness | | | | | 2 | | | | | | 1 | | | | | |
| Pyrexia | | 1 | 1 | | | | | | 1 | | | | | | | |
| Rash | | | | | 2 | | | | 2 | | | | 2 | | 1 | |
| Rhinorrhea | | | | | | | | | 1 | | | | 2 | | | |
| Sinusitis | | | 1 | | | | | | | | | | 1 | | | |
| Somnolence | | 1 | | | | | | | 1 | | | | | | | |
| Upper respiratory tract infection | 1 | 1 | 1 | | | | 3 | | 1 | 1 | | | | 1 | | |
| Vision blurred | | | | 1 | | | | | | 1 | | | | | | |



19

34

# IMVT-1401 has been given as a convenient SC injection

35















20

**35**

# IMVT-1401 designed from inception to be a potentially class-leading SC injection

- Fully human monoclonal antibody
- Generated from Ligand/OMT's OmniAb transgenic rat platform
    - >400 antibody campaigns ongoing that use OmniAb technology[1]
    - 12 clinical-stage antibodies in development[1]
- IgG1 backbone Fc-engineered to reduce effector function
- Optimized for SC delivery
    - Current clinic formulation is 170mg/mL
    - Delivered by 27-gauge needle





IMVT-1401

IMMUNOVANT    1.    Ligand 2019 Analyst Day presentation, presented March 12, 2019    21

36

# IMVT-1401 has the potential to deliver a class-leading profile

| 𝖄 IMVT-1401 attribute | Potential patient benefit |
|---|---|
| Clinically meaningful IgG reductions | • 680mg SC weekly: 78% reduction after four doses<br>• 340mg SC weekly: 63% reduction after four doses |
| SC injection | • Fast and minimally invasive |
| Simple dosing schedule | • No requirement for IV induction doses or lengthy SC infusions<br>• Provides option for at-home administration<br>• Fixed dosing, vs. weight-based, reduces potential for dose miscalculations |
| Fully human antibody | • Low risk of immunogenicity |
| Fc-engineered to reduce effector function | • Low potential for unintended immune responses |

𝖄 IMMUNOVANT

22

**37**

# IMVT-1401 and competitors' programs with subcutaneous (SC) injection or infusion

| Company |  IMMUNOVANT | argenx | ucb | ALEXION affibody | MOMENTA | ALEXION syntimmune |
|---|---|---|---|---|---|---|
| Anti-FcRn candidate | IMVT-1401 | Efgartigimod (ARGX-113) | Rozanolixizumab (UCB7665) | ABY-039 | M281 | ALXN1830 (SYNT001) |
| SC administration regimen | SC injection | IV induction, followed by SC injection[1] | SC infusion given over 30-60 minutes[3,4] | SC injection | Not in clinic with SC formulation | Not in clinic with SC formulation |
| IV induction dosing | N/A | 20mg/kg IV x 2 doses[1] | N/A | N/A | | |
| SC dose | 340mg SC weekly 680mg SC weekly | 300mg SC weekly[1] | 7mg/kg SC weekly[5] | 200mg SC single dose[6] | | |
| Mean IgG reduction observed | 63-78% after 4 doses | "Approximately" 50% after two IV induction doses followed by 8 SC doses[2] | 56% after 3 doses[5] 68% after 6 doses[5] | ~45% | | |

Note: data as of 9/24/2019 and is not based on head to head comparison studies

IMMUNOVANT

1. Argenx, corporate presentation, August 2018
2. Argenx, press release, issued June 14, 2018
3. Kiessling P. et al, The FcRn inhibitor rozanolixizumab reduces human serum IgG concentration: A randomized phase 1 study Science Translational Medicine, 2017
4. UCB, ASH presentation, December 2017
5. UCB, press release, issued October 18, 2018
6. Affibody, PEGS conference presentation, April 2019

23



39

# Myasthenia Gravis overview

- Rare autoimmune disorder affecting an estimated 65,000 people in the US[1]

