# Exhibit B

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant  £

Filed by a Party other than the Registrant  £

Check the appropriate box:

£   Preliminary Proxy Statement

£   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

S   Definitive Proxy Statement

£   Definitive Additional Materials

£   Soliciting Material under §240.14a-12

# HEALTH SCIENCES ACQUISITIONS CORPORATION

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

£   No fee required.

£   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   (1)   Title of each class of securities to which transaction applies:
     Common stock, par value $0.0001 per share

   (2)   Aggregate number of securities to which transaction applies:
     43,000,000 shares of Common Stock

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
     The proposed maximum aggregate value of the transaction was calculated based on $9.96 per share (the average of the high and low prices reported on the Nasdaq Capital Market on September 25, 2019).

   (4)   Proposed maximum aggregate value of transaction:
     $428,280,000

   (5)   Total fee paid:
     $55,590.74

S   Fee paid previously with preliminary materials.

£   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)   Amount Previously Paid:

   (2)   Form, Schedule or Registration Statement No.:

   (3)   Filing Party:

   (4)   Date Filed:

**PROXY STATEMENT FOR SPECIAL MEETING OF STOCKHOLDERS
OF HEALTH SCIENCES ACQUISITIONS CORPORATION**

Proxy Statement dated November 27, 2019
and first mailed to stockholders on or about November 29, 2019

Dear Stockholders:

You are cordially invited to attend the special meeting of the stockholders of Health Sciences Acquisitions Corporation ("HSAC"). HSAC is a Delaware blank check company established for the purpose of entering into a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization or similar business combination with one or more businesses or entities, which we refer to as a "target business."

Holders of shares of HSAC's common stock ("HSAC Shares") will be asked to approve, among other things, the share exchange agreement, dated as of September 29, 2019 (the "Share Exchange Agreement"), by and among HSAC, Immunovant Sciences Ltd., a Bermuda exempted limited company ("Immunovant"), the stockholders of Immunovant (the "Sellers") and Roivant Sciences Ltd., a Bermuda exempted limited company, as representative of the Sellers, and the other related proposals. As of the date of the Share Exchange Agreement, the Sellers owned 100% of the issued and outstanding common shares of Immunovant ("Immunovant Shares").

Upon the closing of the transactions contemplated in the Share Exchange Agreement, HSAC will acquire 100% of the issued and outstanding Immunovant Shares, in exchange for approximately 42,180,277 HSAC Shares, and Immunovant will become a wholly owned subsidiary of HSAC. Upon closing of the transactions, HSAC will change its name to "Immunovant, Inc." The transactions contemplated under the Share Exchange Agreement relating to the business combination are referred to in this proxy statement as the "Business Combination" and the combined company after the Business Combination is referred to in this proxy statement as the "Combined Company."

The Sellers are entitled to receive up to an additional 20,000,000 HSAC Shares (the "Earnout Shares") after the closing of the Business Combination if the volume-weighted average price of the HSAC Shares equals or exceeds the following prices for any 20 trading days within any 30 trading-day period (the "Trading Period") following the closing: (1) during any Trading Period prior to March 31, 2023, 10,000,000 Earnout Shares upon achievement of a volume-weighted average price of at least $17.50 per share; and (2) during any Trading Period prior to March 31, 2025, 10,000,000 Earnout Shares upon achievement of a volume-weighted average price of at least $31.50 per share. In the event that after closing of the Business Combination and prior to March 31, 2025, (i) there is a change of control of HSAC, (ii) any liquidation, dissolution or winding up of HSAC is initiated, (iii) any bankruptcy, dissolution or liquidation proceeding is instituted by or against HSAC, or (iv) HSAC makes an assignment for the benefit of creditors or consents to the appointment of a custodian, receiver or trustee for all or substantial part of its assets or properties, then any Earnout Shares that have not been previously issued by HSAC (whether or not previously earned) shall be deemed earned and due by HSAC to the Sellers, unless in a change of control, the value of the consideration to be received in exchange for a HSAC Share is lower than the share price thresholds described above.

As of September 30, 2019, there was approximately $116,024,698 in HSAC's trust account (the "Trust Account"). On November 20, 2019, the record date for the special meeting of stockholders, the last sale price of the HSAC Shares was $10.35.

