UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————— x

THERESA PITMAN, Individually and on
Behalf of All Others Similarly Situated,

                        Plaintiff,

      vs.

IMMUNOVANT, INC. f/k/a HEALTH
SCIENCES ACQUISITIONS
CORPORATION, RODERICK WONG,
PETER SALZMANN, FRANK M. TORTI,
ANDREW FROMKIN, DOUGLAS HUGHES,
GEORGE MIGAUSKY, ATUL PANDE,
ERIC VENKER, SVB LEERINK LLC,
LIFESCI CAPITAL LLC, CHARDAN
CAPITAL MARKETS LLC, GUGGENHEIM
SECURITIES, LLC, ROBERT W. BAIRD &
CO. INCORPORATED, and ROIVANT
SCIENCES LTD.,

                    Defendants.

——————————————————————— x

: Civil Action No. 1:21-cv-00918-KAM-VMS
:
: CLASS ACTION
:
: PLAINTIFF'S OMNIBUS OPPOSITION TO
: DEFENDANTS' MOTIONS TO DISMISS
: THE SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ....................................................................................1

II.  STATEMENT OF FACTS ........................................................................................3

    A.   The Company and Its Business ...................................................................3

    B.   Background of HSAC and Its Merger with Legacy Immunovant .........................4

    C.   Immunovant Was Required to Assess the Safety of IMVT-1401 Before and During Clinical Trials ...................................................................................6

    D.   A Reasonable Investor Would Have Expected: (i) IMVT-1401 Clinical Trials to Monitor Important Potential Risks, Such as Cholesterol; and (ii) that Statements about IMVT-1401 Clinical Trials Were Based on an Assessment of Important Potential Risks, Such as Cholesterol ...........................7

    E.   Defendants Misrepresented and Omitted Material Facts About IMVT-1401 ...........................................................................................................8

    F.   Defendants' False and Misleading Statements and Material Omissions Caused an Artificial Inflation in the Price of Immunovant Stock .........................8

    G.   Immunovant Reveals Elevations in Cholesterol in an IMVT-1401 Clinical Trial, Immunovant Stock Declines, and Immunovant Develops a New Drug as an Alternative to IMVT-1401 ..................................................9

III. ARGUMENT ........................................................................................................10

    A.   Legal Standard on a Motion to Dismiss ............................................................10

    B.   The SAC Alleges Numerous Reliable Facts Showing Elevated Cholesterol Was an Important Potential Risk of IMVT-1401 ...............................11

        1.   The Allegations Showing Substantial Cholesterol Increases in IMVT-1401's Animal Studies Are Particularized and Reliable ..............13

        2.   Scientific Literature Put Immunovant on Notice that IMVT-1401 Could Impact Cholesterol and Increase the Risk of Cardiovascular Disease ..........................................................................16

        3.   The Monitoring of Cholesterol by Immunovant Competitors Put Defendants on Notice that Elevated Cholesterol Was a Potential Risk ..........................................................................19

C.      Defendants' Alternative Version of the Facts Are Inappropriate for a Motion to Dismiss and Should Be Stricken by the Court ....................................20

D.      The SAC States Claims Under the Exchange Act ...............................................24

    1.      Legal Standard ........................................................................................24

    2.      The SAC Pleads Defendants' Fraud with Particularity ...........................24

    3.      The SAC Adequately Alleges Defendants Issued Materially False and Misleading Statements and Omitted Material Information...............26

    4.      Defendants' Materially False and Misleading Statements and Omissions Are Actionable ......................................................................27

        a.      The SAC Pleads Actionable Misstatements and Omissions Regarding IMVT-1401 and Its Clinical Trial Results .................29

        b.      The SAC Pleads Actionable Misstatements and Omissions Regarding the Impact of Albumin Reductions and the Existence of Studies Indicating Albumin Reductions Elevate Cholesterol ......................................................................34

        c.      The SAC Pleads Actionable Misstatements and Omissions Regarding Immunovant's Compliance with GCP and the Focus of IMVT-1401's Clinical Trials ......................................37

        d.      The SAC Pleads Actionable Misstatements and Omissions Regarding IMVT's Nonclinical Animal Studies .........................42

    5.      Defendants' Arguments Challenging the Adequacy of the Alleged Misrepresentations and Omissions Are Without Merit ..........................43

        a.      This Action Does Not Relate to a Disagreement About Immunovant's Clinical Trial Design ...........................................43

        b.      Defendants' Statements Are Not Nonactionable Opinion Statements .................................................................................48

        c.      Defendants' Statements Are Not Nonactionable Puffery ..............51

        d.      Defendants' Misrepresentations Are Not Protected by the Bespeaks Caution Doctrine or the PSLRA Safe Harbor ..............53

    6.      Plaintiff Adequately Alleges Scienter ....................................................54

        a.      The Exchange Act Defendants Acted with Conscious Misbehavior or Recklessness ..................................................55

- ii -

b.    The SAC Adequately Alleges Defendants' Motive and Opportunity.................................................................63

7.    Plaintiff Adequately Alleges Scheme Liability.......................................67

E.    The SAC Adequately Alleges Defendants Violated Items 303 and 105 of Regulation S-K ...............................................................................................69

1.    Defendants Violated Item 303 ...............................................................69

2.    Defendants Violated Item 105 ...............................................................72

F.    The SAC States Claims Under the Securities Act ...............................................74

1.    The Legal Standards for Stating a Claim Under the Securities Act..........74

2.    The Sept. 2020 Offering Documents Contained Untrue Statements of Material Fact and Omitted to Disclose Material Information..............75

3.    The Securities Act Defendants Were Under a Duty to Disclose the Omitted Facts ........................................................................................76

4.    The Securities Act Claims Do Not Sound in Fraud ................................77

G.    Defendants' Purported Cautionary Language Was Inadequate...........................78

H.    The SAC States Control Person Claims Under Sections 15 of the Securities Act and 20(a) of the Exchange Act.....................................................80

1.    Roivant's Control over Immunovant Cannot Seriously Be Disputed .......81

a.    The SAC Alleges a Primary Violation Against Roivant...............81

b.    The SAC Adequately Alleges Roivant Is Liable Under Sections 15 and 20(a) .................................................................82

I.    Leave to Replead .................................................................................................84

IV.    CONCLUSION .................................................................................................................85

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abely v. Aeterna Zentaris Inc.*,
2013 WL 2399869
(S.D.N.Y. May 29, 2013) ...................................................................................45

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ........................................................................*passim*

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F. 4th 145 (2d Cir. 2021) ...................................................................... 12, 15

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ...............................................................................11

*Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ......................................................................... 39, 49

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ............................................................................67-68

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................11

*Benny v. City of Long Beach*,
2021 U.S. Dist. LEXIS 182305
(E.D.N.Y. Sept. 23, 2021) ...................................................................................22

*Bishins v. Cleanspark, Inc.*,
2023 U.S. Dist. LEXIS 2100
(S.D.N.Y. Jan. 5, 2023) .......................................................................................79

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021) .................................................................83

*Brennan v. Zafgen, Inc.*,
199 F. Supp. 3d 444 (D. Mass. 2016)..................................................................62

*Bricklayers & Masons Loc. No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)..................................................................52

*Chambers v. Time Warner*,
   282 F.3d 147 (2d Cir. 2002) ........................................................................................21

*Christine Asia Co. Ltd. v. Ma*,
   718 F. App'x 20 (2d Cir. 2017) ....................................................................................62

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
   957 F. Supp. 2d 277 (S.D.N.Y. 2013)...........................................................................23

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
   2022 WL 4491093
   (S.D. Cal. Sept. 27, 2022)............................................................................................16

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
   2010 U.S. Dist. LEXIS 107729
   (S.D.N.Y. Sept. 29, 2010).............................................................................................83

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)......................................................................55, 60

*City of Providence v. Aeropostale, Inc.*,
   2013 U.S. Dist. LEXIS 44948
   (S.D.N.Y. Mar. 25, 2013) .........................................................................................14, 15

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020).............................................................................54

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
   2020 WL 248729
   (S.D.N.Y. Jan. 15, 2020) ...............................................................................................27

*Crowell v. Ionics, Inc.*,
   343 F. Supp. 2d 1 (D. Mass. 2004) ...............................................................................64

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012)............................................................................80

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ..........................................................................................63

*Ellenburg v. JA Solar Holdings Co. Ltd.*,
   2010 WL 1983375
   (S.D.N.Y. May 17, 2010) ...............................................................................................57

*Employees' Retirement System of the City of Baton Rouge & Parish of East Baton Rouge v. MacroGenics, Inc.*,
   61 F.4th 369 (4th Cir. 2023) ..........................................................................................45

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ..........................................................................13

*Fidel v. AK Steel Holding Corp.*,
    2002 WL 31545952
    (S.D. Ohio Sept. 19, 2002) .............................................................................28

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015) ...........................................................................17

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................. 28, 56, 78

*Gagnon v. Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019) ..............................................................21

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ............................................................... 25, 52, 63

*Gauquie v. Albany Molecular Rsch., Inc.*,
    2016 U.S. Dist. LEXIS 97295
    (E.D.N.Y. July 26, 2016)................................................................................57

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..............................................................66

*Glazer Cap. Mgmt., L.P. v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ..........................................................................81

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016) ...........................................................................21

*Guevoura Fund v. Sillerman*,
    2016 U.S. Dist. LEXIS 128076
    (S.D.N.Y. Sept. 12, 2016)......................................................................... 67, 68

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) .......................................................................................24

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus.*,
    2022 U.S. Dist. LEXIS 54272
    (E.D. Pa. Mar. 25, 2022)................................................................................60

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008)..........................................................58-59

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ................................................................................. 74, 75

*Hutchins v. NBTY, Inc.*,
2012 WL 1078823
(E.D.N.Y. Mar. 30, 2012) ............................................................................................58

*In re Acadia Pharms. Inc. Sec. Litig.*,
2020 U.S. Dist. LEXIS 95464
(S.D. Cal. June 1, 2020) ...............................................................................................22

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
398 F. Supp. 2d 244 (S.D.N.Y. 2005) ..........................................................................83

*In re Adolor Corp. Securities Litigation*,
616 F. Supp. 2d 551 (E.D. Pa. 2009) ...........................................................................45

*In re Am. Int'l Grp., Inc.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010) ..........................................................................73

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) ..........................................................................57

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010) ..........................................................................81

*In re Barrick Gold Sec. Litig.*,
2015 WL 1514597
(S.D.N.Y. Apr. 1, 2015) ...............................................................................................60

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ..........................................................................81

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017) ............................................................................52

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
2020 WL 1950783
(E.D.N.Y. Apr. 22, 2020) .............................................................................................71

*In re Cassava Scis., Inc. Sec. Litig.*,
2023 U.S. Dist. LEXIS 82417
(W.D. Tex. May 11, 2023) ............................................................................................65

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
586 F. Supp. 3d 199 (E.D.N.Y. 2022) ..........................................................................71

*In re CPI Card Grp. Inc. Sec. Litig.*,
2017 WL 4941597
(S.D.N.Y. Oct. 27, 2017) ..............................................................................................70

*In re Delcath Sys. Inc. Sec. Litig.*,
  36 F. Supp. 3d 320 (S.D.N.Y. 2014) ...................................................................29

*In re EDAP TMS S.A. Sec. Litig.*,
  2015 WL 5326166
  (S.D.N.Y. Sept. 14, 2015) ...................................................................................49

*In re Evci Colls. Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006) ...................................................................13

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) .................................................................74

*In re Fibrogen, Inc. Sec. Litig.*,
  2022 WL 2793032
  (N.D. Cal. July 15, 2022) ..............................................................................54, 66

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) .................................................................57

*In re Henry Schein, Inc. Sec. Litig.*,
  2019 WL 8638851
  (E.D.N.Y. Sept. 27, 2019) .............................................................................53, 59

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
  236 F. Supp. 3d 824 (S.D.N.Y. 2017) .................................................................74

*In re Keryx Biopharmaceuticals, Inc. Securities Litigation*,
  2014 WL 585658
  (S.D.N.Y. Feb. 14, 2014) ...................................................................................44

*In re Lehman Brothers Mortg.-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011) ........................................................................78, 82

*In re MELA Scis., Inc. Sec. Litig.*,
  2012 WL 4466604
  (S.D.N.Y. Sept. 19, 2012) ...................................................................................49

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ...........................................................54, 73

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) .................................................................58

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ...............................................................................74

*In re NIO Sec. Litig.*,
  2021 U.S. Dist. LEXIS 152311
  (E.D.N.Y. Aug. 12, 2021)................................................................................78, 80

*In re Novan, Inc.*,
  2018 WL 6732990
  (M.D.N.C. Nov. 30, 2018)..........................................................................................45

*In re Pall Corp.*,
  2009 WL 3111777
  (E.D.N.Y. Sept. 21, 2009) ..........................................................................................56

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)........................................................................52

*In re Pfizer Inc. Sec. Litig.*,
  584 F. Supp. 2d 621 (S.D.N.Y. 2008) ........................................................................19

*In re Ply Gem Holdings Sec. Litig.*,
  2016 WL 5339541
  (S.D.N.Y. Sept. 23, 2016)..........................................................................................73

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F.Supp. 68 (S.D.N.Y. 1996)................................................................................73

*In re QuantumScape Securities Class Action Litigation*,
  580 F. Supp. 3d (N.D. Cal. 2022) ........................................................................45, 46

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ........................................................................60

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
  697 F.3d 869 (9th Cir. 2012) ................................................................................44, 45

*In re Romeo Power Sec. Litig.*,
  2022 U.S. Dist. LEXIS 99005
  (S.D.N.Y. June 2, 2022) .............................................................................................67

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341
  (S.D.N.Y. Apr. 22, 2016) .....................................................................................*passim*

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015)..........................................................................49

*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011) ........................................................................49

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ...................................................................................24-25

*In re Sepracor, Inc., Sec. Litig.*,
  308 F. Supp. 2d 20 (D. Mass. 2004) ...........................................................................43

*In re Sibanye Gold Ltd. Sec. Litig.*,
  2020 WL 6582326
  (E.D.N.Y. Nov. 10. 2020) ...........................................................................................22

*In re Silvercrop Metals Sec. Litig.*,
  26 F. Supp. 3d 266 (S.D.N.Y. 2014) ...........................................................................67

*In re Sirrom Cap. Corp. Sec. Litig.*,
  84 F. Supp. 2d 933 (M.D. Tenn. 1999) ........................................................................28

*In re Symbol Techs., Inc. Sec. Litig.*,
  2013 WL 6330665
  (E.D.N.Y. Dec. 5, 2013) .........................................................................................53, 80

*In re Tenaris S.A. Sec. Litig.*,
  493 F. Supp. 3d 143 (E.D.N.Y. 2020)..........................................................................54

*In re Vicuron Pharms., Inc. Sec. Litig.*,
  2005 U.S. Dist. LEXIS 15613
  (E.D. Pa. July 1, 2005) ................................................................................................61

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ............................................................................ 25, 32, 53

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)..........................................................................20

*In re XL Fleet Corp. Sec. Litig.*,
  2022 WL 493629
  (S.D.N.Y. Feb. 17, 2022)........................................................................................67, 68

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) .....................................................................................62, 70

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
  14 F.4th 141 (2d Cir. 2021) .........................................................................................11

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020) .....................................................................................59, 63

*Janel World Trade, Ltd. v. World Logistics Servs., Inc.*,
  2009 U.S. Dist. LEXIS 30256
  (S.D.N.Y. Mar. 20, 2009) ........................................................................................26

*Jiangchen v. Rentech, Inc.*,
  2017 U.S. Dist. LEXIS 222743
  (C.D. Cal. Nov. 20, 2017)........................................................................................22

*Kassover v. Essence Partners*,
  2007 U.S. Dist. LEXIS 103845
  (E.D.N.Y. Mar. 31, 2007) ........................................................................................76

*Kramer v. Time Warner, Inc.*,
  937 F.2d 767 (2d Cir. 1991) ....................................................................................21

*Kusnier v. Virgin Galactic Holdings Inc.*,
  2022 U.S. Dist. LEXIS 202432
  (E.D.N.Y. Nov. 7, 2022)...................................................................................27, 47

*LeMatta v. Casper Sleep, Inc.*,
  2022 U.S. Dist. LEXIS 180015
  (E.D.N.Y. Sept. 30, 2022) ............................................................................ 71, 72, 76

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ....................................................................................74

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ..............................................................................59, 84

*Manavazian v. ATEC Grp., Inc.*,
  160 F. Supp. 2d 468 (E.D.N.Y. 2001)................................................................ 10, 25

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..................................................................................................25

*McKenzie v. Grand Cent. P'ship*,
  2016 U.S. Dist. LEXIS 39361
  (E.D.N.Y. Mar. 25, 2016)...................................................................................22, 23

*McMahan & Co. v. Wherehouse Ent. Inc.*,
  900 F.2d 576 (2d Cir. 1990) ....................................................................................25

*Meyer v. Concordia Int'l Corp.*,
  2017 U.S. Dist. LEXIS 119436
  (S.D.N.Y. July 28, 2017)..........................................................................................80

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014) ....................................................................................25

*Micholle v. Opthotech Corp.*,
  2019 U.S. Dist. LEXIS 160131
  (S.D.N.Y. Sept. 18, 2019)..................................................................................21

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
  2022 WL 17815767
  (2d Cir. Dec. 20, 2022).............................................................................34, 69

*Monec Holding AG v. Motorola Mobility, Inc.*,
  2014 U.S. Dist. LEXIS 123898
  (D. Del. Sept. 5, 2014)....................................................................................22

*Montoya v. Mamma.com, Inc.*,
  2006 U.S. Dist. LEXIS 13207
  (S.D.N.Y. Mar. 28, 2006) ..............................................................................26

*Nayani v. Lifestance Health Grp., Inc.*,
  2023 U.S. Dist. LEXIS 78411
  (S.D.N.Y. May 4, 2023) ....................................................................74, 80, 84

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ...........................................................................74

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ..........................................................................66

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .....................................................................*passim*

*Nutriband, Inc. v. Kalmar*,
  2020 U.S. Dist. LEXIS 126931
  (E.D.N.Y. July 20, 2020)..........................................................................*passim*

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)................................................................79

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...........................................................................48, 49, 50

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010) .............................................................................32

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012) ...........................................................................78

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
  2020 WL 5757628
  (S.D.N.Y. Sept. 27, 2020)...............................................................................72

*Pitman v. Immunovant, Inc.*,
  2023 U.S. Dist. LEXIS 24909
  (E.D.N.Y. Feb. 14, 2023) ................................................................................84

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) ...............................................................63

*Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*,
  2012 WL 601448
  (E.D.N.Y. Feb. 23, 2012) ................................................................................80

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) ..........................................................................57

*Puddu v. 6D Glob. Techs., Inc.*,
  2021 U.S. Dist. LEXIS 60905
  (S.D.N.Y. Mar. 30, 2021) ................................................................................66

*Raffaele v. City of N.Y.*,
  144 F. Supp. 3d 365 (E.D.N.Y. 2015)................................................................23

*Rex & Roberta Ling Living Tr. U/A Dec. 6, 1990 v. B Commc'ns Ltd.*,
  346 F. Supp. 3d 389 (S.D.N.Y. 2018) ...............................................................59

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ...................................................................... 11, 22

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ....................................................................43, 79

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018)................................................................29

*SEC v. China Ne. Petroleum Holdings Ltd.*,
  27 F. Supp. 3d 379 (S.D.N.Y. 2014).................................................................68

*SEC v. Glob. Inv. Strategy UK Ltd.*,
  2021 U.S. Dist. LEXIS 202592
  (S.D.N.Y. Oct. 19, 2021) ................................................................................20

*SEC v. Lek Sec. Corp.*,
  276 F. Supp. 3d 49 (S.D.N.Y. 2017).................................................................82

*SEC v. MiMedx Grp., Inc.*,
  2022 U.S. Dist. LEXIS 56055
  (S.D.N.Y. Mar. 28, 2022).................................................................................21

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ...............................................................................68

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010) ..............................................................62

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
  248 F. Supp. 3d 428 (S.D.N.Y. 2017) ...............................................................17

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  545 F. Supp. 3d 120 (S.D.N.Y. 2021) ...............................................................82

*Skiadas v. Acer Therapeutics Inc.*,
  2020 U.S. Dist. LEXIS 105814
  (S.D.N.Y. June 16, 2020) ..................................................................................67

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010) ..............................................................................54

*Smith v. Antares Pharma, Inc.*,
  2020 WL 2041752
  (D.N.J. Apr. 28, 2020) .......................................................................................49

*Stadnick v. Vivint Solar, Inc.*,
  861 F.3d 31 (2d Cir. 2017) ................................................................................71

*STMicroelectronics v. Credit Suisse Grp.*,
  775 F. Supp. 2d 525 (E.D.N.Y. 2011) ...............................................................82

*Tecku v. Yieldstreet, Inc.*,
  2022 WL 1322231
  (S.D.N.Y. May 3, 2022) .....................................................................................64

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .....................................................................................11, 55

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ..............................................................................49

*Uni-Sys., LLC v. U.S. Tennis Ass'n*,
  350 F. Supp. 3d 143 (E.D.N.Y. 2018) ...............................................................17

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ....................................................................................51-52

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013) ...............................................................57

*Wagner v. Royal Bank of Scot. Grp. PLC*,
   2013 U.S. Dist. LEXIS 127551
   (S.D.N.Y. Sept. 5, 2013)..................................................................................................23

*Wang v. Cloopen Grp. Holding Ltd.*,
   2023 U.S. Dist. LEXIS 44788
   (S.D.N.Y. Mar. 16, 2023) ..........................................................................................24, 60

*Wyeth v. Levine*,
   555 U.S. 555 (2009) .........................................................................................................19

*Yannes v. Scworx Corp.*,
   2021 U.S. Dist. LEXIS 116330
   (S.D.N.Y. June 21, 2021) .................................................................................................79

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77k......................................................................................................................................74
   §77k(a).................................................................................................................................74
   §77l(a)(2) ............................................................................................................................74
   §77o........................................................................................................................74, 80, 81
   §77o(a)..........................................................................................................................74, 80
   §78j(b) .........................................................................................................................24, 25, 67
   §78t(a)...................................................................................................................80, 81, 82, 83
   §78u-4..........................................................................................................................24, 26
   §78u-4(b)(2)(A) .................................................................................................................24
   §78u-4(b)(3)(B)..................................................................................................................24

