UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
THERESA PITMAN, individually and on behalf  :
of all others similarly situated,[1]                        :
                                                            :
                              Plaintiff,         :        **REPORT AND RECOMMENDATION**
                                                            :
            -against-                            :            21 Civ. 918 (KAM) (VMS)
                                                            :
IMMUNOVANT, INC. f/k/a Health Sciences           :
Acquisitions Corporation, RODERICK WONG,         :
PETER SALZMANN, FRANK M. TORTI,                  :
ANDREW FROMKIN, DOUGLAS HUGHES,                  :
GEORGE MIGAUSKY, ATUL PANDE, ERICK :
VENKER, SVB LEERINK LLC, LIFESCI                 :
CAPITAL LLC, CHARDAN CAPITAL                     :
MARKETS LLC, GUGGENHEIM                          :
SECURITIES, LLC, ROBERT W. BAIRD & CO.:
INCORPORATED, and ROIVANT SCIENCES :
LTD.,                                                       :
                                                            :
                              Defendants.         :
------------------------------------------------------------ X

**Vera M. Scanlon, United States Magistrate Judge:**

        Presently before the Court are the motions to dismiss the third amended complaint filed

by Lead Plaintiff SEPTA Pension Plan Master Trust ("Plaintiff" or "SEPTA") of Defendants

Immunovant, Inc. f/k/a Health Sciences Acquisitions Corporation ("Immunovant"), Roderick

Wong ("Mr. Wong"), Peter Salzmann ("Dr. Salzmann"), Frank M. Torti ("Dr. Torti"), Andrew

Fromkin ("Mr. Fromkin"), Douglas Hughes ("Mr. Hughes"), George Migausky ("Mr.

Migausky"), Atul Pande ("Dr. Pande") and Eric Venker ("Dr. Venker" and, collectively,

"Immunovant Defendants");[2] Defendants SVB Leerkink LLC, LifeSci Capital LLC, Chardan

---

[1] Plaintiff brings this action as a putative class action.  See ECF No. 82 ¶¶ 39-47.

[2] The Court has ascertained whether the individual Immunovant Defendants are medical doctors
from the third amended complaint.  See ECF No. 82 ¶¶ 21-22, 24-29.

Capital Markets LLC, Guggenheim Securities, LLC and Robert W. Baird and Co. Incorporated

(collectively, "Underwriter Defendants"); and Defendant Roivant Sciences Ltd. ("Roivant" and,

collectively with Immunovant Defendants and Underwriter Defendants, "Defendants").[3]  For the

---

[3] In its opposition, Plaintiff requests that the Court decline to consider Appendix A and Exhibits 4, 5, 6 and 13 to the declaration of Immunovant Defendants' counsel filed with its motion.  <u>See generally</u> ECF No. 89.

As to Appendix A, which is "a chart cataloging each of the statements challenged in Plaintiff's" third amended complaint and containing certain of Immunovant Defendants' responsive arguments, ECF No. 89 ¶ 2, Plaintiff contends that the chart contains 43 new arguments and is therefore "an inappropriate way to exceed the page limits," ECF No. 95 at 43 (citations omitted).  The Court disagrees with Plaintiff's characterization of the chart.  The document is provided for the Court's convenience to assess the text of the statements at issue with Immunovant Defendant's arguments.  As such, the Court has not declined to considered it.

As to Exhibit 4, which is an excerpted and highlighted copy of Immunovant's October 2, 2019 Form 8-K, attaching a press release incorporated by reference into the third amended complaint and a presentation incorporated by referenced into the third amended complaint and publicly available through the SEC's website, <u>see</u> ECF No. 89 ¶ 6, Plaintiff contends that Immunovant Defendants improperly attempt to use the documents "to define decreases in albumin as mild," ECF No. 95 at 43 (citation & quotations omitted).  The Court finds that it may not consider this document for its truth to contradict the allegations in the third amended complaint, a proposition with which Immunovant Defendants appear to agree, <u>see</u> ECF No. 97 at 9 n.2 (citations omitted).  <u>See</u> <u>Lively v. WAFRA Invest. Advisory Grp.</u>, 6 F.4th 293, 304-05 (2d Cir. 2021) (reciting the general rule that "courts may on a Rule 12(c) motion – just as on a Rule 12(b)(6) motion – consider extrinsic material that the complaint incorporate[s] by reference, that is integral to the complaint, or of which courts can take judicial notice" but concluding that "the district court erred by relying on several documents attached to Defendants' answer in deciding their Rule 12(c) motion without converting it into a motion for summary judgment as required by Rule 12(d)" because, as to EEOC and federal court complaints, "[a]lthough the district court may have taken judicial notice that Kraut filed complaints with the EEOC and in federal court, the court erred to the extent that it accepted Kraut's allegations to be true" (citations & quotations omitted)).

As to Exhibits 5 and 6, which are copies of two analyst reports, <u>see</u> ECF No. 89 ¶¶ 7-8, Plaintiff contends that Immunovant Defendants improperly cite to the former in support of the proposition that "the reduction in albumin levels is not a major area of worry" and contends that Plaintiff does not cite to either report in its third amended complaint, ECF No. 95 at 44 (citations & quotations omitted).  Immunovant Defendants concede that these documents cannot be considered for their truth at this juncture.  <u>See</u> ECF No. 97 at 9 n.2 (citations omitted).

reasons discussed below, the Court respectfully recommends that Defendants' motions to dismiss

be granted and that the third amended complaint be dismissed in its entirety.

## I.    FACTUAL BACKGROUND

The parties are referred to the Court's Order and decision previously issued, see generally

ECF No. 80, for an initial description of this case.  The facts herein are drawn from the

subsequently filed third amended complaint.  See generally ECF No. 82.

IMVT-1401 (the "Drug")[4] is "a novel, fully human monoclonal antibody . . . that

selectively binds to and inhibits the neonatal fragment crystallizable receptor ('FcRn')."  ECF

No. 82 ¶ 48.  The Drug was initially developed by HanAll Biopharma ("HanAll"), and, on

approximately December 19, 2017, was exclusively licensed to Roivant for development,

registration, manufacturing and commercialization in all geographic areas outside of Hong Kong,

Macau and Taiwan.[5]  See id. ¶ 49.  Pursuant to the licensing agreement, HanAll and Roivant

formed a joint development committee for the Drug, obligating HanAll to conduct a related

research program and maintain records of the work conducted, and obligating Roivant to assume

responsibility for maintaining a global safety database as to "Compounds and Licensed

---

As to Exhibit 13, which is copies of Wong's Form 4s filed in November 2019 and December
2019, to show his sales, which are publicly available through the SEC's website, see ECF No. 89
¶ 15, Plaintiff contends that "[a] Form 4 cannot be considered on a motion to dismiss to establish
the truth of the matters asserted therein," ECF No. 95 at 44-45 (citation omitted).  The Court
accepts Plaintiff's argument and does not consider this document for that purpose.  See Garber v.
Legg Mason, Inc., 347 F. App'x 665 (2d Cir. 2009) (reasoning that, on a Rule 12(b)(6) motion to
dismiss[,] a court may consider matters of which judicial notice may be taken, including the fact
that . . . regulatory filings[, including SEC filings,] contained certain information, without regard
to the truth of their contents" (emphasis in original) (citations & quotations omitted)).

[4] The Drug was previously referred to as RVT-1401.  See ECF No. 82 ¶ 49.

[5] Harbour BioMed ("Harbour") simultaneously developed its own version of the Drug pursuant
to a license from HanAll in Hong Kong, Macau and Taiwan.  See id.

Products"[6] no later than the commencement of the first Phase 1 clinical trial.  Id. ¶ 51.

Roivant formed Immunovant Sciences Ltd. ("Legacy Immunovant"), a Roivant "business unit formed as a private company," to develop the Drug as a treatment for autoimmune disorders. Id. ¶ 49.  On approximately December 18, 2018, Roivant and Legacy Immunovant entered into an information-sharing and cooperation agreement, which amended a prior agreement, that required Immunovant to share information about its business and IMVT-1401 with Roivant, and afforded Roivant access to information reasonably required to prepare its United States Securities and Exchange Commission ("SEC") filings and to information about IMVT-1401. See id. ¶¶ 66-68.

Health Sciences Acquisitions Corporation ("HSAC") was a special purpose acquisition company[7] formed with the goal of acquiring a healthcare company.[8]  See id. ¶¶ 1, 53-54.  On approximately May 9, 2019, HSAC raised approximately $115 million in capital from investors through its initial public offering, which was deposited into a trust account for the benefit of the investors.  HSAC was required to acquire a company within 24 months of its initial public

---

[6] The third amended complaint does not include the definition of this seemingly defined contractual term.  See generally ECF No. 82.

[7] A special purpose acquisition company "is a blank check company formed solely to raise capital through an initial public offering . . . and then [to] use the money to acquire businesses thereafter."  Id. ¶¶ 3, 53.  The capital raised is often placed in a trust account pending an acquisition or the passage of a certain amount of time.  See id. ¶ 53.  Founders of a special purpose acquisition company "have a financial stake in finding a company to acquire because they invest capital and receive shares" therein, but, in the absence of an acquisition within a specified time period, the company will be dissolved, and the capital will be returned to the investors.  Id.

[8] Health Sciences Holdings, LLC ("HSH"), HSAC's sponsor, was operated by Mr. Wong and an affiliate of RTW Investments, L.P. ("RTW"), "a healthcare-focused investment firm" for which Mr. Wong served as managing partner and chief investment officer, also controlled by Mr. Wong.  Id. ¶¶ 22, 54.  HSH acquired 10 million convertible warrants for $5 million in connection with HSAC's initial public offering.  See id. 55.

offering, or otherwise redeem all outstanding public shares, liquidate and dissolve, at which time public warrants would expire and the proceeds in the trust account would be returned to the investors. See id. ¶ 55.