- Characterized by weakness of voluntary muscles including ocular, facial, oropharyngeal, limb, and respiratory muscles[1]

- 15-20% of MG patients will experience at least one myasthenic crisis over their lifetimes, a potentially life threatening acute complication[2]

- Disease caused by autoantibodies targeting the neuromuscular junction (NMJ)[1]

- ~93% of patients have an identified autoantibody[1]

  - Anti-acetylcholine receptor (AChR) antibodies (~85%)

  - Anti-muscle-specific tyrosine kinase (MuSK) antibodies (~8%)



 IMMUNOVANT

1. Meriggioli M.N. & Sanders D.B. Muscle autoantibodies in myasthenia gravis: beyond diagnosis? Expert Rev Clin Immunol, 2012
2. Sudulagunta S.R. et al. Refractory myasthenia gravis – clinical profile, comorbidities and response to rituximab. Ger Med Sci., 2016

25

**40**

# Unmet need persists despite availability of treatment options

## Current treatment paradigm[1]

| 1st Line | 2nd Line | 3rd Line | 4th Line |
|---|---|---|---|
| • Acetylcholinesterase inhibitors<br>• Corticosteroids | • Immunosuppressive agents<br>• Thymectomy | • IVIg<br>• Plasma exchange<br>• Immunoadsorption<br>• Rituximab (off-label) | • Eculizumab |

## Unmet need

- ~10% of MG patients refractory to current treatments, while 80% fail to achieve complete stable remission[1]

- Existing therapies associated with significant side effects
    - Early line agents can lead to disease exacerbation and do not always prevent disease progression
    - Treatment for more advanced disease often requires invasive and burdensome infusions

- Patients with anti-MuSK antibodies more likely to become refractory[1]
    - ~50% of the refractory MG population, despite comprising <10% of the overall MG population
    - Newest treatment option, eculizumab, only indicated for anti-AChR positive patients



IMMUNOVANT    1: Mantegazza R & Antozzi C. When myasthenia gravis is deemed refractory: clinical signposts and treatment strategies. Ther Adv Neurol Disord., 2018

26

41







42

43



**43**

# Graves' Ophthalmopathy overview

- Also called Graves' orbitopathy or thyroid eye disease (TED)
- 15,000-20,000 patients with active GO in the United States per year
- Clinical features[1]:
    - Proptosis
    - Eye pain
    - Double vision
    - Light sensitivity
- Can be sight-threatening[2]
- Caused by autoantibodies that activate cell types present in tissues surrounding the eye[2]
- Close temporal and pathobiologic relationship with Graves' disease



Bahn, 2010
Figure 1. Patients with Graves' Ophthalmopathy
Panel A shows a 58-year-old woman with excess proptosis, moderate eyelid edema, and erythema with moderate eyelid retraction affecting all four eyelids. Conjunctival chemosis (edema) and erythema with bilateral edema of the caruncles, with prolapse of the right caruncle, are evident. Panel B shows a 40-year old woman with excess proptosis, minimal bilateral injection, and chemosis with slight erythema of the eyelids. She also had evidence, on slit-lamp examination, of moderate superior limbic keratoconjunctivitis.

 IMMUNOVANT

1. Davies T & Burch HB. Clinical features and diagnosis of Graves' orbitopathy (ophthalmopathy), UpToDate, 2018
2. McAlinden C. An overview of thyroid eye disease. Eye and Vision, 2014

29

# Anti-TSHR autoantibodies drive progression of GO and Graves' disease

## Graves' ophthalmopathy



Inflammation and proliferation

## Graves' disease



Thyroid hormone production

- Thyroid-stimulating hormone receptor (TSHR) highly expressed on ocular fibroblasts and adipocytes[1]

- Activation leads to inflammation and proliferation

- Autoantibodies against Insulin-like growth factor-1 receptor (IGF-1R) also identified[2]