Each stockholder's vote is very important. Whether or not you plan to attend the HSAC special meeting in person, please submit your proxy card without delay. Stockholders may revoke proxies at any time before they are voted at the meeting. Voting by proxy will not prevent a shareholder from voting in person if such shareholder subsequently chooses to attend the HSAC special meeting.

**We encourage you to read this proxy statement carefully. In particular, you should review the matters discussed under the caption "Risk Factors" beginning on page 19.**

**HSAC's board of directors unanimously recommends that HSAC stockholders vote "FOR" approval of each of the proposals.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities to be issued in the Business Combination or otherwise, or passed upon the adequacy or accuracy of this proxy statement. Any representation to the contrary is a criminal offense.**

/s/ Roderick Wong

Roderick Wong, M.D.

Chief Executive Officer

Health Sciences Acquisitions Corporation

November 27, 2019

HOW TO OBTAIN ADDITIONAL INFORMATION

This proxy statement incorporates important business and financial information about HSAC that is not included or delivered herewith. If you would like to receive additional information or if you want additional copies of this document, agreements contained in the appendices or any other documents filed by HSAC with the Securities and Exchange Commission, such information is available without charge upon written or oral request. Please contact the following:

**412 West 15th Street, Floor 9**
**New York, NY 10011**
**Telephone: (646) 593-7999**

If you would like to request documents, please do so no later than December 11, 2019 to receive them before HSAC's special meeting. Please be sure to include your complete name and address in your request. Please see "Where You Can Find Additional Information" to find out where you can find more information about HSAC and Immunovant. You should rely only on the information contained in this proxy statement in deciding how to vote on the Business Combination. Neither HSAC nor Immunovant has authorized anyone to give any information or to make any representations other than those contained in this proxy statement. Do not rely upon any information or representations made outside of this proxy statement. The information contained in this proxy statement may change after the date of this proxy statement. Do not assume after the date of this proxy statement that the information contained in this proxy statement is still correct.

**HEALTH SCIENCES ACQUISITIONS CORPORATION**

**412 West 15th Street, Floor 9**
**New York, NY 10011**
**Telephone: (646) 593-7999**

**NOTICE OF SPECIAL MEETING OF**
**HEALTH SCIENCES ACQUISITIONS CORPORATION STOCKHOLDERS**
**To Be Held on December 16, 2019**

To Health Sciences Acquisitions Corporation ("HSAC") Stockholders:

A special meeting of stockholders of HSAC will be held at Loeb & Loeb LLP, 345 Park Avenue, New York, NY 10154, on December 16, 2019, at 10:00 a.m., for the following purposes:

- To approve the transactions contemplated under the Share Exchange Agreement, dated as of September 29, 2019 (the "Share Exchange Agreement"), by and among HSAC, Immunovant Sciences Ltd., a Bermuda exempted limited company, the stockholders of Immunovant (the "Sellers") and Roivant Sciences Ltd., a Bermuda exempted limited company, as representative of the Sellers (the "Business Combination"). This proposal is referred to as the "Business Combination Proposal" or "Proposal No. 1."

- To approve separate proposals to amend HSAC's current Amended and Restated Certificate of Incorporation as set forth in the Second Amended and Restated Certificate of Incorporation of HSAC appended to this proxy statement as <u>Annex B</u> (the "Amended Charter") to adopt certain material changes to be in effect upon the consummation of the Business Combination. These proposals are collectively referred to as the "Amendment Proposal" or "Proposal No. 2."

- To approve the issuance of more than 20% of the issued and outstanding shares of HSAC's common stock ("HSAC Shares") pursuant to the terms of the Share Exchange Agreement, which will result in a change of control, as required by Nasdaq Listing Rules 5635(a), (b) and (d). This proposal is referred to as the "Nasdaq Proposal" or "Proposal No. 3."

- To approve the 2019 HSAC Equity Incentive Plan. This proposal is referred to as the "Equity Incentive Plan Proposal" or "Proposal No. 4."

- To approve the adjournment of the special meeting for the purpose of soliciting additional proxies in favor of the approval of the Business Combination in the event HSAC does not receive the requisite shareholder vote to approve the Business Combination. This proposal is called the "Business Combination Adjournment Proposal" or "Proposal No. 5."

Proposals Nos. 1 through 5 are collectively referred to herein as the "Proposals."