Federal Rules of Civil Procedure
   Rule 8............................................................................................................................27, 78
   Rule 9(b) ...................................................................................................................*passim*
   Rule 12(b)(6)......................................................................................................................10
   Rule 15(a)(2).......................................................................................................................83
   Rule 56...............................................................................................................................21

17 C.F.R.
   §229.105 ..............................................................................................................................72
   §240.10b-5 ....................................................................................................................49, 67
   §240.10b-5(a)................................................................................................................25, 44
   §240.10b-5(b)..........................................................................................................24, 32, 81
   §240.10b-5(c)..........................................................................................................25, 44, 68

21 C.F.R.
   §312.32 .................................................................................................................6, 16, 20, 38

Private Securities Litigation Reform Act of 1995 ("PSLRA")
   Pub. L. No. 104-67, 109 Stat. 737 (1995) ........................................................................*passim*

**GLOSSARY OF ABBREVIATIONS AND DEFINED TERMS**

| | |
|---|---|
| ¶__ or ¶¶__-__ | Paragraphs in the SAC |
| AC | Plaintiff's Amended Complaint, filed on March 15, 2022 (ECF No. 44) |
| AEs | Adverse Events |
| App. A at No. __ | Immunovant Defendants' Appendix A attached to the Speers Decl., titled "Chart of Challenged Statements" |
| Class Period | The period October 2, 2019 through February 1, 2021, inclusive |
| CV disease | Cardiovascular disease |
| Defendants | Immunovant Defendants, Underwriter Defendants, and Roivant |
| Defendants' Motions to Dismiss | Immunovant Defendants' Motion to Dismiss the SAC and Supportive Papers, Underwriter Defendants' Motion to Dismiss the SAC and Supporting Papers, and Defendant Roivant's Motion to Dismiss the SAC and Supporting Papers |
| Disputed Exhibits | Defendants' Appendix A and Exhibits 4, 5, 6, and 13 |
| Exchange Act Claims | Plaintiff's claims under Sections 10(b) and Rule 10b-5, and 20(a) of the Securities Exchange Act of 1934 |
| Exchange Act Defendants | Immunovant, Peter Salzmann, Roderick Wong, and Roivant Sciences Ltd. |
| FDA | U.S. Food and Drug Administration |
| FE | Former Employee of Immunovant |
| GCP | Good Clinical Practices |
| GO | Graves' Opthalmopathy |
| HSAC | Health Sciences Acquisitions Corporation |
| Immunovant or the Company | Immunovant, Inc. |

- xvii -

| | |
|---|---|
| Immunovant Defendants | Immunovant, Roderick Wong, Peter Salzmann, Frank M. Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, and Eric Venker |
| IMVT MTD at __ | Citations to the Memorandum of Law in Support of Immunovant Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint |
| Kauf. Decl. | Declaration of Evan J. Kaufman in Support of Plaintiff's Omnibus Opposition to Defendants' Motions to Dismiss the Second Amended Complaint, dated June 9, 2023 |
| Legacy Immunovant | Immunovant, f/k/a Health Sciences Acquisitions Corporation, prior to being acquired by HSAC |
| License Agreement | Defendant Roivant's license agreement with HanAll Biopharma |
| Merger | HSAC's Acquisition of Legacy Immunovant |
| MG | Myasthenia Gravis |
| Plaintiff | Lead Plaintiff SEPTA Pension Plan Master Trust |
| Pl. App. __ | Citations to Plaintiff's Appendices attached to the Kauf. Decl. |
| Pl. Ex. __ | Citations to Plaintiff's Exhibits attached to the Kauf. Decl. |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Roivant | Defendant Roivant Sciences Ltd. |
| RTW | RTW Investments, L.P. |
| RVT MTD at __ | Citations to the Memorandum of Law in Support of the Motion to Dismiss of Roivant Sciences Ltd. |

| | |
|---|---|
| SAC | Plaintiff's Second Amended Complaint, filed on March 17, 2023 (ECF No. 82) |
| SAEs | Serious Adverse Events |
| SEA | Share Exchange Agreement entered into in connection with the Merger |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act Defendants | Immunovant, Peter Salzmann, Frank M. Torti, Andrew Fromkin, Douglas Hughes, George Migausky, Atul Pande, Eric Venker, SVB Securities LLC (f/k/a SVB Leerink LLC), LifeSci Capital LLC, Chardan Capital Markets LLC, Guggenheim Securities, LLC, and Robert W. Baird & Co. Inc., and Roivant Sciences Ltd. (Roivant is only referred to as a Securities Act Defendant for purposes of Section 15) |
| Sept. 2020 Offering | Immunovant's follow on stock offering on or about September 2-4, 2020 |
| Sept. 2020 Offering Documents | Registration Statement and Prospectus filed in connection with the Sept. 2020 Offering |
| SPAC | Special Purpose Acquisition Company |
| Speers Decl. | Declaration of Heather M. Speers in Support of Immunovant Defendants' Motion to Dismiss the SAC, dated April 28, 2023 |
| Speers Decl. Ex. __ | Citations to Exhibits attached to the Speers Decl. |
| Securities Act Claims | Plaintiff's claims under Sections 11, 12, and 15 of the Securities Act of 1933 |
| TED | Thyroid Eye Disease |
| UD MTD at __ | Citations to the Memorandum of Law in Support of the Underwriter Defendants' Motion to Dismiss the Second Amended Complaint |

Underwriter Defendants

SVB Securities LLC (f/k/a SVB Leerink LLC), LifeSci Capital LLC, Chardan Capital Markets LLC, Guggenheim Securities, LLC, and Robert W. Baird & Co. Inc.

Lead Plaintiff SEPTA Pension Plan Master Trust ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Motions to Dismiss the Second Amended Complaint, dated April 28, 2023.

## I.    PRELIMINARY STATEMENT[1]

This case is a classic example of federal securities laws violations.  Defendant Immunovant, Inc. ("Immunovant"), a clinical-stage biopharmaceutical company, was conducting clinical trials on its only drug candidate during the Class Period (October 2, 2019 to February 1, 2021), named IMVT-1401.[2]  Plaintiff's Second Amended Complaint ("SAC") alleges detailed facts, corroborated by multiple sources, showing there was a potential risk IMVT-1401 elevates LDL and total cholesterol levels, which would increase the risk of cardiovascular ("CV") disease, including: (i) IMVT-1401's preclinical animal studies revealed substantial elevations in cholesterol of animals which received IMVT-1401; (ii) IMVT-1401 reduces a protein named serum albumin and numerous scientific studies and articles indicated albumin reductions elevate cholesterol; and (iii) companies developing similar drugs monitored cholesterol levels.

Defendants repeatedly made positive statements about IMVT-1401 but failed to warn investors about the important potential risks of cholesterol elevations and CV disease.  When IMVT-1401's clinical trial results revealed albumin reductions, Defendants minimized any potential downside, claimed the effects were "asymptomatic," "reversible," and "not associated with any AEs or clinical symptoms," and falsely stated its "hard to find any published literature or expert opinion" on the negative impact of albumin reductions, even though scientific studies were readily available.

---

[1]    Unless otherwise indicated, emphasis is added and internal quotations, citations and alterations are omitted.

[2]    For the Court's convenience, defined terms are listed in the Glossary of Abbreviations and Defined Terms.

Making matters worse, IMVT-1401's clinical trials were required under FDA rules and Good Clinical Practices ("GCP") to monitor and assess these important potential risks but IMVT-1401's early clinical trials failed to do so, notwithstanding Defendants' assurances they had. As a result, when Immunovant reported those clinical trials had shown IMVT-1401 to be "safe," "well-tolerated," and without "adverse events" ("AEs"), investors were not made aware those results did not fully and accurately reflect the potential risks of IMVT-1401.

Because Defendants failed to adequately warn investors about potential risks of IMVT-1401, Immunovant common stock traded at artificially inflated prices and reached predetermined price targets enabling Defendants Roivant Sciences Ltd. ("Roivant"), Roderick Wong and others to obtain "earnout shares" valued at more than *$600 million*. Immunovant benefitted from the artificial inflation in the price of Immunovant common stock by selling hundreds of millions of dollars of Company stock to investors in several follow-on stock offerings, including a follow-on offering on September 2, 2020 (the "Sept. 2020 Offering").

Unbeknownst to investors, Immunovant secretly treated elevated cholesterol as an important potential risk because it began monitoring cholesterol – for the first time – in IMVT-1401's ASCEND GO-2 Phase 2b trial, which was scheduled to report initial results in the first part of 2021. On February 2, 2021, the Company announced it halted the ASCEND GO-2 Phase 2b trial because it had "become aware of a physiological signal consisting of elevated total cholesterol and LDL levels in IMVT-1401-treated patients." Following the Company's February 2, 2021 announcements, the price of Immunovant stock declined 42.08% to close at $25.08 per share. Then, on June 1, 2021, the Company released additional information about IMVT-1401's impact on cholesterol, including that "Albumin and LDL are tightly linked." Following the Company's June 1, 2021 announcements, the price of Immunovant stock fell 38% to close at $9.40 per share.

Plaintiff alleges claims under the Securities Act of 1933 (the "Securities Act") based on materially untrue and misleading statements and omissions in the offering documents for the Sept. 2020 Offering (the "Sept. 2020 Offering Documents"). Plaintiff alleges claims under the Securities Exchange Act of 1934 (the "Exchange Act") based on Defendants' materially false and misleading statements made during the Class Period in SEC filings, press releases, and conference calls and presentations.

Defendants filed three motions to dismiss and assert a scattershot of arguments touching upon nearly every element of Plaintiff's claims. Instead of challenging Plaintiff's claims as alleged, Defendants inappropriately ask the Court to consider facts not alleged in the SAC and try to force a square peg into a round hole by erroneously arguing Plaintiff's claims relate to scientific disagreements over the interpretation of data and clinical trial results. Defendants' other arguments challenging Plaintiff's scienter, control person, and falsity allegations fare no better. Plaintiff adequately alleges claims under the Securities Act and Exchange Act and Defendants' motions should be denied in their entirety.

## II.    STATEMENT OF FACTS

### A.    The Company and Its Business

Immunovant is a clinical-stage biopharmaceutical company that develops monoclonal antibodies for the treatment of autoimmune diseases. ¶48.[3] Prior to and during the Class Period, Immunovant's entire business focused on the development of a single antibody named IMVT-1401, formerly known as RVT-1401, for the treatment of myasthenia gravis ("MG"), thyroid eye disease ("TED") also known as Graves' Opthalmopathy ("GO"), and Warm Autoimmune Hemolytic Anemia ("WAIHA"). *Id.*

---

[3]    Second Amended Complaint for Violations of the Federal Securities Laws (ECF No. 82, the "SAC"), dated March 17, 2023. References to "¶" and "¶¶" refer to the SAC.

- 3 -

IMVT-1401 was originally developed by HanAll Biopharma, a South Korean company. ¶49. On or about December 19, 2017, Defendant Roivant entered into a license agreement with HanAll Biopharma (the "License Agreement") under which HanAll granted Roivant "an exclusive license to develop, register, manufacture and commercialize products containing HL161BKN" outside of Greater China. Roivant renamed the drug RVT-1401, and during 2018, Roivant sought to develop RVT-1401 through a business unit formed as a private company named Immunovant Sciences Ltd. (referred to herein as "Legacy Immunovant"). Roivant launched Legacy Immunovant to develop treatment candidates for autoimmune disorders and specifically to develop RVT-1401, which it renamed IMVT-1401. *Id.* Pursuant to the License Agreement, Roivant and HanAll created a Joint Development Committee ("JDC") for the exchange of information related to the development of the compound. ¶50.

**B.     Background of HSAC and Its Merger with Legacy Immunovant**

On or about December 28, 2018, Defendant Wong, through RTW, purchased more than 2.6 million (or approximately 3%) of Legacy Immunovant shares. ¶52. Defendant Wong also operated a company named Health Sciences Holdings, LLC, which became the sponsor of a blank check company named HSAC. ¶¶53-55. HSAC raised approximately $115 million from investors in its IPO on or about May 9, 2019, and had 24 months from the closing of its IPO in May 2019 to consummate a transaction. ¶55. If HSAC failed to do so, it would have had to redeem 100% of its outstanding public shares, liquidate and dissolve. *Id.*

On May 11, 2019, merely two days after HSAC's IPO, Defendant Wong, who was CEO of HSAC at the time, contacted a Legacy Immunovant Director and the President of Roivant to discuss a transaction between HSAC and Legacy Immunovant. ¶56. Thereafter, HSAC, with Wong as CEO, engaged in months of due diligence into Legacy Immunovant and IMVT-1401 (*id.*), which should have included a review of safety findings. On July 31, 2019, the parties entered into a letter

- 4 -

of intent for the transaction, and between August 1, 2019 and September 20, 2019, HSAC continued to review due diligence materials. *Id.* On October 2, 2019, HSAC and Legacy Immunovant announced in a press release (the "10/2/19 Press Release") they entered into a definitive share exchange agreement ("SEA") under which HSAC would acquire 100% of the issued and outstanding shares of Legacy Immunovant (the "Merger"). ¶57.

The SEA provided substantial financial benefits to Defendants Roivant and Wong if the price of Immunovant stock rose to predetermined price targets within specified time periods. Specifically, Defendants Roivant and Wong, along with other Legacy Immunovant shareholders, were to receive, at no cost, 10 million shares of Immunovant stock "if the share price exceeds $17.50 by March 31, 2023" and an additional 10 million shares "if the share price exceeds $31.50 by March 31, 2025." ¶58.

Roivant exercised control over Immunovant before and after the Merger and throughout the entire Class Period. ¶¶60-72. Among other things: (i) Roivant formed and controlled Legacy Immunovant; (ii) Roivant acquired the licensing rights to develop IMVT-1401 outside China and initially developed it as RVT-1401; (iii) after the Merger, Roivant continued to be Immunovant's controlling stockholder such that Immunovant was a controlled company within the meaning of the listing rules of NASDAQ and therefore had access to non-public information about IMVT-1401; (iv) Immunovant and Roivant entered into multiple agreements, including the SEA, the License Agreement and the Information Sharing and Cooperation Agreement; and (v) Immunovant uses Roivant's platform, services, and financing to operate its business and develop IMVT-1401. Roivant's support and involvement enabled Immunovant to test and develop IMVT-1401. ¶70.

- 5 -

C.      **Immunovant Was Required to Assess the Safety of IMVT-1401 Before and During Clinical Trials**

Immunovant, as the sponsor of IMVT-1401's clinical trials, was required to adhere to FDA rules, guidelines, and GCP.  ¶80.  Immunovant was expected to actively monitor and assess safety information about IMVT-1401 on an ongoing basis through a variety of methods to identify risks.  *Id.*  Among other things, Immunovant was required to determine whether risks could be identified from adverse events in IMVT-1401's animal studies or those reported from other drugs within IMVT-1401's pharmacological class.  *Id.*

According to the FDA's December 2015 Guidance for Industry and Investigators, Immunovant was required to assess safety data from ***all*** sources, including animal studies, clinical investigations, reports in scientific literature, unpublished scientific papers and numerous other places.  ¶86.  Immunovant was responsible and accountable for the complete review of safety ***data*** from IMVT-1401's animal studies, not just the executive summaries provided by the laboratories hired to perform the studies and was required to regularly ***search for*** and ***review*** potential safety issues in scientific literature and other sources.  *Id.*; 21 C.F.R. §312.32.  And adverse events reported in other drugs within a pharmacological class or within the same drug in animal studies should have led to a ***heightened level of surveillance*** for potential risks.  ¶83.

The SAC alleges numerous facts from multiple corroborating sources that by the start of the Class Period elevated and total LDL cholesterol were an important potential risk of IMVT-1401 that would increase the risk of heart disease in humans.  ¶¶82, 87-113.  These facts include, among other things, the following: (i) Immunovant's preclinical animal studies revealed substantial increases in cholesterol in the animals tested with IMVT-1401, with some animals experiencing ***200% to 300% increases***; (ii) IMVT-1401 is an FcRn inhibitor, treatment with FcRn inhibitors will potentially lower serum albumin levels, and numerous scientific studies indicated that albumin reduction, both

- 6 -

independently and as a result of increased cholesterol, is associated with an increased risk of CV disease; (iii) companies developing similar compounds were monitoring cholesterol in clinical trials; and (iv) Immunovant, knowing the above, designed its recent ASCEND GO-2 Phase 2b trial to monitor and assess cholesterol levels, indicating Immunovant viewed them as potential risks, while at the same time, publicly denying any significant risks associated with treatment. ¶¶91-121. Additionally, an indication for IMVT-1401 is the treatment of the thyroid condition GO, and thyroid levels are known to impact cholesterol levels. Therefore, Immunovant should have monitored cholesterol levels for the independent reason of determining if IMVT-1401 mitigated or worsened those changes. ¶¶111-113.

Accordingly, it was a *fact* – at the time of each of Defendants' statements during the Class Period – that IMVT-1401's impact on cholesterol was a potential safety concern that needed to be monitored and assessed. Immunovant, however, failed to monitor these risks or disclose them to investors. ¶¶114-121. Instead, Immunovant conducted several clinical trials of IMVT-1401 without testing cholesterol levels, made positive statements about the results of those trials, and without a reasonable basis, reported IMVT-1401 was safe and well-tolerated without any serious AEs.

> **D.** **A Reasonable Investor Would Have Expected: (i) IMVT-1401 Clinical Trials to Monitor Important Potential Risks, Such as Cholesterol; and (ii) that Statements about IMVT-1401 Clinical Trials Were Based on an Assessment of Important Potential Risks, Such as Cholesterol**

As set forth in the SEA, Immunovant represented it complied with FDA rules, guidelines, and GCP so a reasonable investor would have expected Immunovant and the IMVT-1401 clinical trials to have adhered to these protocols and actively monitor and assess important potential risks. ¶¶122-123. Accordingly, a reasonable investor would have expected Defendants' statements about IMVT-1401, the IMVT-1401 clinical trials, and IMVT-1401's safety, to have been based on clinical trials and clinical trial protocols which monitored and assessed all key potential risks, including

elevations in cholesterol, which is a common health concern of the public.  ¶¶123-124.

**E.      Defendants Misrepresented and Omitted Material Facts About IMVT-1401**

As detailed in §III.D.4, Defendants issued materially false and misleading statements and omitted material information throughout the Class Period.  Additionally, the Sept. 2020 Offering Documents contained untrue statements of material fact and omitted material information required to be disclosed therein.  §III.F.  Defendants repeatedly discussed the positive aspects of IMVT-1401 but failed to disclose elevated cholesterol and CV disease were important potential risks of IMVT-1401.  Defendants represented IMVT-1401 was "safe" and "well-tolerated" but failed to disclose that Immunovant's clinical trial results did not include an assessment of the potential risk of elevated cholesterol.  And Defendants minimized the potential negative impact of albumin reductions and denied the existence of scientific studies discussing important potential risks.  Without disclosing these key facts, Defendants issued materially untrue, false and misleading statements about: (i) IMVT-1401's completed clinical trials; (ii) the potential negative impact of albumin reductions; (iii) findings of significantly elevated cholesterol in IMVT-1401's animal studies; (iv) Immunovant's failure to comply with FDA rules and guidelines and GCP; and (v) the focus of IMVT-1401's clinical trials.

**F.      Defendants' False and Misleading Statements and Material Omissions Caused an Artificial Inflation in the Price of Immunovant Stock**

Defendants' misleading picture of IMVT-1401 caused investors to be unaware of the potential risks of the drug and caused an artificial inflation in the price of Immunovant common stock.  The ASCEND GO-2 Phase 2b trial, which was not scheduled to release results until early 2021, was Immunovant's first clinical trial to monitor cholesterol.  ¶100.  By that time, Defendants were able to reap substantial gains from the public's false perception of IMVT-1401.  ¶¶217-218.

The artificial inflation in the price of Immunovant shares enabled Defendants Wong,

Roivant, and other Legacy Immunovant shareholders to receive all 20 million earnout shares, valued at more than **$600 million,** before Immunovant was scheduled to report results from any clinical trials which monitored cholesterol.  ¶7.  The artificial inflation in the price of Immunovant shares also enabled the Company and selling shareholders to sell hundreds of millions of dollars in Immunovant shares to the public through several public follow-on offerings, including $139.4 million on April 14, 2020, and $200 million in the Sept. 2020 Offering.  ¶¶126, 268, 275-276.

> ### G.    Immunovant Reveals Elevations in Cholesterol in an IMVT-1401 Clinical Trial, Immunovant Stock Declines, and Immunovant Develops a New Drug as an Alternative to IMVT-1401

On February 2, 2021, the Company announced it halted the ASCEND GO-2 Phase 2b trial study because it had "become aware of a physiological signal consisting of elevated total cholesterol and LDL levels in IMVT-1401-treated patients."  ¶167.  Even though Immunovant described a "voluntary" pause in clinical dosing, the FDA would have likely instructed the Company to do so because the FDA may impose a partial or complete clinical hold on a drug study if a significant safety issue is identified.  ¶79.  An analyst report by UBS on February 5, 2021, described the cholesterol data as "a very real and meaningful increase in LDL levels (40-65%)."  ¶176.

Following the Company's February 2, 2021 announcements, the price of Immunovant stock collapsed from a closing price of $43.30 per share on February 1, 2021 to a closing price of $25.08 per share on February 2, 2021, a one-day decline of $18.22 per share, or 42.08%.  ¶325.  Then on June 1, 2021, the Company released additional information about IMVT-1401's impact on cholesterol, including that "Albumin and LDL are tightly linked." ¶179.  Following the Company's June 1, 2021 announcements, the price of Immunovant stock fell from a closing price of $15.16 per share on Friday, May 28, 2021, to a closing price of $9.40 per share on June 1, 2021, a one-day decline of $5.76 per share, or 38%.  ¶180.

Analysts commented that the cholesterol issue would likely reduce IMVT-1401's potential market value. A Guggenheim analyst report downgraded Immunovant to "Neutral" and "remov[ed] [its] PT [(price target)] based on the limited potential for IMVT-1401 given the competitive landscape…and the observed lipid safety issues, which are likely to be an issue for all proposed indications." ¶181. Similarly, a Credit Suisse analyst report lowered its target price to $12 per share "to reflect the lower probability-of-success . . . in TED and the heightened uncertainty across other programs . . ." and commented, "we think IMVT-1401 may struggle to differentiate favorably to other FcRn agents that have minimal impact to albumin levels." ¶182.