On May 11, 2019, Mr. Wong, HSAC's chief executive officer, contacted Mayukh Sukhatme, a director at Legacy Immunovant and the president of Roivant, to discuss a possible transaction between HSAC and Legacy Immunovant. See id. ¶ 56. HSAC and Legacy Immunovant entered into a letter of intent for a transaction on July 31, 2019, and into a share-exchange agreement on September 29, 2019. See id. On October 2, 2019, HSAC and Legacy Immunovant issued a press release announcing the share-exchange agreement, describing that, upon the closing of the transaction, Legacy Immunovant shareholders would sell all issued and outstanding shares to HSAC, and HSAC would issue, or reserve for issuance, approximately 43 million shares in HSAC to Immunovant shareholders for more than $421 million. See id. ¶ 57. Upon effectuation of the transaction on December 16, 2019, Legacy Immunovant became a wholly owned subsidiary of HSAC, and HSAC became Immunovant via a name change. See id. ¶¶ 57, 59. At that time, Immunovant stock was priced at $11.49 per share. See id. ¶ 59. Pursuant to the share-exchange agreement, Roivant and RTW, among others, "were to receive 10 million shares of Immunovant stock at no cost if the share price exceed[ed] $17.50 by March 31, 2023[,] and an additional 10 million shares if the share price exceed[ed] $31.50 by March 31, 2025." Id. ¶ 58 (quotations omitted).

Immunovant is a biopharmaceutical company that, during the putative class period, which spans from October 2, 2019 up to and including February 1, 2021 (the "Putative Class Period"), was developing only the Drug. See id. ¶¶ 1, 48. Immunovant developed the Drug "as a fixed-dose, self-administered subcutaneous injection" with an initial treatment focus on

myasthenia gravis, thyroid eye disease and warm autoimmune hemolytic anemia.  Id. Immunovant pursued clinical trials of IMVT-1401 before the United States Food and Drug Administration ("FDA") and, in doing so, "was expected to actively monitor and assess safety information about IMVT-1401 on an ongoing basis through a variety of methods to identify risks," including by monitoring and assessing "animal studies, clinical investigations, reports in scientific literature, unpublished scientific papers and numerous other places" on a regular basis, in accordance with 21 C.F.R. § 312.32.  Id. ¶¶ 80, 82, 85-86.

Plaintiffs allege that one potential risk[9] of the Drug was "[e]levations in serum cholesterol . . . associated with an increased risk of vascular disease and overall mortality."  Id. ¶ 91.  The sources of information revealing this "potential risk" were (1) "Immunovant's preclinical animal studies[, which] revealed substantial increases in cholesterol in the animals tested with IMVT-1401," namely a 200 to 300 percent increase as compared to the control group, according to an anonymous former employee of Immunovant (the "Former Employee");[10]

_____

[9] A "potential risk" is "a risk that has not yet been observed in humans for the investigational product itself or for other drugs in the class but for which there is reason to suspect it might occur, based on animal toxicology studies or the known pharmacologic properties."  ECF No. 82 ¶ 83 (quotations omitted).

[10] The Former Employee "has a pathology background with a specialization in cardiovascular diseases and is a board-certified toxicologist."  ECF No. 82 ¶ 16.  The Former Employee "had oversight regarding the design, monitoring, data analysis, and reporting of non-clinical study profiles and directed nonclinical strategies necessary to progress drug candidates from preclinical development to clinical trials"; "paid attention to whether a drug candidate had negative impacts"; "has experience with regulatory submissions, general toxicology, and safety pharmacology"; and "has substantial experience with preclinical studies and in reviewing written preclinical study reports."  Id. ¶¶ 16-17.  The Former Employee was "a senior employee in Immunovant's Non-Clinical Development group from the end of 2019 until after the [Putative] Class Period and was hired by Immunovant after two-decades [sic] of experience in preclinical drug development."  Id. ¶ 16 (footnote omitted).  In relation to the Drug, the Former Employee "has direct first-hand knowledge of Immunovant's pre-clinical testing of IMVT-1401"; "personally read the IMVT-1401 animal studies in connection with [the Former Employee's] . . .

(2) as described in numerous scientific studies, FcRn inhibitors, such as the Drug, "will potentially lower serum albumin levels," as occurred in the pre-clinical and clinical trials for the Drug, which may then result in increased serum cholesterol"; (3) companies developing similar compounds, including Harbour, with which "Immunovant had agreements and shared information," and Argenx SE, monitored cholesterol; (4) the Drug was used to treat thyroid eye disease, and, because "[s]cientific studies dating back to 1930 establish connections between thyroid hormone levels and cholesterol," treating this disease "would also be expected to impact cholesterol levels"; and (5) Immunovant's protocol for the Phase 2b trial of the Drug for participants with thyroid eye disease included monitoring of cholesterol levels "because elevated LDL and cholesterol were a potential risk of IMVT-1401," with the protocol having been designed in 2018, as well as updated in February 2019 and August 2019, without disclosure to investors of the details of the protocol, including the cholesterol monitoring, until February 2021. Id. ¶ 91.

Immunovant published the results of the Phase 1 clinical trial on April 9, 2019, disclosing only mild to moderate adverse events. See id. ¶ 114. Immunovant completed its Phase 2a clinical trial for myasthenia gravis on December 21, 2020, and its Phase 2a clinical trial for thyroid eye disease on May 21, 2020. See id. ¶¶ 116-17. Immunovant first monitored cholesterol levels in its Phase 2b trial for thyroid eye disease, and following receipt of reports Immunovant halted the trial on February 2, 2021. See id. ¶ 118. According to Plaintiff, particularly given that "[t]esting for cholesterol is inexpensive and simply requires a blood test,"

---

employment at Immunovant"; "was employed at Immunovant when the ASCEND GO-2 Phase 2b trial was halted"; and "provided first-hand knowledge about IMVT-1401's animal testing and the halting of Immunovant's Phase 2b trial, as announced on or about February 2, 2021." Id. ¶¶ 16-17.

Immunovant should have included cholesterol monitoring in the Phase 1 and Phase 2a clinical trial designs, the failure to do which Immunovant did not disclose to investors until February 2, 2021. Id. ¶¶ 119-20.

## II.    PROCEDURAL HISTORY

Plaintiff Theresa Pitman, individually and on behalf of all others similarly situated ("Pitman"), commenced this putative class action on February 19, 2021. See generally ECF No. 1. Pitman asserted the following causes of action against Immunovant, Mr. Wong, Dr. Salzmann, and Defendant Pamela Yanchik Connealy ("Ms. Connealy"):[11] (1) violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), see 15 U.S.C. § 78j(b), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and violation of United States Securities and Exchange Commission ("SEC") Rule 10b-5, see 17 C.F.R. § 240.10b-5, by Immunovant, Mr. Wong, Dr. Salzmann and Ms. Connealy, and (2) violation of Section 20(a) of the Exchange Act, see 15 U.S.C. § 78t(a), by Mr. Wong, Dr. Salzmann and Ms. Connealy. See generally id.

Bucks County Employees Retirement System ("Bucks"), Erie County Employees' Retirement System ("Erie") and SEPTA each moved to be appointed as the lead plaintiff pursuant to the PSLRA and to have their respective chosen counsel to be appointed as lead counsel for the class. See generally ECF Nos. 7-12. Subsequently, Bucks filed a notice of non-opposition to Erie's motion and SEPTA's motion, see generally ECF No. 13; SEPTA opposed Bucks's motion and Erie's motion, see generally ECF No. 14; and Erie withdrew its motion, see generally ECF No. 15. The Court denied Bucks's motion and granted SEPTA's motion. See generally ECF No. 18.

---

[11] Ms. Connealy is not presently a Defendant in this action. See generally ECF Nos. 46 & 82.

Plaintiff filed a first amended complaint, on behalf of itself and the other members of the putative class.  See generally ECF No. 29.  Plaintiff asserted the following causes of action against Immunovant Defendants, Underwriter Defendants, Roivant and Ms. Connealy: (1) violation of Section 11 of the Securities Act of 1933 (the "Securities Act"), see 15 U.S.C. § 77k, by Immunovant, Underwriter Defendants, Dr. Salzmann, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande, Dr. Venker and Ms. Connealy; (2) violation of Section 12(a)(2) of the Securities Act, see 15 U.S.C. § 77l, by Immunovant, Underwriter Defendants, Dr. Salzmann, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande, Dr. Venker and Ms. Connealy; (3) violation of Section 15 of the Securities Act, see 15 U.S.C. § 77o, by Roivant, Dr. Salzmann, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande, Dr. Venker and Ms. Connealy; (4) violation of Section 10(b) of the Exchange Act, see 15 U.S.C. § 78j(b), and violation of SEC Rule 10b-5, see 17 C.F.R. § 240.10b-5, by Immunovant, Mr. Wong, Dr. Salzmann and Ms. Connealy; and (5) violation of Section 20(a) of the Exchange Act, see 15 U.S.C. § 78t(a), by Mr. Wong, Dr. Salzmann and Ms. Connealy.  See generally id.

Plaintiff filed a second amended complaint, on behalf of itself and other members of the putative class.  See generally ECF No. 44.  Plaintiff asserted the following causes of action against Immunovant Defendants, Underwriter Defendants, Roivant and Ms. Connealy: (1) violation of Section 11 of the Securities Act, see 15 U.S.C. § 77k, by Immunovant, Underwriter Defendants, Dr. Salzmann, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande, Dr. Venker and Ms. Connealy; (2) violation of Section 12(a)(2) of the Securities Act, see 15 U.S.C. § 77l, by Immunovant, Underwriter Defendants, Dr. Salzmann, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande, Dr. Venker and Ms. Connealy; (3) violation of Section 15 of the Securities Act, see 15 U.S.C. § 77o, by Roivant, Dr. Salzmann, Dr. Torti, Mr. Fromkin, Mr.