- TSHR highly expressed on thyrocytes (cells that make up the thyroid gland)[3]

- Activation leads to increased production of thyroid hormone[3]

**IMVT-1401 could address GO and Graves' disease caused by any IgG autoantibody, whether against TSHR or IGF-1R**

 IMMUNOVANT

1. Smith T.J., et al. Role of IGF-1 pathway in the pathogenesis of Graves' orbitopathy. Best Pract Res Clin Endocrinol Metab. 2013
2. Liaboe C.A., et al. An Introductory Tutorial and Overview of Disease - Thyroid Eye Disease (TED), 2016
3. Varewijck A.J., et al. Circulating IgGs may modulate IGF-I receptor stimulating activity in a subset of patients with Graves' ophthalmopathy. J Clin Endocrinol Metab., 2013

30

45



# GO characterized by an active phase, followed by a static phase

Rundle's Curve describes natural history of disease[1]



- Orbital tissue actively inflamed
- Steroids and other immunosuppressive treatments can be effective

- Inflammatory tissue replaced by fibrotic tissue
- Steroids and immunosuppression no longer effective
- Patients to be evaluated for surgery

IMMUNOVANT    1.  Adapted from Hiromatsu Y., et al. Graves' ophthalmopathy: epidemiology and natural history. Intern Med., 2014    31

46

# Limited treatment options for GO

**Current treatment paradigm[1]**

| 1st Line | 2nd Line | 3rd Line | Inactive disease |
|---|---|---|---|
| • Corticosteroids | • Orbital radiotherapy<br>• Immunosuppressive agents | • Rituximab (off-label) | • Orbital surgery |

**Unmet need**

- Currently no FDA-approved therapies for GO
- Corticosteroids are not effective in all patients, and approximately one-third of patients will relapse
- Sight-threatening disease may occur in 3-5% of patients with Graves' disease[2]
    - Medical emergency requiring immediate hospitalization and evaluation for surgery[2]
- Up to 20% of GO patients require surgical invervention[2]



IMMUNOVANT    1. Bothun E.D., et al. Update on thyroid eye disease and management. Clin Ophthalmol., 2009
2. Bartalena L., et al. Management of Graves' Ophthalmopathy: Reality and Perspectives. Endocrine Reviews, 2000

32

47

# ASCEND-GO Phase 2 clinical program



| ASCEND-GO 1 | ASCEND-GO 2 |
|---|---|

- **Phase 2a**
  - Trial ongoing in Canada
  - Single arm, open label
  - N=8
  - 6 weeks of dosing
    - 680mg weekly x 2 doses
    - 340mg weekly x 4 doses

- **Phase 2b**
  - Trial ongoing in USA and Europe
  - Double masked, placebo controlled, randomized
  - N=77
  - 3 drug arms vs placebo
  - 12 weeks of dosing

 IMMUNOVANT

33

**48**



# ASCEND-GO 1: Phase 2a study design



# ASCEND-GO 2: Phase 2b study design



| Screening | Treatment | Follow-up |
|---|---|---|

**Key Inclusion Criteria:**
- Moderate-to-severe active GO
- Clinical activity score (CAS) ≥4
- Anti-TSHR antibody positive

IMVT-1401 680mg SC
N = 22

IMVT-1401 340mg SC
N = 22

IMVT-1401 255mg SC
N = 11

Placebo
N = 22

| 3-6 weeks | 12 weeks | 8 weeks |
|---|---|---|

**Primary Endpoint:**
- Proptosis responder rate
- Safety & tolerability

**Secondary Endpoints:**
- CAS responder rate
- Change from baseline levels of anti-TSHR antibodies, total IgG, and IgG by subclasses

**Exploratory Endpoints:**
- Biomarkers (gene expression, serum pro-inflammatory markers, receptor occupancy)
- CT scans

IMMUNOVANT

35

50



51

# Warm Autoimmune Hemolytic Anemia overview



- Blood disorder marked by red blood cell destruction

- Estimated prevalence of 42,000 patients in US and 66,000 patients in EU[1]