As of November 20, 2019, there were 14,375,000 HSAC Shares issued and outstanding and entitled to vote. Only HSAC stockholders who hold HSAC Shares of record as of the close of business on November 20, 2019 are entitled to vote at the special meeting or any adjournment of the special meeting. This proxy statement is first being mailed to HSAC stockholders on or about November 29, 2019. Approval of the Business Combination Proposal, the Nasdaq Proposal, the Equity Incentive Plan Proposal and the Business Combination Adjournment Proposal will each require the affirmative vote of the holders of a majority of the issued and outstanding HSAC Shares present and entitled to vote at the special meeting or any adjournment thereof. Approval of the Amendment Proposal will require the affirmative vote of a majority of the issued and outstanding HSAC Shares. Attending the special meeting either in person or by proxy and abstaining from voting will have the same effect as voting against all the Proposals and, assuming a quorum is present, broker non-votes will have no effect on the Proposals other than the Amendment Proposal, for which it will have the same effect as voting against the proposal.

Holders of HSAC Shares will not be entitled to appraisal rights under Delaware law in connection with the Business Combination.

Whether or not you plan to attend the special meeting in person, please submit your proxy card without delay. Voting by proxy will not prevent you from voting your HSAC Shares in person if you subsequently choose to attend the special meeting. If you fail to return your proxy card and do not attend the meeting in person, the effect will be that your HSAC Shares will not be counted for purposes of determining whether a quorum is present at the special meeting. You may revoke a proxy at any time before it is voted at the special meeting by executing and returning a proxy card dated later than the previous one, by attending the special meeting in person and casting your vote by ballot or by submitting a written revocation to Health Sciences Acquisitions Corporation, 412 West 15th Street, Floor 9, New York, NY 10011, (646) 593-7999, that is received by us before we take the vote at the special meeting. If you hold your HSAC Shares through a bank or brokerage firm, you should follow the instructions of your bank or brokerage firm regarding revocation of proxies.

**HSAC's board of directors unanimously recommends that HSAC stockholders vote "FOR" approval of each of the Proposals.**

By order of the Board of Directors,

/s/ Roderick Wong

Roderick Wong, M.D.

Chief Executive Officer

Health Sciences Acquisitions Corporation

November 27, 2019

**THE SHARE EXCHANGE AGREEMENT**

*The following is a summary of the material provisions of the Share Exchange Agreement and the related agreements entered or to be entered into in connection therewith, copies of which are attached as <u>Annex A</u> to this proxy statement. You are encouraged to read the Share Exchange Agreement, including the exhibits attached thereto, in its entirety for a more complete description of the terms and conditions of the Business Combination.*

*The representations, warranties and covenants contained in the Share Exchange Agreement were made only for purposes of that agreement and as of specific dates, were solely for the benefit of the parties to the Share Exchange Agreement, and may be subject to limitations agreed upon by the contracting parties, including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the parties to the Share Exchange Agreement instead of establishing these matters as facts, and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Accordingly, you should not rely on the representations and warranties as characterizations of the actual state of affairs of HSAC without considering the entirety of public disclosure about HSAC as set forth in HSAC's SEC filings. Moreover, information concerning the subject matter of the representations and warranties may change after the date of the Share Exchange Agreement, which subsequent information may or may not be fully reflected in this proxy statement or in other public disclosures by HSAC.*

**Business Combination with Immunovant; Acquisition Consideration**

On September 29, 2019, HSAC entered into a Share Exchange Agreement with Immunovant, the Sellers and the Sellers' Representative. As of the date of the Share Exchange Agreement, the Sellers owned 100% of the issued and outstanding Immunovant Shares. Upon the closing of the transactions contemplated in the Share Exchange Agreement, HSAC will acquire all of the Sellers' Immunovant Shares for the consideration described below, and Immunovant will become a wholly owned subsidiary of HSAC. Upon the closing of the transactions, HSAC will change its name to "Immunovant, Inc."

Upon the closing of the Business Combination, the Sellers will sell to HSAC, and HSAC will purchase from the Sellers, all of the issued and outstanding Immunovant Shares and other equity interests in and of Immunovant, and HSAC will issue 42,180,277 HSAC Shares to the Sellers, including 10,000 shares of Series A Preferred Stock of HSAC issued to RSL, subject to pre-closing adjustment for certain indebtedness of Immunovant (other than indebtedness convertible into Immunovant capital stock). The issuance of HSAC Shares to the Sellers is being consummated on a private placement basis, pursuant to Section 4(a)(2) of the Securities Act. The aggregate value of the consideration to be paid by HSAC in the Business Combination is $421,802,770 (calculated as follows: 42,180,277 HSAC Shares to be issued to the Sellers, multiplied by $10.00 (the deemed value of the shares in the Share Exchange Agreement).