The elevations in cholesterol reported in the ASCEND GO-2 Phase 2b trial had a substantial impact on Immunovant's business and strategy. ¶184. Instead of focusing exclusively on IMVT-1401, Immunovant sought to develop a new drug named IMVT-1402. ¶¶185-194. Immunovant emphasized how IMVT-1402 "*may have minimal impact on albumin and LDL*." ¶188. The money raised by Immunovant in the follow-on offerings during the Class Period was crucial for the Company because they provided Immunovant funds to begin developing IMVT-1402.[4]

## III.   ARGUMENT

### A.   Legal Standard on a Motion to Dismiss

On a Rule 12(b)(6) motion, "the Court's task is 'necessarily a limited one.'" *Manavazian v. ATEC Grp., Inc.*, 160 F. Supp. 2d 468, 476 (E.D.N.Y. 2001). In deciding a motion to dismiss, a court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint

---

[4]   A graphic of a timeline and key facts supporting Plaintiff's claims is attached to the Declaration of Evan J. Kaufman in Support of Plaintiff's Omnibus Opposition to Defendants' Motions to Dismiss the Second Amended Complaint ("Kauf. Decl.") as Pl. App. B. References to the appendices and exhibits attached thereto appear herein as "Pl. App. ___" and "Pl. Ex. ___."

liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must "accept all factual allegations in the complaint as true" on Rule 12(b)(6) motions). The Court is "required to credit the plaintiffs' plausible theory when evaluating a Rule 12(b)(6) motion" and give "defendants' contrary and competing explanation for [their] statements … little weight at this stage of litigation[.]" *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021). "[F]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (alterations in original). The question is whether a claim is plausible and, thus, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

**B.      The SAC Alleges Numerous Reliable Facts Showing Elevated Cholesterol Was an Important Potential Risk of IMVT-1401**

A "potential risk" of a drug refers to "a risk that has not yet been observed in humans for the investigational product itself or for other drugs in the class but for which there is reason to suspect it might occur, based on animal toxicology studies or the known pharmacologic properties." ¶83, CIOMS VI Working Group. The SAC alleges numerous facts establishing elevated cholesterol and CV disease were potential risks of IMVT-1401, including:

- Preclinical *animal studies of IMVT-1401* revealed substantial increases in cholesterol in the animals tested with IMVT-1401. ¶¶91(a), 92-100. The cholesterol of animals which received IMVT-1401 substantially increased compared with those which did not. ¶¶91(a), 92-93. FE described increases as *200 to 300 percent higher* than control group. *Id*.

- Without disclosing any concerns of increased cholesterol, *Immunovant* itself began to *monitor cholesterol* in the ASCEND GO-2 Phase 2b trial, indicating it viewed it as an important potential risk. ¶¶91(e), 168.

- *Scientific studies* and *detailed facts* discussing the connection between albumin reductions and risk of cardiovascular disease, both independently and in association with elevated cholesterol. ¶¶91(b), 101-110.

- *Scientific studies* and *detailed facts* explaining why IMVT-1401's treatment of thyroid hormones could negatively impact cholesterol levels. ¶¶91(c), 111-113.

- *Other companies* developing similar compounds, including the license holder for IMVT-1401 in Greater China *assessed cholesterol*, showing those entities recognized elevated cholesterol levels were a potential risk which needed to be monitored. ¶91(d).

Similarly, the SAC details facts supporting Plaintiff's claim that since elevated cholesterol levels and coronary disease were potential risks, Immunovant was required to monitor and assess those risks pursuant to FDA regulations and GCP. ¶¶80-90, 122-123.

Defendants ignore these and other allegations and argue "Plaintiff does not plead facts showing that there was a 'potential risk' that IMVT-1401 would cause elevated cholesterol." UD MTD at 17; IMVT MTD at 23. To accept Defendants' argument would require one to ignore the SAC's allegations. Each of the categories of factual support referenced above would have been sufficient *alone* to raise a plausible reasonable inference that elevations in cholesterol were an important potential risk of IMVT-1401 and *collectively* there can be no legitimate dispute. *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F. 4th 145, 150 (2d Cir. 2021) ("We can infer from these allegations, *taken together*, that the statement in the Proxy Materials … was misleading."). In fact, Immunovant designing the ASCEND GO-2 Phase 2b trial to monitor and assess cholesterol essentially amounts to an admission that Immunovant knew elevations in cholesterol were a potential risk of IMVT-1401. Accepting these facts as true and drawing all reasonable inferences in favor of the Plaintiff – as the Court must – the SAC establishes elevated cholesterol was a potential risk of IMVT-1401 at the time of Defendants' statements. *Id.* ("[The Court] must accept all factual allegations in the complaint as true[.]").

The Immunovant Defendants seek to bolster their arguments by falsely stating Plaintiff has "abandon[ed]" its "prior allegations that elevated cholesterol was an 'anticipated risk.'" IMVT MTD at 31. *See, e.g.*, ¶219(b) (alleging "[t]here was a potential risk and *anticipated risk* [I]MVT-

- 12 -

1401 would substantially increase LDL and cholesterol levels.")  They also ask the Court to mistakenly infer the use of the term "potential risk" in certain places in the SAC compared with "anticipated risk" in the AC somehow reduces Plaintiff's conviction of its allegations.  IMVT MTD at 31.  As the SAC makes clear, a "potential risk" encompasses an "anticipated risk" because "anticipated risks are usually placed in the potential risk category."  ¶83.  The SAC more commonly uses the term potential risk because it is more precise and consistent with regulatory guidance.

### 1. The Allegations Showing Substantial Cholesterol Increases in IMVT-1401's Animal Studies Are Particularized and Reliable

The SAC alleges detailed and reliable facts establishing IMVT-1401's preclinical studies clearly revealed that monkeys which received IMVT-1401 experienced substantial increases in cholesterol.  ¶¶92-100.  Plaintiff's allegations are based on the first-hand account of FE, a former Immunovant employee who learned those facts while working at Immunovant.  ¶¶92-96.  FE recalled that each of the studies revealed significant increases in cholesterol with some animals experiencing 200 to 300 percent increases compared with the control group.  ¶93.  The "animal studies were conducted on Cynomolgus monkeys and therefore the effect of IMVT-1401 on those monkeys are highly relevant to the potential impact on humans."  ¶¶92-100.  As Immunovant acknowledged, "Cynomolgus monkeys were selected . . . given the high degree of sequence homology to human FcRn."  ¶96.  The clear and unambiguous data from the IMVT-1401 animal studies established that elevated cholesterol levels were a potential risk of IMVT-1401.  ¶98.  There can be no dispute the facts provided by FE are reliable and more than plausibly establish that Immunovant's animal studies clearly revealed substantial elevations in cholesterol.[5]

---

[5]  "A complaint may rely on information from confidential witnesses if they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015); *In re Evci Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 96 (S.D.N.Y. 2006).

The Immunovant Defendants attempt to characterize the facts attributed to FE as a "hindsight opinion," and therefore not reliable. IMVT MTD at 32. Even though FE may have personally reviewed the animal study reports in January 2021, those reports were written before the Class Period so those facts existed prior to each of Defendants' misleading statements and omissions. *See City of Providence v. Aeropostale, Inc.*, 2013 U.S. Dist. LEXIS 44948, at *29, *54 (S.D.N.Y. Mar. 25, 2013) (finding defendants had access to facts detailed by a confidential witness and that "facts are alleged in the [SAC] – facts that [the Court] must presume are true – that, if proved, demonstrate that Defendants knew…at the time those statements were made").

Unable to dispute FE was in position to provide the facts as alleged in the SAC, the Immunovant Defendants argue, without any support, that the elevations in cholesterol are essentially meaningless because only "some" of the animals "showed 200 to 300 percent increases in cholesterol levels compared with the control group." IMVT MTD at 32; ¶93. This argument requires one to ignore both the facts as alleged and common sense. Elevations in cholesterol, particularly LDL cholesterol, are well established and accepted surrogate markers of cardiovascular risk and even small increases raise the risk of CV disease in humans.[6] Similarly, the Immunovant Defendants dispute the SAC contains sufficient particularity about the elevations in cholesterol, such as the number of monkeys in the study or the percentage of monkeys showing 200 to 300 percent elevations. IMVT MTD at 32. Plaintiff is not required to plead evidence and the level of detail sought by Defendants is not necessary at this stage. *See, supra*, *City of Providence*, 2013 U.S. Dist. LEXIS 44948, at *21-*23, *28-*29, *40, *54-*55.

The SAC alleges facts provided by FE concerning the animal studies, the types of information provided in the studies, examples of massive increases in cholesterol, and information

---

[6] *See, e.g.*, Pl. Ex. 2 at e1087, e1099-e1100 (10-15% increase in cholesterol raises risk of CV disease).

- 14 -

about a report FE provided to the then-Chief Medical Officer, Rita Jain, which summarized FE's observations of significant increases in cholesterol levels in the monkeys. ¶95. The SAC details the facts provided by FE and establishes FE was in position to know those facts. These facts are sufficiently detailed to raise a plausible inference that the animal studies revealed substantial increases in cholesterol of the monkeys which received IMVT-1401. These allegations are reliable and amply support Plaintiff's claim. *Altimeo*, 19 F.4th at 151 ("even securities plaintiffs need not prove their entire case within the confines of the complaint").[7]

Defendants also dispute the importance of the cholesterol elevations from the animal studies by focusing on the fact that the summary portion of the animal studies may have indicated there were only minor increases in cholesterol. ¶97. First, the SAC alleges FE recalled that the underlying data from the animal studies *clearly* showed substantial increases in cholesterol of animals which received IMVT-1401. Second, FE supports that description with concrete facts, including FE's observation of 200 to 300 percent cholesterol increases in certain monkeys. Third, the SAC alleges, based on facts provided by FE, that the summary portion at the beginning of the reports *erroneously* failed to reflect these increases. *Id*. Therefore, the summary portion was wrong and false (*id*.), and not the result of a scientific disagreement or difference of opinion, as posited by Defendants. IMVT MTD at 32-34; UD MTD at 8-9. Importantly, the facts provided by FE concerning the summary portion highlights the credibility of the facts attributed to FE, including that the summary was wrong.

The Immunovant Defendants inappropriately raise factual issues by disputing whether the summary was wrong and by questioning whether the number of animals with increased cholesterol was "statistically significant." IMVT MTD at 33. Similarly, without any basis, the Immunovant

---

[7]    *City of Providence*, 2013 U.S. Dist. LEXIS 44948, at *54-*55 ("We are only at the pleading stage, and discovery may well undermine . . . Plaintiff's position[,] [b]ut precisely because we are at the pleading stage, where – even under the PSLRA – we have to assume the truth of well-pleaded facts, it would be inappropriate to grant the motion to dismiss.").

- 15 -

Defendants proclaim, "Plaintiff concedes" the animal studies were summarized by "experts," even though the SAC does not allege the report was summarized by an "expert," raising another factual issue. IMVT MTD at 33. Regardless of what the summary indicated, the underlying data from the monkey studies clearly showed elevations in cholesterol and Immunovant was under an obligation pursuant to FDA rules and regulations to have reviewed the data showing the elevations. The Exchange Act Defendants knew, or recklessly disregarded, the animal studies revealed substantial elevations in cholesterol even though the summary of findings may have contained false information. ¶97. The Securities Act Defendants, at minimum, were negligent.

Finally, even though Immunovant's SEC filings repeatedly highlight similarities between the monkeys in the animal studies and humans, the Immunovant Defendants attempt to minimize the elevations in cholesterol in the monkeys by making the irrelevant argument that animal studies should be "viewed with more suspicion than epidemiological studies." IMVT MTD at 33. FDA guidance and GCP requires a sponsor under 21 C.F.R. §312.32 to assess safety data from all sources, including animal studies. ¶¶64, 68.

### 2. Scientific Literature Put Immunovant on Notice that IMVT-1401 Could Impact Cholesterol and Increase the Risk of Cardiovascular Disease

The SAC also raises a plausible inference elevated cholesterol and CV disease were potential risks of IMVT-1401 which should be monitored and assessed by describing the science *in detail* and referencing numerous scientific studies supporting those allegations. ¶¶101-113; *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *10 (S.D. Cal. Sept. 27, 2022) ("Despite allegedly possessing information" that contradicted Defendants' statements about the studies, "Defendants touted the studies' results."). These medical journals and studies reported for years before the start of the Class Period that a lack of FcRn and/or serum albumin levels impacts cholesterol levels and are associated with CV disease. ¶¶101, 105-109.

- 16 -

Unsupported by any legal authority, the Immunovant Defendants argue these facts are insufficient by inappropriately disputing the factual basis of the allegations and putting factual issues in dispute. IMVT MTD at 34-36; *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015) (refusing to consider defendant's argument because it "raise[d] a factual dispute that is inappropriate for resolution on a motion to dismiss"). The Immunovant Defendants argue that it is somehow important the referenced medical journals and studies do not distinguish between albumin reductions and "mild" albumin reductions. IMVT MTD at 34. The Immunovant Defendants also argue that none of the articles conclude that "mild" decreases in albumin cause cholesterol increases. *Id*. The Immunovant Defendants have not provided any basis for distinguishing between albumin reductions and "mild" albumin reductions, and in any event, any purported distinction is another factual issue. *Uni-Sys., LLC v. U.S. Tennis Ass'n*, 350 F. Supp. 3d 143, 166 (E.D.N.Y. 2018) (Matsumoto, J.) (declining to adjudicate material factual disputes because "the substance and merits of plaintiff's factual allegations [] is improper on a motion to dismiss.").

Additionally, as described below, Defendants' statements about albumin reductions were misleading because they minimized the decreases and resultant impact. ¶¶146-148. The Immunovant Defendants, therefore, cannot rely on those same misrepresentations to rebut factual allegations from the SAC. *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 450 (S.D.N.Y. 2017) (refusing to consider defendant's argument because "its objections only raise questions of fact and are thus not sufficient to prevail at the motion-to-dismiss stage."). Without any basis, the Immunovant Defendants also declare causation must be the standard and disregard the importance of the articles highlighting the ***correlation*** between albumin and cholesterol and ultimately CV disease. *See, e.g.*, ¶106 ("lower serum albumin concentrations were associated with an increased risk of coronary artery disease"); ¶109(a) ("low albumin concentration is associated

- 17 -

with increased total and LDL cholesterol levels as well as increased CV mortality risk"); ¶109(c) ("increased excretion of serum albumin via urine . . . has been associated with increased incidence of all-cause and CV mortality").

The Immunovant Defendants argue the articles related to thyroid hormone levels are not specifically related to GO, so they are useless. IMVT MTD at 35-36. But the articles, which were mostly published prior to the Class Period, show that thyroid hormone levels – such as those impacted by GO and MG – are connected to cholesterol levels. ¶¶111-113; *see, e.g.*, ¶112 ("Since [GO] is a thyroid condition, and since thyroid levels are known to impact cholesterol levels, the treatment of [GO] would also be expected to impact cholesterol levels."). With respect to MG, the Immunovant Defendants describe one study as "observing that 60% of the MG patients in the study were diagnosed with dyslipidemia **without addressing cholesterol**." IMVT MTD at 36. On the contrary, dyslipidemia is an abnormality of cholesterol so this article does, in fact, address cholesterol.

Finally, the Immunovant Defendants seek to be relieved of their obligations under the securities laws by asserting that investment analysts and the FDA did not publicly raise concerns about the potential risk of elevated cholesterol levels. IMVT MTD at 7-11. First, it was Defendants' obligation to disclose all material information and not misrepresent facts. Second, these are highly technical scientific issues and Plaintiff's allegations were formulated with the assistance of consultants with extensive clinical, drug development, pharmacovigilance, and protocol development experience. ¶15. Investment analysts focus on how facts impact the financial condition of a Company and its stock price and are not scientists specializing in developing an autoimmune deficiency drug, as is Immunovant. On the one hand Defendants argue that they could not have known that elevated cholesterol was a potential risk of albumin reductions but on the other

- 18 -

hand argue that since investment analysts did not alert them they should not have known about it either. Defendants cannot have it both ways.

Similarly, the Immunovant Defendants' attempt to blame the FDA for their failures should be rejected. IMVT MTD at 11. First, whether the FDA raised concerns and Immunovant's response are non-public factual issues inappropriate for consideration at this stage. Regardless, it is Immunovant's – and not the FDA's – responsibility to monitor, assess, and mitigate potential risks. *Wyeth v. Levine*, 555 U.S. 555, 570-71 (2009) (rejecting defendants' argument that "the FDA, rather than the manufacturer, bears primary responsibility" for making sure its drug is properly labeled because it is the drug manufacturer's responsibility to ensure its drug warnings are accurate); *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 636 (S.D.N.Y. 2008) (rejecting defendants' argument that disclosure to the FDA preempted concealing the information from investors because defendants "incorrectly presume[d] that disclosure to the FDA is equivalent to disclosure to the market."). Indeed, "the FDA is not the arbiter of materiality for purposes of the securities laws." *Id*.

### 3. The Monitoring of Cholesterol by Immunovant Competitors Put Defendants on Notice that Elevated Cholesterol Was a Potential Risk

The Immunovant Defendants do not dispute Immunovant competitors tested for cholesterol but challenge the significance of those facts (IMVT MTD at 36), even though clinical guidelines suggest such information, including the "[e]ffects related to the therapeutic class of the test substance," be considered. ¶89. The Immunovant Defendants argue Argenx's drug has "no effect on albumin" and that Harbour disclosed that it had not observed elevated cholesterol. IMVT MTD at 36. First, the Immunovant Defendants ignore the SAC pleads the treatment of thyroid conditions could negatively impact cholesterol levels, such as MG being addressed by Argenx. ¶¶102-104. Second, even though Harbour may not have observed elevated cholesterol does not mean it was not correct to monitor cholesterol. Indeed, the SAC does not plead that Defendants knew IMVT-1401

- 19 -

*would* elevate cholesterol, it alleges there was a *risk* IMVT-1401 would elevate cholesterol. ¶91. Not until Immunovant complied with GCP and measured cholesterol levels would it know whether IMVT-1401 had such effect. ¶¶80-90; 21 C.F.R. §312.32.

C.    **Defendants' Alternative Version of the Facts Are Inappropriate for a Motion to Dismiss and Should Be Stricken by the Court**

Instead of focusing on the facts as alleged in the SAC, Defendants go to great lengths to distort Plaintiff's factual allegations and inappropriately introduce facts outside the four corners of the SAC based on materials not relied on or integral to the SAC. This tactic is improper and an obvious attempt by Defendants to distract the Court and avoid making legal arguments directed towards the facts as alleged. The Court must accept all well-pled facts as true and draw all reasonable inferences in favor of the Plaintiff. *SEC v. Glob. Inv. Strategy UK Ltd.*, 2021 U.S. Dist. LEXIS 202592, at *25 (S.D.N.Y. Oct. 19, 2021). *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 428 (S.D.N.Y. 2003) (rejecting defendants' introduction of "evidence and arguments intended to establish [their point]" because "they will have an opportunity to do so at a later stage . . . when it is appropriate to weigh the parties' competing evidentiary submissions[,]" because "[o]n this motion, the plaintiffs' allegations are taken as true.").

Defendants improperly raise the FDA's state of mind and argue what the FDA believed, including with respect to Immunovant's plans to "resume clinical development" with modifications even though there are no factual allegations about the perspective of the FDA concerning Immunovant or IMVT-1401. IMVT MTD at 12, 28 n.19. What is more, Defendants argue that Plaintiff did not allege the FDA's concerns or suggestions about IMVT-1401, but as Defendants know, this information is in the sole possession of the FDA and Immunovant and not available to Plaintiff, as shown by the FDA's refusal to provide any documents in response to Plaintiff's FOIA request. Pl. Ex. 1.

- 20 -

By submitting 29 exhibits and a lengthy appendix, Defendants have inappropriately attempted to transform "the [dismissal] inquiry into a summary-judgment proceeding – one featuring a bespoke factual record, tailor-made to suit the[ir] needs[.]" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 560 (2d Cir. 2016). Indeed, Defendants admit "[a] motion to dismiss is not the venue to dispute facts[.]" IMVT MTD at 35 n.23. Defendants will have the opportunity to put forward its purported "evidence" during discovery, but the Court should reject efforts to inject them at this stage.[8]

Specifically, the Immunovant Defendants ask the Court (IMVT MTD at 4 n.1) to improperly consider App. A and Speers Decl. Exs. 4, 5, 6, and 13 (the "Disputed Exhibits").[9] The Court may consider documents incorporated by reference in the SAC if the SAC contains a "clear, definite and substantial reference to that document" or documents integral to the SAC.[10] *Opthotech*, 2019 U.S. Dist. LEXIS 160131, at *15. "For a document to be integral to a complaint, a plaintiff must have known of or possessed the document *and* 'relied heavily upon its terms and effect' in drafting the complaint." *Gagnon*, 368 F. Supp. 3d at 763 (quoting *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original)).

"[C]ourts may consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit." *In*

---

[8] Plaintiff has addressed the substance of Defendants' exhibits and appendices herein, as appropriate.

[9] The Immunovant Defendants' appendix and exhibits are attached to the Declaration of Heather M. Speers, dated April 28, 2023.

[10] "[A] court may not consider *any* materials outside of the pleadings that do not fall within one of the established exceptions without converting the motion to a Rule 56 motion[.]" *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 762 (S.D.N.Y. 2019) (emphasis in original). The court "must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *SEC v. MiMedx Grp., Inc.*, 2022 U.S. Dist. LEXIS 56055, at *13-*14 (S.D.N.Y. Mar. 28, 2022) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)); *Micholle v. Opthotech Corp.*, 2019 U.S. Dist. LEXIS 160131, at *15 (S.D.N.Y. Sept. 18, 2019) (the court may consider allegations contained in the four corners of the complaint).