9

Hughes, Mr. Migausky, Dr. Pande, Dr. Venker and Ms. Connealy; (4) violation of Section 10(b) of the Exchange Act, see 15 U.S.C. § 78j(b), and violation of SEC Rule 10b-5(a), (b) and (c), see 17 C.F.R. § 240.10b-5, by Immunovant, Roivant, Mr. Wong, Dr. Salzmann and Ms. Connealy; and (5) violation of Section 20(a) of the Exchange Act, see 15 U.S.C. § 78t(a), by Roivant, Mr. Wong, Dr. Salzmann and Ms. Connealy. See generally id.

Defendants moved to dismiss Plaintiff's second amended complaint. See generally ECF Nos. 59-68. Plaintiff opposed the motions and, in the alternative, moved for leave to amend. See generally ECF Nos. 69-71. Defendants replied. See generally ECF Nos. 72-75. District Judge Kiyo A. Matsumoto referred the motions to the undersigned. The Court granted Plaintiff's motion for leave to amend and, therefore, found the motions to dismiss moot. See generally ECF No. 80.

Plaintiff filed a third amended complaint, on behalf of itself and other members of the putative class. See generally ECF No. 82. Plaintiff asserted the following causes of action against Immunovant Defendants, Underwriter Defendants and Roivant:[12] (1) violation of Section 11 of the Securities Act, see 15 U.S.C. § 77k, by Immunovant, Underwriter Defendants, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande and Dr. Venker; (2) violation of Section 12(a)(2) of the Securities Act, see 15 U.S.C. § 77l, by Immunovant, Underwriter Defendants, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande and Dr. Venker; (3) violation of Section 15 of the Securities Act, see 15 U.S.C. § 77o, by Roivant, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande and Dr. Venker; (4) violation of Section 10(b) of the Exchange Act, see 15 U.S.C. § 78j(b), and violation of SEC Rule 10b-5(a), (b) and (c), see

---

[12] As between the second and third amended complaints, the legal claims are largely the same, except Plaintiff no longer asserts the first, second and third claims against Dr. Salzmann and Ms. Connealy and no longer asserts the fourth and fifth claims against Ms. Connealy.

17 C.F.R. § 240.10b-5, by Immunovant, Roivant, Mr. Wong and Dr. Salzmann; and (5) violation of Section 20(a) of the Exchange Act, see 15 U.S.C. § 78t(a), by Roivant, Mr. Wong and Dr. Salzmann.  See generally id.

Defendants moved to dismiss Plaintiff's third amended complaint.  See generally ECF Nos. 87-94.  Plaintiff opposed.  See generally ECF Nos. 95-96.  Defendants replied.  See ECF Nos. 97-100.  District Judge Kiyo A. Matsumoto referred the motions to the undersigned. Plaintiff and Defendants jointly requested that the Court hold oral argument on the motions, see generally ECF No. 101, which the Court declined.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a party to assert the defense of failure to state a claim upon which relief can be granted by motion.  Courts addressing motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the" plaintiff.  New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo, 80 F.4th 158, 168 (2d Cir. 2023) (citation omitted).  A complaint will generally survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) (citation & quotations omitted).  Although "pleadings are typically subject to Federal Rule of Civil Procedure 8," which requires "a short and plain statement of the claim," when a plaintiff asserts "claims of fraud[, they] must be state[d] with particularity under Federal Rule of Civil Procedure 9(b)."  Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 462 (2d Cir. 2019) (citations & quotations omitted); see also Fed. R. Civ. P. 9(b) (stating that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," while "[m]alice, intent, knowledge, and other

11

conditions of a person's mind may be alleged generally").

In relation to claims asserted pursuant to Section 10(b) of the Exchange Act, a plaintiff must also comply with the pleading standards set forth in the PSLRA.  See id.  As to misleading statements and omissions, the PSLRA requires that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); see Gamm, 944 F.3d at 462-63 (noting that, read together, Federal Rule of Civil Procedure 9(b) and the PSLRA require a plaintiff "to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent" (citation & quotations omitted)).  As to the required state of mind, the PSLRA requires that a plaintiff, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); see Gamm, 944 F.3d at 462 (citation omitted).

IV.    DISCUSSION

The Court views the overarching issue pertaining to both the Securities Act and the Exchange Act claims presented by Plaintiff's allegations and, by extension, Defendants' motions to dismiss, to be whether Defendants' challenged statements were material misrepresentations or omissions because the clinical trials for the Drug should have been designed differently, such that cholesterol levels should have been monitored in earlier phases of the trials, and because the decision not to monitor cholesterol in earlier phases of the trials should have been disclosed to investors, in view of, in Plaintiff's view, the clear link between the Drug and decreased albumin

levels, as well as between decreased albumin levels and elevated cholesterol levels. The inquiry underlying both related allegations is whether, together, the pre-clinical monkey studies and the available scientific literature, the scientific literature indicating that thyroid eye disease affects cholesterol levels and the fact that Harbour and Argenx SE monitored cholesterol levels when developing similar compounds, demonstrate the scientific fact that increased cholesterol levels were a key potential risk of the Drug. Plaintiff argues in the affirmative, and Defendants argue in the negative.

In the securities fraud context, "where a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement." Kleinman v. Elan Corp., 706 F.3d 145, 147-48, 154, 157 (2d Cir. 2013) (affirming the district court's dismissal of the amended complaint with prejudice and denial of leave to amend due to, inter alia, because a press release allegedly omitting that a control group in a clinical trial for an Alzheimer's drug "showed a larger than expected cognitive decline, which exaggerated any efficacy results," was not a false statement, as the characterization of the alleged omission was "only [Plaintiff's] . . . view" and because the researchers "disagreed with the proposition that the decline in the control group was atypical" and were "not required to adopt [Plaintiff's] . . . view regarding the degree of difference or its effect on the results" (citations omitted)); see Tongue v. Sanofi, 816 F.3d 199, 214 (2d Cir. 2016) (reasoning that, "[a]t bottom, Plaintiffs' allegations regarding Defendants' stated opinion about the Lemtrada trial results are little more than a dispute about the proper interpretation of data, a dispute this Court rejected as a basis for liability in Kleinman," necessitating the conclusion that "Defendants' statements were not misleading simply because the FDA disagreed with Defendants' interpretation of the data" (citation omitted).

Just last year, in In re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408 (2d Cir. 2023), the

Second Circuit addressed a securities fraud action commenced by investors against Philip Morris International Inc. ("PMI") and various of its executives in relation to "PMI's flagship reduced-risk product, 'IQOS,'" which "is an electronic device that <u>heats</u> - but does not combust - tobacco contained in proprietary, single-use cartridges . . . , releasing a flavorful nicotine-containing aerosol inhaled by the user without fire, ash, or smoke." <u>Id.</u> at 413-14 (citations omitted).  PMI applied to the FDA to market IQOS (1) generally, or "unaccompanied by any claims about health benefits relative to conventional cigarettes"; (2) as a "reduced-exposure" tobacco product, or as "a tobacco product that reduce[s] exposure to harmful chemicals"; or (3) as a "reduced-risk" tobacco product, or as "a product that reduce[s] the risk of tobacco-related diseases." <u>Id.</u> at 414-15, 415 n.2 (citations & quotations omitted).  PMI's stock price dropped after each of the following: (1) the publication of an article by <u>Reuters</u> highlighting criticisms of and irregularities with the clinical studies for IQOS; (2) the publication of an article by the <u>New York Times</u> reporting that the Tobacco Products Scientific Advisory Committee ("TPSAC"), an "advisory panel convened by the FDA to conduct a preliminary review of the IQOS studies, issued non-binding recommendations that the FDA grant PMI's application for a reduced-exposure order but deny its application for a reduced-risk order"; and (3) the issuance of an announcement by PMI that sales of the single-use cartridges for use with IQOS had fallen by 39%, well below estimates. <u>Id.</u> at 415 (citations omitted).  The FDA ultimately authorized "reduced-exposure" marketing of IQOS and, as to "reduced-risk" marketing, concluded "that, [a]lthough [PMI] ha[d] not demonstrated that [IQOS] . . . will significantly reduce harm and the risk of tobacco-related disease to individual tobacco users, such "dramatic changes in exposure relative to combusted cigarettes are reasonably likely to . . . translate to lower risk of tobacco-related morbidity and mortality," to be revealed in subsequent studies. <u>Id.</u> at 415-16 (citations & quotations omitted).

The investors brought securities law claims based on the defendants' statements pertaining to IQOS's risk-reducing benefits, arguing "that these statements were revealed to be false when the TPSAC found that the evidence is not sufficient to demonstrate substantiation of either of the claims about reduced risk of tobacco-related disease or harm," as well as those pertaining to the absence of new hazards associated with IQOS. Id. at 420, 424 (citations & quotations omitted). The Second Circuit rejected this challenge, reasoning that, "where [plaintiffs] (and others) . . . take issue with a defendant's view regarding . . . the results [of the defendant's scientific studies,] but the defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement." Id. at 420-21 (citation & quotations omitted). As to this point, the Second Circuit also held "that[,] where the FDA eventually accept[s] a [d]efendant['s] interpretation of the data, that interpretation is per se []reasonable as a matter of law"; even still, however, "[d]efendants' statements about the [implications of their data] cannot be misleading merely because [a regulatory body] disagreed with their conclusion[,] so long as [the defendants] conducted a meaningful inquiry and in fact held th[e] view they expressed." Id. (citations & quotations omitted).

The investors also challenged the defendants' statements pertaining to IQOS's risk-reducing benefits as "misleading by omission," given "that a reasonable investor would understand [these] statements to mean that PMI had disclosed all material information in its possession relevant to determining whether IQOS had a reduced risk of harm compared to cigarettes" but "failed to disclose [four] studies revealing that IQOS contained significant increases of more than a dozen harmful chemicals compared to cigarettes." Id. at 422 (citation & quotations omitted). The Second Circuit similarly rejected this challenge, reasoning that "an opinion statement about the interpretation of . . . data is not misleading simply because the

[speaker] knows, but fails to disclose, some fact cutting the other way"; instead, these statements are "misleading and actionable only [w]hen [the] omitted contrary facts <u>substantially undermine</u> the conclusion [that] a <u>reasonable investor</u> would reach from [the] statement." <u>Id.</u> at 423 (citations & quotations omitted).