- Presentation typically non-specific and occurs over several weeks to months

    - Fatigue, weakness, skin pallor, shortness of breath

- Severe cases can be fatal[2]



1. Park S.H. Diagnosis and treatment of autoimmune hemolytic anemia: classic approach and recent advances. Blood Res., 2016
2. Roumier M., et al. Characteristics and outcome of warm autoimmune hemolytic anemia in adults: new insights based on a single-center experience with 60 patients. Am J Hematol., 2014

37

52

# Limited options for treating WAIHA

### Current treatment paradigm[1,2]

| 1st Line | 2nd Line | 3rd Line | 4th Line |
|---|---|---|---|
| • Corticosteroids<br>• RBC transfusion | • Immunosuppressive agents | • Rituximab (off-label) | • Splenectomy |

### Unmet need

- Currently no FDA-approved therapies for WAIHA

- Only one-third of all patients maintain sustained disease control once steroids are discontinued

  - Majority of patients will require either long-term steroid treatment or additional therapies[1]

- No clear guidelines on choice of treatment in patients failing treatment with corticosteroids

- RBC transfusions are indicated in patients who require immediate stabilization, despite the fact that autoantibodies present in WAIHA patients may react against RBCs in the transfusion product[1,2]



1. Salama A. Treatment Options for Primary Autoimmune Hemolytic Anemia; A Short Comprehensive Review. Transfus Med Hemother., 2015
2. Park S.H. Diagnosis and treatment of autoimmune hemolytic anemia: classic approach and recent advances. Blood Res., 2016

38

53



# ASCEND-WAIHA: Phase 2 study design



| Screening | Treatment | Follow-up |
| --- | --- | --- |

**Key Inclusion Criteria:**
- Primary or secondary WAIHA
- Direct Antiglobulin Test (DAT) positive
- Failed or intolerant to least 1 prior treatment
- Stable on any current therapies

IMVT-1401 680 mg
N = 8

IMVT-1401 340 mg
N = 8

4 weeks | 12 weeks | 8 weeks



**Primary Endpoint:**
- Hemoglobin response rate*
- Safety & Tolerability

**Secondary Endpoints:**
- Change in hemoglobin, LDH, bilirubin, & haptoglobin
- Time to response
- QOL measures
- PK/PD
- Anti-drug antibody levels

**Exploratory Endpoints:**
- Biomarkers (gene expression, serum pro-inflammatory markers, receptor occupancy)

IMMUNOVANT     * Defined as hemoglobin level ≥10 g/dL with at least a ≥2 g/dL increase from baseline     39

54



**55**

**55**



**Our vision:** Normal lives for patients with autoimmune diseases

**Our asset:** IMVT-1401, a novel, fully human monoclonal antibody inhibiting FcRn-mediated recycling of IgG

**Our strategy for IMVT-1401:**
- **Be best-in-class** in target indications where anti-FcRn mechanism has already established clinical proof-of-concept
- **Be first-in-class** in target indications with clear biologic rationale and no known in-class competition

**Our near-term value drivers:** Four anticipated data readouts over the next 20 months

 IMMUNOVANT

41

**56**

**57**

# IMVT-1401: Multiple anticipated near-term value inflection points

**MG**
- ☑ Phase 2a open for enrollment
  - ☐ Top-line results of Phase 2a study expected in 1H 2020
- ☐ Pivotal Phase 3 study initiation expected in 2020

**GO**
- ☑ Phase 2a open for enrollment
  - ☐ Initial results of Phase 2a study in Q1 2020
- ☑ Phase 2b proof-of-concept study open for enrollment
  - ☐ Top-line results of Phase 2b study expected in early 2021

**WAIHA**
- ☐ IND submission expected in 2H 2019

Ψ IMMUNOVANT

42

**57**

58



**58**