The Sellers are entitled to receive up to an additional 20,000,000 Earnout Shares after the closing of the Business Combination if the volume-weighted average price of the HSAC Shares equals or exceeds the following prices for the Trading Period following the closing: (1) during any Trading Period prior to March 31, 2023, 10,000,000 Earnout Shares upon achievement of a volume-weighted average price of at least $17.50 per share; and (2) during any Trading Period prior to March 31, 2025, 10,000,000 Earnout Shares upon achievement of a volume-weighted average price of at least $31.50 per share. In the event that after closing of the Business Combination and prior to March 31, 2025, (i) there is a change of control of HSAC, (ii) any liquidation, dissolution or winding up of HSAC is initiated, (iii) any bankruptcy, dissolution or liquidation proceeding is instituted by or against HSAC, or (iv) HSAC makes an assignment for the benefit of creditors or consents to the appointment of a custodian, receiver or trustee for all or substantial part of its assets or properties, then any Earnout Shares that have not been previously issued by HSAC (whether or not previously earned) shall be deemed earned and due by HSAC to the Sellers, unless in a change of control, the value of the consideration to be received in exchange for a HSAC Share is lower than the applicable Milestone share price thresholds described above.

In addition, on the closing date of the Business Combination, each option to purchase Immunovant capital stock (each, a "Company Option") that is outstanding under Immunovant's equity incentive plan immediately prior to the closing of the Business Combination, and each option or restricted stock units, whether vested or unvested, will, automatically and without any required action on the part of any holder or beneficiary thereof, be assumed by HSAC and converted into an option to purchase HSAC Shares (each, a "Converted Option"), subject to pre-closing

97

adjustment for certain indebtedness of Immunovant (other than indebtedness convertible into Immunovant capital stock). Each Converted Option shall continue to have and be subject to substantially the same terms and conditions as were applicable to such Company Option immediately before the Closing (including expiration date, vesting conditions, and exercise provisions).

We refer to this transaction as the "Business Combination."

**Representations and Warranties**

In the Share Exchange Agreement, Immunovant makes certain representations and warranties (with certain exceptions set forth in the disclosure schedule to the Share Exchange Agreement) relating to, among other things: (a) proper corporate organization of Immunovant and its subsidiaries and similar corporate matters; (b) authorization, execution, delivery and enforceability of the Agreement and other transaction documents; (c) absence of conflicts; (d) capital structure; (e) accuracy of charter documents and corporate records; (f) related-party transactions; (g) required consents and approvals; (h) financial information; (i) absence of certain changes or events; (j) title to assets and properties; (k) material contracts; (l) insurance; (m) licenses and permits; (n) compliance with laws, including those relating to foreign corrupt practices and money laundering; (o) ownership of intellectual property; (p) employees; (q) employment and, labor and compensation matters; (r) taxes and audits; (s) environmental matters; (t) brokers and finders; (u) that Immunovant is in compliance with FDA regulations; and (v) pre-clinical development and clinical trials; (w) litigation; (x) real property; and (y) other customary representations and warranties.

In the Share Exchange Agreement, HSAC makes certain representations and warranties relating to, among other things: (a) title to shares capitalization; (b) proper corporate organization and similar corporate matters; (c) authorization, execution, delivery and enforceability of the Agreement and other transaction documents; (d) brokers and finders; (e) capital structure; (f) validity of share issuance; (g) minimum trust fund amount; (g) validity of Nasdaq Stock Market listing; (h) SEC filing requirements and financial statements; (i) compliance with laws, including those relating to foreign corrupt practices and money laundering; (j) absence of certain changes or events; (k) properties; (l) material contracts; (m) insurance and; (n) taxes, (o) absence of conflicts, (p) board approval and (q) employees and employee benefit plans.

The representation and warranties contained in the Share Exchange Agreement will not survive the closing of the Share Exchange, other than for the sole purpose of recovery under the representation and warranty insurance policy further described below.