*re Sibanye Gold Ltd. Sec. Litig.*, 2020 WL 6582326, at \*13 (E.D.N.Y. Nov. 10. 2020) (Matsumoto, J.). But "[t]he Second Circuit noted that this standard is occasionally misinterpreted, and clarified that 'a plaintiff's ***reliance*** on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.'" *Benny v. City of Long Beach*, 2021 U.S. Dist. LEXIS 182305, at \*23 (E.D.N.Y. Sept. 23, 2021) (Matsumoto, J.) (emphasis in original). Accordingly, the Court should strike the following documents because they are not incorporated by reference in the SAC and are improperly submitted for the truth of their contents (*see Roth*, 489 F.3d at 509, 511):

**Appendix A:**[11] Defendants submitted App. A, which is 25 pages and contains 43 new arguments, as an inappropriate way to exceed the page limits. *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 U.S. Dist. LEXIS 95464, at \*8 (S.D. Cal. June 1, 2020) (defendants' chart was not "simply a chart for the Court's convenience" but "an extension of Defendants' argument"); *Jiangchen v. Rentech, Inc.*, 2017 U.S. Dist. LEXIS 222743, at \*10-\*11 (C.D. Cal. Nov. 20, 2017) (granting plaintiff's motion to strike defendants' chart of misleading statements because it "allow[ed] defendants to make further arguments"); *see also Monec Holding AG v. Motorola Mobility, Inc.*, 2014 U.S. Dist. LEXIS 123898, at \*3 (D. Del. Sept. 5, 2014).

**Speers Decl. Ex. 4:** Speers Decl. Ex. 4 contains a Form 8-K filed on September 29, 2019, a press release dated October 2, 2019, and a Corporate Overview presentation from October 2019. The Immunovant Defendants use Speers Decl. Ex. 4 to attempt to define decreases in albumin as "mild." IMVT MTD at 8. Whether the decreases were mild is a factual dispute that requires resolution by experts – not Defendants' counsel. *McKenzie v. Grand Cent. P'ship*, 2016 U.S. Dist.

---

[11] The Court should strike Appendix A, but if the Court decides to consider Appendix A in deciding the Motions to Dismiss, Plaintiff responds to Defendants' arguments in a chart submitted herewith as Pl. App. A.

LEXIS 39361, at *9 (E.D.N.Y. Mar. 25, 2016) (Matsumoto, J.) (declining to consider exhibits because they were not relied upon for their "terms and effect").

**Speers Decl. Exs. 5 and 6:** Speers Decl. Ex. 5 is a Baird Equity Research Analyst Report and Speers Decl. Ex. 6 is a Credit Suisse Analyst Report. The Immunovant Defendants cite to Speers Decl. Ex. 5 to state the reduction in albumin levels is not a "major area of worry." IMVT MTD at 8-9. These assertions are not in the SAC and Plaintiff does not cite to either of these analyst reports. *McKenzie v. Grand Cent. P'ship*, 2016 U.S. Dist. LEXIS 39361, at *9 (E.D.N.Y. Mar. 25, 2016) (Matsumoto, J.) (declining to consider exhibits because they were not attached to the amended complaint, incorporated by reference, or relied upon for their "terms and effect"); *Raffaele v. City of N.Y.*, 144 F. Supp. 3d 365, 373 (E.D.N.Y. 2015) (Matsumoto, J.) (declining to consider a CCRB Investigative Report submitted by plaintiff in the opposition brief "because the [AC] did not attach the [report], the [report] was not incorporated by reference into the [AC], and the [AC] d[id] not rely on the 'terms and effect' of the report"). The Immunovant Defendants place great weight on the medical opinion of financial analysts – whose job is to analyze the company's stock price, not interpret clinical trial results, and have no role in the regulatory responsibilities for pharmacovigilance. IMVT MTD at 12. *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 289 (S.D.N.Y. 2013) (striking analyst reports because they would be "of no assistance to [defendant] except if taken for the truth").

**Speers Decl. Ex. 13:** Speers Decl. Ex. 13 contains Roderick Wong's Form 4 filings which the Immunovant Defendants use to argue that "[o]ne of Dr. Wong's entities [] did purchase over $9 million of Immunovant shares during the putative class period[.]" IMVT MTD at 18 n.11. A Form 4 cannot be considered on a motion to dismiss to establish the truth of the matters asserted therein. *Wagner v. Royal Bank of Scot. Grp. PLC*, 2013 U.S. Dist. LEXIS 127551, at *7-*11

- 23 -

(S.D.N.Y. Sept. 5, 2013) (rejecting defendants' reliance on a Form 4).  It is unclear how many shares other affiliated entities may have sold.[12]

### D.       The SAC States Claims Under the Exchange Act

### 1.       Legal Standard

The elements of a claim under Section 10(b) and Rule 10b-5(b) are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  Unlike their Securities Act claims (§III.F), Plaintiff's fraud-based claims under the Exchange Act are subject to Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Because Plaintiff's Exchange Act claims are also subject to the PSLRA, the SAC must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2)(A).

### 2.       The SAC Pleads Defendants' Fraud with Particularity

Under the PSLRA, a plaintiff is required to "specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading."  *Wang v. Cloopen Grp. Holding Ltd.*, 2023 U.S. Dist. LEXIS 44788, at *17 (S.D.N.Y. Mar. 16, 2023).  To do so, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  Nevertheless, the Second Circuit "do[es] not require the pleading of detailed evidentiary matter[,]"  *In re Scholastic Corp. Sec. Litig.*,

---

[12]   The Court should not consider any of the Disputed Exhibits.  Doing so would give Defendants an unfair advantage of introducing facts outside the SAC while Plaintiff's hands are tied during the PSLRA's stay on discovery.  15 U.S.C. §78u-4(b)(3)(B).

252 F.3d 63, 72 (2d Cir. 2001), but simply facts sufficient "to support a reasonable belief" that defendants' statements were materially false or misleading.  *Novak*, 216 F.3d at 314 n.1.

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  *McMahan & Co. v. Wherehouse Ent. Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).  Statements of literal truth "can become, through their context and manner of presentation, devices which mislead investors."  *Id.* "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly . . . be considered a material misrepresentation."  *Id.* (internal quotations omitted).  Thus, Defendants had "'a duty to be both accurate and ***complete***'" in their Class Period statements.  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic.") (alteration in original).

An omission is actionable under Section 10(b) if it is "material."  *Manavazian*, 160 F. Supp. 2d at 478.  Omissions are material if there is a "substantial likelihood" their disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).  "'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).  With respect to Plaintiff's Exchange Act claim for a fraudulent scheme under SEC Rules 10b-5(a) and (c), the SAC alleges Defendants' fraud with particularity.  §III.D.2.

**3.     The SAC Adequately Alleges Defendants Issued Materially False and Misleading Statements and Omitted Material Information**

The SAC properly particularizes Defendants' materially false and misleading statements and omissions in accordance with Fed. R. Civ. P. 9(b) and the PSLRA, 15 U.S.C. §78u-4, *et seq*. 22. The SAC specifically identifies what statements are alleged to be false and misleading; "who" made the statements (*i.e.*, Immunovant (¶¶224-225, 248), Salzmann (¶¶222, 246), Wong (¶¶222, 244)); "when" they were made (*i.e.*, 10/2/19 (¶222), 1/17/20 (¶248)) and "where" they were made (*i.e.*, in SEC filings, press releases, analyst calls). *See, e.g.*, ¶¶224-225, 248; *see Janel World Trade, Ltd. v. World Logistics Servs., Inc.*, 2009 U.S. Dist. LEXIS 30256, at *12 (S.D.N.Y. Mar. 20, 2009); *see also Montoya v. Mamma.com, Inc.*, 2006 U.S. Dist. LEXIS 13207, at *14 (S.D.N.Y. Mar. 28, 2006).

The SAC also alleges "why" the statements were materially false and misleading *i.e.*: (i) discussed positive aspects of IMVT-1401 without disclosing the potential risk that IMVT-1401 elevates cholesterol (¶¶223, 251); (ii) misrepresented that IMVT-1401 had been "well-tolerated" with no serious AEs because Immunovant had not assessed or monitored the potential risk of elevated cholesterol and therefore lacked a reasonable basis to make statements (¶¶267, 275, 277); (iii) misrepresented "safety & tolerability" were "Primary Endpoints" because clinical trial failed to assess potential safety and tolerability issue of elevated cholesterol (¶¶232, 236, 249); (iv) false and misleading that clinical trials "are being conducted . . . in accordance with . . . accepted professional and scientific standards" because early clinical trials failed to adhere to GCP (¶241); and (v) lacked reasonable basis to represent IMVT-1401 was "well-tolerated" because Salzmann knew, or recklessly disregarded, that cholesterol levels were not monitored (¶247).

Defendants' misrepresentations and omissions were material to investors, as demonstrated by the precipitous declines in the market value of Immunovant securities when the misrepresented and concealed risks materialized or were disclosed.  ¶¶219-300.  The SAC more than adequately alleges

- 26 -

Plaintiff's claims with particularity. *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 2020 WL 248729, at *5 (S.D.N.Y. Jan. 15, 2020) (complaint pled with particularity where it "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading").

Indeed, the Immunovant Defendants concede the SAC improves upon the AC and they mostly abandon their puzzle pleading argument and relegate the remnants of that argument to a mere footnote. IMVT MTD at 22 n.17. And the Immunovant Defendants are wrong that a few references in the SAC to boilerplate language repeated in Immunovant's SEC filings amounts to a puzzle pleading.[13] The SAC fully satisfies both Rules 8 and 9(b).

### 4. Defendants' Materially False and Misleading Statements and Omissions Are Actionable

Throughout the Class Period, Defendants highlighted the positive aspects of IMVT-1401 but failed to publicly disclose there was a potential risk IMVT-1401 would elevate LDL and cholesterol levels and lead to CV disease. Defendants reported the results of completed clinical trials, failed to disclose clinical trial results did not incorporate assessments of the key risk of elevated cholesterol, and made incomplete and misleading statements concerning the safety, tolerability and AEs of IMVT-1401. ¶¶242-243. Defendants minimized the negative impact of albumin reductions caused by IMVT-1401 and misrepresented the existence of numerous articles and studies discussing the impact of albumin reductions on cholesterol. ¶¶146-148, 286, 288, 291, 293. Further, Defendants misrepresented and omitted facts concerning IMVT-1401's preclinical animal studies, including failing to disclose Immunovant's animal studies revealed substantial elevations in cholesterol for

---

[13] The SAC identifies specific statements, adds emphasis to longer excerpts, and provides reasons for why the statements are misleading. *Kusnier v. Virgin Galactic Holdings Inc.*, 2022 U.S. Dist. LEXIS 202432, at *26 (E.D.N.Y. Nov. 7, 2022) (rejecting defendants' puzzle pleading argument where "defendants and [the court] had no trouble determining why plaintiffs allege the statements were false").

monkeys which received IMVT-1401.  ¶¶92-98, 149-150, 294-295.

One of Defendants' primary arguments is they did not issue materially false and misleading statements because – according to Defendants – elevated cholesterol was not a potential risk of IMVT-1401.  IMVT MTD at 32-36; UD MTD at 26-27.  This should be rejected because, as discussed in §III.B, Plaintiff has more than plausibly alleged facts showing elevated cholesterol and CV disease were potential risks of IMVT-1401.  Additionally, this case is not, as Defendants contend, about criticisms over the type of statistical analysis used to interpret data or disagreements over how Immunovant managed its clinical trial process.  IMVT MTD at 23-26; UD MTD at 5-9. Nor is it about a dispute over trial design.  Rather, this case relates to Defendants' misrepresentations and omissions of the facts existing at the time, including their failure to warn investors there was a potential risk IMVT-1401 could elevate cholesterol, misrepresentations about the potential negative impact of albumin reductions, and misrepresentations about IMVT-1401's safety and tolerability, which constitute securities fraud.  *See, e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) ("Because Plaintiffs allege that Defendants intentionally misled the public, rather than simply making bad business decisions, Plaintiffs have pled more than mere mismanagement."); *accord Fidel v. AK Steel Holding Corp.*, 2002 WL 31545952, at \*5 (S.D. Ohio Sept. 19, 2002).[14]  Defendants also contend that most of the alleged misstatements are nonactionable puffery or opinions and that the remaining alleged misrepresentations are not false or misleading. IMVT MTD at 22-32; UD MTD at 17-26.  As discussed below, Defendants' arguments are meritless.

---

[14]   *In re Sirrom Cap. Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 941 (M.D. Tenn. 1999) (same).

**a.      The SAC Pleads Actionable Misstatements and Omissions
Regarding IMVT-1401 and Its Clinical Trial Results**

Defendants made numerous positive statements about the efficacy and safety of IMVT-1401 but did not present a full and accurate picture because they failed to warn investors about elevations of cholesterol in animal studies and the potential risk to humans that IMVT-1401 could elevate cholesterol.  ¶¶129-145, 244-284.  Defendants supported their positive statements by referring to IMVT-1401's clinical trial results but failed to disclose that those results, and the descriptions of the results, were untrue, incomplete or misleading because the clinical trials did not incorporate assessments of the risk of elevated cholesterol.  *See, e.g.*, ¶¶279, 282.  *In re Delcath Sys. Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) ("Defendants made statements about their Phase III trial results, which given the allegations in the Complaint, were misleading without the disclosure of additional facts that would cast those results in a more negative light."); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018) ("Affirmative statements about a drug's efficacy and safety may be actionable if the underlying clinical data contradicts or does not support them.").

The Merger Presentation for HSAC's merger with Legacy Immunovant highlighted "IMVT-1401 has been well tolerated to date," that there were "no treatment-related serious adverse events (SAEs)," IMVT-1401 was "well-tolerated in Phase 1 study," emphasized "[m]ost common AEs were mild erythema and swelling at injection site," and declared the only two "SAEs" were "unrelated to treatment."  ¶¶225-227, 250.  Similarly, the Sept. 2020 Offering Documents, Immunovant's SEC filings, and other Company statements discussed IMVT-1401 clinical trial results and "safety data," that IMVT-1401 was "generally safe" and did not cause any "treatment-related serious AEs," and that IMVT-1401 was "well-tolerated."[15]  The Offering Documents and Company SEC filings

---

[15]    *See, e.g.*, ¶¶133-134, 137.

described IMVT-1401's "Safety Data," stating in part:

> In our multi-part, placebo-controlled Phase 1 clinical trial, IMVT-1401 has been **observed to be well-tolerated** with no **Grade 3 or Grade 4 AEs** and no discontinuations due to AEs.  The most commonly reported AE has been mild erythema and swelling at the injection site, which typically resolved within hours. . . . To date, **two serious AEs** have been reported, both of which have been assessed as **unrelated to IMVT-1401** by the study investigator.  **There have been no treatment-related serious AEs reported**.

¶¶137, 250, 266, 274.

The above statements and others like them were materially false and misleading because they highlighted positive information about the safety and tolerability of IMVT-1401 but failed to disclose the results did not include assessments of the important potential risk of elevated cholesterol.  Also, Defendants lacked a reasonable basis to represent there had been "no treatment-related serious AEs" because patients may have experienced elevated cholesterol.

Defendants repeatedly made similar types of statements during the Class Period including:

- The 1/17/20 Registration Statement (¶248) and the 2020 Form 10-K (¶272) discussed the "Safety Data" from a Phase 1 clinical trial of IMVT-1401 and stated, "[t]here have been **no treatment-related serious AEs** reported" and that "IMVT-1401 has been observed to be **well-tolerated** with no Grade 3 or Grade 4 AEs and no discontinuations due to AEs."  ¶¶250, 274.

- On the March 30, 2020 Conference Call, Defendant Salzmann discussed results of the ASCEND GO-1 clinical trial: "We are also pleased to report that the safety and tolerability profile we observed in ASCEND GO-1 was in line with our expectations from our Phase 1 study in 99 healthy volunteers.  We saw **no serious adverse events or SAEs, no withdrawals due to adverse events** and no headaches were reported in this trial.  **All adverse events were mild or moderate**."  ¶¶252, 254.

- On April 9, 2019, Immunovant discussed adverse events from a phase 1 study: "**[a]ll adverse events (AEs) were mild to moderate** in severity, with no subjects requiring premature discontinuation due to AEs."  ¶114.

- On August 25, 2020, Immunovant reported the results of a clinical study and stressed that IMVT-1401 was "**generally safe and well-tolerated with no serious adverse events**."  ¶276.

In a March 30, 2020 press release, Salzmann was quoted stating, "[w]e look forward to reporting the study's full results, **including detailed lab observations** and 12 weeks of follow up

- 30 -

data, at an upcoming medical meeting." ¶252; ¶281 (Salzmann: "On the *safety side*, importantly, there were *no serious adverse events*."). Defendant Salzmann's statements about "no serious adverse events," "safety" and "detailed lab observations" were materially false and misleading because there was a potential risk of elevated cholesterol levels and Immunovant failed to test for cholesterol. Defendants also represented IMVT-1401's clinical trials had been progressing smoothly and that the safety results of multiple clinical trials corroborated and strengthened the safety profile of IMVT-1401.

A reasonable investor would have expected that Defendants' statements about the safety of IMVT-1401 incorporated an evaluation of important potential risks, such as elevations in cholesterol. Indeed, at the same time Defendant Salzmann represented completed clinical trials reinforced the safety profile of IMVT-1401, unbeknownst to investors, Immunovant was monitoring and assessing cholesterol in the ASCEND GO-2 Phase 2b trial. ¶91(e). Defendants' failure to disclose that the clinical trial results had not incorporated an assessment of the potential risk of cholesterol rendered their statements misleading.

Furthermore, it was misleading to describe the ASCEND GO-2 Phase 2b trial in the same terms as earlier trials without revealing it was monitoring cholesterol because investors were unaware of a new near-term risk that the clinical trial schedule could be disrupted. In fact, in the 6/29/20 Press Release, Immunovant stated the "clinical results from ASCEND GO-1" had "reaffirmed IMVT-1401's prior safety and pharmacodynamic findings and demonstrated encouraging potential efficacy for patients with TED." The press releases added, "[w]ith proof-of-biology now established . . . Immunovant has chosen to accelerate Phase 3 development of IMVT-1401 in MG." ¶270. Investors were never made aware that Immunovant was monitoring cholesterol for the first time during the ASCEND GO-2 Phase 2b trial and that the assessment of this potential

risk increased the potential for complications with the clinical trial program for IMVT-1401.

The Immunovant and Underwriter Defendants argue that statements about the trial results are not actionable because they disclosed accurate results, the statements are opinions and puffery, and they were under no duty to disclose cholesterol was a potential risk or that Immunovant did not test cholesterol levels. IMVT MTD at 22-31; UD MTD at 10-16, 17-26. Defendants are wrong. "The law is well settled . . . that so-called half-truths - literally true statements that create a materially misleading impression - will support claims for securities fraud." *Vivendi*, 838 F.3d at 240. Defendants chose to make statements about IMVT-1401's clinical trials, including that IMVT-1401 was safe, well tolerated and without serious AEs, so Defendants were under a duty to fully disclose all material information. "The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).[16] Where, as alleged here, Defendants knew or recklessly disregarded that IMVT-1401's clinical trials were not reliable indicators of safety, tolerability or AEs because Immunovant had failed to monitor or assess cholesterol, Defendants' assurances were materially false and misleading when made.

Immunovant did not simply disclose the results of the IMVT-1401 clinical trials. It used statements about the results as a basis to draw conclusions that IMVT-1401 is safe, well tolerated and has strong potential compared with competitors. *See, e.g.*, ¶141. The Merger Presentation stated, "[e]xisting therapies [are] associated with significant side effects" to make IMVT-1401 appear safer and more compelling than alternatives. ¶229. The Sept. 2020 Offering Documents stated, "safe and effective treatment options for patients suffering from autoimmune diseases are

---

[16]    *See also* 17 C.F.R. §240.10b-5(b) (prohibiting "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading").

lacking" and that they "often fail to address patients' needs since they are limited by . . . unfavorable safety profiles." ¶141.  As a purported contrast to competitors' drugs, Immunovant highlighted IMVT-1401 was safe based on nonclinical and clinical results, stating, "[i]n several nonclinical studies and a multi-part Phase 1 clinical trial . . . IMVT-1401 demonstrated dose-dependent IgG antibody reductions and was observed to be well tolerated." *Id*.  These statements were materially misleading because IMVT-1401's preclinical animal trials revealed substantial elevations in cholesterol and because the referenced clinical trials did not test cholesterol levels.  As a result, Defendants overstated the safety profile of IMVT-1401.

Similarly, in the 10/2/19 Merger Press Release, Salzmann described IMVT-1401 as having "both first-in-class and best-in-class potential" because Immunovant has completed "a comprehensive Phase 1 program demonstrating robust IgG reductions." ¶222.  The Phase 1 program, however, was not "comprehensive" because it failed to monitor a key potential risk.  In the same press release, Wong described IMVT-1401 as "a uniquely compelling asset" which he expects "will become a cornerstone therapy." *Id*.  These statements were misleading because Wong lacked a reasonable basis to describe IMVT-1401 as "uniquely compelling" or a "cornerstone therapy" because Immunovant had not yet determined whether IMVT-1401 elevates cholesterol in humans. ¶223.

The Immunovant Defendants argue Defendants were not "obligated to proactively inform investors that the clinical trial results did not take into account cholesterol levels, when no contrary representation was ever made."  IMVT MTD at 25.  Similarly, the Underwriter Defendants argue that the disclosure of clinical trial results did not trigger a duty to disclose the potential risk of elevated cholesterol.  UD MTD at 20-21.  As discussed in §III.F.3, since the 2020 Offering Documents and other statements discussed that IMVT-1401 was safe and well-tolerated, Defendants

- 33 -

were under a duty to disclose full and complete information, including that the results did not reflect an evaluation of an important potential risk. "Having chosen to speak…Defendants had a duty to speak accurately, giving all material facts...to permit investors to evaluate the potential risks." *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at \*4 (2d Cir. Dec. 20, 2022).

The Underwriter Defendants also attempt to classify statements as "reflect[ing] scientific and medical judgments about how to interpret the underlying data." UD MTD at 21. The Underwriter Defendants argue statements about efficacy were not misleading because they reflect scientific judgments about how to interpret underlying data. *Id.* at 22-23. Once again, the Underwriter Defendants miss the point. As discussed in §III.D.5.a, Plaintiff does not dispute how Immunovant conducted its clinical trials or interpreted data. Rather, Defendants made statements that IMVT-1401 was safe and well-tolerated but failed to disclose a potential risk which directly relates to whether the drug is safe and well-tolerated. As a result, the omission of these facts rendered the statements made materially misleading.