The present complaint suffers from similar infirmities. Plaintiff's allegations against Defendants are founded on a fundamental disagreement as to the interpretation of scientific data: a) the pre-clinical monkey studies and the available scientific literature about the monkey studies, b) scientific literature that, according to Plaintiff, indicates that thyroid eye disease affects cholesterol levels, and c) that Harbour and Argenx SE monitored cholesterol levels when developing similar compounds. Plaintiff has not alleged sufficient facts to support the conclusion that Defendants misleadingly interpreted the available scientific material--namely the animal studies, literature in the field, diseases to be treated and other companies' trial designs--in taking the position that mild albumin increases were accurately characterized as evidencing a lack of clinical symptoms or were of unclear import. A reasonable investor's conclusions about Defendants' fairly general statements about the Drug development would not have been substantially undermined even by Plaintiff's interpretation of the scientific data as showing that the albumin increases were clinically significant. The statements by Defendants are not well characterized as alleged misrepresentations or omissions for securities law purposes and are not actionable.

The reasonableness of Defendants' scientific position is evidenced by the FDA's approval of the clinical trial primarily at issue, for thyroid eye disease, which was designed in 2018 and updated in February 2019 and August 2019. <u>See</u> ECF No. 82 ¶ 91. If the issues with cholesterol levels tied to the Drug were as obvious and critical as Plaintiff claims, the FDA

would not have permitted the clinical trials to proceed without cholesterol monitoring until Phase 2b and would not, as Plaintiff admits, allowed for progress with the Drug such that "Immunovant could potentially sell IMVT-1401 to patients if it ultimately obtains FDA approval." Id. ¶ 184. The design of the trial to commence cholesterol monitoring of certain risks to the human subjects diagnosed with cholesterol-related factors part-way through the trial could be subject to reasonable scientific disagreement, but the FDA accepted Defendants' proposed approach when it approved the trial. Defendants' statements were thus reasonable. Defendants have not satisfactorily alleged securities claims based on their post-hoc reassessment of the trial design where the actual trial met the FDA's standards. This alleged reasonable scientific disagreement between Plaintiff and Defendants is not the permissible subject of a securities fraud action.

### A.    The Securities Act Claims

**1.    Claims for Violation of Section 11 of the Securities Act, <u>see</u> 15 U.S.C. § 77k, and for Violation of Section 12(a)(2) of the Securities Act, <u>see</u> 15 U.S.C. § 77l(a)(2), by Immunovant, Underwriter Defendants, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande and Dr. Venker**

The Securities Act generally "requires that companies issuing securities make a full and fair disclosure of information in connection with a public offering." <u>New England Carpenters</u>, 80 F.4th at 168 (citations & quotations omitted). As such, it "permits purchasers of a public company's securities to sue the company and certain corporate officers for any material misstatements or for the omission of material information in the company's registration statements filed with the SEC." Id.

#### a.    Section 11 and Section 12(a)(2) Claims

Section 11 of the Securities Act provides that,

[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact

required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue

> (1) every person who signed the registration statement;
> (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
> (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
> (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;
> (5) every underwriter with respect to such security.

15 U.S.C. § 77k(a).  Section 12(a)(2) of the Securities Act provides that any person who

offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(2).  As such, Section 11 of the Securities Act imposes liability in relation to

material misstatements and omissions in registration statements, and Section 12(a)(2) of the

Securities Act imposes liability in relation to material misrepresentations and omissions in

prospectuses.  See New England Carpenters, 80 F.4th at 168.

Plaintiff alleges that Immunovant's August 31, 2020 Form S-1 registration statement and September 1, 2020 prospectus (the "Fall 2020 Offering Documents") failed to disclose certain facts and, therefore, constituted material misrepresentations and omissions.  See ECF No. 82 ¶¶ 7 n.1, 127.

Plaintiff contends that the following statements are material misrepresentations or omissions because a reasonable investor would expect such a drug trial to monitor all key potential risks and to inform investors of the risk of elevated cholesterol levels, and that some trial participants may have, unknown to Defendants, experienced such increased levels, rendering statements as to adverse events inaccurate, see ECF No. 82 ¶¶ 135-136, 138, 140, 142-43, 145: (1) statements as to the Drug being well-tolerated and safe and concerning adverse events in the Phase 1 clinical trial, see id. ¶¶ 133, 136-37, 139, 141; (2) statements as to Immunovant's belief that FcRn drugs are a viable option with the potential to address many related diseases, see id. ¶ 134; (3) statements that the Phase 2a clinical trials were designed to, inter alia, assess safety and tolerability, see id. ¶ 139; and (4) statements that the Phase 2b clinical trial for thyroid eye disease would assess safety and tolerability, and that the trial was on track, given that this phase of the trial was different than earlier phases due to the cholesterol monitoring, see id. ¶ 145.

Plaintiff contends that the following statements were material misrepresentations or omissions because they "minimized the negative implications of the albumin reductions," "failed to disclose the potential risks associated with serum albumin reductions," and inaccurately characterized the albumin reductions associated with the Drug as "mild" and its effects as "reversible," including by considering it only in the context of a rare disease, ECF No. 82 ¶¶ 146-48: albumin reductions observed were not associated with any adverse events or clinical

19

symptoms, id., and "[t]he clinical relevance of isolated, mild hypoalbuminemia is unknown," individuals with a hereditary syndrome causing low or absent levels of albumin experience only mild symptoms, and the belief that "compensatory mechanisms . . . may allow for relatively normal physiologic function in this population," id. (emphasis removed).

Plaintiff also contends that the following statement is a material misrepresentation or omission because it neglected to disclose the increased cholesterol levels in monkeys and inaccurately stated that clinical trial participants would be carefully monitored for adverse events, as they would not be monitored for cholesterol levels in Phase 1 and Phase 2a clinical trials, see ECF No. 82 ¶ 150: a statement as to the dosage level with no adverse effects and a statement that clinical trial participants would be carefully monitored for adverse events, see id. ¶ 149.

Plaintiff contends that the following warnings were material misrepresentations or omissions because they did not mention the potential risk of increased cholesterol levels, see ECF No. 82 ¶¶ 160, 162, 164: warnings that problems with clinical trials, including those caused by safety issues not exhibited in earlier non-clinical or clinical trials, could result in the need to repeat, delay, suspend, discontinue or abandon such trials or limit the scope of use or labeling of the Drug, see id. ¶ 159; warnings that prior results do not necessarily indicate that the Drug will obtain regulatory approval or have the capacity for commercialization, see id. ¶ 161; and warnings that Immunovant's business was heavily dependent upon successfully developing, obtaining regulatory approval for, and commercializing the Drug, its sole product, see id. ¶ 163.

Plaintiff also contends that the Fall 2020 Offering Documents stated that the clinical trials were required by the FDA to, inter alia, comply with Good Clinical Practices ("GCP"), but the clinical trials did not comply with GCP because they did not monitor cholesterol levels.  See

20

ECF No. 82 ¶ 151.

In sum, Plaintiff's argument is essentially that each of the generalized categories of statements above were misleading by omission. This analysis fails to meet this Circuit's heightened fraud standard in the Securities Act context because

> an opinion statement about the interpretation of . . . data is not misleading simply because the [speaker] knows, but fails to disclose, some fact cutting the other way. Instead, such a statement is misleading and actionable only [w]hen [the] omitted contrary facts <u>substantially</u> <u>undermine</u> the conclusion [that] a <u>reasonable investor</u> would reach from the statement.

<u>In re Philip Morris Int'l Inc. Sec. Litig.</u>, 89 F.4th at 423 (emphasis in original) (citations & quotations omitted). Here, Plaintiff's allegations concerning Defendants' fairly general statements were not substantially undermined by Plaintiff's interpretation of the scientific data, drawn from the animal studies, literature in the field, diseases treated and other companies' trial designs. In fact, the data cited by Plaintiff is not necessarily contrary to Defendants' data or interpretation of the data, namely that the literature on mild albumin increases evidenced a lack of clinical symptoms or was unclear.

Even as to the GCP statements, the Second Circuit "see[s] no meaningful daylight between a statement that 'we complied with Good Clinical Practices' and a statement that 'our clinical practices are good' – the latter of which would <u>obviously</u> be a statement of opinion." <u>Philip Morris Int'l Inc.</u>, 89 F.4th at 419. As such, such a statement is not actionable.

### b.     Item 303 Claim

Item 303 of Regulation S-K requires registrants to "disclos[e] . . . any known trends . . . the registrant reasonably expects will have a material impact on net sales or revenues or income," requiring disclosure "where the trend is both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." <u>Stadnick</u>

v. Vivint Solar, Inc., 861 F.3d 31, 39 (2d Cir. 2017) (citations & quotations omitted).

Plaintiff contends that the failure to disclose the following "known events and uncertainties" violates Item 303: "[t]he increase in cholesterol levels in animals," "that albumin reductions were described in medical journals and studies to elevate cholesterol," "the fact that it was an anticipated risk that IMVT-1401 would increase cholesterol levels in patients, that none of the completed clinical studies had yet tested cholesterol levels, . . . that the ASCEND GO-2 Phase 2b trial was the first clinical trial to test for cholesterol levels," and the concomitant uncertainty as to the progress of the Drug clinical trials and related financial and scheduling impacts.  ECF No. 82 ¶¶ 153, 156.

Whether the aforementioned items were reasonably likely to materially affect Immunovant's financial condition or operational results is tantamount to asking whether Defendants' scientific position was reasonable, as "we are dealing not with statements of fact, but with statements about the proper interpretation of data," or, by extension, its import.  In re Phillip Morris Int'l Inc., 89 F.4th at 422 (citation & quotations omitted).  Because Plaintiff has not alleged sufficient facts to substantially undermine Defendants' reasonably held scientific position, the Court also cannot reach the conclusion that Plaintiff's contrary scientific position as to the aforementioned items made them reasonably likely to materially affect Immunovant's financial condition or operational results.  As such, Plaintiff is not entitled to any relief related to the alleged omissions.