**Conduct Prior to Closing; Covenants**

Immunovant has agreed to operate its business in the ordinary course prior to the closing of the Business Combination (with certain exceptions) and not to take certain specified actions without the prior written consent of HSAC (which shall not be unreasonably withheld, conditioned or delayed).

HSAC has agreed to operate its business in the ordinary course prior to the closing of the Business Combination (with certain exceptions) and not to take certain specified actions without the prior written consent of Immunovant.

The Agreement also contains certain customary covenants, including covenants relating to:

- Each of HSAC and Immunovant providing the other with applicable financial statements.

- HSAC appropriately disbursing the funds in the Trust Account at the closing of the Business Combination.

- Each of HSAC and Immunovant agreed not to solicit, maintain or recommend an alternative transaction by changing the board recommendation.

- The filing of applicable notification pursuant to the Hart Scott Rodino Act.

Neither Immunovant nor HSAC is allowed to enter into a financing transaction or any agreement relating to the sale of such party's assets or equity securities, or a merger or change of control agreement with respect to such party or its assets, without the prior written consent of the other party, other than certain Immunovant permitted financings and licensing by Immunovant in the ordinary course of business.

In addition, the parties agreed to take the following actions, among others, before the completion of the Business Combination:

- Filing a proxy statement relating to the business combination with the SEC.

- The post transaction company filing a registration statement with the SEC within 30 days after the closing of the Business Combination.

**Representation and Warranty Insurance**

In conjunction with entering into the Share Exchange Agreement, HSAC bound a representation and warranty insurance policy concurrently with executing the Share Exchange Agreement. The insurance policy is being provided by Indian Harbor Insurance Company with a policy limit of $10 million and an initial retention amount equal to approximately $0.9 million.

**Conditions to Closing**

*General Conditions*

Consummation of the Transaction is conditioned upon, among other things:

- no applicable law or Order (as defined in the Share Exchange Agreement) that restrains, prohibits or imposes any condition on the consummation of the closing of the Business Combination shall be in force;

- no Action being brought by any governmental Authority to enjoin or otherwise restrict the consummation of the closing of the Business Combination;

- any waiting period under the HSR Act relating to the Transaction shall have expired or been terminated; and

- the transaction expenses of each of HSAC and Immunovant shall have been paid.

*Immunovant's Conditions to Closing*

The obligation of Immunovant to consummate the Business Combination, in addition to the conditions described above, are conditioned upon, among other things, each of the following:

- HSAC having performed in all material respects with its obligations required to be performed by it in the Agreement at or prior to closing of the Business Combination;

- the representations and warranties of HSAC being true and correct on and as of the closing of the Business Combination as if made at and as of such time (except for representations and warranties that speak as of a specific date prior to the closing of the Business Combination, in which case such representations and warranties need only be true and correct as of such earlier date);

- HSAC shall have caused the Sponsor to forfeit or cancel its 10,000,000 Private Warrants;

- HSAC shall have an amount in cash equal to at least $65.0 million, which such amount shall include funds remaining in the Purchaser's Trust Account (net of any redemptions of Purchaser Common Stock);

- HSAC shall have received Nasdaq approval for listing;

- the Amended and Restated Certificate of Incorporation of HSAC shall have been amended and restated in the form of the Amended Charter appended to this proxy statement as Annex B; and

- HSAC shall have received stockholder approval of the Proposals.

99

*HSAC's Conditions to Closing*

The obligations of HSAC to consummate the transactions contemplated by the Share Exchange Agreement, in addition to the conditions described above in the first paragraph of this section, are conditioned upon, among other things, each of the following:

- Immunovant having performed in all material respects its obligations required to be performed by it in the Share Exchange Agreement at or prior to closing of the Business Combination;

- the representations and warranties of Immunovant being true and correct on and as of the closing of the Business Combination as if made at and as of such time (except for representations and warranties that speak as of a specific date prior to the closing of the Business Combination, in which case such representations and warranties need only be true and correct as of such earlier date); provided, that this condition shall be deemed satisfied unless any and all inaccuracies in such representations and warranties, in the aggregate, result in a Material Adverse Effect, in each case without giving effect to any limitation as to materiality or Material Adverse Effect set forth therein;

- there shall have not occurred and be continuing any Material Adverse Effect (as defined in the Share Exchange Agreement) on Immunovant and its subsidiaries;

- HSAC shall have received Schedules (as defined in the Share Exchange Agreement) updated as of the date the Business Combination is consummated; and

- the effectiveness of the representations and warranties insurance policy pursuant to its terms.