> **b.    The SAC Pleads Actionable Misstatements and Omissions Regarding the Impact of Albumin Reductions and the Existence of Studies Indicating Albumin Reductions Elevate Cholesterol**

When Immunovant reported clinical trial results it disclosed that patients experienced reductions in albumin. The Sept. 2020 Offering Documents, 11/27/19 Proxy, 1/17/20 Registration Statement, 2020 Form 10-K, and other SEC filings reported that "[d]ose-dependent and reversible albumin reductions were observed" in IMVT-1401's Phase 1 clinical trial of IMVT-1401, with "[m]ean reduction in albumin levels" of "20% in the 340 mg multiple-dose cohort, and 31% in the 680 mg multiple-dose cohort." ¶¶146, 287; *see also* ¶139 (Sept. 2020 Offering Documents: "Mean albumin reduction from baseline to end of treatment was 24%."). At the time Defendants made these statements, numerous studies and other reports discussed the connection between albumin

- 34 -

reductions, coronary disease and cholesterol levels.  ¶¶101-110.

Instead of warning investors of the potential downside of albumin reductions, or that IMVT-1401's clinical trials did not measure or assess an important AE of albumin reductions, Defendants minimized the impact and declared the albumin reductions "were not associated with any AEs or clinical symptoms and did not lead to any study discontinuations."  ¶146 (Sept. 2020 Offering Documents), ¶287 (11/27/19 Proxy), ¶250 (1/17/20 Registration Statement), ¶266 (4/10/20 Registration Statement).  Those and other similar statements were materially misleading and lacked any reasonable basis because while the Phase 1 clinical trial may not have revealed "any AEs or clinical symptoms," that trial had not monitored or assessed the likely AE of elevated LDL and total cholesterol levels.  *See, e.g.*, ¶¶264-265, 287.  Similarly, during the 8/25/20 Conf Call, Defendant Salzmann lacked a reasonable basis to assert, "[a]ll albumin reductions were asymptomatic" and Defendants lacked a reasonable basis to represent the "reductions were not associated with any AEs." ¶238.  The reductions could have been – and likely were – associated with elevated LDL and cholesterol levels.  The statement also gave the false impression that the clinical trial tested for all potential risks, as required under FDA rules and regulations and GCP.  ¶¶80-90.

The 1/17/20 and 4/10/20 Registration Statements (and other documents) also minimized the potential negative consequences of albumin reductions by characterizing them as "minor" and "reversible" and by discussing them only in the context of an extremely rare condition known as Congenital Analbumenia, which the 1/17/20 and 4/10/20 Registration Statements falsely described as causing "only mild symptoms," even though those patients have an increased risk of CV disease. ¶148.  The 1/17/20 and 4/10/20 Registration Statements failed to disclose there was potential risk albumin reductions would cause elevations in cholesterol and increase the risk of CV disease.

During the SVB Leerink Global Healthcare Conference on February 25, 2020 (the "SVB

Conference"), Salzmann discussed the "20% to 30% reduction in albumin" and acknowledged it was caused by IMVT-1401, stating, "we know what's causing the low albumin, which is a direct hindrance at the binding site." ¶290. Salzmann again minimized the albumin reduction by stating that it was not "associated with any adverse events or edema in the Phase 1 trial." *Id*. During the 3/30/20 Conf Call, Salzmann acknowledged there was "an average reduction of 24%" in albumin but minimized the impact by stating, "[a]lbumin changes were asymptomatic in this trial as they were in Phase I." *Id*. Defendant Salzmann lacked a reasonable basis to claim the albumin reductions were not "associated with any adverse events" or "asymptomatic" because patients were likely experiencing elevated cholesterol levels which were going undetected because Immunovant failed to measure them. ¶291. Defendant Salzmann then falsely stated, "it's pretty hard to find any published literature or expert opinion on what the sequelae of a albumin – of a mild albumin reduction would be. So, we're not seeing any issues to date." ¶290. Contrary to Defendant Salzmann's statements, there were numerous articles indicating albumin reductions cause elevated LDL and cholesterol levels and they were not "pretty hard to find" by someone with his expertise.

During the 10/11/19 Merger Call, Defendants Salzmann and Wong again minimized the potential negative impact of the albumin reductions. ¶¶285-286. Defendant Salzmann described the albumin reductions as "reversible and asymptomatic" even though he lacked a reasonable basis to make those statements because Immunovant had not monitored cholesterol levels. ¶285. Defendant Wong falsely represented that "patients borne with close to 0% albumin . . . in the literature are generally asymptomatic" and that "they're basically healthy people." *Id*. In contrast, the SAC refers to numerous articles linking congenital analbuminemia with cardiovascular health issues, including elevations in cholesterol. ¶¶105-110. In fact, according to the National Institute of Health (the "NIH"), people with congenital analbuminemia may "present with high cholesterol, which may

result in early atherosclerosis and heart problems."[17]

The Underwriter Defendants erroneously argue these statements are not actionable because they "reflect scientific and medical judgments" and are non-actionable statements of opinions." UD MTD at 24. Plaintiff is not disputing the interpretation or analysis of clinical trial data. Rather, the SAC alleges that statements from the Sept. 2020 Offering Documents, such as the clinical trials "were not associated with any AEs or clinical symptoms" were misleading and made without a reasonable basis because cholesterol elevations were an undisclosed potential risk which was not tested for. The Underwriter Defendants contend that statements concerning the albumin reductions are opinions and puffery and therefore not actionable. UD MTD at 23-26. As discussed more fully in §§III.D.5.b and c, the statements challenged as opinions and puffery are actionable. Additionally, the statements regarding albumin reductions are not puffery because they discuss objective concrete facts upon which investors relied. In fact, Defendant Salzmann discussed the albumin reductions in response to a question from an analyst, establishing their materiality. ¶292.

> **c.    The SAC Pleads Actionable Misstatements and Omissions Regarding Immunovant's Compliance with GCP and the Focus of IMVT-1401's Clinical Trials**

**Compliance with GCP:** The SEA, which was attached to the 11/27/19 Proxy, stated that clinical trials are "being conducted in all material respects in accordance with experimental protocols, procedures and controls pursuant to accepted professional and scientific standards for products or product candidates comparable to those being developed by the Company and all applicable laws and regulations[.]" ¶240. The statements were materially false because Immunovant should have – but failed to – perform ongoing surveillance of the adverse events and suspected adverse reactions of elevated LDL and total cholesterol levels. ¶¶239, 241. Specifically, Immunovant failed to adhere to, among other things, GCP and procedures set forth in: (i) Council for

---

[17]    *See* Pl. Ex. 3.

International Organizations of Medical Sciences ("CIOMS") VI; (ii) 21 C.F.R. §312.32; (iii) the Guidance for Industry describing ICH M3 (R2) (Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals); and (iv) the FDA Guidance for Industry regarding ICH S7a (Safety Pharmacology Studies for Human Pharmaceuticals). *See* ¶¶80-90.

Additionally, the 11/27/19 Proxy falsely represented that Immunovant was "not aware of any studies, tests, development or trials the results of which reasonably *call into question the results* of the studies, tests, development and trials conducted by or on behalf of the Company." ¶240. Contrary to this statement, numerous studies, tests and trials called into question the results of IMVT-1401's clinical trials, including IMVT-1401's animal studies, scientific literature indicating elevated cholesterol was a potential risk of IMVT-1401, and the fact that other companies developing similar compounds monitored cholesterol levels. ¶¶91-113. And Immunovant itself was monitoring cholesterol in the ASCEND GO-2 Phase 2b trial. Those studies and results plainly "call[ed] into question the results" (¶240) of Immunovant's clinical studies for IMVT-1401 because Immunovant lacked a reasonable basis to describe IMVT-1401 as "safe," "well-tolerated," or without serious "AEs." *See, e.g.*, ¶¶225-226, 250-251. Since Immunovant had not monitored the potential risk of elevated cholesterol levels, those statements were false and misleading. *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020).

The Immunovant Defendants argue their statements about complying with GCP are not actionable. Ignoring numerous paragraphs in the SAC, they assert the SAC does not plead "facts that [GCP] (or any other accepted professional or scientific standards) require testing all potential risks." IMVT MTD at 25-26. Then, without any basis, the Immunovant Defendants attempt to distinguish the terms "testing" and "asess[ing]" and argue based on unsupported facts outside the

- 38 -

SAC that Immunovant's "assessment resulted in a determination that cholesterol monitoring was not necessary in the Phase 1 or 2a trials." *Id*. at 26. Defendants then improperly portray their fiction about a purported scientific assessment by Immunovant of whether to include cholesterol monitoring in early clinical trials as a dispute about trial design. *Id*. The SAC raises a plausible inference that Immunovant was required under GCP to monitor and assess potential risks, such as elevations in cholesterol, and therefore Defendants' statements were materially false and misleading. And whether Defendants' statements about GCP are misleading is distinguishable from the trial design cases cited by Defendants. *See* §III.D.5.a.

The Underwriter Defendants cite *Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022) to argue that the statements in the Sept. 2020 Offering Documents concerning compliance with GCP were not misleading because a company is not required "to disclose detailed information about [the] design" of its clinical trials. UD MTD at 11, 24-25. The facts of *Bristol-Myers Squibb*, however, are distinguishable. *Bristol-Myers*, which made clear "it would not disclose the exact threshold or confirm speculation or predictions," stated its study "would target patients 'strongly expressing' PD-L1," but did not disclose the exact percentage PD-L1 threshold targeted. *Id*. at 347, 353. The court held that "Bristol Myers had no obligation to disclose the precise percentage" and doing so "would allow competitors to copy or undercut" the target patient population. *Id*. at 353.

This starkly contrasts from the facts here because Plaintiff does not allege Defendants were required to disclose every detail about its clinical trials, and disclosures about the potential risk of elevated cholesterol would not have put Immunovant at a disadvantage. To the contrary, Immunovant's competitors *did* test for cholesterol. Plaintiff is not alleging that more details needed to be disclosed but rather that the Sept. 2020 Offering Documents created the untrue impression that

- 39 -

IMVT-1401's clinical trials complied with GCP.  ¶151.

**Statements about the focus of IMVT-1401's Clinical Trials:** Defendants repeatedly stated IMVT-1401's clinical trials were designed to test safety and tolerability even though Immunovant failed to monitor cholesterol, which directly impacted safety and tolerability.  *See, e.g.*, ¶¶139, 248, 259.  During the 3/30/20 Conf Call, Defendant Salzmann stated the ASCEND GO-1 study "was designed to examine the initial safety and efficacy of IMVT-1401 in thyroid eye disease."  ¶254. The 4/10/20 Registration Statement and Sept. 2020 Offering Documents discussed the ASCEND MG trial and represented it "assesses safety and efficacy of IMVT-1401," and the "primary endpoints of this trial are assessment of the safety and tolerability of IMVT-1401."  ¶¶139, 259. Those and other Company filings described IMVT-1401's other clinical trials in the same manner. ¶¶139, 248, 259.[18]

Importantly, when describing the ASCEND GO-2 Phase 2b trial, Immunovant used the exact same language, stating that the ASCEND GO-2 Phase 2b trial "assesses the safety and tolerability of IMVT-1401" and that the "primary endpoints" include "safety and tolerability."  *See, e.g.*, ¶248. Immunovant provided no warning or indication that earlier clinical trials had not measured cholesterol levels or that there was a heightened risk the ASCEND GO-2 Phase 2b trial could be disrupted because cholesterol was monitored.  ¶249.

The Underwriter Defendants argue Plaintiff cannot allege both that the statements about the early clinical trials were misleading because they failed to monitor cholesterol and the ASCEND GO-2 Phase 2b trial was misleading even though it monitored cholesterol.  UD MTD at 21-22.  The

---

[18]   ¶¶144, 259 (4/10/20 Registration Statement and Sept. 2020 Offering Documents discussed the ASCEND GO-2 Trial); ¶131 (Sept. 2020 Offering Documents discussed the ASCEND WAIHA trial); ¶268 (4/14/20 Prospectus filed by the Company in connection with a follow-on offering of approximately $139.4 million in Immunovant common stock contained nearly identical representations about the Company, the testing of IMVT-1401, and the prospects and safety of IMVT-1401 as contained in the 4/10/20 Registration Statement).

Underwriter Defendants miss the point and Plaintiff's allegations are entirely consistent. First, statements about all the trials were misleading because of the failure to disclose the potential risk of elevations in cholesterol and CV disease. Second, Immunovant included cholesterol monitoring in the ASCEND GO-2 Phase 2b trial precisely *because* it was a potential risk and the failure to disclose this change in monitoring rendered its statements about the early clinical trials misleading. Also, since Immunovant was now monitoring that risk, it heightened the risk that there would be disruptions in the clinical trials compared with earlier trials.

The Immunovant Defendants seek to minimize the materiality of the potential risk of elevations in cholesterol by describing the increases as "mild" and by arguing that IMVT-1401 was safe because "no patients experienced a 'major adverse cardiovascular event.'" IMVT MTD at 23 n.18. First, it cannot be seriously disputed that the elevations in cholesterol reported in the ASCEND GO-2 Phase 2b trial were material. The results caused the study to be halted, Immunovant's stock price plummeted, and Immunovant pivoted to develop IMVT-1402 because it may not elevate cholesterol. ¶¶167-183, 326. Second, even if elevations in cholesterol had not been identified in the ASCEND GO-2 Phase 2b trial, the omission of the potential risk was material, and Defendants' statements were materially false and misleading, because the risk profile of IMVT-1401 was materially worse than Defendants represented. Finally, the Immunovant Defendants' argument based on a lack of a "major adverse cardiovascular event" is a straw man argument because as Defendants presumably are aware, major cardiovascular events are typically the result of prolonged elevations in LDL and cholesterol levels and the clinical trials were not of that length.

The Immunovant Defendants argue the "implication" of Plaintiff's allegations is that "a clinical trial cannot adequately assess safety if it does not monitor every key potential risk" and they are "unequivocally a dispute about trial design." IMVT MTD at 23. The Immunovant Defendants

also argue that "there is no basis to suggest that cholesterol testing is the be-all and end-all of safety." *Id*. at 23 n.18.   The Immunovant Defendants miss the point.   Immunovant publicly represented it complied with GCP, and as such, was obligated to monitor potential risks, such as elevated cholesterol.   A reasonable investor, therefore, would have expected Immunovant's statements about safety and tolerability to have included an analysis of potential risks which they were obligated to have assessed.

### d.     The SAC Pleads Actionable Misstatements and Omissions Regarding IMVT's Nonclinical Animal Studies

The Sept. 2020 Offering Documents stated that "several nonclinical studies . . . demonstrated dose-dependent IgG antibody reductions and was observed to be well tolerated."   ¶141.   That statement was untrue because the nonclinical studies were not observed to be "well-tolerated" because animals experienced substantial elevations in cholesterol.   The Sept. 2020 Offering Documents contained a section titled, "Nonclinical Studies of IMVT-1401," which stated in part:

> Overall, in these nonclinical studies, there was a robust PK/TK and PD correlation in cynomolgus monkeys after removing the confounding element of ADA.   The immunogenicity response to human proteins generated in nonclinical species is generally not predictive of that in the human.   Nevertheless, subjects in clinical trials with IMVT-1401 will be carefully monitored for any AEs, including those related to immunogenicity.

¶149.

The   4/10/20   Registration   Statement   represented,   "[i]n   several   nonclinical studies . . . IMVT-1401 . . . was observed to be well tolerated."   This statement was misleading because the animal studies revealed substantial increases in cholesterol.   ¶¶264-265.   The 4/10/20 Registration Statement stressed that "Cynomolgus monkeys were selected as the primary species for nonclinical testing, given the high degree of sequence homology to human FcRn and IMVT-1401's strong binding affinity for monkey FcRn."   *See, e.g.*, ¶294.   Defendants made positive statements about the nonclinical studies, including about the similarities between the monkeys and humans, but

failed to disclose the negative information about cholesterol.  Since the Offering Documents and other Company SEC filings discussed the nonclinical animal studies, Defendants were under a duty to speak truthfully and fully about those studies, including that they had detected substantial elevations in cholesterol.  ¶91(a).  *In re Sepracor, Inc., Sec. Litig.*, 308 F. Supp. 2d 20, 25, 29 (D. Mass. 2004) (finding statements like, "[p]reclinical studies of [the drug] are very promising" material where defendants omitted information about cardiac effects and liver damage seen in the animal studies).[19]

The Underwriter Defendants argue statements about IMVT-1401's nonclinical trials are not actionable because they amount to "Plaintiff simply disagree[ing] with Immunovant's interpretation of study results."  UD MTD at 25.  But since the 2020 Offering Documents discussed positive aspects of the nonclinical studies, Defendants were under a duty to disclose full and complete information, including that cholesterol was elevated in monkeys.  The Underwriter Defendants argue the statement, "subjects in clinical trials with IMVT-1401 will be carefully monitored for any AE" was not misleading because it relates to the future.  *Id*.  Even though the monitoring may be occurring in the future, the protocols for IMVT-1401's clinical trials had already been completed.

### 5. Defendants' Arguments Challenging the Adequacy of the Alleged Misrepresentations and Omissions Are Without Merit

#### a. This Action Does Not Relate to a Disagreement About Immunovant's Clinical Trial Design

Defendants' core argument challenging falsity is that their materially false and misleading statements are not actionable because – according to Defendants – Plaintiff's claims are based on a disagreement about clinical trial design, and therefore, Defendants' statements are not actionable.

---

[19]  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 700, 704 (9th Cir. 2016) ("Defendants touted the safety and likely approval of [the drug]" while referring to the animal studies.  "But once they raised the animal studies, Defendants were obligated to disclose the Rat Study's existence to the market.").

IMVT MTD at 23-25; UD MTD at 5-10. Defendants' argument, which relies heavily on semantics and false premises, is stitched together from unsupported facts outside the SAC and is wrong under the facts and the law. Importantly, contrary to Defendants' bold assertion, the law is not "clear" that disputes about "trial design" are not actionable under the federal securities laws. IMVT MTD at 24. According to Defendants, since this action involves statements about the safety and viability of IMVT-1401, it must therefore be centered on a scientific disagreement about the methodologies used in Immunovant's clinical trials for IMVT-1401. IMVT MTD at 23-26; UD MTD at 8-10. In essence, Defendants are asking the Court to hold that clinical stage drug companies are immune from the liability provisions of the federal securities laws. Defendants' arguments misconstrue the facts of this case and the law.

The opinions cited by Defendants focus on an entirely distinguishable type of case where the plaintiffs challenged the types of statistical analyses and methodologies used or the manner in which clinical data was interpreted. *See, e.g.*, UD MTD at 6 (citing cases and stating "[c]hallenges to data interpretation or trial design are not a basis for Securities Act claims"). The SAC alleges claims based on Defendants' ***descriptions*** of the IMVT-1401 clinical trials and the types of things they were focusing on, and not whether the trials were ***designed*** correctly or whether the data from the trials was analyzed or described correctly.[20] *See, e.g.*, ¶223 ("could not be described"); ¶247 ("described it as 'comprehensive'").

The cases relied upon by Defendants are inapposite. IMVT MTD at 26; UD MTD at 7-8, 25. The plaintiffs in *In re Keryx Biopharmaceuticals, Inc. Securities Litigation*, 2014 WL 585658, at *7 (S.D.N.Y. Feb. 14, 2014), *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869, 878

---

[20]   Plaintiff's claim under SEC Rule 10b-5(a) and (c) are based on a fraudulent scheme as opposed to Defendants' statements but also are not based on a disagreement about the design of the IMVT-1401 clinical trial. ¶¶217-218; §III.D.7 herein.

(9th Cir. 2012), and *In re Novan, Inc.*, 2018 WL 6732990 (M.D.N.C. Nov. 30, 2018) alleged misrepresentations and omissions relating to scientific disputes over the statistical methodology or scientific trial design used by the defendants in connection with the analysis or reporting of clinical trial data and whether precise details of a methodology need to be disclosed.  IMVT MTD at 26.

Similarly, the plaintiff in *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *8 (S.D.N.Y. May 29, 2013) alleged "the use of multiple research arms" which enabled the defendants "to identify a statistically significant benefit, and heightened the likelihood of finding a false positive." *Id.* at *9; IMVT MTD at 26.  The court in *Abely* stated the plaintiff "does not allege that the existence of these multiple research arms was undisclosed or misleadingly described" and therefore, the allegations "merely amount to a competing view of how the trial should have been designed, not an allegation of material misstatement or omission."  2013 WL 2399868, at *9-*10.

The Immunovant Defendants cite *In re Adolor Corp. Securities Litigation*, 616 F. Supp. 2d 551, 576 (E.D. Pa. 2009) for the proposition that they were under no obligation to disclose they didn't monitor the potential risk of cholesterol. IMVT MTD at 25.  *Adolor*, however, is inapposite because that case focused on how trials were conducted, including whether "data packets must be completely unmarked" for a trial to be "double-blinded" and conclusory allegations that clinical data results were manipulated.  *Adolor*, 616 F. Supp. 2d at 567.  The Underwriter Defendants argue *Employees' Retirement System of the City of Baton Rouge & Parish of East Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369 (4th Cir. 2023) is directly on point.  UD MTD at 6-8.  That case, like the others cited by Defendants, relates to "contest[ing] Defendants' interpretation of [data]." *Id.* at 385.  Here, Plaintiff is not disputing the interpretation of the reported results from IMVT-1401's clinical trials.

An on point case is *In re QuantumScape Securities Class Action Litigation*, 580 F. Supp. 3d

at 714 (N.D. Cal. 2022) where the court rejected defendants' reliance on *Rigel Pharmaceuticals* because the plaintiffs in *QuantumScape* "do not merely allege that [defendants] should have used a different methodology for its studies [but] argue that the studies were represented to be one thing (uncompromised) when they were in fact another (compromised) that required experts . . . to accurately comprehend." *QuantumScape*, 580 F. Supp. 3d at 735.

Plaintiff here does not allege Immunovant should have used a different methodology for IMVT-1401's clinical trials but rather created the misleading impression IMVT-1401 was safe and well-tolerated without disclosing elevated cholesterol was a potential risk and that Defendants' statements about safety and tolerability did not incorporate an evaluation of that potential risk. Here, unlike in the cases relied upon by Defendants, there is no scientific dispute over how Immunovant interpreted data or used a statistical methodology to conduct trials or whether Immunovant designed its clinical trials correctly. As in *QuantumScape*, IMVT-1401's clinical trials were represented to be conducted in accordance with GCP – when they were not, and IMVT-1401 was represented to be safe and well-tolerated, even though the clinical trials did not evaluate an important potential risk directly related to safety and tolerability. Plaintiff alleges that descriptions of the trials and the results of the trials were misleading because Immunovant failed to monitor an important potential risk and had not advised investors of this fact. And none of the cases cited by Defendants relate to the failure to monitor a key potential risk or how the failure caused statements to be misleading. Since Immunovant had not monitored the potential risk of elevated cholesterol levels, those statements were false and misleading. *Abramson*, 965 F.3d at 177 (finding that investors would credit a pharmaceutical company executive's statement "as researched and intentional").