### c.     Item 105 Claim

Item 105 of Regulation S-K requires registrants to "disclos[e] . . . the most significant factors associated with the security," provided that the registrant has actual knowledge of such factors.  Rubinstein v. Credit Suisse Grp AG, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020) (citation

& quotations omitted).

Plaintiff contends that the failure to disclose the following violates Item 105: (1) the Drug was less safe than represented by Immunovant, and (2) the Drug came with the potential risk of increased cholesterol levels, in view of the animal studies; the scientific literature on decreased serum albumin levels; the treatment of thyroid eye disease and myasthenia gravis, which are thyroid conditions known to reduce cholesterol such that treating them would increase cholesterol; the monitoring of cholesterol levels by other companies researching drugs in the same class; the monitoring of cholesterol levels by Immunovant in the Phase 2b trial for thyroid eye disease; Immunovant's failure to discuss this potential risk when discussing clinical trial design and safety results, Immunovant's failure to comply with FDA regulations and GCP by failing to monitor cholesterol levels; undisclosed safety issues due to the failure to monitor cholesterol levels, which could have scheduling and financial impacts on the Drug's development; and misrepresentations of Immunovant's business, operations, and financial condition.  See id.

Whether the aforementioned items were reasonably likely to materially affect Immunovant's financial condition or operational results is tantamount to whether Defendants' scientific position was reasonable, as "we are dealing not with statements of fact, but with statements about the proper interpretation of data," or, by extension, its import.  In re Phillip Morris Int'l Inc., 89 F.4th at 422 (citation & quotations omitted).  Because Plaintiff has not alleged sufficient facts to discount or substantially undermine Defendants' reasonably held scientific position, the Court cannot reach the incompatible conclusion that Plaintiff's contrary scientific position as to the aforementioned items made them reasonably likely to materially affect Immunovant's financial condition or operational results or that Plaintiff failed to disclose

the most significant factors associated with the security.  As such, Plaintiff is not entitled to any relief related to the alleged omissions.

>    2.    **Claim for Violation of Section 15 of the Securities Act, <u>see</u> 15 U.S.C. § 77o, by Roivant, Dr. Torti, Mr. Fromkin, Mr. Hughes, Mr. Migausky, Dr. Pande and Dr. Venker**

Section 15 of the Securities Act provides that

> [e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o(a).  This provision "creates liability for individuals or entities that control[] any person liable under section 11" or 12.  <u>New England Carpenters</u>, 80 F.4th at 168 (citation & quotations omitted).  Because the Court finds that there is no primary violation, <u>supra</u>, Sec. III(A)(1), there cannot be any control person liability.

>    **B.    The Exchange Act Claims**

>    1.    **Claim for Violation of Section 10(b) of the Exchange Act, <u>see</u> 15 U.S.C. § 78j(b), and Violation of SEC Rule 10b-5(a), (b), and (c), <u>see</u> 17 C.F.R. §§ 240.10b-5(a), (b), & (c), by Immunovant, Roivant, Mr. Wong and Dr. Salzmann**

Section 10(b) of the Exchange Act provides that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange[,] . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

SEC Rule 10b-5 provides that

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
    (a) [t]o employ any device, scheme, or artifice to defraud,
    (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
    (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Read together, Section 10(b) of the Exchange Act "forbids (1) the use or employ[ment] . . . of any . . . deceptive device, (2) in connection with the purchase or sale of any security, and (3) in contravention of Securities and Exchange Commission rules and regulations," one of which is SEC Rule 10b-5.  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341 (2005) (citations & quotations omitted).  Before the Court is whether Plaintiff has stated a claim upon which relief can be granted against Immunovant, Roivant, Mr. Wong and Dr. Salzmann for both material misrepresentations or omissions, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b), and for scheme liability, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a), (c).  The Court addresses each in turn.

### a. Claim for Material Misrepresentations or Omissions

In order to state a claim for a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b), "a plaintiff must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) causation."  Noto v. 22nd Century Group, Inc., 35 F.4th 95, 102 (2d Cir. 2022) (footnote omitted); see Dura Pharmaceuticals, Inc., 544 U.S. at 341-42 (citations omitted); Plumber & Steamfitters Local 773

Pension Fund v. Danske Bank A/S, 11 F.4th 90, 98 (2d Cir. 2021) (citation omitted).

### i.    Material Misrepresentation or Omission

In general, "[t]he veracity of a statement or omission is measured not by its literal truth but by its ability to accurately inform rather than mislead prospective buyers." Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Company, 28 F.4th 343, 354 (2d Cir. 2022) (citation & quotations omitted).

As to material misrepresentations, the PSLRA and Federal Rule of Civil Procedure 9(b) require that "allegations of material misstatements . . . be state[d] with particularity and . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," essentially amounting to an explanation "with particularity why the statements were fraudulent." Arkansas, 28 F.4th at 353 (emphasis in original) (citations & quotations omitted).

As to material omissions, "Section 10(b) do[es] not create any affirmative duty to disclose any and all material information," as, "[j]ust because a reasonable investor would very much like to know [a] fact does not create any obligation to speak up." Arkansas, 28 F.4th at 352-53 (citations & quotations omitted). Rather, "[d]isclosure is necessary only if there is a duty to disclose or when necessary to make statements made, in light of the circumstances under which they were made, not misleading." Id. at 353 (citation & quotations omitted).

Plaintiff contends that the following statements were material misrepresentations or omissions, given that they did not disclose the potential risk of elevated cholesterol or account for such risk in formulating the statements, see ECF No. 82 ¶¶ 223, 226, 228, 230, 232, 234, 236, 238, 245, 247, 249, 253, 255, 257, 260, 265, 267, 271, 275, 277, 279, 282, 284, 286, 288, 291, 293, 295: (1) statements as to results obtained, which are (a) statements of the results obtained in

the Phase 1 trial, namely an "IgG reduction of nearly 80%," and "proof-of-biology," id. ¶¶ 221 (quotations omitted), 225, 244, 246, 264, 270 (emphasis removed) (quotations omitted); (b) statements of positive clinical results, see id. ¶ 254; (c) statements of the results obtained in the Phase 2a thyroid eye disease trial, namely an IgG reduction of 65%, see id. ¶¶ 262, 270, 281; and (d) statements of the results obtained in the Phase 2a myasthenia gravis trial, namely IgG reductions of 59% and 76% for the two doses, see id. ¶ 276; (2) statements of belief or expectation as to the future of the Drug, which are (a) statements of the expectation for "[t]op-line" results in the Phase 2a trials, id.; (b) statements of belief as to the future success of the Drug, with "first-in-class and best-in-class potential," see id. ¶¶ 222 (emphasis removed) (quotations omitted), 246, 252, 254, 276; (c) statements that "near-term value drivers" for Immunovant's stock were "[f]our anticipated data readouts over the next 20 months," id. ¶ 224 (quotations omitted); (d) statements as to unmet need for the treatment of myasthenia gravis, other than with treatment options associated with significant side effects, see id. ¶ 229; (e) statements as to the negative aspects of other treatments for thyroid eye disease, see id. ¶ 233; (f) statements that Immunovant had made good progress toward beginning the Phase 3 trial for myasthenia gravis, when Immunovant had begun its internal investigation of the Phase 2b thyroid eye disease trial at that point, see id. ¶ 283; and (g) statements that new indications for the Drug were being explored; see id.; (3) statements as to the study designs and the clinical trial designs, which are (a) descriptions of Phase 1 of the clinical trial as "comprehensive" and Phase 2 as "broad," id. ¶¶ 222 (emphasis removed) (quotations omitted), 246; (b) descriptions of the Phase 2a clinical trial for myasthenia gravis, with safety and tolerability as primary endpoints, see id. ¶¶ 231, 248, 259; (c) descriptions of the Phase 2a clinical trial for thyroid eye disease, with safety and tolerability as primary endpoints, see id. ¶¶ 235, 248, 259, 270; (d) descriptions

of the Phase 2b clinical trial for thyroid eye disease, without mention of cholesterol monitoring, see id. ¶¶ 237, 248, 254, 259, 281; (e) statements that detailed lab observations from the trial would be forthcoming, which was not possible without cholesterol monitoring, see id. ¶ 252; (f) explanations of the reason for the selection of cynomolgus monkeys for study, see id. ¶ 294; and (g) statements that all studies and trials were being conducted in all material respects in accordance with accepted standards and applicable laws and regulations, given the failure to disclose the failure to comply with GCP and FDA rules by failing to monitor cholesterol levels, see id. ¶¶ 239-40; (4) statements as to safety, which are (a) statements that the Drug was "well-tolerated" or safe, id. ¶¶ 225 (quotations omitted), 227, 246, 250, 254, 259, 264, 266, 274, 276, 278; (b) statements describing adverse events and that all adverse events were reported, without cholesterol monitoring, see id. ¶¶ 227, 250, 254, 256, 259, 264, 266, 274, 276, 278, 281; and (c) statements as to albumin reductions, without related statements that such reductions could lead to elevated cholesterol, describing the reductions as dose-dependent, reversible, and generally asymptomatic and associated with no adverse events or discontinuations, as hypoalbuminemia is generally the result of various diseases but either does not cause symptoms or for which the information in the field does not indicate the effect of a mild albumin reduction, see id. ¶¶ 227, 285, 287, 290, 292.

Plaintiff's argument is essentially that each of the generalized categories of statements above, namely 1, 2(a), 2(d), 2(g), 3(b), 3(c), 3(d), 3(e), and 4, were misleading by omission. As noted above with the Sections 11 and 12 claims,

> an opinion statement about the interpretation of . . . data is not misleading simply because the [speaker] knows, but fails to disclose, some fact cutting the other way. Instead, such a statement is misleading and actionable only [w]hen [the] omitted contrary facts substantially undermine the conclusion [that] a reasonable investor would reach from the statement.