**Termination**

The Share Exchange Agreement may be terminated and/or abandoned at any time prior to the closing of the Business Combination, whether before or after approval of the Proposals being presented to HSAC's stockholders, by:

- HSAC or Immunovant, if the Closing has not occurred on or prior to January 31, 2020 (the "Outside Closing Date"); provided, however, that a party shall not be permitted to provide notice of termination if the failure of the closing to occur prior to the Outside Closing Date is attributable to the failure on the part of such party to perform in any material respect any covenant or obligation in the Share Exchange Agreement required to be performed by such party;

- HSAC or Immunovant, in the event an governmental authority shall have issued an order, having the effect of permanently restraining, enjoining or otherwise prohibiting the Share Exchange, which order is final and non-appealable; provided, however, that a party shall not be permitted to so terminate if such event is attributable to the failure on the part of such party to perform in any material respect any covenant or obligation in the Share Exchange Agreement required to be performed by such party;

- HSAC or Immunovant, in the event that HSAC fails to receive the approvals on the Proposals at the HSAC special meeting (subject to any adjournment or recess of such special meeting); provided that HSAC shall not be permitted to terminate if the failure to obtain such approval is proximately caused by any action or failure to act of HSAC that constitutes a breach of the Share Exchange Agreement;

- the mutual written agreement of Immunovant and HSAC;

- HSAC, if: (i) Immunovant shall have breached any representation, warranty, agreement or covenant contained in the Share Exchange Agreement to be performed on or prior to the Outside Closing Date, which has rendered the satisfaction of any of the applicable closing conditions impossible; and (ii) such breach shall not be cured by the earlier of the Outside Closing Date and thirty (30) days following receipt by Immunovant of a written notice from HSAC describing in reasonable detail the nature of such breach, except HSAC will not be allowed to so terminate if it is then in material breach of any representation, warranty, agreement or covenant;

- Immunovant, if: (i) HSAC shall have breached any of its covenants, agreements, representations, and warranties contained herein to be performed on or prior to the Outside Closing Date, which has rendered the satisfaction of any of the applicable closing conditions impossible; and (ii) such breach shall not

100

be cured by the earlier of the Outside Closing Date and thirty (30) days following receipt by HSAC of a written notice from Immunovant describing in reasonable detail the nature of such breach, except Immunovant will not be allowed to so terminate if it is then in material breach of any representation, warranty, agreement or covenant; or

- Immunovant or HSAC, if a Triggering Event with respect to the other party shall have occurred. A "Triggering Event" shall include (a) a change of board recommendation, (b) HSAC failing to convene or hold the HSAC stockholder meeting, (c) breach of the non-solicitation clause and (d) failure of the HSAC board to reaffirm the its recommendation under certain circumstances.

**Effect of Termination**

In the event of termination of the Share Exchange Agreement by either HSAC or Immunovant, all further obligations of the parties shall terminate, other than for liability of any party for common law fraud.

**Related Agreements**

***Sponsor Restricted Stock Agreement***

In accordance with the Sponsor Restricted Stock Agreement, by and between HSAC and the Sponsor, the Sponsor has agreed that, concurrently with the closing of the Business Combination, the Sponsor will (a) forfeit a number of HSAC Shares equal to: (A) 1,800,000, *multiplied b*y (B) (i) the number of HSAC Shares validly redeemed by holders thereof in connection with the Business Combination as reflected in the records of the Company's transfer agent, *divided b*y (ii) 11,500,000 (such number of shares, the "Cancelled Shares"), and (b) subject a number of HSAC shares equal to 1,800,000 minus the Cancelled Shares (the "Sponsor Earnout Shares") to potential forfeiture in the event that the Milestones are not achieved. In the event of an Acceleration Event, all of the Sponsor Earnout Shares shall vest and no longer be subject to forfeiture, unless in a change of control, the value of the consideration to be received in exchange for a HSAC Share is lower than the applicable Milestone share price thresholds described above. Any Sponsor Earnout Shares that have not vested on or prior to March 31, 2025 will be forfeited by the Sponsor after such date.