There can be no scientific dispute as to whether Immunovant monitored and assessed cholesterol levels in IMVT-1401's early clinical trials. Either they monitored cholesterol or they

- 46 -

didn't.  ¶120.  Therefore, none of the cases cited by Defendants are applicable.  As with the clinical trial results, a reasonable investor would have expected that IMVT-1401's early clinical trials had monitored and assessed potential risks such as cholesterol.

Defendants argue "there is no dispute that Defendants did not have information about patients' cholesterol levels when the challenged statements were made because the Phase 1 and 2a clinical trials were not designed to provide that information."  IMVT MTD at 24-25.  First, Plaintiffs do not allege Defendants *knew* clinical trial patients had elevated cholesterol but rather that Defendants knew or recklessly disregarded there was a potential *risk* of cholesterol elevations. Second, it is an issue of fact whether, at the time of their statements about the results of the Phase 1 and 2a clinical trials, Defendants had already been informed by the investigator for the ASCEND GO-2 Phase 2b trial that cholesterol was elevated in patients.  Indeed, Immunovant initiated dosing in the ASCEND GO-2 Phase 2b trial in October 2019 and cholesterol was elevated in patients at week 12 so Defendants could have learned about cholesterol safety issues on an ongoing basis during the trial.  *See Kusnier v. Virgin Galactic Holdings, Inc.*, 2022 U.S. Dist. LEXIS 202432, at *43 (finding statements attributing flight success to an "incredibly safety diligent program . . . anchored in safety experience" actionable where the flight actually had a dangerous deviation). Discovery will reveal when Immunovant first learned of the cholesterol elevations in the ASCEND GO-2 Phase 2b trial.  At minimum, Immunovant likely learned about the cholesterol elevations no later than November 2020 since FE was asked to review IMVT-1401's animal studies in January 2021, about 8 weeks later.  ¶94 (cholesterol elevations observed at week 12 of 20 week study).

### b.    Defendants' Statements Are Not Nonactionable Opinion Statements

Defendants argue certain statements are not actionable because – according to Defendants – they are opinions.  IMVT MTD at 26-29; UD MTD at 17-20.  Defendants are wrong on the law and the facts.  The statements Defendants challenged, including the following, are actionable:

- "Consistent with previously reported Phase 1 results, IMVT-1401 was observed to be generally safe and well-tolerated with no serious adverse events (SAEs), no withdrawals due to adverse events (AEs)." ¶276; App. A at Nos. 5 and 35.

- "There have been no treatment-related serious AEs reported." ¶¶133, 137, 250, 266, 274; App. A at Nos. 1, 4, 25, 32, 34.

- "These reductions were not associated with any AEs or clinical symptoms." ¶¶146, 287; App. A at Nos. 8, 40.

- "IMVT-1401 is a uniquely compelling asset within the FcRn drug class." ¶222; App. A at No. 12.

- "comprehensive Phase 1 program demonstrating robust IgG reductions . . . [and] a broad Phase 2 program with both first-in-class and best-in-class potential." ¶222; App. A at No. 12.

- "[Albumin] reductions were not associated with any AEs or clinical symptoms, and did not lead to any study discontinuations." ¶¶146, 287; App. A at Nos. 8, 40.

- "subjects in clinical trials with IMVT-1401 will be carefully monitored for any AEs, including those related to immunogenicity." ¶149; App. A at No. 9.

- "dose-dependent and reversible albumin reductions were observed." ¶¶146, 287; App. A at Nos. 8 and 40.

IMVT MTD at 26-29; UD MTD at 17-20.

The Supreme Court in *Omnicare* "rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made" and provided two methods of alleging opinion statements are actionable.  *Abramson*, 965 F.3d at 175 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185 (2015)).  First, a plaintiff "can allege that a statement of opinion contained one or more embedded factual statements that can be proven false." *Abramson*, 965 F.3d at 175.  Second, a plaintiff "can

- 48 -

allege that a statement of opinion, without providing critical context, implied facts that can be proven false." *Id.*

With respect to the second method, *Omnicare* provided as an example the statement, "[w]e believe our conduct is lawful." 575 U.S. at 188. As discussed in *Abramson*, "this statement implies, if investors are not informed otherwise, that the speaker has so concluded after investigating the governing law." 965 F.3d at 175. And if the speaker "has not investigated the governing law, and has omitted this critical context, the statement of opinion, although literally true (assuming the speaker believed it) . . . may be misleading by omission and thus actionable under the second part of Rule 10b-5." *Id.* As summed up in *Abramson*, "[i]n other words, when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow." *Id.*

The Immunovant Defendants cite several cases for the proposition that "interpretations of the results of various clinical studies" are opinions because "reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions." IMVT MTD at 27-28[21] (quoting *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015); *Bristol-Myers Squibb*, 28 F.4th at 355; *Smith v. Antares Pharma, Inc.*, 2020 WL 2041752, at *5 (D.N.J. Apr. 28, 2020)). The reasoning in those cases, however, does not apply here because Plaintiff does not dispute how Immunovant interpreted or described data obtained from IMVT-1401's clinical trials. Rather, Plaintiff alleges Immunovant failed to even ***obtain*** data to be interpreted or described so

---

[21] The Immunovant Defendants cite *Tongue v. Sanofi*, 816 F.3d 199, 213-14 (2d Cir. 2016); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 566-67 (S.D.N.Y. 2011); *In re MELA Scis., Inc. Sec. Litig.*, 2012 WL 4466604, at *13 (S.D.N.Y. Sept. 19, 2012); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015). Those cases are inapplicable because Defendants' statements are not protected statements of opinion. *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *12 n.10 (S.D.N.Y. Apr. 22, 2016) (holding that defendants' statements are not opinions because they are "predicated upon untrue supporting statements of fact" or "omit material facts about the speaker's inquiry into or knowledge of facts that would support the stated opinion").

- 49 -

Defendants' statements were materially incomplete and misleading.

Defendants' statements were materially false and misleading because they imply that Immunovant monitored and assessed the potential risks which should have been monitored and which could have impacted "safety data," including whether IMVT-1401 was "well-tolerated" or caused any serious AEs. Since Defendants knew, or reasonably should have known, that Immunovant had not tested for the key potential risk of elevated cholesterol, Defendants' statements were misleading. *Abramson*, 965 F.3d at 175. Additionally, Defendants lacked a reasonable basis to claim that IMVT-1401 was "safe," "well-tolerated," or did not cause any AEs. There was a potential risk IMVT-1401 was not well-tolerated and caused serious AEs but the data and results did not reflect those facts because Immunovant failed to monitor cholesterol.

Furthermore, "*Omnicare* held that the appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor." *Abramson*, 965 F.3d at 175. When "assessing what a reasonable investor would expect, the Supreme Court stressed the importance of context, such as 'the customs and practices of the relevant industry' and whether the opinion was expressed in a formal statement such as an S.E.C. filing or instead was a 'baseless, off-the-cuff judgment[ ], of the kind that an individual might communicate in daily life.'" *Id.*, quoting *Omnicare*. Here, the statements were formally made in SEC filings and during analyst conference calls and a reasonable investor would have expected that Immunovant complied with GCP and tested for all potential risks, including cholesterol. Since that was not true, Defendants' statements were materially false and misleading.

Indeed, the SAC alleges numerous facts raising a plausible inference a reasonable investor would have expected: (i) IMVT-1401 clinical trials to monitor important potential risks, such as cholesterol; and (ii) that statements about IMVT-1401 results and clinical trials were based on an

assessment of important potential risks, such as cholesterol. ¶¶122-124. A reasonable investor would have expected Immunovant and the IMVT-1401 clinical trials to have adhered to FDA rules, guidelines, and GCP and therefore would have expected IMVT-1401's clinical trials to actively monitor and assess key potential risks. ¶123. Further, the SAC alleges multiple facts raising a plausible inference that elevations in cholesterol and heart disease are not merely a potential risk, they are important potential risks that might alter the benefit-risk profile of a drug and are at the forefront of the minds of reasonable investors. ¶124. Among other things, "[h]igh cholesterol is a common health concern," "more than 95 million adults in the United States have high cholesterol levels, which puts them at increased risk for heart disease and stroke" and "more than 80% of American adults surveyed considered it important to manage their cholesterol levels to reduce their risk of heart disease." *Id*.

The Immunovant Defendants argue Defendants' statements are not actionable because "there is not a single well-pled fact in the SAC alleging . . . any Defendant knew IMVT-1401 could increase cholesterol levels." IMVT MTD at 28. As discussed below, the Immunovant Defendants are wrong. *See* §III.D.6. The Immunovant Defendants inappropriately base arguments on facts from outside the SAC (§III.C) to minimize the materiality of the cholesterol elevations but there can be no serious dispute these elevations were material.

### c.      Defendants' Statements Are Not Nonactionable Puffery

Defendants argue a number of alleged misrepresentations are nonactionable puffery. IMVT MTD at 29; UD MTD at 21-23. The Immunovant Defendants argue that statements such as describing IMVT-1401 as a "uniquely compelling asset" and "best-in-class," and describing the clinical trials as "comprehensive" and "broad" are inactionable puffery. IMVT MTD at 29. Misstatements such as these "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Va. Bankshares, Inc. v. Sandberg*, 501

- 51 -

U.S. 1083, 1093 (1991). Additionally, similar type of statements have frequently been held actionable where, as here, "the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (citing *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015)).

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *Petrobras*, 116 F. Supp. 3d at 381; *see also Citizens Utils.*, 228 F.3d at 162 ("[W]hether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case."). Even where the alleged statements are "general enough that, had they been made in isolation, they might not be actionable," numerous courts have found that the repeated touting of such statements "over and over and over" precludes finding the statements immaterial as a matter of law. *BHP Billiton*, 276 F. Supp. 3d at 80 (finding actionable statements regarding BHP's "relentless focus on the health and safety of our people and the communities in which we operate" and its "overriding commitment . . . to ensuring the safety of our people, and respecting our environment and the communities in which we work."); *Bricklayers & Masons Loc. No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (upholding alleged misrepresentations because "[t]he Court cannot say, as a matter of law, that Transocean's representation that [safety and training] efforts were extensive was 'obviously unimportant'" to shareholders).

Here, descriptions of IMVT-1401 as "uniquely compelling" with "best-in-class potential" were misleading because of the undisclosed potential risk of elevations in cholesterol, which would render those statements objectively misleading. Additionally, since cholesterol was not monitored, it was misleading to describe IMVT-1401's clinical trials as "broad" and "comprehensive." *In re*

- 52 -

*Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *12 (E.D.N.Y. Sept. 27, 2019) (properly "viewed in the context of Plaintiff's allegations," statements about competition were not puffery, and statements about sources of company's success that were framed as opinions omitted relevant information which made them materially misleading and therefore actionable); *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *7 (E.D.N.Y. Dec. 5, 2013).

> **d.    Defendants' Misrepresentations Are Not Protected by the Bespeaks Caution Doctrine or the PSLRA Safe Harbor**

The Immunovant and Underwriter Defendants argue certain of the alleged misstatements are protected under the PSLRA safe-harbor and bespeak caution doctrine (IMVT MTD at 29-30; UD MTD at 20, 22, 26; App. A), but those protections only apply to statements that are "forward-looking" and: (1) identified as such and accompanied by meaningful cautionary statements; (2) immaterial; or (3) made without actual knowledge that the statements were false or misleading. *Vivendi*, 838 F.3d at 245. The protections do not apply here because many of the challenged misstatements are mixed statements of present or historical fact, none of them are accompanied by "meaningful" cautionary language, and Defendants had actual knowledge that the statements were false or misleading. For example, Defendants challenge the following statements, which are mixed statements of present or historical fact and the SAC alleges the present or historical portions of those statements as being misleading:

- "***We intend*** to develop IMVT-1401 as a fixed-dose, self-administered subcutaneous injection on a convenient weekly, or less frequent, dosing schedule." ¶134; App. A at No. 2.

- "We ***currently remain on track*** to report initial results from our ASCEND GO-2 trial in the first half of calendar year 2021." ¶144; App. A at No. 7.

- "Top-line data from ongoing Phase 2a trial in Graves' ophthalmopathy ***expected by*** Q1 2020." ¶221; App. A at No. 11.

Statements such as "we intend," "currently remain," and "expected by" are each statements

- 53 -

of present facts and Plaintiff does not challenge the forward looking portions of those statements. *In re Fibrogen, Inc. Sec. Litig.*, 2022 WL 2793032, at \*8 (N.D. Cal. July 15, 2022) ("Statements that mix past or current facts with forward-looking optimistic statements do not qualify for safe harbor protection."); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc.*, 477 F. Supp. 3d 123, 135 (S.D.N.Y. 2020) (finding statements that defendants were "working on" a "rights renewal process" actionable). For example, Plaintiff alleges the statement "currently remain on track" is misleading because **at that time** it created the inaccurate impression the ASCEND GO-2 Phase 2b trial was simply another clinical trial in a long line of clinical trials. Unbeknownst to investors, the ASCEND GO-2 Phase 2b trial was assessing cholesterol so there was a heightened risk elevated cholesterol would be identified which would likely result in a disruption and delay of the IMVT-1401 clinical trial program. ¶145.

Even if the broad array of statements identified by Defendants as "forward-looking" are, in fact, forward-looking (they are not), such statements are shielded from liability only when accompanied by "meaningful cautionary language." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010). "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.* at 772; *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013). As discussed in §§III.E.2 and III.G, Immunovant's purported cautionary language was not adequate.

### 6. Plaintiff Adequately Alleges Scienter

Scienter may be established by pleading **either** of the following: (1) that defendants had the "motive and opportunity" to commit fraud; **or** (2) "strong circumstantial evidence of recklessness or conscious misbehavior." *Novak*, 216 F.3d at 309-310; *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 162-163 (E.D.N.Y. 2020). "The inference that the defendant acted with scienter need not be

irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" so long as it is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "The court's job is not to scrutinize each allegation in isolation, but to consider whether the allegations holistically raise a strong inference of scienter." *Nutriband, Inc. v. Kalmar*, 2020 U.S. Dist. LEXIS 126931, at *23 (E.D.N.Y. July 20, 2020). Any "tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). Considering the SAC's allegations as a whole, which the Court must, the SAC alleges a strong inference of scienter for each of the Exchange Act Defendants. *See, e.g.*, ¶¶301-322.

### a.    The Exchange Act Defendants Acted with Conscious Misbehavior or Recklessness

"Recklessness may be shown by allegations that defendants 'knew facts or had access to information suggesting their public statements were not accurate or failed to check information they had a duty to monitor." *Nutriband*, 2020 U.S. Dist. LEXIS 126931, at *23 (citing *Novak*, 216 F.3d at 311). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. The key question is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id*.

The SAC alleges numerous facts raising a strong inference of scienter. By the start of the Class Period, each of the Exchange Act Defendants had access to: (i) the results of the IMVT-1401 animal studies revealing substantial elevations in cholesterol; (ii) the medical studies and literature indicating albumin reductions and IMVT-1401 elevates cholesterol levels; (iii) information concerning IMVT-1401's clinical trials, including that early clinical trials failed to monitor

- 55 -

cholesterol and that the ASCEND GO-2 Phase 2b trial monitored cholesterol; and (iv) information concerning the testing procedures of other companies developing compounds similar to IMVT-1401. ¶¶91-113. And each of the Exchange Act Defendants had the scientific expertise and knowledge to understand those facts indicated elevated LDL and cholesterol levels were potential risks of IMVT-1401, that IMVT-1401's early clinical trial results did not monitor the potential risk of cholesterol elevations, and that Defendants made materially false and misleading statements or omitted material information.

Plaintiff has alleged a host of facts demonstrating Defendants acted with scienter when they misrepresented and omitted facts as described above and alleged in the SAC. Moreover, because the matters in question concern the primary "core" and only product of the Company, Defendants Salzmann and Wong are presumed to have that knowledge. *See, e.g., E\*Trade*, 712 F. Supp. 2d at 195 (information at core of a company's business may be properly ascribable to senior officers; collecting cases).[22]

**Defendant Salzmann:** There can be no reasonable dispute that the SAC adequately alleges Defendant Salzmann knew facts or had access to information contradicting his and Immunovant's statements. In addition to serving as the Company's CEO, Defendant Salzmann is a highly experienced and knowledgeable professional in the biopharmaceutical industry with extensive knowledge of clinical trials of drugs generally, and IMVT-1401 specifically. ¶303. Defendant Salzmann therefore was knowledgeable about GCP, including that IMVT-1401's clinical trials should monitor, assess, and mitigate potential risks. ¶¶303-305. He was also in position to learn and had access to the red flags that there was a potential risk IMVT-1401 elevated cholesterol. As the highest-level officer of a small company whose prospects hinged entirely upon the development and

---

[22]   *In re Pall Corp.*, 2009 WL 3111777, at *7 (E.D.N.Y. Sept. 21, 2009) (same).

eventual commercialization of IMVT-1401 (¶¶303-306), "it would be 'absurd to suggest that . . . [Defendant Salzmann was] without knowledge of the[se] matter[s].'" *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012); *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021). Plaintiff does not, as the Immunovant Defendants contend, allege Salzmann's scienter based merely on his "title and background[]." IMVT MTD at 19 n.13 (discussing cases where plaintiff based scienter on title and background).

Defendant Salzmann held himself out as knowledgeable about the facts at the center of this case and was the primary person speaking on behalf of the Company about IMVT-1401, including during analyst conference calls and at medical conferences. *See, e.g.*, Speers Decl. Ex. 14; ¶¶246, 252, 254, 256, 278, 281, 285, 290, 292 (Salzmann discussing IMVT-1401 clinical trials, clinical trial results, and the science of IMVT-1401). He regularly discussed the science behind IMVT-1401, reported details about clinical trials, and compared IMVT-1401 with competing products in development by other companies. *See, e.g., Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 473 (S.D.N.Y. 2013) ("find[ing] a strong inference of scienter" where plaintiffs "adequately alleged that defendants were aware of information that contradicted their statements"); *Ellenburg v. JA Solar Holdings Co. Ltd.*, 2010 WL 1983375, at *6 (S.D.N.Y. May 17, 2010) (same). That Defendant Salzmann frequently spoke about these topics supports an inference that he (and Immunovant) "had intimate knowledge of those facts or should have known of them." *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *see also Gauquie v. Albany Molecular Rsch., Inc.*, 2016 U.S. Dist. LEXIS 97295, at *5-*6 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it").

**Defendants Wong and Roivant:** The SAC adequately alleges recklessness against Defendants Wong and Roivant. Defendant Wong acknowledged he was extremely familiar with the

- 57 -

science behind IMVT-1401 and the progress of development, stating on the Merger conference call, as HSAC's CEO, "we've been tracking the development of IMVT-1401 for several years now as part of our competitive analysis of the FcRn drug class, which we expect will become a cornerstone therapy for treating many auto-antibody driven disease." ¶¶222, 308; *Salix*, 2016 WL 1629341, at *14 (scienter adequately alleged by CFO's statement that "we have visibility in the inventories because we know what we ship, we know what pulls through, we know what returns are").

Defendant Roivant acquired the initial license for IMVT-1401 (¶49) and the animal studies showing elevated cholesterol had already been completed. ¶149. Defendant Wong was an investor in Legacy Immunovant and performed due diligence of IMVT-1401 for months prior to the Merger with HSAC. ¶¶308-309, 338. In fact, Wong approached Roivant to propose the sale of Legacy Immunovant to HSAC. ¶56. Defendant Wong was aware IMVT-1401 reduced albumin levels and acknowledged he reviewed scientific literature about potential side effects of albumin reductions. ¶285 (Wong responding to a question about albumin reductions and discussing "people in the literature are generally asymptomatic").

Nevertheless, during the Merger conference call, Defendant Wong minimized the negative impact of albumin reductions and failed to disclose the material risks of IMVT-1401 to investors. *See Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *6 (E.D.N.Y. Mar. 30, 2012) (finding strong circumstantial evidence of conscious misbehavior or recklessness by the defendants, given their failure to disclose material adverse information concerning the company's largest source of business and "the potential resulting adverse impact on costs, sales, pricing, operating leverage and profitability"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009) (allegations that defendant "had 'information suggesting that [his] public statements were not accurate'" were "sufficient to allege . . . scienter"); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F.

Supp. 2d 603, 622 (S.D.N.Y. 2008) (allegations "that [d]efendants had knowledge of facts . . . that explicitly contradicted their public statements … alone [is] enough to satisfy the pleading requirement for scienter.").

**Immunovant:** Where the defendant is a corporation, a plaintiff can "plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Henry Schein*, 2019 WL 8638851, at *22 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)). While there must be "some connection at the corporation between a misstatement and the requisite quantum of knowledge of its falsity" for corporate scienter to attach, this requirement is "generally satisfied where the employee with knowledge of the facts that make a corporate statement misleading occupies a position likely to enjoy some oversight over the company's public-facing representations." *Rex & Roberta Ling Living Tr. U/A Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 409-10 (S.D.N.Y. 2018). The Second Circuit has stated that "the 'most straightforward' way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).[23] Here, there can be no serious dispute that Defendant Salzmann's scienter can be imputed to Immunovant. *Loreley Fin.*, 797 F.3d at 177.

Furthermore, the animal studies were used to support Immunovant's INDs for clinical trials as well as to evaluate potential risks, so at a minimum, Immunovant knew its contents, and

---

[23]   The Immunovant Defendants' reliance on *Jackson* is misplaced.  IMVT MTD at 19-20.  In *Jackson*, the plaintiffs' allegations of knowledge focused on "a handful of employees" but did not connect their knowledge to more senior executives.  960 F.3d at 96.

Defendants Salzmann, Wong and Roivant had access to them, supporting scienter. ¶¶305-310. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("[S]cienter may be found where there are 'specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice' that the public statements were false."); *Lockheed Martin*, 875 F. Supp. 2d at 371 ("[W]hen contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company.").[24] In the 11/27/19 Proxy Statement, Defendants represented the "Company is not aware of any studies, tests, development or trials the results of which reasonably call into question the results of the studies, tests, development and trials conducted by or on behalf of the Company." ¶240. As a result, Defendants attested to the accuracy of the animal study results and, by extension, represented they are aware of the data in the animal studies, including the substantial elevations in cholesterol.