Philip Morris Int'l Inc., 89 F.4th at 423 (emphasis in original) (citations & quotations omitted). Here, Defendants' fairly general statements about the Drug development were not substantially undermined by Plaintiff's interpretation of the scientific data, namely that the animal studies, literature in the field, diseases treated, and other companies' trial designs show that Defendants' statements were misleading. Plaintiff has not alleged facts to show that Defendant's interpretation of the literature and other sources indicated that mild albumin increases evidenced a lack of clinical symptoms or was unclear.

Statements in categories 2(a), 2(b), 2(f), and 3(a) above are characteristically inactionable puffery. See Philip Morris Int'l Inc., 89 F.4th at 417 (agreeing with the district court's conclusion that statements of a study's "methodology as rigorous, extensive, thorough, systematic, unique in . . . completeness and transparency, the best science, and very advanced," with "the scientists who performed them [described] as expert and world-class," were mere puffery, given that the "vague descriptions . . . offer only generally optimistic opinions" and "are too general to cause a reasonable investor to rely upon them" (citations & quotations omitted)).

As to statement 2(c) above, Plaintiff does not even allege that the statement was inaccurate, as required, but rather generally alleges that the presentation in which the statement was made "misrepresented and omitted material facts about IMVT-1401 and the IMVT-1401 clinical trials." ECF No. 82 ¶ 224. As such, Plaintiff is not entitled to relief in relation to this statement. For the same reason, Plaintiff is not entitled to relief as to statement 3(f), which explains the choice for cynomolgus monkeys for use in the animal studies. See id. ¶ 294. The purportedly "materially false and misleading" nature of this statement, according to Plaintiff, is that it "discussed the positive aspects of the animal studies but failed to disclose the negative fact that the IMVT-1401 animal studies revealed substantial elevations in cholesterol." Id. ¶ 295.

However, the statement expressed neither a positive nor negative view of the study itself but, rather, only explained the factual basis for the selection of the cynomolgus monkeys.

As to statement 3(g) above, the Second Circuit "see[s] no meaningful daylight between a statement that 'we complied with Good Clinical Practices' and a statement that 'our clinical practices are good' – the latter of which would <u>obviously</u> be a statement of opinion." <u>Philip Morris Int'l Inc.</u>, 89 F.4th at 419.  As such, the statement is not actionable.

### ii.    Scienter

The PSLRA states that, as to scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which requires the inference to "be more than merely plausible or reasonable" and to "be cogent and at least as compelling as any opposing inference of nonfraudulent intent," <u>New England Carpenters</u>, 80 F.4th at 177 (citations & quotations omitted).  In order to sufficiently plead the scienter element, which is "a mental state embracing intent to deceive, manipulate, or defraud," a plaintiff must "alleg[e] facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." <u>New England Carpenters</u>, 80 F.4th at 177 (citations & quotations omitted); <u>see also</u> <u>Arkansas</u>, 28 F.4th at 355 (citation omitted).  Allegations pertaining to "conscious misbehavior or recklessness should be viewed holistically and together with the allegations of motive and opportunity to determine whether the complaint supports a strong inference of scienter," <u>New England Carpenters</u>, 80 F.4th at 177 (citation & quotations omitted); for example, "[i]f no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior must be correspondingly greater and show

30

highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care," <u>Arkansas</u>, 28 F.4th at 355 (citation & quotations omitted).

### (a)    Motive and Opportunity

Motive can be alleged "by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures," and opportunity can be alleged by asserting "the means used and the likely prospect of achieving concrete benefits by the means alleged." <u>South Cherry Street, LLC v. Hennessee Grp.</u>, 573 F.3d 98, 108 (2d Cir. 2009) (citation & quotations omitted). This test is generally satisfied "when corporate insiders [a]re alleged to have misrepresented to the public material facts about the corporation's performance or prosects in order to keep the stock price artificially high while they sold their own shares at a profit." <u>Id.</u> at 108-09 (citation & quotations omitted). By contrast, alleging "goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation," is insufficient to satisfy the pleading standard for scienter. <u>Id.</u> at 109 (citations & quotations omitted); <u>see New England Carpenters</u>, 80 F.4th at 177-78 (noting that "the desire to sustain the appearance of corporate profitability is not itself the kind of incentive or motivation that raises an inference of scienter" (citation & quotations omitted)).

As to Mr. Wong, Plaintiff alleges that he "had a financial motive to ensure that HSAC acquired a company within two years so he would not need to return the capital raised from investors" and "had a financial motive for HSAC to acquire Legacy Immunovant because [he] . . . had owned shares in Legacy Immunovant since before HSAC's" initial public offering." ECF No. 82 ¶ 314. Plaintiff alleges that "an inference can be drawn that [Mr.] Wong sought to

acquire Legacy Immunovant before the" initial public offering, given that he "contacted Legacy Immunovant about the [m]erger two days after HSAC's" initial public offering.  Id.  Plaintiff separately alleges that, pursuant to the share-exchange agreement, the sellers of the Legacy Immunovant stock, one of whom was Mr. Wong, were "entitled to receive up to 20 million 'earnout shares' of Immunovant common stock of the stock price exceeded pre-defined targets," namely a price of $17.50 per share before March 31, 2023, and a price of $31.50 per share prior to March 31, 2025, which Immunovant met on May 12, 2020, then on September 17, 2020, respectively.  Id. ¶¶ 316-17 (citations omitted).  Plaintiff contends that, even if Mr. "Wong's affiliated entities sold zero shares, the fraud was still profitable" because, "[o]n February 2, 2021, after Immunovant announced the halting of the clinical trial at the end of the [Putative] Class Period[,] which caused a 42% decline in the price of Immunovant shares, the earnout shares were valued at more than $500 million."  Id. ¶ 319.  Plaintiff also alleges that "the artificial inflation of the price of Immunovant common stock enabled . . . various selling shareholders, including entities controlled and owned by . . . [Mr.] Wong, to sell hundreds of millions of dollars of Immunovant common stock to investors through several public follow-on offerings and shelf registrations."  Id. ¶ 320.  For example, "approximately two weeks before Immunovant announced the halting of its IMVT-1401 trials on February 2, 2021, . . . entities controlled by . . . [Mr.] Wong, [among others,] filed a prospectus for the sale of nearly one million shares of Immunovant common stock."  Id.

        As to Roivant, Plaintiff alleges that "Roivant, as the controlling shareholder of Legacy Immunovant, was financially motivated to engage in the fraud alleged herein to monetize its investment in IMVT-1401 and Immunovant by selling Legacy Immunovant to HSAC and then profiting from its ownership of Immunovant."  ECF No. 82 ¶ 315.  Plaintiff separately alleges

that, pursuant to the share exchange agreement, the sellers of the Legacy Immunovant stock, one of which was Roivant, were "entitled to receive up to 20 million 'earnout shares' of Immunovant common stock of the stock price exceeded pre-defined targets," namely a price of $17.50 per share before March 31, 2023, and a price of $31.50 per share prior to March 31, 2025, which Immunovant met on May 12, 2020, then on September 17, 2020, respectively.  Id. ¶¶ 316-17 (citations omitted).  Plaintiff contends that, even if Roivant "sold zero shares, the fraud was still profitable" because, "[o]n February 2, 2021, after Immunovant announced the halting of the clinical trial at the end of the [Putative] Class Period[,] which caused a 42% decline in the price of Immunovant shares, the earnout shares were valued at more than $500 million."  Id. ¶ 319.

As to Dr. Salzmann, Plaintiff alleges that he "was not harmed by the decline in the Company's shares because[,] as reflected in Immunovant's Form Def. 14A filed with the SEC, the Company repriced his options in the Company so that those options would still be valuable even after the decline in the Immunovant stock."  ECF No. 82 ¶ 319.

As to Immunovant, Plaintiff alleges that "the artificial inflation of the price of Immunovant common stock enabled Immunovant . . . to sell hundreds of millions of dollars of Immunovant common stock to investors through several public follow-on offerings and shelf registrations."  Id. ¶ 320.  For example, "approximately two weeks before Immunovant announced the halting of its IMVT-1401 trials on February 2, 2021, Immunovant filed a registration statement for a shelf offering for $150 million worth of common stock."  Id.

Plaintiff's allegations as to motive and opportunity can be distilled as follows: (1) Mr. Wong had a financial motive to ensure that HSAC acquired a company to avoid the need for HSAC to return the capital raised by HSAC to investors; (2) Mr. Wong and Roivant had a financial motive for HSAC to acquire Legacy Immunovant because of the shares that they held

in Legacy Immunovant; (3) Mr. Wong and Roivant benefited from Immunovant's artificially inflated stock price by receiving earnout shares pursuant to the share exchange agreement, despite not selling such shares during the Putative Class Period; (4) entities owned by Mr. Wong and Immunovant registered for sale shares of Immunovant stock during the Putative Class Period;[13] and (5) Dr. Salzmann was not harmed by the decline in Immunovant's stock price because he subsequently repriced his options such that the options remained valuable. See, supra, Sec. III(D)(i)(b)(1)(b).

As to the motivation for HSAC to acquire a company, the allegations do not contribute to a sufficiently pled "motive and opportunity" theory of scienter. This "generalized desire[] fail[s] to establish the requisite scienter because the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired, or to acquire another." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 200-01 (2d Cir. 2009) (rejecting the plaintiffs' allegations of motive, namely that "The Chase Manhattan Corporation was inflating its stock in anticipation of acquiring JP Morgan in the merger that ultimately resulted in the creation of JPMC," which "allowed it to complete the merger without issuing as many shares as it would have had to issue otherwise" (citations & quotations omitted)).