***Lock-Up Agreements***

Each Immunovant stockholder has entered into a Lock-up Agreement with HSAC, in substantially the form attached to the Share Exchange Agreement, with respect to their HSAC Shares (or any securities convertible into, or exchangeable for, or representing the rights to receive HSAC Shares) to be received by it in the Business Combination or during the Lock-up Period (as defined below) (such shares, the "Lock-up Shares"). In such Lock-up Agreement, each Immunovant stockholder has agreed that during the Lock-up Period, it will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any Lock-up Shares), enter into a transaction that would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of Lock-up Shares, whether any of these transactions are to be settled by delivery of any Lock-up Shares, in cash or otherwise, publicly disclose the intention to make any offer, sale, pledge or disposition, or to enter into any transaction, swap, hedge or other arrangement, or engage in any short sales with respect to any security of HSAC.

The "Lock-up Period" means: (i) with respect to 50% of the Lock-up Shares, the shorter of (A) the period commencing on the date of closing of the Business Combination and ending on the date that is six months thereafter; and (B) the period commencing on the date of the closing of the Business Combination and ending on the date on which the last reported closing price of the HSAC Shares on the Nasdaq Capital Market (or such other exchange on which the HSAC Shares are then listed) equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations and recapitalizations) for any 20 trading days during any 30 trading day period thereafter; and (ii) with respect to the remaining 50% of the Lock-up Shares, the period commencing on the date of the closing of the Business Combination and ending on the date that is six months thereafter. In addition, if within six months after the date of the closing of the Business Combination, there is a Change of Control (as defined in the Share Exchange Agreement), then upon the consummation of such Change of Control, all Lock-up Shares shall be released from the foregoing restrictions.

Notwithstanding these restrictions, Immunovant stockholders will be permitted to make transfers or distributions to current or former general or limited partners, managers or members, stockholders, other equity holders or direct or indirect affiliates or to the estates of any of the foregoing; by bona fide gift to a member of such stockholder's immediate family or to a trust, the beneficiary of which is the stockholder or a member of the stockholder's immediate family for estate planning purposes; by virtue of the laws of descent and distribution upon death of the Holder; or pursuant to a qualified domestic relations order, in each case where such transferee agrees to be bound by the terms of a Lock-up Agreement.

### *Registration Rights Agreement*

HSAC and Immunovant stockholders and the Sponsor have entered into the Registration Rights Agreement. Under the Registration Rights Agreement, the Immunovant stockholders and the Sponsor will hold registration rights that obligate HSAC to register for resale under the Securities Act, all or any portion of the HSAC Shares issued under the Share Exchange Agreement, including any Earnout Payments, as well as HSAC Shares held by the Sponsor. Each of the Sponsor and Sellers' Representative, as well as the stockholders holding a majority-in-interest of all such registrable securities will be entitled to make a written demand for registration under the Securities Act of all or part of the their registrable securities, so long as such shares are not then restricted under the Lock-Up Agreement. Subject to certain exceptions, if any time after the closing of the Business Combination, the Combined Company proposes to file a registration statement under the Securities Act with respect to its securities, under the Registration Rights Agreement, the Combined Company shall give notice to the Immunovant stockholders and the Sponsor as to the proposed filing and offer such stockholders an opportunity to register the sale of such number of their registrable securities as they request in writing. In addition, subject to certain exceptions, such stockholders will be entitled under the Registration Rights Agreement to request in writing that HSAC register the resale of any or all of their registrable securities on Form S-3 and any similar short-form registration statement that may be available at such time.

Under the Registration Rights Agreement, HSAC has agreed to indemnify such stockholders and certain persons or entities related to such stockholders against any losses or damages resulting from any untrue statement or omission of a material fact in any registration statement or prospectus pursuant to which they sell registrable securities, unless such liability arose from their misstatement or omission, and such stockholders including registrable securities in any registration statement or prospectus will agree to indemnify the Combined Company and certain persons or entities related to HSAC against all losses caused by their misstatements or omissions in those documents.

### *Other Agreements*

As of the Record Date, HSAC had entered into voting agreements with holders of 4,547,000 HSAC Shares pursuant to which such stockholders, including but not limited to the RTW Entities, Perceptive Advisors, Adage Capital Management, Cormorant Asset Management, and Eventide Asset Management, LLC, agreed to vote in favor of the transactions contemplated by the Share Exchange Agreement and to not redeem or sell their shares.