**Defendants' Arguments:** The Immunovant Defendants rely on several cases to support their argument against Salzmann's scienter, but because Plaintiff does not solely rely on corporate position, they are distinguishable. IMVT MTD at 19. In any event, "[t]he fact that [defendant] was CEO and held himself out as an expert on [the drug] supports a finding of scienter." *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus.*, 2022 U.S. Dist. LEXIS 54272, at *40-*43 (E.D. Pa. Mar. 25, 2022) (finding scienter where corporate defendant had more than 30 years'

---

[24] The Immunovant Defendants argue Plaintiff's allegations are insufficient because Plaintiff is required to allege that a particular defendant reviewed a particular article or report. IMVT MTD at 19-20. That is not the law. Courts in this circuit have repeatedly held that a plaintiff can plead scienter by alleging the existence of circumstantial evidence that the information reached or was accessible to defendants. *See In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *11 (S.D.N.Y. Apr. 1, 2015) (allegations sufficient where "defendants had access to information in the form of monthly progress reports and statements from the Project Manager"); *Wang*, 2023 U.S. Dist. LEXIS 44788, at *42 ("facts contrary to a defendant's public representations may also be learned in other ways" aside from reports).

experience in the pharmaceutical industry); *see also In re Vicuron Pharms., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 15613, at *28 (E.D. Pa. July 1, 2005) (finding a strong inference of scienter against the individual defendants who "had special roles and responsibilities in communicating information to the investment community" about a drug that was the company's lead product in development).

The Immunovant Defendants argue Defendant Salzmann was unaware of the cholesterol elevations reflected in the animal studies and the scientific literature. IMVT MTD at 19-20. The Immunovant Defendants also argue Plaintiff has not adequately alleged scienter regarding the scientific studies because Plaintiff does not allege "anyone raised a concern" about any connection between albumin reductions and elevations in cholesterol or increased cardiovascular risk. IMVT MTD at 22. They fail to acknowledge, however, that Immunovant as the sponsor of IMVT-1401, was required under FDA guidelines to "monitor and assess safety information on an ongoing basis, looking for the emergence of any new risks" and "conduct literature searches regularly . . . to seek safety information."[25] ¶¶82, 85-86. Defendant Salzmann "had a duty to monitor" and be aware of the details of the animal studies and scientific literature and therefore either knew about or "ignored obvious signs of fraud." *Novak*, 216 F.3d at 308, 311. ¶304. It is not believable that Defendant Salzmann and other senior Immunovant employees did not carefully review and discuss those animal studies.

Nevertheless, Defendant Salzmann failed to disclose these risks to investors, minimized the impact of albumin reductions, and denied the existence of relevant scientific studies. *See, e.g.,*

---

[25]    The Immunovant Defendants argue the SAC doesn't allege "any Defendant actually reviewed Harbour's clinical trial protocols" reflecting it monitored cholesterol (IMVT MTD at 20 n.14) but ignore that Immunovant repeatedly made statements about alternative products, thereby attesting to its knowledge about other drugs in the marketplace. Scienter allegations must be viewed holistically and an inference can be drawn that Immunovant was aware of Harbour's protocol under the information sharing agreement.

*Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23-24 (2d Cir. 2017) ("failure to disclose . . . true facts about the threat to the company" constituted "at least 'a reckless disregard of a known or obvious duty to disclose,' and thus powerfully support[ed] a strong inference that the [d]efendants acted with scienter") (internal citations omitted); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (allegations that defendants "acted with at least a reckless disregard of a known or obvious duty to disclose" gave rise to a strong inference of scienter); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 483-84 (S.D.N.Y. 2010) (defendant acted with scienter by "issu[ing] unguardedly optimistic statements" about joint venture while failing to disclose risks).

Defendants' reliance on *Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444 (D. Mass. 2016) is misplaced. IMVT MTD at 21-22. The plaintiff in *Brennan* alleged the defendants failed to disclose two "superficial" AEs even though the defendant had disclosed two serious AEs. 199 F. Supp. 3d at 466. The court found plaintiff's theory "barely plausible" because "it would have been somewhat strange for defendants to alert investors to two serious AEs while, in the very same disclosures, intentionally hiding two superficial AEs." *Id*. As stated by the court in *Brennan*, the "relevant issue concerning scienter in this case is not whether defendants knew about the superficial AEs when they made the allegedly misleading disclosures. It is undisputed that they did know." *Id*. The court in *Brennan* held that the articles, which were the only facts supporting scienter, fell short of demonstrating "defendants knew that they risked misleading investors by not disclosing the two superficial AEs." *Id*.

Here, in contrast, there is no reasonable dispute the undisclosed potential risks to IMVT-1401 were material and the SAC alleges the Exchange Act Defendants knew, or recklessly disregarded, that IMVT-1401 could cause cholesterol elevations or CV disease based on a holistic view of numerous facts, including IMVT-1401's monkey studies, the fact that the ASCEND GO-2 Phase 2b

- 62 -

trial monitored cholesterol, and the existence of numerous scientific studies and reports supporting those facts. ¶¶91-113.

The facts here are very different from the cases cited by the Immunovant Defendants. IMVT MTD at 19 n.13. The plaintiff in *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) simply made a "broad reference to raw data" while Plaintiff here alleges specific facts about the IMVT-1401 animal studies, including details about the results of those studies, as provided by FE. *Jackson*, cited by the Immunovant Defendants, rejected scienter because the complaint did not "identify any individual whose scienter may be imputed to the Corporate Defendants." 960 F. 3d at 98. As discussed above, Salzmann's scienter can be imputed to Immunovant.

### b.    The SAC Adequately Alleges Defendants' Motive and Opportunity

Although Plaintiff satisfies the Second Circuit's pleading requirements for scienter under a recklessness theory, the SAC also pleads motive and opportunity as another basis to find scienter. *See Citizens Utils.*, 228 F.3d at 170 ("[I]f the court decides . . . that the Complaint successfully pleaded the defendants engaged in conscious or reckless misbehavior, it need not also consider the motive and opportunity prong of scienter."). There can be little dispute over the opportunity analysis (and rarely is in these cases). *Nutriband*, 2020 U.S. Dist. LEXIS 126931, at *35 (stating Defendants are "corporate insiders at the highest level, which gives rise to the presumption of an opportunity to commit fraud").

To demonstrate motive, a plaintiff "must allege that the corporate defendant or its officers benefitted in some concrete and personal way from the purported fraud," typically by alleging corporate insiders "made a misrepresentation in order to sell their own shares at a profit." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009);

*Nutriband*, 2020 U.S. Dist. LEXIS 126931, at \*35; *Tecku v. Yieldstreet, Inc.*, 2022 WL 1322231, at \*11 (S.D.N.Y. May 3, 2022). While stock sales are ***typical***, they are not required to show motive. *See id.* The lack of stock sales also does not "establish the absence of a scheme to profit from insider trading[,]" but only establishes the "absence of a successful scheme[,]" or a desire to avoid criminal liability. *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 15 (D. Mass. 2004) ("Defendants could have commenced a fraudulent scheme, in hopes of profiting from insider trading, but simply have waited too long to sell, such that by the time it became apparent that full disclosure would be necessary, massive trades would expose them to potential criminal liability.").

The Exchange Act Defendants stood to benefit financially from hiding from investors that there was a potential risk that IMVT-1401 could elevate cholesterol levels and cause CV disease. Delaying the disclosure of these facts enabled Defendants Immunovant, Wong and Roivant to accumulate hundreds of millions of dollars in cash and securities. Defendants Wong and Roivant had substantial incentives to ensure HSAC and Legacy Immunovant was consummated so Wong could benefit from his investment in HSAC and so Wong and Roivant could monetize their investments in Legacy Immunovant. ¶¶314-315.

Defendants Roivant and Wong were motivated to artificially inflate the price of Immunovant shares and delay disclosing to investors that elevated cholesterol levels were a potential risk of IMVT-1401 until after they received their lucrative earnout shares. ¶¶316-319. The artificial inflation in the price of Immunovant shares enabled Roivant, Wong and others to earn the first tranche of 10 million earnout shares on May 12, 2020 when the price of Immunovant stock was at $22.70 per share (valued at $227 million) and earn the second tranche of 10 million earnout shares when the price of Immunovant was $38.43 per share ($384 million). Collectively, Defendants Roivant, Wong and other Legacy Immunovant shareholders received 20 million earnout shares

valued at more than $611 million on the dates they were earned.  ¶318.

Furthermore, the artificial inflation in the price of Immunovant common stock enabled Immunovant and various selling shareholders, including entities controlled and owned by Defendant Wong, to sell hundreds of millions of dollars of Immunovant common stock to investors through several public follow-on offerings and shelf registrations, including on or about April 10, 2020, April 14, 2020, and September 2, 2020.  The funds raised by Immunovant from these offerings enabled it to have cash to develop IMVT-1402.  ¶¶320-321.  *See In re Cassava Scis., Inc. Sec. Litig.*, 2023 U.S. Dist. LEXIS 82417, at *28-*29 (W.D. Tex. May 11, 2023) ("[B]y pumping up [Immunovant's] stock price, Defendants were able to raise much-needed working capital for the future development of [IMVT-1402].").

The Immunovant Defendants' arguments attacking Plaintiff's motive allegations are without merit.  ***First***, the Immunovant Defendants erroneously argue the "chronology of events undermines the plausibility" of Plaintiff's motive allegations.  IMVT MTD at 16.  The Immunovant Defendants also argue that it would be "illogical" for Defendants to intentionally delay monitoring cholesterol to secure earnout shares, only to then risk it all by monitoring cholesterol during the ASCEND GO-2 Phase 2b trial.  IMVT MTD at 18.  Defendants misconstrue Plaintiff's allegations and focus on the timing and reasons for the cholesterol testing as opposed to Defendants' statements and omissions.  Defendants' motive stems from their materially false and misleading statements ***during*** the Class Period.  Any decisions about when to monitor cholesterol pre-date the Class Period and provide context for Plaintiff's claims but are not the basis of Plaintiff's motive allegations.  Plaintiff alleges that ***because*** Immunovant did not monitor cholesterol in early clinical trials, Defendants failed to disclose that cholesterol was a potential risk of IMVT-1401 and misrepresented the safety and tolerability of IMVT-1401 to enable them to receive the earnout shares.  There was a window of

- 65 -

time when Immunovant was revealing results that did not include cholesterol monitoring and the Exchange Act Defendants took advantage of that window by hiding the potential risk of cholesterol elevations from investors.

Additionally, even when Immunovant began monitoring cholesterol it was not assured the risk would be revealed. Elevated cholesterol levels from IMVT-1401 were only a *risk* and not a *certainty* so there was a possibility that IMVT-1401 would not elevate cholesterol levels during clinical trials. Plaintiff's claims are not like the facts in *Gillis* or *Nguyen* (cited by Defendants IMVT MTD at 18) because, unlike those cases, here there was a chance Defendants' fraud would not be revealed. *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557 (S.D.N.Y. 2016); *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020). Even if the fraud was not successful, Plaintiff's claim would still raise a strong inference of scienter. *Puddu v. 6D Glob. Techs., Inc.*, 2021 U.S. Dist. LEXIS 60905, at *35 (S.D.N.Y. Mar. 30, 2021) ("Plaintiffs need not show that the fraud succeeded, but [] that the false materially misleading statements, or material omissions, 'reasonably could have been expected' to result in a benefit."); *Fibrogen*, 2022 WL 2793032, at *18-*21 (finding an inference of scienter and rejecting defendants' argument that plaintiff's theory is "nonsensical" like that in *Nguyen*).

*Second*, the Immunovant Defendants argue that the SAC does not allege that Wong sold shares. IMVT MTD at 18. As the Immunovant Defendants are certainly aware, Wong's earnout shares were obtained by various entities affiliated with Wong and those transactions may not be reflected on Wong's Form 4 filings. Whether those entities sold shares and how many they may have sold are factual issues for discovery. Importantly, even if Roivant and Wong's affiliated entities sold zero shares, the fraud was still profitable. On February 2, 2021, *after* Immunovant announced the halting of the clinical trial at the end of the Class Period which caused a 42% decline in the price of Immunovant shares, the earnout shares were valued at more than *$500 million*. ¶319.

- 66 -

Therefore, on the day that Plaintiff and the Class suffered losses because of Defendants' fraud, Roivant, Wong and others had a $500 million profit. *In re Romeo Power Sec. Litig.*, 2022 U.S. Dist. LEXIS 99005, at *13 (S.D.N.Y. June 2, 2022) (finding an inference of scienter, rejecting defendants' argument that increasing stock during the class period undermined scienter, and noting that the individual defendants "appear[ed] to have received shares as part of a compensation or incentive package."). Additionally, Immunovant raised hundreds of millions of dollars in follow-on stock offerings, which enabled it to have funds to develop IMVT-1402. *See Skiadas v. Acer Therapeutics Inc.*, 2020 U.S. Dist. LEXIS 105814, at *35 (S.D.N.Y. June 16, 2020) (discussing how a motive to raise money for a company that will otherwise fail to survive is a "strong[] incentive to bet the farm in a reckless gamble because the alternative is certain failure"); *see also In re Silvercrop Metals Sec. Litig.*, 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014) (discussing how a stock offering is an adequate motive when combined with strong circumstantial evidence of recklessness).

### 7.        Plaintiff Adequately Alleges Scheme Liability

Section 10(b) makes it unlawful "[t]o employ any device, scheme or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *6-*7 (S.D.N.Y. Feb. 17, 2022).[26]

A manipulative act "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021). Plaintiff "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim at the early stages of litigation." *Guevoura Fund v. Sillerman*, 2016 U.S. Dist. LEXIS 128076, at *25 (S.D.N.Y. Sept. 12, 2016) (citing *ATSI*

---

[26]  To allege scheme liability, plaintiff is required to show "that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Id*. at *7.

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)). Indeed, "[d]eception is the gravaman of a claim for market manipulation, and the market is not misled when a transaction's terms are fully disclosed." *Set Cap.*, 996 F.3d AT 77; *XL Fleet*, 2022 WL 493629, at *7.

The Immunovant Defendants argue in a footnote that Plaintiff "fails to plead a separate scheme claim." IMVT MTD at 15 n.9. But Plaintiff adequately alleges scheme liability. "[I]t is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b-5 out of the same set of facts[.]" *SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014). The SAC alleges that Defendants engaged in a fraudulent scheme to delay monitoring cholesterol in early IMVT-1401 clinical trials. Defendants knew, or recklessly disregarded, there was a risk IMVT-1401's clinical trials would observe elevations in cholesterol and that the disclosure of that risk could negatively impact the Company's stock price. The Exchange Act Defendants delayed the monitoring of cholesterol to give them time to monetize their interests in Immunovant. Even though it was not a certainty IMVT-1401 would elevate cholesterol levels, delaying the monitoring of cholesterol made it a certainty that the clinical trials would not observe cholesterol elevations.

Specifically, the Exchange Act Defendants delayed monitoring cholesterol to enable Wong and Roivant to obtain their earnout shares and for Immunovant to sell shares and raise money through several public offerings. Defendants' manipulative scheme, including the dissemination of false and misleading information to investors, artificially inflated Immunovant's stock price and allowed Defendants to raise money, reap monetary rewards, and continue developing a drug compound to bring to market.[27]

---

[27] *Guevoura*, 2016 U.S. Dist. LEXIS 128076, at *27 (at the motion to dismiss stage, plaintiff only needs to allege "the nature, purpose, and effect of the fraudulent conduct and the role of the defendants").

**E.      The SAC Adequately Alleges Defendants Violated Items 303 and 105 of Regulation S-K**

Immunovant's SEC filings, including the Sept. 2020 Offering Documents, the 1/17/20 Registration Statement, the 4/10/20 Registration Statement, the 4/14/20 Prospectus, and the 2020 Form 10-K (collectively, the "SEC filings") violated Items 303 and 105 (formerly Item 503) of Regulation S-K because they omitted to inform investors that: (i) there was an increase in cholesterol levels in animals which received IMVT-1401 during preclinical studies; (ii) there was a potential risk IMVT-1401 would increase cholesterol levels in patients; (iii) IMVT-1401's early clinical studies in humans failed to monitor cholesterol levels; and (iv) the ASCEND GO-2 Phase 2b trial was the first clinical trial that tested for cholesterol levels.  These omissions were known events and uncertainties about IMVT-1401 that were reasonably likely to impact Immunovant's continuing operations and were required to be disclosed in the SEC filings.

### 1.      Defendants Violated Item 303

"Item 303 requires disclosure 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.'" *Moab Partners*, 2022 WL 17815767, at *2 (citing SEC's Interpretive Release, Release No. 33-6835, 1989 SEC LEXIS 1011, at *19 (May 18, 1989)).  The increase in cholesterol levels in animals, the fact that it was an important potential risk that IMVT-1401 would increase cholesterol levels in patients, that none of the completed clinical studies had yet tested cholesterol levels, and that the ASCEND GO-2 Phase 2b trial was the first clinical trial to test cholesterol levels, were known events and uncertainties that were having and were reasonably likely to have an impact on the Company's continuing operations and therefore were required to be disclosed in the September 2020 Offering Documents, but were not.  ¶¶153, 297.

It was a known uncertainty that elevated cholesterol levels was a potential risk of IMVT-

- 69 -

1401. *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 27, 2017) (holding that defendants violated Item 303 because "plaintiffs have pleaded specific facts that, at least when taken as a whole, raise a plausible inference that [defendants] knew of the [uncertainty] before the IPO"). Here, the "uncertainty" as to whether IMVT-1401 elevated cholesterol in humans was presently known to management as a result of, among other things, the elevations in cholesterol from the monkey studies, the numerous scientific studies connecting albumin reductions and cholesterol elevations and CV disease, and the other facts indicating elevated cholesterol were a potential risk of IMVT-1401, as discussed in §III.B. And it cannot be reasonably disputed that the undisclosed risk of elevations in cholesterol were reasonably likely to have material effects on Immunovant's financial condition.

The Underwriter Defendants advance several arguments which are without merit. First, the Underwriter Defendants erroneously argue that they had "no indication of elevated cholesterol in either animal studies or human subjects at the time of the September 2020 Offering." UD MTD at 13. The Underwriter Defendants would have learned of the elevated cholesterol in the animal studies, IMVT-1401's potential risk of elevations in cholesterol, and the fact that prior results did not incorporate evaluations of cholesterol in connection with the due diligence for the Sept. 2020 Offering. ¶200. Defendants were in possession of data that contradicted the safety of IMVT-1401.

Second, the Underwriter Defendants argue "Plaintiff does not plead facts showing that any trend or uncertainty . . . was reasonably likely to have material effects on Immunovant's financial conditions or operations." UD MTD at 13. The Underwriter Defendants ignore, however, the material disruption caused by the increases in cholesterol to the ASCEND GO-2 Phase 2b trial, including the halting of the study. *SAIC*, 818 F.3d at 96 (holding defendants required under Item 303 to disclose a then-known trend, event, or uncertainty despite being "uncertain about its likely

- 70 -

effect on [defendant's] current and future revenues."). Indeed, the elevations in cholesterol from the ASCEND GO-2 Phase 2b trial caused Immunovant to focus on developing an entirely different drug, IMVT-1402, because it does not impact cholesterol.  ¶188.

Third, even though Plaintiff does not allege intentional or reckless misconduct in connection with the Securities Act claim, alleging that a defendant knew a particular fact does not amount to alleging they intentionally or recklessly misled investors.  Rather, it simply means they were aware of a particular fact at the time of the offering.  *LeMatta v. Casper Sleep, Inc.*, 2022 U.S. Dist. LEXIS 180015, at *40-*41 (E.D.N.Y. Sept. 30, 2022) (finding that plaintiff's allegations support that "Defendants knew about [] materially adverse trends and risks, and therefore should have disclosed them").  Fourth, the Underwriter Defendants argue that all Item 303 disclosures were made.  None of the purported cautionary language warned of the specific risks or omissions alleged.  §III.G. Defendants were in possession of data that contradicted the safety of IMVT-1401.  ¶91.  Instead of disclosing this to investors, Defendants merely warned of potential "unforeseen safety issues."  ¶159. Immunovant's SEC filings were not "accurate and sufficiently candid."  *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 229 (E.D.N.Y. 2022).

The Underwriter Defendants' reliance on *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31 (2d Cir. 2017) for the proposition that the Offering Documents "contained extensive disclosures about the inherent uncertainty of the clinical trial process generally and the risks associated with adverse events specifically" is misplaced.  UD MTD at 15.  The disclosures warned of "unforeseen safety issues," but failed to advise investors of the foreseeable risk that cholesterol levels in clinical trials would likely increase and that Defendants chose not to include a standard cholesterol panel in clinical trials until the Phase 2b trial.  *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *8 (E.D.N.Y. Apr. 22, 2020) (holding defendants violated Item 303 where plaintiffs alleged

factual content allowing the court to draw a reasonable inference that defendants knew of delays at its facility prior to its IPO).

### 2. Defendants Violated Item 105

Item 105 "requires a disclosure of the 'most significant risk factors' associated with the security." *Casper Sleep*, 2022 U.S. Dist. LEXIS 180015, at *40 (quoting 17 C.F.R. §229.105). "The same facts underlying an Item 303 violation may also support an Item [105] violation, and a court's rationale for determining the former may also support the same determination of the latter." *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020). Defendants violated Item 105 because the SEC Filings failed to include a "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." ¶298. The Underwriter Defendants argue Plaintiff has not satisfied Item 105 for virtually the same reasons as in their Item 303 section and those arguments fail for the reasons set forth above. ¶157.