As to the motivation for HSAC to acquire Legacy Immunovant specifically, the allegations do not contribute to a sufficiently pled "motive and opportunity" theory of scienter. When an acquisition would be financially detrimental to the acquirer, "a strong inference of

---

[13] The Court does not consider Plaintiff's argument that "[t]he funds raised by Immunovant from these offerings enabled it to have cash to develop IMVT-1402," ECF No. 95 at 86 (citations omitted), as this argument is not contained in the allegations in Plaintiff's third amended complaint.

fraudulent intent [on the part of the acquirer] cannot be drawn simply from th[e]" potentially suspicious timing of the acquisition." Ross v. Lloyds Banking Grp., 546 F. App'x 5, 8 (2d Cir. 2013) (rejecting the plaintiff's theory "that, beginning on September 18, 2008, the day Lloyds announced its agreement to acquire HBOS, defendants intentionally misled Lloyds's shareholders about HBO[]s's financial condition in order to coax them into approving the deal" and that, "only after the completed acquisition on January 19, 2009 . . . did defendants slowly reveal HBOS's bleak financial state" (citation omitted)).

As to the earnout shares, the allegations do not contribute to a sufficiently pled "motive and opportunity" theory of scienter.  A generalized motive for "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." Local 134, 553 F.3d at 200-01 (rejecting the plaintiffs' argument "that the individual defendants in the case, Mr. Harrison and Mr. Shapiro, had motive to defraud because they sought to increase their compensation and bonuses" and "secured significant performance-based compensation benefits based on Chase's bargain purchase of JP Morgan and based on JPMC's Enron transactions" (citations & quotations omitted)).

As to the registration of shares, the allegations do not contribute to a sufficiently pled "motive and opportunity" theory of scienter.  Plaintiff does not offer authority for its position that the registration of shares, as opposed to the sale of shares, supports a strong inference of scienter. See South Cherry Street, LLC, 573 F.3d at 108-09 (reasoning that the "motive and opportunity" test is generally satisfied "when corporate insiders [a]re alleged to have misrepresented to the public material facts about the corporation's performance or prosects in order to keep the stock price artificially high while they sold their own shares at a profit" (citation & quotations omitted)).

As to Dr. Salzmann's lack of harm, the allegations do not contribute to a sufficiently pled "motive and opportunity" theory of scienter. Plaintiff does not offer authority for its position that the absence of harm supports a strong inference of scienter.

### (b)    Conscious Misbehavior or Recklessness

As to conscious misbehavior or recklessness, "conscious misbehavior . . . requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure," and recklessness "entails an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," New England Carpenters, 80 F.4th at 178 (citations & quotations omitted), or to the extent "that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud, and hence should have known that they were misrepresenting material facts," South Cherry Street, LLC, 573 F.3d at 109 (citation & quotations omitted).

As to Mr. Wong, Plaintiff alleges that he "would have initially learned the details about IMVT-1401 in connection with his investment in Legacy Immunovant," per his own admission on an October 11, 2019 call regarding the acquisition and as evidenced by his contact with Legacy Immunovant regarding a potential acquisition only two days after HSAC's initial public offering, through both informal discussions and formal due diligence. ECF No. 82 ¶ 308. Through the due diligence, Plaintiff alleges that Mr. "Wong would have known, or was reckless in not knowing, that increased cholesterol levels were a key potential risk of IMVT-1401, that the clinical trials for IMVT-1401 prior to the ASCEND GO-2 Phase 2b trial failed to test for cholesterol, and that the animal studies for IMVT-1401 revealed substantially increased cholesterol levels in test animals." Id. ¶¶ 308-09. Plaintiff also alleges that Mr. "Wong knew

about or recklessly disregarded the literature and studies indicating [that] albumin reductions elevate cholesterol" and even "acknowledged during the HSAC and Legacy Immunovant [m]erger [c]all, on October 11, 2019, that he reviewed scientific literature about potential side effects of albumin reductions in support of his misleading statement that people in the literature are generally asymptomatic." Id. ¶ 309 (quotations omitted). Mr. Wong also "remained a beneficial owner of a large amount of Immunovant securities, controlled one director, and had the right to obtain additional shares of Immunovant after the [m]erger." Id. Plaintiff alleges that Mr. Wong, "by virtue of [his] . . . high-level position[] with the Company or HSAC," was directly involved with Immunovant or HSAC and, as such, had access to confidential information and had ultimate authority over the false and misleading statements issued. Id. ¶ 311.

As to Roivant, Plaintiff alleges that "Roivant first acquired the license for IMVT-1401, then formed Legacy Immunovant, then sold it to HSAC in the [m]erger, and continued its control over Immunovant after the [m]erger." ECF No. 82 ¶ 307. As it related to Immunovant, Plaintiff alleges that "Immunovant was a subsidiary of Roivant and dependent upon Roivant for important business and drug development functions and services," and Plaintiff alleges that, by agreement, "Immunovant was . . . required to provide information about IMVT-1401 and other business information to Roivant." Id.

As to Dr. Salzmann, Plaintiff alleges that, "as the CEO of Immunovant, [he] would have been made aware of potential risks," including "the science and the scientific literature related to serum albumin, thyroid levels, and other issues that made elevated LDL and cholesterol levels a potential risk of IMVT-1401." ECF No. 82 ¶ 304; see id. ¶ 305 (stating that Dr. Salzmann "should have been aware of key facts related to the testing and risks involved with IMVT-1401,

including that the animal studies showed an increase in cholesterol, that an increase in cholesterol levels was an anticipated risk of IMVT-1401, and that the completed clinical trials of IMVT-1401 had not tested for cholesterol and that the ASCEND GO-2 Phase 2b trial was the first time the Company tested for cholesterol in clinical trials"). Plaintiff also alleges that Dr. Salzmann "would have been directly involved with the design, approval and/or review of the IMVT-1401 clinical trials[,] as well as the preparation and/or review of all reports and studies that were provide [sic] to the FDA concerning IMVT-1401, including the animal studies showing an increase in cholesterol and information concerning the trial protocols, including the lack of cholesterol testing in early clinical trials, as well as the fact that the ASCEND GO-2 Phase 2b trial protocol included assessments of cholesterol," and that Dr. "Salzmann would . . . have been aware that[,] according to Good Clinical Practices and standards, Immunovant should have designed each of its phase 1 and 2 trials to test for and report on all key potential risks, including cholesterol levels." Id. ¶¶ 304, 306. Plaintiff alleges that Salzmann, "by virtue of [his] . . . high-level position[] with the Company or HSAC," was directly involved with Immunovant or HSAC and, as such, had access to confidential information and had ultimate authority over the false and misleading statements issued. Id. ¶ 311.

As to Immunovant, Plaintiff alleges that "Immunovant was obligated to search for and review relevant scientific studies." ECF No. 82 ¶ 304.

Plaintiff asserts generally that, because the Drug "was the core and sole business of Immunovant, . . . knowledge of the fraud may be imputed to Defendants." ECF No. 82 ¶ 310. Plaintiff also asserts generally that Mr. Wong, Roivant, Dr. Salzmann and Immunovant "possessed knowledge of facts or had access to information contradicting their public statements," including "the IMVT-1401 animal studies, scientific information showing that

elevated cholesterol levels were an anticipated risk of IMVT-1401, and details about the clinical trial protocols, including that Immunovant had not tested for cholesterol during the Phase 1 trials or any Phase 2 trials prior to the ASCEND GO-2 Phase 2b trial," such that they "failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud." Id. ¶ 312.

Plaintiff's allegations as to conscious misbehavior or recklessness can be distilled as follows: (1) Mr. Wong was a beneficial owner of shares in, controlled one director of, and had the right to obtain additional shares in Immunovant following the acquisition; (2) Mr. Wong knew or recklessly disregarded that albumin reductions result in elevated cholesterol, as evidenced by his statement on an October 11, 2019 call about the transaction between HSAC and Legacy Immunovant that he had reviewed the relevant literature and concluded that individuals with reduced albumin are generally asymptomatic; (3) Dr. Salzmann would have been involved with the clinical trial design for the Drug, including allegedly knowing that it should have involved cholesterol testing in phase 1 and all phase 2 trials, and with reports and studies provided to the FDA; (4) Mr. Wong and Dr. Salzmann knew or recklessly disregarded that increased cholesterol levels were a key potential risk of the Drug, as revealed by the animal studies, but that the clinical trials did not test for cholesterol before the Phase 2b trial; (5) Mr. Wong and Dr. Salzmann, by virtue of their respective positions, had access to confidential information and had ultimate authority over the false and misleading statements issued; (5) Roivant was integral to the acquisition of the Drug and the formation of Immunovant, a subsidiary of Roivant, which was required to provide certain information related to the Drug to Roivant and on which it depended on Roivant for various functions and services; (6) Immunovant had a duty to search for and review relevant studies; (7) knowledge of the fraud

may be imputed to Mr. Wong, Roivant, Dr. Salzmann and Immunovant because the Drug was Immunovant's core business; and (8) Mr. Wong, Roivant, Dr. Salzmann and Immunovant possessed knowledge of facts or had access to information that contradicted their public statements.  See, supra, Sec. III(D)(i)(b)(2)(b).

None of the allegations made by Plaintiff constitutes a sufficient pleading of knowledge of fraud on the part of Mr. Wong, Roivant, Dr. Salzmann or Immunovant.[14]  As such, Plaintiff must allege recklessness by pleading an extreme departure from the standards of ordinary care, such that the danger was known to them, the danger was so obvious that they must have been aware of it, they had a duty to monitor but failed to review or check the information to be monitored, or they ignored obvious signs of fraud.

As to the reckless disregard for the key potential risk of elevated cholesterol levels, particularly in failing to monitor such levels until Phase 2b of the clinical trial, by Mr. Wong and Dr. Salzmann, with Mr. Wong recklessly disregarding the link between albumin reductions and elevated cholesterol and with Dr. Salzmann being involved with the allegedly improper clinical trial design and related reports to the FDA, the allegations do not constitute a sufficiently pled "recklessness" theory of scienter.

In general, disagreement as to the interpretation of scientific data is not a basis upon which scienter can be sufficient pled.  See In re Philip Morris Int'l Inc., 89 F.4th at 420 (recounting that the Second Circuit has "rejected the proposition that a mere dispute about the proper interpretation of data can form a basis for liability under section 10(b) and Rule 10b-5"

---

[14] As to knowledge, Plaintiff alleges that Mr. Wong stated that he reviewed literature pertaining to albumin reductions and concluded that individuals with reduced albumin levels were generally asymptomatic.  At most, however, this allegation evidences disagreement as to the conclusions to be drawn from scientific studies, assuming that Mr. Wong reviewed the same studies referenced by Plaintiff.