In addition, as of the Record Date, HSAC had entered into agreements with other investors that agreed to purchase up to 2,374,400 HSAC Shares at HSAC's request and not to redeem such HSAC Shares in connection with the closing of the Business Combination.

**Annex A**

**SHARE EXCHANGE AGREEMENT**

**dated**

**September 29, 2019**

**by and among**

**Immunovant Sciences Ltd., a Bermuda exempted limited company,**

**the stockholders of the Company,**

**Roivant Sciences Ltd., a Bermuda exempted limited company,**

**and**

**Health Sciences Acquisitions Corporation, a Delaware corporation**

receiver is appointed for the Purchaser or a substantial part of its assets or properties, or (iv) the Purchaser makes an assignment for the benefit of creditors, or petitions or applies to any Authority for, or consents or acquiesces to, the appointment of a custodian, receiver or trustee for all or substantially all of its assets or properties (each of clauses (i) through (iv), an "Acceleration Event"), then any Earnout Shares that have not been previously issued by the Purchaser (whether or not previously earned), shall be deemed earned and due by the Purchaser to the Stockholders upon such Acceleration Event unless, in the case of an Acceleration Event that is a Change of Control, the Earnout Shares for Milestone #1 or Milestone #2 shall not be accelerated if the value of the consideration to be received in exchange for a share of Purchaser Common Stock in such Change of Control is lower than the applicable stock price threshold set forth in Section 3.3(a) for Milestone #1 and Milestone #2, respectively. For purposes hereof, a "Change of Control" means the occurrence in a single transaction or as a result of a series of related transactions, of one or more of the following events: (i) a merger, consolidation, reorganization or similar business combination transaction involving the Purchaser in which the holders of all of the outstanding equity interests of the Purchaser immediately prior to the consummation of such transaction do not directly own, beneficially or of record, immediately upon the consummation of such transaction, outstanding equity interests that represent a majority of the combined outstanding voting securities of the surviving entity in such transaction or a parent of the surviving entity in such transaction; (ii) a transaction in which a majority of the Purchaser's voting securities are transferred to any Person, or any two more Persons acting as a group, and all Affiliates of such Person or Persons (each, a "Group") or (iii) the consummation of the sale of substantially all of the assets of the Purchaser to any Person or Group.

(d)     All distributions of Purchaser Common Stock with respect to the Earnout Shares during the Earnout Period, including, but not limited to, shares of Purchaser Common Stock issued as a result of a stock dividend, stock split, combination of shares or otherwise, shall be deemed to be Earnout Shares and shall be set aside and not issued until the Earnout Shares have been issued to the Stockholders or, if the Earnout Shares are not earned and issued, then all such distributions declared during the Earnout Period shall be forfeited.

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except (a) as set forth in the Disclosure Schedule or (b) set forth in the Proxy Statement, the Company hereby represents and warrants to the Purchaser that each of the following representations and warranties are true, correct and complete as of the date of this Agreement and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be so true, correct and complete as of such earlier date).

4.1     Corporate Existence and Power. The Company is an exempted limited company duly incorporated, validly existing and in good standing under the Laws of Bermuda. The Company has all power and authority, corporate and otherwise, and all governmental licenses, franchises, Permits, authorizations, consents and approvals required to own and operate its properties and assets and to carry on the Business as presently conducted and as proposed to be conducted. The Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its Business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect. Other than this Agreement and the transactions contemplated thereby, there is no Contract to which the Company is a party in respect of any merger, consolidation, sale of all or substantially all of its assets, reorganization, recapitalization, dissolution or liquidation.

4.2     Authorization. The execution, delivery and performance by the Company of this Agreement and the Additional Agreements and the consummation by the Company of the transactions contemplated hereby and thereby are within the corporate powers of the Company and have been duly authorized by all necessary action on the part of the Company. Assuming due authorization, execution and delivery by each other party hereto and to the Additional Agreements, this Agreement constitutes, and, upon their execution and delivery, each of the Additional Agreements will constitute, a valid and legally binding agreement of the Company enforceable against the Company in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

4.3     Governmental Authorization. Except for filings under the HSR Act or any other applicable Laws relating to antitrust and except for the requirement for permission of the Bermuda Monetary Authority under the Exchange Control Act 1972 of Bermuda and related regulations, neither the execution, delivery nor performance