The cautionary language on which Defendants principally rely, including that IMVT-1401 may never receive FDA approval or be commercially successful (IMVT MTD at 6), and "a side effect of IMVT-1401 [] could delay the clinical studies and harm Immunovant's financial condition and results of operations" (UD MTD at 15) are the definition of boilerplate and contain no warnings concerning the risk and uncertainty associated with IMVT-1401 increasing cholesterol levels in humans. *Jianpu*, 2020 WL 5757268, at *12 (rejecting defendants' argument that they disclosed certain risks because the "statements [were] all framed as mere hypotheticals"). Despite Defendants' statements to the contrary, general disclosure of "unforeseen safety issues" alone is insufficient. UD MTD at 27; IMVT MTD at 9 and 38 n.25. *Salix*, 2016 WL 1629341, at *11 (finding defendants' cautionary language "brief and generic" because "broad disclaimer[s] fail[] to alert investors to the

specific risks they are facing").[28]

Further, none of the purported risk disclosure statements provide a specific warning of the potential cholesterol safety issue or that Defendants decided not to test for cholesterol in early clinical trials. UD MTD at 4-5 ("Failures can occur at any stage of clinical trials. . . . If we experience delays in the commencement or completion of our clinical trials, or if we terminate a clinical trial prior to completion, the commercial prospects of our product candidate could be harmed[.]"); *In re Ply Gem Holdings Sec. Litig.*, 2016 WL 5339541, at *6 (S.D.N.Y. Sept. 23, 2016) (holding that the potential future impact of a particular known trend, event, or uncertainty on defendant's business was "certainly not public knowledge" even where defendants disclosed the existence of certain issues). Defendants did not disclose the specific risk that unquestionably materialized once Immunovant announced the halting of the IMVT-1401 clinical trial; that IMVT-1401 caused elevations in cholesterol. ¶¶168-172.

"By superficially warning of [the] possible risk[] [of unforeseen safety issues] while failing to disclose [the] critical fact[]" that there was a substantial risk that IMVT-1401 was unsafe because it elevates cholesterol levels "was akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *MF Glob.*, 982 F. Supp. 2d at 318 (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y. 1996)). Defendants knew, recklessly, or negligently (with respect to Plaintiff's Securities Act claim) disregarded that the risk of elevated cholesterol was a present and material risk and therefore cannot hide behind their boilerplate disclaimers.

---

[28] *In re Am. Int'l Grp., Inc.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("[G]eneric risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.").

**F.      The SAC States Claims Under the Securities Act**

**1.      The Legal Standards for Stating a Claim Under the Securities Act**

Sections 11, 12(a)(2), and 15 of the Securities Act allow plaintiffs to sue for and recover damages for false statements or omissions of material facts made in connection with the offering of securities.   15 U.S.C. §77k(a) (establishing action based on false statements or omissions in registration statements); 15 U.S.C. §77l(a)(2) (establishing action based on false statements or omissions made by seller orally or in prospectuses); 15 U.S.C. §77o(a) (establishing action against persons controlling those liable under Sections 11 and 12(a)(2)); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011).  The Securities Act imposes "a stringent standard of liability," and plaintiffs "need only show a material misstatement or omission to establish his *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

"Sections 11 and 12(a)(2) create three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading."  *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 830 (S.D.N.Y. 2017) (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)).

The "heightened pleading standards" of the Private Securities Litigation Reform Act of 1995 ("PSLRA") do not apply.  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 157 (2d Cir. 2012).  Rather, a Securities Act plaintiff only needs to allege falsity.  *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013).  "[L]iteral accuracy is not enough … [a]n issuer must as well desist from misleading investors by saying one thing and holding back another."  *Nayani v. Lifestance Health Grp., Inc.*, 2023 U.S. Dist. LEXIS 78411, at *7-*8 (S.D.N.Y. May 4, 2023).  Under Section 11, "[l]iability against the issuer of a

- 74 -

security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence." *Herman & MacLean*, 459 U.S. at 382. Plaintiff has adequately met the applicable standard.

### 2. The Sept. 2020 Offering Documents Contained Untrue Statements of Material Fact and Omitted to Disclose Material Information

The Sept. 2020 Offering Documents contained untrue statements of material fact and omitted material information because they failed to disclose: (a) IMVT-1401 was less safe than represented by the Company; (b) there was an important potential risk that IMVT-1401 would substantially increase LDL and total cholesterol levels; (c) Immunovant's statements about IMVT-1401's clinical trials, including about safety results, failed to incorporate an assessment of the potential risk of elevated cholesterol levels; (d) Immunovant failed to follow FDA regulations and GCP in connection with IMVT-1401 because it failed to perform ongoing surveillance of the adverse events and suspected adverse reactions of elevated LDL and total cholesterol levels; (e) The undisclosed safety issues of substantially elevated LDL and cholesterol levels, if publicly disclosed, threatened to delay and/or disrupt IMVT-1401's prospects for commercial viability and profitability; and (f) Immunovant's business, operations and financial condition were not as represented.[29] ¶127.

---

[29] With respect to item (b), the SAC alleges the Sept. 2020 Offering Documents *failed to disclose* there was a potential risk IMVT-1401 would substantially increase LDL and cholesterol levels because, among other reasons: (i) Immunovant's animal studies for IMVT-1401 revealed a substantial increase in cholesterol for animals which received IMVT-1401; (ii) IMVT-1401 was in a class of drug which lowered serum albumin levels, and medical journals and studies reported that low serum albumin levels increase LDL and total cholesterol levels; (iii) thyroid conditions which were indications for IMVT-1401 are known to impact cholesterol, so there should have been a heightened awareness of the need to monitor cholesterol; (iv) other companies researching the same class of drug apparently recognized this risk because they tested cholesterol levels; and (v) Immunovant monitored cholesterol in the ASCEND GO-2 Phase 2b trial because it was a potential risk. ¶127(b)(i)-(v). The Underwriter Defendants are therefore wrong that "Plaintiff does not base its Securities Act claims on a failure to disclose" these listed items. Similarly, Plaintiff never admits these facts were publicly disclosed. UD MTD at 8 n. 4. Even though some of the information may have been available to Defendants and certain members of the scientific community, they were not readily available to, or understandable by, the typical investor.

### 3. The Securities Act Defendants Were Under a Duty to Disclose the Omitted Facts

The Underwriter Defendants argue that there was no duty to disclose the omitted facts as alleged in the SAC. UD MTD at 10-17. The Underwriter Defendants erroneously argue that "Plaintiff does not identify any misleading statement in the Offering Documents that would create a duty to disclose that there was a 'potential risk' that IMVT-1401 would cause elevated cholesterol levels" or that IMVT-1401's early clinical trials did not monitor or assess cholesterol. UD MTD at 11. And a fundamental basis for the Underwriter Defendants' argument is that there could have been no duty to disclose because "the Offering Documents said nothing about cholesterol." UD MTD at 11. The Underwriter Defendants are wrong.

First, there can be no dispute the Securities Act Defendants have a duty to disclose accurate and complete information in the Sept. 2020 Offering Documents, regardless of whether they specifically discussed cholesterol.[30] *Kassover v. Essence Partners*, 2007 U.S. Dist. LEXIS 103845, at *30-*31 (E.D.N.Y. Mar. 31, 2007) (holding that defendants had a duty to disclose material and adverse facts that altered the total mix of information because they "could have easily and accurately qualified or softened their broad, positive statements"). Statements in the Offering Documents, such as, "several nonclinical studies . . . demonstrated . . . [IMVT-1401] was observed to be well tolerated" were affirmative statements about IMVT-1401's nonclinical studies and the tolerability of IMVT-1401. ¶141. Defendants, therefore, were under a duty to speak fully and accurately. *Casper Sleep*, 2022 U.S. Dist. LEXIS 180015, at *30 ("because [Defendants] chose to speak about [the nonclinical studies], [Defendants] had an obligation to ensure its statements were 'both accurate and complete[.]'"). Elevations in cholesterol directly relate to whether IMVT-1401 is well tolerated. The statement was materially untrue and misleading because contrary to the statement, animals

---

[30] Similarly, the Exchange Act Defendants were under a duty to disclose the material omissions alleged in the SAC.

given IMVT-1401 experienced substantial elevations in cholesterol.  ¶93.

Second, the Offering Documents represented "[d]ose-dependent and reversible albumin reductions were observed" but that the "reductions were not associated with any AEs or clinical symptoms and did not lead to any study discontinuations."  ¶146.  Since the Offering Documents discussed the albumin reductions and since a key risk of albumin reductions is elevated cholesterol, the Securities Act Defendants were under a duty to fully disclose the risks associated with albumin reductions and IMVT-1401.  The Underwriter Defendants miss the point by arguing that the lack of statements about cholesterol means "Plaintiff has not alleged a duty to disclose as a result of any misleading statement in the Offering Documents."  UD MTD at 12.  Additionally, the Offering Documents discussed albumin reductions so they were under a duty to discuss the risks of albumin reductions.  *Id*.  The lack of any mention of any of these risks rendered the Offering Documents misleading.

For a similar reason, the statements IMVT-1401 being "safe," "well-tolerated," and without any "serious AEs" were materially misleading.  The Offering Documents failed to disclose material facts about the potential risks to IMVT-1401 directly related to whether it was safe, well-tolerated or without any serious AEs.  ¶116.  The Underwriter Defendants argue that certain statements from the are opinions or forward-looking statements, and therefore not actionable.  As discussed in §§III.D.5.b and III.D.5.d, the statements are actionable.  Additionally, the purportedly cautionary language referenced by Defendants was boilerplate and not tailored to the risks experienced by Immunovant.  §III.G.  As a result, they did not adequately warn investors of the undisclosed risks.

### 4.   The Securities Act Claims Do Not Sound in Fraud

The Immunovant and Underwriter Defendants argue that Plaintiff's Securities Act claims "sound in fraud" and should be subject to the heightened pleading standards of Rule 9(b).  IMVT MTD at 39-40; UW MTD at 14-15 n.8.  Not so.  The Securities Act Claims, which sound in strict

- 77 -

liability and negligence, are only subject to the notice pleading standard of Rule 8. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.,* 681 F.3d 114, 120 (2d Cir. 2012); *In re Lehman Brothers Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 174 (2d Cir. 2011). Plaintiff's claims "are analytically distinct, even if overlapping conduct forms the basis for both." *In re NIO Sec. Litig.*, 2021 U.S. Dist. LEXIS 152311, at *15 (E.D.N.Y. Aug. 12, 2021) (Rule 9(b) inapplicable to Securities Act claim when plead separately in the complaint). Nevertheless, Plaintiff has particularized its Securities Act claims so they would satisfy Rule 9(b) even if it applied.

## G. Defendants' Purported Cautionary Language Was Inadequate

As discussed in §III.E.2, the purported cautionary language and risk disclosures Defendants referenced did not sufficiently warn investors of the risks of investing in Immunovant. IMVT MTD at 30, 38; UD MTD at 4-5, 15-16, 26-27. Plaintiff does not, as the Underwriter Defendants contend, allege Immunovant was required to "list every potential side effect of IMVT-1401." UD MTD at 26. And despite the nearly 60 pages of risk disclosures the Underwriter Defendants point to in the Offering Documents, it is *quality* and not *quantity* of those disclosures which matters under the federal securities laws. *E*Trade*, 712 F. Supp. 2d at 193-94 (finding that defendants' misleading statements "nullified any risk disclosures" and "their risk disclosures were insufficient to counterbalance their…misleading statements").

The Underwriter Defendants argue that "[t]he risk disclosures were not misleading simply because they did not specifically identify a risk of elevated cholesterol levels." UD MTD at 26. But "Defendants cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings, because such a broad disclaimer fails to alert investors to the specific risks they are facing." *Salix*, 2016 WL 1629341, at *11. And despite the Underwriter Defendants' argument that Plaintiff's allegations are "impermissible hindsight," the risk of increased cholesterol levels had, in fact, come to pass by the time of the Sept.

2020 Offering.  UD MTD at 26-27; *Yannes v. Scworx Corp.*, 2021 U.S. Dist. LEXIS 116330, at \*21 (S.D.N.Y. June 21, 2021) (rejecting defendants' fraud-by-hindsight argument where plaintiff alleged that publicly accessible information was available to defendants prior to their announcement); *Salix*, 2016 WL 1629341, at \*17 (rejecting defendants' fraud by hindsight claim because defendants "failed to take into account information that was available to [them]" when they made incorrect statements or omissions).

Defendants also erroneously argue that their generic, boilerplate risk disclosure statements were adequate and "to the extent disclosure was required, it was made."  IMVT MTD at 38. Immunovant was required to monitor, assess and mitigate the potential risks during its preclinical and clinical trials and a reasonable investor would have expected these risks to be monitored.  And when Defendants issued cautionary language and risk warnings, it was a ***fact*** that there was a potential risk that albumin reductions cause elevations in cholesterol.   Also, Immunovant's preclinical animal studies, which Defendants re-reviewed before halting the Phase 2b clinical trial, displayed increased cholesterol levels in animals.  *Arena Pharms.*, 840 F.3d at 700, 704.

Unbeknownst to investors, and not covered by the generic risk disclosures, Immunovant failed to warn that its clinical trials should be viewed from the perspective that the IMVT-1401 clinical trials did not monitor, assess or mitigate a key potential risk.  *Bishins v. Cleanspark, Inc.*, 2023 U.S. Dist. LEXIS 2100, at \*27 (S.D.N.Y. Jan. 5, 2023) ("Cautionary language must expressly warn of or directly relate to the risk that brought about Plaintiffs' loss[.]").[31]

---

[31]   *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) (finding defendants general disclosures and "vague warning" inadequate to warn investors of the specific risk at issue).

**H.      The SAC States Control Person Claims Under Sections 15 of the Securities Act and 20(a) of the Exchange Act**

"The control person provisions are broadly construed as they were meant to expand the scope of liability under the securities laws." *Meyer v. Concordia Int'l Corp.*, 2017 U.S. Dist. LEXIS 119436, at *26-*27 (S.D.N.Y. July 28, 2017).  Under Section 20(a), "[e]very person, who directly or indirectly, controls any person liable under any provision of this chapter shall be liable to the same extent as the controlled person for the underlying violation." *NIO*, 2021 U.S. Dist. LEXIS 152311, at *37.  Here, the Immunovant Defendants argue that Plaintiff's Sections 15 and 20(a) claims should fail in a one sentence footnote.  IMVT MTD at 40 n.26.  But the SAC states a claim for primary violations, so Plaintiff's control person liability claims should succeed.  *Nutriband*, 2020 U.S. Dist. LEXIS 126931, at *40-*41.[32]  Salzmann managed Immunovant and Wong managed HSAC as CEO and Chairman of the Board, so their control cannot seriously be disputed.  *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 257 (S.D.N.Y. 2012).

Section 15 attaches liability to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under section[s] [11 or 12 of the Securities Act]."  15 U.S.C. §77o(a).  The Securities Act Individual Defendants signed the Sept. 2020 Offering Documents and served as directors.  *NIO*, 2021 U.S. Dist. LEXIS 152311, at *36 (finding Section 15 liability where defendants exercised "control over the primary violator" because they signed the registration statement).  "It is well settled law that officers and directors of the primary violator who signed the registration statements containing alleged violations fulfill the control prong." *Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*, 2012 WL 601448, at *20 (E.D.N.Y. Feb. 23, 2012); *Lifestance*, 2023 U.S. Dist. LEXIS 78411, at *11 (finding control person liability where defendants participated in the IPO by signing the registration

---

[32]    *See In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *16.

- 80 -

statement).[33]

### 1.   Roivant's Control over Immunovant Cannot Seriously Be Disputed

### a.   The SAC Alleges a Primary Violation Against Roivant

Roivant is liable under Sections 15 and 20(a).  First, the SAC alleges a primary violation against Roivant.  Indeed, Roivant signed the SEA, which Plaintiff alleges contained a materially false and misleading statement.  *See* ¶240.  Roivant argues that "statements from the [SEA] cannot provide a basis for 10b-5(b) liability against any of the parties to that agreement."  RVT MTD at 16 (emphasis in original).  Not so.  "A reasonable investor would have understood the Merger Agreement to constitute a statement of fact."  *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 298 (S.D.N.Y. 2010) (citing *Titan Report*, S.E.C. Release No. 51283, 2005 WL 1074830, at *2 (Mar. 1, 2005)) ("the inclusion of the FCPA Representation in a disclosure document filed with the [SEC], whether by incorporation by reference or other inclusion, constitutes a disclosure to investors")).

Indeed, investors were "encourage[d] to read this proxy statement carefully."  The SEA was attached to the Proxy Statement so investors could review it and decide to vote and approve the SPAC transaction.  It was therefore an essential document for investors.  *Bank of Am.*, 757 F. Supp. 2d at 299 (quoting *Glazer Cap. Mgmt., L.P. v. Magistri*, 549 F.3d 736 (9th Cir. 2008)) (mergers are "a very significant event for [a] company" that should lead to "intense investor interest in the details of the merger").  The statement in the SEA, regardless of its placement in the document, constituted a statement to investors and Roivant's arguments that "Lead Plaintiff does not attribute a single statement to Roivant" and "failed to plead reliance" should be rejected.  RVT MTD at 16-17.

---

[33]   Plaintiff need not allege "culpable participation" for purposes of Section 15.  *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (collecting cases).

**b.      The SAC Adequately Alleges Roivant Is Liable Under Sections 15 and 20(a)**

Roivant is wrong that Plaintiff's allegations "centers on Roivant's 'status' as a controlling shareholder of Immunovant." RVT MTD at 6.  Even if Plaintiff's allegations rested solely on Roivant's status as a controlling shareholder (which they do not), "[i]n cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership and common principals." *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 150 (S.D.N.Y. 2021) (control person is a factual issue).

The SAC is replete with instances of Roivant's control and Roivant's argument that "Lead Plaintiff alleges precious little" is baseless. RVT MTD at 7.  "Roivant is currently [Immunovant's] majority stockholder, and [it is] a 'controlled company' within the meaning of the listing rules of Nasdaq." ¶63. "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise.'" *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 63 (S.D.N.Y. 2017) (citing *Lehman Brothers*, 650 F.3d at 185).

Aside from retaining over 50% of Immunovant shares throughout the Class Period, Roivant also controlled Immunovant through its board of directors and relationship with at least six board members. ¶¶62-65.  Roivant's argument that its appointment and relationship with a majority of Immunovant directors fails to raise a plausible inference that Roivant actually controlled Immunovant should be rejected.  RVT MTD at 7-8.  "Actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof." *STMicroelectronics*, 775 F. Supp. 2d at 536 (finding control where plaintiff "has sufficiently pled a mix of substantial stock ownership, shared officers and principals, and at least some direct involvement").

Roivant argues the SAC describes agreements between Roivant and Immunovant but does not allege what the obligations of those agreements entail.  RVT MTD at 7.  That is false (*see* ¶¶60, 66-68) but even if it were true, "the content of these agreements, and the agreements themselves, should be 'peculiarly within defendants' knowledge' and possession."  *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 254 (S.D.N.Y. 2005).  As a "member of the Roivant family of companies," Roivant provided operational functions, technology, innovation platforms, and "an embedded team of scientific experts, physicians and technologists to help optimize clinical development and commercial strategies."  ¶69.  It is disingenuous to argue that the SAC is nothing more than "bare status allegations," (RVT MTD at 9) when Roivant provided Immunovant the license to IMVT-1401, supported its clinical trials through technology, operations, and a scientific team, appointed multiple directors, signed the SEA which contained a materially false and misleading statement, and told its own investors to "carefully consider . . . other materials filed or furnished by our majority-controlled subsidiary Immunovant, Inc. [] with the SEC."  ¶¶60-72.

Plaintiff adequately pleads culpable participation.  *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 2010 U.S. Dist. LEXIS 107729, at *22 (S.D.N.Y. Sept. 29, 2010) (plaintiff adequately alleged culpable participation "at least approximating recklessness" where defendants failed to disclose serious adverse events about its drug).  Further, as discussed in §III.D.6, Plaintiff adequately alleges scienter, which satisfies culpable participation.  Even if Plaintiff's allegations do not give rise to scienter – which they do – Roivant was still a culpable participant.  *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 144-45 (D. Conn. 2021) (defendant was a culpable participant for purposes of Section 20(a) even though the factual allegations did not give rise to scienter).

Roivant and Immunovant entered into the Information Sharing and Cooperation Agreement

which stated, "[f]or the avoidance of doubt, proper purpose includes use by Roivant of any such information, data, documents or other materials for its own internal research purposes, including but not limited to, *for purposes of analyzing, and/or deriving learnings from, clinical data provided by the Company to Roivant hereunder*[.]" ¶68. Despite the Information Sharing and Cooperation Agreement, Roivant argues it is unclear whether Roivant could have requested information about preclinical animal studies. RVT MTD at 11. Roivant acquired the license to develop IMVT-1401 from HanAll in 2017 so it would have identified risks in the animal studies in connection with its due diligence. It also worked with Immunovant in 2018 to continue developing the drug and appointed directors to Immunovant's board. ¶¶49-50. A plausible inference can be drawn that Roivant has full access to data concerning IMVT-1401. *Lifestance*, 2023 U.S. Dist. LEXIS 78411, at *11 (finding control person liability where defendants "had access to LifeStance's interim retention data and participated in LifeStance's IPO[.]").

## I.    Leave to Replead

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Plaintiff has amended the complaint to address purported deficiencies raised in Defendants' motions to dismiss the Amended Complaint and discussed in the Court's opinion granting leave to amend. *Pitman v. Immunovant, Inc.*, 2023 U.S. Dist. LEXIS 24909, at *21 (E.D.N.Y. Feb. 14, 2023). Nevertheless, if the Court determines the SAC is deficient, Plaintiff respectfully requests leave to amend to cure any deficiencies because Plaintiff has not had the benefit of the Court's views on Plaintiff's claims at the time of the amendment. "Without the benefit of a ruling, many a plaintiff will not . . . be in a position to weigh the practicality and possible means of curing specific deficiencies." *Loreley Fin.*, 797 F.3d at 190. Due to the highly complex facts underlying Plaintiff's claims, Plaintiff can include additional facts or detail if the Court determines the SAC does not contain sufficient particularity. *Pitman*, 2023 U.S. Dist. LEXIS 24909, at 20 n.2

("Granting this motion to amend at this stage does not waive Plaintiff's right to request another opportunity to make amendments[.]").

## IV.   CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' Motions to Dismiss the SAC in their entirety.

DATED:  June 9, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
NATALIE C. BONO

_____
             */s/ Evan J. Kaufman*
            EVAN J. KAUFMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
nbono@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I, Evan J. Kaufman, hereby certify that on June 9, 2023, I caused a true and correct copy of the foregoing document to be served on all counsel of record by providing them with copies via electronic mail.

*/s/ Evan J. Kaufman*

EVAN J. KAUFMAN