(citation & quotations omitted)).

As to the scientific inquiry of these subject trials, particularly with regard to the animal studies, Plaintiff alleges that the studies performed on cynomolgus monkeys, which were used due to the "high degree of sequence homology to human FcRn," included cholesterol monitoring. See ECF No. 82 ¶¶ 92, 96 (quotations omitted). After Immunovant learned of the increased cholesterol levels in the participants in the Phase 2b clinical trial, the Former Employee was instructed by Immunovant's chief medical officer at the time to review and provide a report as to the animal studies, which, according to the Former Employee, revealed significant increases in cholesterol and triglyceride levels in the animals that had received the Drug, as compared to the animals in the control group. See id. ¶¶ 93-95. The Former Employee's interpretation of the data is that it "conclusively and unambiguously showed that cholesterol levels increased for animals taking IMVT-1401," despite "the summary portion of the reports erroneously indicat[ing] that there were only minor increases in cholesterol." Id. ¶ 97. Plaintiff contends that Immunovant did not disclose this potential risk, or that clinical trials prior to the Phase 2b trial, prior to halting the Phase 2b trial. See id. ¶¶ 99-100. Plaintiff recognizes the possibility, however, that "IMVT-1401 could impact humans and monkeys differently such that IMVT-1401 would not elevate cholesterol in humans." Id. ¶ 98.

These allegations as to the pre-trial animal studies do not support a strong inference of scienter. Plaintiff admits that the cynomolgus monkeys were selected for use in the studies due to the considerable sequence homology with humans for the receptor on which the Drug acts, such that increased cholesterol levels might not translate from one species to another. Plaintiff adopts the position that the Former Employee's conclusion as to the data that the animals experienced significant increases in cholesterol levels is conclusive and unambiguous, while the

summary of the data erroneously concludes that cholesterol level increases were only mild.  See id. ¶ 97.  This discrepancy appears to indicate disagreement as to the interpretation of data, as between the authors of the studies and the Former Employee, rather than indicating intent by Defendants to commit securities fraud.  That the Former Employee was asked by Immunovant to review the animals studies after the Phase 2b clinical trial revealed increased cholesterol in human participants, in conjunction with the trial design monitoring cholesterol not prior to the Phase 2b trial, evidences a response to unanticipated results in the Phase 2b trial, as opposed to knowing or reckless intent to engage in fraud by concealing information for a period of time.

As to studies not directly related to Immunovant or the Drug but available in the available scientific literature, Plaintiff alleges that the link between decreased albumin levels, which are caused by the Drug, increased serum cholesterol levels, and cardiovascular disease and coronary artery disease are "widely known in the medical community," ECF No 82 ¶¶ 101, 103, and cites various studies in support of the connection.  See id. ¶¶ 106-10.  Plaintiff alleges that thyroid function, which is affected by two of the diseases sought to be treated by the Drug, namely thyroid eye disease and myasthenia gravis, and cholesterol levels are inversely related, see ECF No. 82 ¶¶ 111-13.  As to this information, Plaintiff appears to contend that Mr. Wong, Roivant, Dr. Salzmann and Immunovant had access to this information and a duty to monitor cholesterol as a result but failed to do so and made statements in contravention of this information.  See id. ¶¶ 101-121.

Under such circumstances, in order to plead conscious misbehavior or recklessness, a plaintiff must "provide specific instances in which [d]efendants received information that was contrary to their public declarations."  Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Bank of Commerce, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (finding insufficient

the plaintiff's failure to "specifically identif[y] any reports or statements or any dates or time frame in which [d]efendants were put in notice of contradictory information" and rejecting the plaintiff's contention that an executive must have received contradictory information due to his position as "too general an allegation from which to conclude [he] . . had actionable data alerting him to the falsity of his statements" (citations & quotations omitted)).  Here, Plaintiff has identified specific studies that it alleges supports its scientific position but Plaintiff has failed to allege that Mr. Wong, Roivant, Dr. Salzmann or Immunovant, reviewed such studies, agreed with the conclusions reached in such studies, and more importantly, agreed with the conclusions that Plaintiff alleges should be drawn as to cholesterol-related risks, particularly as to the trial design.  In fact, as to Mr. Wong's position on albumin reductions, he took the position that individuals experiencing such reductions were generally asymptomatic.  See ECF No. 82 ¶ 309; In re Philip Morris Int'l Inc., 89 F.4th at 420 (recounting that the Second Circuit has "rejected the proposition that a mere dispute about the proper interpretation of data can form a basis for liability under section 10(b) and Rule 10b-5" (citation & quotations omitted)).

As to the respective roles in relation to Immunovant and the Drug of Mr. Wong, Roivant and Dr. Salzmann, "position-based allegations" and "generalized allegations about the . . . [d]efendants' educational backgrounds and extensive experience" are insufficient to plead scienter.  Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Retirement Sys. v. Mechel OAO, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011), aff'd sub nom., Frederick v. Mechel OAO, 475 F. App'x 353 (2d Cir. 2012) (citations & quotations omitted).

As to the core-business argument, whether this doctrine survived the enactment of the PSLRA is unanswered by the Second Circuit, Frederick, 475 F. App'x at 356 (citation omitted); see also In re Bristol-Myers Squibb Co. CVR Securities Litig, 658 F. Supp. 3d 220, 234 (citation

omitted), and, "[a]t best, core-operations allegations are supplementary – that is, they are not independently sufficient means to plead scienter," <u>Bristol-Myers Squibb Co.</u>, 658 F Supp. 3d at 234 (citations & quotations omitted).

### iii.   Connection Between the Misrepresentation and the Purchase or Sale of a Security

Plaintiff alleges that Defendants' scheme "cause[d] Plaintiff and other members of the [putative] Class to purchase or otherwise acquire Immunovant securities and options at artificially inflated prices." ECF No 82 ¶ 335. No party disputes that this element is sufficiently alleged.

### iv.   Reliance on the Misrepresentation or Omission

Plaintiff alleges that "a presumption of reliance applies" because "the market for Immunovant securities promptly digested current information regarding Immunovant from all publicly available sources and reflected such information in the price of the securities." ECF No. 82 ¶ 329. No party disputes that this element is sufficiently alleged.

### v.   Economic Loss

Plaintiff alleges that, "[a]s a result of their purchases of Immunovant common stock during the [putative] Class Period, Plaintiff and the other Class members suffered economic loss . . . under the federal securities laws." ECF No. 82 ¶ 323. No party disputes that this element is sufficiently alleged.

### vi.   Causation

Plaintiff alleges that "[t]he economic loss . . . suffered by Plaintiff and the other [putative] Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Immunovant securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed and there was a materialization of the undisclosed risks." ECF No. 82 ¶

327.  No party disputes that this element is sufficiently alleged.

### b.    Claim for Scheme Liability

In order to state a claim for violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a), (c), "a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act ['in connection with the purchase or sale of a[ ]security'], (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." Plumber, 11 F.4th at 105 (citation & quotations omitted).  Although "misstatements and omissions can form part of a scheme liability claim, . . . an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination." S.E.C. v. Rio Tinto PLC, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original).

Plaintiff alleges that Defendants hid the risk of elevated cholesterol from investors, instead of disclosing it, to enable the acquisition between HSAC and Legacy Immunovant to be effectuated and for stock sales in Immunovant to take place and in the hopes that the risk might never materialize.  See ECF No. 82 ¶¶ 217-18.

Plaintiff's allegations fail to allege a scheme beyond the misstatements and omissions already alleged, as required, and as explained above, Plaintiff has not sufficiently alleged that Defendants made any actionable misstatements or omissions.

### 2.    Claim for Violation of Section 20(a) of the Exchange Act, see 15 U.S.C. § 78t(a), by Roivant, Mr. Wong, and Dr. Salzmann

In order to state a claim for violation of Section 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (citation & quotations omitted).  As there is no primary violation,

there is no control person liability.

## V.    CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Defendants' motions to dismiss be granted for failure to state a claim and that the third amended complaint be dismissed in its entirety.

The Court respectfully recommends that Plaintiff be denied leave to replead.  The significant pleading deficiencies discussed in this report and recommendation are inextricably intertwined with Plaintiff's theory of the case and are therefore not curable.  Even if curable, the Court respectfully recommends heeding the guidance of the Second Circuit, namely that, "[w]hen a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." National Credit Union Administration Bd. v. U.S. Bank Nat. Ass'n, 898 F.3d 243, 257-58 (2d Cir. 2018) (citations & quotations omitted).  Multiple pleadings have been filed in this action.  See generally ECF Nos. 1, 29, 44 & 82.  Particular consideration is given to this Court's prior Order granting Plaintiff leave to file the operative third amended complaint, see generally ECF No. 80, which did not foreclose Plaintiff's ability to request another opportunity to amend its pleading but alerted Plaintiff that leave for further amendments would not be granted ad infinitum.  Granting leave to file another pleading in this action would be unreasonable.

## VI.    OBJECTIONS

Any written objections to this report and recommendation must be filed with the Clerk of the Court within fourteen days of service.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Any

requests for an extension of time for filing objections must be directed to the District Judge

assigned to this action prior to the expiration of the fourteen-day period for filing objections.

Failure to file objections within fourteen days will preclude further review of this report and

recommendation by both the District Court and the Court of Appeals.  See Miller v. Brightstar

Asia, Ltd., 43 F. 4th 112, 120 (2d Cir. 2022) (reasoning that, "although Rule 72 applies only to

the district court's review of a report and recommendation, this court has adopted the rule that

when a party fails to object timely to a magistrate's recommended decision, it waives any right to

further review of that decision" (citation & quotations omitted)).

Dated: Brooklyn, New York
         February 25, 2024

_Vera M. Scanlon_
VERA M. SCANLON
United States Magistrate Judge